Andrew G. Dietderich
Sharon Cohen Levin
Christopher J. Dunne
Jacob M. Croke
Alexa J. Kranzley
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel to the Authorized Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PRINCE GLOBAL HOLDINGS LIMITED *et al.*,[1]<br><br>    Debtors in Foreign Proceedings. | Chapter 15<br><br>Case No. 26-(_____) (__)<br><br>(Joint Administration Requested) |

**DECLARATION OF PAUL PRETLOVE IN SUPPORT OF (A) THE
EMERGENCY MOTION FOR ENTRY OF ORDERS GRANTING (I) *EX PARTE*
RELIEF AND (II) PROVISIONAL RELIEF, PURSUANT TO SECTION 1519 OF THE
BANKRUPTCY CODE AND (B) THE VERIFIED PETITION UNDER CHAPTER 15
FOR RECOGNITION OF FOREIGN MAIN PROCEEDINGS AND RELATED RELIEF**

I, Paul Pretlove, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.    I am a Managing Director of Interpath Ltd in the United Kingdom.  I, along with my colleagues David Standish, also of Interpath Ltd in the United Kingdom, and James Drury of Interpath (BVI) Limited (together with Interpath Ltd, "Interpath") in the British Virgin Islands

---

[1]    Each of the Chapter 15 debtors is registered in the British Virgin Islands and maintains its registered address at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, British Virgin Islands, VG1110.  A complete list of the Debtors and their company numbers is attached as Exhibit A.

(the "BVI") have been appointed as joint provisional liquidators (in such capacity, the "JPLs" or, individually, a "JPL") of 30 entities (collectively, the "Debtors") incorporated in the BVI associated with the group referred to as the "Prince Group."

2.     I submit this declaration in support of (i) the *Emergency Motion for Entry of Orders Granting (I) Ex Parte Relief and (II) Provisional Relief, Pursuant to Section 1519 of the Bankruptcy Code* in my capacity as JPL and, in such capacity, an officer of the Eastern Caribbean Supreme Court in the BVI High Court of Justice (Commercial Division) (the "BVI Court"), and (ii) the *Verified Petition under Chapter 15 for Recognition of Foreign Main Proceedings and Related Relief* (the "Verified Petition" and, together with the petitions, the "Petitions"), filed pursuant to chapter 15 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code").

3.     The facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, and information supplied to me by others in the course of my duties as a JPL.  Where I refer to facts based on information provided by others, such information is true to the best of my knowledge and belief.  I am duly authorized to submit this declaration on behalf of the Debtors, and if called upon to testify, I could and would testify competently to the facts set forth herein.

4.     Section I of this declaration describes my professional background and experience.  Section II describes the Debtors, specific information about the Debtors' businesses and background information on the Prince Group.  Section III details the ongoing criminal investigations, sanctions and forfeiture proceedings with respect to the Debtors and the broader Prince Group.  Section IV describes the legal proceedings currently pending in the BVI.  Section V

2

describes certain pending actions by the JPLs in furtherance of their mandate.  Section VI describes why Chapter 15 relief is necessary and should be granted.

## I.   PROFESSIONAL BACKGROUND AND EXPERIENCE

5.      I am a licensed insolvency practitioner with over 25 years of experience in restructuring and insolvency matters.  I am a Fellow of the Association of Chartered Certified Accountants (FCCA), a Fellow of R3, the Association of Business Recovery Professionals (FABRP), and a Fellow of the Insolvency Practitioners Association (FIPA).  I am currently based in London, having previously been based in the BVI for over 13 years.[2]

6.      Interpath is an international advisory and restructuring firm with offices in, among other places, the United Kingdom, France, the BVI, Bermuda, Hong Kong and the Cayman Islands.  As relevant in this matter, Interpath specializes in asset tracing, investigations, contentious insolvency matters, and cross-border restructuring engagements.

7.      The other JPLs are also experienced licensed insolvency practitioners.  David Standish is based in London with more than 30 years of experience.  James Drury is based in the BVI with more than 15 years of experience.

8.      In each of our professional capacities, the JPLs have acted in court-appointed roles in insolvency and restructuring proceedings, including in matters involving fraud and asset-tracing claims and freezing orders.

9.      I am familiar with the UNCITRAL Model Law on Cross-Border Insolvency, which has been substantially adopted in the United States as Chapter 15 of the

---

[2]   I joined Zolfo Cooper (BVI) Limited in the BVI in February 2012.  This company and its BVI practice was subsequently rebranded as AlixPartners (BVI) Limited (December 2016), then became Kalo (BVI) Limited (May 2017) and, following a purchase and change of control, was rebranded as Interpath (BVI) Limited in July 2022. I relocated from the BVI to London in April 2025.

Bankruptcy Code. I currently serve as the liquidator and foreign representative in *In re Kingate Global Fund, Ltd*, *In re Kingate Euro Fund, Ltd* and *In re Three Arrows Fund Limited*, which have also been recognized as foreign main proceedings in the United States.[3]

10.     Neither I nor the other JPLs had any relationship with the Debtors or the Prince Group prior to our appointment as JPLs.

## II.    THE DEBTORS AND THE PRINCE GROUP

11.     Each of the Debtors was incorporated under the laws of the BVI as a business company pursuant to the BVI Business Companies Act, 2004, a form of limited liability company that I understand to be broadly comparable to a corporation under United States law.

12.     The U.S. Department of the Treasury has identified 28 of the Debtors as part of the so-called "Prince Group"—an alleged transnational criminal enterprise based in Southeast Asia that has been linked to large-scale online fraud, human trafficking, and money laundering operations targeting victims globally.   The remaining two Debtors—Amber Hill Ventures Limited ("Amber Hill") and Lateral Bridge Global Limited ("Lateral Bridge")—are not the subject of sanctions designations but were identified in the civil forfeiture complaint further detailed in Section III below as entities used to launder the Prince Group's illicit proceeds.

