# EXHIBIT 10

## April 14, 2026 Skeleton Argument of the BVI Attorney General

**Case Number :BVIHCOM2026/0027**

**FILED**
**HIGH COURT**
**TERRITORY OF
THE VIRGIN ISLANDS**

**IN THE EASTERN CARIBBEAN SUPREME COURT**

**IN THE HIGH COURT OF JUSTICE**

**BRITISH VIRGIN ISLANDS**

**COMMERCIAL DIVISION**

**Submitted Date:14/04/2026 16:18**

**Filed Date:15/04/2026 08:30**

**Fees Paid:0.00**

CLAIM NO BVIHC (COM) 2026/0027, CLAIM NO BVIHC (COM) 2026/0001, CLAIM NO BVIHC (COM) 2026/0002, CLAIM NO BVIHC (COM) 2026/0003, CLAIM NO BVIHC (COM) 2026/0004, CLAIM NO BVIHC (COM) 2026/0005, CLAIM NO BVIHC (COM) 2026/0006, CLAIM NO BVIHC (COM) 2026/0007, CLAIM NO BVIHC (COM) 2026/0008, CLAIM NO BVIHC (COM) 2026/0009, CLAIM NO BVIHC (COM) 2026/0010, CLAIM NO BVIHC (COM) 2026/0011, CLAIM NO BVIHC (COM) 2026/0012, CLAIM NO BVIHC (COM) 2026/0013, CLAIM NO BVIHC (COM) 2026/0014, CLAIM NO BVIHC (COM) 2026/0015, CLAIM NO BVIHC (COM) 2026/0016, CLAIM NO BVIHC (COM) 2026/0017, CLAIM NO BVIHC (COM) 2026/0018, CLAIM NO BVIHC (COM) 2026/0019, CLAIM NO BVIHC (COM) 2026/0020, CLAIM NO BVIHC (COM) 2026/0021, CLAIM NO BVIHC (COM) 2026/0022, CLAIM NO BVIHC (COM) 2026/0023, CLAIM NO BVIHC (COM) 2026/0024, CLAIM NO BVIHC (COM) 2026/0025, CLAIM NO BVIHC (COM) 2026/0026, CLAIM NO BVIHC (COM) 2026/0028, CLAIM NO BVIHC (COM) 2026/0029, CLAIM NO BVIHC (COM) 2026/0030

BETWEEN:

IN THE MATTER OF SURE TYCOON LIMITED AND TWENTY-NINE OTHER COMPANIES

AND IN THE MATTER OF THE INSOLVENCY ACT, 2003 OF THE LAWS OF THE VIRGIN ISLANDS.

THE ATTORNEY GENERAL

**Applicant**

-v-

SURE TYCOON LIMITED and
TWENTY-NINE OTHER COMPANIES

**Respondents**

---

**SKELETON ARGUMENT OF THE APPLICANT**
**(For the appointment of liquidators over the Respondents)**
**(April 16 & 17, 2026)**

---

**Introduction**

1.    The Attorney General has filed two Affidavits.  The first was filed on 5 January 2026 and supported the application the appointment of the JPLs (see **AB/29** et seq).  The second was filed on 8 April 2026 (see S**AB/157** et seq).  She has filed three skeletons.  The first dated 6 January 2026 supported the application for appointment of the JPLs [**CSAB/1-22**].  The second was dated 28 January 2026 [**CSAB/24-31**].  The third was dated 1 March 2026 ('**the March skeleton**') [**CSAB/32-48**] supported what was to have been the application for the

1

appointment of liquidators over the Companies then scheduled for 2 March 2026.  The Court is invited to read these Affidavits and skeletons and the detail of the points made in them are not repeated.

2.      As there indicated:

2.1.    The Attorney General makes the application under s.162 of the Insolvency Act, as amended (see §42 of the March skeleton [**CSAB/40-41**]).  The Attorney General is named as one of the parties who can make an application for the appointment of a liquidator (in s.162(2)(h)), no doubt on the basis of her function as guardian of the public interest.

2.2.    The procedural requirements have been complied with by the Attorney General: see §§29-36 of the March skeleton [**CSAB/38-39**].

2.3.    The procedural history is summarised in the Attorney General's second Affidavit at §§5-19 [**SAB/158-162**].

3.      The company respondents can be grouped into three categories: (a) 25 companies represented by Campbells ("the Campbells Companies"), (b) Lateral Bridge and Amber Hill represented by Kobre & Kim ("the K&K Companies"), and (c) three unrepresented companies including Jumbo High Limited which was formerly represented by Campbells ("the Unrepresented Companies")[1]. All the Companies have or had Vistra as their registered agent.

