## EXHIBIT A



**Case Number :BVIHCOM2026/0027**

IN THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE

BRITISH VIRGIN ISLANDS

COMMERCIAL DIVISION

**Submitted Date:06/01/2026 13:38**

**Filed Date:06/01/2026 13:39**

**Fees Paid:0.00**

CLAIM NO BVIHC (COM) 2026/0027, CLAIM NO BVIHC (COM) 2026/0001, CLAIM NO BVIHC (COM) 2026/0002, CLAIM NO BVIHC (COM) 2026/0003, CLAIM NO BVIHC (COM) 2026/0004, CLAIM NO BVIHC (COM) 2026/0005, CLAIM NO BVIHC (COM) 2026/0006, CLAIM NO BVIHC (COM) 2026/0007, CLAIM NO BVIHC (COM) 2026/0008, CLAIM NO BVIHC (COM) 2026/0009, CLAIM NO BVIHC (COM) 2026/0010, CLAIM NO BVIHC (COM) 2026/0011, CLAIM NO BVIHC (COM) 2026/0012, CLAIM NO BVIHC (COM) 2026/0013, CLAIM NO BVIHC (COM) 2026/0014, CLAIM NO BVIHC (COM) 2026/0015, CLAIM NO BVIHC (COM) 2026/0016, CLAIM NO BVIHC (COM) 2026/0017, CLAIM NO BVIHC (COM) 2026/0018, CLAIM NO BVIHC (COM) 2026/0019, CLAIM NO BVIHC (COM) 2026/0020, CLAIM NO BVIHC (COM) 2026/0021, CLAIM NO BVIHC (COM) 2026/0022, CLAIM NO BVIHC (COM) 2026/0023, CLAIM NO BVIHC (COM) 2026/0024, CLAIM NO BVIHC (COM) 2026/0025, CLAIM NO BVIHC (COM) 2026/0026, CLAIM NO BVIHC (COM) 2026/0028, CLAIM NO BVIHC (COM) 2026/0029, CLAIM NO BVIHC (COM) 2026/0030

BETWEEN:

IN THE MATTER OF SURE TYCOON LIMITED AND TWENTY-NINE OTHER COMPANIES

AND IN THE MATTER OF THE INSOLVENCY ACT, 2003 OF THE LAWS OF THE VIRGIN ISLANDS.

THE ATTORNEY GENERAL

**Applicant**

-v-

SURE TYCOON LIMITED and
TWENTY-NINE OTHER COMPANIES

**Respondents**

_____

**SKELETON ARGUMENT OF THE APPLICANT**
**(For the appointment of provisional liquidators over the Respondents)**
_____

**INTRODUCTION**

1.    These are submissions of the Applicant, the Attorney General in support of her thirty (30) applications pursuant to section 170 of the Insolvency Act 2003 ("**the Act**") to appoint joint provisional liquidators ("**JPL's**") over the respondents **("the Companies")** listed in schedule 1 to

this skeleton argument **("the JPL Applications")**.

2.      Unless expressly stated otherwise, the references below in the form *[HB/tab/page/paragraph]* and *[AB/tab/page/paragraph]* are references to the volume, tab, pages and/or paragraphs (as the case may be) of the Hearing Bundle, and the Authorities Bundle, respectively, both filed on January 6, 2025.

3.      The evidence in support of the JPL Applications is set out in the First Affidavits of Dawn J Smith filed on January 5, 2026.

**Suggested pre-reading**

4.      By way of pre-reading and if time permits, the Court is respectfully asked to review the following (estimated reading time up to three hours):

   a.    This skeleton argument and the attached schedules.

   b.    The Originating Application to appoint joint liquidators of Sure Tycoon Limited *[HB/6/436-449]*

   c.    The ordinary application to appoint provisional liquidator over Sure Tycoon Limited *[HB/2/7-17]*

   d.    Affidavit of Dawn J Smith filed in support of the originating application for the appointment of liquidators and for the appointment of joint liquidators over Sure Tycoon **("Smith1")** *[HB/3/18-27]*

5.      The originating applications to appoint liquidators over the Companies **("the Liquidation Applications"),** the JPL Applications, and the affidavits in support of those applications are similar and the differences are set out in schedule 2 to this skeleton argument.

6.      The Attorney General commenced these proceedings by filing the Liquidation Applications on January 5, 2026.  In the Liquidation Applications, she seeks the appointment of Mr. James Drury, a BVI licensed insolvency practitioner, and Mr. Paul Pretlove and Mr. David Standish, both eligible overseas insolvency practitioners, as the joint liquidators of the Companies on the bases that it is in the public interest and just and equitable that liquidators be appointed *[HB/6/436-437]*.

**BACKGROUND**

7.      The background is comprehensively set out in Smith 1 and is summarized in the following paragraphs.

**The parties**

8.      The Attorney General is the principal legal adviser to the Government of the Virgin Islands **("the Government")** pursuant to section 58 of the Virgin Islands Constitution Order, 2007 and has overall responsibility for all aspects of civil litigation on behalf of the Government *[HB/3/19/4]*.

9.      The Companies were incorporated under the laws of the BVI. Their registered office is located at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, BVI, VG1110 *[HB/4/263-264]*.

10.     Vistra filed its intention to resign as registered agent for a number of the Companies (see schedule 2) in October and November, 2025 *[HB/4/301]*.  Amber Hill Ventures Limited **("Amber Hill")** was dissolved on 10 November 2023, and an application will be filed for its restoration.

