**<u>EXHIBIT B</u>**

**Case Number :BVIHCOM2026/0008**

**FILED**
**HIGH COURT**
**TERRITORY OF**
**THE VIRGIN ISLANDS**

**IN THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**VIRGIN ISLANDS**
**COMMERCIAL DIVISION**

**Submitted Date:01/03/2026 15:20**

**Filed Date:02/03/2026 08:30**

**Fees Paid:72.59**

**CLAIM Nos: BVIHC (COM) 2026/0001; BVIHC (COM) 2026/0002; BVIHC (COM) 2026/0004; BVIHC (COM) 2026/0005; BVIHC (COM) 2026/0006; BVIHC (COM) 2026/0007; BVIHC (COM) 2026/0008; BVIHC (COM) 2026/0009; BVIHC (COM) 2026/0012; BVIHC (COM) 2026/0013; BVIHC (COM) 2026/0014; BVIHC (COM) 2026/0015; BVIHC (COM) 2026/0016; BVIHC (COM) 2026/0017; BVIHC (COM) 2026/0018; BVIHC (COM) 2026/0019; BVIHC (COM) 2026/0020; BVIHC (COM) 2026/0021; BVIHC (COM) 2026/0023; BVIHC (COM) 2026/0024; BVIHC (COM) 2026/0025; BVIHC (COM) 2026/0026; BVIHC (COM) 2026/0027; BVIHC (COM) 2026/0029; BVIHC (COM) 2026/0030**


**IN THE MATTER OF THE INSOLVENCY ACT, 2003**

**ATTORNEY GENERAL**

**Applicant**

**and**

|  |  |  |
|---|---|---|
| 1. | **BVIHC (COM) 2026/0001** | **BRIGHT TEAM GLOBAL LIMITED** |
| 2. | **BVIHC (COM) 2026/0002** | **AUSPICIOUS TYCOON LIMITED** |
| 3. | **BVIHC (COM) 2026/0004** | **DELIGHTFUL THRIVE LIMITED** |
| 4. | **BVIHC (COM) 2026/0005** | **EVEN SINCERITY LIMITED** |
| 5. | **BVIHC (COM) 2026/0006** | **FULAM INVESTMENT LIMITED** |
| 6. | **BVIHC (COM) 2026/0007** | **GIANT VICTORY HOLDINGS LIMITED** |
| 7. | **BVIHC (COM) 2026/0008** | **GOLDEN ASCEND INTERNATIONAL LIMITED** |
| 8. | **BVIHC (COM) 2026/0009** | **HARMONIC STATE LIMITED** |
| 9. | **BVIHC (COM) 2026/0012** | **LUMINOUS GLOW LIMITED** |
| 10. | **BVIHC (COM) 2026/0013** | **MIGHTY DIVINE LIMITED** |
| 11. | **BVIHC (COM) 2026/0014** | **NOBLE TITLE LIMITED** |
| 12. | **BVIHC (COM) 2026/0015** | **ORIENTAL CHARM HOLDINGS INVESTMENT LIMITED** |
| 13. | **BVIHC (COM) 2026/0016** | **PACIFIC CHARM HOLDINGS INVESTMENT** |
| 14. | **BVIHC (COM) 2026/0017** | **PRINCE GLOBAL GROUP LIMITED** |
| 15. | **BVIHC (COM) 2026/0018** | **PRAISE MARBLE LIMITED** |
| 16. | **BVIHC (COM) 2026/0019** | **PRINCE GLOBAL HOLDINGS LIMITED** |
| 17. | **BVIHC (COM) 2026/0020** | **RESPECTFUL STEED LIMITED** |
| 18. | **BVIHC (COM) 2026/0021** | **RETAIN PROSPER LIMITED** |
| 19. | **BVIHC (COM) 2026/0023** | **SIMPLY ADVANCED LIMITED** |
| 20. | **BVIHC (COM) 2026/0024** | **SOUTHERN HERITAGE LIMITED** |
| 21. | **BVIHC (COM) 2026/0025** | **STAR MERIT GLOBAL LIMITED** |
| 22. | **BVIHC (COM) 2026/0026** | **STARRY BLOOM LIMITED** |
| 23. | **BVIHC (COM) 2026/0027** | **SURE TYCOON LIMITED** |
| 24. | **BVIHC (COM) 2026/0029** | **TOWARDS SUNSHINE LIMITED** |
| 25. | **BVIHC (COM) 2026/0030** | **UNITED RICHES GLOBAL LIMITED** |

**Respondents**

---

**EXHIBIT CB-1**

---

This is the exhibit CB-1 of the Affirmation of Cosimo Borrelli affirmed March 2026.

Before me

_____

Commissioner of Oaths

**Press Release**

**The Ministry of Interior of the Royal Government of Cambodia** wishes to inform the national and international community that, within the scope of cooperation in combating transnational crime and pursuant to a request from the relevant authorities of the People's Republic of China, the authorities of the Kingdom of Cambodia have arrested three Chinese nationals - namely **Chen Zhi, Xu Ji Liang**, and **Shao Ji Hui** and extradited to the People's Republic of China.

This operation was carried out on 6 January 2026, following several months of joint investigative cooperation between the relevant authorities of the Kingdom of Cambodia and the People's Republic of China. **The Ministry of Interior of the Royal Government of Cambodia** further clarifies that **Chen Zhi**'s Cambodian nationality was revoked by a Royal Decree, issued by His Majesty the King, in accordance with the Law on Nationality of the Kingdom of Cambodia, in December 2025.

The national and international community are hereby informed of the facts regarding this matter.

Phnom Penh, 7 January 2026



中    EN

HOME > Cases

## Ringleader of cross-border gambling, fraud syndicate extradited from Cambodia to China

2026-01-09   Source：Xinhua

BEIJING, Jan. 8 (Xinhua) -- Chen Zhi, the ringleader of a major cross-border gambling and fraud criminal syndicate, has been extradited from Cambodia to China, China's Ministry of Public Security (MPS) said on Thursday.

Chen, a Chinese national, was successfully extradited on Wednesday with the support and cooperation of Cambodian authorities, marking yet another significant milestone in law enforcement collaboration between the two countries, according to the MPS.

It said that Chen's criminal group is suspected of engaging in a variety of crimes, including the operation of gambling dens, fraud, illegal business operations, and the concealment and disguise of the proceeds of these crimes.

Chen has been placed under compulsory measures in accordance with the law, and the relevant cases are under further investigation.

An MPS official said that the ministry will issue a wanted notice for an initial number of key members of Chen's criminal group in the near future, voicing determination to hunt down and apprehend all fugitives involved.

The MPS also issued a stern warning to the criminals, urging them to halt their criminal activities before it's too late, and to surrender immediately and seek lenient treatment.

[ CLOSE ]        [ PRINT ]



版权所有：中华人民共和国公安部   地址：北京市东长安街14号   邮编：100741
京ICP备05070602号      京公网安备 11010102000001号   网站标识码：bm09000013

# China executes 4 more members of Myanmar-based group in crackdown on scam operations

**LIVE** US-Iran latest    **LIVE** Hillary Clinton testimony    Jeff Galloway dies    FBI raids LAUSD    'Bridgerton'

BY SIMINA MISTREANU

Updated 12:31 AM EST, February 2, 2026

Leer en español

Taipei, TAIWAN (AP) — China executed four people found guilty of causing the deaths of six Chinese citizens and running scam and gambling operations out of Myanmar worth more than $4 billion, authorities said on Monday.

The Shenzhen Intermediate People's Court in south China announced the executions in a statement Monday morning, though it was not clear when they had been carried out.

The executions of 11 other people accused of running scam centers in Myanmar were announced last week.

The Shenzhen court had sentenced five people, including members of the notorious Bai family, accused of running a network of scam centers and casinos, to death in November.

One of the defendants, group leader Bai Suocheng, died of illness after his conviction, the court said.

The group had established industrial parks in Myanmar's Kokang region bordering China, from where they were accused of running gambling and telecom scam operations involving kidnappings, extortion, forced prostitution and drug manufacturing and trafficking.

ADVERTISEMENT



New York New York Are You Aware of This Debt Relief Program?

Debt Relief

Hilary Knight wants focus on the US women's Olympic success, not Trump's 'distasteful' joke

3

They defrauded victims of more than 29 billion yuan ($4.2 billion) and caused the death of six Chinese citizens and injuries to others, the court said.

---

## RELATED STORIES



**China executes 11 members of Myanmar-based group in crackdown on scam operations**

---

**Cambodia will send 73 online scam suspects to South Korea**

Their crimes "were exceptionally heinous, with particularly serious circumstances and consequences, posing a tremendous threat to society," the court's statement read.

The defendants had initially appealed their verdict, but the Guangdong Provincial High People's Court dismissed their appeals, it added.

The executions are part of a broader crackdown by Beijing on scam operations in Southeast Asia, where scam parks have become an industrial scale business, especially in Myanmar, Cambodia and Laos. A mix of trafficked and willing labor there have carried out digital scams on victims around the world, including thousands of Chinese citizens.

Authorities in the region face growing international pressure from China, the United States and other nations to address the proliferation of crime.



**SIMINA MISTREANU**
Mistreanu is a Greater China reporter for The Associated Press, based in Taipei, Taiwan. She has reported on China since 2015.





ADVERTISEMENT



**Auspicious Tycoon Limited**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** ___26 February_____ **2026**

---

In accordance with the Company's Memorandum and Articles of Association dated 3 July 2018 (the "**Articles**"), the undersigned, acting as primary attorney-in-fact (the "**Primary Attorney**") to the sole member of the Company (the "**Member**") pursuant to a power of attorney, or a authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

1. **Sanctions Compliance Matters**

1.1.    **IT IS NOTED THAT:**

(a)    the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i)    ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii)    ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii)    maintaining the Company in good standing for so long as is required by law; and

(iv)    preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)    any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)    the passing of these resolutions, the Director Appointment and Removal (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3493048v1

7

(d)    the Company, its Director and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)    without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the director of the Company (the "**Director**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Director may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)    the Company, its Director and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)    in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.    **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

## 2.   Background – Deed of Delegation and Appointment of Special Manager

2.1.    **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)    Mr Chen Zhi, as sole member of the Company, executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ▮▮▮▮▮ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in the Company;

#3493048v1

8

(b)     by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(c)     the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(d)     Pursuant to Article 7.7 – 7.9 of the Articles, a member may appoint a proxy to speak or vote on their bhehalf, and pursuant to Article 7.21 the Member is permitted to pass resolutions in writing in lieu of holding a meeting; and

(e)     the undersigned, being the duly appointed attorneys-in-fact of the Member acting pursuant to the Power of Attorney and the Deed of Delegation, now wish to pass the resolutions set out below.

2.2.    **IT IS RESOLVED THAT:**

(a)     the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)     all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**3.   Director Appointment and Removal**

3.1.    **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2.    **IT IS FURTHER NOTED THAT:**

(a)     the Sole Member has the power to remove a director from office pursuant to Article 8.5 of the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removals**");

(b)     it is proposed that Mr Cosimo Borrelli (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the

"**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)    the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)    in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.    **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.    **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)    the Removals be and hereby are approved in all respects and the removed directors shall cease to hold office as directors of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removals;

(b)    the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Director of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)    any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)    pay necessary costs and expenses of the Company;

(ii)    preserve and safeguard assets; and

(iii)    take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)    all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to

#3493048v1

10

act only on the instructions of the Director and only to the extent permitted by applicable law and any relevant licence or approval;

(e)     the Director of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)     these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

  (i)     the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

  (ii)     the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

  (iii)     any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)     if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)     the Director be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)     nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Director shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)     any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

#3493048v1

11

(k)    any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)    the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)    the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)    all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)    any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3493048v1

12

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**CHEN ZHI**

By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025

By: ██████████████████████████████

**Name**: ████████████████

**Title**: Attorneys

**Date**: 26 February 2026
_____

#3493048v1

13

**Bright Team Global Limited**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** ___23 February_____ **2026**

---

In accordance with the Company's Memorandum and Articles of Association (the "**Articles**"), the undersigned being the sole member of the Company (the "**Sole Member**") hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

1. **Sanctions Compliance Matters**

    1.1. **IT IS NOTED THAT:**

    (a)    the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

    (i)    ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

    (ii)    ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

    (iii)    maintaining the Company in good standing for so long as is required by law;

    (iv)    preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

    (b)    any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

    (c)    the passing of these resolutions, the Director Appointment and Removal (each as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3494549v1

14

(d)    the Company, its Directors and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)    without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the directors of the Company  (the "**Directors**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Directors of the Company may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)    the Company, its Directors and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)    in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

2.    **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

3.    **Director Appointment**

3.1.  **IT IS NOTED THAT:**

(a)    it is proposed that Mr Cosimo Borrelli (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the "**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(b)    the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of

#3494549v1

15

appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(c)    in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

4.    **IT IS FURTHER NOTED THAT** the Sole Member of the Company may pass a written resolution, which shall take effect immediately and without the need for any meeting or further notice.

5.    **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)    the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(b)    any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)    pay necessary costs and expenses of the Company;

(ii)    preserve and safeguard assets; and

(iii)    take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(c)    all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to act only on the instructions of the Directors and only to the extent permitted by applicable law and any relevant licence or approval;

(d)    the Directors of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(e)    these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

(i)    the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

#3494549v1

16

(ii)  the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

(iii)  any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(f)  if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(g)  the Directors be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(h)  nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Directors shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(i)  any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("Ancillary Documents") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(j)  any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(k)  the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(l)  the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as

required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(m) all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(n) any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3494549v1

18

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

_____

**Name**: **Sandy Zhou**

**Title**: Sole Member

**Date**: 23 February 2026 _____

#3494549v1

19

**Delightful Thrive Limited**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** __26 February__ **2026**

---

In accordance with the Company's Memorandum and Articles of Association (the "**Articles**"), the undersigned, acting as primary attorney-in-fact (the "**Primary Attorney**") to the sole member of the Company (the "**Sole Member**") pursuant to a power of attorney, or an authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

**1.      Sanctions Compliance Matters**

1.1.      **IT IS NOTED THAT:**

(a)      the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i)      ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii)      ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii)      maintaining the Company in good standing for so long as is required by law; and

(iv)      preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)      any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)      the passing of these resolutions, the Director Appointment and Removal (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3494557v1

20

(d)     the Company, its Directors and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)     without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the Directors of the Company (the "**Directors**" and each a "**Director**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Directors of the Company may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)     the Company, its Directors and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)     in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.     **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

## 2.     Background – Deed of Delegation and Appointment of Special Manager

2.1.     **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)     Mr Chen Zhi, as sole member of the Company, executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ███████ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in the Company;

#3494557v1

21

(b)    by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(c)    the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(d)    Pursuant to the Articles, members may pass unanimous resolutions in writing in lieu of holding a meeting; and

(e)    the undersigned, being the duly appointed attorney-in-fact of the Sole Member acting pursuant to the Power of Attorney and the Deed of Delegation, now wishes to pass the resolutions set out below.

2.2.    **IT IS RESOLVED THAT:**

(a)    the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)    all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**3.    Director Appointment and Removal**

3.1.    **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2.    **IT IS FURTHER NOTED THAT:**

(a)    the Sole Member has the power to remove a director from office under the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removals**");

(b)    it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the

"**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)    the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)    in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.    **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.    **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)    the Removals be and hereby are approved in all respects and the removed directors shall cease to hold office as a director of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removal;

(b)    the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)    any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)    pay necessary costs and expenses of the Company;

(ii)    preserve and safeguard assets; and

(iii)    take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)    all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to

#3494557v1

23

act only on the instructions of the Directors and only to the extent permitted by applicable law and any relevant licence or approval;

(e)     the Directors of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)     these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

   (i)     the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

   (ii)     the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

   (iii)     any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)     if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)     the Directors be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)     nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Directors shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)     any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

#3494557v1

24

(k)     any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)     the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)     the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)     all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)     any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3494557v1

25

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**CHEN ZHI**

By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025.

By █████████████████████████████████

**Name**: █████████████████

**Title**: Attorneys

**Date**: ___26 February 2026_____

#3494557v1

26

**EVEN SINCERITY LIMITED**
**誠均有限公司**
(the "**Company**")

---

**Written Resolutions of the Sole** Member **of the Company dated** __26 February__ **2026**

---

In accordance with the Company's Memorandum and Articles of Association dated 13 February 2018 (the "**Articles**"), the undersigned being the sole member of the Company (the "**Member**"), hereby takes the following actions and adopts the following resolutions as written resolutions of the Member on the date set out above.

1.      **Sanctions Compliance Matters**

1.1.     **IT IS NOTED THAT:**

(a)      the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i)      ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii)      ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii)      maintaining the Company in good standing for so long as is required by law; and

(iv)      preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)      any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)      the passing of these resolutions, the Director Appointment and Removal (each as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with"

#3494078v1

27

funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

(d) the Company, its Directors and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e) without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the Directors of the Company have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Directors of the Company may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f) the Company, its Directors and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g) in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2. **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

2. **Background – Deed of Delegation and Appointment of Special Manager**

2.1. **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a) the Company is a subsidiary indirectly owned by Mr Chen Zhi;

#3494078v1

28

(b)    Mr Chen Zhi, as an indirect member of the Company, has executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ▮▮▮▮▮ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in certain companies owned or controlled (directly or indirectly) by Mr Chen Zhi;

(c)    by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(d)    the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(e)    the Member acknowledges and notes the existence of the Power of Attorney and the Deed of Delegation, and acknowledges that the Special Manager has been appointed to exercise management and governance functions in respect of certain entities within the broader group structure of which the Company forms part; and

(f)    the Member now wishes to pass the resolutions set out below.

2.2.    **IT IS RESOLVED THAT:**

(a)    the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)    all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**3.    Director Appointment**

3.1.    **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Director notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2.    **IT IS FURTHER NOTED THAT:**

#3494078v1

29

(c)   it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the "**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(d)   the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(e)   in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.   **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.   **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)   the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(b)   any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)   pay necessary costs and expenses of the Company;

(ii)   preserve and safeguard assets; and

(iii)   take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(c)   all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to act only on the instructions of the Directors and only to the extent permitted by applicable law and any relevant licence or approval;

(d)   the Directors of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

#3494078v1

30

(e)     these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

    (i)     the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

    (ii)    the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

    (iii)   any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(f)     if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(g)     the Directors be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(h)     nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Directors shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(i)     any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("Ancillary Documents") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(j)     any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(k)     the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(l)     the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(m)     all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(n)     any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3494078v1

32

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

CHEN ZHI
By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025

**Name**s: ███████████

**Title**: Attorneys-in-fact

**Date**:    26 February 2026
_____

#3494078v1

33

**Fulam Investment Limited**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** 26 February _____ **2026**

---

In accordance with the Company's Memorandum and Articles of Association dated 24 July 2009 (the "**Articles**"), the undersigned being the sole member of the Company (the "**Member**") pursuant to a power of attorney, or a authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

**1.   Sanctions Compliance Matters**

1.1.      **IT IS NOTED THAT:**

(a)    the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i)    ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii)    ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii)    maintaining the Company in good standing for so long as is required by law; and

(iv)    preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)    any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)    the passing of these resolutions, the Director Appointment and Removal (each as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

(d)     the Company, its Director and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)     without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the directors of the Company (the "**Director**")  have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Director may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)     the Company, its Director and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)     in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.     **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

## 2.   Background – Deed of Delegation and Appointment of Special Manager

2.1.     **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)     the Company is indirectly owned by Mr Chen Zhi;

(b)     Mr Chen Zhi, as an indirect member of the Company, has executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ███████ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact,

#3493294v1

35

(b)    with full power and authority to exercise all rights attaching to his shares in certain companies owned or controlled (directly or indirectly) by Mr Chen Zhi;

(c)    by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(d)    the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(e)    the Sole Member acknowledges and note the existence of the Power of Attorney and the Deed of Delegation, and acknowledge that the Special Manager has been appointed to exercise management and governance functions in respect of certain entities within the broader group structure of which the Company forms part; and

(f)    the undersigned, being the Sole Member now wishes to pass the resolutions set out below.

2.2.    **IT IS RESOLVED THAT:**

(a)    the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)    all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

## 3. Director Appointment and Removal

3.1.    **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2.    **IT IS FURTHER NOTED THAT:**

(a)    the Sole Member  has the power to remove a director from office pursuant to Article 9.5 of the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removal**");

(b)   it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the "**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)   the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)   in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.   **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.   **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)   The Removals be and hereby are approved in all respects and the removed directors shall cease to hold office as directors of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removals;

(b)   the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)   any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)   pay necessary costs and expenses of the Company;

(ii)   preserve and safeguard assets; and

(iii)   take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)   all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the

#3493294v1

Company be requested and directed to continue to maintain any applicable freezes, and to act only on the instructions of the Director and only to the extent permitted by applicable law and any relevant licence or approval;

(e)    the Director be and is authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)    these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

   (i)    the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

   (ii)    the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

   (iii)    any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)    if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)    the Directors be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)    nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Director shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)    any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

#3493294v1

38

(k)     any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)     the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)     the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)     all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)     any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3493294v1

39

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**Ample Luck Investments Limited**

By: CHEN ZHI
By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025

By: ███████████████████████

**Name**s: █████████████

**Title**: Attorneys-in-fact

**Date**: ___26 February 2026_____

#3493294v1

**Giant Victory Holdings Limited**
(the "**Company**")

**Written Resolutions of the Sole Member of the Company dated** ___26 February___ **2026**

In accordance with the Company's Memorandum and Articles of Association dated 1 December 2016 (the "**Articles**"), the undersigned being the sole member of the Company (the "**Member**") pursuant to a power of attorney, or a authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

**1.   Sanctions Compliance Matters**

1.1.    **IT IS NOTED THAT:**

(a)    the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

   (i)    ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

   (ii)    ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

   (iii)    maintaining the Company in good standing for so long as is required by law; and

   (iv)    preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)    any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)    the passing of these resolutions, the Director Appointment and Removal (each as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3493332v2

41

(d)     the Company, its Director and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)     without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the directors of the Company (the "**Director**")  have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Director may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)     the Company, its Director and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)     in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.     **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

## 2.   Background – Deed of Delegation and Appointment of Special Manager

2.1.     **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)     the Company is indirectly owned by Mr Chen Zhi;

(b)     Mr Chen Zhi, as an indirect member of the Company, has executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ▮▮▮▮ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact,

#3493332v2

42

with full power and authority to exercise all rights attaching to his shares in certain companies owned or controlled (directly or indirectly) by Mr Chen Zhi;

(c)     by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(d)     the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(e)     the Sole Member acknowledges and note the existence of the Power of Attorney and the Deed of Delegation, and acknowledge that the Special Manager has been appointed to exercise management and governance functions in respect of certain entities within the broader group structure of which the Company forms part; and

(f)     the undersigned, being the Sole Member now wishes to pass the resolutions set out below.

