**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>PRINCE GLOBAL HOLDINGS LIMITED *et al*,<br><br>     Debtors in Foreign Proceedings. | **FOR PUBLICATION**<br><br>Chapter 15<br><br>Case No. 26-10769 (MG)<br><br>(Jointly Administered) |

## MEMORANDUM OPINION GRANTING PROVISIONAL RELIEF

*A P P E A R A N C E S:*

SULLIVAN & CROMWELL LLP
*Attorneys for the Proposed Foreign Representatives*
125 Broad Street  New York, NY 10004
By:    Andrew G. Dietderich, Esq,
        Sharon Cohen Levin, Esq.
        Christopher J. Dunne, Esq.
        Jacob M. Croke, Esq..
        Alexa J. Kranzley, Esq.

KOBRE & KIM LLP
*Attorneys for Amber Hill Ventures Limited and Lateral*
*Bridge Global Limited*
800 Third Avenue
New York, New York 10022
By:    Daniel J. Saval, Esq.
        Jeremy O. Bressman, Esq.
        Adam M. Lavine, Esq.
        Martine B. Forneret, Esq.

BOIES SCHILLER FLEXNER LLP
*Attorneys for Alleged Objecting Debtors*
55 Hudson Yards
New York, New York 10001
By:    Matthew L. Schwartz, Esq.

1

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the *Corrected Emergency Motion for Entry of Orders Granting (I) Ex Parte Relief and (II) Provisional Relief, Pursuant to Section 1519 of the Bankruptcy Code* (the "Provisional Relief Motion," ECF Doc. # 27), the *Declaration of Paul Pretlove in Support of (A) the Emergency Motion for Entry of Orders Graning (I) Ex Parte Relief and (II) Provisional Relief, Pursuant to Section 1519 of the Bankruptcy Code and (B) the Verified Petition Under Chapter 15 for Recognition of Foreign Main Proceedings and Related Relief* (the "Pretlove Declaration," ECF Doc. # 3), the *Declaration of Andrew Barrington Chissick in Support of (A) the Emergency Motion for Entry of Orders Graning (I) Ex Parte Relief and (II) Provisional Relief, Pursuant to Section 1519 of the Bankruptcy Code and (B) the Verified Petition Under Chapter 15 for Recognition of Foreign Main Proceedings and Related Relief* (the "Chissick Declaration," ECF Doc. # 4), the *Response in Support of Corrected Emergency Motion for Entry of Orders Granting (I) Ex Parte Relief and (II) Provisional Relief, Pursuant to Section 1519 of the Bankruptcy Code* (the "Response," ECF Doc. # 30), and the *Supplemental Declaration of Andrew Barrington Chissick in Support of Corrected Emergency Motion for Entry of Orders Granting (I) Ex Parte Relief and (II) Provisional Relief, Pursuant to Section 1519 of the Bankruptcy Code* (the "Supplemental Chissick Declaration," ECF Doc. # 31) submitted by Paul Pretlove, David Standish and James Drury (collectively, the "Foreign Representatives" or the "JPLs").

Additionally, Prince Global Holdings Limited, Auspicious Tycoon Limited, Bright Team Global Limited, Delightful Thrive Limited, Even Sincerity Limited, Fulam Investment Limited, Giant Victory Holdings Limited, Golden Ascend International Limited, Harmonic State Limited,

2

Luminous Glow Limited, Mighty Divine Limited, Noble Title Limited, Oriental Charm Holdings Investment Limited, Pacific Charm Holdings Investment Limited, Praise Marble Limited, Prince Global Group Limited, Respectful Steed Limited, Retain Prosper Limited, Simply Advanced Limited, Southern Heritage Limited, Star Merit Global Limited, Starry Bloom Limited, Sure Tycoon Limited, Towards Sunshine Limited, and United Riches Global Limited (collectively, the "Objecting Debtors") filed the *Objecting Debtors' Objection to Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* (the "Objection," ECF Doc. # 17).  Amber Hill Ventures Limited ("Amber Hill") and Lateral Bridge Global Limited ("Lateral Bridge") also filed the *Objection of Amber Hill Ventures Limited and Lateral Bridge Global Limited to Emergency Motion for Orders Granting (I) Ex Parte Relief and (II) Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* (the "Amber Hill Objection" or "AM Objection," ECF Doc. # 18).

For the following reasons, the Court **GRANTS** the Provisional Relief Motion.  A separate Order will be entered.

## I.   BACKGROUND

### A. The Motion

#### I. Company Background

Prince Group Holdings Limited and its affiliated debtors (collectively, the "Debtors") are entities incorporated in the British Virgin Islands ("BVI") as a business company pursuant to the BVI Business Companies Act, 2004, which is a form of limited liability company comparable to a corporation under U.S. law.  (Pretlove Decl. ¶ 11.)  The Debtors did not operate independently,

rather they were part of a complex corporate structure that Prince Group employed to hold real property, investments, financial accounts, and assets around the world. (Motion ¶ 9.)

The U.S. Department of Justice and the U.S. Department of Treasury identified 28 of the Debtors as part of the "Prince Group" which is described as a "transnational criminal enterprise." (Pretlove Decl. ¶ 12.) Two Debtors, Amber Hill Ventures Limited ("Amber Hill") and Lateral Bridge Global Limited ("Lateral Bridge"), are not the subject of sanctions designations but were identified in the Forfeiture Complaint (defined below) as entities involved in laundering the Prince Group's illicit proceeds. (*Id.*)

Chen Zhi served as Chairman of the Prince Group since 2015, which operated more than 100 business entities in over 30 countries. (*Id.* ¶ 13.) Mr. Chen has been a citizen of China, Cambodia, Vanuatu, St. Lucia, and Cyprus, and resided at various times in in Cambodia, Singapore, Taiwan, and the United Kingdom. (*Id.*) Mr. Chen is the sole shareholder and director of several of the Debtors, while others are held via intermediate holding companies or are registered by individuals associated with Mr. Chen or the Prince Group. (*Id.* ¶ 16.)

The Prince Group was purportedly focused on real estate development, financial services, consumer services, technology, food and beverages, and lifestyle businesses. (*Id.* ¶ 14.) However, Mr. Chen and his associates allegedly grew the Prince Group into one of the largest transnational criminal organizations in Asia. (*Id.* ¶ 15.) It operated publicly disclosed businesses in Cambodia including Prince Real Estate Group, Prince Huan Yu Real Estate Group, Prince Bank, and Awesome Global. (*Id.*)

### 2. DOJ Indictment

On October 14, 2025, Mr. Chen, the alleged chairman and key figure of the Prince Group, was charged by the DOJ with wire fraud conspiracy and money laundering conspiracy.

4

(*Id.* ¶ 20.)  Mr. Chen was allegedly responsible for overseeing the operation of the Prince Group's forced-labor scam compounds that stole billions of dollars from people across the world. (*Id.*).  The scams involved cryptocurrency investment fraud and other schemes that leveraged the Prince Group's network of businesses to launder the illegal proceeds of criminal activity.  (*Id.* ¶ 15.)

