UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: | Chapter 15<br>Case No. 26-10769 (MG) |
| PRINCE GLOBAL HOLDINGS LIMITED, *et al.*, | (Jointly Administered) |
| | Courtroom No. 523<br>One Bowling Green<br>New York, New York 10004 |
| Debtors in Foreign Proceedings. | Wednesday, April 22, 2026<br>10:59 a.m. |

TRANSCRIPT OF:
HYBRID STATUS CONFERENCE RE: MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) SCHEDULING THE RECOGNITION HEARING AND OBJECTION DEADLINE, (II) SPECIFYING THE FORM AND MANNER OF SERVICE OF NOTICE AND (III) GRANTING RELATED RELIEF, FILED APRIL 8, 2026 (DOCKET #6)
HYBRID HEARING RE: MOTION FOR PROVISIONAL RELIEF RE:(DOC# 9, 10, 16 TO 18, 27, 30, 31, 35)

**BEFORE THE HONORABLE MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

APPEARANCES:

| | |
|---|---|
| For the Foreign Representative: | Andrew Dietderich, Esquire<br>SULLIVAN & CROMWELL LLP<br>125 Broad Street<br>New York, New York 10004 |

(APPEARANCES CONTINUED)

| | |
|---|---|
| Audio Operator: | Kevin Su, ECRO |
| Transcription Company: | Reliable<br>The Nemours Building<br>1007 N. Orange Street, Suite 110<br>Wilmington, Delaware 19801<br>Telephone: (302)654-8080<br>Email: gmatthews@reliable-co.com |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES:

For the Foreign Representative:
Andrew Dietderich, Esquire
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004

For the U.S. Trustee:
Shara Claire Cornell, Esquire
OFFICE OF THE UNITED STATES TRUSTEE
One Bowling Green
Suite 534
New York, New York 10004

For Amber Hill Ventures Limited, Lateral Bridge Global Limited:
Jeremy Bressman, Esquire
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022

For Prince Global Holdings Limited, Auspicious Tycoon:
Peter Skinner, Esquire
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
20th Floor
New York, New York 10001

INDEX


| MOTIONS: | | PAGE |
|---|---|---|
| Agenda Item 1: | Corrected Emergency Motion for Entry of Orders Granting (I) Ex Parte Relief and (II) Provisional Relief, Pursuant to Section 1519 of the Bankruptcy Code, filed April 18, 2026 [Docket No. 27] | 5 |
| Agenda Item 2: | Motion of the Debtors for Entry of an Order (I) Scheduling the Recognition Hearing and Objection Deadline, (II) Specifying the Form and Manner of Service of Notice and (III) Granting Related Relief, filed April 8, 2026 [Docket No.6] | |

| DECLARATIONS: | PAGE |
|---|---|
| Declarations ECF 3, 4, and 31 | 57 |

(Proceedings commence at 11:00 a.m.)

THE COURT: Please be seated.

Mr. Dietderich, go ahead.

MR. DIETDERICH: Good morning, Your Honor.

THE COURT: Good morning.

MR. DIETDERICH: Your Honor, for the record Andy Dietderich, Sullivan & Cromwell, for the proposed -- the joint provisional liquidators.

Your Honor, thank you for seeing us this morning. I should start perhaps by introducing our team on behalf of the JPL's. In the courtroom with me is Sharon Cohen Levin -- oh, coming into the courtroom and making an appearance exactly on time is Sharon Cohen Levin. She is the co-head of our national defense practice at Sullivan & Cromwell. Also speaking today will be Chris Dunn, litigation partner. With us is Jake Croke, an investigations partner. And you may know Alexa Kranzley, bankruptcy partner. More importantly then us, is our two declarants. Paul Pretlove is the lead JPL. And Andrew Chissick is our BVI counsel.

We are here today on a motion for provisional relief for 30 JPL debtors. We have two objections and a threshold issue of corporate authority. We also have our own burden to carry today for the Court and I propose to proceed if Your Honor --

THE COURT: Let's take up -- I have the letter. I

saw it this morning for the first time from Kobre & Kim asking that the hearing be adjourned. I will let them very, very briefly address that.

MR. DIETDERICH: Sure. I will cede the podium. Thank you, Your Honor.

MR. BRESSMAN: Good morning, Your Honor. Jeremy Bressman of Kobre & Kim on behalf of objecting debtors, Amber Hill Ventures Limited and Lateral Bridge Global Limited.

Your Honor, I will be very brief on this. I think Your Honor may have seen in our objection, which is at Docket Number 18, that we were a bit confused already coming into this what relief was being sought in this particular hearing, whether it's just on the emergency motion that had been set up, a hearing on the provisional relief, or we were going forward on provisional relief.

I think that is compounded by what we saw in the letter that was sent on Saturday and everything that has sort of come since then. And we would just ask Your Honor that a brief pause, essentially, be put here. That we adjourn, give all the parties, including ourselves, time to review the corrected motion, time to respond to the corrected motion.

As we said in our papers, Your Honor, we don't oppose the extension of the automatic stay, at least speaking on behalf of my clients. We don't oppose that. So, we don't see what the rush is here in terms of having a contested

hearing.

THE COURT: But I often have a 1519 *ex parte* application for provisional relief. You wouldn't even be entitled to an opportunity to stand at the podium. I don't understand your objection. I am not asked today to decide on recognition, you know, the proceeding as to which foreign debtors the proceeding should or shouldn't be recognized but to grant provisional relief.

As I say, I have, in the past in other cases, granted that relief or denied the relief just on paper without an opportunity for opposing parties to appear and oppose it. So, what is your -- what is it that you are objecting to?

MR. BRESSMAN: Your Honor, I completely understand. I, again, won't belabor the point.

Just with the -- especially now with the corrected motion that was filed over the weekend, the changes that were made to that, we would just ask that a brief adjournment be had so that we have an opportunity to respond to that. I don't want to say that new points were made in the motion but there were some changes that we believe are substantive that we would like an opportunity to address.

THE COURT: All right. Let me hear from Mr. Dietderich on the issue of the request to adjourn this hearing.

MR. DIETDERICH: Thank you, Your Honor. Andy Dietderich.

We do need our provisional relief. We feel provisional relief is conventional and as Your Honor noted of the type that is often provided on an *ex parte* temporary basis pending the recognition hearing.

With respect to the two topics that were raised on the letter to the Court, you know, with respect to the AI related errors in our submission we have taken full responsibility for those. I will not personally express a view on immateriality. That is for the Court. But I will say that we are prepared to proceed today. That in a conversation with counsel at Kobre & Kim yesterday we asked them to identify anything that might --

THE COURT: Keep your voice up.

MR. DIETDERICH: -- anything that -- we asked them to identify anything that -- I need a taller microphone, I'm afraid. Asked them to identify anything that might be particularly prejudicial in case we could address it in some specific way. They declined to identify any enumerated item. So, we defer to the Court on how to proceed but we don't think these -- the corrections are relevant for the facts that would be important for the Court today.

The second item is more interesting, the question of corporate authority. And we did raise, for the first time

in our reply, the issue of the corporate authority of counsel to represent individuals who are purporting to represent the debtor. On that issue, we raised it in our reply only because we didn't know how they would be appearing and at least the Boies firm did appear in the criminal forfeiture proceeding on behalf of both Mr. Chen and the "Prince Group."

It is our view on the corporate authority question that we do not want it to stand in the way of our provisional relief. So, we are open minded on how to proceed.