13.     Since approximately 2015, Chen Zhi served as Chairman of the Prince Group, which operated more than 100 business entities in over 30 countries.   Chen Zhi was at various times a citizen of China, Cambodia, Vanuatu, St. Lucia, and Cyprus, and resided at various times in Cambodia, Singapore, Taiwan, and the United Kingdom.   *See* Verified Compl. in Rem ¶¶

---

[3]     *In re Kingate Global Fund, Ltd*, No. 19-12853 (Bankr. S.D.N.Y. Sept. 5, 2019); *In re Three Arrows Cap., Ltd.*, 649 B.R. 143 (Bankr. S.D.N.Y. 2023).  Other cases in which I have served as foreign representative include *In re FCI Mkts.*, No. 21-14743 (CL) (Bankr. S.D. Fla., May 14, 2021);  *In re Hector Dao*, No. 24-16067 (MBK) (Bankr. D.N.J., June 17, 2021);  *In re Limora Invs.*, No. 19-11678 (MG) (Bankr. S.D.N.Y., May 23, 2019);  *In re Olinda Star Ltd.*, 614 B.R. 28 (Bankr. S.D.N.Y. Mar. 6, 2020); *In re World Fin. Grp.*, No. 17-22869 (AJC)  (Bankr. S.D. Fla., Oct. 25, 2017); *In re Cinque Terre Fin.*, No. 16-11086 (JLG) (Bankr. S.D.N.Y., Apr. 27, 2016).

16(a), 16(o), *United States* v. *Approximately 127,271 Bitcoin*, No. 1:25-cv-05745-RPK (E.D.N.Y. filed Oct. 14, 2025).

14. Ostensibly, the Prince Group was focused on real estate development, financial services, and consumer services. Its publicly disclosed business units in Cambodia included Prince Real Estate Group, Prince Huan Yu Real Estate Group, Prince Bank, and Awesome Global Investment Group, operating across sectors including banking, finance, tourism, logistics, technology, food and beverages, and lifestyle. *See* Verified Compl. in Rem ¶ 21, *United States* v. *Approximately 127,271 Bitcoin*, No. 1:25-cv-05745-RPK (E.D.N.Y. filed Oct. 14, 2025); Indictment ¶ 29, *United States* v. *Chen Zhi*, No. 1:25-cr-00312-RPK (E.D.N.Y. filed Oct. 8, 2025).

15. However, the criminal indictment of Chen Zhi and the civil forfeiture complaint further detailed in Section III alleges that, in secret, Chen Zhi and his top executives grew the Prince Group into one of the largest transnational criminal organizations in Asia. The indictment alleges that, under Chen Zhi's direction, the Prince Group generated enormous profits by operating forced-labor scam compounds across Cambodia that engaged in cryptocurrency investment fraud and other fraudulent schemes and used its network of ostensibly legitimate business enterprises to launder the proceeds of those criminal activities. The schemes are alleged to have resulted in billions of dollars in losses incurred by victims in the United States and around the world.

16. It also is alleged in the criminal indictment, the civil forfeiture complaint, and the sanctions designations further detailed in Section III, that the Debtors formed part of the Prince Group's complex multinational corporate structure. It is alleged that they were not independent operating businesses but served as components of a layered corporate architecture through which the Prince Group held real property, investment interests, financial accounts, and

other assets across multiple jurisdictions, including the United States, the United Kingdom, Hong Kong, Singapore, the Cayman Islands, Cambodia and Spain. The corporate structure is alleged to have been deliberately designed to obscure the ultimate beneficial ownership and control of assets and to facilitate the movement and laundering of proceeds derived from criminal activity. *See, e.g.,* Verified Compl. in Rem ¶¶ 40, 48, *United States* v. *Approximately 127,271 Bitcoin*, No. 1:25-cv-05745-RPK (E.D.N.Y. filed Oct. 14, 2025). Chen Zhi is directly recorded as the sole shareholder and director of several of the Debtors. Others are held through intermediate holding companies or registered in the names of individuals whom the Office of Foreign Assets Control ("OFAC") has identified as associates of Chen Zhi or the Prince Group. The JPLs' investigation into the full ownership chain and ultimate beneficial ownership of each Debtor is ongoing.

17.    According to the civil forfeiture complaint further detailed in Section III below, one senior Prince Group executive boasted in 2022 that, by 2018, the enterprise was generating over $30 million per day from fraudulent pig-butchering schemes and related illicit activities—an amount that annualizes to approximately $11 billion. The civil forfeiture complaint refers to internal Prince Group financial documents maintained by Chen Zhi which indicate that, as of January 2024, total annual revenue from the organization's legitimate business operations, by contrast, likely did not exceed several hundred million dollars, and some key Prince Group entities maintained negative cash flows. *See* Verified Compl. in Rem ¶ 57, *United States* v. *Approximately 127,271 Bitcoin*, No. 1:25-cv-05745-RPK (E.D.N.Y. filed Oct. 14, 2025).

18.    As described in greater detail in Section III below, the civil forfeiture complaint alleges that the proceeds of the Prince Group's criminal activities were laundered through a variety of complex methods, including through the Debtors and other BVI companies within the Prince Group's corporate structure. By around 2020, Chen Zhi is reported to have

6

amassed approximately 127,271 Bitcoin (worth over $8.7 billion as of the date of this Declaration) across unhosted cryptocurrency wallets he personally controlled—now the subject of a civil forfeiture action pending in the U.S. District Court for the Eastern District of New York.