4.      In summary, the background to this application is as summarised in the March skeleton at §§9-15 [**CSAB/34-35**].   That background indicates that, after very considerable investigation (in particular by the US authorities), there has been concerted multi-national action against Chen, the Prince Group and others involved with them.  That action has included sanctions both in the US and the UK.  It has also included criminal action and civil forfeiture action (supported by a detailed complaint) in the US.  That action sits alongside action taken by other states – including for example the liquidation of Prince Bank in Cambodia.

5.      That action has been based on detailed allegations, based on such investigations, that there have been transnational criminal activities on an enormous scale.   The nature of those activities was summarised in the March skeleton at §§16-24 [**CSAB/35-37**].  In short, the criminal activity involved fraudulent schemes and scamming individuals around the world.  It resulted in billions of dollars of losses to those individuals (the forfeiture complaint in the US seeks to trace amounts in the region of $15 billion). That activity was organised and orchestrated on an industrial scale including in scam compounds in Cambodia, involving violent forced labour and human trafficking.  The proceeds were then subject to money laundering, using techniques of which examples are given in §19 of the March skeleton [**CSAB/36**].  The washed proceeds were used in a range of ostensibly legitimate companies and business activities, some within the Prince Group.

6.      The OFAC investigation indicates that the Companies were part of a complex network of companies which were used by Chen and the Prince Group to conceal, hold, transfer and

---

[1] The companies are referred to collectively below as 'the Companies' with the different groupings distinguished where indicated.

launder proceeds derived from these criminal activities: see §§21-24 of the March skeleton [**CSAB/36-37**].

**Just and equitable, and in the public interest, to make the appointment**

7.  The grounds for the appointment of liquidators are set out at §§44-58 of the March skeleton [**CSAB/41-45**]. The just and equitable, and the public interest bases are relied on by the Attorney General.  It is evident that there is considerable overlap between the two in the present context.[2]    Three particular points are emphasised.

8.  **First**, the extensive investigation into Chen, the Prince Group and those assisting them has led to concerted sanctioning and other action in multiple nations on the basis that they have been and are involved in extremely serious, and enormous, criminal activity.  It is the effective disruption of this activity, and the proper multi-jurisdictional steps to seek to protect those who have been victims of it, that lies at the heart of this application.  It provides the key public interest (and just and equitable) foundation for it.

9.  **Second**, the first point has a specific aspect.  The Virgin Islands are a leading international finance centre.  There is the strongest public interest in the Virgin Islands being, and being seen to be, an international finance centre that takes effective steps to tackle this sort of criminal activity in which Virgin Islands companies and businesses are mixed up.  That is both in the public interest generally and in the interests of protecting the victims of the criminal activity. Moreover, it demonstrates the Virgin Island's proper commitment to international cooperation in combating financial fraud and supporting the work of other states taken to the same end.

10.  **Third**, it is evident that the appointment of liquidators is an essential step to those ends.  In particular:

    10.1   The Companies are owned and controlled by Chen and/or his associates and co-conspirators. Despite the actions taken in multiple jurisdictions, the Companies continue to be under their control and, based on the allegations, are free to be used by them (i) to continue to facilitate their criminal and fraudulent activities and (ii) to launder, hold, and conceal the proceeds of such activities. It is self-evidently and strongly not in the public interest for that state of affairs to continue.

    10.2   Liquidators appointed by the Court are both independent and act as officers of the court.  Placing them in control of the Companies ensures that the public interest just mentioned is met.

    10.3   That appointment is also necessary, and in the public interest,
        10.3.1   To ensure that the Companies' affairs are properly investigated.  That is of obvious and critical importance to ensure that appropriate steps are taken to recover assets and maximise returns to defrauded investors, including participation in cross-border asset recovery efforts; and, more broadly, to assist in preventing similar schemes in the future.

---

[2] For convenience, references to the public interest below include references to the just and equitable basis.

3

10.3.2    To facilitate and ensure proper cooperation with enforcement authorities, regulators, and insolvency practitioners in the Virgin Islands and other jurisdictions – that is especially important given the multi-jurisdictional nature of the scheme.