11.     The Companies are alleged to be members of a transnational criminal organization that is headed by the Prince Group **("the Prince Group")** which is a Cambodian corporate conglomerate that includes companies incorporated in the Virgin Islands **("BVI")**, the Cayman Islands, Singapore, Hong Kong, and Taiwan *[HB/4/40, 41, 42, 70/15 & 135-136]*.  Chen Zhi, **("Chen")** is alleged to be the chairman of the Prince Group *[HB/4/41, 42/1 & 137]*.

12.     According to corporate records, Chen is the sole shareholder and sole director of a number of the Companies.  In some of the Companies, he is the director and beneficial owner and in others, his associates and co-conspirators are their shareholders and directors *[HB/4/288 – 289]*. The membership and directorship information of each company is set out in the attached schedule 2.

**Actions taken in the US and UK against the Prince Group**

13.     On October 14, 2025, the United States Department of Justice **("US DOJ"),** the United States Department of the Treasury's Office of Foreign Assets Control **("OFAC")** and the United Kingdom Government announced coordinated actions targeting Chen and the Prince Group *[HB/4/135]*.

3

*Action taken in the US*

14.    The US DOJ announced that Chen had been indicted in the United States District Court for the Eastern District of New York **("the NY District Court")** on charges of conspiracy to commit wire fraud and conspiracy to commit money laundering **("the US Indictment")** *[HB/4/42-66]*. Concurrently, the US DOJ filed a civil forfeiture complaint **("the US Complaint")** seeking forfeiture of approximately 127,271 Bitcoin (valued at approximately US$15 billion) allegedly representing proceeds traceable to criminal activity associated with Chen and the Prince Group *[HB/4/67-134]*. The criminal and civil proceedings will together be referred to as **"the US Proceedings***".

15.    The OFAC issued a press release in which it stated that it had imposed sweeping sanctions on 146 targets within the Prince Group *[HB/4/135-143 at 135]*. It designated the Prince Group as a transnational criminal organization *[HB/4/135 & 137]*. The effect of this designation is that all properties and interests in property of the targets that are in the United States are "blocked" and U.S. persons are, in effect, prohibited from dealing with them *[HB/4/142-143]*. The targets include the Companies with the exception of Amber Hill and Lateral Bridge Global Limited **("LBG")** *[HB/4/145-159]*. Amber Hill and Lateral Bridge are however included in the US Complaint as relevant entities and co-conspirators 6 and 7 are alleged to have been their directors *[HB/4/73]*.

16.    In addition, the OFAC identified a network of 117 entities and individuals which were designated as part of the Prince Group's transnational criminal enterprise *[HB/4/137]*. These entities are mainly companies in multiple jurisdictions which are owned or controlled by, or purport to act for or on behalf of, members of the Prince Group, which are engaged in no apparent real commercial or business activity. The OFAC issued a list of these entities and individuals *[HB/4/162-167]*. A number of the Companies are on this list.

*Action taken in the UK*

17.    On 14 October 2025, the United Kingdom Government also imposed sanctions on Chen and the Prince Group *[HB/4/169-171]*. In doing so, it noted that Chen and his associates have incorporated companies in the BVI that own properties in London, including a £12 million mansion on Avenue Road in North London, a £100 million office building on Fenchurch Street in the City of London, and seventeen flats on New Oxford Street and in Nine Elms in South London *[HB/4/169]*.

4

Copies of the property registers for these properties are at pages 172-173 & 174-178 of the Hearing Bundle.  The registered owner of the Avenue Road property is Chen and the lessee of the French Street property is Noble Title Limited, a respondent in these proceedings *[HB/4/172 & 176].*

18.    The effect of these sanctions is to prevent the transfer of these properties, freeze any business in which Chen and the Prince Group are involved and lock Chen and the Prince Group transnational criminal network out of the UK's financial system *[HB/4/169].*

**BVI implementation of sanctions**

19.    The BVI implements all international sanctions that the UK extends through Orders in Council **(OIC).** Following the sanction imposed by the UK on Chen and the prince Group, on October 15, 2025, the BVI Financial Services Commission **("the FSC")** issued Sanctions Circular No 100 of 2025 **("the Sanction Notice")** which, among other things:

   a.    stated that Chen and Prince Global Group Limited had been added to the Consolidated List;

   b.    included a reminder as to what actions businesses and individuals must take in relation to the Sanctions Notice; and

   c.    emphasized that failure to comply with financial sanctions legislation and seeking to circumvent its provisions constitute a criminal offence *[HB/4/409-417].*

20.    While there is no legislative basis for US/OFAC Sanctions to apply in the BVI, US sanctions involving BVI companies have reputational implications for the BVI. They may also have extra-territorial effect, for example, on financial institutions that participate in certain transactions that involve sanctioned countries, and any party, either foreign or domestic, that provides goods or services to any Specially Designated Nationals (SDN) listed on the OFAC list.