2.2.    **IT IS RESOLVED THAT:**

(a)     the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)     all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**3.   Director Appointment and Removal**

3.1.    **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member note that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2.    **IT IS FURTHER NOTED THAT:**

(a)     the Sole Member  has the power to remove a director from office pursuant to Article 8.5 of the Articles and proposes to remove Chen Zhi as a director of the Company with effect from the date of these resolutions (the "**Removals**");

#3493332v2

43

(b)    it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the "**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)    the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)    in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.    **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.    **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)    The Removals be and hereby are approved in all respects and the removed directors shall cease to hold office as directors of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removals;

(b)    the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)    any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)    pay necessary costs and expenses of the Company;

(ii)    preserve and safeguard assets; and

(iii)    take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)    all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the

#3493332v2

44

Company be requested and directed to continue to maintain any applicable freezes, and to act only on the instructions of the Director and only to the extent permitted by applicable law and any relevant licence or approval;

(e)     the Director be and is authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)     these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

(i)     the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

(ii)    the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

(iii)   any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)     if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)     the Directors be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)     nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Director shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)     any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

#3493332v2

45

(k)     any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)     the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)     the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)     all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)     any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3493332v2

46

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**Deluxe Heaven Limited**

By: CHEN ZHI
By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025

By: ███████████████████████████

Names: ████████████████

Title: Attorneys-in-fact

**Date**: _____26 February 2026_____

#3493332v2

47

**Golden Ascend International Limited**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** __26 February_____ **2026**

---

In accordance with the Company's Memorandum and Articles of Association dated 18 April 2018 (the "**Articles**"), the undersigned, acting as primary attorney-in-fact (the "**Primary Attorney**") to the sole member of the Company (the "**Member**") pursuant to a power of attorney, or a authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

1. **Sanctions Compliance Matters**

1.1.    **IT IS NOTED THAT:**

(a)    the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

    (i)    ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

    (ii)    ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

    (iii)    maintaining the Company in good standing for so long as is required by law; and

    (iv)    preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)    any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)    the passing of these resolutions, the Director Appointment and Removal (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3493126v1

48

(d)     the Company, its Director and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)     without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the director of the Company (the "**Director**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Director may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)     the Company, its Director and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)     in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.    **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

## 2.   Background – Deed of Delegation and Appointment of Special Manager

2.1.    **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)     Mr Chen Zhi, as sole member of the Company, executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ███████ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in the Company;

#3493126v1

49

(b)   by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(c)   the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(d)   Pursuant to Article 7.7 – 7.9 of the Articles, a member may appoint a proxy to speak or vote on their behalf, and pursuant to Article 7.21 the  Member is permitted to pass resolutions in writing in lieu of holding a meeting; and

(e)   the undersigned, being the duly appointed attorneys-in-fact of the Member acting pursuant to the Power of Attorney and the Deed of Delegation, now wish to pass the resolutions set out below.

2.2.    **IT IS RESOLVED THAT:**

(a)   the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)   all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**3.   Director Appointment and Removal**

3.1.    **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2.    **IT IS FURTHER NOTED THAT:**

(a)   the Sole Member has the power to remove a director from office pursuant to Article 8.5 of the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removals**");

(b)   it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the

#3493126v1

50

"**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)     the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)     in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.     **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.     **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)     the Removals be and hereby are approved in all respects the removed directors shall cease to hold office as directors of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removals;

(b)     the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Director of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)     any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

   (i)     pay necessary costs and expenses of the Company;

   (ii)     preserve and safeguard assets; and

   (iii)     take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)     all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to

#3493126v1

51

act only on the instructions of the Director and only to the extent permitted by applicable law and any relevant licence or approval;

(e)    the Director of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)    these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

(i)    the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

(ii)    the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

(iii)    any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)    if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)    the Director be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)    nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Director shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)    any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

#3493126v1

52

(k)     any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)     the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)     the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)     all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)     any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3493126v1

53

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**CHEN ZHI**

By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025

By: 

**Name**: 

**Title**: Attorneys

**Date**: 26 February 2026
_____

#3493126v1

**HARMONIC STATE LIMITED**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** __26 February_____ **2026**

---

In accordance with the Company's Memorandum and Articles of Association dated 21 January 2020 (the "**Articles**"), the undersigned, acting as primary attorney-in-fact (the "**Primary Attorney**") to the sole member of the Company (the "**Sole Member**") pursuant to a power of attorney, or a authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

1.  **Sanctions Compliance Matters**

1.1.    **IT IS NOTED THAT:**

(a)    the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i)    ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii)    ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii)    maintaining the Company in good standing for so long as is required by law;

(iv)    preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)    any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)    the passing of these resolutions, the Director Appointment and Removal (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3494079v1

55

(d)     the Company, its Directors and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)     without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the Directors of the Company (the "**Directors**" and each a "**Director**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Directors of the Company may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)     the Company, its Directors and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)     in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.     **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

## 2.   Background – Deed of Delegation and Appointment of Special Manager

2.1.     **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)     Mr Chen Zhi, as sole member of the Company, executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ▮▮▮▮ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in the Company;

#3494079v1

56

(b)     by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(c)     the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(d)     Pursuant to Article 7.7 – 7.9 of the Articles, a member may appoint a proxy to speak or vote on their behalf, and pursuant to Article 7.21 the Sole Member is permitted to pass resolutions in writing in lieu of holding a meeting; and

(e)     the undersigned, being the duly appointed attorneys-in-fact of the Sole Member acting pursuant to the Power of Attorney and the Deed of Delegation, now wish to pass the resolutions set out below.

2.2.     **IT IS RESOLVED THAT:**

(a)     the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)     all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**3.   Director Appointment and Removal**

3.1.     **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2.     **IT IS FURTHER NOTED THAT:**

(a)     the Sole Member has the power to remove a director from office pursuant to Article 8.5 of the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removals**");

(b)     it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the

"**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)     the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)     in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.     **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.     **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)     The Removals be and hereby are approved in all respects and the removed directors shall cease to hold office as a director of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removals;

(b)     the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)     any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)      pay necessary costs and expenses of the Company;

(ii)     preserve and safeguard assets; and

(iii)    take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)     all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to

#3494079v1

58

act only on the instructions of the Directors and only to the extent permitted by applicable law and any relevant licence or approval;

(e)    the Directors of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)    these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

(i)    the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

(ii)    the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

(iii)    any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)    if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)    the Directors be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)    nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Directors shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)    any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

#3494079v1

59

(k)    any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)    the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)    the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)    all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)    any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3494079v1

60

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**CHEN ZHI**

By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025

By: ███████████████████████████

**Name**: ███████████████

**Title**: Attorneys

**Date**: 26 February 2026
_____

61

#3494079v1

**Luminous Glow Limited**
**(明煒有限公司)**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** _____26 February_____ **2026**

---

In accordance with the Company's Memorandum and Articles of Association dated 11 September 2018 (the "**Articles**"), the undersigned, acting as primary attorney-in-fact (the "**Primary Attorney**") to the sole member of the Company (the "**Sole Member**") pursuant to a power of attorney, or an authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

**1.    Sanctions Compliance Matters**

1.1.    **IT IS NOTED THAT:**

(a)    the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i)    ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii)    ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii)    maintaining the Company in good standing for so long as is required by law; and

(iv)    preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)    any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)    the passing of these resolutions, the Director Appointment and Removal (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with"

#3494082v1

62

funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

(d)    the Company, its Directors and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)    without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the Directors of the Company have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the directors of the Company (the "**Directors**" and each a "**Director**")  may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)    the Company, its Directors and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)    in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.    **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

## 2.   Background – Deed of Delegation and Appointment of Special Manager

2.1.    **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)    Mr Chen Zhi, as sole member of the Company, executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ▮▮▮▮▮▮ as the primary attorney-in-

fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in the Company;

(b)      by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(c)      the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(d)      Pursuant to Article 7.7 – 7.9 of the Articles, a member may appoint a proxy to speak or vote on their behalf, and pursuant to Article 7.21 the Sole Member is permitted to pass resolutions in writing in lieu of holding a meeting; and

(e)      the undersigned, being the duly appointed attorneys-in-fact of the Sole Member acting pursuant to the Power of Attorney and the Deed of Delegation, now wish to pass the resolutions set out below.

2.2.      **IT IS RESOLVED THAT:**

(a)      the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)      all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**3.   Director Appointment and Removal**

3.1.      **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2.      **IT IS FURTHER NOTED THAT:**

(a)      the Sole Member has the power to remove a director from office pursuant to Article 8.5(a) of the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removal**");

#3494082v1

64

(b)     it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the "**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)     the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)     in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.    **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.    **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)     the Removal be and hereby is approved in all respects and the removed directors shall cease to hold office as a director of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removal;

(b)     the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)     any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)      pay necessary costs and expenses of the Company;

(ii)     preserve and safeguard assets; and

(iii)    take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)     all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the

#3494082v1

65

Company be requested and directed to continue to maintain any applicable freezes, and to act only on the instructions of the Directors and only to the extent permitted by applicable law and any relevant licence or approval;

(e)     the Directors of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)     these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

  (i)     the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

  (ii)     the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

  (iii)     any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)     if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)     the Directors be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)     nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Directors shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)     any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(k)     any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)     the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)    the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)     all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)     any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3494082v1

67

68

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**CHEN ZHI**

By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025.

By: ███████████████████████

**Name**: ████████████

**Title**: Attorneys

**Date**: ___26 February 2026_____

#3494082v1

68

**Mighty Divine Limited**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** <u>23 February 2026</u> **2026**

---

In accordance with the Company's Memorandum and Articles of Association (the "**Articles**"), the undersigned being the sole member of the Company (the "**Sole Member**") hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

**1. Sanctions Compliance Matters**

1.1. **IT IS NOTED THAT:**

(a) the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i) ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii) ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii) maintaining the Company in good standing for so long as is required by law;

(iv) preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b) any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c) the passing of these resolutions, the Director Appointment and Removal (each as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3494552v1

69

(d)    the Company, its Directors and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)    without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the directors of the Company  (the "**Directors**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Directors of the Company may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)    the Company, its Directors and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)    in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

2.   **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

3.   **Director Appointment**

3.1.  **IT IS NOTED THAT:**

(a)    it is proposed that Mr Cosimo Borrelli (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the "**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(b)    the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of

appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(c)    in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

4.  **IT IS FURTHER NOTED THAT** the Sole Member of the Company may pass a written resolution, which shall take effect immediately and without the need for any meeting or further notice.

5.  **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)    the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(b)    any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)    pay necessary costs and expenses of the Company;

(ii)    preserve and safeguard assets; and

(iii)    take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(c)    all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to act only on the instructions of the Directors and only to the extent permitted by applicable law and any relevant licence or approval;

(d)    the Directors of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(e)    these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

(i)    the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

#3494552v1

71

(ii)    the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

(iii)    any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(f)    if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(g)    the Directors be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(h)    nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Directors shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(i)    any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("Ancillary Documents") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(j)    any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(k)    the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(l)    the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as

#3494552v1

72

required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(m) all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(n) any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3494552v1

73

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

_____

**Name**: **Sandy Zhou**

**Title**: Sole Member

**Date**: 23 February 2026 _____

#3494552v1

74

**Noble Title Limited**
(the "**Company**")

---

**Written Resolutions of the Sole Director of the Company dated** ____23 February____ **2026**

---

In accordance with the Company's Memorandum and Articles of Association as amended on 1 March 2017 (the "**Articles**"), the undersigned being the director of the Company (the "**Director**"), hereby takes the following actions and adopts the following resolutions as written resolutions of the sole Director on the date set out above.

**1.   Sanctions Compliance Matters**

   1.1.  **IT IS NOTED THAT:**

   (a)     the Director records and declares that the purpose and intent of these resolutions is strictly limited to:

   (i)      ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

   (ii)     ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

   (iii)    maintaining the Company in good standing for so long as is required by law; and

   (iv)    preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

   (b)     any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

   (c)     the passing of these resolutions, the Director Appointment (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3494440v1

75

(d)    the Company, its Directors and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)    without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the Directors of the Company have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Directors of the Company may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)    the Company, its Directors and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)    in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.  **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

2.  **Background – Deed of Delegation and Appointment of Special Manager**

2.1.  **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)    the Company is indirectly owned by Mr Chen Zhi;

(b)    Mr Chen Zhi, as an indirect member of the Company, has executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ▮▮▮▮▮ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact,

#3494440v1

76

with full power and authority to exercise all rights attaching to his shares in certain companies owned or controlled (directly or indirectly) by Mr Chen Zhi;

(c)     by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(d)     the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(e)     the Director acknowledges and notes the existence of the Power of Attorney and the Deed of Delegation, and acknowledge that the Special Manager has been appointed to exercise management and governance functions in respect of certain entities within the broader group structure of which the Company forms part; and

(f)     the undersigned, being the sole Director now wishes to pass the resolutions set out below.

2.2.  **IT IS RESOLVED THAT:**

(a)     the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)     all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

3.   **Director Appointment and Removal**

3.1. **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Director notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders  and directors must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2. **IT IS FURTHER NOTED THAT:**

(c)     it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the "**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

#3494440v1

77

(d)     the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(e)     in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.  **IT IS FURTHER NOTED THAT** pursuant to the Articles, the directors of the Company may pass a written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.  **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)     the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(b)     any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)     pay necessary costs and expenses of the Company;

(ii)    preserve and safeguard assets; and

(iii)   take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(c)     all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to act only on the instructions of the Directors and only to the extent permitted by applicable law and any relevant licence or approval;

(d)     the Directors of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(e)     these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

#3494440v1

78

        (i)        the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

        (ii)       the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

        (iii)      any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(f)      if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(g)      the Directors be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(h)      nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Directors shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(i)      any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("Ancillary Documents") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(j)      any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(k)      the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

#3494440v1

(l)     the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(m)    all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(n)    any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3494440v1

80

**IN WITNESS WHEREOF** the undersigned, being the Sole Director of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**Name**: Sheng Haoran

**Title**: Sole Director

**Date**: _____23 February 2026_____

#3494440v1

81

**Oriental Charm Holdings Investment Limited**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** ____23 February_____ **2026**

---

In accordance with the Company's Memorandum and Articles of Association (the "**Articles**"), the undersigned, acting as primary attorney-in-fact (the "**Primary Attorney**") to the sole member of the Company (the "**Member**") pursuant to a power of attorney, or a authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

**1.   Sanctions Compliance Matters**

1.1.     **IT IS NOTED THAT:**

(a)     the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

  (i)     ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

  (ii)     ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

  (iii)     maintaining the Company in good standing for so long as is required by law; and

  (iv)     preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)     any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)     the passing of these resolutions, the Director Appointment (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3494604v1

(d)    the Company, its Director and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)    without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the director of the Company (the "**Director**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Director may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)    the Company, its Director and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)    in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.    **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

## 2.  Director Appointment

2.1.    **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

#3494604v1

83

2.2. **IT IS FURTHER NOTED THAT:**

(a) it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the "**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(b) the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(c) in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

2.3. **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

2.4. **ACCORDINGLY, IT IS RESOLVED THAT:**

(a) the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Director of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(b) any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

  (i) pay necessary costs and expenses of the Company;

  (ii) preserve and safeguard assets; and

  (iii) take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(c) all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to act only on the instructions of the Director and only to the extent permitted by applicable law and any relevant licence or approval;

#3494604v1

84

(d)     the Director of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(e)     these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

(i)     the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

(ii)     the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

(iii)     any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(f)     if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(g)     the Director be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(h)     nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Director shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(i)     any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(j)     any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for

#3494604v1

85

the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(k)     the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(l)     the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(m)    all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(n)     any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3494604v1

86

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

_____

**Name**: Li Caiyun

**Title**: Director

**Date**: _____23 February 2026_____

#3494604v1

**Pacific Charm Holdings Investment Limited**
(the "**Company**")

**Written Resolutions of the Sole Member of the Company dated** __26 February__ **2026**

In accordance with the Company's Memorandum and Articles of Association dated 26 April 2018 (the "**Articles**"), the undersigned, acting as primary attorney-in-fact (the "**Primary Attorney**") to the sole member of the Company (the "**Member**") pursuant to a power of attorney, or a authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

**1.      Sanctions Compliance Matters**

1.1.      **IT IS NOTED THAT:**

(a)      the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i)      ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii)      ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii)      maintaining the Company in good standing for so long as is required by law; and

(iv)      preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)      any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)      the passing of these resolutions, the Director Appointment and Removal (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3493056v1

88

(d)     the Company, its Director and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)     without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the director of the Company (the "**Director**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Director may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)     the Company, its Director and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)     in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.    **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

**2.      Background – Deed of Delegation and Appointment of Special Manager**

2.1.    **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)     Mr Chen Zhi, as sole member of the Company, executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ▮▮▮▮▮ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in the Company;

#3493056v1

89

(b)    by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(c)    the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(d)    Pursuant to Article 7.7 – 7.9 of the Articles, a member may appoint a proxy to speak and vote on their behalf, and pursuant to Article 7.21 the  Member is permitted to pass resolutions in writing in lieu of holding a meeting; and

(e)    the undersigned, being the duly appointed attorneys-in-fact of the Member acting pursuant to the Power of Attorney and the Deed of Delegation, now wish to pass the resolutions set out below.

**3.   IT IS RESOLVED THAT:**

(a)    the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)    all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**4.    Director Appointment and Removal**

4.1.    **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

4.2.    **IT IS FURTHER NOTED THAT:**

(a)    the Sole Member has the power to remove a director from office pursuant to Article 8.5 of the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removals**");

(b)    it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the

"**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)    the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)    in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

4.3.    **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

4.4.    **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)    the Removals be and hereby are approved in all respects and the removed directors shall cease to hold office as directors of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removals;

(b)    the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Director of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)    any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

    (i)    pay necessary costs and expenses of the Company;

    (ii)    preserve and safeguard assets; and

    (iii)    take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)    all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to

#3493056v1

91

act only on the instructions of the Director and only to the extent permitted by applicable law and any relevant licence or approval;

(e)    the Director of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)    these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

  (i)    the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

  (ii)    the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

  (iii)    any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)    if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)    the Director be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)    nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Director shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)    any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(k)     any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)     the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)     the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)     all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)     any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3493056v1

93

94

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**CHEN ZHI**

By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025

By: ███████████████████████████

**Name**: ████████████████

**Title**: Attorneys

**Date**: _26 February 2026_____

#3493056v1

94

**Praise Marble Limited**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated 27 February 2026**

---

In accordance with the Company's Memorandum and Articles of Association dated 12 January 2016 (the "**Articles**"), the undersigned being the sole member of the Company (the "**Sole Member**"), hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

1.      **Sanctions Compliance Matters**

1.1.     **IT IS NOTED THAT:**

(a)      the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i)      ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii)     ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii)    maintaining the Company in good standing for so long as is required by law; and

(iv)     preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)      any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)      the passing of these resolutions, the Director Appointment and Removal (each as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3493729v1

95

(d)     the Company, its Directors and its attorneys-in-fact shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)     without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the directors of the Company (each a "**Director**" and together, the "**Directors**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Directors of the Company may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)     the Company, its Directors and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)     in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.    **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

## 2.   Director Appointment and Removal

2.1.    **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

#3493729v1

96

2.2.  **IT IS FURTHER NOTED THAT:**

(a)  the Sole Member has the power to remove a director from office pursuant to Articles 14.1 and 14.4 of the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removals**");

(a)  it is proposed that Mr Cosimo Borrelli (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the "**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(b)  the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(c)  in connection with the proposed Appointment, the Company has received a signed consent to act as a director of the Company from the Additional Director.

2.3.  **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

2.4.  **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)  the Removals be and hereby are approved in all respects and the removed directors shall cease to hold office as directors of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removals;

(b)  the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)  any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)  pay necessary costs and expenses of the Company;

(ii)  preserve and safeguard assets; and

#3493729v1

97

(iii)    take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)    all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to act only on the instructions of the Directors and only to the extent permitted by applicable law and any relevant licence or approval;

(e)    the Directors of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)    these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

(i)    the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

(ii)    the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

(iii)    any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)    if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)    the Directors be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)    nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Directors shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)    any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts,

#3493729v1

98

authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(k) any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l) the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m) the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n) all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o) any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

*[signature page follows]*

#3493729v1

99

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**Geotech Holdings Ltd.**

By: _____

**Name:** Hui Sai Kwong, Garrison

**Title:** Director

**Date:** 27 February 2026

#3493729v1

100

**Prince Global Group Limited**
**(太子環球集團有限公司)**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** <u>     26 February     </u> **2026**

---

In accordance with the Company's Memorandum and Articles of Association dated 3 August 2018 (the "**Articles**"), the undersigned, acting as primary attorney-in-fact (the "**Primary Attorney**") to the sole member of the Company (the "**Sole Member**") pursuant to a power of attorney, or an authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

1. **Sanctions Compliance Matters**

1.1. **IT IS NOTED THAT:**

(a)    the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i)    ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii)    ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii)    maintaining the Company in good standing for so long as is required by law; and

(iv)    preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)    any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)    the passing of these resolutions, the Director Appointment and Removal (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with"

#3494083v1

101

funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

(d)    the Company, its Directors and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)    without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the Directors of the Company have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the directors of the Company (the "**Directors**" and each a "**Director**")  may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)    the Company, its Directors and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)    in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.    **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

## 2.   Background – Deed of Delegation and Appointment of Special Manager

2.1.    **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)    Mr Chen Zhi, as sole member of the Company, executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ▆▆▆▆ as the primary attorney-in-

fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in the Company;

(b)     by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(c)     the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(d)     Pursuant to Article 7.7 – 7.9 of the Articles, a member may appoint a proxy to speak or vote on their behalf, and pursuant to Article 7.21 the Sole Member is permitted to pass resolutions in writing in lieu of holding a meeting; and

(e)     the undersigned, being the duly appointed attorneys-in-fact of the Sole Member acting pursuant to the Power of Attorney and the Deed of Delegation, now wish to pass the resolutions set out below.

2.2.     **IT IS RESOLVED THAT:**

(a)     the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)     all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**3.   Director Appointment and Removal**

3.1.     **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2.     **IT IS FURTHER NOTED THAT:**

(a)     the Sole Member has the power to remove a director from office pursuant to Article 8.5(a) of the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removals**");

#3494083v1

103

(b)      it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the "**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)      the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)      in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.    **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.    **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)      the Removals be and hereby are approved in all respects and the removed directors shall cease to hold office as directors of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removals;

(b)      the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)      any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)       pay necessary costs and expenses of the Company;

(ii)      preserve and safeguard assets; and

(iii)     take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)      all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the

#3494083v1

104

Company be requested and directed to continue to maintain any applicable freezes, and to act only on the instructions of the Directors and only to the extent permitted by applicable law and any relevant licence or approval;

(e)     the Directors of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)     these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

(i)     the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

(ii)     the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

(iii)     any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)     if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)     the Directors be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)     nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Directors shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)     any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(k)     any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)     the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)     the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)     all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)     any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3494083v1

106

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**CHEN ZHI**

By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025.

By ███████████████████████

**Name**: ████████████

**Title**: Attorneys

**Date**: 26 February 2026 _____

#3494083v1

107

**Prince Global Holdings Limited**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** __26 February__ **2026**

---

In accordance with the Company's Memorandum and Articles of Association dated 3 August 2018  (the "**Articles**"), the undersigned, acting as primary attorney-in-fact (the "**Primary Attorney**") to the sole member of the Company (the "**Sole Member**") pursuant to a power of attorney, or an authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

**1.   Sanctions Compliance Matters**

1.1.    **IT IS NOTED THAT:**

(a)    the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i)    ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii)    ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii)    maintaining the Company in good standing for so long as is required by law; and

(iv)    preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)    any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)    the passing of these resolutions, the Director Appointment and Removal (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3494085v1

108

(d)     the Company, its Directors and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)     without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the Directors of the Company (the "**Directors**" and each a "**Director**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Directors of the Company may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)     the Company, its Directors and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)     in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.    **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

**2.   Background – Deed of Delegation and Appointment of Special Manager**

2.1.    **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)     Mr Chen Zhi, as sole member of the Company, executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ▮▮▮▮▮ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in the Company;

#3494085v1

109

(b) by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(c) the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(d) Pursuant to Article 7.7 – 7.9 of the Articles, a member may appoint a proxy to speak or vote on their behalf, and pursuant to Article 7.21 the Sole Member is permitted to pass resolutions in writing in lieu of holding a meeting; and

(e) the undersigned, being the duly appointed attorneys-in-fact of the Sole Member acting pursuant to the Power of Attorney and the Deed of Delegation, now wishes to pass the resolutions set out below.