According to the indictment, Mr. Chen directed the Prince Group to build and operate at least 10 scam compounds in Cambodia.  (*Id.* ¶ 21.)  Thousands of migrant workers traveled to Cambodia seeking legitimate employment but were instead trafficked and forced to participate in cryptocurrency investment fraud schemes, often under the threat of violence.  (*Id.*)  The scam compounds, which functioned as forced labor camps, included dormitories surrounded by high walls and barbed wire.  (*Id.*)  Individuals at two scam facilities alone were utilizing 1,250 mobiles phones that controlled 76,000 social media accounts.  (*Id.*)  Mr. Chen is alleged to have personally maintained records of the profits generated from the scam which referenced "pig-butchering."[1]  (*Id.*)  In addition, internal Prince Group records featured detailed instructions on building relationships with the victims and for registering social media accounts in bulk.  (*Id.*)

The Prince Group's fraud scheme targeted victims in the United States and across the globe.  (*Id.* ¶ 22.)  For example, there was a Brooklyn-based money laundering network (the "Brooklyn Network") that helped further an investment fraud scheme operating out of one of the Prince Group compounds.  (*Id.*)  The Brookyln Network allegedly facilitated the fraudulent transfer and laundering of more than $18 million from more than 250 victims for the Prince

---

[1]     "'Pig-butchering' (or 'sha zhu pan') scams were cyber-enabled investment fraud schemes in which malicious actors contacted unwitting victims through messaging or social media applications and convinced them to transfer cryptocurrency or other funds to specified accounts based on false promises that the funds would be invested and generate profits. In reality, the funds were misappropriated from the victims and laundered for the benefit of the perpetrators. Pig-butchering scams often relied on social engineering to earn victims' trust to induce the fraudulent investment."  Verified Complaint ¶ 17(a).

5

Group between May 2021 and August 2022. (*Id.*) The victims' funds were allegedly transferred through bank accounts registered to Brooklyn and Queens-based shell companies to the Prince Group and its top executives. (*Id.*)

Mr. Chen and his co-conspirators also allegedly used their political influence to protect the same operations from law enforcement by bribing officials from the Chinese Ministry of Public Security and Ministry of State Security for information ahead of law enforcement raids. (*Id.* ¶ 23.) Mr. Chen allegedly kept record of hundreds of millions of dollars in reimbursements to Prince Group associates for bribes and luxury purchases. (*Id.*) In addition, Prince Group associates allegedly used violence and coercive measures to enforce discipline at the scam compounds and to maintain the Prince Group's power. (*Id.*) International human rights organizations and the United Nations documented physical abuse that took place at the scam compounds including beatings, electric shocks, prolonged confinement, sexual violence, and other forms of torture used to force victims to participate in fraud schemes. (*Id.*)

### 3. Civil Forfeiture Action

On October 14, 2025, the United States Attorney's Office for the Eastern District of New York and the DOJ's National Security Division filed a civil forfeiture complaint (the "Forfeiture Complaint") against the Prince Group in the U.S. District Court of Eastern District of New York. (*Id.* ¶ 24.) The action sought forfeiture of about 127,271 Bitcoin worth an estimated $8.7 billion. (*Id.*) The funds are alleged to be proceeds of the Prince Group's fraud and money laundering schemes. (*Id.*) According to the Forfeiture Complaint, Mr. Chen and his co-conspirators laundered illegal profits through "illegal money shops," "underground money houses," and "water houses." (*Id.* ¶ 25.) These laundering operations collected proceeds from the scams in

the form of bitcoin and other stablecoins and converted them to fiat currency. (*Id.*) The fiat currency was then used to buy clean bitcoin or other cryptocurrencies. (*Id.*)

The illegal proceeds were also laundered through companies registered in the BVI, including Amber Hill, Lateral Bridge, and potentially other Debtor entities or companies within Prince Group's corporate hierarchy. (*Id.* ¶ 26.) The entities opened accounts at U.S. financial institutions with allegedly incorrect business descriptions, and they materially understated their transaction volumes. (*Id.*) Mr. Chen and his co-conspirators also allegedly laundered illicit proceeds through Prince Group's online gambling business, which continued to operate after Cambodia banned online gambling. (*Id.*) Proceeds were also allegedly laundered through large-scale cryptocurrency mining operations including Lubian, a Chinese-based company that was for a time the sixth-largest bitcoin mining operation in the world. (*Id.*) Mr. Chen allegedly bragged to associates that the mining business was very profitable because there was no cost and the operating capital was funds stolen from the scam victims. (*Id.*)

Mr. Chen and his co-conspirators allegedly used complex cryptocurrency laundering techniques including "spraying" and "funneling" to further hide the illicit scam proceeds. (*Id.* ¶ 27.) These techniques disaggregated large amounts of cryptocurrency across many wallets and then re-consolidated it into fewer wallets. (*Id.*) This allegedly deliberately commingled the illicit funds with newly mined Bitcoin, which made the laundered proceeds appear to come from legitimate bitcoin mining operations. (*Id.*) According to the U.S. Federal Bureau of Investigation ("FBI"), the 127,271 Bitcoins were in wallets personally controlled by Mr. Chen. (*Id.*) The wallets were primarily funded by cryptocurrency mining, including addresses associated with Prince Group operations and indirect transfers from wallets at centralized

cryptocurrency exchanges, including wallets controlled by BVI companies within the Prince Group's corporate structure.  (*Id.*)

### 4.  Sanctions

In addition, on October 14, 2025, the Prince Group, Mr. Chen, and 146 associated individuals and entities were sanctioned by the Office of Foreign Assets Control ("OFAC"), the Financial Crimes Enforcement Network ("FinCEN"), and the United Kingdom's Foreign, Commonwealth and Development Office.  (*Id.* ¶ 28.)  The United Kingdom's sanctions were automatically extended and adopted by BVI and the Cayman Islands in their capacities as British Overseas Territories due to the Overseas Territories Orders in Council.  (*Id.*)

The Prince Group was designated a "Transnational Criminal Organization" and Prince Holding Group and numerous affiliates were placed on the Specially Designated Nationals and Blocked Persons List ("SDN List") by OFAC.  (*Id.*)  For any individual or entity placed on the SDN List that is subject to U.S. jurisdiction, their property was blocked and all U.S. persons were barred from transactions with them without a license from OFAC.  (*Id.*)
Twenty-eight of the Debtors are included among the sanctioned entities.  (*Id.* ¶ 30.)  Amber Hill Ventures Limited and Lateral Bridge Global Limited, the two remaining Debtor entities, have not been designated but have been identified in the Forfeiture Complaint as entities involving in laundering illicit proceeds.  (*Id*. ¶¶ 29-30.)

### 5.  Arrest of Chen Zhi & Alleged Fraud

Mr. Chen was arrested in Cambodia and extradited to China on January 6, 2026, and remains in Chinese Custody.  (*Id.* ¶ 32.)  The Chinese Ministry of Public Security has stated that Mr. Chen is suspected of fraud and concealing proceeds and planned to issue arrest warrants for other members of his criminal syndicate.  (*Id.*)  The U.S. Department of the Treasury has

described the Prince Group as a "dominant player in Cambodia's scam economy" that "has controlled illicit financial flows of billions of dollars." (*Id.* ¶ 33.) TRM Labs, a leading blockchain analytics firm, described the Prince Group in its 2026 Crypto Crime Report as "one of the largest pig butchering scam operations ever uncovered." (*Id.*) TRM found that one Cambodian payment platform, HuiOne Pay has been designated as an institution of primary money laundering concern and received nearly 80% of funds from a Prince Group-linked escrow service. (*Id.*) Monthly inflows peaked in July 2025 at approximately $4.7 billion. (*Id.*)

### 6.  Alleged Human Trafficking and Forced Labor Activities

The Indictment details the Prince Group's alleged involvement in the trafficking of thousands of individuals who were forced into Prince Group compounds and forced to participate in fraud schemes under threat of violence. (*Id.* ¶ 36.) Prince Group is alleged to have operated at least 10 forced labor compounds and to be among the largest operators in the region. (*Id.* ¶ 37.) The JPLs note that they have not conducted an independent investigation and have not yet formed a view of the allegations included in the materials discussed above. (*Id.* ¶ 38.)