THE COURT: Let me see if I can briefly address that.

MR. DIETDERICH: Sure.

THE COURT: And I will listen to counsel about it but it seems to be an issue of BVI law that ought to be addressed in the first instance by the BVI Court. And I don't know whether that Court has addressed it at this point or whether there are any hearings that are forthcoming.

It seems to me that while the matter is live in both Courts, it should be the BVI Court that addresses the issue. Corporate formalities, corporate standing is governed by the law of the place of incorporation registration. And -- which I understand is BVI, not US certainly.

I am prepared to go on and consider the issues today with respect to the provisional relief. And I guess it's clear that I want to go forward. As I indicated in my

(indiscernible) remarks it is sometimes granted without a hearing at all, as I have authority to do. And I can do that by -- you know, I don't reject the objections. I'm not ruling on whether or not the objectors have standing to object but I will go on and assume their standing and go on and decide it on the papers that are before me.

Now, I don't know, are there more hearings set in BVI?

MR. DIETDERICH: Let me see, Your Honor, because I think we, among counsel in a conversation overnight, reached very much the same conclusion Your Honor has reached which is as follows:

That we asked counsel to disclose from whom they were actually taking instruction and --

THE COURT: And they declined.

MR. DIETDERICH: -- they did disclose --

THE COURT: Oh, they did.

MR. DIETDERICH: -- who they are taking instruction from. In the case of the Boies firm counsel has instructed us they're taking the engagement letter, at least, signed by (indiscernible - 11:08:21) Borelli who is an insolvency practitioner of --

THE COURT: I met Mr. Borelli years ago.

MR. DIETDERICH: Well, he has been purported to be appointed in this case through a chain of undisclosed

attorneys in fact, originally appointed by Mr. Chen before his incarceration.

And for the Kobre & Kim they have confirmed that they are acting at the instruction of the registered directors of the companies who we understand to be Fan Yang (phonetic) for Amber Hill and Minyi Tang (phonetic) for Lateral Bridge. What we have said is on the basis of those disclosures to us we have no concern with this proceeding today on provisional relief but with three procedural observations that are important to the debtors and the JPL's.

The first is we want to be very clear that although the internal governance question is one of BVI law, it is a threshold question that needs to be resolved. And we do not think that anyone other then the JPL's has corporate authority to appear in the United States on behalf of the debtors.

If I may quote the late John Dorsey, who was, as Your Honor has been confronted with foreign law issues around the world, "The nice thing about English law is it's in English and I can read it." And in this case the corporate authority question, the deprivation of the directors -- pre-insolvency directors powers are patent on the face of the penal notice in the BVI orders.

So, our position is that we have informed counsel that if they do wish to appear at the recognition hearing we

have kindly suggested that they restructure their arrangements so they can appear on behalf of a party in interest, Mr. Chen as shareholder, or creditor, or some other party in interest and then we can avoid this but we will be -- we do intend to pursue the standing objection if they continue to purport to represent the debtors.

THE COURT: Is that teed up in the BVI Court?

MR. DIETDERICH: Well, its not teed up yet in the BVI Court. We do think, and this is related, that its not merely a violation of BVI law. We think this violates the bold text penal notice. So, in our view, its contempt of the BVI High Court. We don't know what we will be doing in response to that but it is important for us to say that our agreement to allow this proceeding to proceed today is not a waiver of any right to relief in BVI.

THE COURT: And as I indicated in my preliminary remarks, I do think this raises issues in the BVI law and that Court, in the first instance, ought to decide what we hear today on provisional remedies. I don't see the problem in giving -- in passing -- not deciding that issue in the first instance but rather decide the provisional relief on the merits.

MR. DIETDERICH: Your Honor, if I may make one last procedural point related to this as we proceed today. You know, that we, obviously, will need to make our witnesses

available for cross-examination. We do that with a bit of hesitancy given what we believe is a lack of a client and the nature of the people that they're taking instructions from and the duration of that authority and the overall circumstances of the case.

So, we have to do that to carry our burden today but we do want to make clear that we intend to do our best to limit cross-examination to matters relevant to the Court today and not to turn this into a fishing expedition by the targets of investigation or recovery efforts against the plans of the JPL's.

THE COURT: So, let me -- one of the preliminary remarks that goes to that, Mr. Dietderich, is that I typically granted 1519 relief for 14 days treating this as preliminary injunction. And we'd have to come back. We would agree on a date for you to come back and, you know, to the extent that there would be cross-examination it would happen outside of -- at least in the first instance, through depositions outside of this courtroom and we would come back if you are not able to agree on the terms of assuming I grant the relief today, what will be in place going forward after the 14 days remains to be seen.

MR. DIETDERICH: I understand. And maybe it relates a little bit to the final topic we had today which is -- I'm taking the agenda almost exactly out of order, which

is the date for the recognition hearing itself which we will need the Court to schedule today.

THE COURT: Yeah, we need a date for the recognition hearing.

MR. DIETDERICH: That is right. And we had had some informal conversations about that date and we were settling on June 4th as the consensus date for the recognition hearing.

THE COURT: I have to look at my calendar.

MR. DIETDERICH: To give the Court a sense of the duration of the interim period.

THE COURT: Okay.

MR. DIETDERICH: With that, Your Honor, if I may --

THE COURT: Please, go ahead.

MR. DIETDERICH: -- turn to preliminary remarks.

THE COURT: Okay.

MR. DIETDERICH: Thank you, Your Honor.

So, I have three points to make to the Court this morning about the case overall.

The first, Your Honor, is that this is a substantial matter. Its substantial in the scale of the criminal -- allegedly criminal enterprise.

THE COURT: Who is the Judge who has the criminal case?

MR. SKINNER: Judge Kovner.

THE COURT: I'm sorry, I couldn't hear you.

MR. SKINNER: Judge Kovner, Rachel Kovner.

THE COURT: Okay. Each time, just so we have a clear record, you need to identify yourself so that we have a clear transcript each time somebody speaks.

MR. SKINNER: Apologies, Your Honor. Peter Skinner.

THE COURT: Thank you very much.

MR. DIETDERICH: Than you, Mr. Skinner.

In 2018, according to an insider of the enterprise, the Prince Group was generating $30 million a day of a scam proceeds. This amount is $11 billion annually. The activity at this scale appears to have continued and likely increased until the indictment of Mr. Chen by US authorities and the imposition of global sanctions in October 2025. $11 billion for seven years is approximately $80 billion of potential victim losses for fraud. That makes this one of the largest potential insolvencies filed in any court anywhere in the world ever.

In order to commit fraud on this industrial scale the Prince Group was not relying on voluntary labor. They are alleged to have trafficked and forcibly detained thousands of individuals under threat of violence. We expect substantial claims from this second group of victims as well.

According to the United Nations, in August 2023, at least 100,000 people in Cambodia were held in situations where they were forced to conduct online scams. Prince Group is alleged to have operated at least 10 such compounds and to have been among the largest scam centers in the region.

To quote the Honorable Mr. Justice Wallbank of the High Court of the BVI when he summarized the attorney general's application this alleged criminal conduct is the worst of the worst:

"We have come across some pretty un-prepossessing and unattractive conduct before this Court, obviously, but it has never got as colorful as this and as abysmal and infernal as this."

And crime is for our present purposes, Your Honor, tort creating damages claims under civil law by the victims. The JPL's have not found $80 billion in assets to pay victims in full, at least not yet. But they have already identified substantial sources of recovery for victims. They have confirmed ownership by the debtors of well over a billion dollars of assets.