## III.   CRIMINAL INVESTIGATIONS AND SANCTIONS

### A.   The DOJ Indictment and the Scam Compound Operations

19.   Following years of reporting by news outlets, international organizations, and human rights agencies on forced labor and scam compounds in Cambodia with alleged ties to the Prince Group, governments spanning multiple jurisdictions launched formal criminal investigations into the Prince Group and Chen Zhi.

20.   On October 14, 2025, the U.S. Department of Justice ("DOJ") unsealed an indictment (the "Indictment") against Chen Zhi in the U.S. District Court for the Eastern District of New York, charging him with wire fraud conspiracy and money laundering conspiracy for directing the Prince Group's operation of forced-labor scam compounds across Cambodia that stole billions of dollars from victims in the United States and around the world.  *See* Indictment, *United States* v. *Chen Zhi*, No. 1:25-cr-00312-RPK (E.D.N.Y. filed Oct. 8, 2025).

21.   The Indictment alleges that, at Chen Zhi's direction, the Prince Group built and operated at least 10 scam compounds throughout Cambodia in which thousands of migrant workers who had traveled to Cambodia seeking legitimate employment were instead trafficked and forced to execute cryptocurrency investment fraud and other fraudulent schemes, often under threat of violence.  *Id.* ¶¶ 30-31.  The compounds housed vast dormitories surrounded by high walls and barbed wire and functioned as forced labor camps.  *Id.*  Two facilities alone are reported to have been staffed with 1,250 mobile phones controlling 76,000 accounts on a popular social media platform.  *Id.* ¶ 33.  Chen Zhi is alleged to have personally maintained records tracking profits from the scams that explicitly referenced pig-butchering, and internal Prince Group

documents included detailed instructions on building rapport with victims and guidance on registering social media accounts in bulk.  *Id.* ¶ 34.

22.      The Indictment further alleges that the Prince Group's fraud schemes targeted victims around the world, including in the United States.  *Id.* ¶ 41.  The Indictment describes a Brooklyn-based money laundering network (the "Brooklyn Network") that facilitated an investment fraud scheme perpetrated by scammers at one of the Prince Group's compounds.  *Id.*  Between approximately May 2021 and August 2022, the Brooklyn Network allegedly facilitated the fraudulent transfer and laundering of more than $18 million on behalf of the Prince Group from over 250 victims in the Eastern District of New York and throughout the United States.  *Id.* ¶ 44.  Victim funds are stated to have been deposited into bank accounts in the names of Brooklyn- and Queens-based shell companies, then sent through a series of accounts back to Prince Group scammers, where they were further laundered before returning to the Prince Group and its top executives.  *Id.* ¶¶ 42-44.

23.      The Indictment further alleges that Chen Zhi and his co-conspirators used their political influence to protect the scam operations from law enforcement, including by bribing officials of the Chinese Ministry of Public Security and Ministry of State Security for advance information about law enforcement raids.  *Id.* ¶ 36.  Chen Zhi maintained ledgers tracking hundreds of millions of dollars in reimbursements to Prince Group associates for bribes and luxury purchases, and Prince Group associates used violence and coercion to maintain the enterprise's dominance and enforce discipline within the compounds.  *Id.* ¶¶ 38-39.  Prince Group associates are alleged to have used violence and coercion against individuals within the compounds, including beatings and threats of further violence.  *Id.* ¶ 40.  Reports from the United Nations and international human rights organizations have documented additional abuses within scam

compounds across the region, including beatings, electric shocks, prolonged confinement, sexual violence and other forms of torture used to compel participation in fraud operations.[4]

B. The Civil Forfeiture Action and the Laundering Pipeline

24. On October 14, 2025, the U.S. Attorney's Office for the Eastern District of New York and the DOJ's National Security Division filed a verified civil forfeiture complaint (the "Forfeiture Complaint") seeking forfeiture of approximately 127,271 bitcoin—at the time of seizure, the largest forfeiture action in U.S. history—as proceeds and instrumentalities of Chen Zhi's fraud and money laundering schemes (the "EDNY Forfeiture"). *See* Verified Compl. in Rem, *United States* v. *Approximately 127,271 Bitcoin*, No. 1:25-cv-05745-RPK (E.D.N.Y. filed Oct. 14, 2025).

25. The Forfeiture Complaint alleges that Chen Zhi and his co-conspirators laundered illicit profits through professional money laundering operations—referred to in internal Prince Group communications as "illegal money shops," "underground money houses," and "water houses"—which collected scam proceeds in the form of bitcoin or stablecoins, converted them to fiat currency, and then used the cash to purchase clean bitcoin or other cryptocurrencies. *Id.* ¶ 46.

26. The Forfeiture Complaint also describes that illicit proceeds were also laundered through BVI companies, including Amber Hill, Lateral Bridge, and potentially other entities among the Debtors or within the Prince Group's corporate structure. *Id.* ¶ 16. These entities maintained accounts at U.S. financial institutions that were opened with allegedly falsified

---

[4] *See A Wicked Problem:  Online Scam Operations and Trafficking into Forced Criminality in Southeast Asia,* UN Office of the High Commissioner for Human Rights (Feb. 20, 2026), https://www.ohchr.org/en/press-releases/2026/02/un-report-details-grave-abuses-against-those-trafficked-scam-centres; *"I Was Someone Else's Property":  Forced Online Scam Labour in Cambodia,* Amnesty Int'l (June 2025), https://www.amnesty.org/en/wp-content/uploads/2025/06/ASA2394472025ENGLISH.pdf.

business descriptions and materially understated transaction volumes—in one instance, by more than 1,000%. *Id.* ¶ 47. The Forfeiture Complaint further alleges that Chen Zhi and his co-conspirators laundered proceeds through the Prince Group's own online gambling operations—which continued to operate in multiple countries even after Cambodia's ban on online gambling—and through large-scale cryptocurrency mining operations, including the China-based Lubian, which was for a time the sixth-largest bitcoin mining operation in the world. *Id.* ¶¶ 48–49. Chen Zhi is stated to have boasted to associates that the mining business's "profit is considerable because there is no cost"—the operating capital comprised funds stolen from victims. *Id.* ¶ 49.