11.    The ability to invoke this public interest in the appointment of liquidators sits alongside other remedies that might be, or in practical terms become, available.  They include the possibility of an application for relief under the Proceeds of Criminal Conduct Act, including forfeiting the assets of the defendants.  Such an application may well be appropriate in future including once the process of investigation and understanding of the Companies currently being undertaken by the JPLs (and other jurisdictions) is further advanced.  The existence of such other possible remedies plainly does not cut down the ability of the Court to appoint liquidators on public interest grounds.  All of the swift and critical benefits of doing so outlined above provide their own, freestanding benefits of doing so.

12.    The appointment of liquidators will enable an orderly process to be undertaken.  In that process, the Companies' assets can be identified and protected in the liquidation.  Those who have or may have a claim on those assets, including shareholders, creditors and victims of crime who wish to claim, can also be identified; and a proper process then arrived at before any disposal of the assets is undertaken.  In this process, the liquidator is an officer of the court with statutory powers set out in s.186 and Schedule 2 of the Act.  Thus, for example:

12.1    In a public interest liquidation, the liquidator is required to carry out an investigation of the company's affairs and report to the court. Reports are usually submitted quarterly, or as directed by the court. Upon completion of the liquidation process the liquidator will submit a final report to the members and creditors of the company. The final report is also sent to the Registrar of Companies who will strike the company off the register of companies and dissolve it (s.234).  The Companies are in provisional liquidation and the JPLs have been conducting their investigations as provisional liquidators.  If they are appointed by the court as official liquidators, they will continue their investigations; and continue to report to the Court.

12.2    The process is conducted under the Court's direction.  So, if at the end of the investigation there are assets for distribution, there will be a range of matters to be considered by the Court.  How matters proceed at that point, will depend upon the circumstances then in existence.  Shareholders will plainly have interests to be considered.  But, in the light of all the information then to hand, there may well be other claims – potentially by the state in forfeiture proceedings; potentially by victims of the alleged criminal activities.  The key point is that it will be the Court to decide what process should justly be followed.

12.3    In the meantime, the appointment will protect the assets with the liquidators able to take control of the Companies, investigate their activities, secure the assets, and stop the wrongful activities of the wrongdoers protecting the integrity of the Virgin Islands as a respected international financial centre.

13.    The Companies' principal contention is that it is a necessary precondition to the appointment that either there has been a conviction (or convictions) of those involved or that the allegations made eg in the US complaint are proved. That is wrong:

4

13.1    There is no such limitation in s.162.  No such limitation is expressly included and none should be implied or read into the section.  Nor is such a limitation inherent in the concept of the public interest.[3]

13.2    On the contrary, what must be demonstrated is simply that it is in the public interest to appoint liquidators.  The public interest thus focuses on the effects of such an appointment and whether they would be in the public interest.

13.3    In the present case, as noted above, the first effect of appointment would be to place the affairs of the Companies into the hands of independent professionals acting as officers of the court – and thereby ensuring that they could not be used, as it is alleged they have been, for the purpose of furthering the criminal activities of Chen and the Prince Group.  The second effect would be to enable investigation by the liquidators of the Companies affairs.  That, combined with other information that may be obtained as a result of transnational cooperation, will serve the variety of public interests attendant on having access to such information – including the protection of the interests of victims of the criminal activities.  This aspect is particularly important because it is of the essence of the sort of enormous multi-jurisdictional criminal activity that is alleged here that every effort is made by the criminals to conceal and obfuscate – especially in attempting to hide (through laundering) the criminal source of assets and in attempting to create the impression of legitimate business activity as part of that.

13.4    These facets of the public interest illustrate that it cannot have been the intent of the legislation to impose a requirement to prove the allegations of criminality, laundering etc.  That would be to impose what in most cases would simply be an impossible burden.  It is also a burden which would place the cart before the horse, given that a key aspect of the public interest in appointment is to assist in ascertaining the factual position despite criminal efforts to conceal it; and to ensure that criminal enterprises should not be able to continue to operate in the meantime.

14.    In the present case, there is a proper and sufficient grounding or basis for invoking the public interest.  In particular:

14.1    The multi-state sanctioning and other action is a powerful indication that the allegations of enormous criminality have a proper basis.