**Action taken in other jurisdictions**

21.    News reports reveal that Singapore, Hong Kong, Taiwan and Thailand have also taken the following significant actions against Chen, the Prince Group, and its related entities and companies:

5

a.   On 31 October, 2025, Singapore police announced that they had seized over S$150 million (approximately US$115 million) in assets linked to the Prince Group *[HB/4/180]*. The seized assets include six properties, bank accounts, securities accounts, and cash which are said to represent the proceeds of money laundering and forgery offences committed by Chen and the Prince Group *[HB/4/180 & 186-187]*.

b.   On 4 November, 2025, Hong Kong authorities announced that they had frozen assets worth HK$2.75 billion (approximately US$354 million) which are suspected to represent proceeds of international cross-border telecommunications fraud and money laundering activities committed by the Prince Group.  At least 18 Hong Kong companies were blacklisted by the US in connection with the Prince Group, including two publicly listed companies *[HB/4/192]*.

c.   On 4 November 2025, Taiwanese prosecutors announced that they had detained 25 individuals and seized T$4.5 billion (approximately US$147 million) in assets tied to the Prince Group. The seized assets include 26 high-end cars, properties and bank accounts tied to the organization and to Chen in relation to money laundering and forced labour offences *[HB/4/193].*

d.   On 3 December 2025, the Thai authorities announced that they had seized assets worth more than 10,157 million baht (approximately US$318 million) and issued arrest warrants for 42 individuals linked to transnational online scam operations connected to Chen and Cambodian nationals Kok An and Yim Leak. As of 3 December, 2025, twenty-nine (29) individuals had been arrested Thailand's Anti-Money Laundering Office stated that investigators had found "*information on networks of online fraud, human trafficking, and money-laundering*" that were linked to Chen and his associates*[HB/4/208-209]*.

22.   These additional actions demonstrate the widespread international concern regarding the alleged criminal activities of the Prince Group and the global response to combat the transnational organized crime in which the Companies are said to be involved.

**Allegations against Chen and the Prince Group**

23.   According to the US Indictment, the US Complaint and the OFAC's press release, the Prince Group is alleged to have been engaged in several fraudulent schemes including cryptocurrency investment fraud, human trafficking, money laundering, wire fraud, bank fraud, forced labour,

illegal online gambling and "pig butchering" which involved the scamming of unsuspecting individuals around the world *[99]*.  The scams involved cultivating - sometimes over the course of many months - elaborate relationships with victims, gaining their trust and confidence and then inducing them to "invest" funds in fraudulent investment platforms that were ultimately controlled by scammers.  The scammers thereafter disappeared after taking every dollar they could from their victims *[HB/4/74 & 138]*.

24.   It is alleged further that Chen has operated forced-labour scam compounds in Cambodia. These compounds are described as surrounded by high walls and barbed wire, effectively operating as violent forced-labour camps. Workers who resist are allegedly subjected to severe physical abuse and torture. The workers at these compounds, many of whom were trafficked there, were forced to conduct the fraud schemes *[HB/4/49, 79 & 169-170]*.

25.   The US Indictment alleges that Chen maintained meticulous records of the compounds' operations, including ledgers tracking profits generated from the fraud schemes, documents detailing "phone farms" used in the schemes, and images depicting methods of beating and torture used against workers  *[HB/4/53, 80 & 123-124]*.

26.   The US DOJ alleges that the schemes carried out by the Prince Group resulted in billions of dollars in losses incurred by victims in the United States and around the world. The documents filed in the US Proceedings allege that proceeds from these criminal activities have been laundered through various means, including cryptocurrency (using "spraying" and "funneling" techniques), online gambling operations, and cryptocurrency mining operations *[20 & 88]*. Chen, his associates and companies within the Prince Group, "washed" and returned the fraudulent proceeds to the Prince Group. The "washing" was done by using the Prince Group's vast network of seemingly legitimate business enterprises to launder its criminal proceeds. One common method was to collect the fraudulent proceeds in the form of bitcoin or stablecoins and then off-ramp them into conventional currencies, for example, the US dollar *[HB/4/ 57 & 125]*. The launderers then used that cash to purchase clean bitcoin or other cryptocurrencies. Chen was directly involved in coordinating these laundering efforts *[HB/4/57 & 75]*.

27.   It is further alleged in the US Proceedings that Chen and his associates subsequently used the fraudulent proceeds to fund luxury travel and entertainment and to make extravagant purchases

7

such as watches, yachts, private jets, vacation homes, high-end collectibles and rare artwork, including a Picasso painting *[HB/4/ 57 & 85]*.

**Allegations against the Companies**

28.     The OFAC has determined that the Companies form part of a complex network of companies which were used by Chen and the Prince Group to conceal, hold, transfer, and launder proceeds derived from their alleged criminal activities including forced labour, human trafficking, fraud, and other serious criminal conduct *[HB/4/144 & 147159]*.

29.     In the US Complaint, the US DOJ alleged that Chen and his associates also laundered fraudulent proceeds through several companies including companies in the BVI which are under their control *[HB/4/85]*.  It alleged further that these companies do not serve any real purpose other than to launder funds.

30.     The US Complaint discloses that personnel from the Federal Bureau of Investigation ("FBI") have conducted extensive blockchain tracing to analyze the movements of the Prince Group's cryptocurrency. The tracing revealed that approximately 92,983.43 Bitcoin of the 127,271 Bitcoin which the US DOJ seeks to forfeit flowed through wallets which were controlled by Amber Hill, LBG and Future Technology Investment, an entity incorporated in the Cayman Islands *[HB/4/90-101]*.

31.     It is also alleged that Amber Hill had a banking relationship with a financial institution in the United States. It was recorded in the account opening documents with that financial institution that Amber Hill's anticipated deposit and withdrawal activity would amount to approximately $2 million each.  However, according to account statements, in February 2020, Amber Hill's account with that financial institution had approximately $22.5 million in deposits and $21.8 million in withdrawals *[HB/4/86]*.