2.2. **IT IS RESOLVED THAT:**

(a) the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b) all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**3.     Director Appointment and Removal**

3.1. **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2. **IT IS FURTHER NOTED THAT:**

(a) the Sole Member has the power to remove a director from office pursuant to Article 8.5(a) of the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removals**");

(b) it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the

"**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)     the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)     in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.    **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.    **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)     the Removals be and hereby are approved in all respects and the removed directors shall cease to hold office as directors of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removals;

(b)     the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)     any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)     pay necessary costs and expenses of the Company;

(ii)    preserve and safeguard assets; and

(iii)   take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)     all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to

#3494085v1

111

act only on the instructions of the Directors and only to the extent permitted by applicable law and any relevant licence or approval;

(e)     the Directors of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)     these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

(i)     the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

(ii)     the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

(iii)     any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)     if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)     the Directors be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)     nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Directors shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)     any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

#3494085v1

112

(k)     any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)     the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)     the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)     all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)     any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3494085v1

113

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**CHEN ZHI**

By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025.

By █████████████████████████████

**Name**: ██████████████

**Title**: Attorneys

**Date**: 26 February 2026 _____

#3494085v1

114

**Respectful Steed Limited**
(the "**Company**")

**Written Resolutions of the Sole Member of the Company dated** ___26 February___ **2026**

In accordance with the Company's Memorandum and Articles of Association dated 3 August 2018  (the "**Articles**"), the undersigned, being the sole member of the Company (the "**Sole Member**"), or attorney pursuant to a power of attorney, or an authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

1.   **Sanctions Compliance Matters**

1.1.    **IT IS NOTED THAT:**

(a)    the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i)    ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii)    ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii)    maintaining the Company in good standing for so long as is required by law; and

(iv)    preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)    any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)    the passing of these resolutions, the Director Appointment and Removal (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3494553v1

115

(d)     the Company, its Directors and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)     without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the Directors of the Company (the "**Directors**" and each a "**Director**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Directors of the Company may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)     the Company, its Directors and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)     in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.   **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

2.   **Background – Deed of Delegation and Appointment of Special Manager**

2.1.   **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)     Mr Chen Zhi, as sole member of the Company, executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ▮▮▮▮▮ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in the Company;

#3494553v1

116

(b)    by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(c)    the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(d)    Pursuant to Article 7.7 – 7.9 of the Articles, a member may appoint a proxy to speak or vote on their behalf, and pursuant to Article 7.21 the Sole Member is permitted to pass resolutions in writing in lieu of holding a meeting; and

(e)    the undersigned, being the Sole Member acting pursuant to the Power of Attorney and the Deed of Delegation, now wishes to pass the resolutions set out below.

2.2.    **IT IS RESOLVED THAT:**

(a)    the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)    all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**3.    Director Appointment and Removal**

3.1.    **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2.    **IT IS FURTHER NOTED THAT:**

(a)    the Sole Member has the power to remove a director from office pursuant to Article 8.5(a) of the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removals**");

(b)    it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the

#3494553v1

117

"**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)     the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)     in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.    **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.    **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)     the Removals be and hereby are approved in all respects and the removed directors shall cease to hold office as directors of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removals;

(b)     the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)     any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)     pay necessary costs and expenses of the Company;

(ii)    preserve and safeguard assets; and

(iii)   take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)     all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to

#3494553v1

118

act only on the instructions of the Directors and only to the extent permitted by applicable law and any relevant licence or approval;

(e)    the Directors of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)    these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

    (i)    the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

    (ii)    the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

    (iii)    any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)    if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)    the Directors be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)    nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Directors shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)    any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

#3494553v1

119

(k)  any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)  the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)  the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)  all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)  any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3494553v1

120

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**Prince Group Holdings Limited**
By: CHEN ZHI
By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025

Names:

Title: Attorneys-in-fact

**Date**:  26 February 2026

_____

#3494553v1

121

**Retain Prosper Limited**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** ___26 February_____ **2026**

---

In accordance with the Company's Memorandum and Articles of Association dated 26 September 2019 (the "**Articles**"), the undersigned, acting as primary attorney-in-fact (the "**Primary Attorney**") to the sole member of the Company (the "**Sole Member**") pursuant to a power of attorney, or a authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

**1.   Sanctions Compliance Matters**

1.1.    **IT IS NOTED THAT:**

(a)    the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i)    ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii)    ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii)    maintaining the Company in good standing for so long as is required by law; and

(iv)    preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)    any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)    the passing of these resolutions, the Director Appointment and Removal (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3494087v1

122

(d)     the Company, its Directors and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)     without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the Directors of the Company have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Directors of the Company may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)     the Company, its Directors and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)     in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.    **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

## 2.     Background – Deed of Delegation and Appointment of Special Manager

2.1.    **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)     Mr Chen Zhi, as sole member of the Company, executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ▮▮▮▮▮ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in the Company;

(b)    by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(c)    the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(d)    Pursuant to Article 7.7 – 7.9 of the Articles, a member may appoint a proxy to speak or vote on their behalf, and pursuant to Article 7.21 the  Sole Member is permitted to pass resolutions in writing in lieu of holding a meeting; and

(e)    the undersigned, being the duly appointed attorneys-in-fact of the Member acting pursuant to the Power of Attorney and the Deed of Delegation, now wish to pass the resolutions set out below.

2.2.    **IT IS RESOLVED THAT:**

(a)    the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)    all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**3.    Director Appointment and Removal**

3.1.    **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2.    **IT IS FURTHER NOTED THAT:**

(a)    the Sole Member has the power to remove a director from office pursuant to Article 8.5  of the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removals**");

(b)    it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the

#3494087v1

124

"**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)    the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)    in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.    **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.    **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)    the Removals be and hereby are approved in all respects and the removed directors shall cease to hold office as directors of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removal;

(b)    the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)    any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)    pay necessary costs and expenses of the Company;

(ii)    preserve and safeguard assets; and

(iii)    take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)    all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to

#3494087v1

125

act only on the instructions of the Directors and only to the extent permitted by applicable law and any relevant licence or approval;

(e)     the Directors of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)     these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

(i)     the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

(ii)    the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

(iii)   any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)     if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)     the Directors be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)     nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Directors shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)     any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("Ancillary Documents") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

#3494087v1

126

(k) any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l) the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m) the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n) all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o) any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3494087v1

127

128

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**CHEN ZHI**

By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025

By: ███████████████████ _____

**Name**: ███████████████

**Title**: Attorneys

**Date**: _26 February 2026_____

#3494087v1

128

**Simply Advanced Limited**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** <u>26 February</u>    **2026**

---

In accordance with the Company's Memorandum and Articles of Association dated 22 April 2020 (the "**Articles**"), the undersigned, acting as primary attorney-in-fact (the "**Primary Attorney**") to the sole member of the Company (the "**Member**") pursuant to a power of attorney, or a authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

1.1.    **Sanctions Compliance Matters**

1.2.    **IT IS NOTED THAT:**

(a)    the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i)    ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii)    ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii)    maintaining the Company in good standing for so long as is required by law; and

(iv)    preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)    any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)    the passing of these resolutions, the Director Appointment and Removal (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3493016v1

129

(d)     the Company, its Director and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)     without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the director of the Company (the "**Director**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Director may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)     the Company, its Director and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)     in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.3.    **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

1.4.    **Background – Deed of Delegation and Appointment of Special Manager**

1.5.    **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)     Mr Chen Zhi, as sole member of the Company, executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ▮▮▮▮▮ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in the Company;

#3493016v1

130

(b) by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(c) the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(d) Pursuant to Article 7.7 – 7.9 of the Articles, a member may appoint a proxy to speak or vote on their behalf, and pursuant to Article 7.21 the  Member is permitted to pass resolutions in writing in lieu of holding a meeting; and

(e) the undersigned, being the duly appointed attorneys-in-fact of the Member acting pursuant to the Power of Attorney and the Deed of Delegation, now wish to pass the resolutions set out below.

1.6. **IT IS RESOLVED THAT:**

(a) the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b) all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

1.7. **Director Appointment and Removal**

1.8. **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

1.9. **IT IS FURTHER NOTED THAT:**

(a) the Sole Member has the power to remove a director from office pursuant to Article 8.5 of the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removals**");

(b) it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the

#3493016v1

131

"**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c) the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d) in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

1.10. **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

1.11. **ACCORDINGLY, IT IS RESOLVED THAT:**

(a) the Removals be and hereby are approved in all respects and the removed directors shall cease to hold office as directors of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removal;

(b) the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Director of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c) any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i) pay necessary costs and expenses of the Company;

(ii) preserve and safeguard assets; and

(iii) take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d) all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to

#3493016v1

132

act only on the instructions of the Director and only to the extent permitted by applicable law and any relevant licence or approval;

(e)    the Director of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)    these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

(i)    the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

(ii)    the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

(iii)    any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)    if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)    the Director be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)    nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Director shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)    any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

#3493016v1

133

(k)     any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)     the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)     the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)     all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)     any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3493016v1

134

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**CHEN ZHI**

By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025

By: █████████████████████████

**Name**: ███████████████

**Title**: Attorneys

**Date**: ___26 February 2026_____

#3493016v1

135

**Southern Heritage Limited**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** <u>26 February</u> **2026**

---

In accordance with the Company's Memorandum and Articles of Association dated 23 April 2020 (the "**Articles**"), the undersigned, acting as primary attorney-in-fact (the "**Primary Attorney**") to the sole member of the Company (the "**Member**") pursuant to a power of attorney, or an authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

**1.    Sanctions Compliance Matters**

1.1.    **IT IS NOTED THAT:**

(a)    the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

   (i)    ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

   (ii)    ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

   (iii)    maintaining the Company in good standing for so long as is required by law; and

   (iv)    preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)    any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)    the passing of these resolutions, the Director Appointment and Removal (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3493061v1

136

(d)    the Company, its Director and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)    without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the director of the Company (the "**Director**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Director may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)    the Company, its Director and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)    in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.    **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

**2.**    **Background – Deed of Delegation and Appointment of Special Manager**

2.1.    **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)    Mr Chen Zhi, as sole member of the Company, executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ▮▮▮▮▮ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in the Company;

137

(b)  by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(c)  the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(d)  Pursuant to Article 7.7 – 7.9 of the Articles, a member may appoint a proxy to speak or vote on their behalf, and pursuant to Article 7.21 the Member is permitted to pass resolutions in writing in lieu of holding a meeting; and

(e)  the undersigned, being the duly appointed attorneys-in-fact of the Member acting pursuant to the Power of Attorney and the Deed of Delegation, now wish to pass the resolutions set out below.

2.2.  **IT IS RESOLVED THAT:**

(a)  the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)  all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**3.  Director Appointment and Removal**

3.1.  **IT IS NOTED THAT:** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order** "). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2.  **IT IS FURTHER NOTED THAT:**

(a)  the Sole Member has the power to remove a director from office pursuant to Article 8.5 of the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removals**");

(b)  it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the

#3493061v1

138

"**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)   the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)   in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.    **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.    **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)   the Removals be and hereby are approved in all respects and the removed directors shall cease to hold office as directors of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removal;

(b)   the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Director of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)   any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)    pay necessary costs and expenses of the Company;

(ii)   preserve and safeguard assets; and

(iii)  take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)   all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to

#3493061v1

139

act only on the instructions of the Director and only to the extent permitted by applicable law and any relevant licence or approval;

(e)    the Director of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)    these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

    (i)    the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

    (ii)    the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

    (iii)    any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)    if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)    the Director be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)    nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Director shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)    any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(k)     any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)     the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)     the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)     all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)     any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3493061v1

141

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**CHEN ZHI**

By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025

**Name**:

**Title**:  Attorneys

**Date**: _26 February 2026_____

#3493061v1

**Star Merit Global Limited**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** _____26 February_____ **2026**

---

In accordance with the Company's Memorandum and Articles of Association dated 3 July 2018 (the "**Articles**"), the undersigned, acting as primary attorney-in-fact (the "**Primary Attorney**") to the sole member of the Company (the "**Member**") pursuant to a power of attorney, or a authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

**1.      Sanctions Compliance Matters**

1.1.      **IT IS NOTED THAT:**

(a)      the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i)      ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii)      ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii)      maintaining the Company in good standing for so long as is required by law; and

(iv)      preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)      any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)      the passing of these resolutions, the Director Appointment and Removal (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

(d) the Company, its Director and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e) without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the director of the Company (the "**Director**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Director may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f) the Company, its Director and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g) in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2. **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

## 2. Background – Deed of Delegation and Appointment of Special Manager

2.1. **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a) Mr Chen Zhi, as sole member of the Company, executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ▮▮▮▮ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in the Company;

#3493073v1

144

(b)     by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(c)     the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(d)     Pursuant to Article 7.7 – 7.9 of the Articles, a member may appoint a proxy to speak or vote on their behalf, and pursuant to Article 7.21 the Member is permitted to pass resolutions in writing in lieu of holding a meeting; and

(e)     the undersigned, being the duly appointed attorneys-in-fact of the Member acting pursuant to the Power of Attorney and the Deed of Delegation, now wish to pass the resolutions set out below.

2.2.     **IT IS RESOLVED THAT:**

(a)     the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)     all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**3.     Director Appointment and Removal**

3.1.     **IT IS NOTED THAT: t**he Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2.     **IT IS FURTHER NOTED THAT:**

(a)     the Sole Member has the power to remove a director from office pursuant to Article 8.5 of the Articles and proposes to remove all of the directors of the Company with effect from the date of these resolutions (the "**Removals**");

(b)     it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the

#3493073v1

145

"**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)    the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)    in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.    **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.    **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)    the Removals be and hereby are approved in all respects and the removed directors shall cease to hold office as directors of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removal;

(b)    the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Director of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)    any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)    pay necessary costs and expenses of the Company;

(ii)    preserve and safeguard assets; and

(iii)    take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)    all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to

#3493073v1

146

act only on the instructions of the Director and only to the extent permitted by applicable law and any relevant licence or approval;

(e)    the Director of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)    these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

    (i)    the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

    (ii)    the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

    (iii)    any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)    if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)    the Director be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)    nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Director shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)    any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

#3493073v1

147

(k)     any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)     the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)     the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)     all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)     any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3493073v1

148

149

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**CHEN ZHI**

By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025

██████████████████████████████████████

**Name**: ████████████████

**Title**: Attorneys

**Date**: ___26 February 2026_____

#3493073v1

**Starry Bloom Limited**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** _____23 February_____ **2026**

---

In accordance with the Company's Memorandum and Articles of Association (the "**Articles**"), the undersigned, as the sole member of the Company (the "**Member**") hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

**1.    Sanctions Compliance Matters**

1.1.    **IT IS NOTED THAT:**

(a)    the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i)    ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii)    ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii)    maintaining the Company in good standing for so long as is required by law; and

(iv)    preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)    any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)    the passing of these resolutions, the Director Appointment (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3494605v1

150

(d)  the Company, its Director and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)  without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the director of the Company (the "**Director**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Director may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)  the Company, its Director and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)  in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.  **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

## 2.  Director Appointment and Removal

2.1.  **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

#3494605v1

151

2.2.    **IT IS FURTHER NOTED THAT:**

(a)    it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the "**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(b)    the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(c)    in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

2.3.    **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

2.4.    **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)    the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Director of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(b)    any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)    pay necessary costs and expenses of the Company;

(ii)    preserve and safeguard assets; and

(iii)    take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(c)    all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to act only on the instructions of the Director and only to the extent permitted by applicable law and any relevant licence or approval;

#3494605v1

(d)    the Director of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(e)    these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

   (i)    the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

   (ii)    the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

   (iii)    any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(f)    if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(g)    the Director be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(h)    nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Director shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(i)    any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(j)    any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for

#3494605v1

153

the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(k) the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(l) the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(m) all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(n) any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3494605v1

154

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

_Zhang Fan_

**Name**: Zhang Fan

**Title**: Director

**Date**: 23 February 2026

**Sure Tycoon Limited**
(the "**Company**")

**Written Resolutions of the Sole Member of the Company dated** __26 February__ **2026**

In accordance with the Company's Memorandum and Articles of Association dated 21 January 2020  (the "**Articles**"), the undersigned, acting as primary attorney-in-fact (the "**Primary Attorney**") to the sole member of the Company (the "**Sole Member**") pursuant to a power of attorney, or an authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

**1.      Sanctions Compliance Matters**

1.1.      **IT IS NOTED THAT:**

(a)      the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

   (i)      ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

   (ii)      ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

   (iii)      maintaining the Company in good standing for so long as is required by law; and

   (iv)      preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)      any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)      the passing of these resolutions, the Director Appointment and Removal (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3494076v1

156

(d)     the Company, its Directors and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)     without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the Directors of the Company (the "**Directors**" and each a "**Director**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Directors of the Company may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)     the Company, its Directors and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)     in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.     **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

2.     **Background – Deed of Delegation and Appointment of Special Manager**

2.1.     **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)     Mr Chen Zhi, as sole member of the Company, executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ███████ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in the Company;

#3494076v1

157

(b)     by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(c)     the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(d)     Pursuant to Article 7.7 – 7.9 of the Articles, a member may appoint a proxy to speak or vote on their behalf, and pursuant to Article 7.21 the Sole Member is permitted to pass resolutions in writing in lieu of holding a meeting; and

(e)     the undersigned, being the duly appointed attorney-in-fact of the Sole Member acting pursuant to the Power of Attorney and the Deed of Delegation, now wishes to pass the resolutions set out below.

2.2.    **IT IS RESOLVED THAT:**

(a)     the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)     all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**3.      Director Appointment and Removal**

3.1.    **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2.    **IT IS FURTHER NOTED THAT:**

(a)     the Sole Member has the power to remove a director from office pursuant to Article 8.5(a) of the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removals**");

(b)     it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the

#3494076v1

158

"**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)    the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)    in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.    **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.    **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)    the Removals be and hereby are approved in all respects and the removed directors shall cease to hold office as a director of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removal;

(b)    the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)    any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)    pay necessary costs and expenses of the Company;

(ii)    preserve and safeguard assets; and

(iii)    take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)    all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to

#3494076v1

159

act only on the instructions of the Directors and only to the extent permitted by applicable law and any relevant licence or approval;

(e)     the Directors of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)     these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

(i)     the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

(ii)    the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

(iii)   any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)     if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)     the Directors be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)     nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Directors shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)     any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

#3494076v1

160

(k)     any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)     the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)    the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)     all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)     any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3494076v1

161

162

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**CHEN ZHI**

By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025.

By: ███████████████████████

**Name**: ████████████

**Title**: Attorneys

**Date**: ____26 February 2026_____

#3494076v1

162

**Towards Sunshine Limited**
**（向暉有限公司）**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** _26 February_ **2026**

---

In accordance with the Company's Memorandum and Articles of Association dated 8 February 2018 (the "**Articles**"), the undersigned being the sole member of the Company (the "**Member**"), or attorney of the Sole Member pursuant to a power of attorney, or a authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

**1.      Sanctions Compliance Matters**

1.1.      **IT IS NOTED THAT:**

(a)      the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

(i)      ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

(ii)      ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

(iii)      maintaining the Company in good standing for so long as is required by law; and

(iv)      preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

(b)      any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

(c)      the passing of these resolutions, the Director Appointment and Removal (each as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with"

#3494441v1

163

funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

(d) the Company, its Directors and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e) without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the Directors of the Company have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Directors of the Company may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f) the Company, its Directors and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g) in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2. **IT IS FURTHER NOTED THAT t**he Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

## 2. Background – Deed of Delegation and Appointment of Special Manager

2.1. **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a) the Company is indirectly owned by Mr Chen Zhi;

#3494441v1

(b)    Mr Chen Zhi, as an indirect member of the Company, has executed a power of attorney dated 29 December 2025 (the "Power of Attorney") appointing ███████ as the primary attorney-in-fact (the "Primary Attorney") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in certain companies owned or controlled (directly or indirectly) by Mr Chen Zhi;

(c)    by a deed of delegation and appointment of special manager dated 13 February 2026 (the "Deed of Delegation"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "Special Manager") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(d)    the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(e)    the Sole Member acknowledges and notes the existence of the Power of Attorney and the Deed of Delegation, and acknowledges that the Special Manager has been appointed to exercise management and governance functions in respect of certain entities within the broader group structure of which the Company forms part; and

(f)    the undersigned, being the Sole Member now wishes to pass the resolutions set out below.

2.2.    **IT IS RESOLVED THAT:**

(a)    the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)    all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**3.   Director Appointment and Removal**

3.1.    **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2.    **IT IS FURTHER NOTED THAT:**

#3494441v1

165

(a)     the Sole Member has the power to remove a director from office pursuant to Article 8.5 of the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removals**");

(b)     it is proposed that Mr Cosimo Borrelli (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the "**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)     the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)     in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.    **IT IS FURTHER NOTED THAT** pursuant to Article 10.8 of the Articles, the members of the Company may pass a written resolution, notified to and approved by all members of the Company, which shall take effect immediately and without the need for any meeting or further notice.

3.4.    **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)     the Removals be and hereby are approved in all respects and the removed directors cease to hold office as directors of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removal;

(b)     the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)     any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)      pay necessary costs and expenses of the Company;

(ii)     preserve and safeguard assets; and

(iii)    take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those

#3494441v1

166

authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)     all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the Company be requested and directed to continue to maintain any applicable freezes, and to act only on the instructions of the Directors and only to the extent permitted by applicable law and any relevant licence or approval;

(e)     the Directors of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f)     these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

   (i)      the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

   (ii)     the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

   (iii)    any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g)     if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h)     the Directors be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i)     nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Directors shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j)     any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("Ancillary Documents")

as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(k)    any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)    the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)    the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)    all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)    any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3494441v1

168

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**Prince Global Group Limited**

By: CHEN ZHI
By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025

██████████████████████████

_____

Names: ████████████████

Title: Attorneys-in-fact

**Date**:    26 February 2026

_____

#3494441v1

169

**United Riches Global Limited**
(the "**Company**")

---

**Written Resolutions of the Sole Member of the Company dated** __26 February_____ **2026**

---

In accordance with the Company's Memorandum and Articles of Association dated 3 July 2018 (the "**Articles**"), the undersigned, acting as primary attorney-in-fact (the "**Primary Attorney**") to the sole member of the Company (the "**Member**") pursuant to a power of attorney, or a authorised representative of the Primary Attorney, hereby takes the following actions and adopts the following resolutions as written resolutions of the Sole Member on the date set out above.