### 7.  BVI Insolvency Proceedings and Appointment of JPLs

Pursuant to section 162(1)(c) of the BVI Insolvency Act, 2003 (the "BVI Insolvency Act") the Attorney General of the BVI is permitted to seek the appointment of a liquidator on public interest grounds. (*Id.* ¶ 39.) On January 5, 2026, the Attorney General of the BVI, Dawn J. Smith (the "BVI Attorney General"), applied to the BVI Court for the appointment of the JPLs as liquidators pursuant to sections 162(1)(a) and (c) of the BVI Insolvency Act (the "Liquidation Applications"). (*Id.* ¶ 40.) The BVI Attorney General also sought the appointment of the JPLs as provisional liquidators of the Debtors pursuant to section 170 of the BVI Insolvency Act. (*Id.*)

Following an *ex parte* hearing on January 9, 2026, the Honorable Justice Abbas Mithani of the BVI Court granted orders (collectively, the "BVI Orders"), which appointed the JPLs as provisional liquidators of the Debtors.  (*Id.* ¶ 41.)  The JPLs displaced the Debtors' prior directors and officers, and exclusive authority over the affairs and assets of the Debtors is now vested in the JPLs.  (*Id.* ¶ 42.)  The BVI Orders vest the JPLs with broad authority, including the authority to seek relief in the United States to protect the Debtors' estates.  (*See id.* ¶¶ 44-45.)

On January 29, 2026, the BVI Court continued the BVI Orders pending final determination of the Liquidation Applications which was scheduled for hearing April 16–17, 2026, but has now moved to early May.  (*Id.* ¶ 46.)

### 8.   Investigatory Steps by the JPLs

The JPLs commenced an investigation into the Debtors' financial affairs and assets pursuant to their powers under the BVI Orders to protect and retrieve the assets and records of the Debtors if necessary.  (*Id.* ¶ 47.)  The Foreign Representatives claim that the JPLs have limited visibility into the Debtors' assets as the Prince Group has deliberately obfuscated its corporate structure and books and records.  (*Id.*)  Accordingly, the JPLs' knowledge of the Debtors' financial affairs and assets is primarily based upon publicly available information.  (*Id.*) The JPLs have engaged with the Debtors' former registered agent, and various regulatory and law enforcement authorities across multiple jurisdictions.  (*Id.* ¶ 48.)

The sanctions imposed upon the Debtors have resulted in severe operational consequences for the Debtors, with financial institutions and service providers refusing to engage with the Debtors, the Debtors' bank accounts have been frozen, and counterparties have refused to transact with the JPLs in the absence of regulatory licenses, which the JPLs are currently

seeking. (*Id.* ¶¶ 49-53.) Counsel for the JPLs stated at the Hearing that they have now obtained regulatory licenses that permit the JPLs to gather this information.

The JPLs also note that they have encountered resistance from parties associated with Mr. Chen and the Prince Group who have taken steps to challenge the JPLs' authority and to interfere with the JPLs' efforts in multiple jurisdictions. (*Id.* ¶ 54.) Campbells Legal (BVI) Limited ("Campbells"), a law firm purporting to represent 25 of the Debtors, has asserted that Cosimo Borrelli, a Hong Kong-based restructuring professional, was purportedly appointed as director of 25 of the Debtors, and that this appointment was made by unspecified individuals acting pursuant to a purported power of attorney from Chen Zhi dated December 29, 2025. (*Id.* ¶ 55.) Campbells has not produced the purported powers of attorney or identified the individuals purportedly authorized to act thereunder. (*Id.*) Mr. Borrelli and Campbells have claimed they are receiving and relying on information supplied by Boies Schiller Flexner LLP ("BSF"). (*Id.*)

Although the JPLs are unaware of the full extent of Campbells' or Mr. Borrelli's activities, the JPLs note that Borrelli or Campbells or individuals acting in coordination with them have changed registered offices of two Hong Kong Exchange listed companies in which the Debtors hold majority interests and appointing a new director to one such company without the majority shareholder's consent. (*Id.* ¶ 57.) Campbells has also moved to dismiss the BVI Proceeding and discharge the JPLs. (*Id.* ¶ 58.) Another law firm representing Amber Hill and Lateral Bridge has appeared in the BVI seeking to exclude those two entities from the BVI Attorney General's application, claiming that they are not connected to the Prince Group, which the JPLs contest. (*Id.*)

9. Chapter 15 Relief

The Foreign Representatives argue that, absent the requested relief, the JPLs'

investigation of the Debtors would be jeopardized as they would be unable to obtain records,

communications, contracts, account information, and transactional documents located in the

United States or held by U.S. counterparties, their ability to investigate the Debtors' affairs and

the Prince Group's use of U.S. financial infrastructure. (*Id.* ¶ 67.) There is also a risk to

sanctions relief that has been obtained thus far, as the relief is predicated upon the JPLs' status as

court-appointed fiduciaries. (*Id.* ¶ 68.) Absent recognition, the JPLs standing in the U.S. would

be uncertain. (*Id.*) Also, there is an interference risk from proxies and persons associated with

Mr. Chen. (*Id.* ¶ 69.)

The Foreign Representatives further contend that the Debtors are likely to qualify for

recognition as a foreign main proceeding, as the Debtors were formed under the laws of the BVI,

have continuously maintained their registered offices there, and the JPLs are administering the

Debtors under the supervision of the BVI Court. (*Id.* ¶ 70.) The Foreign Representatives submit

that the requested provisional relief pending recognition is necessary for the reasons explained

*infra* and requests a waiver of the 14-day of effectiveness. (*Id.* ¶¶ 72-77.)

**B. The Objection**

1. Challenges to the Propriety of the BVI Proceedings

The Objecting Debtors contend that the JPLs have been kept them "in the dark" regarding

the activities they have taken with respect to the Debtors' assets. (Objection ¶ 13.) The JPLs

have filed two *ex parte* reports with the BVI Court, and the Objecting Debtors have requested

information clarifying the costs incurred and requested notice of any proposed dealings with the

Objecting Debtors' assets, which the JPLs refused. (*Id.*)

12

In March 2026, BSF became concerned that the JPLs sought to sell all or some of Allied Cigar Group, a group of operating companies in which Chen Zhi had a majority interest. (*Id.* ¶ 14.) BSF then wrote to the JPLs to demand that they preserve records (the "BSF Hold Notice," ECF Doc. ## 3-5). (*Id.*) The JPLs did not respond to the BSF Hold Notice and have recognized that they have taken steps to sell assets despite the BVI Orders not authorizing the JPLs to sell, realize, distribute, or administer assets during the provisional relief period. (*Id.*)

The Objecting Debtors note that they have offered to have Mr. Cosimo Borrelli provide any information to the BVI Attorney General that is necessary to coordinate actions to preserve the value of the Debtors and their assets. (*Id.* ¶ 15.)

### 2. The Requested Relief Exceeds the Scope and Authority of Chapter 15

The Objecting Debtors contend that the *ex parte* relief sought by the JPLs falls outside of that which is authorized by section 1519 of the Code. (*Id.* ¶ 18.) First, the Objecting Debtors claim that the Foreign Representatives' claim that section 1519 permits *ex parte* relief is incorrect and not stated in the Code. (*Id.*) Furthermore, the Proposed Order includes language staying "[a]ll rights and remedies of any person or entity" subject to police power carve outs. (*Id.* ¶ 19 (internal citation omitted).) The Objecting Debtors claim that this relief is not confined to the United States and is impermissible to the extent it is extraterritorial. (*Id.*) The Proposed Order, they argue, would appear to prevent the parties from participating in the April 16-17, 2026, BVI hearing, which does not concern this Court when sitting in a chapter 15 capacity. (*Id.*)

The Objecting Debtors also argue that the JPLs request is barred because it exceeds their BVI-law authority. (*Id.* ¶ 20.) The Objecting Debtors also contend that this relief bypasses section 1519(a)(2), as section 1519(a)(2) permits asset realization during the provisional window

only to the extent that the assets are "perishable, susceptible to devaluation or otherwise in jeopardy." (*Id.* (quoting 11 U.S.C. § 1519(a)(2)).)  This is in opposition to section 1521(a)(5), which authorizes the realization of U.S.-located assets generally once recognition has been granted.  (*Id.*)

The Objecting Debtors also claim that the requested relief poses due process concerns to non-Debtors, as the JPLs do not specify to which non-debtors are to benefit from this protection. (*Id.* ¶ 21.)  The protections granted by the BVI Court do not apply to non-debtors and the Objecting Debtors request that the Court deny the requested relief.  (*Id.*)

### 3.   The Requested Relief is Not Urgently Needed as Required by Section 1519(a)

Next, the Objecting Debtors argue that the Foreign Representatives have not demonstrated urgency, as the JPLs were appointed three (3) months ago, but waited until a week before the possible expiration of their authority to seek chapter 15 relief.  (*Id.* ¶ 23.)  Next, the JPLs have not identified any U.S.-based assets that are in need of protection.  (*Id.* ¶ 24.)  Third, the discovery requests are unwarranted in light of the limited time remaining before a hearing on recognition.  (*Id.* ¶ 25.)  Counsel for the JPLs explained at the Hearing that they were waiting to receive regulatory licenses that permitted the JPLs to take possession of property; the licenses were received this week.