These assets include a controlling in Allied Cigar, one of the largest cigar companies in the world with over $300 million EBITDA in 2024. If this business can be stabilized it alone could be a substantial source of victim recoveries. The JPL's are making active efforts to stabilize

Allied Cigar and two of the JPL's, Paul Pretlove, our declarant, and David Standish are currently serving on boards of the applicable parent companies.

We also have significant commercial real estate in the UK, Hong Kong, and maybe other countries. The JPL's have located over $300 million of cash in banks.

THE COURT: Where?

MR. DIETDERICH: Hong Kong and around the world. The largest accounts are in Hong Kong.

Potential interest in hotels, casinos, luxury homes and personal property. Litigation claims against insiders and leaders of the enterprise. Avoidance actions against those who did business with the enterprise or received payments of value from victims. I should note that many of these assets are currently blocked by sanctions, a point I will return to in a moment.

And the case is substantial, Your Honor, in the scale of the work ahead. I know this may sound like a daunting project for the Court but I want to state clearly my own view that this is a job for insolvency law and insolvency proceedings. And the tools in the insolvency professionals toolbox are fit for purpose.

The challenges we face are common challenges that have been resolved in other cross border cases; incomplete access to books and records, an uncertain perimeter in terms

of the debtor and its assets, the need for cooperation from governmental authorities around the world, the need for cooperation of custodial financial institutions, the need for close coordination with non-US tribunals especially the High Court of the British Virgin Islands, and mass tort like techniques for providing notice to victims and ultimately valuing and establishing a trustworthy distribution regime. This is a very substantial matter.

The second point I have for Your Honor is its early days. We are proceeding deliberately. The JPL's were not appointed on the application of any particular creditor, a stockholder or any private party. The JPL's were appointed on the application of the attorney general of the British Virgin Islands in the public interest for the benefit of victims. Although this is very much a civil liquidation, we are respectful of how it started and the important role of government actors. Similarly, we must respect the pending prosecutions and asset seizures by criminal authorities.

THE COURT: Well, I do have a question about the asset seizures and the impact on this case.

MR. DIETDERICH: Absolutely. Seized assets in the US alone include over 127,000 bitcoin, which is the largest asset seizure in US history. A couple things about the asset seizures, Your Honor, that I think are conceptually important.

First, is that the mandate of the JPL's includes a mandate to cooperate with law enforcement. The JPL's believe that as a matter of being prudent custodians of this business the cooperation with law enforcement is in their financial interest, in the financial interest of the debtors. Why? Because cooperation with law enforcement is the way to avoid entity level indictments. And in addition, cooperation and coordination with law enforcement is a way to learn more, from the JPL's perspective, in their hunt for recoverable assets. So, there has been a determination of the JPL's as fiduciaries, as businessmen really, that cooperation with the government is in the best interest of these estates.

Now, the -- we are also at early days in terms of how we think about the really daunting list of options for how to conduct a case like this jurisdictionally. And there's two central pieces that we're considering.

The first is we've initiated this as a Chapter 15 but this is a global enterprise. The 30 JPL companies alone own subsidiary companies all around the world. I want to get back to sanctions in a moment but the sanctions do have an effect of chilling some action against the blocked assets but not all. And it may be possible that the right answer here is a Chapter 11 case either combined with a Chapter 15 case or that supersedes the Chapter 15 case in some way where we coordinate activity between this Court and the High Court in

the Bahamas. We have not ruled that out.

The other procedural question we have that we're not yet clear to answer is we do not see a tension between the asset seizures and our case. There are assets such as the Allied Cigar business, which is an operating business, that by their nature really can't be the type of assets that either can be seized or will survive seizure.

So, we see ourselves operating in parallel with criminal authorities on the understanding that victims are creditors and creditors are victims. And ultimately, money in the custody of the government that will go to victims and money in our custody that will go to victims are both steps forward from the victims perspective.

It does raise the question whether the future of this case is, if you will forgive the analogy, Madoff like or FTX like. What do I mean by that?

In the Madoff case the criminal forfeiture proceeding and the civil insolvency proceeded in parallel and two separate distributional regimes were established. In the FTX case a single united distributional scheme was used for recoveries in the bankruptcy case, which was an international bankruptcy case, and recoveries in the forfeiture proceeding because the government felt comfortable with the bankruptcy system as a way to distribute the forfeiture proceeds. We believe that had real advantages on the facts of FTX but

we're a long way from concluding that that is the right way to proceed here, right, and it is not our decision, I should say. It is very much the government's decision, not ours.

I will note that we also have to be sensitive to the role of the High Court of the Bahamas. And, again, to use FTX as an analogy, the centralized distribution scheme was overseen not just by the bankruptcy court in Delaware but it was also overseen by the court in the Bahamas as well.

So, we don't know how we will coordinate with the asset seizures but what we do know is we don't think -- we think that the seizure of an asset in reliable custody of a government around the world and the taking of an asset into the custody of the JPL's away from the bad guys are both steps forward. And what we do with it after we have it, we will have to work out.

Is that responsive?

THE COURT: Go ahead.

MR. DIETDERICH: So, another reason why we are proceeding deliberately is the sanctions environment and we should drill down on that for just a moment because it is not novel but certainly not a common constraint upon a Chapter 15 case.

The debtors and their assets are subject to comprehensive sanctions imposed by the Office of Foreign Asset Control in the United States and the Office of

Financial Sanctions Implementation in the UK and other sanctioning authorities around the world. These OFAC sanctions are very broad, they restrict all US persons, including myself and Your Honor, from having anything to do with the blocked assets of the debtor. We have been in discussions with OFAC, OFSI and other sanctioning authorities about a series of licenses that would allow us to administer this insolvency.

We first obtained from OFAC a temporary license related to the Allied Cigar business which was facing a complete disruption of its business because it had lost access to the financial banking system. We arighted that ship, thanks to that temporary license from OFAC.

We obtained a broad license from OFSI which permits UK persons to be involved in the administration of the debtors and their assets. Just yesterday afternoon we received a broad license from OFAC that also allows US persons to be involved with the debtors and their subsidiaries in the administration of these cases. This was a very key step forward for us. That license applies until April 2028.

We would like to thank OFAC and OFSI for the speed with which this relief was obtained. The sanction authorities, Your Honor, are overwhelmed by the complexity of the job in front of them and I think its fair to say that the

people that know about these license applications regard what we have done as being done at breakneck speed. We still have sanctions relief to obtain in other jurisdictions and we have the hard work of communicating to banks and other counterparties to this effort that its now okay to transact for the debtors.

THE COURT: Do you have an estimate at this point of the magnitude of the assets that are in the United States?

MR. DIETDERICH: No, we do not. No we do not. We are very much in the dark about exactly that question.

Two other important elements of sanctions relief, Your Honor. One is that the assets of the debtor, despite the license, remain blocked assets and the debtors remain sanctioned entities. What the JPL's have is a license that permits UK persons, US persons, and other persons effected by the sanctions to work with the debtors under the control of the JPL's and Court supervision. The license is premised on the continued control of the debtors by the JPL's as estate neutrals and the continued oversight of courts. And in particular, the lack of control of the debtors by Chen Zhi, or his alleged coconspirators, or business affiliates.

Another element of the sanctions relief that is very important is that it does not apply to distributions to victims. When we eventually have a distributional scheme, we expect that the process for identifying victims who are

eligible to receive distributions will involve farther discussions with OFAC and the sanctioning authorities which leave me, Your Honor, to perhaps the most difficult challenge that we do face, the victims.