27.     Chen Zhi and his co-conspirators are also alleged to have employed sophisticated cryptocurrency laundering techniques to further obscure the origins of the illicit proceeds, including "spraying" and "funneling" techniques in which large volumes of cryptocurrency were repeatedly disaggregated across scores of wallets and then re-consolidated into fewer wallets, and the deliberate commingling of illicit funds with newly mined bitcoin to make laundered proceeds appear to originate from legitimate mining activity. *Id.* ¶¶ 50–52. Blockchain tracing by the U.S. Federal Bureau of Investigation ("FBI") is said to have determined that the 127,271 Bitcoin in wallets personally controlled by Chen Zhi were primarily funded by two categories of sources: cryptocurrency mining, including addresses associated with Prince Group mining operations; and indirect transfers from wallets at centralized cryptocurrency exchanges, including wallets controlled by BVI shell companies within the Prince Group's structure. *Id.* ¶ 45.

C.  OFAC and OFSI Sanctions Designations

28.     Also on October 14, 2025, OFAC and the Financial Crimes Enforcement Network ("FinCEN"), alongside the United Kingdom's Foreign, Commonwealth, and Development Office, imposed sanctions on the Prince Group and 146 individuals and entities

within and connected to it.[5] OFAC designated the Prince Group as a "Transnational Criminal Organization" and placed Prince Holding Group and many of its affiliates—including more than 100 corporate entities and more than a dozen officers and employees—on the Specially Designated Nationals and Blocked Persons List (the "SDN List"). As a result, all property of the SDN List designees subject to U.S. jurisdiction was blocked, and all U.S. persons were prohibited from transacting business with the designees without a license from OFAC.

29. The United Kingdom imposed corresponding sanctions targeting Chen Zhi and the Prince Group through HM Treasury's Office of Financial Sanctions Implementation ("OFSI") under the Global Human Rights Sanctions Regulations 2020.

30. Twenty-eight of the Debtors are among the 146 individuals and entities designated under the U.S. and/or U.K. sanctions regimes. The remaining two Debtors—Amber Hill and Lateral Bridge Global Limited—are not the subject of sanctions designations but were identified in the Forfeiture Complaint as entities used to launder the Prince Group's illicit proceeds.

31. By way of Overseas Territories Orders in Council, the U.K. sanctions automatically extend to and are adopted by the BVI and the Cayman Islands in their capacities as British Overseas Territories.

D. The Arrest and Extradition of Chen Zhi

32. On January 6, 2026, Chen Zhi was arrested in Cambodia and extradited to China. Cambodia's Interior Ministry confirmed the extradition and announced that Chen Zhi's Cambodian citizenship had been revoked by royal decree in December 2025. China's Ministry of Public Security stated that Chen Zhi and his "criminal gang" are suspected of crimes including

---

[5] Press Release, U.S. Dep't of the Treasury, *U.S. and U.K. Take Largest Action Ever Targeting Cybercriminal Networks in Southeast Asia* (Oct. 14, 2025), https://home.treasury.gov/news/press-releases/sb0278.

operating fraud operations and concealing their proceeds and announced that arrest warrants would be issued for additional key members of the criminal syndicate.  I understand that Chen Zhi remains in custody in China as of the date of this Declaration.[6]

E.    Alleged Financial Fraud

33.    The Indictment and the Forfeiture Complaint allege that the Prince Group's operations generated harm on an extraordinary scale.  The U.S. Department of the Treasury has described the Prince Group as a "dominant player in Cambodia's scam economy" that "has controlled illicit financial flows of billions of dollars."[7] TRM Labs, a leading blockchain analytics firm, described the Prince Group in its 2026 Crypto Crime Report, a copy of which is attached hereto as Exhibit B, as "one of the largest pig butchering scam operations ever uncovered."  TRM's analysis found that HuiOne Pay—a Cambodian payments platform that was subsequently designated by FinCEN as a foreign financial institution of primary money laundering concern— served as a high-volume financial gateway for the Prince Group's laundering operations.  HuiOne Pay received nearly 80% of funds from a Prince Group-linked escrow service, with monthly inflows peaking at approximately $4.7 billion in July 2025.  TRM observed that HuiOne Pay suspended operations and halted withdrawals following an apparent bank run in December 2025, with incoming volume falling from multiple billions per month to approximately $100 million by December 2025.

34.    Based on publicly available information, the number of potential fraud victims may be vast.  The United States Institute of Peace has estimated that total annual revenue

---

[6]    *Cambodia Extradites Chair of Alleged 'Criminal' Conglomerate to China*, OCCRP (Jan. 7, 2026), https://www.occrp.org/en/news/chairman-of-alleged-criminal-conglomerate-arrested-in-cambodia-and-extradited-to-china.