14.2    The detail in the US Complaint [**AB/78**-] is compelling.  It sets out in considerable detail the nature of the fraudulent, mass scamming schemes organised using forced labour, torture and human trafficking and the sort of laundering techniques that had been used.  See especially, in that respect, (a) the description of the fraud at §§18-37 [**AB/88-95**]; (b) the description of some of the money laundering schemes at §§38 et seq [**AB/96**-] including involving Amber Hill and Lateral Bridge (see eg §40 and §47 at **AB/96-97, 103-104**).  That latter, by way of example, included transfers of many millions of dollars in crypto currency through various bitcoin wallets controlled by Amber Hill: see §55.

---

[3] It is also to be noted that the breadth of the public interest in s.162 is reinforced by the fact that in 2024, s.162 was amended to include a new ground that the Financial Services Commission can apply to appoint a liquidator under s.162(1)(c) (public interest) if the target company is, or at any time has been, involved in or convicted for an offence relating to money laundering, terrorist financing or proliferation financing; breaches or contravenes any enactment relating to sanctions or embargoes; or is otherwise engaged in an activity which the FSC considers to be not in the best interest of the Territory's financial services industry or generally in the public interest.

14.3 The nature of the allegations is thus that assets were generated by the massive fraud, they were then laundered through a variety of companies and businesses around the world, and after that had been done the 'washed' assets were used in ostensibly legitimate companies and businesses.  All of this was done through a series of complex corporate and other structures, and using associates and other companies assisting, around the world. Where a company forms part of that network, through ownership or control by Chen or his associates, the inference that it was available to and used for those purposes is a proper and available one on the present evidence. That inference is not displaced by the absence of a conviction or formal finding.  Thus, any company owned or controlled by Chen or his associates is to be taken to be part of this criminal enterprise.

15. The Respondents challenge the admissibility of the of the US Complaint and the US Indictment ("**the US Documents")** on the ground that they breach the rule in Hollington v Hewthorn [1943] 1 KB 587 and section 90 of the Evidence Act in that they establish findings in separate proceedings that cannot stand as evidence of facts in these proceedings. However, the Attorney General is not seeking to admit the US Documents to prove the truth of what is alleged in the Documents. They are introduced to show that serious allegations have been made against the Companies, and are being proceeded with in courts outside the BVI.  As such, it is inimical to the public interest of the BVI that these companies should continue as BVI companies under the control of the alleged wrongdoers. The Attorney General repeats her position that it is not necessary to prove in these public interest proceedings that the Companies are guilty of the matters alleged in the US Documents.

16. In relation to the ownership and control of the Companies:

16.1 The Companies membership and directorship information is set out in Schedule 2 to the 1st skeleton.  In summary, it is not disputed that these are all owned and/or controlled by Chen and his associates.

16.2 That fact is also evident from Mr Borelli's affidavit, sworn on behalf of the Campbells companies in opposition to the continuation of the appointment of the JPLs [**ref**].  As appears from that Affidavit, ownership and control by Chen is not disputed (and it is accepted that the "*ultimate beneficial owners of the [Companies] have been sanctioned by the US or UK or both"* (§16)).  It also appears that Chen's "*attorneys in fact*" continue to seek to take action on his behalf and in his interests (§13).  Indeed, even after the appointment of the JPLs, those attorneys were seeking to take steps to reconstitute the boards of the Companies so as to appoint Mr Borelli as sole director and 'Special Manager'.  Those steps were both a cause for concern, and also evidently not any form of acceptable substitute for Court appointed liquidators – see in that respect, §§59-62 of the 2nd skeleton argument.

17. The K&K companies deny that they are or have been part of the Prince Group.  That formal denial does not advance matters given that there plainly are links between the K&K companies and the criminal activities on which the application is based.

17.1 Their involvement in assisting in transfers of assets associated with the fraud is dealt with the US Complaint and is referred to above.  They have not been designated by

6

OFAC. However, the reason for including them in the application was set out at §§30-31 of the Attorney General's first Affidavit [**SAB/36**].

17.2 Moreover, the connections into the Prince Group, Chen and his associates appears from the matters dealt with in the Attorney General's second Affidavit at §§25-27 [**SAB/163-164**].

17.3 The statement at paragraph 45(a) of Smith 1 that Chen is the sole shareholder and director of Lateral Bridge is an obvious error given that at paragraph 6 of that same affidavit, she states that according to corporate records (which she exhibited), Minyi Tang was the sole shareholder and director of Lateral Bridge. She also states that Lateral Bridge is named in the US complaint and that co-conspirator 7 is alleged to be its director.