**THE LAW**

32.     Section 170 of the Act provides that *[AB/1/9 & AB/2/24/7]*:

> *"(1) Where an application for the appointment of a liquidator of a company has been filed but not yet determined or withdrawn, the Court may, on application by a person specified*

8

*in subsection (2), appoint the Official Receiver or an eligible insolvency practitioner as provisional liquidator of the company on the grounds specified in subsection (4)."*

*(2) Subject to subsection (3), an application under subsection (1) may be made by one or more of the following:*

*(a) the applicant for the appointment of a liquidator;*

*(b) …*

*(h) the Attorney General"*

33. The Court therefore has jurisdiction to appoint a provisional liquidator where an application for a liquidation is pending before it - **Jin Yao Holdings Ltd v Forever Winner International Ltd and Another[1] *[AB/3/53/84]*.**

34. The Court must be satisfied that an applicant for the appointment of provisional liquidator has at least a good prima facie case that the application for appointment of liquidator will succeed and liquidators will be appointed.  See **Re Highfield Commodities Ltd[2] *[AB/4/66/d-e]***. At this interlocutory stage the applicant does not have to prove his case on a balance of probabilities – that is a matter for the trial judge - **RGB Resources PLC[3]**; *[AB/5/81/21]*.

35. The relevant grounds for appointing provisional liquidators pursuant to section 170(4) are set out as follows *[AB/1/9-10]*

*(b)  "the Court is satisfied that the appointment of a provisional liquidator—*
*(i)    is necessary for the purpose of maintaining the value of assets owned or managed by the company; or*
*(ii)   is in the public interest."*

36. In **KMG International NV v DP Holding SA[4]** Nelson JA (Ag) set out with approval the following passage from Harman J in **Re a company (No. 003102 of 1991) ex parte Nyckeln Finance Co. Ltd** in in relation to what is sufficient to justify the appointment of a provisional liquidator pursuant to section 170(4)(i) *[AB/6/107/62]*:

*"It is not a dissipation in the Mareva sense of simply deliberately making away with the*

---

[1] Claim No. BVIHC(COM) 0641 of 2024, judgment delivered on May 14, 2025
[2] [1984] 3 All ER 886 at 892 d-e
[3] BVI Civil Appeal No 6 of 2003,
[4] BVIHCMAP2017/0013, judgment delivered on May 3, 2018

*assets but any serious risk that the assets may not continue to be available to the company."*

37. Nelson JA explained at paragraphs 64 and 65 of the judgment that *[AB/6/108]* :

> *"Indeed, section 170(4) of the Act gives the court power to appoint a provisional liquidator where such appointment is necessary for the purpose of preserving the value of the assets owned or managed by the company sought to be put in liquidation. On the facts of this case, it was not necessary to prove asset stripping. It was enough to show a need to preserve the value of the DPH assets pending the liquidation if ordered.*
> *In the result, we uphold the learned judge's finding that there was no reliance on the DPH documents said to have been stolen. The judge properly relied on the public documents and information advanced by the appellant, not so much as evidence of asset-stripping, but as evidence of the ease and rapidity with which assets within the DPH group could be moved from jurisdiction to jurisdiction. In light of DPH's continued opposition to the claim during the arbitration proceedings resulting in a partial final award that has not been challenged in the Netherlands and its resistance to its enforcement in the Netherlands and Switzerland, the learned judge was justified in making an order for appointment of joint provisional liquidators."*

38. The Court is empowered under section 170 (5) to appoint a provisional liquidator "*on such terms as it considers fit*" and may "*as a condition precedent to the appointment, require the applicant to deposit at Court, or otherwise secure to the satisfaction of the Court, such sum as the Court considers reasonable to cover the remuneration of the provisional liquidator.*" *[AB/1/10]*.

39. Once a provisional liquidator is appointed, section 171 of the Insolvency Act provides that he/she has "*the rights and powers of a liquidator to the extent necessary to maintain the value of the assets owned or managed*" *[AB/1/10]*.

**STANDING**

40. The Applicant has standing to apply for the appointment of provisional liquidators, as she is a person listed in section 170(2) paragraphs (a) and (h).

10

**THE LIQUIDATION APPLICATIONS**

41.     The Applicant applies to appoint liquidators over the Sanctioned BVI Companies pursuant to section 162 of the Act, which provides that: *[AB/1/5]*.

> *"(1)     The Court may, on application by a person specified in subsection (2), appoint a liquidator of a company under section 159(1) if—*
> > *(a)     the company is insolvent;*
> > *(b)     the Court is of the opinion that it is just and equitable that a liquidator should be appointed; or*
> > *(c)     the Court is of the opinion that it is in the public interest for a liquidator to be appointed."*

42.     The Attorney General has set out in the Liquidation Applications that she is entitled to apply for the appointment of liquidators of the Companies on the grounds that (i) it is just and equitable that liquidators be appointed and (ii) it is in the public interest for liquidators to be appointed *[section 162(2) at AB/1/5]*.

**Just and equitable ground**

43.     For the reasons set out in Smith 1 and summarized in paragraphs 8-31 above, it is submitted that the evidence discloses, at least on a prima facie basis, that it is just and equitable for the Court to appoint liquidators of the Companies and that the Liquidation Applications will most probably succeed on this ground.

44.     Chen is alleged to be the mastermind of the Prince Group which has been designated by OFAC as a transnational criminal organization which is allegedly responsible for horrific criminal activities, to include forced labour, human trafficking, large-scale fraud, and money laundering on a massive international scale. Chen has been criminally indicted in the United States and is subject to personal sanctions by both the United States and the United Kingdom.

45.     The Companies (excluding Amber Hill and LBG) have been specifically designated as being a part of the Prince Group and are sanctioned by the United States.  In the US Complaint it was alleged that 127,271 Bitcoin which represents the proceeds of the fraudulent activities of the Prince Group and which the US DOJ seeks to forfeit flowed through wallets controlled by Amber Hill and LBG.