1. **Sanctions Compliance Matters**

1.1.     **IT IS NOTED THAT:**

   (a)     the Sole Member records and declares that the purpose and intent of these resolutions is strictly limited to:

   (i)     ensuring the Company's compliance at all times with applicable sanctions laws and regulations having force in the British Virgin Islands (including as extended by the relevant UK Orders in Council) and in any other jurisdiction engaged by the Company's affairs;

   (ii)     ensuring full compliance with the BVI Business Companies Act, 2004 (as amended) (the "**Act**") and any applicable rules made thereunder;

   (iii)     maintaining the Company in good standing for so long as is required by law; and

   (iv)     preserving the value and integrity of the Company's assets, including ensuring that any funds or economic resources subject to asset-freeze measures remain frozen, pending any licence or other authorisation issued by a competent authority;

   (b)     any funds or economic resources owned, held or controlled (directly or indirectly) by, or for the benefit of, any designated person, sanctioned person or person owned or controlled by such a person, shall remain frozen and shall not be dealt with, used, accessed, moved, transferred, altered or otherwise changed in their volume, amount, location, ownership, possession, character or destination, save to the extent authorised by a licence, direction or other written approval issued by the relevant competent authority, and no step will be taken which would enable the use of such funds or economic resources absent such authorisation;

   (c)     the passing of these resolutions, the Director Appointment and Removal (as defined below) and the exercise of corporate governance or stewardship functions for the purposes described herein are not intended to, and shall not, of themselves constitute "dealing with" funds or economic resources, "allowing access to" funds, or "making any other change that would enable use" within the meaning of applicable sanctions legislation;

#3493042v1

170

(d)    the Company, its Director and its attorneys-in-fact (as defined below) shall conduct the Company's affairs in a manner that preserves the frozen status of any affected assets and is consistent with the protective and precautionary purposes of applicable sanctions regimes, including the preservation of value for the benefit of ultimate stakeholders in accordance with law and public policy;

(e)    without prejudice to any statutory duties, the Company shall not take any step in relation to any funds or economic resources that are, or may be, subject to an asset freeze (including any realisation, distribution, transfer, set-off, payment of costs and expenses, or exercise of rights that would change the volume, amount, location, ownership, possession, character or destination of such assets) unless and until the director of the Company (the "**Director**") have obtained and hold in force all licences, directions or other written approvals required from each relevant competent authority with jurisdiction over the proposed act; provided that the Director may take preparatory, custodial, preservatory and record-keeping steps that do not constitute dealing with frozen funds or economic resources, and may apply for, receive and implement any licences or approvals, in each case strictly in accordance with applicable law;

(f)    the Company, its Director and its attorneys-in-fact shall conduct the Company's affairs in a manner aligned with applicable public policy objectives of the relevant sanctions regimes, including the preservation of assets for the ultimate benefit of lawful stakeholders and avoidance of any act that would defeat or frustrate the object and purpose of the sanctions; and

(g)    in pursuing any licensed activity, the Company shall act only to the extent necessary and proportionate to preserve, protect or realise assets in accordance with the terms and conditions of the licence and applicable law.

1.2.    **IT IS FURTHER NOTED THAT** the Company proposes to take such steps as are reasonably necessary to maintain the Company in good standing and to comply with statutory filing, notice and reporting requirements under British Virgin Islands law, including the payment of government fees, registered office fees and reasonable professional fees; provided that if any such step would involve dealing with frozen funds or economic resources, it shall be undertaken only pursuant to and in accordance with an applicable licence, direction or other approval from the relevant competent authority.

## 2.   Background – Deed of Delegation and Appointment of Special Manager

2.1.    **IT IS NOTED AND ACKNOWLEDGED THAT:**

(a)    Mr Chen Zhi, as sole member of the Company, executed a power of attorney dated 29 December 2025 (the "**Power of Attorney**") appointing ███████ as the primary attorney-in-fact (the "**Primary Attorney**") alongside a number of other attorneys-in-fact, with full power and authority to exercise all rights attaching to his shares in the Company;

#3493042v1

171

(b)    by a deed of delegation and appointment of special manager dated 13 February 2026 (the "**Deed of Delegation**"), the Primary Attorney has delegated to Mr Cosimo Borrelli (the "**Special Manager**") the powers conferred under the Power of Attorney in respect of shares and other interests in companies owned or controlled (directly or indirectly) by Mr Chen Zhi, and has appointed Mr Cosimo Borrelli as Special Manager over such assets and entities;

(c)    the delegated powers include, non-exhaustively, the authority to exercise voting and management rights, to appoint and remove directors and other officers, and to execute resolutions and other instruments concerning the relevant assets;

(d)    Pursuant to Article 7.7 of the Articles, a member may appoint a proxy or authorise any person to speak and vote on their behalf, Article 7.7 – 7.9 provides that such proxy or authorised person is permitted to exercise all delegated powers of the member, and pursuant to Article 7.21 the  Member is permitted to pass resolutions in writing in lieu of holding a meeting; and

(e)    the undersigned, being the duly appointed attorneys-in-fact of the Member acting pursuant to the Power of Attorney and the Deed of Delegation, now wish to pass the resolutions set out below.

2.2.    **IT IS RESOLVED THAT:**

(a)    the entry into and execution of the Deed of Delegation by the Primary Attorney on behalf of Mr Chen Zhi be and is hereby acknowledged, confirmed, ratified and approved in all respects; and

(b)    all acts done and documents executed by the Primary Attorney and/or the Special Manager pursuant to and in accordance with the Power of Attorney and the Deed of Delegation in connection with the Company be and are hereby acknowledged, confirmed, ratified and approved in all respects.

**3.   Director Appointment and Removal**

3.1.    **IT IS NOTED THAT** the Company is currently subject to provisional liquidation proceedings pursuant to an Order of the Court (the "**Order**"). Nothing in these resolutions is intended to contravene or interfere with any aspect of the Order. The Sole Member notes that the Order does not prohibit the appointment and removal of directors and that, by necessary implication, the shareholders must be able to continue to exercise those powers in order for there to be a board of directors in existence who can represent the interests of shareholders and monitor, and if necessary challenge, the actions of the provisional liquidators.

3.2.    **IT IS FURTHER NOTED THAT:**

(a)    the Sole Member has the power to remove a director from office pursuant to Article 8.5 of the Articles and proposes to remove all of the directors with effect from the date of these resolutions (the "**Removal**");

#3493042v1

172

(b)     it is proposed that Mr Cosimo Borrelli  (the "**Additional Director**") be appointed as an additional director of the Company with effect from the date of these resolutions (the "**Appointment**") to hold office in accordance with the Articles, as the same may be amended and/or restated from time to time;

(c)     the Additional Director has agreed to accept his appointment as a director of the Company on the basis that the indemnity in the Articles will be deemed to form part of his terms of appointment with the Company and accordingly that he would be able to enforce such indemnity against the Company; and

(d)     in connection with the proposed Appointment, the Company has received a signed consent to act as a Director of the Company from the Additional Director.

3.3.     **IT IS FURTHER NOTED THAT** the members of the Company may pass a unanimous written resolution, which shall take effect immediately and without the need for any meeting or further notice.

3.4.     **ACCORDINGLY, IT IS RESOLVED THAT:**

(a)     the Removals be and hereby are approved in all respects and the removed directors shall cease to hold office as directors of the Company with immediate effect, and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Directors of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Removal;

(b)     the Appointment be and hereby is accepted and approved in all respects and the registered agent of the Company be and is hereby authorised and instructed to update the Register of Director of the Company accordingly and to attend to all necessary filings with the Registrar of Corporate Affairs in the British Virgin Islands in respect of the Appointment;

(c)     any Director be authorised and instructed to prepare, make and prosecute applications to the relevant competent authorities (including, as applicable, His Excellency the Governor of the British Virgin Islands acting with the consent of the UK Secretary of State, and any other licensing authority with jurisdiction) as they deem necessary for licences or other approvals required to:

(i)     pay necessary costs and expenses of the Company;

(ii)     preserve and safeguard assets; and

(iii)     take any other steps permitted by law; and be further authorised to make such disclosures and give such undertakings as are reasonably required by those authorities, regulators, custodians, banks or administrators for compliance with sanctions and applicable law;

(d)     all banks, custodians, administrators, registered agents, corporate service providers and other counterparties holding or controlling any funds or economic resources of, or for, the

#3493042v1

173

Company be requested and directed to continue to maintain any applicable freezes, and to act only on the instructions of the Director and only to the extent permitted by applicable law and any relevant licence or approval;

(e) the Director of the Company be and are authorised to provide copies of these resolutions to such persons as evidence of their mandate and the restrictions herein;

(f) these resolutions shall be interpreted and implemented consistently with the views of the common law courts that:

(i) the exercise of shareholder or corporate governance rights to appoint or remove officeholders does not, of itself, constitute prohibited dealing with frozen funds or economic resources;

(ii) the sanctions regimes are protective and precautionary and aim to preserve assets intact, not to paralyse lawful stewardship that does not dissipate value; and

(iii) any act that would use, allow access to or enable use of frozen assets requires appropriate licensing;

(g) if any provision of these resolutions would, absent a licence or approval, contravene an applicable sanctions prohibition, such provision shall be construed, limited and applied so as to comply with the prohibition and shall be effective only to the extent permitted by any applicable licence, direction or other authorisation; and nothing in these resolutions shall authorise, require or permit any person to take any step that would contravene applicable sanctions law;

(h) the Director be authorised and instructed to establish and maintain records sufficient to demonstrate ongoing compliance with applicable sanctions laws and the terms of any licences, directions or approvals obtained, and shall make such reports or notifications to competent authorities as are required by law or licence;

(i) nothing in these resolutions shall derogate from or limit the statutory duties, powers and discretions of directors of a company under the Act; provided that, where the exercise of any such power would amount to dealing with frozen funds or economic resources, the Director shall exercise such power only to the extent permitted by, and in accordance with, an applicable licence, direction or other approval from the relevant competent authority;

(j) any Director be authorised to give, make, sign, execute (under hand or seal or as a deed) and deliver any agreements, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies, appointments of agents for service of process and other documents (whether of a like nature or not) ("**Ancillary Documents**") as may in the sole opinion and absolute discretion of any such director of the Company be considered necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

#3493042v1

174

(k)     any Director be authorised to do all such acts and things and to agree all fees, as might in the sole opinion and absolute discretion of any such director be necessary or desirable for the purpose of giving effect to, consummating or completing or procuring the performance and completion of the transactions contemplated by or referred to in these resolutions;

(l)     the Ancillary Documents be in such form as any Director shall in such Director's absolute discretion and sole opinion approve, the signature of any such Director on any of the Ancillary Documents being due evidence for all purposes of such Director's approval of the terms thereof on behalf of the Company;

(m)     the Ancillary Documents (where required to be executed by the Company) be executed by the signature of any Director or, where required to be executed as a deed, be either (a) sealed by the affixing thereto of the common seal of the Company, and witnessed as required by the Articles, or (b) executed as a deed by any Director on behalf of the Company;

(n)     all the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner set out above; and

(o)     any and all prior acts of any Director, officer and/or other agent of the Company in connection with the Appointment and the aforementioned matters including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorisations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be and are hereby confirmed, ratified and approved in all respects.

[*signature page follows*]

#3493042v1

175

**IN WITNESS WHEREOF** the undersigned, being the Sole Member of the Company for the time being, hereby adopts and passes the foregoing resolutions on the date set out above.

**CHEN ZHI**

By his duly appointed attorneys-in-fact pursuant to the Power of Attorney dated 29 December 2025

By: █████████████████████████

**Name**: ███████████████

**Title**: Attorneys

**Date**: _____26 February 2026_____

#3493042v1





26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B - Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 181 of 278

# Part I:

# Chinese courts go after 'notorious' Cambodian conglomerate

*Under Cambodian patronage, the Prince Group netted billions; Chinese courts accuse it of massive money laundering.*

**Jack Adamović Davies and Mary Zhao for RFA Investigative**

2024.02.05

Sahajak Boonthanakit, a Thai actor, will never forget the day he met Chen Zhi.

"He was very much – I don't want to make this too dramatic – but very much like a godfather. He didn't say much, I believe, except hello," Sahajak recalled in an interview with RFA. "He seemed so powerful."

Chen, a Chinese émigré, is indeed one of Cambodia's best-connected tycoons. At the time of the 2018 meeting, he held a position equal to secretary of state as an adviser to Cambodia's Interior Ministry. He later became an adviser to then-Prime Minister Hun Sen and today holds the same position for Hun Sen's successor and son, Prime Minister Hun Manet, according to royal decrees granting him the roles. His Prince Group

conglomerate, which includes real estate, malls, banks and more across Cambodia, has raked in billions of dollars.

To Sahajak, though, the short, pale, goateed 30-year-old was just the enigmatic "money man" financing his latest film and hosting a meal at a Phnom Penh villa overlooking the Mekong river.

After luxury cars ferried the cast and crew to Chen's home, Sahajak and his colleagues were led to a banquet hall. A large round table seating roughly 20 was laid with fine wines and delicacies, including shark-fin soup, which regularly sells for hundreds of dollars a bowl.

The film they were celebrating was Cambodia's first attempt at a homegrown, Hollywood-style action flick. "The Prey" centers on Xin, a Chinese detective wrongly imprisoned in a remote Cambodian prison while working undercover to penetrate a violent gang engaged in unspecified but lucrative cybercrimes.

In backing Cambodia's first big-budget action movie, Chen likely sought to establish himself as a tycoon of consequence.

But it was also a sort of Freudian slip of the checkbook. Chinese police have been investigating whether much of Chen's wealth is drawn from illegal activities similar to those featured in the film, RFA has learned.

Previously unreported Chinese criminal court judgments dating from 2020 to 2022 describe Chen's Prince Group as a "notorious transnational online gambling criminal group" that has generated at least 5 billion yuan ($700 million) in illicit revenue. In May 2020, Beijing police established a special task force to investigate the Prince Group, court records show. Since then, there have been at least seven judgments from separate Chinese provincial courts convicting low-level Prince Group or Prince Group-linked employees of gambling and money laundering offenses.

The Prince Group itself and Chen so far do not appear to have become the subjects of a Chinese prosecution. A representative of Prince Group told RFA the company denies all the allegations, which it believes are the result of "impersonation by criminal elements."

26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B - Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 184 of 278

But to understand how Prince Group could draw such scrutiny, it is necessary to look at how Chen transformed from an unknown small business owner in his native China to a multibillionaire Cambodian citizen. Today, he boasts deep connections to Cambodia's most powerful officials, which may well have protected him and other Prince Group executives — at least thus far.

This is the first of three stories examining how his Prince Group came to rise so rapidly, where the wealth came from and why Chinese law enforcement is looking at it so closely.

# A princely rise to power

Chen was born on Dec. 16, 1987, in Fujian, which has for centuries been a hub of international trade. He was "a young business prodigy," according to a biography posted on the website of DW Capital Holdings, the Singapore fund manager for his personal investments. Before the age of three, the biography claims, he was assisting with a family business in Shenzhen.

Chen's first solo venture was apparently a small internet café in Fujian's capital, Fuzhou, according to the website. In 2011, the bio noted, Chen sailed off into the "uncharted waters of real estate development in Cambodia."

Chen's business ventures came into sharper focus when he emigrated to Cambodia, where opportunities abound for the smart and well-connected.

His first firm was a Phnom Penh-based real estate company established the year he emigrated, according to bank records seen by RFA. In 2015, he founded Prince and it soon became an omnipresent brand on the streets of Cambodian cities.

Its real estate arm, the Prince Group, played a major role in the transformation of Sihanoukville from a quiet, if seedy, coastal resort to a Chinese casino boomtown. Having seen healthy returns on its thousands of Sihanoukville apartments and hotels, the Prince Group branched out into Phnom Penh condominiums, supermarkets and shopping malls. Within a year of its founding, they began offering banking services as a private microfinance institution. Three years later, the group received its commercial bank license.

As Chen's businesses were growing, so too was his political capital.

On Feb. 16, 2014, Chen was naturalized as a Cambodian citizen. Naturalization – which requires an investment or government donation of about $250,000 – has become an increasingly popular route for wealthy foreigners, but few have made the personal inroads Chen has. Three years later, a royal decree declared him an adviser to the Interior Ministry. While unpaid, the role gave Chen status in Cambodia equivalent to that of an undersecretary of state.

Weeks after he received that title in 2017, Chen went into business with Sar Sokha. At the time, Sokha's father was the powerful interior minister. In 2023, Sokha took over the position himself.

Chen and Sokha's business – Jinbei (Cambodia) Investment Co. Ltd. – was dissolved in 2021, but it was the first of five companies with names featuring the word Jinbei established by Chen and other Prince executives, according to Cambodian business records. Together, the companies formed the Jinbei Group, whose website today boasts of $300 million invested in the Cambodian tourism sector.

Though they are separate entities, so close is the association between the companies that Chinese authorities have called Jinbei a "subsidiary" of Prince in court documents linking the two – a description Prince Group rejects.

Jinbei's flagship is arguably a seven-story, 16,500 square meter Sihanoukville hotel and casino called the Jinbei, or Golden Shell, in Mandarin. It opened in 2017.

The resort, which boasts 43 gaming tables spread over a 2,000 square meter casino floor, and two V.I.P. saloons, was one of more than 100 casinos to open in Sihanoukville in the years leading up to 2019 – boom years that saw the city feted as a new Macau.

Speaking to Macau Business in 2019, Jinbei's marketing manager, Victor Chong, attributed this flourishing to the Cambodian government's "pro-business" stance, under which he said a casino license was issued to anyone willing to pay the $40,000 annual fee.

26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B -
Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 188 of 278

# Online, under the table

Though the laws are not always enforced, gambling is
illegal for Cambodian citizens. It was Chinese nationals
who made up most of the customers in Sihanoukville's
gambling dens as well as the lion's share of proprietors.

Throughout the mid- and late-2010s, the gamblers were joined by an influx of Chinese gangsters looking to make quick money as loan sharks and extortionists. Bodies started washing up on the beach. Prostitution, illegal in Cambodia, flourished. Cybercriminals, who had long used Sihanoukville as a base, exploded in numbers. Many scammers targeted their compatriots back in China.

A sense of impunity began to reign with brazen gangland-style shootings in the streets and at restaurants. The intended victims were invariably Chinese, although Cambodians were occasionally caught in the crossfire.

The atmosphere drew China's ire – but what may have troubled Beijing even more than the upswing in crimes against its nationals was the business model many of the casinos used. Most were hosting online gambling websites targeting customers in China, a clear violation of Chinese law.

Citing the rising crime, and likely bowing to pressure from Beijing, Prime Minister Hun Sen in 2019 outlawed online gambling operations. The consequences for Sihanoukville were nearly instantaneous. More than 200,000 Chinese workers and entrepreneurs abandoned the city, and thousands more were stuck without funds to get home.

The pandemic, China's tight travel restrictions and its domestic economic struggles have only compounded the problems. Four years on and Sihanoukville's skyline is a mess. At night, the blinking lights of the few remaining casinos glimmer through skeleton frames of half-finished skyscrapers, abandoned mid-construction.

But if there are losers here, the Prince Group isn't one of them.

On a visit by RFA last year, Jinbei was still welcoming guests through its doors under a gigantic neon clam filled with lucky red dice. The multi-story Prince Mall, home to luxury goods stores, a videogame arcade and the Prince Supermarket, replete with lobster tanks, still beckoned the odd shopper. And at the heart of the

mall's ground floor a display stand for the group's real estate arm showcased architects' models for coastal and metro skyscraper apartments.

Even the Nonni II, Chen's $24 million superyacht with an onboard home cinema and a disco bar, still could be seen docked at Sihanoukville's ports from time to time.

What has allowed Prince to flourish while so many competitors saw their bubbles burst? The answer, according to court documents, is crime – on a massive scale.

# High-tech money mules

According to court records seen by RFA, Chinese law enforcement began openly investigating the Prince Group in 2020 and, in particular, whether at least a third of its estimated $2 billion investment value came from illegal online gambling operations.

In May 2020, the Beijing Municipal Public Security Bureau created a group called the 5.27 Special Task Force. It was formed "to investigate and handle the case of the notorious transnational online gambling criminal group, known as the 'Prince Group,' in Cambodia," according to a 2021 court judgment. Prince spokesman Gabriel Tan wrote in an email that this task force "is not related to any activities of Prince Holding Group." In a follow-up note he said that any explicit mention of Prince within court documents is due to " impersonation issues."

The judgment describing the task force – from a district court in Henan – was one of several issued in different provinces against individuals linked to the Prince Group who are accused of money laundering and gambling.

Some of these individuals worked directly for the conglomerate, while others worked for Prince-linked companies, including Jinbei. One judgment describes Jinbei as "a subsidiary of the Cambodian Prince Group" that "has developed a series of gambling software and put it on the Chinese network platform."

The Prince Group is also accused of continuing to run the type of online casinos Hun Sen banned in 2019, the court documents suggest.

Chinese citizens are allowed to move only $50,000 out of the country each year. Those capital controls would stymie the efforts of anyone trying to run illicit online

189

casinos, such as the Prince Group has been accused of doing.

The solution Prince is alleged to have arrived at, the Chinese courts found, was employing a vast network of individuals to ferry bank cards between China and Cambodia. In all, the task force identified 458 people who had allegedly moved money in this way for the Prince Group.

One such money mule, Guo Caina, was 28 when in March 2018 she was recruited from her hometown of Luoyang to work for Prince in Cambodia, according to the court judgment against her. Her job would be a mix of customer service and bookkeeping, she had been told. Once in Cambodia, Guo handed over four Chinese bank cards in her name in exchange for 1,000 yuan ($140) per card. She quit the company after one day and went back to China but was rebuffed when she asked to have her bank cards returned. By the end of April 2018 more than 140 million yuan ($19.5 million) in gambling funds had passed through her bank accounts, according to the judgment.

Guo pled guilty to being part of a conspiracy to open a casino. She was given a suspended sentence and fined 30,000 yuan ($4,200).

Guo's case is far from unique. The court judgments reviewed by RFA are littered with mules like Guo being convicted for processing gambling funds, so the Chinese believe, on behalf of the Prince Group and Jinbei.

A July 2022 announcement by the Wancang County Court in Sichuan province estimated the Prince Group's illicit profits from gambling activities since 2016 at more than 5 billion yuan ($700 million).

Multiple attempts to reach Chen were unsuccessful, but Prince spokesman Tan told RFA that the company "categorically denies any involvement with Jinbei Group and the alleged online gambling operations."

190

26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B - Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 194 of 278

"The references to 'Cambodia Prince Group' in the Chinese court documents are likely the result of impersonation by criminal elements," Tan wrote in an email, adding that the company is "aware of multiple instances where our company's name has been misused by unauthorized entities, individuals and criminal elements."

He similarly denied that the company had made use of Chinese employees' bank cards to transfer online gambling funds, calling the allegations "completely unfounded with respect to the Prince Holding Group." Jinbei could not be reached for comment.

191

# Too connected to jail?

The prosecutions against Prince's alleged money mules and betting agents are part of a wider war on gambling announced by the Chinese government in 2018. Beijing views online casinos as a national security threat, estimating gambling to be responsible for 1 trillion yuan ($145 billion) in capital flight each year.

In January 2023, a Macau court sentenced Alvin Chau, one of the island's most successful gaming tycoons, to 18 years in prison on 162 charges, including heading an organized crime group, fraud and facilitating illegal online gambling.

In August, nine Chinese-born Cambodians were arrested in Singapore as part of the city state's largest ever money-laundering investigation. Prosecutors accused them of operating illegal gambling websites targeting mainland China. Observers noted that the crackdown came one week after Chinese Foreign Minister Wang Yi visited Singapore, suggesting that Beijing might have been behind the charges – especially since several of the accused had outstanding arrest warrants in China.

The Prince Group may present a more complex challenge for Beijing. The Chinese police and judiciary appear intent on pursuing a case that Prince and its subsidiaries constitute a criminal group. But the names of Chen and other senior figures in the group – many of whom are his uncles and cousins – have been wholly absent from any Chinese court judgments.

Where they remain present, however, is in the political fabric of China's most reliable regional ally.