### 4.   The Requested Relief Fails to Meet the Requirements of Section 1522(a)

The Objecting Debtors claim that the requested relief runs the risk of upending, rather than preserving the Debtors' estates.  (*Id.* ¶ 27.)  The JPLs request effectively asks the Court to permit it to administer and realize the Debtors' assets, including the power to sell assets, which is the antithesis of the status quo.  (*Id.*)  The Objecting Debtors claim that this departs from established practice and courts typically prevent a foreign representative from selling assets

14

during the provisional period by including a proviso to this effect, which is not present in the Proposed Order. (*Id.*) The Objecting Debtors claims that the JPLs are contemplating transactions involving regulated assets, which exceeds the authority the BVI Court has granted to the JPLs to preserve the status quo. (*Id.* ¶ 28.)

5. The Requested Relief Fails to Satisfy the Requirements for a Preliminary Injunction

The Objecting Debtors claim that the JPLs cannot demonstrate a likelihood of success on the merits. (*Id.* ¶ 31.) JPLs are allegedly unable to make this demonstration because the BVI Proceedings do not constitute either "collective" or "for the stated purpose of reorganization or liquidation" under the definition of "foreign proceeding." (*Id.* ¶ 32.) The Objecting Debtors argue that the BVI Proceedings are not "collective" in that as they do not involve the administration or adjudication of creditor claims and are not conducted for the benefit of creditors collectively. (*Id.* ¶ 34.) Instead, the BVI Attorney General initiated proceedings on public interest grounds, bypassing insolvency provisions also present in the BVI statute. (*Id.*) Furthermore, the BVI Proceedings fail to qualify because they were commenced, not for the purpose of reorganization or liquidation, but for investigative purposes. (*Id.* ¶ 35.) The Objecting Debtors note that the UNCITRAL Guide to Enactment of the Model Law states that foreign proceedings may not be recognized when "they are not for the purpose of reorganization or liquidation." (*Id.* (internal citation and quotation marks omitted).) The Objecting Debtors characterize the BVI Proceedings as "investigative undertakings [] to further [] efforts to cooperate with foreign law enforcement and sanctions authorities." (*Id.*)

Next, the Objecting Debtors argue that the JPLs have made no showing of irreparable harm. The JPLs have not demonstrated the existence of U.S.-located assets and if any assets did exist, the existing sanctions would prohibit dissipation. (*Id.* ¶ 37.) Moreover, the Objecting

15

Debtors claim that the sole support for the claim that the Debtors have concealed assets stems from conclusory claims in the Pretlove Declaration, and the Objecting Debtors are not mentioned in the Forfeiture Complaint. (*Id.*)

The JPLs also claim that they may face litigation in the U.S. challenging the sale of the Debtors' assets in the event the requested relief is not granted. (*Id.* ¶ 38.) However, the harm posited by the JPLs is not harm to the Debtors or their stakeholders, and thus irrelevant to the Court's decision on whether to grant a preliminary injunction. (*Id.*) Even if it was relevant to the analysis, the Objecting Debtors argue that the harm is monetary in nature and therefore not irreparable. (*Id.*)

The Objecting Debtors also claim that the balance of equities weighs against relief. The Objecting Debtors claim that the JPLs will plan to sell assets related to the Allied Cigar Group, and any proposed asset sales exceed the JPLs' BVI-law authority. (*Id.* ¶ 42.) The relief would also subject the Objecting Debtors to burdensome discovery and would interfere with the BVI Proceeding and other potential proceedings by constraining the Objecting Debtors' ability to challenge the authority of the JPLs. (*Id.* ¶¶ 43-44.)

Lastly, the Objecting Debtors argue that public interest considerations disfavor relief. The Objecting Debtors contend that the JPLs' request for relief that is unattainable in the BVI Court, violates principles of comity, there is no emergency warranting emergency relief, and if there is, it is a result of the JPLs' own actions, the requested relief is a waste of judicial resources in light of the existing enforcement actions and sanctions, and the chapter 15 proceeding is not used for a reorganization or liquidation purpose. (*Id.* ¶¶ 46-49.)

16

### C. The Amber Hill Objection

Amber Hill Ventures and Lateral Bridge Global Ltd. offer a limited objection to the Motion to the extent that the JPLs seek to take discovery in the United States pursuant to sections 1519(a)(3) and 1521(a)(4) of the Bankruptcy Code and Bankruptcy Rule 2004, including authority to issue subpoenas for the production of documents and testimony ("Discovery Authorization"). (AM Objection ¶ 1.) Amber Hill and Lateral Bridge note that they intend to object to recognition on various grounds including, *inter alia*, that the BVI Proceeding does not constitute a "collective proceeding" and do not qualify as a "foreign proceeding." (*Id.* ¶ 3.)

Amber Hill and Lateral Bridge note that they do not object to the Motion's proposal to have the court first rule on the Emergency Order and then institute a briefing schedule and hearing for the Provisional Relief Order at a later date. (*Id.* ¶ 7.) However, they do oppose the Motion to the extent it seeks either authorization to take discovery in conjunction with the Emergency Motion or entry of the Provisional Relief Order without a full briefing schedule and hearing on that request for relief. (*Id.* ¶ 9.) Amber Hill and Lateral Bridge argue that it is not entirely clear if the JPLs intended to take discovery in conjunction with the Emergency Motion or entry of the Provisional Relief Order without a full briefing schedule and hearing on the requested relief. (*Id.*)

To the extent the JPLs seek Discovery Authorization, Amber Hill and Lateral Bridge contend that the JPLs are not likely to succeed on the merits because the BVI Proceedings are not collective in nature and thus do not qualify as a "foreign proceeding." (*Id.* ¶ 13.) Second, Amber Hill and Lateral Bridge contend that the JPLs have not established that any need for discovery is urgent. (*Id.* ¶ 14.) Even accepting the JPLs argument as true, Amber Hill and

17

Lateral Bridge contend that there is no reason why discovery cannot wait until after the Court has had an opportunity to rule on the Chapter 15 Petitions.  (*Id* ¶¶ 10-11.)

**D. The Response**

1. The Objections Are Not Authorized by the Objecting Parties

The Foreign Representatives argue that the Objecting Debtors are not authorized to file the Objection, as BVI law provides that the JPLs are the only legal representatives of the Debtor. (Response ¶ 4.)  The BVI Orders displace the Debtors former officers and directors and replaces them with the JPLs.  (*Id.* ¶ 5.)  Accordingly, the proposed Foreign Representatives argue that the Objecting Debtors lack corporate authority to file the Objection in these chapter 15 cases and the JPLs request dismissal.  During the April 22 Hearing, the Court stated that the standing of the Objectors to object depends on BVI corporate law and that the Court in BVI should address that issue; for present purposes, without deciding that standing issue, the Court will permit them to assert their objections and assume for sake of argument that they have standing.