Another reason to proceed slowly here or deliberately here is the nature of the creditor body. The JPL's anticipate that we will need to coordinate a worldwide process for providing notice and an opportunity to participate. The team is already in contact with NGO's who represent victims in various capacities. A leading NGO that represents victims of fraud and another leading NGO that worked with victims of trafficking. These discussions are trying to figure out how to provide notice and facilitate collective action by the victims.

To give the Court a sense of the complexity of this, we anticipate classes of creditors would include trade and ordinary creditors, fraud victims in the US, Europe, Asia and around the world, victims of trafficking and wrongful detention. Victims of physical violence and families who paid ransom payments.

Here, Your Honor, I must note one struggle we already anticipate from our conversation with the NGO experts in this space. We need to prevent secondary fraud by opportunists that solicit victims for farther cash to "assist in recoveries," an insolvency claims process supervised by an

insolvency court and properly designed will have techniques to address this but rushing into that process could encourage bad actors.

Finally, Your Honor, we need to proceed deliberately out of respect for the source of the JPL's corporate authority, the High Court of the BVI and the BVI Attorney General. The proceeding is an application for liquidation and the provisional liquidators are appointed currently on only an interim basis.

There was a hearing last week, Your Honor, about commencement of liquidation, formal liquidation. Lawyers acting at the instruction of Mr. Chen or others with authority derivative of Mr. Chen appeared to challenge the commencement of liquidation and also moved to discharge the interim order under which the joint provisional liquidators are proceeding. The Court heard argument, the Court requested supplemental briefing. There are many possible outcomes and we do not wish to get ahead in any way of the Honorable Justice Wallbank.

Mr. Chissick is in the courtroom and can speak to these matters as needed but I understand that we do not expect a decision until the summer or potentially fall at the earliest and that any decision may be subject to various appeals. I think as a practical matter, Your Honor, my working hypothesis is that we may be operating under interim

relief in the BVI for some period of time if the Judge does not grant the attorney general's application for commencement of full liquidation.

My third point, Your Honor, is that provisional relief is, indeed important. At some level the most important relief is recognition, with a lowercase R. Who speaks for the debtor in the United States. This is the fundamental assistance that we need. And given the number of conversations we are having with government and private actors and the stakes involved, we do need it now.

We expect governmental authorities and banks in particular to have concerns that the exclusive authority of the JPL's to act in the United States is called into question. Related are the threats the JPL's have received by US counsel to Mr. Chen and potentially others to whom he may have delegated authority.

THE COURT: Is -- in the papers I read he was returned to China.

MR. DIETDERICH: He is incarcerated in China. That is our understanding.

THE COURT: He's incarcerated in China, okay.

MR. DIETDERICH: These threats have included the use of US legal process to sue the JPL's for their official activities. Also related are our continuing discussions in sanctions relief which, again, is premised on the JPL's

having exclusive control of the debtors and specifically not Mr. Chen and his advisors having control of the debtors.

Other critical relief includes the ability to conduct discovery to identify any assets in the United States, which is a black box to us; asset custodians of financial records in the US, which records may relate to both US and non-US property. And, Your Honor, we only had the sanctions relief that permitted US persons to be involved in the case yesterday afternoon. So, that is why our answer without US assets is, at least in our view, and I'm sure the Court's, currently highly unsatisfactory.

Finally, when we reach out now to seek cooperation from unknown US persons it is critical to have the protection of the automatic stay so that we minimize the risk that asking about an asset encourages its disappearance.

So, Your Honor, those are my preliminary remarks. I am happy to answer general questions about the case and then I do think we have a procedural question, how the Court would like to proceed today. We have declarants ready to testify. We have declarations ready to move into evidence. They are prepared to testify today. They are prepared for cross-examination, etc., but I defer entirely to Your Honor in terms of the process by which you would like to proceed.

THE COURT: Let me hear from the objectors counsel before we -- we are going to go forward.

MR. DIETDERICH: Thank you, Your Honor, very much. I cede the podium.

MR. SKINNER: Good morning, Your Honor. Peter Skinner on behalf of the objecting debtors and let me introduce the folks that are with me today. I am joined, by my firm, by Dan Boyle, Gordon Novod, and Sophie Roytblat.

Mr. Dietderich said a lot. There is a lot I want to respond to but I think we should start by focusing on the issue that we are here to resolve today, which is whether the preliminary relief should be granted. Section 1519(a) says that from the time a filing a petition for recognition and until the Court rules on the petition, the Court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interest of the creditors, grant relief on a provisional nature. Urgently needed, Your Honor, I think is what we should be focusing on here today and the bottom line is relief is not urgently needed.

THE COURT: You say but, you know, its easy to say and its another thing where efforts around the world to collect assets, etc., by multiple parties. Isn't it important in a Chapter 15 case that the Chapter 15 Court put its imprimatur on, at least, during this gap period between filing and recognition to freeze things in place?

MR. SKINNER: Well for sure, Your Honor, it's easy

to say but its not like I'm coming in with no objective evidence of the lack of urgency. Take the simple fact, Your Honor, that the joint provisional liquidators were appointed in the beginning of January. It is now the middle of April and they waited months to come in and ask for this emergency relief.

If there was an urgent need to secure the assistance of a US Court with respect to the BVI proceedings you might have expected them to come in a bit earlier and its not like there weren't facts well in play long ago that demonstrated to them that the BVI proceeding was a contested matter and that the issues that they're now complaining of existed from the start.

THE COURT: Are the hearings scheduled in BVI to address your objections there?

MR. SKINNER: Yeah, the hearing was scheduled and it took place last week, Your Honor. It was a two-day hearing and the Court in BVI has now requested supplemental briefing which will be filed on May 15th. I agree with Mr. Dietderich that we are not likely to have a decision from the Court in the BVI as to whether the JPL's will be made permanent liquidators and we will proceed to a windup until after May 15th. I don't think we agree that it may last into the summer or the fall. And I also don't know what relevance appeal is if we win. And, you know, I think we would

probably each characterize the hearing in our own way.

So, put that aside but I think its fair to say that over two days of argument there were very significant issues raised in the BVI as to whether this proceeding, which is not an insolvency proceeding in BVI. It was initiated by the BVI Attorney General under a statute that is fairly unique in the BVI that allows them to impose liquidators provisionally in the public interest.

There are serious questions down there as to whether this is a proper use of that statute and whether they should be appointed permanently because the simple matter is, Your Honor, there are no creditors. No one has emerged in the BVI or elsewhere claiming that some debt is owed to them and that their interests need to be protected. Mr. Dietderich has identified no creditors. And he says, well, we haven't had the ability to conduct US discovery.

They've had control of the entities for months. They have had access to communications. They have had access to bank records. Its been a public proceeding in the BVI and nobody has emerged down there stating a claim. The simple truth is these are not insolvent entities. If there are any debts they are only owed back to shareholders, majority shareholders.

THE COURT: That's not the allegation. The allegation is that numerous people around the world were

scammed by these debtors and they haven't -- we haven't -- there hasn't been proceedings in which a bar date has been established for creditors. The fact that they haven't come forward so far is not at all surprising to me.