[7]    *See U.S. and U.K. Take Largest Action Ever Targeting Cybercriminal Networks in Southeast Asia*, U.S. Dep't of the Treasury (Oct. 14, 2025), https://home.treasury.gov/news/press-releases/sb0278.

generated by cyber-enabled scam operations in Southeast Asia exceeded $63 billion in 2023.[8]  The FBI's Internet Crime Complaint Center reported record total cybercrime losses of $16.6 billion in 2024, with cryptocurrency-related fraud alone accounting for $9.3 billion in losses—a 66% increase from 2023.  Cryptocurrency investment fraud, the dominant subcategory, caused $5.8 billion in losses across more than 41,000 complaints.[9]  The U.S. Department of the Treasury separately estimated in September 2025 that Americans had lost at least $10 billion to Southeast Asia-based scam operations in 2024.[10]  These figures are widely understood to be substantially underreported, as the vast majority of victims never file complaints with law enforcement.

35.      The TRM Labs 2026 Crypto Crime Report corroborates these estimates, reporting that actors sent approximately $35 billion in cryptocurrency to fraud schemes in 2025 alone, with investment-related schemes—including pig-butchering scams of the type allegedly operated by the Prince Group—accounting for 62% of observed fraud inflows.  TRM further noted that fraud reporting is often delayed and that the vast majority of victims never report at all, meaning that observed totals almost always understate the true scale of activity.

F.   Alleged Human Trafficking and Forced Labor Activities

36.      The Indictment alleges that the Prince Group's operations also involved an enormous number of trafficking victims—thousands of individuals who were allegedly trafficked into the Prince Group's scam compounds and forced to execute fraud schemes under threat of violence.

---

[8]   *See Transnational Crime in Southeast Asia: A Growing Threat to Global Peace and Security*, U.S. Inst. of Peace (May 2024), https://www.usip.org/sites/default/files/2024-05/ssg_transnational-crime-southeast-asia.pdf.

[9]   *See Federal Bureau of Investigation Internet Crimes Report 2024*, FBI Internet Crime Complaint Ctr. (Apr. 23, 2025), https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

[10]   Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions Southeast Asian Networks Targeting Americans with Cyber Scams* (Sept. 8, 2025), https://home.treasury.gov/news/press-releases/sb0237.

37.     The United Nations reported in August 2023 that at least 100,000 people in Cambodia may be held in situations where they are forced to execute online scams.[11]  More recent estimates place the number of scam compounds across Cambodia alone in the hundreds, with the cybercriminal labor force across Cambodia and other countries in the region estimated to exceed 350,000 people.[12]  The Prince Group is alleged to have operated at least 10 such compounds and to have been among the largest operators in the region.

G.  Independent Investigation by the JPLs

38.     The JPLs have not completed an independent professional investigation of facts relevant to their mandate and have not yet formed any view as to the merits of the allegations included in the Indictment, the Forfeiture Complaint, the sanctions designations or the various other materials cited above.

## IV.    THE BVI PROCEEDINGS AND THE APPOINTMENT OF THE JPLS

A.  The BVI Insolvency Framework

39.     Pursuant to section 162(1)(c) of the BVI Insolvency Act, 2003 (the "BVI Insolvency Act"), as described in greater detail in the Declaration of Andrew Chissick filed contemporaneously herewith (the "Chissick Declaration"), the Attorney General of the BVI may seek the appointment of a liquidator on public interest grounds.  A BVI liquidation is a court-supervised collective process in which appointed liquidators and provisional liquidators serve as officers of the BVI Court.  If a company is placed into liquidation, the liquidation process will

---

[11]    *Hundreds of Thousands Trafficked to Work as Online Scammers in SE Asia, Says UN Report,* UN Off. of the High Comm'r for Hum. Rts.*,* (Aug. 29, 2023), https://www.ohchr.org/en/press-releases/2023/08/hundreds-thousands-trafficked-work-online-scammers-se-asia-says-un-report.

[12]    Jacob Sims, *Policies and Patterns State-Abetted Transnational Crime in Cambodia as a Global Security Threat*, Human.    Rsch.    Consultancy    (May    2025),    https://cdn.prod.website-files.com/662f5d242a3e7860ebcfde4f/68264cff356caba111f2db1e_Policies%20and%20Patterns_16052025.pdf.

involve the adjudication of creditor claims, realization of assets, and distribution of proceeds in accordance with statutory priority, at the conclusion of which the company is dissolved and ceases to exist.  *See* Chissick ¶¶ 17, 32, 40.

B.   The Liquidation Applications and the BVI Orders

40.   On January 5, 2026, in response to the criminal investigations, sanctions designations, and enforcement actions described in Section III above, the Attorney General of the BVI, Dawn J. Smith (the "BVI Attorney General"), applied to the BVI Court for the appointment of the JPLs as liquidators pursuant to sections 162(1)(a) and (c) of the BVI Insolvency Act (the "Liquidation Applications").  In parallel, the BVI Attorney General sought the appointment of the JPLs as provisional liquidators of the Debtors pursuant to section 170 of the BVI Insolvency Act pending the determination of the Liquidation Applications, stating in the written submissions filed in support of the applications that these matters "require urgent investigation by independent professionals to determine the full extent of the fraudulent activities, identify, secure, protect and trace assets held by or on [the Debtors'] behalf; and identify potential claims against third parties." *See* Chissick Declaration Exhibit D ¶ 47.

41.   Following an *ex parte* hearing on January 9, 2026, the Honorable Justice Abbas Mithani of the BVI Court granted orders (collectively, the "BVI Orders") appointing the JPLs as provisional liquidators of the Debtors.  Copies of the BVI Orders are attached hereto as Exhibit C.

C.   The JPLs' Powers and Authority

42.   Pursuant to the BVI Orders, the JPLs have acquired formal legal control of the Debtors.  The powers of the Debtors' prior directors and other officeholders with respect to the affairs and assets of the Debtors have, in material part, been displaced and now vest exclusively in

the JPLs.  *See* Chissick Declaration ¶ 40.  While legal ownership of the Debtors has not changed as a result of the JPLs' appointment, the registered directors of the Debtors—which at the relevant time included Chen Zhi in the case of entities where he served as director—have no power to act in that capacity during the pendency of the provisional liquidation.