17.4 In relation to Amber Hill, the Attorney General states at paragraph 7 of Smith1 that Fan Yang was its sole shareholder and director and that in the US complaint, co-conspirator 6 is alleged to have been its director. However, at paragraph 46 (a) of Smith 1, she states that available records reveal that the Company is controlled by an associate and alleged co-conspirator of Chen. It is clear from the US complaint that the director of Amber Hill is alleged to be a co-conspirator of Chen which, if correct, would also provide a clear basis for him to be also characterised as an associate.

17.5 In any event, the Attorney General has shown that there is an association/connection between Amber Hill and the Prince Group at paragraph 27 of her second affidavit.

18. It is also to be noted that there is an absence of any form of substantive response from or on behalf of the Companies to the allegations made eg in the US Complaint. There is no evidence before the Court even seeking to maintain that some or all of the Companies were in fact legitimate businesses with no connections back to the criminal activities of Chen and his associates. That is no doubt in significant part because Chen appears currently to be in China; but also because, given the scale and nature of the alleged criminality and the laundering etc activities, on the present state of the information such a case would be difficult properly to mount. The fact remains that the JPLs are now able to access some information, and may well need to liaise and cooperate with other jurisdictions, in order to gain a more complete or accurate picture.

**Conclusion**

19. For all of the foregoing reasons, it is respectfully submitted that this is an appropriate case for the appointment of liquidators over the Companies and accordingly, for orders to be granted in terms of the drafts filed with the Originating Applications.

**Dated: April 14, 2026**

**Sir James Eadie KC**
**Paul B. Dennis, K.C.**
**Nadine Whyte Laing**
**Koya Ryan**
**O'NEAL WEBSTER**
**Legal Practitioners for the Applicant**

7

THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE

VIRGIN ISLANDS

COMMERCIAL DIVISION

**CLAIM NO BVIHC (COM) 2026/0027, CLAIM NO BVIHC (COM) 2026/0001, CLAIM NO BVIHC (COM) 2026/0002, CLAIM NO BVIHC (COM) 2026/0003, CLAIM NO BVIHC (COM) 2026/0004, CLAIM NO BVIHC (COM) 2026/0005, CLAIM NO BVIHC (COM) 2026/0006, CLAIM NO BVIHC (COM) 2026/0007, CLAIM NO BVIHC (COM) 2026/0008, CLAIM NO BVIHC (COM) 2026/0009, CLAIM NO BVIHC (COM) 2026/0010, CLAIM NO BVIHC (COM) 2026/0011, CLAIM NO BVIHC (COM) 2026/0012, CLAIM NO BVIHC (COM) 2026/0013, CLAIM NO BVIHC (COM) 2026/0014, CLAIM NO BVIHC (COM) 2026/0015, CLAIM NO BVIHC (COM) 2026/0016, CLAIM NO BVIHC (COM) 2026/0017, CLAIM NO BVIHC (COM) 2026/0018, CLAIM NO BVIHC (COM) 2026/0019, CLAIM NO BVIHC (COM) 2026/0020, CLAIM NO BVIHC (COM) 2026/0021, CLAIM NO BVIHC (COM) 2026/0022, CLAIM NO BVIHC (COM) 2026/0023, CLAIM NO BVIHC (COM) 2026/0024, CLAIM NO BVIHC (COM) 2026/0025, CLAIM NO BVIHC (COM) 2026/0026, CLAIM NO BVIHC (COM) 2026/0028, CLAIM NO BVIHC (COM) 2026/0029, CLAIM NO BVIHC (COM) 2026/0030**

**BETWEEN:**

**IN THE MATTER OF SURE TYCOON LIMITED AND TWENTY-NINE OTHER COMPANIES**

**AND IN THE MATTER OF THE INSOLVENCY ACT, 2003 OF THE LAWS OF THE VIRGIN ISLANDS**.

**THE ATTORNEY GENERAL**

**Applicant**

**-v-**

**SURE TYCOON LIMITED and TWENTY-NINE OTHER COMPANIES**

**Respondents**

---

**SKELETON ARGUMENT OF THE APPLICANT**
**(For the appointment of liquidators over the Respondents)**

---



Legal Practitioners for the Applicant
2nd Floor Commerce House
181 Main Street
P.O. Box 961, Road Town, Tortola
British Virgin Islands VG 1110
Tel: (284) 393 5800 l Fax: (284) 393 5805
www.onealwebster.com