11

46.     The Companies are owned and controlled by Chen and/or his associates and co-conspirators. Despite the actions taken in multiple jurisdictions, the Companies continue to be under their control and based on the allegations are free to be used by them (i) to continue to facilitate their criminal and fraudulent activities and (ii) to launder, hold, and conceal the proceeds of such activities.

47.     The affairs of the Company require urgent investigation by independent professionals to determine the full extent of the fraudulent activities, identify, secure, protect and trace assets held by or on its behalf for the benefit of the victims of the fraud; and to identify potential claims against third parties.

48.     Independent liquidators are necessary to ensure proper coordination with regulatory and enforcement authorities and liquidators, trustees, or receivers appointed in the Virgin Islands and other jurisdictions, given the multi-jurisdictional nature of the scheme. Independent liquidators would also enable the Company to participate in cross-border asset recovery efforts and ensure that any recovered assets are properly distributed.

49.     Given its scale and complexity and the international and horrific nature of the fraudulent scheme, it is manifestly just and equitable that the Company should be placed into liquidation to ensure that its affairs are properly investigated and wound up under the supervision of this Honourable Court.

**Public Interest ground**

50.     The Attorney General is permitted by section 162 (4) of the Act to apply for the appointment of liquidators of a company on the public interest ground.

51.     The relevant principles to be applied on an application to appoint liquidators on the ground of public interest were summarized by Norris J **in In re PAG Management Service Ltd**[2015] BCC 720 and cited with approval by Asplin LJ in **Secretary of State v Celtic Consultancy & Enterprises Ltd and others[5] *[AB/7/123/39]***.  The principles are:

        a.      Even if an applicant thinks it expedient in the public interest to wind up a company, the

---

[5] [2020] EWCA Civ 1017

court still has a discretion whether or not to make an order.

b. Before making an order the court must be satisfied that it is just and equitable to wind the company up and that burden lies on the applicant.

c. The court must balance competing reasons why the company should be wound up and why it should not be wound up upon a consideration of the totality of the evidence.

d. As a result of undertaking that exercise the court must be able to identify for itself the aspects of the public interest which would be promoted by making a winding up order in the particular case.

e. It is not necessary for the business of the company to involve illegality.

f. Where the business of the company does not involve the commission of illegal acts or breaches of regulatory requirements the company may nonetheless be wound up if its business is "inherently objectionable" because its activities are contrary to a clearly identified public interest.

g. Such conduct is sometimes described as disclosing 'a lack of commercial probity', and whilst this frequently might involve preying on the public and inducing individual members of the public to participate in transactions which are without benefit to them, it can also involve prejudice to the public generally (for example by casting burdens on the general body of tax payers).

h. However in making the judgment whether a business is inherently objectionable 'the court has to be careful of being 'priggish'. Concepts such as 'inherent objectionability' or 'want of commercial probity' are bound to have some moral content, though that content is not the subjective moral perception of the individual judge, but must be informed by any discernible policy of the law and guided by the view of other judges in other cases.

i. To wind up an active and solvent company is a serious step, and the court must be satisfied that reasons of sufficient weight have been advanced to justify taking that course.

52. Those principles clearly apply in this case.

53. The BVI, as a leading international finance centre, has a fundamental public interest in protecting its reputation and preventing its corporate vehicles from being used for or to facilitate criminal conduct, including forced labour, human trafficking, large-scale fraud, and money laundering.

13

54. The Companies are alleged to have been used as vehicles in what has been described by international law enforcement authorities as one of the largest fraudulent investment schemes in recent history. These criminal and fraudulent activities are inherently objectionable and are contrary to the public interest of the Territory.

55. The use of the Companies in such a large-scale international fraudulent scheme causes significant reputational harm to the BVI as a financial centre and threatens confidence in BVI incorporated companies and the BVI's regulatory framework.

56. The appointment of liquidators aligns with the BVI's commitment to taking appropriate and decisive action when BVI companies are used for fraudulent purposes.

57. The appointment of liquidators will:

   a) facilitate cooperation with enforcement authorities, regulators, and insolvency practitioners in the BVI and other jurisdictions, demonstrating the BVI's commitment to international cooperation in combating financial fraud;

   b) ensure that the Companies' affairs are properly investigated and that appropriate steps are taken to recover assets and maximise returns to defrauded investors;

   c) enable a proper investigation into how the Companies were used in the fraudulent scheme, which may assist in preventing similar schemes in the future.

58. Given that enforcement authorities in at least six countries have taken action and frozen or seized assets valued at over US$16 billion, it is in the public interest that the BVI, as the jurisdiction of incorporation of the Companies, takes prompt and decisive action through the appointment of liquidators.

59. In all the circumstances, it is not only just and equitable but also in the public interest that Joint liquidators be appointed over the Companies to prevent them from being used to further Chen's and the Prince Group's criminal enterprise.

60. Based on the foregoing, it is abundantly clear that there is a good prima facie case that the Liquidation Applications will succeed on both the just and equitable and public interest grounds and that liquidators will be appointed over the Companies.