When regional heads of state converged on Phnom Penh in November 2022 for the Association of Southeast Asian Nations' biannual meeting, Hun Sen presented them with limited-edition luxury watches

2/28/26, 7:15 PM

26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B - Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 196 of 278

valued at $20,000 apiece. The face of each timepiece was emblazoned with the name of Chen's Cambodian watchmaker, Prince Horology.

26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B - Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 197 of 278

Further afield, in his role as Hun Sen's personal adviser – a position he has held since 2020 – Chen has accompanied him on a diplomatic mission to Cuba and doled out aid on the government's behalf to neighboring Laos. He is also a personal adviser to former National Assembly President Heng Samrin and former Interior Minister Sar Kheng. Shortly after Hun Manet became Cambodia's first new prime minister in four decades, Chen was named one of his 104 advisers. Those ranks give him a rank equal to minister.

Any attempt to charge Chen directly, then, would necessarily implicate Cambodia's top law enforcement official and embarrass both the former and current prime ministers. Beijing spent decades of diplomatic effort and billions of dollars turning the Hun dynasty into one of China's most ardent friends.

Sok Eysan, a spokesman for the ruling Cambodian People's Party, said he could not comment and referred RFA to Cambodian government spokesman Pen Bona, who did not respond to multiple requests for comment.

Cambodian American academic Ear Sophal, who has authored books on Cambodia and China, told RFA it seems unlikely Chen will be heading to prison anytime soon.

"Clearly, someone's untouchable," Sophal said. "Is Chen Zhi trying to do something political in China? No. So it's okay, it's just money; his underlings will pay."

https://www.rfa.org/english/special-reports/prince-group/assets/p1-prince-group-investigation.html

194

2/28/26, 7:15 PM

26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B -
Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 198 of 278

Previous                                                                                      Next



**Part III: Torture, forced labor alleged at Prince Group-linked compound**

**Part II: Red flags abound in Prince Group's offshore dealings**

195

**Part III: Torture, forced labor alleged at Prince Group-linked compound**

**Part II: Red flags abound in Prince Group's offshore dealings**





## Part II:

# Red flags abound in Prince Group's offshore dealings

*An RFA investigation raises questions about the legitimacy of a Prince gaming subsidiary.*

**By Jack Adamović Davies for RFA Investigative**

2024.02.08

Since its founding eight years ago, the Prince Group has emerged as one of Cambodia's most ubiquitous brands. Its name touches nearly every corner of the Cambodian marketplace: shopping malls, supermarkets, banks, casinos, apartments, cinemas, office blocks, private jets, pleasure boats, film production, hotels, venture capital firms, ride-hailing services, restaurants and more.

The company's reach also extends well beyond Cambodia. Its leaders have a controlling interest in at least three companies listed on the Hong Kong stock exchange. Prince Chairman Chen Zhi, an enigmatic 36-year-old Chinese national who rose to become a top adviser to both Cambodia's current and former prime ministers, owns a quarter of Cuba's national cigar company, valued at $2.8 billion, as well as a $114 million office building in one of London's richest neighborhoods.

In total, RFA has identified more than $1.5 billion of assets and investments in 31 countries in which senior Prince Group executives have a stake.

The group, however, has never fully accounted for its wealth. It maintains that its multi-billion dollar growth over the past eight years is due to savvy business practices and what was, until recently, Cambodia's relentlessly booming property market.

But an RFA investigation that includes court records, banking documents, payment slips and interviews with company insiders tells a different story.

In the first part of our series, RFA examined the Prince Group's rapid rise, political connections and alleged criminality.

Here we explore how the Prince Group has stealthily moved millions of dollars around the world in a way that experts say bears many of the hallmarks of money laundering.

RFA's investigation has revealed that a company controlled by Chen, Amiga Entertainment, registered in the Isle of Man, is in fact a shell company that uses these suspected money laundering tactics.

RFA's investigation supports allegations made by Chinese prosecutors that much of the money Prince has used to build its empire was acquired through fraud, including hundreds of millions from illegal gambling and an extensive money laundering network.

RFA has attempted to contact Chen on numerous occasions without success, but the Prince Group disputes the charges against both the company and its chairman. A spokesperson for the company responded to allegations of illegality in Chinese courts by claiming it is a victim of identity theft and that criminals have used its corporate identity to carry out illicit activities.

26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B -
Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 202 of 278

# The wealthy uncle

199

In December 2018, a company owned by Prince Group founder Chen named Amiga Entertainment applied for an account with the Cayman National Bank in the Isle of Man. The bank rejected the company's request, despite the fact that by then the Prince Group was a key player in the Cambodian marketplace. A hack of the bank's records 11 months later gives a clue as to why.

Money laundering is the process of making money gained through illegal means appear legitimate. It usually involves bouncing the money through a series of fictitious transactions, often spanning multiple jurisdictions, to give the illusion that it is the product of legitimate business activity.

Emails, transaction records and other documents contained within the hack, which was shared by whistleblowing non-profit Distributed Denial of Secrets, chart Amiga Entertainment's failed attempt to land an account with Cayman National Bank. The hack showed the Prince Group was unwilling to reveal the source of its money – even when applying for a bank account.

Any time a person or a business applies for a bank account or conducts a large transaction, bank officials are supposed to ask where the money comes from and to verify the claims as best they can. This process is designed to prevent criminals from getting access to the financial system and spending their ill-gotten gains. In the case of Amiga Entertainment, the due diligence carried out by Cayman National Bank shows just how little the mega-conglomerate was willing to share about the source of its funds.

At the time of the application, Amiga's immediate parent company was an Isle of Man online casino operator named Ableton Prestige Global Limited. An email to the bank by Ableton director John Corteen, which was among the hacked documents, reveals that Ableton's owners were Prince Group chairman Chen and his wife,

200

26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B - Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 204 of 278

Li Caiyun. Corteen included a link to a Prince Group advertisement in the Phnom Penh Post to provide "some details of Mr. Chen's businesses."

The bank responded by seeking more information about the origins of Chen's wealth.

"In respect of Mr. Chen Zhi's source of wealth, Mr. Chen Zhi first obtained a personal loan of US$2 million from his uncle to start Cambodian Heng Xin Real Estate Investment Co. Ltd. sometime in or around 2011," reads an internal Cayman National Bank file note summarizing the response of Chen's representatives, dated July 2019.

Chen's explanation for the origins of his fortune would be unacceptable to most banks, according to financial crime expert Graham Barrow, who spent 25 years working for banks and the wider financial services industry.

"An uncle who lends you $2 million is such a generic statement as to be wholly inadequate for any financial institution to accept because they need to understand the ultimate source of wealth, not an intermediate source," Barrow told RFA. "It gives the impression that they don't want anyone to dig too deep into their source of wealth."

A little over two months after the file note was created, a compliance official at the bank sought more details, in an email dated Oct. 7, 2019. Crucially, she wanted to know the name of the uncle who loaned Chen the $2 million in 2011 and where he got the money.

Chen and his representatives never responded, which is another red flag, according to Oliver Bullough, author of "Moneyland: Why Thieves and Crooks Now Rule the World and How To Take It Back."

"If someone asks you to explain your wealth and you go away, that's not a good sign because it isn't that difficult to do," Bullough told RFA.

2/28/26, 7:16 PM

26-10769-mg   Doc 31-2   Filed 04/20/26   Entered 04/20/26 16:17:23   Exhibit B -
Exhibit CB-1 of the Affirmation of Cosimo Borrelli   Pg 205 of 278

Corteen and Chen did not respond to requests for comment on the issues raised in this story. Emails to the address listed on Amiga's website bounced back with an error message indicating the message had been blocked, while emails to Ableton went unanswered.

# Don't ask, don't tell

If the mystery funds set off alarm bells, the ownership structure of Amiga may well have rung others.

At the time of its incorporation in October 2018, Amiga Entertainment's ultimate parent company was the Singapore-registered Infinite Deemarco Pte Ltd. The man listed in Singapore company records as Infinite Deemarco's owner at that time, a Filipino American lawyer named Henry Yeh, told RFA that he had no idea where the company's financing came from.

"I was told that it came from China as Prince [management] are all from China," Yeh said. "They have every right not to tell me or to lie to me as I was just an employee."

In admitting that he was the owner in name only, Yeh shed light on how Prince Group frequently manages its subsidiaries as a series of shell corporations so that their connection to the group is not apparent from their shareholders and directors. A 2022 report by the World Bank warned that such structures are ripe for abuse.

This "don't ask, don't tell" approach to managing billions of dollars is familiar to Kimberly Kay Hoang, a University of Chicago sociology professor who spent 18 months shadowing Southeast Asian investment professionals for her book "Spiderweb Capitalism." The book reveals the way high-level business is done in the region, allowing politically connected individuals to merge their illicit wealth with legitimate business enterprises.

CEOs like Yeh find themselves "assuming all the criminal and reputational risk and being highly compensated for doing it," Hoang told RFA. In exchange, they "generally don't ask questions about the origin and source of funds." Yeh is not accused of any wrongdoing.

Eighteen months after he founded the company, Yeh transferred his shares to an individual who holds directorships in three Prince Group companies in Cambodia, according to Singaporean and Cambodian corporate records reviewed by RFA.

2/28/26, 7:16 PM

26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B -
Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 207 of 278

Ben Cowdock, a senior investigator at Transparency International U.K., also believes Yeh's description of arrangements at Infinite Deemarco are cause for concern.

"If you have the CEO and shareholder of a company not knowing where their business earns money, they're either wildly negligent or acting on behalf of someone else," Cowdock told RFA, having been briefed on Infinite Deemarco's ownership structure. "Those putting their name on official paperwork for a third party is a widely known method of avoiding undue scrutiny from the authorities."

26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B - Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 208 of 278

# Slot machines and washing machines

In 2020, Beijing established a special police task force to investigate the Prince Group. Subsequent court cases against low-level employees have determined that at least 5 billion yuan ($700 million) of Prince Group funds are from illegal gambling.

RFA's investigation into Amiga Entertainment sheds additional light on how Prince Group sought to hide where its money came from.

It was during Yeh's brief tenure as Infinite Deemarco's owner and CEO that the company incorporated Amiga Entertainment as its subsidiary in the Isle of Man. Yeh told RFA that Amiga Entertainment's business model was, "to make similar games without infringing IPs [intellectual property]." In essence, to produce cheap knock-offs of already existing video games.

Documents reviewed by RFA show the true business model was more complex.

Amiga Entertainment's website showcases the games it develops. Each one is essentially a slot machine, with players placing bets in the hope that certain combinations of symbols appear. Such games are legal in the Isle of Man. However, banking records seen by RFA show that Amiga was licensing these games to companies in China, where – outside of the state lottery – all forms of gambling are strictly forbidden.

The contracts specified that the Chinese companies would pay £940,000 ($1 million) a year in exchange for the right to market one of Amiga Entertainment's games to their customers. Additionally, the Chinese companies would pay 30% of any revenue earned. (Asked about these contracts, Yeh responded, "I don't know anything about copycat games for millions.")

The twist, according to a former Prince insider who was familiar with the workings of Amiga Entertainment and its parent companies, is that these transactions were fictitious. The insider asked not to be named for safety reasons.

"[Amiga Entertainment] is the one they used for laundering money," the person told RFA. "They pumped in all the money through here."

The companies in China were neither utilizing the games nor paying for them, the source claimed. Instead, the contracts signed between Amiga Entertainment and the Chinese companies were used to justify large cash transfers between Southeast Asia and the Isle of Man.

Typically, businesses move money from one area of their operation to another through a bank. But the money sent to Amiga Entertainment came instead from a money services operator in Hong Kong. Also known as remittance agencies, money services operators transfer funds internationally on behalf of customers, who are frequently people or small businesses that cannot access traditional banking. Some, such as Western Union, have become household names. There are, however, thousands of smaller operators across the world, such as the one used by Amiga Entertainment's purported Chinese clients. Remittance agencies charge far steeper fees than banks, and it is highly unorthodox for a large company to move money in this way. With the higher fees, though, come fewer questions.

"The remittance company doesn't care where the real source of money is," the person said.

Copies of remittance slips, contracts and invoices reviewed by RFA bore details that correlated with payments that could also be identified in the Cayman National Bank leak. While Amiga Entertainment never had an account with the bank, a money services operator that handled payments for the company was a client. (Four payments worth a total of $830,000 were identified within Cayman National Bank's records as destined for Amiga Entertainment Limited all bore the reference CLA0878, which was also the payment reference used on the remittance slips reviewed by RFA.)

26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B - Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 212 of 278

"The Isle of Man will ask what's the reason for the money, so you need a proxy in China," the Prince insider said, referring to the licensees. In reality, "the money never originated in China," they added.

Once the money had been remitted to Amiga Entertainment's account in the Isle of Man, it would begin its journey up through the various layers of the company's ownership, the source continued.

Corporate records seen by RFA back up the source's account and indicate that the ultimate destination for the funds would be Chen and his wife's family office in Singapore. The money would appear as the legitimate profits from the couple's investment in successful Isle of Man gambling businesses.

An internal spreadsheet of Amiga Entertainment's finances viewed by RFA suggests that more than $100 million was moved this way.

Transparency International's Cowdock said the transactions appeared highly suspicious and called on the Isle of Man to investigate.

"If someone is selling licenses for gambling games to a country where this activity would be illegal, and accepts payments outside of usual banking channels, this is a major red flag that needs investigating," said Cowdock.

The Prince Group's director of communications, Gabriel Tan, told RFA in an email that the company's "primary focus lies in investments and developments within Cambodia" and that it is "not involved in the allegations you mentioned regarding activities in … Singapore, Cuba, or the Isle of Man."

"In all his business dealings, Chairman Chen Zhi consistently complies with the laws of the jurisdictions in which he operates, as well as with those governing him as a Cambodian citizen," Tan added.

Messages seeking comment sent to the contact address listed on Amiga Entertainment's website returned error messages, suggesting the company's servers were not properly set up to receive emails.

# Spread the wealth

Despite his success as a Cambodian citizen, Chen and other senior Prince Group figures in recent years have begun relocating their lives from Phnom Penh to the United Kingdom and the United States.

Chen is listed in British corporate records as the owner of a $114 million office block in the heart of London's financial district and a mansion worth in excess of $25 million on the city's exclusive Avenue Road.

Another senior Prince executive is the owner of two British companies that own 17 London apartments purchased for a total of $32 million.

Across the Atlantic, three Prince Group executives own mansions in suburban Los Angeles worth a total of $8 million. One of them also owns a 26-meter Sunseeker pleasure yacht docked off the coast of California, along with a luxury car dealership and a sex toy manufacturer in the state, according to California court and corporate records reviewed by RFA.

High-end homes in London and LA are typical trappings of the ultra-wealthy. But a source close to Cambodia's Interior Ministry suggested another motivation for the Prince executive migration: having a place to run to if China's investigation into the conglomerate expands.

"In 2019, the Chinese ambassador told Chen Zhi to cease all criminal acts and not to interfere in investigations into his people," the source said, asking not to be named as they were not authorized to speak publicly. "The Chinese government has not come to extradite anyone since Covid began, but they will."

Previous                                                                   Next

Part I: Chinese courts go after              🏠              Part III: Torture, forced labor alleged at
'notorious' Cambodian conglomerate                          Prince Group-linked compound





2/28/26, 7:16 PM

26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B - Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 217 of 278

# Part III:

# Torture, forced labor alleged at Prince Group–linked compound

*Escaped workers were beaten and tased before being dragged back, witnesses recount.*

**By Jack Adamović Davies for RFA Investigative and RFA Khmer**

2024.02.12

Panha has an idea of the horrors that take place within the Golden Fortune Science and Technology Park in Cambodia's southeastern border town Chrey Thom. He has witnessed what happens to those who try to leave.

"When they recapture escaped workers they beat them until they're barely alive. I've seen it with my own eyes," Panha told RFA, declining to give his family name. His brother, he said, is head of security at the 15-acre (four-hectare) facility, and Panha has watched him hunt down escapees. "If you don't beat them they will stop being afraid and more will try to escape."

While the compound is ostensibly open to the public, and billed as an industrial park, it is surrounded by a 10-foot-high (three-meter) concrete wall topped with

barbed wire. Its heavy, metal front gate is manned by uniformed security guards, who bar entry to ordinary visitors.

Built by the powerful and well-connected Prince Group, the facility now counts cyberscam operations among its businesses, according to witnesses, staff and former employees. While the group denies any involvement in the park, it is run by a company headed by Prince executives and bears several other indicators of connections to the group.

Inside, locals allege, trafficked Vietnamese, Malaysian and Chinese nationals are forced to carry out cyberscams. They are part of an enslaved workforce that the U.N. estimates numbers approximately 100,000 people across Cambodia – a claim the government denies.

Fourteen local residents – among them current and former employees working at the Golden Fortune compound – separately told RFA they had witnessed security guards violently subduing escaped workers before returning them to the compound. For security reasons, witnesses requested their names not be used. At least two other Prince Group-linked properties have previously been connected with human trafficking and cyberscam operations, according to local and international media reports.

Prince Group spokesperson Gabriel Tan told RFA that while the conglomerate built the Golden Fortune compound, it did so at the request of a client, whom he declined to identify. Asked about allegations of trafficking and cyberscam operations within the compound he added, "we are unaware of the incident you mentioned."

Cambodian corporate records suggest that the park's parent company, Golden Fortune, is run by Ing Dara, a businessman with extensive ties to the Prince Group. He holds directorships in a number of Prince companies, including one cited by the Prince Group's founder as the ultimate source of his wealth in disclosures to an offshore bank. Ing Dara and Golden Fortune could not be reached for comment.

RFA has previously revealed that Chinese police have established a special task force to investigate the Prince Group's alleged money laundering and illegal online gambling operations run from Cambodia. In part two of our series, RFA explored how illicit funds appear to be washed and funneled into legal Prince Group-affiliated businesses.

This final installment in the three-part investigation into the company explores allegations that one of its facilities holds victims of Asia's blossoming cyber-slavery industry.

# Dirty jobs

Chrey Thom is a one-road town abutting the Bassac river just a few hundred yards upstream from Vietnam. Like many border communities in Cambodia, the town is thick with casinos built to service foreigners who face restrictions on gambling in their own countries.

A Cambodian government crackdown against online casinos in 2019 forced many to close. In some cases, the empty real estate has been taken over by criminal gangs that force trafficked workers to perform cyber fraud. Such frauds have exploded in recent years, in particular "pig butchering" in which victims are lured into putting large sums of money into phony investment schemes. However, those performing the scams are often also victims held against their will and forced to find people to dupe using various online platforms.

As cyberscam operations have proliferated, they've also been found operating in office blocks, apartment complexes and what appear to be purpose-built compounds.

218

Set on 15 acres of land and surrounded by concrete walls topped with barbed wire, the Golden Fortune facility hosts a soccer field, a basketball court and 18 large dormitory style buildings, all of which were constructed since mid-2019, according to satellite imagery reviewed by RFA.

Metal bars cover the dormitory windows on each of the five floors, suggesting they are designed to keep people in.

Those allegedly imprisoned inside are mostly Vietnamese and Chinese, locals said. Cambodians work inside the compound, too, in security roles. Online Khmer-language advertisements for jobs within the compound seen by RFA called for Cambodians who speak Vietnamese, offering a salary of $600-800 a month on top of three meals a day and accommodation.

Though relatively well-paid, such work is wholly unappealing to 60-year-old Moeun, who asked that her full name not be used. She spoke with RFA reporters while standing in the thigh-high oily water of a drainage canal, catching fish with her bare hands.

"If we don't do good work and torture they will cut our salaries, so we prefer to come here and catch some fish to get some money," said Moeun, whose children had worked inside the compound. "Besides working for them, what else can we do?"

220

Her account was confirmed by a current Golden Fortune employee, who told RFA that disobedient or unproductive workers are detained on the first floor of a building named B1 and violently punished. Many female workers in the complex are forced into prostitution and pornography, the staffer added.

The employee compared the situation inside Golden Fortune to the Chinese thriller "No More Bets," in which Chinese nationals are trafficked into a Southeast Asia scam compound, where they are abused and forced to help run illegal online gambling scams.

"The problems in there are like what the Chinese movie has revealed," the staffer said. "Scams and extortion exist in there."

According to the employee, besides the scams, prostitution and pornography, extortion is another business model. Victims are released only if their families pull together adequate ransom – a common hallmark of scam compounds.

"If ransom was not provided as demanded, mistreatment, beating and electrocution would be used and video clips [about the torture] are sent to the family to see," the staffer said.

Another local resident, who lives near the compound told RFA that he had seen security guards knock escapees to the ground with a car and tase them with electric cattle prods before driving them back to the compound. He claimed local police are employed as security guards at the compound.

Local Sampav Poun commune police chief Khuth Bunthorn told RFA that he was unaware of any cases of detention or forced labor in his commune.

A former security guard at the Golden Fortune compound told RFA that trafficked scam employees worked 12 hours a day and would usually be sold on to another compound within six to 12 months. The former guard added that while they were no longer employed at Golden Fortune, they would still occasionally hunt down escaped workers from the compound. Local residents told RFA that Golden Fortune doles out $50 bounties for returned escapees.

Interior Ministry Secretary of State Chou Bun Eng, who is secretary general of the National Committee for Counter Trafficking, told RFA that she was unaware of any trafficking cases in Chrey Thom.

# A bustling compound

RFA reporters were barred from entering the Golden Fortune compound when they visited Chrey Thom last year, with security guards declining to say why.

Footage posted to social media in September showcases an array of restaurants, massage parlors and even a small hospital within its walled kingdom. Both the videos and satelite imagery indicate it is home to more and higher quality paved roads than the surrounding village. In one video, a billboard within the park can be glimpsed advertising 6,700-square-foot (622-square-meter) villas in Phnom Penh.

The Golden Fortune compound is listed on the official website of Prince Huan Yu Real Estate – a subsidiary of the Prince Group – and its location is pinpointed on its "property distribution map."

The Prince Group bills itself as one of Cambodia's hottest conglomerates, with interests in everything from real estate to film production. It was founded a little under a decade ago by Chen Zhi, a politically connected Chinese émigré who became a naturalized Cambodian in 2014. Chinese court documents have termed his conglomerate a "notorious transnational online gambling criminal group" and alleged at least 5 billion yuan ($700 million) of its revenue came from illegal online gambling.

In 2022, a court in the Chinese county of Wancang announced that 45 individuals had been found guilty of establishing illegal online casinos in collaboration with the Prince Group. The announcement listed three locations in Cambodia where this had taken place, among them was "Caitong City," the Chinese name for Chrey Thom.

The eyewitness testimony related to RFA would suggest that like so many online gambling operations in Cambodia, the Prince Group has pivoted to forced labor.

In a 2022 documentary by Al Jazeera, a victim explained how he had been held captive and forced to scam poor Chinese farmers over messaging apps in a property held by Cambodian Heng Xin Real Estate. That company was founded by Chen; in leaked banking records shared by whistleblowing non-profit Distributed Denial of Secrets, the company is listed as the source of Chen's wealth. Today, Cambodian Heng Xin Real Estate has two directors, both of whom have extensive links to the Prince Group. One of them, Ing Dara, is listed as the chairman of Golden Fortune Resorts World, whose name and address matches the Chrey Thom complex.

Months before it was shut down by the government, local news outlet Voice of Democracy reported on a human trafficking raid on another Prince Group-linked property.

Such linkages between Prince Group property and cyberscam operations could prove awkward for Prince's political patrons. These include recently retired Prime Minister Hun Sen, former Interior Minister Sar Kheng, former National Assembly President Heng Samrin, as well as the current Prime Minister Hun Manet – each of whom Chen serves as an officially appointed political adviser.