2. The Objections Should be Overruled

The Foreign Representatives claim that the JPLs are not seeking to extend the automatic stay to non-debtor affiliates or outside the territorial jurisdiction of the United States, nor are they seeking approval from this Court or the BVI Court for an asset sale at this time.  (*Id.* ¶ 7.)  To make this clear, the Foreign Representatives modified the Provisional Relief Order to clarify these points.  (*Id.* ¶ 8.)

The JPLs again claim that provisional relief is urgent, and the urgency is evidenced by the fact that parties have objected to the Motion purporting to represent the Debtors and notes

that BSF represents Mr. Chen and Prince Holding Group in a variety of matters including the Forfeiture Proceeding.  (*Id.* ¶ 10.)

The Foreign Representatives argue that that the Debtors are likely to succeed on the merits and argue that the BVI Proceeding is a "foreign proceeding."  (*Id.* ¶ 12.)  The BVI Proceeding is "collective in nature" because it was initiated in the public interest and is not directed toward the enforcement of the rights of any single creditor or stakeholder.  (*Id.* ¶ 13.) Additionally, the BVI Proceedings are not merely for the sake of investigation.  (*Id.* ¶ 14.)  The Foreign Representatives notes that the JPLs have powers, *inter alia*, to "identify assets, protect assets from removal or dissipation, seek recognition of their appointment as provisional liquidators around the world, commence litigation to recover and protect assets, commence litigation against former insiders, vote the shares in subsidiaries, maintain and operate bank accounts and carry on the business of the Debtors" in addition to paying creditors in full.  (*Id.*) The BVI Proceedings are also for the purpose of reorganization or insolvency as they have been commenced for the sake of the victims of the fraud perpetrated by the Prince Group.  (*Id.* ¶ 15.)

The JPLs then reaffirm their arguments that the requested relief is necessary because in its absence the Debtors would suffer irreparable harm, the balance of equities weighs in favor of granting the relief, and the relief is in the public interest.  (*Id.* ¶¶ 17-20.)

## II.    LEGAL STANDARD

### A. Eligibility to File for Chapter 15

"Foreign debtors seeking relief under chapter 15 must satisfy the debtor eligibility requirements set forth in section 109(a) of the Bankruptcy Code." *In re Servicos de Petroleo Constellation S.A.*, 600 B.R. 237, 268 (Bankr. S.D.N.Y. 2019).  Section 109(a) provides that

19

"only a person that resides or has a domicile, a place of business, or property in the United

States, or a municipality, may be a debtor" under the Code. 11 U.S.C. § 109(a). Where a foreign

debtor does not have a place of business in the United States, the question often arises whether

the foreign debtor has "property in the United States" as a condition precedent to eligibility

under section 1517. *See In re Cell C Proprietary Ltd.*, Case No. 17-11735 (MG), 571 B.R. 542,

550–52, 2017 WL 3190568, at *6–7 (Bankr. S.D.N.Y. July 27, 2017). Section 109(a) does not

address how much property must be present or when or how long property must have a situs in

the United States. As this Court explained in *In re U.S. Steel Canada Inc.*, 571 B.R. 600 (Bankr.

S.D.N.Y. July 31, 2017):

> Some courts, including this one, have held that an undrawn retainer in a United
> States bank account qualifies as property in satisfaction of section 109(a). *See, e.g.*,
> *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372–73 (Bankr. S.D.N.Y. 2014)
> ("There is a line of authority that supports the fact that prepetition deposits or
> retainers can supply 'property' sufficient to make a foreign debtor eligible to file in
> the United States.") (citing *In re Cenargo Int'l PLC*, 294 B.R. 571, 603 (Bankr.
> S.D.N.Y. 2003)); *see also In re Berau Capital Resources Pte Ltd.*, 540 B.R. 80, 82
> (Bankr. S.D.N.Y. 2015) ("The Court is satisfied that the retainer provides a
> sufficient basis for eligibility in this case."); *In re Global Ocean Carriers Ltd.*, 251
> B.R. 31, 39 (Bankr. D. Del. 2000) (holding that a $400,000 retainer paid on behalf
> of the debtors to bankruptcy counsel in that case qualifies as sufficient property in
> the United States under section 109(a)).
>
> Further, "[c]ontracts create property rights for the parties to the contract. A debtor's
> contract rights are intangible property of the debtor." *Berau Capital*, 540 B.R. at
> 83 (citing *U.S. Bank N.A. v. Am. Airlines, Inc.*, 485 B.R. 279, 295 (Bankr. S.D.N.Y.
> 2013), aff'd, 730 F.3d 88 (2d Cir. 2013)). Those property rights can be and typically
> are tied to the location of the governing law of the contract. *See id.* at 84 (holding
> that the situs of intangible property rights governed by New York law was New
> York). Accordingly, debt subject to a New York governing law clause and a New
> York forum selection clause constitutes property in the United States. *See In re
> Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 655 (Bankr. S.D.N.Y.
> 2016) ("[D]ollar-denominated debt subject to New York governing law and a New
> York forum selection clause is independently sufficient to form the basis for
> jurisdiction.") (citation omitted); *Berau Capital*, 540 B.R. at 84 ("The Court
> concludes that the presence of the New York choice of law and forum selection
> clauses in the Berau indenture satisfies the section 109(a) 'property in the United
> States' eligibility requirement.") (footnote omitted).

*Id.* at 609–11; *see also In re Suntech Power Holdings Co.*, 520 B.R. 399, 412–13 (Bankr. S.D.N.Y. 2014) (concluding that establishment of a bank account in New York prior to commencement of the chapter 15 proceeding was sufficient to satisfy section 109(a)); *In re Paper I Partners, L.P.*, 283 B.R. 661, 674 (Bankr. S.D.N.Y. 2002) (finding that debtors' maintenance of original business documents in the United States constituted "property in the United States" under section 109); *Berau Capital*, 540 B.R. at 83-84 ("The Court concludes that the presence of the New York choice of law and forum selection clauses in the Berau indenture satisfies the section 109(a) 'property in the United States' eligibility requirement."); *In re Servicos de Petroleo Constellation S.A.*, 600 B.R. at 269 ("This Court has previously held that a debtor's contract rights, including rights pursuant to debt that contains a New York governing law and forum selection clause, constitute intangible property of the debtor in New York for purposes of section 109(a)."); s*ee also Wallach v. Nowak (In re Sherlock Homes of W.N.Y., Inc.)*, 246 B.R. 19, 23–24 (Bankr. W.D.N.Y. 2000) (stating that listing contracts between the debtor/broker dealer and prospective sellers bestowed contractual rights upon the parties and the contract rights were assets of the debtor); *Slater v. Town of Albion (In re Albion Disposal, Inc.)*, 217 B.R. 394, 407–08 (W.D.N.Y. 1997) (noting that "it is well-established . . . that a debtor's contractual rights—including rights arising under post-petition contracts—are included in the property of the estate").

## B.  Appropriate Venue for Chapter 15

28 U.S.C.A. § 1410 governs venue for cases under chapter 15, and provides that chapter 15 proceedings may be "commenced in the district court of the United States for the district—(1) in which the debtor has its principal place of business or principal assets in the United States; (2) if the debtor does not have a place of business or assets in the United States, in which there is

pending against the debtor an action or proceeding in a Federal or State court; or (3) in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative." Section 1410 establishes a "hierarchy of choices." 1 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 4.04[1] (16th ed. 2014) (quoting H.R. REP. NO. 109–31, at 119 (2005)). "If the debtor maintains its principal place of business or principal assets in the United States in a particular district, venue must be placed in that district; if not, we turn to subparagraph two. If there is no litigation pending against the debtor in a district, subparagraph three then applies." *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 414 (Bankr. S.D.N.Y. 2014).