MR. SKINNER: Well, Your Honor, let's -- I think we should look at that. The allegation is not that the objecting debtors, the entities that we represent for purposes of the objections in this bankruptcy proceeding, are in any way connected to the allegations -- the criminal prosecution in the Eastern District of New York other than the fact that Mr. Chen is a shareholder in many of those companies. Not all but many. They are not referenced in the indictment with the exception of the two entities that are represented by Kobre & Kim. They're not referenced in the forfeiture complaint. These are separate entities that --

THE COURT: Well, what are the assets that the government so far is seeking to forfeit?

MR. SKINNER: The only assets the government is seeking to forfeit are the 127,000 bitcoin that it has somehow come into possession of. Now, Mr. Dietderich says that there are seized assets in the United States that alone include 127,000 bitcoin. That is not entirely correct. We don't know whether these assets were seized or whether they came into possession of the United States in some other way. All that the government has said in the forfeiture proceeding

and in the criminal indictment is that they "came into the custody of the United States."

And as we point out in briefs, we filed to dismiss the forfeiture complaint that is highly unusual, to say the least. The government is sitting on what, at the time of its original forfeiture complaint was roughly $15 billion worth of bitcoin and it hasn't said when or how it came into possession of the bitcoin which is a fundamental problem with their forfeiture complaint as we've pointed out.

So, I think it's worth noting I don't want to go down a rabbit hole of arguing the merits of the Eastern District of New York prosecution and forfeiture allegations. But suffice it to say, they are highly unusual and highly problematic for the reasons that we point out in the filings that we submitted to the Eastern District of New York, which we have attached to my declaration.

I think the most significant problems with them, from the indictment perspective, is that they are obviously based, at least in part, on evidence that is just plainly mischaracterized by the government. They attach photos to the indictment that they purport to show the criminal activities of my client. And I say "my client" because I represent him in the Eastern District of New York, that is Mr. Chen Zhi.

And as we explain in our filings, a simple reverse

internet search, which is essentially where you take the picture and put it into a search engine and see what comes up, demonstrates that most of these photos came out of press reports that had nothing to do with my client from years earlier. How did they end up on the indictment? We don't know. We may never know but I think it's a reasonable guess that they were taken from some type of electronic device that they associate with my client. And like all of us, he had been looking at pictures in the news and other places and they have now mischaracterized that.

THE COURT: Let's stop. Somebody needs to close the door in the courtroom.

MR. SKINNER: So in any event, I agree with Mr. Diederich that this is a serious matter. And from our perspective it's a serious matter because of the injustice that has been done to our client.

He's now in custody in China where he was rendered with no process and we're not likely to see him again any time soon to be honest as a result of the allegations that were made by the United States Government which are plainly problematic at best.

But to turn back to the issue at hand which is whether provisional relief should be granted, as I noted, there simply is no fire here, Your Honor. The debtors waited months from their appointment to come in, they've identified

no U.S. assets that are at imminent risk over the next month or so until we can have, until we come back in for the recognition proceeding.

I will affirmatively represent that we are aware of no U.S. assets. It's not a question of they've had the inability to identify it, they simply don't exist. So, you know, if they serve discovery demands on us and ask us to identify them, we're going to tell them there are none.

The assets that exists are a cigar company which is owned by multiple entities all of which are incorporated in companies outside all which are incorporated outside the United States. Some --

THE COURT: Where are they incorporated?

MR. SKINNER: It's in bit of a complicated structure as you might imagine, Your Honor, but it's a combination, to the best of my recollection, of Cayman Islands. Ultimately the entity that owns the cigar company is incorporated in Spain, and there are entities above that that are in the Caribbean and I think perhaps at least one in the Middle East. If that's an issue, we could, of course, get that information for Your Honor.

But I don't think there's any allegation from anyone that they're incorporated in the United States. There's simply no U.S. interest in a cigar company. Not surprising, Your Honor, because the cigar company ultimately

owns cigar plants in Cuba, so a U.S. company is not going to own a Cuban cigar company.

When we're talking at the end of the day about whether a preliminary injunction should be granted, we should really be talking about likelihood of success in irreparable harm. With respect to the likelihood of success, at least at the provisional stage which is where we are now, we do not believe that there is a likelihood of success when we get to the actual recognition hearing. The primary reason for that is that the provisional matter that is proceeding in the BVI is not collective for the reasons that we explored --

THE COURT: I reject that. I read the papers very carefully, so I reject the argument that proceeding in BVI is not collective.

MR. SKINNER: Well, Your Honor, specially I think --

THE COURT: Go on to your next point.

MR. SKINNER: Fair, Your Honor. Why don't we just talk about the risk of irreparable harm because I think that's probably where the rubber hits the road here? What is the potential harm that might arise if there is not provisional relief entered between now and whenever we come back to conduct a provisional hearing, at which point I hope if there have been developments in the BVI, and in particular if the liquidators have, if the liquidation has been

dismissed, we may have a different view on the likelihood of success with respect to the recognition proceedings. But putting that aside, the time did weigh in our minds their arguments with respect to irreparable harm.

The claim that there's some kind of harm to the JPLs in their fight over their legitimacy, there's no case support for that being a factor that the Court should even consider, and I frankly don't really understand it.

You know, the fact that somebody might be challenging their appointment doesn't mean that they're suffering irreparable harm in the meantime that this Court has to protect. Their rights are, they're ably represented in the BVI. They put their arguments forward, we put our arguments forward, and a judge in the BVI is going to resolve that issue. They've had no limits on their ability to talk to any governmental authorities, whether they're in the United States, the Caribbean or elsewhere.

If you look at the preliminary statement, one of the first things they say is it's our mandate from the BVI to be able to talk to authorities. Okay, fine. There's no limit on their ability to talk to authorities here.

It appears that they've had ample communications with the authorities, and they've been able to secure relief from sanctions in the United States with no issues. So it's not clear to me how at all there is some risk of irreparable

harm to them absent provisional relief with respect to their ability to talk to the authorities.

What we're focused on in an insolvency proceeding is harm to the debtors, their assets, and their stakeholders. And there's no risk of harm to those entities between now and when we might come back to consider the provisional relief.

Your Honor, at the bottom what this is really about is whether anything needs to be done while we wait for the BVI to resolve the issue of whether the liquidators are going to be transferred from their provisional status to a permanent status and the companies will be placed in liquidation. There wasn't anything that needed to be done up until for some reason they decided ten days ago or whatever it was that they had to come in here and ask for this relief.

THE COURT: Well, I think immediately after the filing of the chapter 15 case, my courtroom deputy reached out because the papers indicated their request for provisional relief. And we raised the subject of extension, was prepared to hear it within a day as I ordinarily do. And what I heard in response was they would like to schedule it in line up with today.

MR. SKINNER: Which I think, Your Honor, is indicative of the lack of an emergent nature here.

THE COURT: I don't think so. But anyway --

MR. SKINNER: Your Honor, if there was something,

anything, that was an actual risk and that was not speculation about claims that future victims might have --

THE COURT: So clearly assets within the U.S., the seizure and forfeiture matters, orders put those assets, put a safety valve on any transfer of those assets. I don't dispute that. So I wasn't surprised that they wanted to wait until today.

MR. SKINNER: Well then what are we really talking about, Your Honor, then? We all agree --

THE COURT: Go on with your argument. On the point, I think your argument that they haven't shown the need for provisional relief is falling flat with the Court.

MR. SKINNER: Fair enough, Your Honor, then I won't belabor it. But I do think then we should be talking about what that provisional relief is, and it's not clear to me what they actually need.

THE COURT: Well, provisional, provisional relief they've asked us for the right to take discovery, and that is a form of relief that I have granted in many chapter 15 cases in the past on provisional, where provisional relief has been sought. And I would be inclined to do that here.