43.     The appointment of the JPLs was sought on the basis that it was necessary to, amongst other things (i) divest Chen Zhi and his associates of control of the Debtors and prevent them from continuing to use the Debtors to further the criminal enterprise thereby continuing to inflict public harm; (ii) identify and preserve the Debtors' assets (iii) conduct thorough investigations into past transactions, and (iv) review banking records, asset transfers, and corporate dealings to identify and locate the potential money laundering activities.

44.     The BVI Orders confer broad powers on the JPLs as court-appointed officers.  *See* Chissick Declaration ¶¶ 36–38.  Pursuant to those orders, the JPLs are empowered to, among other things and without further sanction of the BVI Court:

    i.    take control of corporate governance and operations of the Debtors;

    ii.    act on behalf of the Debtors in legal proceedings in any jurisdiction;

    iii.    manage, operate, and control the Debtors' bank accounts;

    iv.    appoint agents and professional advisers;

    v.    gain entry to the Debtors' premises and take possession of and preserve the books and records of the Debtors, "to investigate the affairs of the [Debtors] so far as necessary to protect and, if necessary, retrieve the assets and records of the [Debtors]"; and

16

vi.   take further steps, including initiating legal proceedings, conducting discovery, investigating past conduct, and taking control of assets previously managed by prior stakeholders.

45.   The BVI Orders also expressly authorize the JPLs to "seek the recognition (or its equivalent) of the appointment of the Joint Provisional Liquidators in the United States, United Kingdom, Singapore, Hong Kong, Taiwan, Thailand and Cambodia or elsewhere for the purposes of securing, realising and remitting assets to the control of the JPLs and for the purpose of obtaining access to and control of the records of the Company."  BVI Orders ¶ 3(c).

D.  Continuation of the JPLs' Appointment

46.   On January 29, 2026, the BVI Court continued the BVI Orders pending final determination of the Liquidation Applications currently scheduled for April 16–17, 2026.  Copies of the continuation orders are attached as Exhibit D.

V.   **PENDING ACTIVITIES OF THE JPLs**

A.  Investigatory Steps

47.   Following their appointment, the JPLs commenced an investigation into the Debtors' financial affairs and assets pursuant to their powers under the BVI Orders to investigate the affairs of the Debtors so far as necessary to protect, and if necessary, retrieve the assets and records of the Debtors.  At present, the JPLs have limited visibility into the full scope of assets held by the Debtors.  The Prince Group is alleged in the Forfeiture Complaint to have deliberately obfuscated its corporate structure and books and records.  The JPLs' present understanding of the Debtors' assets is based principally on publicly available information, U.K. and Hong Kong land registry documents, the Debtors' corporate registers, documents obtained from the Debtors' former registered agent, and the JPLs' further preliminary investigation.  Additional assets, entities,

17

jurisdictions, and counterparties are expected to be identified as records are obtained and investigations progress.

48. To date, the JPLs and their counsel, in accordance with the BVI Court Orders (and the protocol therein), have actively engaged with the BVI Attorney General, the Debtors' former registered agent, and regulatory and law enforcement authorities across multiple jurisdictions, including the DOJ, the FBI, OFAC, the U.K. National Crime Agency, and OFSI, and numerous current and former counterparties to various of the Debtors and their affiliated entities. These engagements remain ongoing and have been productive.

B. Sanctions Impact and Licensing Efforts

49. The sanctions described above have had immediate and severe operational consequences for the Debtors. Financial institutions and service providers across multiple jurisdictions have ceased to engage with the Debtors, bank accounts have been frozen, and counterparties have declined to transact with or provide information to the JPLs absent appropriate regulatory licenses. The JPLs have been actively seeking licenses in relevant jurisdictions to provide clear regulatory confirmation that transactions undertaken pursuant to the JPLs' court-appointed mandate are authorized under applicable sanctions laws and regulations.

50. On February 20, 2026, the JPLs submitted a license application to OFAC requesting the issuance of a license on an expedited basis with respect to the Debtors. The JPLs remain in active contact with OFAC regarding this license application.

51. Meanwhile, in response to urgent developments at the Allied Cigar Group—a group of operating companies engaged in the global distribution of premium cigar products in which one of the Debtors holds a majority investment—OFAC issued at the JPLs

18

request a temporary license (License No. TCO-2026-1464321-2) on March 18, 2026, to facilitate financial transactions necessary to stabilize operations.

52.     In the United Kingdom, the JPLs have been engaging with the Foreign, Commonwealth and Development Office and OFSI to explore the issuance of a license under the Global Human Rights Sanctions Regulations 2020.  On March 13, 2026, OFSI confirmed that it had begun its assessment.

53.     The JPLs have also engaged with relevant authorities in the BVI and the Cayman Islands to begin the parallel process of obtaining comparable licenses, and with the Cayman Islands Monetary Authority and the Cayman Financial Reporting Authority in connection with regulated subsidiaries of certain of the Debtors.

A.  Interference by Chen Zhi and His Proxies

54.     Since the entry of the BVI Orders, the JPLs have encountered active resistance from parties associated with Chen Zhi and the Prince Group who have taken steps to challenge the JPLs' authority and to interfere with the JPLs' efforts in multiple jurisdictions.