14

**THE JPL APPLICATIONS**

**Proceeding ex parte /Urgency**

61.     It is essential that joint provisional liquidators be appointed on an urgent basis to take immediate control of the Companies because:

   a.     The enforcement actions which have been taken in other jurisdictions have no doubt put Chen and his associates, who are alleged to be sophisticated criminals, on notice of the scrutiny being placed on the Prince Group network and its corporate structures.

   b.     The Companies are likely to have received proceeds of the criminal and fraudulent activities and to have documentation that may assist in recovering the proceeds of the crime.

   c.     There is a real and substantial risk that, absent the immediate appointment of provisional liquidators, assets held by or through the Companies, will be transferred, concealed, or dissipated, and documents will be destroyed or concealed.

   d.     This real and substantial risk will increase once the Companies are served with the originating applications.

   e.     The appointment of provisional liquidators will immediately remove control from Chen and his associates and place the Companies under the supervision and control of officers of this Court, thereby protecting the integrity of any investigation and preserving assets for the benefit of the victims of Chen and the Prince Group's fraudulent and criminal activities.

**The need for the appointment of joint provisional liquidators**

62.     It is essential that joint provisional liquidators be appointed over the Companies immediately (without notice to it and its principals) and before the originating application is heard and determined for the following reasons:

   a.     The Companies continue to be under the control of Chen and his associates/coconspirators and as a result, they can use or continue to use them to further their criminal enterprise, thereby continuing to inflict public harm.

   b.     Given the serious allegations set out in Smith 1, the sanctions imposed by the United States and the UK Government, the US Indictment and the US Complaint, it is appropriate

15

and necessary that provisional liquidators be appointed immediately to:

(i)      take full control of the Companies;

(ii)     identify and preserve its assets that may represent proceeds of crime by preventing further movement, concealment, or dissipation of those assets;

(iii)    maintain the value of the Companies' assets;

(iv)    take control of its books and records;

(v)     conduct thorough investigations into its past transactions; and

(vi)    review banking records, asset transfers, and corporate dealings to identify and locate the potential money laundering activities.

c.    The information and evidence gathered by the liquidators may provide crucial support for law enforcement authorities, both in the BVI and internationally, to apply for freezing orders, forfeiture orders, and other remedies. In this case, given that the United States has already filed the US Complaint seeking forfeiture of 127,271 Bitcoin valued at approximately US$15 billion allegedly connected to the Prince Group's criminal activities, the work of the liquidators could materially assist in tracing assets and preserving evidence relevant to that and other enforcement actions.

d.    The appointment of provisional liquidators over the Companies align with the BVI's National AML/CFT Policy and its commitment to international cooperation and combating serious transnational crime *[HB/3/26-27/32- 38]*.

e.    The coordinated enforcement actions taken by the US DOJ and UK Government on 14 October, 2025 signal the seriousness with which these major jurisdictions view the alleged criminal activities of the Prince Group.

f.    The appointment of provisional liquidators by this Honourable Court will demonstrate that the BVI is equally committed to ensuring that its corporate structures are not used as vehicles for serious criminality and would facilitate cooperation with international authorities in their ongoing investigations and asset recovery efforts.

**THE PROPOSED LIQUIDATORS**

63.    The proposed joint provisional liquidators are Mr. James Drury of Interpath (BVI) Limited, PO Box 4571, 4th Floor, LM Business Centre, Fish Lock Road, Road Town, Tortola, British Virgin Islands, VG1110, Mr. Paul Pretlove and Mr. David Standish, both of Interpath Ltd, 10 Fleet Place, London EC4M 7RB.  Mr Pretlove and Mr. Standish are eligible overseas insolvency practitioners who

16

obtained the necessary approval from the Financial Services Commission *[HB/4/302-313 at 312 and 313]*. All three proposed insolvency practitioners are fit and proper persons to be so appointed. They have all consented to accept appointments as joint provisional liquidators and joint liquidators of the Companies *[HB/4/295-300]*

**FULL AND FRANK DISCLOSURE**

64.    The principles to be applied by the Court pertaining to the duty of full and frank disclosure and fair presentation apply to an ex parte application to appoint provisional liquidators. The Applicant must therefore make full and frank disclosure of all material facts and matters known to it, including matters not known but which could have been discovered on reasonable enquiry.[6] In compliance with that duty the Applicant makes the points set out below.

65.    The Companies may say there is no real urgency justifying the ex parte applications and the Companies and other stakeholders are adequately protected by the enforcement actions in other jurisdictions, details of which are set out in paragraphs 13 to 20 above. However, the Companies continue to be under the control of Chen and his associates/co-conspirators and can continue to participate in or facilitate the various criminal and fraudulent activities that have been alleged against them. As shown at paragraphs 46, 47, 61 and 62 (a) and (b) above, the Attorney General disputes that there is sufficient protection in place.

66.    The Companies may object to the applications to appoint joint provisional liquidators on the ground that the applications are based solely on news reports and on allegations made in the US Proceedings which Chen, his associates and related companies intend to defend on the grounds set out at paragraph 70 of Smith 1 *[HB/3/36 & HB/4/258-261]*.

67.    However, as shown above, the US DOJ initiated the US Proceedings and the OFAC sanctioned Chen, his associates and companies within the Prince Group. The steps taken by the US DOJ and the OFAC could not have been taken lightly or done hurriedly, without the benefit of proper investigation. Further:

   a.    The US DOJ has shown a link between the Bitcoins and companies, including Amber Hill and LBG, which are owned and controlled by Chen's co-conspirators.

_____

[6] **Brink's Mat Ltd v Elcombe and others** [1988] 1 WLR 1350 *[AB/7/104/51]*

17

b.    The OFAC correctly found that the Companies are owned and controlled by Chen and/or his associates/co-conspirators.

c.    The UK has also sanctioned Chen and the Prince Group and in so doing, must have carried out its own investigations.