2/28/26, 7:16 PM

China, Cambodia's most forceful sponsor on the world stage, has made clear its intention to crack down on cybercrime overseas. In October, Cambodia's newly appointed premier, Hun Manet, met with Chinese President Xi Jinping in Beijing. Buried on the third page of a press release issued by Cambodia's Foreign Ministry after the meeting was a commitment, "to further

enhance cooperation in law enforcement, particularly in combating cross-border gambling, drug and human trafficking, cybercrime and fake news."

For some in Chrey Thom, though, that cooperation could not come soon enough.

One resident of Chrey Thom said he and his neighbors would always try to help whenever they encountered an escapee. He remembered one time in particular, when cries of, "Thief, thief, thief," preceded a bedraggled man crashing into his home.

"He put his hands together and begged for mercy," he recalled, adding that he gave the man five dollars before sending him on his way, wishing he could have done more for him.

"We pity them and the injustice they suffer, but we cannot do anything," he said.

Previous                                                          Next

**Part II: Red flags abound in Prince Group's offshore dealings**                            🏠                            **Part I: Chinese courts go after 'notorious' Cambodian conglomerate**

2/24/26, 8:22 PM    26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B -
China's 'romance scam billionaire ran web of fraud from Britain'
Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 231 of 278



# China's 'romance scam billionaire ran web of fraud from Britain'

Chen Zhi, who has links to Chinese intelligence, is thought to be worth an estimated £46 billion but criminal allegations have prompted sanctions against him



Jack Adamović Davies | Richard Lloyd Parry, Asia Editor
Wednesday November 12 2025, 6.25pm GMT, The Times

H e is the boss of what has been called the world's biggest criminal organisation, a network of businesses estimated to be worth £46 billion. He is accused of having made his fortune in online fraud, perpetrated on vulnerable people across the world by a

workforce of slaves who were tricked, abducted and tortured into submission.

He has intimate links with Chinese state intelligence and the government of Cambodia, and owns companies across the world. He was shunned by the United States, but for five years he operated out of central London. He owned a luxury home, a £100 million office building and numerous shell companies allegedly established for the purposes of money laundering.

A month after British authorities finally swooped, The Times can disclose the extraordinary world of Chen Zhi, also known as "Vincent", the Chinese-born head of the Prince Group, whose estimated wealth eclipses that of the biggest Latin American drug lords.



Cliff Teo managed part of Chen's network of offshore companies for seven years

A former business associate-turned-whistleblower has spoken for the first time about the man who emerged from obscurity as a Chinese migrant and within 15 years established himself, if the authorities are correct, as one of the most successful criminals on the planet. Apparently fearful of being turned on by his sponsors in Beijing's intelligence agencies, Chen, 37, found a home away from home in London.

"They told me that if China was going to clamp down on them, the best place to guard against it is the UK or US," Cliff Teo, a Singaporean who managed part of Chen's sprawling network of offshore companies for seven years, said. The American

authorities refused visas to Chen and his lieutenants, but in Britain he was welcomed, along with his two partners and their children.

ADVERTISEMENT

Teo said: "They try to spread their eggs all around. They will put [their money and people] in different countries — some in the US, some in the UK, some in Cambodia. The UK is the easiest, so that's why, previously, they're all residing there. Yeah, even his first family [and] second family. That was where they tend to go."

The welcome was abruptly reversed on October 14, when Britain and the US announced co-ordinated sanctions against Chen and his business associates in the Prince Group, the conglomerate he controls, which they called "one of the largest transnational criminal organisations in Asia".

The same day, US federal prosecutors unsealed charges against Chen himself, as the group's chairman. The indictment outlined a criminal enterprise driven by greed and underpinned by violence and bribery.



## Private jets and casinos

Since Chen founded the Prince Group in Cambodia in 2015, it has operated or invested in businesses as diverse as shopping

230

malls, banks, casinos, apartments, private jets, pleasure boats, hotels, restaurants and sex toys.

However, according to the British and US governments, his greatest source of profit is the network of "scam centres". At least ten are in Cambodia, each staffed by thousands of trafficked workers forced to use telephone and social media to befriend and then defraud people across the world in a romance fraud known as "pig butchering".

ADVERTISEMENT

Workers who have escaped from such isolated compounds have described being held under duress, having been deceived into believing that they were taking respectable clerical jobs. When they failed to meet scamming quotas, they were sometimes forced into prostitution or beaten.



The inside of Chen's luxury London house



Photographs seized by US authorities from Chen's digital devices show scarred and bruised men who are allegedly victims of such violence.

In one case, Chen is alleged to have approved a troublemaker's torture with the caveat that the victim not be "beaten to death". One photograph shows an alleged victim strapped to a plastic garden chair with the seat removed to allow his genitals to be whipped — a form of torture borrowed from the James Bond film *Casino Royale*.

## 'Ledger of bribes'

The US indictment also describes the vast amount of bribery alleged to have been used to keep the syndicate safe from government interference. So extensive was the corruption, US prosecutors allege, that Chen kept a ledger of bribes, ranging from cash to multimillion-dollar watches and pleasure cruisers, paid out to Cambodian politicians and Chinese law enforcement and intelligence officials.

232

26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B -
Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 236 of 278

Chen's talent for cultivating powerful allies is legendary in Cambodia, where he moved 15 years ago from his native China. As an adviser to the current and former prime ministers, he holds a rank within the government equivalent to that of a minister.

ADVERTISEMENT

To establish himself in his adopted homeland as a respectable tycoon, Chen donated tens of millions of dollars to good causes in Cambodia — from his eponymous Chen Zhi Scholarships to Covid-19 vaccines — much of it through his organisation's charitable arm, Prince Foundation.

In March 2023, he caused a diplomatic stir when his charity paid $10,000 to sponsor the American Chamber of Commerce's charity gala. The US ambassador, W Patrick Murphy, found himself obliged to give a speech alongside the logo of a conglomerate that his embassy was already certain was disreputable.

233



The Prince Group has operated or invested in businesses such as casinos

BRENT LEWIN/BLOOMBERG/GETTY IMAGES

The scale of the profits made by Prince Group is staggering. The US treasury department reported seizing $13 billion worth of bitcoin in its raids last month. Even this may not have put more than a dent in Chen's total wealth. Teo said that when he asked him, Chen reported that his net worth was $60 billion (£46 billion).

The Prince Group's holdings include publicly-traded companies on the Hong Kong Stock Exchange, involved in everything from engineering to machine tooling, and close to a third of the Cuban state's cigar monopoly. According to one US official, their scale and breadth dwarfs those of other crime groups.

"We're seeing a lot of the same money laundering techniques used by the [Latin American drug] cartels but we've never seen them used on this scale before," the US official said. "My feeling is that Prince Group has parlayed their supposed legitimacy into a massive, globe-spanning illicit economy that I just don't think someone like El Mencho [the notorious Mexican cartel boss] could replicate, given the nature of their crimes."

ADVERTISEMENT

234



## 'Everything changes so fast'

Teo provides unique insight into Chen's character, as well as his businesses, and his unprecedented rise from obscurity. Chen was born in Fujian in China in 1987. Teo was running a corporate services provider in his native Singapore when they first met in 2014.

Chen, who had by then acquired Cambodian nationality, owned a small Phnom Penh internet service provider, Citylink Solutions, and needed a Singaporean subsidiary set up so that he could apply to the city state for a work visa. But within three years, Chen had built a bombastic office building in Cambodia and undergone a personality change.

"He's just a normal business person who owns an internet service provider [when I first met him]," said Teo. "But after that, everything changes so fast. He was in jeans and T-shirt in 2014 and suddenly in 2017 and 2018, he got to build a plaza. He was wearing a suit. He was wearing all branded stuff, Stefano Ricci, which is the extremely expensive belt with the eagle head buckle."

235

2/24/26, 8:22 PM
China's romance scam billionaire ran web of fraud from Britain
26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B -
Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 239 of 278



A Prince Group compound in Chrey Thum, Cambodia, called Golden Fortune Science and Technology Park, which was sanctioned last month by the UK government

JACK ADAMOVIC DAVIES



A photograph from a page of the indictment against Chen showed banks of hundreds of phones

At the request of Prince Group companies, Teo established dozens of companies in Taiwan, as well as offshore bank accounts. He insists that he had no control over the flow of funds, which was controlled by the true owners, Chen and associates, who were listed as the accounts' only authorised signatories.

But, in order to file financial reports for the companies he was able to view their account statements which is how he said he stumbled onto something alarming. Between them, these accounts held $300 million, with a quarter of a million dollars flowing into each most weeks.

ADVERTISEMENT

"Then I got scared, I really got scared. That's too much money," said Teo. "There was a lot of money flowing around and to where it goes, we have no idea. So that's why that is the time that I had to leave. I had to draw my line."

He insisted that he was an innocent bystander in the alleged criminality perpetrated by Chen and his operations and that he reported concerns about his clients to financial authorities as early as 2021. The Prince Group accuses Teo of embezzling money, which he denies.



## Meetings with Chinese officials

Chen's newly acquired suavity and confidence seem to have coincided with his developing relationship, starting in 2015, with Chinese intelligence officials.

One former Chinese intelligence agent, who now goes by the pseudonym Eric, described attending meetings in Phnom Penh at which Chen would receive Chinese Ministry of Public Security officials in his club, and lay out a "high-end tea set"

and "golden cushions," acting "all fawning and subservient" while asking favours from Eric's handler from the ministry.

He said that hackers employed by the Prince Group were often utilised by the ministry in its pursuit of dissidents. His testimony chimes with the US indictment's allegation that the Prince Group was bribing numerous officials from both the Ministry of Public Security, which oversees the police and efforts to round up dissidents, and the Ministry of State Security, which handles domestic and overseas intelligence.

This fits an established pattern. "Chinese security services will make use of Chinese organised crime," David Sauer, a recently retired US intelligence officer who spent most of his career in east Asia, said. "You've seen that with the Prince Group. There have been a couple of other occasions inside Taiwan where they probably instigated people getting harassed."

The connections between the Cambodian-Chinese businessman and the Beijing spies make the ease with which the Prince Group penetrated Britain all the more striking. Chen's relations with the Chinese authorities were not straightforward. In 2020, mainland Chinese police announced that they had established a task force to investigate the group and small-time employees were prosecuted and convicted for helping to operate online casinos.

About the same time, the Prince Group's bankers in Taiwan began demanding stricter documentation for each transaction. "That's why they got afraid and the UK became the best destination for them," Teo alleged.

## Operations move to Britain

The Prince Group's first choice had been the US but almost all of the group's leadership had their visas rejected. British immigration officials, by contrast, were not so fussy. Teo said: "They went through the investor visa route, which were accessible and very easy to obtain."

Formally known as Tier 1 visas, they were scrapped in 2022 over national security concerns. "The UK had just experienced Brexit at that time and they needed funds," Teo added. "That became a very good bargaining chip for them [Prince Group] to relocate to

https://www.thetimes.com/world/asia/article/chinas-romance-scam-billionaire-ran-web-of-fraud-from-britain-tz9w5v258?gaa_at=eafs&gaa_n=AWEts… 11/17

238

2/24/26, 8:22 PM                    China's romance scam billionaire ran web of fraud from Britain

26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B -
Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 242 of 278

the UK, and indeed they got their residence passes fairly quickly."

Thus began a [London property buying spree](#). First, Chen spent £94 million on an office block on Fenchurch Street, near the Bank of England. Later, he bought and renovated a £12 million mansion in St John's Wood.

Chen's properties have been "frozen", meaning they cannot be sold or otherwise disposed of, by the UK government sanctions against Chen and the Prince Group. Today, the house is protected by a security guard who instructs anyone lingering in front of it to "move on". Lights were on in the house when The Times visited and three cars were parked in the driveway.



Chen's office building on Fenchurch Street

JACK ADAMOVIC DAVIES

According to Teo, it was occupied by Chen's wife and her two children. He said that Chen's mistress also lived in London with her family. "She could have left already," he said. "But I think the kids were having education there."

Chen's cousin, Qiu Wei Ren, also acquired 17 London apartments for a total of £26 million, according to the British government, including seven overlooking the US embassy in south London.

To those who know the world of Chinese spying, this also raises alarm — a group accused of serious criminality on a global scale with ties to Chinese state intelligence overlooking the UK base of the world's superpower.

"There should be some concern about it," Sauer said. "If they did co-operate with Chinese intelligence, or Chinese intelligence rented those apartments from them, they could set up an observation post. To watch who's coming and going, to get a 'pattern of life' of the employees, to try to figure out who's who in the embassy, who's important, who's not. There's also the possibility of them setting up some kind of signals collection operation there."

The sanctions against Chen and his lieutenants mean they are unlikely to set foot in London any time soon. The first western shot across the bows of the Prince Group came on the Isle of Man, where in March this year police raided the group's offices as part of a money-laundering investigation.

According to a source, Chen was allowed to fly out of the country through a London airport later on the day of the raid. He has not returned but Teo doubted that the sanctions have seen him off for good.

He said: "I don't think this will eliminate them once and for all. I think it will damage them, but I don't think they will die off just like that. Maybe for the next couple of years they may tone down but at the end of day, they may just come back."

The Prince Group said: "The Prince Group categorically rejects the notion that it or its chairman, Chen Zhi, has engaged in any unlawful activity. The recent allegations are baseless and appear aimed at justifying the unlawful seizure of assets worth billions of dollars. Nonetheless, these unfounded allegations, amplified by media reports repeating these and other unverified claims, have caused undue harm to thousands of innocent employees, partners, and communities who the Group serves.

"The Group remains committed to integrity, responsible investment, and sustainable economic growth across the region. For over a decade, the Group has operated transparently and in

241

compliance with all applicable laws, as will be clear when all of
the evidence is presented."

World  >  Asia

# Related articles



## China's hold on UK infrastructure — from nuclear power to Heathrow

October 15 2025, 7.55pm BST

Larisa Brown, Defence Editor



## Police seize properties worth £130m linked to Cambodian scam network

October 14 2025, 8.05pm BST

Shayma Bakht

PROMOTED CONTENT



**The best luxury ski children**

LUXURY SKIWEAR

**Ask a Pro:**

SMARTASSET



**See for Yourself**

SMARTASSET



**The best luxury ski children**

LUXURY SKIWEAR

⌃BACK TO TOP

**THE TIMES
THE SUNDAY TIMES**

Get in touch

| About us | Contact us | Help |
| --- | --- | --- |
| The Sunday Times Editorial Complaints | Place an announcement | Classified adverti |
| The Times corrections | The Sunday Times corrections | Careers |

More from The Times and The Sunday Times

The Times e-paper

The Times Archive

The Sunday Times Rich List

Newsletters

Best Law Firms

Best Places to Work

The Sunday Times 100

More from News Corp

26-10769-mg    Doc 31-2    Filed 04/20/26    Entered 04/20/26 16:17:23    Exhibit B -
Exhibit CB-1 of the Affirmation of Cosimo Borrelli    Pg 247 of 278

The Australian

Investor's Business Daily

The Sun

© Times Media Limited 2026.
Registered in England No. 894646.
Registered office: 1 London Bridge Street, SE1 9GF.

| Privacy & cookie policy | Generative AI editorial guidelines | Licensing | Site map |
| Topics | Puzzles Archive | Authors | Commissioning |
| Terms and conditions | | | |

ipso. Regulated

# 臺灣臺北地方法院民事裁定

112年度補字第683號

| 原　　告 | 澄碩有限公司 | 設台北市大安區和平東路1段101號30樓 |
|---|---|---|
| | 邁羽有限公司 | 設台北市大安區和平東路1段101號34樓 |
| | 睿督有限公司 | 設台北市大安區和平東路1段101號35樓 |
| | 博居有限公司 | 設台北市大安區和平東路1段111號33樓 |

共　　同
法定代理人　林忠良　　住同上
共　　同
訴訟代理人　吳佳霖律師
　　　　　　謝佳縈律師
　　　　　　許儒珩律師

上列原告與被告張剛耀（TEO KANG-YEOW, CLIFF）等間損害賠償事件，原告起訴未據繳納裁判費，查本件訴訟標的金額折合為新台幣884,182,088元（計算式：美金11,000,000元＋美金10,000,000＋美金4,000,000＋美金1,510,042.81元＋新台幣67,937,870＝884,182,088，以原告起訴時美金對新台幣匯率30.79計算，元以下四捨五入），應徵第一審裁判費新台幣6,930,263元。茲依民事訴訟法第249條第1項但書之規定，限原告於收受本裁定送達5日內補繳，逾期不繳，即駁回其訴，特此裁定。

中　　華　　民　　國　　112　年　　4　　月　　11　　日
　　　　　　民事第七庭　　法　官　　林欣苑
以上正本係照原本作成。
如不服本裁定關於核定訴訟標的價額部分，應於送達後10日內向本院提出抗告狀，並繳納抗告費新台幣1,000元；其餘關於核定訴訟標的金額及命補繳裁判費部分，不得抗告。

1

土股

中　華　民　國　　112　年　4　月　　11　　日



書記官　　范煥堂

2

Taiwan Taipei District Court Civil Ruling

112 Year Back Payment No. 683

| Plaintiff(s) | Greenbay Properties Co., Ltd. | 30th Floor, No. 101, Section 1, Heping East Road, Da'an District, Taipei City |
| | Huntsman Investments Co., Ltd | 34th Floor, No. 101, Section 1, Heping East Road, Da'an District, Taipei City |
| | Binary Properties Co., Ltd. | 35th Floor, No. 101, Section 1, Heping East Road, Da'an District, Taipei City |
| | Drew Properties Co., Ltd. | 33rd Floor, No. 101, Section 1, Heping East Road, Da'an District, Taipei City |
| Joint Statutory Agent(s) | Lim Zhong Liang | Address same as above |
| Joint Agent(s) Ad Litem | Wu Jialin Attorney Xie Jiaying Attorney Xu Ruheng Attorney | |

In the damages case between Plaintiffs listed above and Defendant Zhang Gangyao (TEO KANG-YEOW, CLIFF), Plaintiffs filed the lawsuit but failed to pay the court fees. The amount in dispute in this case, converted to New Taiwan Dollars, is NTD $884,182,008 (Calculation: USD $11,000,000 + USD $10,000,000 + USD $4,000,000 + USD $1,510,042,81 + NTD $67,937,870 = $884,182,088, calculated based on the US dollar to New Taiwan dollar exchange rate when Plaintiffs filed the lawsuit, rounding down to the nearest NTD). First-instance court costs of NTD $6,930,263 should be collected. Hereby, according to the proviso of Article 249-1 of Taiwan Code of Civil Procedure, Plaintiffs must pay the outstanding fees 5 days within the receipt of this ruling. Failure to pay in time will lead to dismissal of the lawsuit. The ruling is heraby made.

April 11, 2023 (Republic of China Year 112)

Civil Courtroom 7      Judge   Lin Xinyuan

The above authentic copy is made according to the original.

If there is any disagreement with the part regarding the approved value in dispute in this ruling, please file an appeal to this court 10 days within the receipt of this ruling, and pay appeal fee of NTD $1,000. Other parts regarding the approved amount in dispute and the order to pay the outstanding court fees are incontestable.

Tu Branch

1

247

April 11, 2023 (Republic of China Year 112)

Clerk   Fan Huantang

2

248

# Campbells

**By Email**

O'Neal Webster
2nd Floor Commerce House
PO Box 961
VG1110,
British Virgin Islands

Attn: Nadine Whyte

21 February 2026

Campbells Legal (BVI) Limited
Floor 4, Banco Popular
Building
PO Box 4467
Road Town, Tortola VG-1110
British Virgin Islands
**T** +1 284 494 2423
**E** gcarroll@campbellslegal.com

Our Ref:
Your Ref:

BVI **|** CAYMAN **|** HONG KONG

Dear Sirs

**Re: Certain Companies in Provisional Liquidation**

We act for 26 of the 30 companies currently in provisional liquidation ("**PL**") in the British Virgin Islands on your client's application - which for convenience we will refer to as the " **Campbells PL-COs**".

**Limited Evidence in Support of Application**
Our clients express serious concerns about the appointment of PLs in this case. Based on the evidence filed in support of the PL (and liquidation) application it appears that the entirety of the evidence relied upon amounts to little more than allegations in the press and the fact that proceedings have been instigated in the US against certain ultimate beneficial owners

We are not aware of any precedent whereby companies have been placed into provisional liquidation in this circumstance without any evidence being presented to the Court linking the companies to any wrongdoing or receipt of any proceeds of any wrongdoing.

**Role of PLs / Costs of investigations**
We understand the PLs have begun immediate investigations, in various jurisdictions around the world, into the Campbells PL Cos.  Furthermore, at the return date hearing the PLs sought and have obtained an order whereby the fruits of their investigations are sealed.  The PLs, who have been appointed on public policy grounds, are therefore effectively operating in secrecy without any information being provided to the Campbells PL COs as to their activities and/or to further conduct.  This offends the notion of natural justice and we assume the AG does not support the PLs operating in secrecy, and would be grateful for confirmation that the AG will not support the PLs work being subject to a court seal.

Finally, the costs of investigative work carried out by the PLs should not be borne by the Campbells PL Cos. If the intention of the BVI Government is to conduct an investigation into the Campbells PL COs then those costs should be met by the BVI Government solely.  The position of the Campbells PL-COs is that they will

249

undertake to cooperate fully with any such investigation but they will object strenuously to any attempt to shift the costs of that investigation to them through the use of provisional liquidators.

**Ongoing Damage**

We applaud the Attorney General for seeking to take positive steps to safeguard the reputation of the British Virgin Islands in matters touching on alleged financial crime. However, it should be noted that defence counsel in the US, Boies Schiller Flexner, will shortly be applying to dismiss the US proceedings on grounds that, inter alia, they contain misleading and exaggerated evidence. There are also a number of highly sensitive matters which are not currently in the public domain which, if known, would paint the existing public narrative in an entirely different light. In light of these concerns, we consider that the PL Orders are highly likely to result in damage to the Campbells PL COs (and such damage may well have already been incurred).

Moreover, the assets of each of the Campbells PL-COs are frozen under relevant sanctions regimes, so the suggestion that the assets might be dissipated relies on an assumption both that the Campbells PL-Cos would breach sanctions and that banks and other counterparties would also do so. That suggestion is clearly fanciful.

In summary, the PL orders have been made in circumstances where there is no evidence whatsoever of wrongdoing by the Campbells PL-Cos, has not identified any creditors or any party who has been harmed by any of those entities, where the stated aims of investigation and asset protection are flawed, where no undertakings or other less intrusive remedy was sought from the Campbells PL-Cos and where it is not clear that it was explained to the Court whether alternative remedies would be available or whether they would be appropriate in this case.

We therefore consider that there is no basis for either provisional or final liquidation orders against any of Campbells PL COs. In particular, any final liquidation orders would result in irreparable harm to the Campbells PL COs, their owners, contractual counterparties and downstream employees in circumstances where the underlying reasons for the applications are bare allegations with no proof in support.

**Collaborative Route Forwards to Protect Public Interest**

We wish to advise that Mr Cosimo Borrelli of Admiralty Partners Asia (formerly Managing Director and Head of Asia Pacific and Offshore Restructuring for Kroll, and previously Borelli Walsh, both of whom operate in the BVI) has been appointed as Special Manager with delegated powers from the shareholders of the Campbells PL COs and he is in the course of being appointed as director of each of the Campbells PL Cos.