### C. Availability of Interim Relief under Section 1519

Section 1519(a) of the Bankruptcy Code permits the Court to grant certain forms of provisional relief in the gap period between the chapter 15 filing and recognition hearing "where relief is urgently needed to protect the assets of the debtor or the interests of creditors." In determining whether provisional relief is appropriate, the Court applies the "standards, procedure, and limitations" applicable for the entry of a preliminary injunction. 11 U.S.C. § 1519(e); *In re Beechwood*, No. 19-11560 (MG), 2019 WL 3025283, at *2 (Bankr. S.D.N.Y. July 10, 2019). In the context of a chapter 15 proceeding, a preliminary injunction is warranted when (a) there is a likelihood of success on the merits (*i.e.*, the request for recognition); (b) there is "an imminent irreparable harm" to the debtor if the preliminary injunction is not issued; (c) "the balance of harms tips in favor of the moving party"; and (d) "the public interest weighs in favor of an injunction." *Lyondell Chem. Co. v. Centerpoint Energy Gas Servs. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 588–89 (Bankr. S.D.N.Y. 2009).

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation omitted). To satisfy this element, the plaintiff must demonstrate that, absent the injunction, it "will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id*. Moreover, the "likelihood of success" element is satisfied in the context of a motion under section 1519 if the movant shows that it will likely obtain recognition of the foreign proceeding. *See In re Innua Can. Ltd.*, 2009 WL 1025088, at *3–4 (Bankr. D.N.J. 2009).

In addition, section 1522 of the Bankruptcy Code "states that relief can be granted, modified or terminated under section 1519, as the case may be, only if the interests of creditors and other interested parties are sufficiently protected." 1 COLLIER ON BANKRUPTCY ¶ 13.06 (16th ed. 2022). "A court may (but is not required to) condition relief on the posting of some form of security or a bond." *Id*.

### D.  Section 1517(a): Foreign Proceeding Recognition

Section 1517(a) of the Bankruptcy Code establishes three requirements for the recognition of a foreign proceeding under chapter 15.  In order to recognize the foreign proceeding, a court must conclude that:

> (1) The foreign proceeding constitutes a "foreign main proceeding" or a "foreign nonmain proceeding" as defined under section 1502;
> (2) The foreign representative applying for recognition is a person or body; and
> (3) The petition meets the requirements of section 1515.

11 U.S.C. § 1517(a).

Recognition of the foreign proceeding is statutorily mandated if the three requirements of section 1517(a) are met, and no exception is applicable. *See In re Millard*, 501 B.R. 644, 651 (Bankr. S.D.N.Y. 2013).

1.  <u>1517(b)(1): foreign main proceeding recognition</u>

Section 1517(a) of the Bankruptcy Code distinguishes between "foreign main" and

"foreign nonmain" proceedings.  Section 1517(b) establishes conditions for recognition of each.

In relevant part, section 1517(b)(1) states that a foreign proceeding shall be recognized

"as a foreign main proceeding if it is pending in the country where the debtor has the center of its

main interests."  11 U.S.C. § 1517(b)(1).  Section 1502(4) uses the same language to define

"foreign main proceeding."  11 U.S.C. § 1502(4).

a.  *"Foreign proceeding"*

Section 101(23) defines a "foreign proceeding" as:

> [A] collective judicial or administrative proceeding in a foreign country, including
> an interim proceeding, under a law relating to insolvency or adjustment of debt in
> which proceeding the assets and affairs of the debtor are subject to control or
> supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).  Based on this definition, courts have held that a "foreign proceeding"

requires:

> (i) [the existence of] a proceeding;
> (ii) that is either judicial or administrative;
> (iii) that is collective in nature;
> (iv) that is in a foreign country;
> (v) that is authorized or conducted under a law related to insolvency or the adjustment of
> debts;
> (vi) in which the debtor's assets and affairs are subject to the control or supervision of a
> foreign court; and
> (vii) which proceeding is for the purpose of reorganization or liquidation.

*See Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.)*, 480 B.R. 129, 136

(S.D.N.Y. 2012) (citing *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *In re*

*ENNIA Caribe Holding N.V.*, 594 B.R. 631, 638 (Bankr. S.D.N.Y. 2018); *In re Agro Santino,*

*OOD*, 653 B.R. 79, 89 (Bankr. S.D.N.Y. 2023).

b. *"Center of Main Interests"*

The Bankruptcy Code does not define the term "center of main interests" (COMI). However, section 1516(c) provides that, in the absence of an objection or evidence to the contrary, a debtor's registered office or habitual residence "is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c); *see also In re Olinda Star I*, 614 B.R. 28, 41 (Bankr. S.D.N.Y. 2020); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 705 (Bankr. S.D.N.Y. 2017); *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 333 (Bankr. D. Del. 2010), *aff'd*, 728 F.3d 301 (3d Cir. 2013) (internal citations omitted). The relevant temporal anchor for the determination of the location of the debtor's COMI is the date on which the chapter 15 petition is filed. S*ee Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013) (hereinafter "*Fairfield Sentry*").

In assessing whether a movant challenging the registered office presumption has overcome that presumption, courts in this District have applied a list of non-exclusive factors, including: (i) the location of the debtor's headquarters; (ii) the location of those who actually manage the debtor; (iii) the location of the debtor's primary assets; (iv) the location of the majority of the debtor's creditors, or a majority of the creditors who would be affected by the case; and (v) the jurisdiction whose law would apply to most disputes. *Fairfield Sentry*, 714 F.3d at 137 (citing *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)). While these factors offer a "helpful guide" in determining a debtor's COMI, they are not exclusive, consideration of these specific factors is "neither required nor dispositive," and courts are cautioned against their "mechanical application." *Id.* (citing *SPhinX*, 351 B.R. at 117).

Additionally, in determining a debtor's COMI, the Second Circuit and this Court have examined the expectations of creditors and other interested parties, as a company's COMI must

25

be "ascertainable by third parties." *See Fairfield Sentry,* 714 F.3d at 136–38 (citation omitted);

*In re Millennium Global Emerging Credit Master Fund Ltd.*, 474 B.R. 88, 93 (S.D.N.Y. 2012).

As the Second Circuit has explained, by examining factors "in the public domain," courts are

able to evaluate whether a debtor's COMI is in fact "regular and ascertainable [and] not easily

subject to tactical removal." *Fairfield Sentry*, 714 F.3d at 136–37.  The expectations of creditors

can be assessed through examination of the public documents and information available to

"guide creditor understanding of the nature and risks of their investments." *In re Oi Brasil*

*Holdings Cooperatief U.A.*, 578 B.R. 169, 228 (Bankr. S.D.N.Y. 2017).  In practice, courts

evaluate creditor expectations by reviewing disclosures in offering memoranda, indentures, and

similar documentation. *See id*. at 228–32 (analyzing noteholder expectations, as set forth in

offering memorandum, as part of COMI inquiry); *In re OAS S.A.*, 533 B.R. 83, 102–03 (Bankr.

S.D.N.Y. 2015) (same); *Millennium Glob.*, 474 B.R. at 93–94 (same); *In re Suntech Power*

*Holdings Co., Ltd.*, 520 B.R. 399, 418 (Bankr. S.D.N.Y. 2014) (reviewing indenture agreement

provisions to establish creditor expectations regarding likely location of a restructuring as part of

COMI inquiry).

As discussed, the determination of a debtor's COMI should be based on facts available at

or around the time the Chapter 15 petition is filed. *Fairfield Sentry,* 714 F.3d at 137.  The

Second Circuit in Fairfield Sentry clarified that "the factors that a court may consider in this

analysis are not limited and may include the debtor's liquidation activities." *Id*. at 138; *see also*

*In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 783 (Bankr. S.D.N.Y. 2022) (finding that a

Cayman Islands court's supervision of a debtor's scheme of arrangement established the Cayman

Islands as the debtor's COMI, despite the debtor's real estate investments in China and the

United States, when creditor expectations were considered).  Pre-filing restructuring efforts may

26

shift a debtor's COMI, particularly where the debtor is an entity with such limited operations that restructuring activity constitutes its "primary business activity" prior to the filing of the chapter 15 petition. *Modern Land*, 641 B.R. at 789–90.