MR. SKINNER: Your Honor, I think we should be talking about what the scope of that discovery is.

THE COURT: Well, I will, you know, typically the order where I've granted provisional relief grants the right

to discovery. It does not judge any objections that the, they have to be brought to me and they usually resolve. I don't hear discovery motions, so, or objections to a subpoena for depositions. We usually have a telephone or a Zoom hearing within a day or two and I don't drag out proceedings while people brief issues that I'm quite comfortable in dealing with.

But it doesn't preclude the proposed opponents from objecting if they have a basis, and I'll rule quite quickly, I'll listen to both sides and rule quite quickly that we don't drag out. If I grant the provisional relief, includes the right of the foreign representative, the proposed foreign representative to move forward with discovery, fine, okay, then we'll do that. And to the extent that they serve subpoenas and there are objections, I will deal with them quite promptly. But it doesn't meet the advance objections that might be made.

MR. SKINNER: Well, Your Honor --

THE COURT: The only thing I would emphasize is because I deal with discovery motions on a very, very expedited basis, usually a deterrence for what I would consider frivolous objections because they get resolved very quickly.

MR. SKINNER: And hopefully also a deterrence to frivolous discovery demands in the first place.

THE COURT: Well --

MR. SKINNER: Which is what, which frankly, Your Honor, is what we are concerned about.

THE COURT: You know, if I grant the provisional relief, it will give the foreign, the proposed foreign representative the right to go forward with discovery, it will not judge who is, who are the subjects of depositions and what documents may have to be produced.

MR. SKINNER: Well, Your Honor, I would submit that discovery very well may be proper in this case if it's properly taken after the proceeding the BVI actually recognized. And that it really --

THE COURT: I understand your position, but discovery in a chapter 15 in the United States is not tied to what the foreign jurisdiction law is on discovery.

MR. SKINNER: That's what I understand, Your Honor. But where we just had a hearing on propriety of the appointment of the JPLs in the first place and we can expect a ruling from the Court at some point in the near future --

THE COURT: Go on to your next argument.

MR. SKINNER: Your Honor, it appears that we're, I don't want to belabor the Court with arguments that have already fallen flat.

THE COURT: Your argument, what proposed discovery they want to take is premature.

MR. SKINNER: I was hoping that we might be able to have discovery confined to each of the parties for purposes of the provisional stage, and we're not dealing with the situation where hundreds of subpoenas are being issued.

THE COURT: So typically when I've granted provisional relief, it is included, the language on permitting a foreign representative, proposed foreign representative, to proceed with discovery. And in the extent, you know, if you represent the witnesses who are to be deposed and you object, you know, you meet and confer and you attempt to resolve them. And if not, within a day or two, I will hear (indiscernible) and resolve it.

MR. SKINNER: And what we're concerned about, discovery on the parties is one thing, asking us for our witnesses, our documents and the like, that is one thing. But having open discretion to serve hundreds of subpoenas throughout the United States wherever they think they might find something, is a lot more. And it places a heavy burden on us to have to police that and litigate it, and then given no basis on which they need that right this second.

We may not have a BVI proceeding very soon. But, you know, we haven't even addressed the substantive issues of whether this Court should recognize the BVI proceeding in its present form. And while we have a month or so to get there, we should not have to spend countless hours litigating

irrelevant subpoenas.

THE COURT: You won’t spend countless hours, I’m just telling you that right now, okay. I resolve these issues with, you know, if you disagree about the scope of discovery, you send a letter to the Court and we have a hearing and I resolve the issue properly. We don’t go through extensive briefing. We don’t allow 14 days for motions to stand in the way -- those are my normal procedures, not only in chapter 15 cases, but in all cases before me.

MR. SKINNER: Your Honor --

THE COURT: And I have no doubt that that’s the way, if I grant the provisional relief, that’s how we’ll go forward.

MR. SKINNER: Your Honor, if they have just general Rule 45 subpoena authority during this provisional period, we can expect many, many, many --

THE COURT: Go on to your next point. I hear your objection.

MR. SKINNER: Just with respect to third party subpoenas, the first thing you’re going to say is we don't have standing to object. And then we’re dependent upon third parties to come here and object. It’s creating a whole bunch of discovery and fees. And that’s probably what a lot of this is ultimately about at the end of the day is keeping

this investigation going.

THE COURT: You made your argument, go on to your next point.

MR. SKINNER: Fair enough, Your Honor. What we primarily cared about and what is the crux of our objection in the first place was their request to have the ability to sell assets during provisional period --

THE COURT: They've withdrawn that, I think.

MR. SKINNER: I know, they've withdrawn that, which is good, that's a start. We object to the provisional relief for all the reasons that I've noted, and I understand that I'm arguing up hill and that Your Honor is not persuaded.

THE COURT: The procedures I impose with respect to discovery existed on all the cases before me, not only in chapter 15 cases.

MR. SKINNER: Your Honor, let me just, let me just conclude by noting that we agree that this is a serious matter as I noted before but for entirely different reasons. The charging instruments that gave rise to all of this in the first place are highly problematic. The fact that they were able to take those charging instruments and get something going in the BVI with respect to companies that really have nothing to do with the charges that were raised in the Eastern District of New York, and then to come here and seek

additional relief to try to buttress what they're doing down there just shows what this all really is, which is bootstrapping one proceeding into another and to another to get relief to try to get to protections for whatever creditors might exist in the future but we don't know of any right now where there are no creditors, where there are no U.S. assets, we don't believe provisional relief is warranted.

If it is going to be entered, then we think it should be limited to the stay and not extended to discovery so that we don't have to come back to that for the next month. But I appreciate I've already said that and have not had great success in persuading Your Honor.

So unless the Court has any other questions for me, I will cede the podium to my colleagues from Kobre & Kim. Thank you, Your Honor.

THE COURT: Okay. Let me hear from any other objectors.

MR. BRESSMAN: Jeremy Bressman from Kobre & Kim, Your Honor. I'm going to attempt to be exceedingly brief. I promise not to take up more than two to three minutes.

First, I wanted to answer a question that Your Honor posed earlier that I don't think you got an answer to which is whether the issue of corporate standing has been teed up with the BVI. My understanding is that it has not

yet but is likely to be by application within the next few days. So Your Honor should have a ruling on that. I don't know when that will come. Ideally it would come before the hearing on recognition.

I'm not going to retread any ground that Mr. Skinner covered. I think needless to say we dispute much of what's in the papers and what my colleagues representing the joint provisional liquidator said. We're going to address that on the petition for recognition. We don't need to cover that now.

We'll just say we don't think that the papers make the case for the need for discovery now. I just want to repeat what we said in our papers which is we don't depose extension of automatic stay. That gives them the status quo that they need. The question is, do they need to take discovery between now and maybe June 4th or whenever we set the condition for recognition. We don't think the papers make out a case for that. Of course, we're going to respect the Court's decision on that, and we look forward to opposing recognition at the appropriate time.

Thank you, Your Honor.

THE COURT: Thank you very much.

Anybody else in opposition? All right. Yeah, come on up to the podium.

MS. CORNELL: Good morning, Your Honor, Shara

Cornell on behalf of the Office of the United States Trustee.

THE COURT: Nice to see you, Ms. Cornell.

MS. CORNELL: Thank you, nice to see you as well. I just wanted to let Your Honor know that prior to the filing of this chapter 15 petition, the United States Trustee had extensive discussions with counsel for the foreign liquidators. And as part of those discussions, we did discuss the difference between the extension of 1519 and the discovery that's being sought today.