55.     Campbells Legal (BVI) Limited ("Campbells"), a law firm purporting to represent 25 of the Debtors, has asserted that Cosimo Borrelli, a Hong Kong-based restructuring professional, purportedly has been appointed as director of 25 of the Debtors, and that this appointment was made by unspecified individuals acting pursuant to a purported power of attorney from Chen Zhi dated December 29, 2025—eight days before Chen Zhi's arrest.  Despite repeated requests, Campbells has not produced the purported powers of attorney or identified the individuals purportedly authorized to act thereunder.  Campbells has also declined to identify the person(s) or entities presently directing Campbells' actions, although Mr. Borrelli has stated in a sworn filing that he is receiving and relying on information from a U.S. law firm, Boies Schiller

Flexner LLP ("BSF"), and in correspondence with the Debtors' former registered agent predating the JPLs' appointment, Campbells similarly stated that it was acting pursuant to instructions from BSF.

56.     In subsequent correspondence, Campbells has stated that the individuals acting under the purported powers of attorney "are not prepared to disclose their identities at this time," and that that position is reinforced by the fact that the JPLs have been "communicating with foreign governments in secret"—an apparent reference to the JPLs' express authorization under the BVI Orders to communicate and cooperate with law enforcement and regulatory authorities investigating Chen Zhi and his alleged co-conspirators.  *See* BVI Orders ¶¶ 3(n)–(o).

57.     The JPLs are not currently aware of the full scope of the activities of Campbells or Mr. Borrelli.  But Campbells, Mr. Borrelli or persons acting in coordination with them have taken actions relating to the Debtors and their property that, including changing the registered offices of two Hong Kong Exchange listed companies in which the Debtors hold majority interests, and appointing a new director to one such company without the majority shareholder's consent.  The JPLs have also been provided with unsigned statements of affairs for the Debtors which describe assets as "pledged for liabilities to shareholders."

58.     In the BVI, Campbells has indicated that it intends to appear on behalf of the Debtors at a BVI Court hearing scheduled for April 16–17, 2026 seeking a dismissal of the BVI Attorney General's Liquidation Applications and the discharge of the JPLs' appointment. Separately, a law firm purporting to represent Amber Hill and Lateral Bridge has appeared in the BVI to seek to exclude those entities from the Attorney General's application, arguing that they have no connection to the Prince Group—an assertion contradicted by the allegations in the Forfeiture Complaint.

59.     In the United States, BSF sent the JPLs a litigation hold notice on March 25, 2026.  The letter, which copied Campbells, asserts Chen Zhi's ownership interest in the Debtors and expressly contemplates litigation against the JPLs in the event they pursue asset dispositions. A copy is attached as Exhibit E.

60.     In the United Kingdom, the JPLs have encountered similar interference. Persons associated with Chen Zhi and the Prince Group—including a solicitor who has publicly declared that he acts for Chen Zhi—have contacted counterparties and service providers in relation to a valuable commercial property in the City of London held by one of the Debtors.

61.     Recognition in the United States is therefore essential for the JPLs to fulfil the mandate for which they have been appointed by the BVI Court.  In addition to recognition in the United States under Chapter 15, the JPLs intend to seek recognition of the BVI Proceedings in the United Kingdom, Hong Kong, Singapore and other jurisdictions as appropriate.  I believe these Chapter 15 proceedings, the anticipated U.K. recognition proceedings, and the ongoing BVI Proceedings are complementary and mutually reinforcing.  Any delay in recognition in the United States would impair the JPLs' ability to administer the Debtors' global estates in a coordinated and value-maximizing manner and would create opportunities for interested parties—including persons acting on Mr. Chen's behalf—to exploit gaps in cross-border protection.

## VI.    CHAPTER 15 PROCEEDINGS AND RELIEF SOUGHT

### A.  Why Chapter 15 Relief Is Necessary

62.     I believe, for the reasons set forth in this declaration, that recognition of the BVI Proceedings under Chapter 15 of the Bankruptcy Code and granting the related relief are necessary to enable the JPLs to carry out their court-appointed mandate in the United States and preserve the Debtors' U.S. assets.

63.     As described above, the Prince Group's enterprise has a direct and substantial nexus to the United States, including pending DOJ criminal and civil forfeiture proceedings, the apparent use of certain of the Debtors to launder illicit proceeds through U.S. financial institutions, and a money laundering network operating in New York that appears to have facilitated the fraudulent transfer of more than $18 million from over 250 U.S. victims.  In my view, recognition is necessary to enable the JPLs to administer the Debtors' estates in a manner consistent with these ongoing U.S. enforcement actions, to coordinate with U.S. authorities, and to support the objectives of the U.S. sanctions regime through court-supervised administration under the direction of independent, licensed insolvency practitioners.

64.     In addition to coordination efforts with the U.S. authorities and enforcement agencies, the JPLs' investigation requires engagement with, and coordination from, U.S.-based counterparties, including financial institutions that held accounts for entities within the Prince Group's corporate structure, as well as other persons and entities in the United States that may hold information, assets, or records relevant to the Debtors' affairs.  Recognition will provide the JPLs with standing before U.S. courts and bind U.S. third parties to recognize the JPLs' authority.

65.     I believe that recognition is consistent with the principles of comity and cross-border cooperation reflected in the UNCITRAL Model Law, which Chapter 15 implements, and advances the policy objectives of the Bankruptcy Code, including the promotion of cooperation between U.S. courts and foreign courts in cross-border insolvency cases.  11 U.S.C. § 1501(a).

66.     I believe that the risks if recognition is not granted are immediate and material.  As described above, the JPLs face active, multi-jurisdictional opposition from parties

22

seeking to obstruct the BVI Proceedings and challenge the JPLs' authority, and the Debtors' U.S. assets remain at risk of dissipation absent the protections of the automatic stay.