68.    The chances of the steps taken in the US Proceedings being proven erroneous and/or unjustified are remote.

**NO UNDERTAKING IN DAMAGES**

69.    For the reasons set out at paragraph 61 above the JPL Applications are made ex parte.  The JPL Applications are made in large part on the ground of public interest in the proper exercise of the Attorney General's statutory duty to protect the reputation of the BVI and to prevent its corporate vehicles from being used to participate in or facilitate criminal conduct, and also to preserve the assets of the Companies for the benefit of the stakeholders. The Attorney General is not asserting a proprietary interest in the assets of the Companies.  On the authority of **Re Highfield Commodities Ltd**[7] and general principles of fairness, balance and public policy, the Court is being asked to not require her to post an undertaking in damages.

**CONCLUSION**

70.    In the circumstances, it is just and equitable and in the public interest to grant the orders appointing the joint provisional liquidators over the Companies without notice, until the Liquidation Applications are heard and determined.

**Dated: January 6, 2026**

**Paul B. Dennis, K.C.**
**Nadine Whyte Laing**
**Koya Ryan**
**O'NEAL WEBSTER**
**Legal Practitioners for the Applicant**

---

[7] Supra note 0000

**SCHEDULE 1**

| No. | Name of Company |
| --- | --- |
| 1. | Amber Hill Ventures Limited |
| 2. | Auspicious Tycoon Limited |
| 3. | Bright Team Global Limited |
| 4. | Delightful Thrive Limited |
| 5. | Even Sincerity Limited |
| 6. | Fulam Investment Limited |
| 7. | Giant Victory Holdings Limited |
| 8. | Golden Ascend International Limited |
| 9. | Harmonic State Limited |
| 10. | Jumbo High Limited |
| 11. | Lateral Bridge Global Limited |
| 12. | Luminous Glow Limited |
| 13. | Mighty Divine Limited |
| 14. | Noble Title Limited |
| 15. | Oriental Charm Holdings Investment Limited |
| 16. | Pacific Charm Holdings Investment Limited |
| 17. | Praise Marble Limited |
| 18. | Prince Global Group Limited |
| 19. | Prince Global Holdings Limited |
| 20. | Respectful Steed Limited |
| 21. | Retain Prosper Limited |
| 22. | Robust Harmony Limited |
| 23. | Simply Advanced Limited |
| 24. | Southern Heritage Limited |
| 25. | Star Merit Global Limited |
| 26. | Starry Bloom Limited |
| 27. | Sure Tycoon Limited |
| 28. | Sword River Limited |
| 29. | Towards Sunshine Limited |
| 30. | United Riches Global Limited |

**<u>SCHEDULE 2</u>**

| No. | Name of Company | Date of incorporation | Director | Shareholder | Status | Notice of intention to resign |
|---|---|---|---|---|---|---|
| 1. | **Amber Hill Ventures Limited** | 3 January, 2018 | Fan Yang - In the US Complaint, co-conspirator 6 is alleged to have been the director of this company | Fan Yang | Dissolved on 10 November 2023 for non-payment of fees | N/A |
| 2. | **Auspicious Tycoon Limited** | 3 July 2018 | Chen Zhi | Chen Zhi | In penalty | Filed on 17 November, 2025 |
| 3. | **Bright Team Global Limited** | 3 July 2018 | Zhou Yunis (Chen Zhi's financial assistant and wealth manager) | Zhou Yunis | In penalty | Filed on 17 November, 2025 |
| 4. | **Delightful Thrive Limited** | 11 September 2018 | Chen Zhi | Chen Zhi | In penalty | Filed on 17 November, 2025 |
| 5. | **Even Sincerity Limited** | 13 February 2018 | Chen Zhi | Prince Global Group Limited. Its sole shareholder is Chen Zhi | In penalty for not filing its beneficial ownership information | Filed on 17 November, 2025 |
| 6. | **Fulam Investment Limited** | 24 July 2009 | Haoran Sheng | Ample Luck Investment Limited. Its sole shareholder is Chen Zhi | In penalty | Filed on 17 November, 2025 |
| 7. | **Giant Victory Holdings Limited** | 1 December 2016 | Chen Zhi | Deluxe Heaven Limited. Its sole shareholder is Chen Zhi | In Penalty | Filed on 17 November, 2025 |
| 8. | **Golden Ascend International Limited** | 18 April 2018 | Xia Zeng | Chen Zhi | Active | N/A |
| 9. | **Harmonic State Limited** | 21 January 2020 | Chen Zhi, Zhou Yun (Chen Zhi's financial assistant and wealth manager) and Wu An Ming | Chen Zhi | Active | N/A |
| 10. | **Jumbo High Limited** | 4 July 2018 | Fu Chao | Fu Chao, Li Hongchun and Delightful Thrive Limited. Its sole shareholder is Chen Zhi. | In penalty | Filed on 17 November, 2025 |