Mr Borrelli is prepared to agree undertakings in relation to the provision of information to the BVI Attorney General in similar terms to those in the current orders and to coordinate actions to preserve the value of the various companies and their assets which would mean that the PL orders are entirely otiose.

Additionally, if the PLs are discharged and replaced by an independent information sharing and asset preservation regime, with regular information sharing, the Campbells PL COs are prepared to offer the Attorney General a full release and waiver for all actions taken to date and for the pre-discharge fees of the provisional liquidators to be paid from the assets of the companies.

If that approach is not agreed and your client intends to proceed with the PLs in their current form and with their applications to liquidate the companies we hereby put you on notice that we will be instructed to oppose those applications and to seek the costs of the same from your client.

2

Yours faithfully

**Campbells LLP**

3

# Campbells

**By Email**

Interpath (BVI) Limited
LM Business Centre
Fish Lock Road
P.P. Box 4571
Road Town
VG1110
British Virgin Islands

Campbells Legal (BVI) Limited
Floor 4, Banco Popular Building
PO Box 4467
Road Town, Tortola VG-1110
British Virgin Islands
**T** +1 284 494 2423
**E** gcarroll@campbellslegal.com
pkennedy@campbellslegla.com
slinn@campbellslegal.com
mchan@campbellslegal.com

Our Ref:   GC/PK/20785-45687
Your Ref:

BVI **|** CAYMAN **|** HONG KONG

24 February 2026

Dear Sirs,

**Re: Certain Companies in Provisional Liquidation**

We write concerning the 26 companies listed in the Schedule to this letter (together, the "**Companies**") in connection with the provisional liquidation proceedings in which you have been appointed as provisional liquidators. We are instructed to act on behalf of the Companies through their boards.

The purpose of this letter is twofold: first, to request certain information pursuant to our clients' rights as interested parties in these proceedings; and secondly, to put you on formal notice regarding our clients' position in relation to the administration of the Companies' assets.

**1.   Costs to Date**

1.1 Please provide a full breakdown of all costs and expenses incurred to date in connection with your appointment, including sufficient detail to enable our clients to assess the reasonableness and propriety of such costs.

1.2 In particular, please confirm:

a)   the total professional fees charged;

b)   all disbursements incurred; and

c)   any other costs or liabilities arising from the provisional liquidation of the Companies.

252

1.3 We further request that you explain the basis upon which such costs have been apportioned as between each of the Companies, including the methodology applied and the rationale for any differential allocation.

**2.    Safeguarding of Assets**

2.1 Please provide confirmation of the steps you have taken, and propose to take, to safeguard the assets of each of the Companies, including in particular:

   a)   The steps that have been taken to secure all physical and intangible assets;

   b)   The steps taken to secure any bank accounts and to prevent any unauthorised withdrawals or transfers;

   c)   Confirmation as to whether any formal valuations of the Companies' assets have been undertaken or are proposed, and if so, please provide copies of any valuation reports obtained. If valuations are proposed, please provide an indication of the anticipated timescale; and

   d)   Details of any investigations undertaken to identify assets held by or on behalf of the Companies, whether within or outside the British Virgin Islands.

2.2 Please also provide details of any ongoing contracts or trading activities being continued or disclaimed, and the basis for any such decisions.

**3.    Notice Regarding Dealings with Assets**

3.1 We hereby put you on formal notice that our clients require prior notification of any proposed dealings with any of the Companies' assets prior to any such steps being taken.

3.2 Should you intend to sell, transfer, encumber or otherwise dispose of any assets, or to take any material steps in connection with the administration of any of the Companies' assets, we require that an application be made to the Court on notice to our clients so as to enable them to be heard on any such application.

3.3 Please provide confirmation by return that you will not take any material steps in relation to the assets of the Companies, including but not limited to any sale, transfer or other disposition, without first notifying our clients in sufficient time to enable our clients to consider their position and, where appropriate, to make representations to the Court.

**4.    Sanctions Compliance**

4.1 We note that certain of the Companies or their assets may be subject to sanctions regimes administered by relevant authorities, including but not limited to the Office of Financial Sanctions Implementation (OFSI) in the United Kingdom, the Office of Foreign Assets Control (OFAC) in the United States, and the Financial Sanctions Unit of the BVI Financial Services Commission.

2

4.2  Please confirm whether any applications for specific licences have been made to any sanctions authority in connection with the provisional liquidation of the Companies or in respect of any dealings with assets that may be subject to sanctions restrictions.

4.3  If any such applications have been made, please provide:

 a)  copies of all applications submitted;

 b)  copies of all licences granted;

 c)  details of any applications that remain pending or have been refused; and

 d)  details of any conditions attached to any licences granted and the steps being taken to ensure compliance with such conditions.

**5.  Response Required**

Please provide the information sought in this letter within seven (7) days and in any event by no later than 3 March 2026.

Please confirm receipt of this letter and your intention to comply with the requests herein by return.

Yours faithfully

**Campbells Legal (BVI) Limited**

3

254

**Schedule**

1.  Auspicious Tycoon Limited;

2.  Bright Team Global Limited;

3.  Delightful Thrive Limited;

4.  Even Sincerity Limited;

5.  Fulam Investment Limited;

6.  Giant Victory Holdings Limited;

7.  Golden Ascend International Limited;

8.  Harmonic State Limited;

9.  Jumbo High Limited;

10. Luminous Glow Limited;

11. Mighty Divine Limited;

12. Noble Title Limited;

13. Oriental Charm Holdings Investment Limited;

14. Pacific Charm Holdings Investment Limited;

15. Praise Marble Limited

16. Prince Global Group Limited;

17. Prince Global Holdings Limited;

18. Respectful Steed Limited;

19. Retain Prosper Limited;

20. Simply Advanced Limited;

21. Southern Heritage Limited;

22. Star Merit Global Limited;

23. Starry Bloom Limited;

24. Sure Tycoon Limited;

25. Towards Sunshine Limited; and

26. United Riches Global Limited.

4

255

## Milton Chan | Campbells

| | |
|---|---|
| **From:** | Nadine Whyte <NWhyte@onealwebster.com> |
| **Sent:** | Wednesday, 18 February 2026 1:36 am |
| **To:** | Grant Carroll \| Campbells |
| **Cc:** | Koya Ryan; Jeni-lee Watson; Paul Kennedy \| Campbells; Saskia Linn \| Campbells |
| **Subject:** | RE: Without Prejudice - JPL Companies |

**EXTERNAL EMAIL: This email originated from outside of Campbells.**

Dear Grant,

Thank you.   We will take instructions and get back to you as soon as possible.

**Kind Regards,**
**Nadine Whyte Laing** | Partner
2nd Floor, Commerce House, 181 Main Street | P.O. Box 961 | Road Town, Tortola, British Virgin Islands VG1110
nwhyte@onealwebster.com | Tel +1-284-393-5800 | Cell +1-284-340-2840 | www.onealwebster.com

    

This email is confidential and may be subject to legal professional privilege. Read more
🐾 Before you print think about the environment.

**From:** Grant Carroll | Campbells <GCarroll@campbellslegal.com>
**Sent:** Tuesday, February 17, 2026 1:34 PM
**To:** Nadine Whyte <NWhyte@onealwebster.com>
**Cc:** Koya Ryan <KRyan@onealwebster.com>; Jeni-lee Watson <JWatson@onealwebster.com>; Paul Kennedy | Campbells <PKennedy@campbellslegal.com>; Saskia Linn | Campbells <SLinn@campbellslegal.com>
**Subject:** Without Prejudice - JPL Companies

> **Caution:** This email originated from outside O'Neal Webster. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear ONW

We continue to act for the 26 JPL companies and write with reference to the upcoming liquidation hearings on 2 March 2026.

We have instructions to agree to an adjournment and continuation of the PL orders for a period of 2 months on the terms of the orders as currently drafted.

As you will be aware, a liquidation order is terminal and at the present there have been no findings (adverse or otherwise) made against Chen Zi or indeed the Prince Group more generally. It is correct that claims exist, but no judicial determinations have been made to our knowledge.

Accordingly the BVI government would be seeking to wind up companies based upon press coverage alone and would open up the government to possible claims should the allegations ultimately prove to be unfounded or if there is other shareholder value erosion as a result of the BVI government's actions.

We therefore hope the above suggestion meets with approval and we can execute a consent order accordingly.

1

256

Kind regards


Grant

**Grant Carroll**
BVI Managing Partner


**E** gcarroll@campbellslegal.com
**T** +1 284 494 2423 **C** **+1** 284 346 6160


**Campbells**
Floor 4, Banco Popular Building
Road Town, Tortola VG1110, British Virgin Islands
campbellslegal.com│LinkedIn


This email including any attachments are strictly private and confidential. It is solely for the use of the intended recipient(s) and may contain confidential and privileged information. Internet email is not a secure communications medium and may contain viruses. All work carried out by us is subject to our standard terms and conditions (click here to view) unless other terms and conditions are agreed in writing between you and us. The Campbells Group is deemed not to be the author, editor or publisher of personal messages, which fall outside the scope of any individual's employment. Thank you.



This email is confidential and may be subject to legal professional privilege. Read more

Before you print think about the environment.

2

257

# Campbells

Campbells Legal (BVI) Limited
Floor 4, Banco Popular Building
PO Box 4467
Road Town, Tortola VG-1110
British Virgin Islands
**T** +1 284 494 2423
**E** gcarroll@campbellslegal.com

**By Email**

O'Neal Webster
2nd Floor Commerce House
PO Box 961
VG1110,
British Virgin Islands

Our Ref:   GC/PK/20785-45687
Your Ref:

BVI **|** CAYMAN **|** HONG KONG

Attn: Nadine Whyte

24 February 2026

Dear Sirs

**Re: Certain Companies in Provisional Liquidation**

We refer to our letter of 21 February 2026 and write further on behalf of the 26 Campbells PL-Cos.

We take this opportunity to reiterate and expand upon the serious concerns expressed in our previous correspondence regarding the legal basis for both the PL orders and the substantive applications for final liquidation orders.  For the reasons set out below, we maintain that there is no proper foundation for the continuation of these orders and that they should be discharged forthwith.

**The Applicable Legal Test**

Given the potentially ruinous effect a PL or liquidation order may have on an otherwise active and solvent company, it goes without saying that the power to appoint provisional liquidators and to liquidate companies on grounds of public interest is a serious and extreme measure that must be exercised sparingly and with appropriate judicial caution.

When considering whether to exercise its discretion, the court must balance the competing reasons for and against liquidation upon a consideration of the totality of the evidence[1] and be able to identify the aspects of the public interest which would be promoted upon making the relevant order[2].  The court would need to examine whether the business of the company involves the commission of illegal acts or if its business is otherwise "*inherently objectionable*" or disclosing "*a lack of commercial probity*" because its activities are contrary to a clearly identified public interest[3].

---

[1]  In re PAG Management Service Ltd [2015] BCC 720, cited with approval in Secretary of State v Celtic Consultancy & Enterprises Ltd and others [2020] EWCA Civ 1017; Re Walter L Jacob & Co Ltd [1989] BCLC 345 at 353.
[2] Re Walter L Jacob & Co Ltd [1989] BCLC 345 at 353
[3] *In re PAG Management Service Ltd* [2015] BCC 720

In any event, it is the applicant that bears the burden to satisfy the court that it should exercise its discretion to make an order in circumstances that it is just and equitable to order the liquidation of a company[4] after considering the abovementioned factors.

**The Evidential Threshold Has Not Been Met**

The evidence filed in support of the PL applications falls significantly short of the standard required to justify such an intrusive measure.

The alleged misconduct grounding the application must be significant and must relate to the companies themselves. A mere relationship with individuals alleged to have committed wrongdoing elsewhere is not sufficient of itself to justify winding up[5]. There must be "*a substantial and compelling body of evidence in support of the allegations*"[6]. The evidence required from the petitioner must demonstrate, to the civil standard of proof, that it is just and equitable to wind up the company namely that the companies themselves have engaged in wrongdoing or have been used as vehicles for wrongdoing. The courts have made it very clear that a public interest winding up order will not be made where the company in question is associated with another person against whom allegations or even findings of wrongdoings have been made.[7]

In the present case, the entirety of the evidence relied upon amounts to little more than allegations in the press and the fact that proceedings have been instigated in the United States against certain ultimate beneficial owners. Those proceedings are in their early stages and are being contested fully by the defendants. What is conspicuously absent from the evidence is any allegation, much less any proof, that:

1. The Campbells PL-COs themselves have engaged in any wrongdoing;

2. The Campbells PL-COs have received any proceeds of any alleged wrongdoing;

3. Any creditors of the Campbells PL-COs have been harmed;

4. Any party has been harmed by any conduct of the Campbells PL-Cos; or

5. Any party has even come forward to complain about the actions of the Campbells PL-Cos.

We would emphasise that it is the applicant's burden to establish evidence of wrongdoing or lack of commercial probity for each individual company. It is not sufficient nor permissible to take a broad-brush approach by simply lumping together all companies and make generalised allegations. If the test for winding up a company in the British Virgin Islands were that allegations or proceedings have been levelled against its beneficial owner or parties associated with it then the volume of such applications would increase exponentially and the trust which investors worldwide put in BVI corporate structures and legal system would be rocked. However, that is not the test either in the BVI or in England. Rather, the court is required to consider what each company has done to warrant being wound up, on an individual basis. We appreciate that your client will have been reacting as quickly as possible to protect the reputation of the jurisdiction in the face of a very lurid narrative being propagated in the media and by the current US administration

---

[4] *Secretary of State v Celtic Consultancy & Enterprises Ltd and others* [2020] EWCA Civ 1017
[5] *Secretary of State for Business Energy and Industrial Strategy v Sentor Solutions Commercial Ltd* [2022] EWHC 2734 (Ch); *Secretary of State for Trade and Industry v Atlantic Property Ltd* [2006] EWHC 610 (Ch)
[6] *Re City Vintners Ltd* [2001]
[7] *Re Tag World Services Ltd* [2008] 7 WLUK 945

2

however this has unfortunately mean that your client has manifestly failed to discharge this burden in respect of any of the Campbells PL-COs.

The transcript records counsel's submission that: "These companies, it is said, My Lord, do not serve any real purpose other than to facilitate this money-laundering enterprise." It is not clear what the basis for that submission was as no evidence was before the Court that any of the Campbells PL-Cos have facilitated money laundering. Counsel correctly noted that two of the companies now in provisional liquidation are named in the US indictment (Amber Hill and Lateral Bridge). However, those companies are not among the Campbells PL-Cos and we have no instructions to discharge the provisional liquidation orders in respect of them.

In the authorities where liquidation orders (or their equivalent) were granted on public interest grounds, the focus was on the wrongdoing and inherently objectionable conduct undertaken by the companies themselves, such as:

1.  Making fraudulent misrepresentations to customers;

2.  Operating without necessary regulatory authorisation;

3.  Conducting investment fraud;

4.  Failing to keep proper accounting records;

5.  Misleading the public through deceptive documentation.

In contrast, the only issue taken in respect of the Campbells PL-Cos is that there are allegations made against their beneficial owners, which allegations are themselves denied.  There is no evidence that the companies themselves have engaged in any illegal, fraudulent, or inherently objectionable conduct or that any of their assets are the proceeds of such conduct. For the avoidance of doubt, the companies have not engaged in such conduct and their assets are not the proceeds of illegal conduct.

**The purpose of PL**

We must reiterate that the purpose of provisional liquidation is not to conduct a cost-shifting exercise whereby the companies can be investigated at their own expense.  The Campbells PL-Cos' position is that they will undertake to cooperate fully with any legitimate investigation, but they object strenuously to any attempt to shift the costs of that investigation to them through the use of provisional liquidators. The authorities make clear that the gateway is cogent evidence of wrongdoing by the company in question. Once that is established the jurisdiction is enlivened and provisional liquidators can seize control of the company's affairs and take whatever steps are deemed necessary with regard to investigations. To have liquidators appointed on the basis of mere suspicions and allegations and then have them charge the companies for the costs of trying to find evidence of wrongdoing turns the law and the authorities on their head.

If the intention of the BVI Government is to conduct a law enforcement investigation into the Campbells PL-COs, then those costs should properly be met by the BVI Government and not extracted from the assets of companies against whom no wrongdoing has been established.  The current approach offends against principles of natural justice.  The provisional liquidators have been permitted to operate in secrecy, without

3

any information being provided to the Campbells PL-COs as to their activities, whilst simultaneously seeking to deplete the assets of those companies to fund their investigations.

This is not a proper use of the provisional liquidation jurisdiction.  The court's power to appoint provisional liquidators should be exercised as a remedy of last resort where urgent protection is genuinely required, not as a mechanism to fund fishing expeditions at the expense of the very companies whose innocence has not been disproved.

As we have alluded to previously, the asset protection aspect of the application appears not to have taken into account the fact of sanctions applying to the Campbells PL-Cos and that the risk of asset dissipation is virtually non-existent.

The transcript does not show that there was any attempt to explore less onerous remedies than provisional liquidation – which your client was required to do. However, we have made it clear that the companies consider that such remedies are available which would protect the public interest at no cost to the pubic purse and without the administrative burden and use of court time than a provisional or permanent liquidation.

**Conclusion**

For the reasons set out above and in our previous correspondence, we maintain that the provisional liquidation orders should be discharged and the substantive applications for final liquidation orders dismissed.  The evidential threshold has not been met, no wrongdoing by the companies themselves has been established, and the current regime represents a disproportionate and unjustified interference with the rights of the Campbells PL-COs.

We have previously proposed a collaborative alternative involving Mr Cosimo Borrelli of Admiralty Partners Asia, who has been appointed as Special Manager and as a director of almost all of the Campbells PL-Cos. That offer remains open.  We invite your client to engage constructively with this proposal, which would adequately serve any legitimate public interest without the continuing harm and expense caused by the current provisional liquidation regime.

If your client is not prepared to take that approach and intends to proceed with the applications to liquidate the companies, we are instructed to oppose those applications vigorously and to seek costs from your client.

We look forward to your response.

Yours faithfully

**Campbells Legal (BVI) Limited**

4

261

## Milton Chan | Campbells

| | |
|---|---|
| **From:** | Nadine Whyte <NWhyte@onealwebster.com> |
| **Sent:** | Thursday, 26 February 2026 3:29 am |
| **To:** | Grant Carroll | Campbells; Paul Kennedy | Campbells; Saskia Linn | Campbells; Milton Chan | Campbells |
| **Cc:** | Paul Webster; Paul Dennis; Koya Ryan; Jeni-lee Watson |
| **Subject:** | RE: Letter to ONW [IMAN-IMANLIT.FID173141] |

**EXTERNAL EMAIL: This email originated from outside of Campbells.**

Dear Grant,

As indicated, we expect that the hearing will be a directions hearing.

The applications were advertised and there is the possibility that we may receive notices of intention to appear.   The hearing cannot therefore be vacated.   Additionally, we do not believe that we can properly agree directions without giving anyone who files a notice intention to appear the opportunity to have an input in the directions.

**Kind Regards,**
**Nadine Whyte Laing** | Partner
2nd Floor, Commerce House, 181 Main Street | P.O. Box 961 | Road Town, Tortola, British Virgin Islands VG1110
nwhyte@onealwebster.com | Tel +1-284-393-5800 | Cell +1-284-340-2840 | www.onealwebster.com



This email is confidential and may be subject to legal professional privilege. Read more
Before you print think about the environment.

**From:** Grant Carroll | Campbells <GCarroll@campbellslegal.com>
**Sent:** Wednesday, February 25, 2026 3:11 PM
**To:** Nadine Whyte <NWhyte@onealwebster.com>; Paul Kennedy | Campbells <PKennedy@campbellslegal.com>; Saskia Linn | Campbells <SLinn@campbellslegal.com>; Milton Chan | Campbells <MChan@campbellslegal.com>
**Cc:** Paul Webster <PWebster@onealwebster.com>; Paul Dennis <PDennis@onealwebster.com>; Koya Ryan <KRyan@onealwebster.com>; Jeni-lee Watson <JWatson@onealwebster.com>
**Subject:** Re: Letter to ONW [IMAN-IMANLIT.FID173141]

**Caution:** This email originated from outside O'Neal Webster. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Nadine

You have just sent us an email regarding attending the hearing on Monday by video.

Can you please urgently respond to the below query. We are entirely in the dark as to your client's position and welcome clarification.

If we can agree a consent order (which should be entirely possible if you are not seeking to wind the companies up on Monday) then a hearing may not be necessary.

1

Regards

Grant

**Grant Carroll**
BVI Managing Partner

**E** gcarroll@campbellslegal.com
**T** +1 284 494 2423 **C** +1 284 346 6160

**Campbells**
Floor 4, Banco Popular Building
Road Town, Tortola VG1110, British Virgin Islands
campbellslegal.com│LinkedIn

CAYMAN **|** BVI **|** HONG KONG
**From:** "Grant Carroll | Campbells" <GCarroll@campbellslegal.com>
**Subject:** Letter to ONW [IMAN-IMANLIT.FID173141]
**Date:** 25 February 2026 10:53
**To:** "Nadine Whyte" <NWhyte@onealwebster.com>, "Paul Kennedy | Campbells" <PKennedy@campbellslegal.com>, "Saskia Linn | Campbells" <SLinn@campbellslegal.com>, "Milton Chan | Campbells" <MChan@campbellslegal.com>
**Cc:** "Paul Webster" <PWebster@onealwebster.com>, "Paul Dennis" <PDennis@onealwebster.com>, "Koya Ryan" <KRyan@onealwebster.com>, "Jeni-lee Watson" <JWatson@onealwebster.com>


Dear Nadine

Thank you - so to be clear, you will not be seeking the immediate liquidation of the companies on Monday?

If that is case we should be able to agree some appropriate directions. Please let me know.

Grant

**Grant Carroll**
BVI Managing Partner

**E** gcarroll@campbellslegal.com
**T** +1 284 494 2423 **C** +1 284 346 6160

**Campbells**
Floor 4, Banco Popular Building
Road Town, Tortola VG1110, British Virgin Islands
campbellslegal.com│LinkedIn

CAYMAN **|** BVI **|** HONG KONG
**From:** "Nadine Whyte" <NWhyte@onealwebster.com>
**Subject:** Letter to ONW [IMAN-IMANLIT.FID173141]
**Date:** 25 February 2026 10:49
**To:** "Grant Carroll | Campbells" <GCarroll@campbellslegal.com>, "Paul Kennedy | Campbells" <PKennedy@campbellslegal.com>, "Saskia Linn | Campbells" <SLinn@campbellslegal.com>, "Milton Chan | Campbells" <MChan@campbellslegal.com>
**Cc:** "Paul Webster" <PWebster@onealwebster.com>, "Paul Dennis" <PDennis@onealwebster.com>, "Koya Ryan" <KRyan@onealwebster.com>, "Jeni-lee

2

263

Watson" <JWatson@onealwebster.com>

**EXTERNAL EMAIL: This email originated from outside of Campbells.**

---

Dear Grant,

We are making every effort to respond to your letters by close of business today.

At the hearing on Monday, we intend to follow the usual procedure and seek directions for the substantive hearing of our client's applications for the appointment of liquidators.

**Kind Regards,**
**Nadine Whyte Laing** | Partner
2nd Floor, Commerce House, 181 Main Street | P.O. Box 961 | Road Town, Tortola, British Virgin Islands VG1110
nwhyte@onealwebster.com | Tel +1-284-393-5800 | Cell +1-284-340-2840 | www.onealwebster.com



This email is confidential and may be subject to legal professional privilege. Read more
🖶 Before you print think about the environment.