### 2. 1517(b)(2): foreign non-main proceeding

The Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign nonmain proceeding" if the debtor has an "establishment" in the country in which the foreign proceeding is pending. 11 U.S.C. §§ 1502(5), 1517(b)(2). An "establishment" is "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2). Courts have held that the location should:

> constitute a 'seat for local business activity' for the debtor. The terms 'operations' and 'economic activity' require a showing of a local effect on the marketplace, more than mere incorporation and record-keeping and more than just the maintenance of property.

*In re Creative Fin. Ltd.*, 543 B.R. 498, 520 (Bankr. S.D.N.Y. 2016) (internal citations omitted).

### 3. 1517(a)(2): foreign representative recognition

The term "foreign representative" is defined in section 101(24) of the Bankruptcy Code as follows:

> [A] person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

### 4. 1517(a)(3): Section 1515 and Rule 1007 Requirements

Section 1515 separately imposes the following procedural requirements:

> (a) A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.
> (b) A petition for recognition shall be accompanied by—

27

(1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

(3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

(c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

(d) The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The court may require a translation into English of additional documents.

11 U.S.C. § 1515.  Additionally, Bankruptcy Rule 1007 imposes additional procedural requirements, including the filing of a corporate disclosure statement.  Fed. R. Bankr. P. 1007.

# III.   DISCUSSION

For the following reasons, the Foreign Representatives have met their burden for provisional relief under section 1519 of the Code.

## A.  The BVI Proceeding is Likely a "Foreign Main Proceeding" for Each of the Debtors

### 1.   BVI Proceeding is Likely a "Foreign Proceeding"

The BVI Proceeding is likely a "foreign proceeding" within the meaning of section 101(23) for the Code.  The Foreign Representative's BVI law expert, Andrew Chissick, details how the BVI Orders provides the JPLs, jointly and severally, the power to maintain the value of the Debtors' assets and carry out other functions.  (Chissick Decl. ¶ 11.)  The BVI Proceeding is supervised by the BVI Court under the BVI Insolvency Act and provides that the JPLs may (i) take possession of and preserve books and records, (ii) identify and secure assets, (iii) investigate the affairs of the Debtors, (iv) commence and pursue proceedings in the name and on behalf of the Debtors, (v) obtain documents and information from third parties, (vi) operate and control

28

bank accounts and (vii) cooperate and share information with regulatory and law enforcement authorities in the BVI and in other jurisdictions. (*Id.* ¶ 24.)

The Objecting Debtors contend that the BVI Proceeding is not a "foreign proceeding" because it is not collective and because it was initiated for investigative purposes and not for reorganization or liquidation. (Objection ¶¶ 33-35.) However, the BVI Proceeding was initiated under the BVI Insolvency Act with the express purpose of liquidating the Debtors. (Chissick Decl. ¶¶ 55-57.) The JPLs have the power to pay classes of creditors in full, and to compromise debts and liabilities. (Response ¶ 14.) Furthermore, the BVI Attorney General has stated the purpose of the appointment of the JPLs was to remove control of the Debtors from Mr. Chen and preserve assets for the benefits of victims of the Prince Group's criminal activities. (Chissick Decl., Ex. D. Skeleton Argument of the BVI Attorney General ¶ 61(e).)

The Objecting Debtors relies on *In re Global Cord Blood Corp.*, No. 22-11347 (DSJ), 2022 WL 17478530 (Bankr. S.D.N.Y. Dec. 5, 2022), in the Objection to contend that this Court should not recognize the BVI Proceeding because it is primarily focused on remediating corporate fraud, rather than a creditor-related proceeding that reflects the purpose of chapter 15. (Objection ¶ 35.) However, the Cayman proceeding in *Global Cord* contained distinct differences from this case. First, the JPLs in *Global Cord* did not contend that a liquidation was being pursued or that liquidation was the purpose of the Cayman proceeding. *Global Cord.*, No. 22-11347 (DSJ), 2022 WL 17478530 at *10. Judge Jones specifically noted that "[t]he Court views this reality as fatal to the JPLs' effort to satisfy this element based on the possibility that a liquidation or reorganization may be necessary in the future if the JPLs' current asset recovery and corporate governance efforts fail." *Id.* In the instant case, the Debtors are not positing that a liquidation is a mere hypothetical. Rather, the BVI Attorney General has initiated a liquidation

29

proceeding and this is sufficient for the Court to conclude that the BVI Proceeding was initiated for the purpose of liquidation.

Additionally, the BVI Proceeding is "collective in nature" as it was initiated to provide for the administration and recovery of creditors generally. The BVI Proceedings were not initiated for the enforcement of the rights of a single creditor and were commenced in the public interest. The Foreign Representatives enumerate four goals of the BVI Proceeding, which are to (i) centralize control of the Debtors' affairs under court supervision, (ii) preserve the Debtors' assets, (iii) facilitate investigation of the Debtors' activities and transactions and (iv) enable coordinated administration and recovery. (Chissick Decl. ¶ 58.)

### 2. Each Debtor's COMI as of the Petition Date is Likely the BVI

Each of the Debtors' COMI is likely the BVI. Section 1516(c) of the Bankruptcy Code establishes a rebuttable presumption that a debtor's registered office is presumed to be the center of a debtor's main interest. 11 U.S.C. § 1516(c). The Foreign Representatives provided testimony that each of the Debtors was incorporated in the BVI and has maintained its registered office there. (Motion ¶ 29.) No evidence has been presented to indicate that the Debtors' registered offices are not its COMI and the Court, at this stage, finds that the BVI is the COMI for each of the Debtors.

### B. The Requested Discovery Is Warranted

The JPLs request the ability to issue subpoenas and conduct discovery pursuant to section 1521(a)(4) of the Bankruptcy Code and Bankruptcy Rule 2004. (Motion ¶ 55.) Section 1519 of the Bankruptcy Code permits the Court to grant certain forms of provisional relief "where relief is urgently needed to protect the assets of the debtor or the interests of the creditors . . . ." 11 U.S.C. § 1519(a). Specifically, section 1519 provides, among other things, that the court may

30

grant "any relief referred to in paragraph (3), (4) or (7) of section 1521(a)." 11 U.S.C. §

1519(a)(3). In relevant part, paragraph (4) of section 1521(a) provides that upon recognition of a

foreign proceeding, whether main or nonmain, a court may grant any appropriate relief at the

request of the foreign representative "providing for the examination of witnesses, the taking of

evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations

or liabilities." 11 U.S.C. § 1521(a)(4).

This Court's power to grant relief under section 1521 is not limitless. Section 1522(a) of

the Code provides that relief under section 1519 or section 1521 may be granted "only if the

interests of the creditors and other interested entities, including the debtor, are sufficiently

protected." 11 U.S.C. § 1522(a). "The idea underlying [§ 1522] is that there should be a balance

between relief that may be granted to the foreign representative and the interests of the persons

that may be affected by such relief." *In re Platinum Partners Value Arbitrage Fund L.P.*, 583

B.R. 803, 809 (Bankr. S.D.N.Y. 2018) (quoting *In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614,

626 (Bankr. S.D.N.Y. 2010)).

The JPLs have demonstrated that the provisional relief is necessary to prevent acts

inconsistent with the BVI Orders and protect assets within the territorial jurisdiction of the

United States. Absent the requested relief, the JPLs are unable to know the status of, and

positions taken in, ongoing discussions and litigation with U.S. governmental entities, and the

JPLs need to settle the issue of who is the rightful representative of the Debtors. (Response ¶

10.)