And in response to the United States Trustee's inquiries, the discovery requests were put over to this hearing because the United States Trustee had additional questions, I wanted to make sure that there was proper noticing for all of the parties which has clearly happened today.

So I just wanted to put that on Your Honor's radar so to speak that that is one of the reasons why we're here today instead of hearing everything on an ex parte basis. Thank you.

THE COURT: Thank you. Anybody else want to be heard?

Mr. Diederich?

MR. DIEDERICH: Thank you, Your Honor. Andy Diederich of Sullivan & Cromwell. I should confirm those discussions with our colleagues at the U.S. Trustee's Office

and thank them. We consulted with them multiple times in advance of filing this case and their cooperation was very prompt and thorough and I think we have been able to avoid any objection.

Your Honor, I'll be very brief in response. I think I was intentionally quite measured in my opening about the nature of this case, and frankly the nature of the opposition. But I do want to address a couple of points.

Why are we so late being here? Well, as I mentioned to Your Honor, yesterday afternoon we received an order for the first time permits U.S. persons to assist in anything to do with these blocked assets. I think we had concluded internally at the firm and also had solicited and received a view from OFAC that the simple filing of a chapter 15 case was not a violation of sanctions.

But anything else that we wanted to do did not put us in the same position of clarity. So to commence a proceeding in front of Your Honor and literally be able to do nothing within the United States involving U.S. persons because of sanctions is not an appropriate use of Your Honor's time.

We filed this case as soon as we could have a sense that the sanctions from OFAC was going to come. And we were right, and we got it almost in perfect timing yesterday afternoon before this hearing. The glove is now off and we

can proceed in the United States. But the delay is not our fault and it's certainly not OFAC's fault because I want to underscore that OFAC gave us this license and this exemption with what we regard as breakneck speed. So I think that puts the problem of any implication that our delay is a lack of urgency hopefully to rest.

THE COURT: What does the license permit you to do? When I say you --

MR. DIEDERICH: Very good question, Your Honor. So the license is very broad in its scope. So we start with the concept of blocked assets and sanction entities. And effectively, U.S. persons are prohibited. And here I'm paraphrasing and I have colleagues in the room that know it far better than I, so I may embarrassingly get this wrong.

But the U.S. persons are prohibited for facilitating the transfer of the administration of the blocked assets. So that means, for example, they can't pay professional advisors, right, they can't retain professional advisors, that if you're a bank and you get a letter asking for information about the blocked assets, you may not be able to respond to that letter; if you sent the blocked assets or put them in a different account and you were the bank, you would be violating it, right. Anybody that would be involved, that's really quite extensive. And so it would shut down the administration of these cases from the very

beginning.

The license allows us to do everything that we could think of that we needed to do in very broad language. But it does have a couple fundamental parameters. One, as I said is we cannot make distributions to victims.

THE COURT: Are you entitled to take possession of assets?

MR. DIEDERICH: Yes, we are.

THE COURT: How does that square with the forfeiture and seizure orders in the criminal case?

MR. DIEDERICH: Well, the forfeiture and seizure orders relate to the specific assets that are subject to those, you know, to that proceeding. So the 127,000 bitcoin is safely in the custody of the U.S. Government. We're more focused on, for example, the bank accounts that we have identified. I mentioned the $300 million of bank accounts around the world, those.

Now, you may say those are outside of the United States. Well, they're in dollars, right, and it may take the cooperation of a U.S. financial institution to effectuate the seizure of those, you know, seizure is the wrong word, but are taking custody of those assets. We may wish to deposit those assets in a U.S. bank account, which we can now open for the first time today which we couldn't do yesterday, and so on and so on.

So we do think that we've gone through the catalog of things we would normally do in a bankruptcy case and that the OFAC license that we received is broad enough to allow us to do that until as I mentioned April 2028 as long as we do not make distributions to victims. And so if there ever is a plan of distribution or a chapter 11 plan or a plan of distribution in the high court that we ask Your Honor to help implement in the United States, there will be a moment when we go back to the sanction authorities and show them who we're giving the money to, what our KYC procedures are, etc.

But for now we think we, you know, we always, there may be interpretive provisions from time to time that we need to work through with our colleagues at OFAC and obviously around the world, but we think we have what we need. Okay.

THE COURT: Okay.

MR. DIEDERICH: I should mention something about U.S. assets because it is a little bit contradictory to say there are no assets in the United States, please don't conduct any discovery in the United States.

We're not after just U.S. assets, those would be great if we find some, but primarily we're after books and records that are in the United States that may help locate assets whether in the United States or outside the United States.

THE COURT: The decisional authority from this district, Platinum Partners, which was Judge Chapman's decision, and Marcus (phonetic) case, which was my case, permitted discovery focused on people outside of the U.S. within a chapter 15 proceeding.

MR. DIEDERICH: Yeah, we're aware of that, Your Honor. I just want to make the very simple point, right, because there was a sense that, you know, the relevance of no assets in the United States. We intend to use the assistance of this Court to the full extent we can to pursue assets outside of the United States as well, and we know the appropriate boundaries for that relief, and if there's any concern that that relief is overblown, the word frivolous, we'd never be accused of anything like that, especially given who we're working for.

THE COURT: Assuming that I grant provisional authority including discovery, how many of the parties do you intend to seek documents from or on depositions?

MR. DIEDERICH: Well, Your Honor, we would first begin with written voluntary requests to financial institutions and custodial institutions that are likely to have assets. And I think we would go from there.

We have not yet made the decision with what to do with law firms that are representing Mr. Chen in the United States or others and how we approach that. But we certainly

don’t expect extensive depositions during the provisional period. This is information gathering first and foremost.

And then finally, Your Honor, I want to address this question of timing of the BVI. And, again, we don't want to get ahead of the high court judge, but I did quote his comments on the nature of this case. And I think as we recognize chapter 15’s background and principles of comity, and frankly the judicial notice that this Court can take about the actions taken not just by the Department of Justice of the United States, but by OFAC and by the British authorities and by the Cayman authorities and the BVI authorities and the Chinese authorities and authorities around the world.

Protestations of Mr. Chen’s innocence are for another forum, I express no view on that. But as I said, I was measured in my initial remarks. But it is very rich for someone accused of doing what this man did to come to court and suggest that an investigation into the circumstances of his alleged crimes should be delayed because it’s not urgent.

We are dealing with one of the greatest transnational crime scenes the world has ever seen, potentially by someone accused of doing things that are beyond the pale, and we think that any balancing of harms on an urgency provision of relief, TO or other standard needs to take into account who is asking for the relief and who is

objecting to it.

So thank you, Your Honor.

THE COURT: Okay.

MR. SKINNER: Your Honor, if I may make just one point. Just with respect to the --

THE COURT: Just identify yourself for the record.

MR. SKINNER: Yes, Your Honor. Peter Skinner on behalf of the objecting debtors.

Just with respect to the proposed order that was submitted by the authorized foreign representatives, as the Court noted, they have struck the request, the language in realization from paragraph 11. That leaves in that the representative shall be entrusted with administration of the debtors' affairs and assets located in the United States. I don't know what administration means. I know they do have broad authorities that have been granted to them by the BVI court. They now have a license to operate in the U.S.