67.     **Investigation risk**.  If the JPLs cannot obtain records, communications, contracts, account information, and transactional documents located in the United States or held by U.S. counterparties, their ability to investigate the Debtors' affairs and the Prince Group's use of U.S. financial infrastructure will be seriously impeded.  This risk is heightened by the fact that the JPLs have not yet identified the full scope of the Debtors' assets, and assets that remain unknown to the JPLs are particularly vulnerable to dissipation or diversion before the JPLs can take steps to preserve them.

68.     **Sanctions Risk.**  The sanctions relief obtained to date, including the OFAC license described above, is premised on the JPLs' status as court-appointed fiduciaries acting pursuant to a public-interest liquidation.  Recognition of the BVI Proceedings will reinforce the framework on which that relief depends by confirming the JPLs' authority in the United States and providing assurance to OFAC, financial institutions, and other counterparties that the JPLs are the lawful administrators of the Debtors' estates.  Absent recognition, the JPLs' standing in the United States remains uncertain, which risks undermining the cooperative relationship with U.S. enforcement authorities that has enabled the sanctions licensing process to date.

69.     **Interference Risk**.  As described in <u>Section V</u> above, proxies and persons associated with Chen Zhi have taken steps to interfere with the JPLs' authority across multiple jurisdictions, including through U.S. litigation threats, and engagement with counterparties without JPLs' authorization.  Absent recognition, there is nothing to prevent these competing actors from commencing proceedings in U.S. courts, engaging with U.S. counterparties while disputing the JPLs' standing, or taking other actions inconsistent with the BVI Orders.

B.  The JPLs Are Foreign Representatives and the BVI Proceedings Qualify for Recognition as Foreign Main Proceedings

70.     As set forth above, the JPLs have been appointed by the BVI Court on a provisional basis to administer the Debtors' affairs and have been expressly authorized by the BVI Orders to seek recognition (or its equivalent) in jurisdictions including the U.S.  As a result, the JPLs are authorized to seek recognition under Chapter 15.  Based on consultation with U.S. counsel and as set forth in the Chissick Declaration, I believe that the BVI Proceedings satisfy the requirements for recognition under Chapter 15 of the Bankruptcy Code, that the JPLs are "foreign representatives" within the meaning of section 101(24), and that the BVI Proceedings qualify as "foreign main proceedings" within the meaning of section 1502(4).  The Debtors were formed under the laws of the BVI, have continuously maintained their registered offices there, and the JPLs are administering the Debtors under BVI Court supervision.

71.     The JPLs are not aware of any basis on which recognition could be refused under section 1506 of the Bankruptcy Code.  To the contrary, the BVI Proceedings advance U.S. policy interests by facilitating coordination with U.S. law enforcement, preserving assets for the benefit of U.S. victims, and supporting the objectives of the U.S. sanctions regime.

C.  The Need for Emergency and Provisional Relief Pending Recognition

72.     I understand from the Debtors' U.S. counsel that recognition of the BVI Proceedings will require at least 21 days' notice of the recognition hearing and that, as a result, recognition cannot be granted for several weeks at the earliest.  In the interim, the JPLs will have no standing or enforceable authority under U.S. law, and the Debtors' U.S. assets will be unprotected by any court order in this jurisdiction.

73.     In my professional judgment, the Debtors' assets cannot safely remain unprotected during this period.  As I have described in this declaration, the JPLs have limited

24

visibility into the full scope of the Debtors' assets, while persons acting at Chen Zhi's direction are likely to have detailed knowledge of the Debtors' asset holdings, corporate structures, bank accounts, and counterparty relationships. This information asymmetry creates a serious risk: those who wish to frustrate the JPLs' mandate are better positioned to act against the Debtors' U.S. assets than the JPLs are to protect them.

74. The pattern of interference described in Section V above confirms that this risk is not speculative. Campbells has not only refused to identify the individuals purporting to exercise corporate authority over the Debtors on behalf of Chen Zhi, but has referenced the JPLs' communication and cooperation with law enforcement and regulatory authorities as a reason for that refusal. In my experience, parties who have been willing to act to frustrate the JPLs' investigations will not hesitate to exploit the absence of any Court-mandated protections in the United States.

75. Without emergency and provisional relief from this Court, the JPLs cannot compel U.S. financial institutions and other counterparties to produce records needed to trace the Debtors' assets, cannot prevent the commencement of adverse proceedings in U.S. courts, and have no enforceable basis on which to require U.S. counterparties to engage with the JPLs rather than with persons purporting to act on behalf of the Debtors without authorization. For these reasons, I believe the emergency and provisional relief sought in the *Emergency Motion for Entry of Orders Granting (I) Ex Parte Relief and (II) Provisional Relief, Pursuant to Section 1519 of the Bankruptcy Code* is necessary to enable the JPLs to protect the Debtors' assets during this critical stabilization period.

D. Waiver of the 14-Day Stay of Effectiveness

76.     I understand from the Debtors' U.S. counsel that, upon recognition, section 1517(d) of the Bankruptcy Code ordinarily imposes a 14-day stay before the recognition order takes effect.  This would create a second gap—after recognition is granted but before the automatic stay applies—during which the Debtors' U.S. assets would again be unprotected.  For the same reasons set forth above, I do not believe the Debtors' assets can safely remain unprotected for any additional period.   The circumstances described in this declaration make any delay in the effectiveness of recognition a material risk to the estates.

77.     For these reasons, I respectfully submit that this Court waive the 14-day stay of effectiveness and grant immediate recognition of the BVI Proceedings as foreign main proceedings, together with all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code, including the imposition of the automatic stay within the United States.

Dated: April 8, 2026
     London, UK

Paul Pretlove
Joint Provisional Liquidator and Authorized
Foreign Representative of the Debtors