**SCHEDULE 2**

| | | | | | | |
|---|---|---|---|---|---|---|
| 11. | **Lateral Bridge Global Limited** | 21 January 2020 | Minyi TANG  - In the US Complaint, co-conspirator 7 is alleged to have been the director of this company | Minyi TANG | Active | N/A |
| 12. | **Luminous Glow Limited** | 11 September 2018 | Chen Zhi | Chen Zhi | Active | Filed on 28 October, 2025 |
| 13. | **Mighty Divine Limited** | 20 November 2017 | Zhou Yun (Chen Zhi's Financial Assistant and Wealth Manager) | Zhou Yun | Active | N/A |
| 14. | **Noble Title Limited** | 12 October 2016 | Seng Haoran | Retain Prosper Limited. Its sole shareholder is Chen Zhi. | In penalty | Filed on 17 November, 2025 |
| 15. | **Oriental Charm Holdings Investment Limited** | 26 April 2018 | Li Caiyun | Chen Zhi | Active | N/A |
| 16. | **Pacific Charm Holdings Investment Limited** | 26 April 2018 | Chen Zhi | Chen Zhi | Active | N/A |
| 17. | **Praise Marble Limited** | 12 January 2016 | Garrison Hui Sai Kwong | Geotech Holdings Ltd **("Geotech")** is the Company's sole Shareholder. Chen Zhi is Geotech's Chairman. | Active | N/A |
| 18. | **Prince Global Group Limited** | 3 August 2018 | Chen Zhi | Chen Zhi | In penalty | Filed on 17 November, 2025 |
| 19. | **Prince Global Holdings Limited** | 3 August 2018 | Chen Zhi | Chen Zhi | In penalty | N/A |
| 20. | **Respectful Steed Limited** | 2 March 2018 | Chen Zhi | Prince Group Holdings Limited. Its sole shareholder is Chen Zhi. | Active | N/A |
| 21. | **Retain Prosper Limited** | 26 September 2019 | Sheng Haoran | Chen Zhi. | In penalty | Filed on 17 November, 2025 |

**<u>SCHEDULE 2</u>**

| 22. | **Robust Harmony Limited** | 22 February 2018 | Chen Zhi | Prince Group Holdings Limited. Its sole shareholder is Chen Zhi. | Active | N/A |
|---|---|---|---|---|---|---|
| 23. | **Simply Advanced Limited** | 23 April 2020 | Chen Zhi | Chen Zhi | Active | N/A |
| 24. | **Southern Heritage Limited** | 23 April 2020 | Chen Zhi | Chen Zhi | Active | N/A |
| 25. | **Star Merit Global Limited** | 3 July 2018 | Chen Zhi | Chen Zhi | In penalty | Filed on 17 November, 2025 |
| 26. | **Starry Bloom Limited** | 22 April 2020 | Chen Zhi | Chen Zhi | Active | N/A |
| 27. | **Sure Tycoon Limited** | 21 January 2020 | Chen Zhi | Chen Zhi | Active | N/A |
| 28. | **Sword River Limited** | 21 January 2020 | Chen Zhi | Prince Group Holdings Limited. Its sole shareholder is Chen Zhi. | Active | N/A |
| 29. | **Towards Sunshine Limited** | 8 February 2018 | Chen Zhi | Prince Group Holdings Limited. Its sole shareholder is Chen Zhi. | Active | N/A |
| 30. | **United Riches Global Limited** | 3 July 2018 | Chen Zhi | Chen Zhi | In penalty | Filed on 17 November, 2025 |

THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE

VIRGIN ISLANDS

COMMERCIAL DIVISION

**CLAIM NO BVIHC (COM) 2026/0027, CLAIM NO BVIHC (COM) 2026/0001, CLAIM NO BVIHC (COM) 2026/0002, CLAIM NO BVIHC (COM) 2026/0003, CLAIM NO BVIHC (COM) 2026/0004, CLAIM NO BVIHC (COM) 2026/0005, CLAIM NO BVIHC (COM) 2026/0006, CLAIM NO BVIHC (COM) 2026/0007, CLAIM NO BVIHC (COM) 2026/0008, CLAIM NO BVIHC (COM) 2026/0009, CLAIM NO BVIHC (COM) 2026/0010, CLAIM NO BVIHC (COM) 2026/0011, CLAIM NO BVIHC (COM) 2026/0012, CLAIM NO BVIHC (COM) 2026/0013, CLAIM NO BVIHC (COM) 2026/0014, CLAIM NO BVIHC (COM) 2026/0015, CLAIM NO BVIHC (COM) 2026/0016, CLAIM NO BVIHC (COM) 2026/0017, CLAIM NO BVIHC (COM) 2026/0018, CLAIM NO BVIHC (COM) 2026/0019, CLAIM NO BVIHC (COM) 2026/0020, CLAIM NO BVIHC (COM) 2026/0021, CLAIM NO BVIHC (COM) 2026/0022, CLAIM NO BVIHC (COM) 2026/0023, CLAIM NO BVIHC (COM) 2026/0024, CLAIM NO BVIHC (COM) 2026/0025, CLAIM NO BVIHC (COM) 2026/0026, CLAIM NO BVIHC (COM) 2026/0028, CLAIM NO BVIHC (COM) 2026/0029, CLAIM NO BVIHC (COM) 2026/0030**

**BETWEEN:**

**IN THE MATTER OF SURE TYCOON LIMITED AND TWENTY-NINE OTHER**

**COMPANIES**

**AND IN THE MATTER OF THE INSOLVENCY ACT, 2003 OF THE LAWS OF THE VIRGIN ISLANDS**.

**THE ATTORNEY GENERAL**

**Applicant**

**-v-**

**SURE TYCOON LIMITED and**
**TWENTY-NINE OTHER COMPANIES**

**Respondents**

_____

**SKELETON ARGUMENT OF THE APPLICANT**
**(For the appointment of provisional liquidators over the Respondents)**
_____



Legal Practitioners for the Applicant
2nd Floor Commerce House
181 Main Street
P.O. Box 961, Road Town, Tortola
British Virgin Islands VG 1110
Tel: (284) 393 5800 l Fax: (284) 393 5805
www.onealwebster.com

19