---

**From:** Grant Carroll | Campbells <GCarroll@campbellslegal.com>
**Sent:** Wednesday, February 25, 2026 9:27 AM
**To:** Nadine Whyte <NWhyte@onealwebster.com>; Koya Ryan <KRyan@onealwebster.com>; Jeni-lee Watson <JWatson@onealwebster.com>; Paul Kennedy | Campbells <PKennedy@campbellslegal.com>; Saskia Linn | Campbells <SLinn@campbellslegal.com>; Milton Chan | Campbells <MChan@campbellslegal.com>
**Subject:** RE: Letter to ONW [IMAN-IMANLIT.FID173141]

**Caution:** This email originated from outside O'Neal Webster. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Nadine

Will you be able to come back to us today?  I believe the most pressing issue is the upcoming hearing on Monday.  Is your client willing to agree to an adjournment of those hearings?

Many thanks

Grant

**Grant Carroll**
BVI Managing Partner

E gcarroll@campbellslegal.com
T +1 284 494 2423 C +1 284 346 6160

**Campbells**
Floor 4, Banco Popular Building
Road Town, Tortola VG1110, British Virgin Islands
campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

## Milton Chan | Campbells

| | |
|---|---|
| **From:** | Nadine Whyte <NWhyte@onealwebster.com> |
| **Sent:** | Friday, 27 February 2026 9:20 pm |
| **To:** | Grant Carroll | Campbells |
| **Cc:** | Paul Kennedy | Campbells; Saskia Linn | Campbells; Milton Chan | Campbells; Paul Webster; Paul Dennis; Koya Ryan; Jeni-lee Watson |
| **Subject:** | RE: Monday's hearing (draft order - adjournment / directions) [IMAN-IMANLIT.FID173141] |

**EXTERNAL EMAIL: This email originated from outside of Campbells.**

Dear Grant,

We  have not received full instructions and will get back to you later today.

**Kind Regards,**
**Nadine Whyte Laing** | Partner
2nd Floor, Commerce House, 181 Main Street | P.O. Box 961 | Road Town, Tortola, British Virgin Islands VG1110
nwhyte@onealwebster.com | Tel +1-284-393-5800 | Cell +1-284-340-2840 | www.onealwebster.com



This email is confidential and may be subject to legal professional privilege. Read more
Before you print think about the environment.

**From:** Grant Carroll | Campbells <GCarroll@campbellslegal.com>
**Sent:** Friday, February 27, 2026 9:19 AM
**To:** Nadine Whyte <NWhyte@onealwebster.com>
**Cc:** Paul Kennedy | Campbells <PKennedy@campbellslegal.com>; Saskia Linn | Campbells <SLinn@campbellslegal.com>; Milton Chan | Campbells <MChan@campbellslegal.com>; Paul Webster <PWebster@onealwebster.com>; Paul Dennis <PDennis@onealwebster.com>; Koya Ryan <KRyan@onealwebster.com>; Jeni-lee Watson <JWatson@onealwebster.com>
**Subject:** RE: Monday's hearing (draft order - adjournment / directions) [IMAN-IMANLIT.FID173141]

**Caution:** This email originated from outside O'Neal Webster. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Nadine

Do you have instructions on the draft consent order?  Would a call be helpful?

Many thanks

Grant

**Grant Carroll**
BVI Managing Partner

**E** gcarroll@campbellslegal.com
**T** +1 284 494 2423 **C** +1 284 346 6160

**Campbells**
Floor 4, Banco Popular Building
Road Town, Tortola VG1110, British Virgin Islands
campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

---

**From:** Nadine Whyte <NWhyte@onealwebster.com>
**Sent:** 26 February 2026 14:43
**To:** Grant Carroll | Campbells <GCarroll@campbellslegal.com>
**Cc:** Paul Kennedy | Campbells <PKennedy@campbellslegal.com>; Saskia Linn | Campbells <SLinn@campbellslegal.com>; Milton Chan | Campbells <MChan@campbellslegal.com>; Paul Webster <PWebster@onealwebster.com>; Paul Dennis <PDennis@onealwebster.com>; Koya Ryan <KRyan@onealwebster.com>; Jeni-lee Watson <JWatson@onealwebster.com>
**Subject:** RE: Monday's hearing (draft order - adjournment / directions) [IMAN-IMANLIT.FID173141]

**EXTERNAL EMAIL: This email originated from outside of Campbells.**

---

Dear Grant,

Thank you.  We will seek instructions.

**Kind Regards,**
**Nadine Whyte Laing** | Partner
2nd Floor, Commerce House, 181 Main Street | P.O. Box 961 | Road Town, Tortola, British Virgin Islands VG1110
nwhyte@onealwebster.com | Tel +1-284-393-5800 | Cell +1-284-340-2840 | www.onealwebster.com

   

This email is confidential and may be subject to legal professional privilege. Read more
Before you print think about the environment.

---

**From:** Grant Carroll | Campbells <GCarroll@campbellslegal.com>
**Sent:** Thursday, February 26, 2026 1:40 PM
**To:** Nadine Whyte <NWhyte@onealwebster.com>
**Cc:** Paul Kennedy | Campbells <PKennedy@campbellslegal.com>; Saskia Linn | Campbells <SLinn@campbellslegal.com>; Milton Chan | Campbells <MChan@campbellslegal.com>; Paul Webster <PWebster@onealwebster.com>; Paul Dennis <PDennis@onealwebster.com>; Koya Ryan <KRyan@onealwebster.com>; Jeni-lee Watson <JWatson@onealwebster.com>
**Subject:** Monday's hearing (draft order - adjournment / directions) [IMAN-IMANLIT.FID173141]

> **Caution:** This email originated from outside O'Neal Webster. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Nadine

Please see attached a draft order dealing with an adjournment of the upcoming liquidation hearings.  We have also proposed directions, including deadlines for the filing of evidence in relation to seeking discharge of the PL appointments.  I suspect those dates will be largely uncontroversial, however please do let me knowand we can seek to tweak them accordingly.

2

266

I would be incredibly grateful if you could please take urgent instructions on this owing to the short time frames.  If we can present an agreed position to the court for Monday I'm sure that would be gratefully appreciated by the Judge.


Kind regards


Grant


**Grant Carroll**
BVI Managing Partner

**E** gcarroll@campbellslegal.com
**T** +1 284 494 2423 **C** +1 284 346 6160

**Campbells**
Floor 4, Banco Popular Building
Road Town, Tortola VG1110, British Virgin Islands
campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG


This email including any attachments are strictly private and confidential. It is solely for the use of the intended recipient(s) and may contain confidential and privileged information. Internet email is not a secure communications medium and may contain viruses. All work carried out by us is subject to our standard terms and conditions (click here to view) unless other terms and conditions are agreed in writing between you and us. The Campbells Group is deemed not to be the author, editor or publisher of personal messages, which fall outside the scope of any individual's employment. Thank you.

## Milton Chan | Campbells

| | |
|---|---|
| **From:** | Grant Carroll | Campbells |
| **Sent:** | Saturday, 28 February 2026 3:03 am |
| **To:** | Nadine Whyte; Jeni-lee Watson; Koya Ryan; Paul Kennedy | Campbells; Saskia Linn | Campbells; Milton Chan | Campbells; Paul Dennis; Paul Webster |
| **Subject:** | RE: Letter to ONW [IMAN-IMANLIT.FID173141] |

Dear Nadine

We are incredibly surprised to learn that the AG is intending to proceed with an application for the liquidation of all of the companies given that we have asked repeatedly over the past 10 days what your client's intended position is and have not received any response other than your client would simply be seeking directions.  We have relied on those assertions and given previous experience of ONW was entirely confident that appropriate directions could be agreed as we had a mutual aim (i.e that 2 March would be used as a directions hearing) and now, at the eleventh hour, you are entirely changing position.

We do not understand what connection the Walkers queries have to your client's decision to seek a full liquidation of the companies on Monday.  However you have raised it and so plainly believe it relevant and we assume intend to raise it on Monday.  Please therefore explain so that we may properly address it as well.

In any event, we can confirm that:

1.  Campbells has been taking instructions from the directors of each of the relevant companies (or their attorneys-in-fact).  As previously advised, Cosimo Borrelli has recently been appointed as director and is now the director of each of the companies represented by Campbells. It is clearly the case that a director of a company which has been placed into provisional liquidation has authority to instruct counsel to oppose the liquidation; and

2.  We can also confirm that Campbells has not been paid any fees or expenses.

3.  We are in the process of finalising evidence to be filed ASAP (and in any event prior to the hearing) opposing both the PL orders and also the liquidation applications.

Given those confirmations, and the fact that the Court list has now been circulated and only provides for one (1) hour on Monday, can you please confirm whether it remains your intention to seek to move 30 liquidation applications?  Given the prevailing circumstances and time available it seems unlikely that this is feasible.  We completely understand that you will need to seek instructions on this as the logistical issues represent a change from what may have been anticipated, and we remain available to discuss logistics.

Best

Grant

**Grant Carroll**
BVI Managing Partner

**E** gcarroll@campbellslegal.com
**T** +1 284 494 2423 **C** +1 284 346 6160

**Campbells**
Floor 4, Banco Popular Building
Road Town, Tortola VG1110, British Virgin Islands
campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

1

268

**From:** Nadine Whyte <NWhyte@onealwebster.com>
**Sent:** 27 February 2026 13:45
**To:** Grant Carroll | Campbells <GCarroll@campbellslegal.com>; Jeni-lee Watson <JWatson@onealwebster.com>; Koya Ryan <KRyan@onealwebster.com>; Paul Kennedy | Campbells <PKennedy@campbellslegal.com>; Saskia Linn | Campbells <SLinn@campbellslegal.com>; Milton Chan | Campbells <MChan@campbellslegal.com>; Paul Dennis <PDennis@onealwebster.com>; Paul Webster <PWebster@onealwebster.com>
**Subject:** RE: Letter to ONW [IMAN-IMANLIT.FID173141]

**EXTERNAL EMAIL: This email originated from outside of Campbells.**

Dear Grant,

As indicated on the call today, we had a meeting with our client this afternoon.

We have been instructed to proceed with the application for liquidation for all the companies including the companies which Campbells represent as Campbells has failed to provide the following information requested by Walkers in its letter dated February 25, 2026:

   a. An explanation in relation to each company detailing from whom it has been taking instructions on behalf of each company to date and in each case on what basis that individual was authorised to provide instructions; and

   b. Confirmation as to the sources from which Campbells' fees and expenses, are being paid and confirmation as to whether those fees are being paid from assets owned or held by any of the companies over which the JPLs have been appointed.

This email supersedes our previous indications that the hearing will be treated as a directions hearing.

**Kind Regards,**
**Nadine Whyte Laing** | Partner
2nd Floor, Commerce House, 181 Main Street | P.O. Box 961 | Road Town, Tortola, British Virgin Islands VG1110
nwhyte@onealwebster.com | Tel +1-284-393-5800 | Cell +1-284-340-2840 | www.onealwebster.com



This email is confidential and may be subject to legal professional privilege. Read more
🖷 Before you print think about the environment.

**From:** Grant Carroll | Campbells <GCarroll@campbellslegal.com>
**Sent:** Friday, February 27, 2026 11:12 AM
**To:** Jeni-lee Watson <JWatson@onealwebster.com>; Nadine Whyte <NWhyte@onealwebster.com>; Koya Ryan <KRyan@onealwebster.com>; Paul Kennedy | Campbells <PKennedy@campbellslegal.com>; Saskia Linn | Campbells <SLinn@campbellslegal.com>; Milton Chan | Campbells <MChan@campbellslegal.com>; Paul Dennis <PDennis@onealwebster.com>
**Subject:** RE: Letter to ONW [IMAN-IMANLIT.FID173141]

**Caution:** This email originated from outside O'Neal Webster. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Jeni-Lee

Thank you for the letter, which we have read. However we will not respond at this stage to the content.

Turning to the hearing on Monday, we have proposed directions as to how to move forwards on this matter concerning the companies which we represent.  Can you please confirm your position with regards to those directions and if they are not agreed, what will you be seeking on Monday.  I have attached the draft directions again for your ease.


Best

Grant


**Grant Carroll**
BVI Managing Partner

**E** gcarroll@campbellslegal.com
**T** +1 284 494 2423 **C** +1 284 346 6160

**Campbells**
Floor 4, Banco Popular Building
Road Town, Tortola VG1110, British Virgin Islands

campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

---

**From:** Jeni-lee Watson <JWatson@onealwebster.com>
**Sent:** 27 February 2026 11:03
**To:** Grant Carroll | Campbells <GCarroll@campbellslegal.com>; Nadine Whyte <NWhyte@onealwebster.com>; Koya Ryan <KRyan@onealwebster.com>; Paul Kennedy | Campbells <PKennedy@campbellslegal.com>; Saskia Linn | Campbells <SLinn@campbellslegal.com>; Milton Chan | Campbells <MChan@campbellslegal.com>; Paul Dennis <PDennis@onealwebster.com>
**Subject:** RE: Letter to ONW [IMAN-IMANLIT.FID173141]


**EXTERNAL EMAIL: This email originated from outside of Campbells.**

---

Dear Mr. Carroll,

Please see the attached correspondence in response to your February 21, 2026 correspondence.

**Kind regards,**

**Mrs. Jeni-Lee Joseph-Watson** | Paralegal
2nd Floor, Commerce House, 181 Main Street | P.O. Box 961 | Road Town, Tortola, British Virgin Islands VG1110
jwatson@onealwebster.com | Tel +1-284-393-5800 | Fax +1-284-393-5805 | www.onealwebster.com



This email is confidential and may be subject to legal professional privilege. Read more
Before you print think about the environment.

---

**From:** Grant Carroll | Campbells <GCarroll@campbellslegal.com>
**Sent:** Saturday, 21 February 2026 3:17 pm
**To:** Nadine Whyte <NWhyte@onealwebster.com>; Koya Ryan <KRyan@onealwebster.com>; Jeni-lee Watson <JWatson@onealwebster.com>; Paul Kennedy | Campbells <PKennedy@campbellslegal.com>; Saskia Linn | Campbells <SLinn@campbellslegal.com>; Milton Chan | Campbells <MChan@campbellslegal.com>
**Subject:** Letter to ONW [IMAN-IMANLIT.FID173141]

**Caution:** This email originated from outside O'Neal Webster. Do not click links or open attachments unless you recognize the sender and know the content is safe.

3

270

Dear Nadine

Please see attached correspondence.

Kind regards

Grant

**Grant Carroll**
BVI Managing Partner

**E** gcarroll@campbellslegal.com
**T** +1 284 494 2423 **C** +1 284 346 6160

**Campbells**
Floor 4, Banco Popular Building
Road Town, Tortola VG1110, British Virgin Islands
campbellslegal.com │ LinkedIn

CAYMAN | BVI | HONG KONG

This email including any attachments are strictly private and confidential. It is solely for the use of the intended recipient(s) and may contain confidential and privileged information. Internet email is not a secure communications medium and may contain viruses. All work carried out by us is subject to our standard terms and conditions (click here to view) unless other terms and conditions are agreed in writing between you and us. The Campbells Group is deemed not to be the author, editor or publisher of personal messages, which fall outside the scope of any individual's employment. Thank you.

4

271



www.onealwebster.com

February 27, 2026

Our Ref: PAW:jw/LG/101538
Your Ref:

**VIA EMAIL**

Campbells
Floor 4, Banco Popular Building
Road Town, Tortola
British Virgin Islands

**Attention: Mr. Grant Carroll**

Dear Sirs,

**Re: Certain Companies in Provisional Liquidation**

We acknowledge receipt of your letter of February 21, 2026 in the captioned matter and are instructed to respond thereto as outlined below, adopting for convenience, the headings used in your letter.

**Limited Evidence in Support of Application**

Our client does not accept the premise that the evidence adduced in support of the provisional liquidation application (or indeed, the substantive liquidation application) is inadequate. We are loathe to embark upon litigation of the merits of the applications, by correspondence. Suffice it to say that, given the statutory mandate of the Attorney General which underpins the proceedings and the overriding public interest imperatives detailed in those proceedings, our client is confident that the supporting evidence adduced by her in the matter provided cogent and compelling grounds for the appointment of provisional liquidators to preserve the assets of the affected companies, pending the hearing and determination of the substantive originating applications.

Those same public interest imperatives also cogently support the case for full liquidation of the companies in question.

It is understandable that those instructing you may hold a different view and of course it remains open to them to take appropriate steps to contest the substantive liquidation applications if they so wish. Our client will be happy to address any such challenges at the appropriate stage, but until then, she is content to stand by the evidence which has already been put before the court in support of those applications.

**Role of Provisional Liquidators/Costs of Investigations**

As regards the order for the sealing of the reports of the provisional liquidators, this order was obtained for good reason. Given the nature of the matters being investigated by the provisional liquidators, there is obviously a need for the protection of potentially sensitive materials and information which come to their knowledge during the course of performance of their duties. There are no "breach of natural justice" implications here: the order clearly makes provision for inspection of the reports upon application being made to, and granted by, the court. There is nothing to prevent your clients from availing themselves of that opportunity, should the need arise.

2nd Floor, Commerce House, ■ PO Box 961, Road Town, Tortola, British Virgin Islands, VG1110 ■ Phone 284 393 5800 ■ Fax 284 393 5805

Member

**LexMundi**
**World Ready**

Lex Mundi is the world's leading
network of independent law
firms with in-depth experience
in 100⁺ countries worldwide.

272

*Prince Group*                                                                                       *February 27, 2026*
*Re: Certain Companies in Provisional Liquidation*                                                      *Page 2 of 2*

In any event, any evidence on which our client intends to rely or which the provisional liquidators deem relevant to the proceedings, will be adduced by way of affidavit evidence in the usual way and served on your clients. They will then be able to respond as they see fit.

On the issue of costs of the investigative work carried out by the provisional liquidators, the idea that provisional liquidation has been employed simply as a mechanism for the BVI Government to conduct an investigation into the relevant companies is wholly misconceived. In fact, as the relevant filings disclose, the primary purpose of putting the companies in provisional liquidation is to protect their assets, pending the hearing and determination of the substantive liquidation applications. There is therefore no basis for the suggestion that it is being sought to shift the cost of a BVI Government investigation to the companies, through the use of provisional liquidators.

**Ongoing Damage**

The matters of which you now seek to complain under this head of your letter are all matters which it was open to your clients to raise by way of opposition to the continuation of the ex-parte order appointing the joint provisional liquidators. They chose not to do so and it is quite pointless at this stage to attempt to engage in ex post facto litigation of these issues, through correspondence. Again, it remains open to those instructing you to take appropriate steps to contest the pending applications for the substantive appointment of liquidators over the companies. Our client is content to address any such challenges in substance if and when they are launched.

**Collaborative Route to Protect Public Interest**

We are not sure what to make of your information as to the appointment of a "Special Manager", as described under this head of your letter - an office which does not appear to us to be known to BVI law. In any event, as you well know, a newly appointed director of the companies can have no power to act as such in circumstances where those companies are in provisional liquidation. However, from your proposal as to the role of this appointee, it appears to us that the idea here is to replace the joint provisional liquidators, who are independent officers of the court, with someone who clearly is not - a course which would be defeasive of the whole objective of the provisional liquidations in the first place.

That is simply not a proposal to which our client is prepared to accede and we are accordingly instructed to reject the proposals contained in your letter.

Please be guided accordingly.

Yours faithfully,
**O'NEAL WEBSTER**

**Paul B. Dennis, K.C.**
Senior Partner and Head of Litigation
pdennis@onealwebster.com

273

**IN THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**VIRGIN ISLANDS COMMERCIAL DIVISION**

**CLAIM Nos:** BVIHC (COM) 2026/0001; BVIHC (COM) 2026/0002; BVIHC (COM) 2026/0004; BVIHC (COM) 2026/0005; BVIHC (COM) 2026/0006; BVIHC (COM) 2026/0007; BVIHC (COM) 2026/0008; BVIHC (COM) 2026/0009; BVIHC (COM) 2026/0012; BVIHC (COM) 2026/0013; BVIHC (COM) 2026/0014; BVIHC (COM) 2026/0015; BVIHC (COM) 2026/0016; BVIHC (COM) 2026/0017; BVIHC (COM) 2026/0018; BVIHC (COM) 2026/0019; BVIHC (COM) 2026/0020; BVIHC (COM) 2026/0021; BVIHC (COM) 2026/0023; BVIHC (COM) 2026/0024; BVIHC (COM) 2026/0025; BVIHC (COM) 2026/0026; BVIHC (COM) 2026/0027; BVIHC (COM) 2026/0029; BVIHC (COM) 2026/0030

**B E T W E E N:**

**ATTORNEY GENERAL**

**Applicant**

**-and-**

| | |
|---|---|
| BVIHC (COM) 2026/0001 | **BRIGHT TEAM GLOBAL LIMITED** |
| BVIHC (COM) 2026/0002 | **AUSPICIOUS TYCOON LIMITED** |
| BVIHC (COM) 2026/0004 | **DELIGHTFUL THRIVE LIMITED** |
| BVIHC (COM) 2026/0005 | **EVEN SINCERITY LIMITED** |
| BVIHC (COM) 2026/0006 | **FULAM INVESTMENT LIMITED** |
| BVIHC (COM) 2026/0007 | **GIANT VICTORY HOLDINGS LIMITED** |
| BVIHC (COM) 2026/0008 | **GOLDEN ASCEND INTERNATIONAL LIMITED** |
| BVIHC (COM) 2026/0009 | **HARMONIC STATE LIMITED** |
| BVIHC (COM) 2026/0012 | **LUMINOUS GLOW LIMITED** |
| BVIHC (COM) 2026/0013 | **MIGHTY DIVINE LIMITED** |
| BVIHC (COM) 2026/0014 | **NOBLE TITLE LIMITED** |
| BVIHC (COM) 2026/0015 | **ORIENTAL CHARM HOLDINGS INVESTMENT LIMITED** |
| BVIHC (COM) 2026/0016 | **PACIFIC CHARM HOLDINGS INVESTMENT** |
| BVIHC (COM) 2026/0017 | **PRINCE GLOBAL GROUP LIMITED** |
| BVIHC (COM) 2026/0018 | **PRAISE MARBLE LIMITED** |
| BVIHC (COM) 2026/0019 | **PRINCE GLOBAL HOLDINGS LIMITED** |
| BVIHC (COM) 2026/0020 | **RESPECTFUL STEED LIMITED** |
| BVIHC (COM) 2026/0021 | **RETAIN PROSPER LIMITED** |
| BVIHC (COM) 2026/0023 | **SIMPLY ADVANCED LIMITED** |
| BVIHC (COM) 2026/0024 | **SOUTHERN HERITAGE LIMITED** |
| BVIHC (COM) 2026/0025 | **STAR MERIT GLOBAL LIMITED** |
| BVIHC (COM) 2026/0026 | **STARRY BLOOM LIMITED** |
| BVIHC (COM) 2026/0027 | **SURE TYCOON LIMITED** |
| BVIHC (COM) 2026/0029 | **TOWARDS SUNSHINE LIMITED** |
| BVIHC (COM) 2026/0030 | **UNITED RICHES GLOBAL LIMITED** |

**Respondents**

_____

EXHIBIT CB-1

_____

#3503725v1

Campbells
Floor 4, Banco Popular Building
Road Town
Tortola VG1110
British Virgin Islands
Tel: (284) 494 2423
Ref: SDA/MCH/KCH/20785-45687
**Legal Practitioners for the Respondents**

#3503725v1