The Objecting Debtors argue that Chapter 15 does not permit the requested relief because

it exceeds the JPLs BVI-law authority. (Objection ¶ 20.) However, "[f]oreign law does not

preclude the availability of additional relief under chapter 15, particularly when granting such

31

relief does not run contrary to the public policy of the foreign jurisdiction." *Platinum Partners*,

583 B.R. at 815. A foreign nation may limit discovery in its own jurisdiction "for reasons

peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal

objection to aid from United States federal courts." *Intel Corp. v. Advanced Micro Devices*, Inc.,

542 U.S. 241, 261 (2004). The Objecting Debtors have not provided any indication that the

requested relief would be contrary to the public policy of the BVI, and the Court should

accordingly find that the requested discovery is appropriate under section 1519 and 1521 of the

Code. Additionally, the JPLs have struck language in the proposed order relating to the

"realization" of assets in paragraph 11 of the Provisional Relief Order. (Response ¶ 8.)

Therefore, the Objecting Debtors' contentions with respect to the realization of U.S.-based assets

prior to recognition is moot.

### C. Irreparable Harm Will Result from Denial of Motion

In the cross-border insolvency context, courts have recognized that irreparable harm

exists where local actions could hinder the orderly process of a foreign proceeding and the goal

of the fair distribution of assets. *See In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y.

2003) ("[A]s a rule, therefore, irreparable harm exists whenever local creditors of the foreign

debtor seek to collect their claims or obtain preferred positions to the detriment of the other

creditors."); *In re Berau Capital Res. PTE Ltd.*, No. 15-11804 (MG) (Bankr. S.D.N.Y. Aug. 6,

2015) (ECF Doc. # 20) at 3 (granting provisional relief to prevent potential interference with

foreign debtor's "efforts to administer its estate and restructure its operations pursuant to the

[f]oreign [p]roceeding" and "undermining the [f]oreign [r]epresentative's efforts to achieve an

equitable result for the benefit of all of the [f]oreign [d]ebtor's creditors and interest holders" in

the absence of the requested relief); *In re Banco Nacional de Obras y Servicios Publicos, S.N.C.*,

32

91 B.R. 661, 664 (Bankr. S.D.N.Y. 1988) (finding injunctive relief necessary "to prevent individual American creditors from arrogating to themselves property belonging to the creditors as a group"); *In re Lines*, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988) (concluding that "the premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury").

The Foreign Representatives have provided testimony that irreparable harm is likely to result in the absence of the requested relief. The Foreign Representatives have likely demonstrated that asset dissipation poses a substantial threat to the Debtors. Prince Group's complex corporate structure and history of concealment of assets complicates the Foreign Representative's attempts to trace assets, and absent judicial intervention, the assets may disappear. (Motion ¶ 35.) The Foreign Representatives further note how the Prince Group is alleged in the Forfeiture Complaint to have deliberately obfuscated its corporate structure and books and records. (Pretlove Decl. ¶ 47.) The Foreign Representatives also note that there is a risk of individuals acting at Mr. Chen's direction disposing of the Debtors' assets, as these individuals are likely to have knowledge of, *inter alia*, the Debtors' corporate structure, bank accounts, and holdings. (Motion ¶ 36.)

The Objecting Debtors claim that the JPLs have failed to demonstrate harm that would occur in the absence of the requested relief because the JPLs have failed to identify property located within the U.S., and any litigation the JPLs may face is not harm to the Debtors or their stakeholders as required by section 1519(a) of the Code. (Objection ¶ 38.) The Foreign Representatives detail how the Objecting Debtors plan to use the Debtors' assets to pay Mr. Borrelli, despite failing to provide an explanation of his fees or provide how Mr. Borrelli was

33

purportedly appointed as a director of the Debtors, or who appointed Mr. Borrelli.  (Motion ¶ 37.)

Accordingly, there appears to be specific irreparable harm that would result in the absence of injunctive relief.  However, even if this Court was not persuaded that irreparable harm exists, Courts in this district have issued injunctive relief absent a showing of irreparable harm where the action to be enjoined threatens the reorganization process or would impair the Court's jurisdiction.  *In re Soundview Elite Ltd.*, 543 B.R. 78, 119–20 (Bankr. S.D.N.Y. 2016).

### D.  Balance of Harms Favors Provisional Relief

The balance of harms favors the Foreign Representatives.  The Foreign Representatives have explained how the interim relief will protect the Debtors' estates and thereby serve the creditor body.

Additionally, the discovery recipients will not be significantly harmed, and the discovery appears necessary for the Foreign Representatives to preserve the Debtors' assets.  The Provisional Relief Orders do not bar any party from participating in the BVI Proceeding or in any proceeding before this Court.  Therefore, the balance of harms favors the Foreign Representatives.

### E.  Granting Relief is in the Public Interest

Granting relief is in the public interest and is consistent with the policies underlying the Bankruptcy Code and Chapter 15.  It would prevent the erosion of the Debtors' estates via an international workaround to the BVI Proceedings and would ensure the equitable treatment of creditors.  Moreover, it would minimize interjurisdictional inconsistencies and enable cooperation between this Court and the BVI Court.  Furthermore, the Provision Relief Orders comport with, rather than conflict with, the actions of various U.S. Government entities like the

34

DOJ and OFAC.  The Provisional Relief Orders attempt to support the U.S.'s enforcement goals by preserving assets that are potentially the proceeds of a transnational criminal enterprise. Moreover, it would minimize interjurisdictional inconsistencies and enable cooperation between this Court and the BVI Court.

The Objecting Debtors' argument that the relief is not urgently needed is unpersuasive. The relief appears to be sufficiently urgent insofar as the Debtors require the relief to seek sanctions relief and protect against the dissipation of assets.  The remaining contentions raised by the Objection Debtors with respect to the public interest have been discussed *infra* and are not persuasive.

### F.  Sufficient Protection

As required under section 1522(a) of the Bankruptcy Code, all parties are "sufficiently protected" such that this Court may grant the Provisional Relief.  11 U.S.C. § 1522(a); *see SPhinX*, 351 B.R. at 112–13 (holding that section 1522 provides that the court may grant or modify interim relief under section 1519 only if the interests of all parties are "sufficiently protected").  Relief under section 1519 of the Bankruptcy Code should be denied for a lack of sufficient protection only "if it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors."  H.R. REP. NO. 109-31, pt.1, at 116 (2005).  In this matter, the Debtors note that the BVI Attorney General placed the Debtors into liquidation on public-interest grounds, with the aim of protecting creditors, not prejudicing them.  (Motion ¶ 48.)  All parties who may be impacted by the entry of the Provisional Relief Order may seek relief from this Court or the BVI Court and are therefore sufficiently protected.

The Objecting Debtors argue that the JPLs should not be permitted to sell assets prior to recognition. Again, this contention is now moot in light of the JPLs decision to amend the Proposed Order and remove "realization" of assets from the JPLs' authority.

### G. Security

No security is required here. "[A] temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)['s requirement to give security]"). *See* Fed. R. Bankr. P. 7065. The Court has "wide discretion to set the amount of a bond [under Rule 65(c)], and even to dispense with the bond requirement." *Doctor's Assocs. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997). Accordingly, the Court may, but is not required to, mandate that the Foreign Representatives provide security. The Foreign Representatives maintain that such security requirements are unnecessary, as the substantial majority of the Debtors' assets are blocked pursuant to OFAC sanctions and are unavailable for transaction absent OFAC approval. (Motion ¶ 60.) Furthermore, the Debtors are under the supervision of the BVI Court, and the provisional relief will last only until this Court rules on the Petitions. Therefore, there is no reason to impose a bond on the Debtors.

## IV.   CONCLUSION

For the reasons explained above, the Court **GRANTS** the Foreign Representatives' Provisional Relief Motion. A separate Order will be entered.

Dated:   April 23, 2026
New York, New York

*Martin Glenn*
MARTIN GLENN
Chief United States Bankruptcy Judge

36