THE COURT: Well, the chapter 15 has two relevant provisions with respect to entrustment. And 1521(a)(5) which I'm able to provide that relief provides for entrustment, entrusting the administration or realization of all or part of the debtors' assets within the territory or jurisdiction of the United States to the foreign representative or another person including, but does not permit the removal outside of the United States of those assets. It permits the foreign

representative to recover assets but keep them in the United States.

MR. SKINNER: I --

THE COURT: Let me finish.

MR. SKINNER: Sure.

THE COURT: 1521(b) provides that upon recognition of a foreign proceeding, we're not at that stage, whether main or not main the Court may at the request of the foreign representative entrust the distribution of all or part of the debtors' assets located in the United States to the foreign representative or another person. And it goes on from there.

And that's the provision that authorizes the Court to permit the rule of assets from the United States, in this case it would be the BVI, we're clearly not at that stage. So the 1521(a)(5) assets which remain in the United States, but, you know, the foreign representee can, is able to take possession of those assets, ones that are not from the United States.

MR. SKINNER: Then it should be, so long as we're tracking the language of the statute, then that's fine.

THE COURT: Anything else?

MR. SKINNER: No, Your Honor. Thank you for your time.

THE COURT: Mr. Diederich, do you want to introduce any declarations in support of the relief that

you're seeking?

MR. SKINNER: Your Honor, with apologies, I should note if the Court wants to proceed to a hearing right now we're, of course, prepared to take testimony from the witnesses who are here. We can also do that by deposition with the 14 day period as Your Honor had noted at the start.

THE COURT: That would be satisfactory to me rather than taking the time to do it in Court at the present time. But I leave it to you to work out with Mr. Diederich what those arrangements are.

MR. SKINNER: Okay. I just wanted to let you know that if you did want to proceed today, we're prepared to proceed. But that's also fine with us.

THE COURT: Okay. And so it was suggested I think June 4th as the date for recognition. That's during the Second Circuit Judicial Conference, I will not be here. The following week, which is June 8th, is wide open on my calendar.

MR. SKINNER: The following week is wide open for me as well, Your Honor.

THE COURT: I'm committed to the Second Circuit Judicial Conference.

MR. DIEDERICH: I understand. Thank you, Your Honor, Andy Diederich. Yeah, we had forgotten that. I'm actually going to be there too. But --

THE COURT: We won't talk about this.

MR. DIEDERICH: We won't talk about that now. Your Honor, I think what we will do on a date if it's okay, let us compare calendars with everybody --

THE COURT: Yes, please do that.

MR. DIEDERICH: -- and come up with a convenient date to propose to yourself, and we'll aim for that week of the 8th. Does that make sense? Colleagues? Okay. Good.

Now in terms of, you know, today, you know, with the June 4th hearing, I guess we're fine to have another --

THE COURT: We won't have a hearing on June 4th.

MR. DIEDERICH: On June 4th, with the early June hearing, let's call it, with the recognition hearing. Is Your Honor still proposing that the provisional relief today be 14 days provisional relief and we have a subsequent hearing?

THE COURT: No, I think if you agree that the provisional relief will remain in place until, I given you that week that I'm available, and I'm assuming you will be able to work out a schedule for that.

MR. DIEDERICH: Absolutely.

THE COURT: If you stipulate the provisional relief will remain in place until the hearing that week, that's when we'll deal with it.

MR. DIEDERICH: Thank you, Your Honor. We'll do

that. So, Your Honor, I should move our declarations into evidence, I think that is appropriate to do.

THE COURT: You should.

MR. DIEDERICH: So, Your Honor, I'd like to move into evidence our declarations at Docket Nos. 3, 4 and 31. I hear bingo from my table. And so we move those into evidence now, Your Honor, on the understanding that, you know, we would --

THE COURT: And all the declarants will be subject to cross-examination at the time of the hearing.

MR. DIEDERICH: Absolutely. At the recognition hearing.

THE COURT: Any objections?

MR. SKINNER: No objections, Your Honor. As noted, we reserve our right to cross-examine during the deposition.

I would note that with respect to the extension of the provisional relief after the typical 14 day period, we'll agree to that but without prejudice to our right to come and seek relief earlier if necessary if something comes up at those depositions that we think warrants the Court's attention.

THE COURT: As long as it isn't June 2nd, 3rd, or 4th.

MR. SKINNER: It would be earlier than that I

believe, Your Honor. Thank you.

THE COURT: So the Court will now admit into evidence declarations which are ECF 3, 4, and 31 subject to cross-examination at the next hearing.

(Declarations ECF 3, 4, and 31 entered into evidence)

MR. BRESSMAN: Jeremy Bressman. Obviously, no objection, Your Honor. We just want to make sure because we're pushing off the corporate standing point until recognition that we're not going to get pushed back from counsel to the GPLs on our ability to cross-examine their witnesses and (indiscernible) as long as they're on board with that, we have no objection.

MR. DIEDERICH: I think, Your Honor, we have no problem with that as a provisional matter subject to what I said initially which is that we do believe that counsel should identify a client that's a party in interest other than the debtors themselves. We understand it's a question of BVI law, but where we currently understand BVI law being if counsel appears on behalf of the companies at the recognition hearing, we do intend to prosecute the standing and court authority objection.

THE COURT: I understand that. And, you know, I still am of the belief that it should be the BVI Court in the first instance that decides the issue of the standing of the various objectors to act on behalf of any other foreign

debtors.

MR. DIEDERICH: We completely agree, Your Honor, and so hopefully we can make some progress in the BVI on that basis.

THE COURT: I don't think there's any -- so I've had court to court communications with judges in Cayman, but I don't recall court to court communications with any of the judges in BVI, but I, but I leave that open as a potential issue.

MR. DIEDERICH: Thank you, Your Honor.

THE COURT: Okay. So in terms of the ruling today, and I intend to issue a written opinion on the issue, the Court grants the motion of the proposed foreign representatives for provisional relief. And we've had extensive discussion about the discovery. And I'm not deciding on issues about the scope.

If there are issues that come up, if you can't work them out, you will try to work them out. And to the extent that you can't work them out, my normal procedures will apply. Basically the party needing assistance of the Court arranges, lets my courtroom deputy know that you want a hearing and we'll do it the same day or the next day. And at most I will take letter briefs. I don't want extensive briefing.

And ordinarily I'm able to resolve those issues

very, very quickly. Occasionally I may ask for more briefing. But it does, you can tell me if I'm wrong, but this does seem to be an issue of BVI law, a standing issue.

MR. DIEDERICH: That's correct, Your Honor. That's correct. And we have no, you know, we're not, we don't think the standing issue will be relevant to discovery.

THE COURT: So what I will do is in the next day or so issue a memorandum opinion granting provisional relief, but the form of the order you ought to work out to the extent you can. I've already made clear with respect to discovery. I don't expect provisions other than that tracking the statute that gives the authority to the foreign representative to take discovery and it preserves the right of any, you know, party that receives a document request or a subpoena for a deposition, but it depends on the standing of that party to object.

MR. DIEDERICH: Understood. Thank you, Your Honor.

THE COURT: All right. Is there anything else that we need to deal with today?

MR. DIEDERICH: No, I think we're good on our end.

THE COURT: We're adjourned. Thank you very much.

ALL: Thank you, Your Honor.

(Proceedings adjourned 12:20 p.m.)

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

/s/ William J. Garling April 23, 2026

William J. Garling, CET-543
Certified Court Transcriptionist
For Reliable

/s/ Theresa Pullan April 23, 2026

Theresa Pullan, CET-782
Certified Court Transcriptionist
For Reliable