# EXHIBIT 7

## Transcript of April 17, 2026 BVI Hearing

IN THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE
BRITISH VIRGIN ISLANDS
COMMERCIAL DIVISION

CLAIM NO. BVIHC (COM) 2026/0027, CLAIM NO. BVIHC (COM) 2026/0001, CLAIM NO. BVIHC (COM) 2026/0002, CLAIM NO. BVIHC (COM) 2026/0003, CLAIM NO. BVIHC (COM) 2026/0004, CLAIM NO. BVIHC (COM) 2026/0005, CLAIM NO. BVIHC (COM) 2026/0006, CLAIM NO. BVIHC (COM) 2026/0007, CLAIM NO. BVIHC (COM) 2026/0008, CLAIM NO. BVIHC (COM) 2026/0009, CLAIM NO. BVIHC (COM) 2026/0010, CLAIM NO. BVIHC (COM) 2026/0011, CLAIM NO. BVIHC (COM) 2026/0012, CLAIM NO. BVIHC (COM) 2026/0013, CLAIM NO. BVIHC (COM) 2026/0014, CLAIM NO. BVIHC (COM) 2026/0015, CLAIM NO. BVIHC (COM) 2026/0016, CLAIM NO. BVIHC (COM) 2026/0017, CLAIM NO. BVIHC (COM) 2026/0018, CLAIM NO. BVIHC (COM) 2026/0019, CLAIM NO. BVIHC (COM) 2026/0020, CLAIM NO. BVIHC (COM) 2026/0021, CLAIM NO. BVIHC (COM) 2026/0022, CLAIM NO. BVIHC (COM) 2026/0023, CLAIM NO. BVIHC (COM) 2026/0024, CLAIM NO. BVIHC (COM) 2026/0025, CLAIM NO. BVIHC (COM) 2026/0026, CLAIM NO. BVIHC (COM) 2026/0028, CLAIM NO. BVIHC (COM) 2026/0029, CLAIM NO. BVIHC (COM) 2026/0030

BETWEEN:

IN THE MATTER OF SURE TYCOON LIMITED AND TWENTY-NINE OTHER COMPANIES

AND IN THE MATTER OF THE INSOLVENCY ACT, 2003 OF THE

LAWS OF THE VIRGIN ISLANDS

THE ATTORNEY GENERAL )
)
Applicant )
V )
)
1) AMBER HILL VENTURES LIMITED )
2) AUSPICIOUS TYCOON LIMITED )
3) BRIGHT TEAM GLOBAL LIMITED )
4) DELIGHTFUL THRIVE LIMITED )
5) EVEN SINCERITY LIMITED )
6) FULAM INVESTMENT LIMITED )

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

7) GIANT VICTORY HOLDINGS LIMITED )
8) GOLDEN ASCEND INTERNATIONAL LIMITED )
9) HARMONIC STATE LIMITED )
10) JUMBO HIGH LIMITED )
11) LATERAL BRIDGE GLOBAL LIMITED )
12) LUMINOUS GLOW LIMITED )
13) MIGHTY DIVINE LIMITED )
14) NOBLE TITLE LIMITED )
15) ORIENTAL CHARM HOLDINGS INVESTMENT LIMITED )
16) PACIFIC CHARM HOLDINGS INVESTMENT LIMITED )
17) PRAISE MARBLE LIMITED )
18) PRINCE GLOBAL GROUP LIMITED )
19) PRINCE GLOBAL HOLDINGS LIMITED )
20) RESPECTFUL STEED LIMITED )
21) RETAIN PROSPER LIMITED )
22) ROBUST HARMONY LIMITED )
23) SIMPLY ADVANCED LIMITED )
24) SOUTHERN HERITAGE LIMITED )
25) STAR MERIT GLOBAL LIMITED )
26) STARRY BLOOM LIMITED )
27) SURE TYCOON LIMITED )
28) SWORD RIVER LIMITED )
29) TOWARDS SUNSHINE LIMITED )
30) UNITED RICHES GLOBAL LIMITED SURE TYCOON LIMITED )
)
Respondents )
______________________________________________________)

TRANSCRIPT OF OPEN COURT PROCEEDINGS

Friday, 17th April, 2026
(10:01 a.m. to 4:42 p.m.)

BEFORE: HON. MR. JUSTICE GERHARD WALLBANK, K.C., Judge

Court Reporting Unit
Government of the Virgin Islands
Road Town, Tortola
British Virgin Islands

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

APPEARANCES:

O'NEAL WEBSTER
Chambers
Road Town, Tortola
British Virgin Islands
BY: SIR JAMES EADIE, K.C.,
MR. PAUL DENNIS, K.C.,
MRS. NADINE WHYTE LAING and
MS. KOYA RYAN
For the Applicant

KOBRE & KIM
Chambers
Road Town, Tortola
British Virgin Islands
BY: MR. PETER TYERS-SMITH
and MR. TIMOTHY DE SWARDT
For the KOBRE & KIM Respondents

CAMPBELLS
Chambers
Road Town, Tortola
British Virgin Islands
MR. ANDREAS GLEDHILL, K.C.,
MR. TOBY BROWN, MR. GRANT CARROLL,
MR. PAUL KENNEDY and
MR. DAN GRIFFIN
For the Campbell Respondents

WALKERS
Chambers
Road Town, Tortola
British Virgin Islands
MR. OLIVER CLIFTON and
MS. ALANNA-J JOSEPH
For the JPLs

* * *

P-R-O-C-E-E-D-I-N-G-S

* * *

(Matter commences at 10:01 a.m.)

THE BAILIFF: This Honourable Court now resumes its sitting.

THE COURT: Thank you very much.

Okay. So I take it the appearances are as yesterday, which for the record I will briefly read out. So we have Sir James Eadie KC with Mr. Paul Dennis KC and with Nadine Whyte Laing and Ms. Koya Ryan for the Applicant. We have Mr. Peter Tyers-Smith, and with him Mr. Timothy de Swardt and Mr. Merrick Watson for these so-called "Kobre and Kim Companies". We have Mr. Andreas Gledhill KC and with him Mr. Toby Brown, Mr. Grant Carroll, Mr. Paul Kennedy and Mr. Dan Griffin for the so-called "Campbells Companies". And then we have Mr. Oliver Clifton, and with him Ms. Allana J. Joseph of Walkers for the JPLs. We have the Attorney General present. And we also have in attendance Ms. Fiona Forbes and Mr. Stephen Grayson from the AG's Chambers. And the three JPLs, Mr. James Drury, Mr. Paul Pretlove and Mr. David Standish are all also in attendance. Yes.

So I think we were in the middle of

submissions from the Respondents or we have started those submissions from the Respondents, if I am remembering correctly, yes?

MR. GLEDHILL: My Lord, that's right.

THE COURT: And you had just taken me to be some photographs, which were quite important because they showed two things: One was a so-called phone farm, was not a phone farm or photograph of a phone farm of Mr. Chen or his fraud, but from a different fraud, of a different category, namely to boost viewing figures of large stream or streamed videos on platforms like presumably YouTube and things. That was one photograph.

The other photograph, it showed a man squirming on a hospital bed with a chair stuck to his nether regions that wasn't violence by Mr. Chen and his associates at all, but a gentleman during Covid who had sat himself down without clothes on and got, as [inaudible] would call it, his stone stuck between the slacks and the chair. Then there were a few other photographs which you had told me not to look at or talk about. Where I did get with my viewing of those, before you injuncted me from doing so, was to see that these pictures of men who had great big bloody slashes

on them or skin breaches, are apparently the victims not of violence of Mr. Chen or anybody else, but of over-enthusiastic use of Chinese massage techniques. And where I understand you are going with that, was that you have an application on foot or it will be on foot soon in the US to have various of the US legal proceedings set aside on account of it. Yes. So I think that's where we are right now.

And, of course, I am very concerned, very concerned to note that apparently once again, and I say "once again" because it's not the first time I have seen this US attorneys seem to think they need to embellish the record.

MR. GLEDHILL: My Lord, that's right. That's where we got to yesterday evening or yesterday afternoon Your Lordship's time. And if My Lord recalls the force of that submission then, was to make the point about the inherent dangers of doing justice in any jurisdiction, but specifically in the jurisdiction of public interest winding up on the basis of unproven allegations, because that's all the allegations in the United States are.

My Lord, before I go into the legal analysis, which is really at the heart of what Your Lordship is tasked with deciding, I am going to spend a

little bit of time, if I may, just in relation to the facts.

Now, I am hoping, I am assuming that Your Lordship has now had an opportunity of reading the skeleton argument which we filed.

THE COURT: I have seen it.

MR. GLEDHILL: I am very grateful for that. And that gives Your Lordship a pretty clear idea of what we say the relevant facts are for Your Lordship's purposes, but I am going to do two things. The first is I am just going to summarise what we say the absolutely crucial points from that are. And the second thing I am going to do is to then turn to one or two things where there have been developments or things that we have become aware of only since we have filed our evidence in these proceedings.

THE COURT: Yes.

MR. GLEDHILL: So starting with the facts, as we presented them in the skeleton argument. There are really four key points for Your Lordship's purposes, none of which we say are in dispute. All of these are clear on the papers that are already before Your Lordship.

The first point is that there is no allegation in the US Criminal Proceedings or the US

Forfeiture Proceedings that the Campbells Respondents were involved in wire fraud, hold or ever had held proceeds of crime or have ever been involved in money laundering or any other criminality.

In the course of his submissions to Your Lordship yesterday, Sir James repeatedly suggested that the assets which Campbells Respondents holds ultimately represent the proceeds of crime post-laundering. There is no evidence for that anywhere in the papers before Your Lordship.

The starting point is to note that the US Government expressly accepts in the U.S. proceedings that the Prince Group always had legitimate and profitable businesses, for example, in banking, in hotels, in casinos, that sat alongside the allegedly illegal ones which their refer to. We have given Your Lordship the references for that in our skeleton argument. You can collect those, if you wish, at paragraph 9.3, but the material passages are set out in the applications which Boies Schiller made within the US proceedings.

So there is both a legal, on the US Government's own case, there is both a legal and an illegal aspect to the Prince Group business.

The important corollary of that is that

it is plainly wrong to say that if an asset is owned by Mr. Chen or one of his associates, it can only represent the proceeds of alleged crimes. It may do; it may not, but whether it does in any given case is going to be a matter for evidence.

The only case in which anybody in the international community has made an allegation that a specific asset represents crime proceeds is in the US forfeiture claim. The only asset which the US Government alleges in the forfeiture claim to represent the proceeds of crime rather than the proceeds of Prince Group's admittedly legitimate business activities is the $15 billion hold of Bitcoin, the Defendant, Bitcoin.

The US Government says that an extensive investigation by the FBI has established that the two Kobre Respondents had dealings with that asset. They dealt with the Bitcoin. But following that investigation, it makes no similar allegation against the Campbells Respondents. There is no suggestions that we had any dealings in the Bitcoin, nor is it alleged in the US Proceedings that the Campbells Respondents have done anything else improper. No one has suggested, for example, were complicit in any way what happened in Cambodia.

And as I am going to show Your Lordship in a moment, the JPLs inquiries to date has thrown no evidence of wrongdoing either. So the highest matters go as against that, is that we were members of a group of companies owned and run by Mr. Chen and his associates. And it is, with respect, simply incorrect to suggest, as Sir James did, that there is anything in the evidence to the effect that our assets derived from criminal activity. And I'll come back to that point briefly at a later juncture in my submissions as well. So that's the first point from the facts.

The second point, turning to the US sanctions, for Your Lordship's purposes, they prove nothing relevant against the Campbells Respondents either. And so far as that's concerned, if I can invite My Lord to take out in Bundle 1, Tab 4, and turn up within that page 16, Bundle 1, Tab 4, page 161.

Does My Lord have that?

[Pause.]

THE COURT: Yes.

MR. GLEDHILL: My Lord, I don't know if you can hear me, but I am afraid you are breaking up and your image is frozen on screen.

[Pause.]

Can I check, can other people hear me

other than the Judge?

THE COURT: Hello.

MR. GLEDHILL: My Lord, yes. Do we have you back?

THE COURT: Yes, yes.

MR. GLEDHILL: My Lord, I am so sorry.

THE COURT: I have been here the whole time. I have been here the whole time, but then I have now switched wifi networks. Now I hope that's going to be slightly better.

MR. GLEDHILL: My Lord, I am very grateful, and I apologise. You image froze and we couldn't hear you, so I wasn't aware.

So I had directed you to Bundle 1, Tab 4, page 161.

THE COURT: Yes.

MR. GLEDHILL: As you will recall, I am on the point about what the US sanctions show Your Lordship.

THE COURT: Yes.

MR. GLEDHILL: The document in front of you --

THE COURT: Okay. Hold up, please. Can I ask everybody else who is not talking

right now to mute or take their videos off because I do have a bandwidth problem, according to this. The Court's router, which I am using, apparently has a low bandwidth. Very good. Now that everybody has disappeared, we might have a better reception.

MR. GLEDHILL: My Lord, yes.

THE COURT: Very good. Excellent. Okay.

MR. GLEDHILL: So looking at bundle page 161, what you have here is the annex to the Press Release by OFAC, by the Department of Treasury indicating the entities which had been the subject of sanctions in October of last year. And this is the list of companies which were part of that sanctions designation. And for your purposes what matters is the text right at the top under the heading:

"The following entities are being designated pursuant to Executive Order of 13581, as amended by Executive Order for being owned or controlled by, or having acted or purported to act for or on behalf of, directly or indirectly, Chen Zhi."

And if you look at No. 2, Auspicious Tycoon, that's one of the Campbells Respondents.

All 25 of the Campbells Respondents are on this list, but the key thing to focus on is the

reason. And as I have just read out, the reason is based entirely on either ownership or control by Chen Zhi.

So being on this list does not suggest that any of these Companies have done anything illegal. All it means, once again, is that they are either owned or controlled by Mr. Chen or have in the past acted for him, whether directly or indirectly. That's all the facts of the making of US sanctions tells you.

THE COURT: Yes.

MR. GLEDHILL: The third point, turning to the sanctions imposed by the UK's Foreign Office, those don't prove anything relevant against the Campbells Respondents either.

As you've heard from Sir James during the course of his submissions yesterday, the FCOO sanctions were made under the Global Human Rights Sanctions Regulations or GHRSR for short. So the UK sanctions have a rather different focus to the US sanctions.

In point of fact, only one of the 25 Campbells Respondents was, in fact, sanctioned by the Foreign Office. That's a Company called Prince Global Group Limited, which I'll refer to as PGGL. And all the designation of that Company tells you is that the foreign secretary had "reasonable cause to suspect"

PGGL of compliciting human rights violations.

And just to make that good, if I can invite My Lord to take out in our Authorities Bundle Tab 10.

THE COURT: Yes. One moment. Campbells Authorities Bundle. We don't seem to have tabs in this version, so can you give me the page, please.

MR. GLEDHILL: Page 268.

THE COURT: 268. Okay.

MR. GLEDHILL: Just so that you can see what you are in.

THE COURT: Yes.

MR. GLEDHILL: So I am showing the --

THE COURT: I am looking at the Sanctions Regulation 2020.

MR. GLEDHILL: My Lord, yes. And if you could please go on to bundle page -- give me one moment, I have given myself a duff reference. At 272, please.

THE COURT: Yes, "Conditions for the designation of persons by name".

MR. GLEDHILL: Yes. And what we are concerned with for this purpose are paragraphs

(3) and (4):

"(3) The Secretary of State may not designate a person except where condition A is met.

(4) Condition A is that the Secretary of State has reasonable grounds to suspect that that person is an involved person."

So the designation of PGGL tells you and tells you only that the Foreign Secretary considered that she had reasonable cause to suspect a complicity in human rights abuses. And we make the point in our skeleton argument that you take note, of course, of the fact that she didn't evidently conclude herself to have the same course as suspect in relation to the other 24. But even in relation to PGGL, the designation tells Your Lordship nothing from an evidential and probative point of view. And to make that good, if I can take you on in our authorities bundle, please, to a case which you find if you go to page No. 896.

THE COURT: Yes.

MR. GLEDHILL: My Lord should have a case called LLC Synesis. It's a case of Mr. Justice Jay. And he is not dealing with the regulation that Your Lordship is dealing with, but he is concerned with regulation in materially similar terms.

THE COURT: Yes.

MR. GLEDHILL: And within that, if you please turn on to page 916. Mr. Justice Jay in this case discusses the distinction between the material and the process by reference to which the relevant government minister can come to the conclusion that he or she has reasonable cause to suspect and the standard of proof within a civil law context in an English court.

THE COURT: Yes.

MR. GLEDHILL: So picking it up at paragraph 71:

"A distinction needs to be drawn and maintained between the statutory threshold - 'reasonable grounds to suspect' - and the standard of review applied by this court."

And then you can omit paragraph 72. And can I ask you just to read, to save my speaking voice, paragraph 73 through to yourself.

THE COURT: Yes. One moment.

(Court reads document.)

Right.

MR. GLEDHILL: So the submission is that in a court of law, which unlike the

[inaudible] estate is not entitled to have regard to inadmissible material or material which might not strictly be considered to be probative. The mere fact that the UK Government has designated PGGL proves nothing, even as against that one company, let alone as against the other 24, which had not similarly been designated.

The fourth point: Although PGGL was the only Campbells Respondent designated under the US and BVI and UK sanctions regime, under the UK and BVI sanctions regime, as Your Lordship appreciates the effect of the designations that were made was to freeze the assets of most and probably all of them, both in the BVI and in the UK. And if you take out our skeleton argument and within that please look at paragraph 11.2.

THE COURT: Yes.

MR. GLEDHILL: You will recall that we explained the reason for that there. So the effect of sanctions is not only to freeze the assets of the designated person, but it's also to freeze the assets of persons either owned or controlled by the designated person.

Now, as I say, it's slightly unclear whether all of the assets of each of the Campbells

Respondents was, in fact, frozen because in some cases that will turn on the test of control. That's an evidential question and there isn't evidence in relation to that in front of Your Lordship. But it is pretty clear, as we point out in our skeleton argument at paragraph 15.3, that certainly 20 of the Campbells Respondents satisfy the ownership test and consequently that at all material times after October of last year, their assets were the subject of a freeze as a result of the designation of the people who were sanctioned.

Now, in my learned friend's skeleton argument for this hearing, even as late as exchange of skeletons on Tuesday of this week, there was still a suggestion made that if Joint Provisional Liquidators had not been appointed when they were appointed by Mr. Justice Mithani, that Mr. Chen and those connected with him were free to make up with the assets or to deal with them without any inhibition. And for the reason I have just given, that is in point of fact mainly incorrect.

That proposition was, of course, fundamental to the decision which Mr. Justice Mithani made in January of this year to order to appoint Provisional Joint Liquidators when he did that ex parte.

And I make the point in passing that it was also plainly central to the assessment that the Applicant originally made as to whether or not the public interest required these companies to be wound up. She was acting under a misapprehension. That misapprehension was then conveyed and relied upon by Mr. Justice Mithani. So both the 9th of January Order and the Applicant's original determination of what the public interest required in this case were for that reason based upon a mistaken premise.

My Lord, that's all I was going to say by way of summarising the factual section in our skeleton. I am now going to supplement what we said there by reference to two matters, both of which have come to our attention since we filed our evidence in these proceedings, which was Mr. Borrelli's first witness statement, which we filed on the 24th of March.

I want to start off the first topic, if I may, by showing you two things. And the first is something that you find if you now go to Bundle No. 3.

THE COURT: Yes.

MR. GLEDHILL: And within that turn up Tab 1, page 1.

THE COURT: Yes.

MR. GLEDHILL: My Lord, should

have a document headed "Notice of Opposition".

THE COURT: Yes.

MR. GLEDHILL: So this is the Notice we filed before the hearing before Justice Mithani on the 3rd of March:

"Take notice that the Respondents oppose the Applicant's Notice of Application for an order appointing liquidators for the following reasons:

1. The Companies oppose the Applicant's PL Application, continuation of the provisional liquidation orders and the Liquidation Application.

2. There is no evidence of any wrongdoing by the Companies. The entirety of the evidence relied upon by the Applicant amounts to little more than allegations in the press release concerning the ultimate beneficial owners and the fact that proceedings had been instigated in the United States against certain ultimate beneficial owners."

So, in effect, in this document, filed now slightly over five weeks ago, we threw down the gauntlet and made plain that our case was that these applications are fundamentally defective because the Applicant is not making good any substantive allegations of wrongdoing as against the Campbells Respondents. That's the first point I wanted to make.

The second arises out of an authority, and you find that within our Authorities Bundle at bundle page 388 and if you are using tabs, that should be Tab 16.

THE COURT: Yes.

MR. GLEDHILL: And if My Lord has that, this is the case of Re Walter Jacob Ltd, which Sir James took you during the course of yesterday morning. We relied on it in our skeleton for the proposition that on a petition to wind up on public interest grounds, the Applicant has to discharge the order of civil standard of proof on the balance of probabilities. And I am going to come back to that point in due course.

But for immediate purposes, I wanted to get a slightly different point out of this or authority, which arises from something that you see at bundle page 398.

THE COURT: Yes.

MR. GLEDHILL: Sir James explained to you yesterday, this was a public interest winding up petition that was tried before Mr. Justice Harman and it went up to the Court of Appeal on the appeal of the Secretary of State who made various criticisms of the way in which the Judge had conducted

the first instance proceedings. And one of the criticisms was that he had excluded certain evidence. And if My Lord has page 398 open, I am looking at the paragraph just beneath letter F.

THE COURT: Yes.

MR. GLEDHILL: "Further, and still in the context of the adequacy of the accounting records, I must mention the reports prepared by the special manager. It seems that when the petition was heard on 7 July..., the official receiver was represented in court by counsel, who had available to him the first three, and possibly the fourth, of the reports prepared for the official receiver by the special manager. After the evidence of the petitioner and the company had been read to the judge, counsel for the petitioner asked the judge to hear the official receiver. Without calling upon counsel for the company, the judge took the view that the Secretary of State was seeking to boost his case by introducing new evidence. He declined to hear the official receiver.

In my view the judge fell into error in so ruling. I can see no basis on which, in the exercise of his discretion in this case, he could properly have refused to see the reports in question. No doubt the contents of a report made by an official

receiver acting as provisional liquidator, or the contents of a report made by a special manager appointed by the court, may assist one or other of the parties to a winding-up petition. In my view, far from that being a reason for the court not receiving those reports, it is a reason why the court should admit them."

And the reason I show you this is to make good the point that where provisional liquidators have been appointed in the context of a public interest petition alleging impropriety, certainly in England it is perfectly orthodox for the provisional liquidator to put in a report at the hearing of the petition assisting the court in a neutral way, of course, by setting out what he or she has learnt since appointment about whether those allegations of impropriety are well-founded or not. There are no such reports in evidence before Your Lordship and it may be helpful to explain why that is.

After the ex parte order was made on the 9th of January, there was a further short hearing before Mr. Justice Mithani on the 29th of January on which we weren't represented, at which the appointment of the joint provisional liquidators was confirmed pending the hearing of the petitions to wind up, which

are now before you.

And we know from the order made on that date, I don't need to take you to it, but for your note it's Bundle 2, Tab 10, page 479. That by that time, the JPLs had filed reports. We know that because the Attorney General asked for and got when ordered that those reports be not open for inspection on the court file.

Now, we have, in fact, asked for those reports a number of times in correspondence. And just to show you an example of that, if you take out the bundle marked 7, so the correspondence bundle, within that it's Tab 32 at bundle page 743.

THE COURT: Okay.

MR. GLEDHILL: Tab 33, I am sorry. Does My Lord have that page?

THE COURT: I am getting there. Sorry it was page? I have got the bundle open. And page what, please?

MR. GLEDHILL: 743, please.

THE COURT: 743. Yes, I am there.

MR. GLEDHILL: So it's a letter from Campbells to the Attorney General's legal representatives, O'Neal Webster. Looking at the first

paragraph under the rubric "JPLs Reports":

"We refer to the two Joint Provisional Liquidator reports filed in the various proceedings, which are subject to a court seal. An application was filed on 1 March seeking the unsealing of the reports. At the hearing on 2 March... the issue of the sealed reports is ventilated. His Lordship Justice Mithani confirmed that he has not yet read the JPL reports."

Skipping to the last paragraph:

"In any event it did not appear that His Lordship supported the continued sealing of the JPL reports as against the Campbell PL Companies. It was suggested that this issue could be dealt with via correspondence. Against this backdrop, we would be grateful if you would please confirm that you are now in agreement to the JPL reports being released to the Campbells Respondents forthwith."

So by this stage, there are two JPL reports. The Applicant has seen both of them. The Judge has suggested, Mr. Justice Mithani has suggested that the matter be dealt with in correspondence and we have written asking for them, but the Applicants stonewalled that request. There was never a substantive reply to this letter and so we have never had access to those reports. Why might that be? And,

of course, we don't know, but we submit that there are good grounds to infer the answer from something else I can show Your Lordship. If we now go into Bundle 5 and within that, please, turn up Tab 7, which is at bundle page 164.

Does Your Lordship have page 164 open?

THE COURT: I do.

MR. GLEDHILL: My Lord, can see from looking at this document what this is. It's something that Your Lordship is likely to have seen many times before. This is an application to the US District Court in New York under Chapter 15 of the US Bankruptcy Code seeking recognition the Applicants are the Joint Provisional Liquidators from the BVI. And if My Lord looks at the top of bundle page 164, you can see that this application is marked filed on the 8th of April 2026. So that's on Wednesday of last week.

THE COURT: Okay.

MR. GLEDHILL: And this application was -- forgive me.

THE COURT: Yes, I am looking at it.

MR. GLEDHILL: And this application was supported by a declaration from one of the Joint Provisional Liquidators from Mr. Pretlove.

And My Lord finds that within the same bundle by going on a few pages to bundle page 194.

THE COURT: 194. Okay. Yes.

MR. GLEDHILL: So that's Mr. Pretlove's declaration in support. So he deals mainly with the facts. There is other one deals with law, which we don't need to look at. For my purposes, what matters within this starts at bundle page 200.

THE COURT: Okay.

MR. GLEDHILL: And My Lord sees on the fourth line of that page there is a section (iii) "Criminal Investigations and Sanctions".

THE COURT: Yes.

MR. GLEDHILL: And from there, for a number of pages continuing over, Mr. Pretlove sets out the broad nature of the allegations against the Prince Group relying for that purpose heavily for the summary of the US criminal indictment and the forfeiture action. And the summary runs on all the way down to bundle page 207. If you could go to that, please. Finishing with the paragraph 37. And then if you are on page 207, you can see that there is a paragraph 38 headed "Independent investigations by the JPLs". 38:

"The JPLs have not completed an independent professional investigation of facts relevant to their mandate and have not yet formed any view as to the merits of the allegations included in the Indictment, the Forfeiture Complaint, the sanctions designation or the various other materials cited above."

THE COURT: Right.

MR. GLEDHILL: So it's quite clear from the passage that I have just read to Your Lordship that the JPLs have been looking for evidence to see if there is anything to support the substantive allegations that the Campbell Respondents have received the proceeds of crime or have been involved in money laundering activity.

I said a moment ago to Your Lordship that when we filed our Notice of Opposition five weeks ago, we effectively threw down a gauntlet. That gauntlet has been picked up. But after three months of no doubt expensive work, the JPLs have unearthed nothing to suggest that the Campbells Respondents have been culpable of impropriety. There is nothing in this document suggesting that there is anything to corroborate the suggestion that the Campbells Respondents have been involved in human rights abuses,

wire fraud, receiving of proceeds of crime, money laundering or that the assets they hold are traceable to crime.

Now, the JPLs are, of course, officers of the Court and as such should, of course, be neutral as between the parties to this application. If the outcome of the JPLs investigation to date has been that they uncovered nothing to suggest that the Campbells Respondents were involved in wrongdoing, I respectfully suggest that that is a pretty material point which Your Lordship was entitled to be told about, most obviously by means of report from the JPLs which, as I have pointed out, it would certainly have been customary in England. But instead of that, as I have explained, the Applicant has ensured that the JPLs reports are sealed and has simply stonewalled request from us that she make them available.

The only reason that you are in a position to know today that three months into their investigation the JPLs have unearth precisely zero evidence of wrongdoing is because of Mr. Pretlove's statement within the US Recognition Proceedings. And I point out that we only ever obtained this document at all by chance. Neither the Applicant, nor the JPLs, told us they were making this application. We only

found out about it because it popped up on an online news alert allowing us to get the documents off the court file.

And, My Lord, that is not the only point on which a bit of neutral input from the JPLs might have been of some assistance to this Court. If My Lord could keep Mr. Pretlove's declaration to hand for a moment. Just give me a moment just to get -- we just keep Mr. Pretlove's declaration to hand for a moment.

THE COURT: Yes.

MR. GLEDHILL: And now also get out Bundle 1.

THE COURT: Yes.

MR. GLEDHILL: And within that turn up Tab 3, page 18, which should be the Attorney's first witness statement for the purposes of these proceedings.

THE COURT: Right.

MR. GLEDHILL: And the witness statement in the bundle is, as it happens, is one for a company called United Riches Global Limited. And as I understand it, it's the same witness statement that has been replicated in relation to each of the 30 Respondents. So it's substantially the same in each case.

And if My Lord turns on within this to bundle page 28, you will be in a section where the Attorney is setting out her summary of what it is that justifies the making of a winding up order on the just and equitable ground.

Does My Lord page 28 open?

THE COURT: Yes.

MR. GLEDHILL: Paragraph 45, she says:

"It is also just and equitable that liquidators be appointed over the Company for the following reasons."

The paragraph that matters for present purposes is paragraph f:

"The Company is alleged to be a shell company which was used solely as a vehicle for the fraudulent scheme."

Now, My Lord may remember, having read our skeleton argument, we have made the point there that all the Applicant knows about this is what she has learnt from public pronouncement in the United States. And that even taken at face value, those announcements do not support the proposition that My Lord sees at 45f. The references for that point, if Your Lordship wanted to chase them down, were in paragraph 28 of our

skeleton.

But more relevantly, for the purposes of the point that I am now on, if it were, in fact, the case that the Campbells Respondents were mere shell companies whose function were to be "vehicles for the fraudulent scheme", you would have expected the Joint Provisional Liquidators to say that in their evidence to the US Court for the purposes of the Chapter 15 Recognition Application. It would have been pretty easy for them to establish that point early doors that these companies had no genuine operational activity. And if so, that would have been a highly material point to make, but there is nothing to that effect in Mr. Pretlove's declaration.

More than that, there is, in fact, a passage which is flatly inconsistent with the proposition that you have just seen advanced in the Attorney's witness statement. And if you now take his witness statement back out, his declaration for the US proceedings. So we are back in Bundle 5, and this time, please, if you turn to page 211.

THE COURT: 211, okay.

MR. GLEDHILL: Does My Lord have a page in the middle, "B sanctions Impact and Licensing Efforts"?

THE COURT: I do, yes.

MR. GLEDHILL: Could I invite you to save my reading voice to read to yourself paragraphs 49, 50 and 51, and then I'm make some points about this.

THE COURT: Okay.

(Court reads document.)

Yes.

MR. GLEDHILL: And for your purposes, the important point to note, making the obvious point perhaps, beginning at paragraph 49:

"The sanctions described above have had immediate and severe operational consequences for the Debtors."

So far from the Company being, as the Attorney claimed in her evidence, "mere vehicles for fraud", the passage I have just invited Your Lordship to read is consistent and consistent only with them having, not only significant operations, but also perfectly legitimate operations, because otherwise the Joint Provisional Liquidators would not have needed to apply for licenses from sanction and nor presumably would OFAC have been prepared to grant them.

THE COURT: Yes.

MR. GLEDHILL: My Lord, that's

what I wanted to say about the US Recognition Application.

And the only other point that I wanted to make in relation to the facts before I turn to legal submissions arises out of another document which My Lord finds in Bundle 5. This time it's Tab 6 at page 130.

THE COURT: Yes. Page 130.

MR. GLEDHILL: Please.

THE COURT: Judicial Review Claim Form.

MR. GLEDHILL: My Lord. So My Lord is aware that the sanctions in the UK have been imposed under the GHRSR. The document My Lord has open before him now is a claim by a man called Zhongbiao Zhu. Mr. Zhu is one of those who was sanctioned by the UK and the BVI last October. And My Lord can see just from the front sheet that this was a claim for judicial review.

If My Lord turns on to bundle page 148, you should have the accompanying Statements of Facts and Grounds. And for my purposes it's enough just to show you two very short passages in this. The first is one is at bundle page 155.

THE COURT: Yes.

MR. GLEDHILL: D, in the middle of the page, a little beneath the middle, grounds for judicial review.

"The claimant proposes to seeks judicial review on the essential basis that:

Insofar as... the 2018 Act and the 2020 Regulations permit the designation of an individual on the basis of past involvement in 'gross violations of human rights', they are unlawful because they are incompatible with the minimum procedural protections required by Article 6... and/or at common law."

So you see the general drift of the argument.

And turning on the final page of the document, please, which is bundle page 163.

THE COURT: Yes.

MR. GLEDHILL: You will see from that last page that this claim has been settled by some names that may be familiar to you. Paragraphs 29 and 30, the relief that's sought:

"...the Claimant submits that the 2020 Regulations... are unlawful."

Paragraph 30:

"The Claimant seeks: an order quashing the relevant part of the 2020 Regulations; and a

declaration of incompatibility..."

Now, it's my understanding that a permission decision in respect of this judicial review claim is still awaited. So, as things stand, there is at least the possibility that the legislation which has resulted in Chen and the others being sanctioned, both in the United Kingdom and in this jurisdiction will be quashed. This document maintains that the GHRSR is, in material part, unlawful.

Now, of course, as at today's date, that is no more than an unsubstantiated argument yet to be tested in court. But then, of course, we say exactly the same holds good in relation to the entirety of the Applicant's case for winding up.

My Lord, that's all I was proposing to say about the facts. I am now going to turn to the law. And the starting point so far as that is concerned is to say something about the decision framework within which Your Lordship is operating for the purposes of determining these applications.

And Sir James, of course, has already made some points to you in relation to that and I am going to hope to avoid repeating anything that he has already said during the course of his submissions.

So far as the decision framework is

concerned, we have made the point in our skeleton argument and I don't need to take you to the authority at the moment. That the leading authority in this jurisdiction in relation to just and equitable winding up is the Privy Council's decision in a case called Lau v Chu, which was an appeal from a just and equitable petition decided in this court. That's in Tab 25 of our Authorities Bundle, but I am going to take it to you at this stage. I will come back to it later. Because the short point for which it's authority which matters for your purposes is that:

"...the UK case law is the primary source of authority for the scope of the jurisdiction, and the principles upon which it is to be exercised..."

And that's Lord Briggs at paragraph 9 of that decision.

THE COURT: Yes.

MR. GLEDHILL: It is however necessary to draw your attention at the outset to two respects in which the UK statutory scheme for public interest winding up petitions differs from the statutory scheme in this jurisdiction. One of those differences we say makes no substantive difference at all; the other one potentially does. Within our authorities bundle at Tab 1, page 1, you will have a

copy of the UK statutory provision governing public interest winding up petitions.

Does My Lord have -- I think we have lost the Judge again.

(Pause.)

THE COURT: Sorry, I dropped, but I am back.

MR. GLEDHILL: My Lord, I am very grateful.

I just asked you to go in our authorities bundle to Tab 1, page 1.

Does My Lord have a copy of the English Insolvency Act 1986 open?

THE COURT: Yes.

MR. GLEDHILL: Section 124A.

THE COURT: Your Authorities Bundle, Tab 1?

MR. GLEDHILL: Page 1.

THE COURT: Page 1. Yes, yes, yes. Page 1. Very good. That is the Insolvency Act 1986.

MR. GLEDHILL: Yes. Section 124A, subjection (1):

"Where it appears that the Secretary of State from -

(a) any report made or information obtained from..."

And then it recites certain statutory provisions.

Or: "(b) any report made by inspectors..."

Skip over (b), (c) and (d).

"That is it is expedient in the public interest that a company should be wound up, he may present a petition for it to be wound up if the court thinks it just and equitable for it to be so."

And then My Lord also has the BVI statute in our Authorities Bundle at bundle page 1 -- one moment. No. In fact, it is easiest to go to it in Sir James Eadie's Authorities Bundle, because our print of the Act was slightly incomplete.

THE COURT: Okay.

MR. GLEDHILL: So that is -- give me one moment. Yes. It's in his authorities bundle at page 4.

THE COURT: Yes. Okay. All right. Yes.

MR. GLEDHILL: And as My Lord can see, just looking at Section 162, sub (1), it is a rather simpler provision and it is different to the

English one. 162:

"The court may on application by a person specified... to appoint a liquidator of a company... if -

(a) the company is insolvent;

(b) ...just and equitable; or

(c) the Court is of the opinion that it is in the public interest for a liquidator to be appointed."

So there are two points of distinction to note between the BVI statutory scheme and the English scheme.

The first is that whereas in the BVI the public interest ground is drafted as a freestanding ground of winding up, in England it's expressed slightly differently. In England, at the first stage the secretary of state decides what is or what is not in the public interest and decides the petition, but the actual ground of winding up in England is the just and equitable ground.

Now, that's the point that I say makes no substantive difference to your exercise, because as I'll show Your Lordship in a moment, it's clear on the English authorities that unlike public interest petition, the Courts have to consider for themselves

the public interest which will or will not be served by the making of a winding up which I think addresses a question which My Lord raised yesterday afternoon during the course of my learned friend, Mr. Dennis' submissions. So both jurisdictions do substantially the same exercise and this difference is, I respectfully suggest, purely one of form rather than of substance.

The second point however to note is that in deciding whether to petition or not, the Secretary of State in England is entitled and indeed required to have regard to the matters listed in section 124(a)(1), which I looked up with My Lord a moment ago, which includes reports made by inspectors appointed to investigate under the provisions of the Companies Act.

Now, as Your Lordship has seen, there is no counterpart to those provisions in the BVI statute and that lead to a point of real difference. And I can show you what it is if we now have a look at a case in our authorities called In re St. Piran Ltd and that's at Tab 2 of our authorities -- forgive me. Tab 158 of our authorities and bundle page 379.

THE COURT: 379, yes, In re St. Piran Ltd.

MR. GLEDHILL: That's the one.

Your Lordship is ahead of me.

Within this could we please turn to bundle page 383.

THE COURT: Yes.

MR. GLEDHILL: Just by way of preface, what had happened in this case was that inspectors appointed by the Secretary of State had made a report to the Secretary of State. It was in the public domain. The Secretary of State didn't then himself a petition, but a contributory did, seeking to rely on the contents of the Inspector's report. And the question was, among other things, the extent to which member of the public could rely upon reports which had commissioned pursuant to the statutory process. The Judge is Mr. Justice Dillon. And looking at bundle page 383, if My Lord picks it up in the final paragraph starting just a line or so above the letter H, the Judge says:

"There is no doubt at all that the general rule is that allegations in a winding up petition must be proved by proper evidence in accordance with the ordinary rules as to the admissibility of evidence in civil litigation and not by hearsay. In addition it is a rule of practice, though not an inflexible rule of law, that a

contributory's winding up petition in which allegations of fraud or serious misconduct are made should be supported by affidavits to prove the fraud or misconduct in addition to the statutory affidavit. There are however, two well-established exceptions to the rule about hearsay evidence.

The first is the Court is entitled to act on the statutory affidavit, although it is often hearsay..."

And then picking it just above letter B, My Lord:

"The second exception to the hearsay rule is that the court hearing a winding up petition can accept the contents of a report by inspectors appointed by the Secretary of State under the Companies Act 1948 as material which it is proper for the court to take into consideration if, at any rate, the petition has been presented by the Secretary of State under section 35" which is the precurser provision to section 124(a) which I showed Your Lordship a moment ago.

So in the United Kingdom, in England and Wales, the position was formerly as it still is, in this jurisdiction the hearsay evidence is subject to exceptions inadmissible, but there was a significant exception for that in the case of company inspector

reports, subject to that the normal rules of admissibility and exclusion for hearsay apply.

In England, that point matters very much less if indeed at all now than it formerly did, because the bar on hearsay was removed by the Civil Evidence Act 1995. And the point that a statement is hearsay now goes to weight rather than to admissibility. But, of course, in the BVI the position is different and there is no equivalent of an inspector report upon which a court would be permitted to rely by way of a hearsay exception.

Just to remind My Lord, I am sure you are very familiar with it, but just to remind Your Lordship of the controlling provisions in the Evidence Act. That's back in our Authorities Bundle at Tab 8, bundle page 123 is where it starts.

THE COURT: Yes.

MR. GLEDHILL: And if I can start it off by taking you to bundle page 137, in transit, as it were, to provisions I really want to get to. If you have 137, you are in the midst of the definition section.

THE COURT: Okay.

MR. GLEDHILL: And three-quarters of the way down the page, do you see the

definition of the term "previous representation".

THE COURT: Yes.

MR. GLEDHILL: "Previous representation means a representation made otherwise in the course of the giving of evidence in the proceedings in which evidence of the representation is sought to be adduced."

So that's the important definition.

If you now move on please, to bundle page 163. You should have Part 12 of the Act.

THE COURT: Yes.

MR. GLEDHILL: Entitled "Exception to the relevant rule hearsay". 67, sub (1) Entitled "Exclusion of hearsay evidence.

Evidence of a previous representation is not admissible to prove..."

That's the term you've just see defined.

"...is not admissible to prove the existence of a fact that the person who made the representation intended to assert by the representation (in this Part referred to as an 'asserted fact')."

So that's the prohibition.

And then over the page, there are provisions creating exceptions from that at paragraphs 68, 69 and 70. And those will likely be very familiar

to Your Lordship, but those exceptions are inapplicable in this case for at least two reasons. The first is that hearsay notices would have had to have been served under Section 73, and they never have been. Because as you have heard for the purposes of this hearing, the Attorney frankly disavows any reliance on the substance to the allegations made in the United States or indeed in press announcements in the United Kingdom or anywhere else.

And the second point is that even were it not for the lack of hearsay notices, looking at Section 68 on page 164, if you have it open, the exceptions that follow in Sections 69 to 70 only apply to firsthand hearsay. And that exception wouldn't have helped the Applicants here because the allegations she is relying on are multiple hearsay.

And just to give you an example of why I say that. If you put the Act away and get out Application Bundle 1, and within that go to Tab -- Application Bundle 1. I am looking at Tab 4 and within that at bundle page 134.

THE COURT: Page 134.

MR. GLEDHILL: Yes.

THE COURT: Okay.

MR. GLEDHILL: You have the

United States Department of Treasury press release. This is the press release. You looked at the appendix a moment ago with you.

THE COURT: Yes.

MR. GLEDHILL: And can I ask you please to turn on to page 139. This is just an illustration of the point I am making by reference to the Evidence Act.

Do you have 139?

THE COURT: Yes.

MR. GLEDHILL: The first paragraph on the page is detailing some of the allegations that had been made publicly about the Prince Group's business methods. And two lines down from the top of the page you can see that these are allegations referring to man called Lei Bo. And about six lines down from the top of the page, the sentence starting "He and Ing Dara. Do you see that? So:

"Lei Bo and Ing Dara maintained an ownership interest in the Golden Fortune scam compound, where locals have told journalists that they have seen workers 'beaten until they are barely alive' before being forcefully returned after escaping."

So this is multiple hearsay. Workers have told journalists, journalist have published the

allegation and the Department of Treasury is then relying on it in a press release. And the Applicant in these proceedings, the Attorney in these proceedings is relying on an allegation which, as I say, is multiple hearsay.

So those are the two points of difference that I just wanted to draw out for My Lord between the English and the BVI statutory frameworks. And the key point to emerge from that is that there is, in fact, no admissible evidence of wrongdoing by anyone before Your Lordship.

That only leaves one other preliminary matter which I wanted to cover before turning to submissions, which is to take you back to the leading UK authority which Sir James yesterday on how you exercise your discretion in the context of a public winding up application. And that in our authorities is Tab 28 at bundle page 768.

THE COURT: 768, Secretary of State for Business, Energy and Industrial Strategy v PAG.

MR. GLEDHILL: Yes.

And, My Lord, Sir James took you to yesterday to the material passage in this and invited you to mark it. It's at bundle page 779. It

was paragraphs 38 and 40. And I just wanted to take My Lord back to it to flag or make three short points.

THE COURT: Yes.

MR. GLEDHILL: So the first one arises on bundle page 780 out of paragraph 40, which makes good the point that I made to Your Lordship a moment ago, that even on the different language of the English statutes, the Courts in England considered for themselves what the public interest requires. So just reading 40 out so we know what we are talking about.

"It is important to bear in mind, therefore, although the opinion of the Secretary of State that it is expedient in the public interest that a company should be wound up is the prerequisite to the presentation of a petition by him or her, it is for the court to carry out a balancing exercise based upon all the circumstances and all the evidence... It must weigh the factors which point to a conclusion that it would be just and equitable to wind up the company against those which point away from it. In order to carry out the balancing exercise, where the petition is based upon the public interest: 'the court must be able to identify for itself the aspect or aspects of public interest which, in the view of the court, would be

promoted by making a winding up order in the particular case'."

So the Secretary of State's determination in England that it is in the public interest to bring a petition does not mean that the Court itself does not have to reach its own view on that point.

And that point, with respect, has special force on the facts of this case, given the point that I made to Your Lordship earlier, that the Applicant's original determination here as to what the public interest required, was premised at least in part, on a faulty misunderstanding of none of or only one of the Campbells Respondents was, in fact, subject to an asset freeze as a result of sanctions in the BVI and the UK.

Secondly, staying within that case, and turning now back to bundle page 779, looking now at letter F, you can see between paragraphs F, continuing in paragraphs G and H, as Sir James pointed out to you yesterday, there is a discussion about whether for the purposes of invoking the Court's jurisdiction, it is necessary to prove illegality on the part of the Respondent Companies. And the answer over the page at paragraph H is no. It can be enough to show what's referred to as "a lack a commercial probity".

But the simple point to make here is that

whether the test is illegality or less or lack of probity, that has to be established and established by admissible evidence. The statutory question for the Court, which it is tasked with determining is, is it in the public interest for this company to be permitted to continue to trade? If not, is there a risk that it might not be?

THE COURT: Okay. Let me stop you here. I don't want to waste any time, but I think it's important for me to understand. In an insolvency winding up situation, then usually what happens is that the Court ask itself, first of all, do I have jurisdiction to wind up the company? And in a sense the Court has a jurisdiction to wind up any company. That's just a very broad statement. But has the threshold been met for the Court to start considering its discretionary powers over whether or not to wind up a company?

So, for example, usually it's simply a case of either seeing whether a company is able to pay its debts as they fall due or whether it is balance sheet solvent or insolvent. But once those things are established, the next thing is the Court have to ask itself, is it in all the circumstances of the case the right order to wind up the company? And usually it

will be. But then because there are creditors out there who need to be satisfied or partially satisfied or -- yes.

So basically it's a two-stage process. One is, are the circumstances satisfied for the Court to consider making a winding up order? That's the first step. In other words, is the Court's power or jurisdiction engaged? That's the first question. Because, of course, if the Court doesn't have power or doesn't have jurisdiction, then that's fundamental, it can't make an order. So you first of all have to ask, do I have the power to make an order? That's the first question.

And then the second question is, should I exercise the power to make an order on the facts of the case as demonstrated by the evidence, whatever that evidence is? So it's a two-stage process usually.

How are we in terms of that for a public interest winding up application? Is it the same two-stage process or do you say that basically to engage the power of the Court, there first of all has to be sufficient evidence to satisfy the Court that there is, in fact, a public interest that would be served by winding the Company up?

MR. GLEDHILL: So in the

public interest context, jurisdiction question very seldom arise, so there is that material difference. Public interest petitions in England, as I have pointed out, a winding up actually takes place on the just and equitable ground. The difference between a just and equitable ground on most creditor petitions, certainly all creditor petitions, they are predicated on cash flow rather than balance-sheet insolvency, is that they will necessitate the Court engaging in a detailed evaluation of fact and often resolving difficult issues of fact over the course of a lengthy trial. Of course, you almost never do that within the context of an allegation of cash flow insolvency. You do sometimes have to do it in the context of a balance sheet insolvency case. And I am going to show Your Lordship some authority later on, it's a well-known decision of the Supreme Court in Eurosail which comments quite specifically on where the onus lies in that case. And the exercise where it is balance sheet insolvency, where it is just and equitable winding up, where it is public interest winding up, in each of those cases it's the same. The petitioner has to allege in the petition the facts and matters which the petitioner says give rise to the possibility of the exercise of the Court's jurisdiction to wind up. The Court may or may not be

satisfied with those matters.

Then as Your Lordship indicates, even it is satisfied with those matters, it may yet take the view that it would not be appropriate to make a winding up order.

To take an absolutely vanilla example, you may have a case where a petitioner alleges balance sheet insolvency, but multiple creditors appear to oppose winding up because they think they will be better off by continuing the company in business and letting it try to trade out of its difficulties. The exercise in the public interest context is in principle absolutely no different. The Court is presented with the primary fact which the petitioner alleges found the Court's jurisdiction in principle to make an order for winding up on the public interest or just and equitable basis. Those facts have to be proved to the ordinary balance of the civil standard. In other words, more probable than not.

Once those facts have been proved, Your Lordship is then left with, if I could put it this way, what in appellate terms would be called a "broad evaluative discretion" as to what the sensible thing to do is.

So the decision making at the

fact-finding stage, Your Lordship is conducting a fact-finding exercise. Once you leave that behind, you then move on to the evaluative decision. Both of them very difficult, of course, to appeal normally in an appellate context because both of them are regarded as preeminently being matters for the trial judge to determine. But that's the bright-line distinction.

And, in fact, one of the submissions that I am going to make is Sir James' submission yesterday, well public interest is very large and multiple interests have to come into court to enable the public to be safeguarded. It is absolutely plain in the case, the cases repeatedly stress it, that the jurisdiction is wide, it is liberal and it is elastic. But it emphatically does not follow from that that the Court abandons ordinary principles of civil litigation and the law of evidence when it is approaching the fact-finding exercise which it has to conduct.

Does that address Your Lordship's question?

THE COURT: It certainly does. Because one of the things I've got in my mind, firmly in front of my mind, is the warning basically which I think the circumstances of this case bring into being, namely, that the Court has to be satisfied on

the evidence, on the basis of evidence that it is correct to make a winding up order or indeed even a provisional liquidation order. And I am very attune to the fact that there is a massive danger in just assuming that facts which are stated in press releases and stuff like that are based in accurate reality.

I mean, it is so very easy for one little special agent in the FBI, or whatever his name might be, to write something up and embellish it, because he wants to succeed on a case or for whatever reason and then he verifies a complaint and even on the pain of perjury. And then everybody says, well, you know he is a special agent in the FBI, isn't he? And he has verified his complaint and he says he recognise and he could be liable to perjury if he put mistakes or embellishes, so what he says is probably true, so we are going to accept that.

And then you get the snowball effect and before you know it, the entire nations and jurisdictions operate on the fanciful fictitious mind of one little man in some field office in some semi-populated state and with no kind of check and balance of whether what he says is actually true.

I mean, if for example, somebody were to come and say, okay, we have, we are the FBI on this.

We are on this case for investigating this man Chen and just so to give you some context, we have recovered 150,000 documents relating to his activities which we have been going through with a team of 54 highly specialised white color crime investigators. Whilst our investigations are still ongoing, it seems to us to be at least a case to answer that this is what Mr. Chen has been doing and we have got documentary evidence which strongly points to this and that and these are lines of inquiry which we will obviously going to pursuing and we are bottoming out, but there is certainly enough material before us to be very concerned. And by the way, in our verified complaint here, we will actually, when we get to Court, cross-reference our data room to the data so that the Court can see what we are talking about.

What we have here is just sort of a press release and so almost journalistic quality statements that this is what happened, but we are not shown any of the underlying material whatsoever.

Now, you know, there is a huge danger of moving on the basis of secondhand knowledge. Now, it's one thing if you are, for example, in the military and you are told that there is some kind of bad cartel camp in some jungle and that's what your intelligence shows.

And then you get all the photographs in the right military department with all the aerial photographs, et cetera and you say, well it must be that. There is always some element of doubt, but, you know, the chances are we are right and we need to go and secure, you know, clear that jungle for cartels, et cetera, so let's go and drop some bombs on it. That might be the way that the executive government might work in terms of safeguarding a population, for example, and there might be good reasons for doing it that way. And 99 per cent of the case you are probably right.

I mean, if you have, let's say, fast boats sitting across the gulfs of the United States with six engages on apparently fishing boats with no fish in sight on the boat, et cetera and don't stop when you are told to stop. I mean, you are bound to ask, is this actually a drug running boat? And then there might be a good reason to just blowing it up and saying, well, right, yes, we are pretty sure you've got the right guys here. But we are a court of law. We have to be careful because we are dealing with fundamental rights. It's not a question of kind of covering for the bad guys and getting them off the hooks, et cetera, and making it difficult for the good guys to get justice. You basically can't make bricks

without straw. Well, I am not seeing any straw here. That's the problem.

MR. GLEDHILL: My Lord knows that the observations that you've just made are observations certainly we would endorse by way of submissions. Your Lordship read in the skeleton argument, I am sure, I am not suggesting Your Lordship turn it up, but at the end of our paragraph 24 we referred to a state in Re A Child. It's a decision of Lord Justice Munby when he was present into the Family Division here where he was making precisely this point about building cases on the basis of he said; she said; it is alleged that they didn't do this when he said:

"Failure to understand these principles... can lead, as here, to the unwelcomed realisation that a seemingly impressive case is, in truth, a tottering edifice built on inadequate foundations."

So effectively, the point that Your Lordship has just been making.

THE COURT: Yes. Just more Portia Language. I mean, and language that you write in a judgment. But yes, I am very attuned to the fact, particularly now you've point out there is embellishment, at least, or a kind of fictitious

illustration going on here on the face of things.

MR. GLEDHILL: Yes. I mean, it appears to be in respect --

THE COURT: Yes. And where does it stop? I mean, is the whole edifice torturing on kinds of cheap journalism and cheap field office simplistic illustrative examples? I mean, it's not good enough in a court of law.

MR. GLEDHILL: My Lord, I appreciate the Court, and this is the last point I was going to make by reference to this summary in the case that Your Lordship has open.

What Your Lordship is being asked to do is to exercise, in effect, a state power to shut down a company which is not insolvent. There is no suggestion anywhere that these companies are insolvent. Being asked to shut down as far as the evidence goes profitable company, according to the liquidator, the provisional liquidator's evidence to the US Court, companies with significant operations such that they needed relief from sanctions in order to continue to do business.

And looking at bundle page 780 in the Authorities Bundle, I just want to highlight finally that paragraph J you see here, just before we get to

paragraph 40.

"...to wind up an active and solvent company is a serious step, and the Court must be satisfied that reasons of sufficient weight have been advanced to justify taking that course."

So those are the points I was going to make in relation to what I have described as the "decision framework" within which Your Lordship is operating. I hope I haven't too greatly repeated things that Sir James probably might more eloquently expressed during the course of yesterday morning.

I am now moving on to a different topic. I am conscious of the time. I am in Your Lordship's hands when you would like me to take a break.

THE COURT: Shall we take the mid-morning break now. We are now just gone quarter past 11:00 here in the BVI. So if we take the break for 15 minutes now and you are going to a new topic, then we will be fresh for that.

MR. GLEDHILL: I am grateful, My Lord.

THE COURT: Yes. So we will take the mid-morning break now. Thank you.

(Break taken at 11:17 a.m. to 11:30 a.m.)

THE COURT: Yes, learned

counsel.

MR. GLEDHILL: My Lord, I am now coming on to the question which is really the heart of what My Lord is being asked to decide, which is whether this Court will exercise its discretion to wind up the Company on public interest grounds on the basis that serious allegations have been made against it, but in circumstance where the Attorney does not herself seek to make those allegations good.

And if My Lord has our skeleton argument to hand, I will remind you, we dealt with this question in a section which was section C(ii), starting on page 14 of that document. And if you turn on to paragraph 21 on page 15 of the skeleton, you see that we made the point there that the default rule in civil proceedings is that the claimant usually has to prove the facts in issue on the civil standard of probabilities. That's the default rule.

What do I mean by facts in issue? Where the claimant brings a claim for breach of contract, for example, the claimant has to prove on a balance of probabilities that there was a contract and that the contract was breached by the defending counterparty. Where as here, touching on the discussion that we had with Your Lordship before the short break, relief is

sought by way of either just and equitable or public interest winding up. The Claimant, the Petitioner has to prove, plead and then prove the primary allegations of fact on which he or she is going to rely as bringing the court's exercise of its statutory discretion into play.

Then looking on to paragraph 22 of the skeleton, we said that we accept that there are some important exceptions to the rule that I've just expressed, which are established by what has become quite a complicated body of appellate case law of which a leading recent instance is a case called Pearce and the Parole Board, and I am going to take My Lord to that and you will find it in our Authorities Bundle at Tab 31.

THE COURT: And page?

MR. GLEDHILL: It's page 848.

THE COURT: Yes.

MR. GLEDHILL: Pearce and the Parole Board. The Crown on the application of Pearce against the Parole Board.

The question in this case, as the name would suggest, it's a question about parole and the issue is whether in deciding to grant parole to a prisoner, the Parole Board could only take account of

allegations about the prisoner's past conduct which had been proven to be true on the balance of probabilities. And the conclusion that the Supreme Court came to in very broad terms, was that while proof to that standard was generally preferable, against the specifics of this case there could be situations in which unproven allegations made against the prisoner could be material to the decision whether to release him from custody or not. So the issue is very similar. It's identical to the case which Your Lordship has before you.

Now as I say, this is one of a number of cases which grapples with this sort of issue, many of them in the context of sanctions and care proceedings relating to children. But happily, it's not necessary to take Your Lordship through those authorities in any detail for a short reason that I can show you, if you turn on in this tab until you get to bundle page 887. And you are reading the speech for the majority of Lord Hodge and Lord Hughes, towards the bottom of the page between letters G and H, "(12) The use of allegations in the board's risk assessment".

"72. The central question is whether there is anything in the legal context of the Board's role, when it addresses allegations of past criminal or otherwise risky behaviour, which confines the matters

which the Board may take into account to proven facts of past behaviour while excluding from consideration in any circumstance the possibility that the unproven allegations might be true.

In our view there is not. The question at all times is one of statutory interpretation." Those are the key words for your purposes. "The statutory remit of the Board (para 7 above) is that it may not direct the release of the prisoner unless it is satisfied that it is no longer necessary for the protection of the public that he should be confined. There is no further express statutory specification as to how the Board satisfies itself of that test."

So the question in all cases where, as before Your Lordship, the determination takes place against the statutory background, is what does the statute require. Does it require that allegations have to be proved to the usual civil standard, or is it permissible to take into account allegations which have been made but not proven, on the basis of the possibility that they might subsequently turn out to be well founded?

And for Your Lordship's purposes, this is the critical point. In his submissions to you yesterday, Sir James proposed that on a public interest

petition in deciding what the public interest requires, you can have regard to unproven allegations as well as to facts proven to the civil standard. I say that that is straightforwardly confusing two separate things. As I indicated before the short adjournment, everybody agrees that the jurisdiction to wind up for public interest reasons creates a very flexible discretion at that final stage of determination that I discussed with Your Lordship earlier on, at the stage at which you are making an evaluative judgment as to whether or not the company should be wound up. Everybody accepts that that is a wide discretion that Your Lordship has. But it does not begin to follow that the Court therefore adopts a different standard to the usual civil standard in determining what matters should be taken into account in exercising that discretion. You can only get to that conclusion, as Sir James does, i.e. that unproven allegations come in, if there is something in the language of the relevant statutory provision that warrants that conclusion.

Now probably still the leading case on how that construction exercise works in practice, is the decision of the House of Lords in a case called In re H. And you will find that --

THE COURT: Just before you

go there, I think it's important that we look at this quite carefully.

What of course we have in Pearce is the requirement, as it's stated in paragraph 3, that the parole board may not direct the release of the prisoner unless it is satisfied that it is no longer necessary for the protection of public that he should be confined.

In other words, you start off with a presumption that the prisoner is in prison and he is going to stay there, unless the parole board is satisfied that the safety of the public is not going to be impinged.

So you start off from a proposition that you stay in jail. And you can see there can be all sorts of things logically, which can satisfy the parole board that somebody is either still a threat or might be a threat, or not a threat. So it's logical in that context that you are not specifically dealing with proven facts because you have a kind of presumption that somebody should in fact be staying in jail. Whereas the complete opposite applies here. Here, we have a company which it is being proposed to be put into liquidation on the grounds of public interest. And normally speaking, a company should be allowed to

continue in existence unless, of course, there is a good reason, I am not putting it as a legal test at the moment, but unless there is a good reason or a sufficient legal reason why it should not be allowed to continue. And indeed, as you pointed out yesterday, and I haven't forgotten, there is also the important aspect of separating somebody from his assets.

MR. GLEDHILL: My Lord, that's right, which is of course a right which is protected under the jurisdiction's Constitution as well, subject to a carve out in favour of liquidation process, and that's necessary to protect the interests of those interested in the estate. But the fundamental point, as I've said before the short adjournment, is this is a deeply invasive remedy. What you are being asked to do is effectively to interfere in private property rights.

If I can take you to the House of Lords decision, I am looking at In re H now which is at 403 of our Authorities Bundle. I've made the point to Your Lordship by reference to Pearce that the question in this context is always a question of statutory construction. And the reason for showing you in re H is because it will be instructive for Your Lordship to see how that construction exercise plays out in a leading decision and generates in this conclusion a

conclusion opposite to the decision which is arrived at in the Pearce case which I just showed to Your Lordship.

So these are proceedings to do with care orders in respect of children. And in a nutshell, on the facts of this case, a woman and her four children lived with her partner who is referred to in the report throughout by the letter R. One of the children, the eldest child, a girl, alleged that she had been raped by R. R was indicted for rape but acquitted following a trial, but the local authority nevertheless decided to seek care orders in respect of the three younger children on the basis that all R's acquittal showed was that R had not been proven guilty to the higher criminal standard. That's all Your Lordship needs to know about the facts.

If you turn on within the bundle until you get to bundle page 423, the House of Lords in fact divided by 3 to 2, but at 423 you have the speech of Lord Nicholls of Birkenhead which was the majority decision. And just about letter D, Lord Nicholls:

"My Lords, the subject of this appeal is the care of children. Section 31 of the Children Act 1989 empowers the court to make an order placing a child in the care of a local authority or putting a

child under the supervision of a local authority or a probation officer. Section 31(2) provides that a court may only make such an order:

'if it is satisfied — (a) that the child concerned is suffering, or is likely to suffer, significant harm'."

And I emphasize those words in reading out because as you will see during the course of his analysis, Lord Nicholls says what you see in A is effectively two disjunctive limbs, two basis upon which an order can be made. The local authority can either show that the child is actually suffering harm at the moment, or it could show that the child is likely to suffer significant harm which is obviously a forward-looking exercise.

Now, the local authority in this case did not suggest that it could show that the three younger children were actually suffering harm because R might have raped the eldest daughter. Its case instead was that they were likely to suffer harm and it argued that for the purposes of demonstrating that, it did not have to show on a balance of probabilities that R had in fact raped the eldest daughter. Their submission was that it sufficed for their purposes, for the purposes of showing that it was quite "likely" that R might have

raped her. That was the point upon which the local authority lost at first instance. They lost on appeal to the Court of Appeal and Lord Nicholls' speech upholds that decision.

And the reason why this case is particularly helpful from your point of view, lies in the reasoning of the majority which you get from Lord Nicholls' speech.

If My Lord would please go on to bundle page 426 now, at the top of this page between letters A and B, there is a sentence starting 'the general principle'. I will just read this passage out:

"The general principle is that he who asserts must prove. Generally, although there are exceptions, a plaintiff or applicant must establish the existence of all the preconditions and other facts entitling him to the relief he seeks. There is nothing in the language or context of section 31(2)," what I've just read out, "to suggest that the normal principle should not apply to the threshold conditions."

So at this stage of the analysis, Lord Nicholls is saying that the general principle is he who asserts must prove and he says there is nothing in the statute that displaces that. But what's important for Your Lordship's purposes is that he actually then goes

further than that and he concludes that the language of the statute in issue here specifically and actually necessitates the application of the general principle. And you get that if you please turn on now to bundle page 429, do you see at letter C a section headed 'A conclusion based on facts'?

THE COURT: Yes.

MR. GLEDHILL: I will just read the passage out:

"The starting point here is that courts act on evidence. They reach their decisions on the basis of the evidence before them. When considering whether an applicant for a care order has shown that the child is suffering harm or is likely to do so, a court will have regard to the undisputed evidence. The judge will attach to that evidence such weight, or importance, as he considers appropriate. Likewise with regard to disputed evidence which the judge accepts as reliable. None of that is controversial. But the rejection of a disputed allegation as not proved on the balance of probability leaves scope for the possibility that the non-proven allegation may be true after all. There remains room for the judge to have doubts and suspicions on this score. This is the area of controversy.

In my view these unresolved judicial doubts and suspicions can no more form the basis of a conclusion that the second threshold condition in section 31(2) (a) has been established," that's likely to suffer harm, "than they can form the basis of a conclusion that the first has been established." That is suffering harm.

And the reasoning for that My Lord sees over the page, starting over the page at bundle page 430, looking at letter D, Lord Nicholls says:

"There are several indications in the Act that when considering the threshold conditions the court is to apply the ordinary approach, of founding its conclusion on facts, and that nothing less will do."

And then over the page again at bundle page 431, you see what he relies upon for saying that. And again just to save my reading voice if I may, you see the page starts with a sentence saying "the next pointer is that the second threshold."

THE COURT: Yes.

MR. GLEDHILL: And then three lines down from letter D it ends with the line starting "section 31(2) should work in this way."

Could you just read that extract

yourself, please.

THE COURT: Yes, of course.

(Pause)

THE COURT: Yes.

MR. GLEDHILL: So Lord Nicholls is saying not only as a general proposition that he who asserts must prove wrongdoing and not merely the possibility of wrongdoing, he is saying that the statute here necessitated the conclusion that the local authority had to prove that R had raped the eldest child if it was to show that the children were likely to suffer harm. Because otherwise you would get to the impossible conclusion that whereas the possibility that R had committed rape would plainly not suffice for the first limb of the section, i.e. had the children been harmed, it could nevertheless suffice for the second limb, i.e. was it likely that they would suffer harm in future. That's the point that His Lordship is making in the first paragraph.

And the other point that he is making in that second paragraph is that if you proceeded in that way, you would effectively reverse the burden of proof because it would be enough for the local authority to say well there is the possibility that R committed rape, and R would then be put to the task of proving a

negative.

Now, against that background, can I now take you to the statutory provision with which you are directly concerned again, and that was in Mr. Eadie's Bundle of Authorities at bundle page 4, I think, section 162. I looked at subsection (1) with My Lord earlier. Now I am looking at subsection (2) and My Lord of course is aware that the Attorney General is one of the number of parties with standing to petition. And another one at sub(2)(e), is of course the Financial Services Commission. And looking at 162(4), you see that the only people who are entitled to apply under the subsection (1)(c), public interest ground, are the Commission, the Tax Authority, the Public Protection Scheme, and the Attorney.

And then if you look on to 162(5), you can see that there are important qualifications on the rights of the Commission to apply on the public interest ground. So the Commission may only make an application under the public interest ground if someone is or has at any time been a regulated person; (b) is carrying, at any time carried on unlicensed financial services business. And just look at (d) whilst you are on it, breaches or contravenes any enactment relating to sanctions or embargoes.

Now, two points emerge from that. The first is that the legislature has quite specifically turned its mind to the interrelation of sanctions and public interest winding up, and it has given the Commission the power to seek winding up where sanctions have been breached. It has not given the Commission or anybody else, the power to wind up an entity on public interest grounds simply because it has been sanctioned. And to the extent the Applicant's case for public interest winding up here rests on the basis that OFAC or the FCDO has imposed sanctions, and those sanctions have been given effect to by the Governor, we say that that point is a short and complete answer to that. This is the clearest indicator you could wish for that in the contemplation of the legislature, the mere fact that an entity has been sanctioned does not justify its winding up on public interest grounds. That's the first point.

The second point is this. Assume the Commission did bring a public interest petition on the basis that sanctions had been breached, ask oneself forensically, would it suffice for it to come to court to say well, we don't know whether sanctions have been breached or not, but there has been a credible allegation that they might have been. It plainly

couldn't suffice.

Now, if I am right about that, it is equally obvious that the same must hold good where the Attorney is the Applicant on public interest grounds, because it cannot possibly be right that the Attorney is entitled to rely on unproven allegations for the purposes of an application under section 162(1)(c), but the Commission has to clear a higher standard when applying under the same provision. There is no textual warrant for that anywhere within the section.

And if there were any doubt about that submission, may I respectfully suggest that the clincher is this. When the Act permits and requires a lesser standard than proof on a balance of probabilities to be applied, it expressly says that. And that's what Your Lordship sees if you now look at section 162(3):

"An application under subsection (1)(a) by a member may only be made with the leave of the court, which shall not be granted unless the court is satisfied that there is a prima facie case that the company is insolvent."

So prima facie proof of insolvency suffices for subsection 162(3) purposes. But to make the obvious point, the reason it's necessary to spell

that out expressly, is because for all the other provisions in this section, the normal standard of proof applies. Subsection (3) is the exception for the general rule, and on the provisions drafted it is the only exception.

So we say that section 162 is strongly consistent with our submission that it's simply not enough for the Applicant to say that the Campbells Respondents should be wound up because others have made allegations which might turn out to be true; and we say that that position is absolutely clear even before one comes on to the authorities.

Now so far as those are concerned, in our skeleton we made three broad points which I am going to seek to make good relatively quickly by reference to the materials in our Authorities Bundle. The first point we made was that there is English Court of Appeal authority that says in terms that on a public interest winding up petition the applicant bears the usual civil burden of proof. That case is in Re Walter Jacob, My Lord has already looked at it twice and I am just going to show you the relevant passage for this purpose. So it's in our Authorities Bundle at page 388, please.

THE COURT: Yes.

MR. GLEDHILL: We looked at

this earlier in relation to the use of reports by provisional liquidators. I am looking at a different point now which emerges from bundle page 394, or starts at bundle page 394. You have a page headed in italics 'The public interest', and this is quoting from the first instance decision of Mr. Justice Harman.

"The judge summarised his conclusion in these words:

In my view the allegations in the petition, which, as I say, are really quite short and contain no averment whatever of insolvency or failure to pay clients at any time, are not made out by the evidence in any way which would justify the very serious act of winding up this company compulsorily. I have to be satisfied that it is in the public interest that that be done, and for that purpose, as I see it, a fairly heavy onus must lie on the Secretary of State to show that matters have occurred and are likely to occur which warrant the company being put into liquidation. In a case of a company where there is no risk to the public, as it seems to me that test is the heavier. In my view this petition ought not to succeed."

Now, on appeal, the complaint made by Counsel for the Secretary of State was that when Mr. Justice Harman had referred to there being 'a fairly

heavy onus' on the Secretary of State, that what he had done was to subvert the common place civil burden of proof on a balance of probabilities and imposed a higher one. And Lord Justice Nicholls' discussion of that submission My Lord finds if you turn on to bundle page 396.

THE COURT: Yes.

MR. GLEDHILL: You see the heading a third of the way down, 'Making out a case for a winding up order'.

"A further criticism made of the judge's conclusion was that he erred in his view of the burden of proof resting on the Secretary of State when he said that "a fairly heavy" onus must lie on the Secretary of State. I see nothing in this point. I do not understand the judge to have been suggesting in the passage quoted above that, in areas of disputed fact, there was a heavier burden on the Secretary of State than the normal burden in civil proceedings, namely, proof on the balance of probabilities. I understand the judge to have been directing his attention at a different point, namely, that to wind up an active company compulsorily is a serious step, and he who asserts that it is just and equitable for the court to take that step must put forward and establish reasons

which have a weight justifying the court taking that step. I agree with that approach."

So that is the authority that we rely on. And, of course, it's those lines in the middle of that paragraph where His Lordship, just beneath letter D, talks about the application of the normal burden in civil proceedings, namely, proof on a balance of probabilities. And as Sir James rightly pointed out when he helpfully took you through the PAG case in the Court of Appeal yesterday morning, that is also endorsed in that decision as well. So that principle finds its place in two Court of Appeal decisions.

So that's the Court of Appeal authority we rely on in England for the proposition that the Secretary of State has to prove on the balance of probabilities the facts on which the public interest is said to rely. And that that is so is corroborated, and this is the second of the three points by reference to authority that I am making, by the fact that that is plainly also the test in respect of both creditor petitions where the allegation is that the company is balance sheet insolvent and member petitions on the just and equitable ground.

Now so far as creditor petitions are concerned, if My Lord now goes in our Authorities

Bundle to page 678, you will have a decision I suspect you are very familiar with, the Supreme Court decision in Eurosail which of course is the leading authority in relation to the balance sheet insolvency test. That's not of course the point I need to look at with My Lord. The point that I want, I get from page 694, paragraph 37, so you are in the speech of Lord Walker which is one of the majority speeches. Just beneath letter G, do you see a sentence starting 'the express reference to assets'?

THE COURT: Yes.

MR. GLEDHILL: "The express reference to assets and liabilities is in my view a practical recognition," he is talking about section 123 of the Act, "that once the court has to move beyond the reasonably near future (the length of which depends, again, on all the circumstances) any attempt to apply a cash-flow test will become completely speculative, and a comparison of present assets with present and future liabilities (discounted for contingencies and deferment) becomes the only sensible test. But it is still very far from an exact test, and the burden of proof must be on the party which asserts balance-sheet insolvency."

So the claimant for winding up bears the

burden of proving balance sheet insolvency, even though that in turn is a notoriously subtle and difficult enquiry often. The company either is or it isn't, proven to be balance sheet insolvent on the [unclear] in the application. There is no intermediate position. There is no room for a finding it might be. There is no room for winding up a company on the basis that it might turn out to be insolvent once the winding up has taken its course. Proof has to be at the stage at which the order is made.

Then so far as the just and equitable ground is concerned, My Lord has an authority at bundle page 741 which I mentioned previously. It's the Privy Council's decision in Lau and Chu. So this is an authority from this jurisdiction, originally an appeal from a trial decision here. I referred to it earlier on simply for the proposition that the English case law is generally relevant for the purposes of your jurisdiction here. But now I am getting at a different point which you find if you turn on in the bundle to page 750. And the speech of Lord Briggs, or the advice of Lord Briggs on behalf of the Board, picking it up at paragraph 20, just beneath letter E in the middle of the page:

"It is well established that winding up

is a shareholders remedy of last resort. But this does not mean that winding up is unavailable to members if they have any other remedy. The member retains a significant element of choice in the remedy he seeks, even though the court has the last word. As is clearly enshrined in section 167(3) of the 2003 Act, the court carries out a three stage analysis, asking:

(a) Is the applicant entitled to some relief?

(b) If so, would a winding up be just and equitable if there were no other remedy available?

(c) If so, has the applicant unreasonably failed to pursue some other available remedy instead of seeking winding up?

The legal burden of proof is on the applicant at stages (a) and (b) but it shifts to the respondent at stage (c)."

So, on a just and equitable petition, the Petitioner has the legal burden of proving the facts he relies on as entitling him to relief. And that, for Your Lordship's purposes, is an important point for this reason. I made the point to My Lord earlier on that the BVI and English insolvency schemes differ, to the extent that in England although the Secretary of State determines in the first instance that it is in

the public interest to bring a winding up petition, the basis upon which the Court is asked to wind up ultimately, is the just and equitable ground. And that is why there is no English case which corroborates Sir James' submission that public interest winding up can go on the basis of unproven allegations. The jurisdiction in England that is in place is precisely the just and equitable jurisdiction and it is absolutely clear in that context, that he who asserts must prove.

As a petitioner on the just and equitable ground, you cannot come to court saying dear Court, take into account unproven allegations. That's precisely what Lord Briggs is saying in Lau. That's a decision of the Privy Council on appeal from this jurisdiction and consequently, with respect, binding upon you. So Sir James' argument would in fact be an impossible one in England.

The only reason it's even a viable argument in this jurisdiction at all is because public interest is drafted to be a separate ground for winding up in its own right. But I've already shown, when read as a whole, section 162 is consistent and consistent only with the conclusion that the Attorney has to prove facts just like everybody else.

The Attorney's case before you effectively comes down to saying we don't know whether or not wrongdoing has been perpetrated here, so let's put the Respondents into provisional liquidation or liquidation and find out. And we say that is an impermissible approach. And as I submitted yesterday afternoon, dangerous not least to these islands' reputation as a stable jurisdiction governed in accordance with the principles of the rule of law.

Today, as it so happens, the allegations to which the Attorney wishes to give effect to, derive from allegations made by UK and US governmental authorities. What happens if tomorrow they come from China or Russia or Saudi Arabia, or somewhere else? Is the Court supposed to pick and choose which country's allegations are acceptably probative and which not? And if so, on what basis?

That takes me to my third point. There are reported instances in England where the Secretary of State has sought to justify a public interest winding up petition in part on the basis of complaints about the relevant company made by third parties, but without himself seeking to prove the substance of those complaints at trial. In each of those instances that we have been able to identify, that evidence has been

discounted as irrelevant and worthless. We found three which we summarized in paragraph 25 of our skeleton. But for good order, I am only going to take you to two of them to make this point good.

The first you find in our Authorities Bundle at page 473, please. If you are using tabs, it's Tab 19. It's a decision of Mr. Anthony Mann, subsequently Mr. Justice Mann, dated from 2002. It's unreported. You don't need to know anything about the facts, you can dive straight into the material passage which you find at bundle page 477, paragraph 12, middle of the page.

"The petitions also contain a heading "Complaints" which refers to 62 complaints received by Wirral Trading Standards about these companies, which is said to be the second highest number of complaints ever received by that authority in respect of a publisher (publishers being a sector on which WTS apparently keeps a close eye)."

And if you skip down about six lines from there, do you see a sentence starting 'it was never clear to me'?

THE COURT: Yes.

MR. GLEDHILL: "It was never clear to me what relevance these matters had to the

petitions because the detail of the complaints is not relied on in the petition, and, apart from the seven complainants whom Mr. Moore spoke to, it was never apparent in the evidence either. When Mr. Moore spoke to them it was still not clear whether the complaints they had made were ones that could be relevant to these proceedings. The existence of complaints by themselves, without alleging and proving their substance, can hardly be a justification for winding up in the public interest.

At the beginning of his final speech, Mr. Green, for the Secretary of State, accepted that these complaints were not matters on which I could rely on in considering whether to wind up the companies. In the circumstances these complaints are not matters which I have taken into account in this judgment."

So that's the first instance in which we have been able to identify that the Secretary of State has relied upon the fact of allegations without then seeking to go the further step of proving those allegations to be substantively correct.

And the next one you find if you turn on please to bundle page 606. This was a fairly high profile and contentious public interest winding up petition by a company called Amway that failed back in

2008, the attempt to wind it up failed. Again you don't need to know anything about the underlying facts of this. It was alleged to have been effectively a Ponzi scheme and the Secretary of State lost at trial and then lost in the Court of Appeal.

What matters for your purposes we can get from bundle page 663 and in the middle of that page, paragraph 44, you are in fact in the decision of Lord Justice Rix in the Court of Appeal dismissing the Secretary of State's appeal. And I will just read out -- in fact, can I ask you to read that paragraph 44 to yourself, just that one paragraph, paragraph 44.

(Pause).

THE COURT: Yes.

MR. GLEDHILL: So the Secretary of State adduces evidence on the hearing of the petition from somebody who is described as a vocal critic of the respondent and somebody else who is an attorney for the people who have taken proceedings against it. And just beneath that you see the important sentence, "he, the Secretary of State, did not seek to establish the substance of the complaints about which he now wish to give evidence."

And you can see what the Court of Appeal made of that. This came on, this issue arose in the

appeal as a sort of procedural point. The substance of it doesn't matter. And if you turn over the page to page 664, you can see what Lord Justice Rix pithily said in relation to the attempt to adduce that evidence.

Paragraph 47, four lines down:

"As to the first," so that's the point we've just been looking at, "As to the first, the judge was unwilling to have the substantive matters for debate at trial lost under a welter of irrelevant, hearsay evidence of unsubstantiated complaints."

So those are the authorities that we rely on before Your Lordship. Let me now summarize where I say all of that takes us to.

The Applicant makes no bones about the fact she is not offering to prove the allegations of wire fraud and so on against Mr. Chen and the Prince Group for the very obvious reason that she simply has no means at her disposal by which to do so. So instead, she effectively says she has proved these allegations have been made by other governments and that that alone suffices for winding up.

In point of fact, for the reasons I explained at the outset of my submissions this morning, there are no relevant allegations of wrongdoing against

the Campbells Respondents at all. They are not accused of anything in the US Proceedings and for the reasons I've given, the fact that they have been sanctioned in the US and the UK neither proves anything nor warrants winding up. And while the JPLs appear to have been busy trying to find evidence of wrongdoing by us in the three months since their appointment as the evidence filed in support of the Chapter 15 application shows, they have so far gone nowhere.

But even if relevant allegations of wrongdoing had been made against us in the United States, for the reasons I've given, that would plainly not suffice. The court does not wind up companies on the basis that there is a chance that continuing to allow them to trade is not in the public interest. And I say that is quite clear not simply from the authorities I've taken Your Lordship to, but from the structure of section 162 of the Act itself. Where proof of a chance suffices, the Act expressly says so. That's section 162(3), otherwise the normal principle applies.

The Applicant has to prove her case on the balance of probabilities and on these applications before Your Lordship, the Applicant has not even tried to discharge that burden.

My Lord, that deals with what I described at the outset as the key point of principle for your determination. And I can now structure the majority of the rest of what I have to say by reference to the Applicant's skeleton argument. So if My Lord would be so good as to take that out, and I will use that as effectively a route map for the remainder of the submissions that I am going to make to you.

THE COURT: Yes.

MR. GLEDHILL: Can I start it off by picking off a couple of assertions about the state of the evidence before you --

THE COURT: Your skeleton or the other side's skeleton?

MR. GLEDHILL: I am asking you to look at my learned friend's skeleton. I am asking you to look at the Attorney's skeleton, please. And so looking at the second page of that, I am just going to pick up a couple of evidential points from the bottom of page 2.

So looking first of all at paragraph 5, well first of all, looking at paragraph 4 you can see that they say, starting the second line:

"The background indicates that, after very considerable investigation (in particular by the

US authorities), there has been concerted multi-national action against Chen." It refers to the sanctions or the forfeiture action. Then at the beginning of paragraph 5 it said:

"That action," in other words the forfeiture action, "has been based on detailed allegations."

And then at the end of that paragraph, paragraph 5, you see the final sentence:

"The washed proceeds were used in a range of ostensibly legitimate companies and business activities, some within the Prince Group."

Now, it's not quite clear that that appears to be referring to the allegations made in the US Proceedings. But if so, it is inaccurate, certainly to the extent it is suggesting that the Campbell Respondents stand accused of receiving or laundering crime proceeds. Because as I've explained, we are not accused of that in the forfeiture proceedings. No allegations are made against us at all in the forfeiture proceedings.

Then looking next at my learned friend's paragraph 6, it says:

"The OFAC investigation indicates that the Companies were part of a complex network of

companies which were used by Chen and the Prince Group to conceal, hold, transfer and launder proceeds derived from these criminal activities."

Now, so far as that is concerned, I am afraid that again is simply factually inaccurate. OFAC has indeed sanctioned the Campbells Respondents, but not on the basis set out there. I showed Your Lordship the relevant document earlier on. Just for your reference, it's Bundle 1, Tab 4, page 123. The basis upon which the Campbells Respondents have been sanctioned by OFAC was that they are owned or controlled by Chen. It is not on the basis that we have laundered the proceeds of crime.

Turning over to my learned friend's page 3, you will see there is a heading in the third line, 'Just and equitable, and in the public interest, to make the appointment'. And then beneath that, there is a list of three points which the Applicant says she places particular reliance upon for the purposes of justifying winding up. The first one at paragraph 8 is that there is a need to protect against criminal activity. And at risk of repetition of what we've said in our skeleton, nobody seriously disputes that. But it does not for a moment follow that winding up is the correct response, still less elementary principles of

the law of evidence go out of the window.

The second point that's made at paragraph 9 is that this jurisdiction has a reputation to protect. Again, nobody is seriously disputing that but as I've already submitted, its standing is also critically dependent upon maintenance of the rule of law.

Then looking at paragraph 10, and specifically looking at paragraph 10.3.1, you see this:

"That appointment," so we are talking about the appointment of liquidators now, "is also necessary and in the public interest to ensure the Companies' affairs are properly investigated. That is of obvious and critical importance to ensure that appropriate steps are taken to recover assets and maximise returns to defrauded creditors, including participation in cross-border asset recovery efforts; and, more broadly, to assist in preventing similar schemes in the future."

Now with all due respect, this is a little stretched. What's alleged in this case is that there has been an industrial scale scam perpetrated from Cambodia defrauding countless people across the world of enormous sums of money, but in particular, in China and the United States. Aside from being the

jurisdiction of incorporation for all 30 of the Respondents before Your Lordship, however, the only thing the evidence discloses which links the BVI to any of this, is the allegation that the bitcoin was laundered through the two Kobre Respondents. This jurisdiction is at best a marginal player in what has gone on here and to suggest that three BVI insolvency practitioners are the most appropriate people to lead the international charge to restore stolen funds globally and prevent further global recurrences is, with all due respect, a slightly hollow claim.

Turning over the page and looking at paragraph 11, we get to a point which really again goes to the heart of what all of this is about. My learned friend says this:

"The ability to invoke the public interest in the appointment of liquidators sits alongside other remedies that might be, or in practical terms become, available. They include the possibility of an application for relief under the Proceeds of Criminal Conduct Act, including forfeiting the assets of the defendants. Such an application," note these words, "may well be appropriate in future including once the process of investigation and understanding of the Companies currently being undertaken by the JPLs

(and other jurisdictions) is further advanced."

So what's being said in paragraph 11 is that the liquidators will conduct the process of investigation, then presumably, pass material over to the Applicant under what I will call the Mithani Protocol, the Protocol attached to Mr. Justice Mithani's order of the 9th of January. And armed with that material, the Crown may then at some imponderable point in the future be in a position to commence forfeiture proceedings under the terms of the Proceeds of Criminal Conduct Act. And I will call that for short the PCCA.

Your Lordship will recall that we flag the potential application and relevance of the PCCA to these applications in our skeleton and you can find the provision itself, the enactment itself in our Authorities Bundle at page 48. It's Tab 3. Tab 3, page 48 of our Authorities Bundle.

Now, so far as forfeiture is concerned, if you move on, please, to bundle page 95, the material statutory provision is section 34A at the bottom of page 95, 'Forfeiture', 34A, sub(1):

"Subject to subsection (3), where a person is convicted of an offence under section 28, 29 or 30, the court —

(a) may, in passing sentence, order forfeiture to the Government of the Territory of any real property or any ship or vessel," and so forth.

And the important point, just for your note, 28, 29 and 30, the reference in subsection (1) is effectively to the money laundering offences created by this Act. So yes, forfeiture proceedings would in principle be available in future but only if one or more of the Respondents were ever first convicted of one of the section 28, 29, 30 money laundering offences.

Now, the Applicant obviously doesn't have the material to file criminal charges against the Campbells Respondents as things stand, but the Crown does of course have power to seek evidence to investigate money laundering, of which the principal one you see if you turn on to bundle page 97. That's section 36, 'Order to make material available'. 36(1):

"A police officer may, for the purposes of an investigation into money laundering as defined or whether any person has benefitted from any criminal conduct or into the extent or whereabouts of the proceeds of any criminal conduct, apply to the court for an order under subsection (2) in relation to a particular material or material of a particular

description.

(2) If, on an application under subsection (1), the court is satisfied that the conditions in subsection (4) are fulfilled, it may make an order that the person who appears to the court to be in possession of the material to which the application relates shall —

(a) produce it to a police officer for him or her to take away; or

(b) give a police officer access to it."

So there is the power to obtain effectively disclosure in aid of an investigation. And for My Lord's purposes, it's also useful to note the power which the Crown has effectively by way of interim remedy to restrain the dissipation of what may be improperly obtained assets and property. And My Lord finds that in section 17 of the Act, back at bundle page 73. You have bundle page 73, 'Restraint order', section 17 at the bottom.

"The High Court may make a restraint order prohibiting a person from dealing with any realisable property, subject to such conditions and exceptions as may be specified in the order.

Now just picking up on a point that My Lord made yesterday, if you turn over the page and look

at bundle page 74 in the continuation of the section, have a look at subsection 7 in the middle of the page:

"Where the High Court has made a restraint order, it may at any time appoint a receiver to take possession of any realisable property."

So the Crown has effectively powers of pre-emptive disclosure. It has powers to freeze assets in advance of conviction. And in aid of that power, it actually has the power to appoint a Receiver.

So why is the Crown in this case invoking the court's winding up jurisdiction rather than more orthodoxly pursuing those statutory remedies? The simple answer to that question is that it is not in a position to satisfy any of the relevant statutory preconditions. We start by going back to bundle page 97 where we began in section 36. I've read out to you subsections (1) and (2). If you now go over the page to page 98, subsection (2) said an order can be made if the subsection (4) conditions were satisfied. And you see what those are towards the top of the page:

"(4) The conditions referred to in subsection (2) are that —

(a) there are reasonable grounds for suspecting that a specified person is involved or may be related to an act of money laundering or has

benefitted from any criminal conduct.

(b) there are reasonable grounds for suspecting that the material to which the application relates -

(i) is likely to be of substantial value (whether by itself or together with other material) to the investigation for the purposes of which the application is made."

And (a), (b) and (c) are the continuation, are conjunctive rather than disjunctive conditions.

So the Crown in this case couldn't get an order under section 36 for the simple reason that it has no basis as things stand for thinking that we have materials that might be relevant to the commission of money laundering offence under the BVI statute.

And then turning back, my apologies for jumping around, back to bundle page 73, I read out to you a moment ago section 17(1), when can the Crown apply for a restraint order ahead of conviction under this provision. Those requirements are set out in section 16 which My Lord finds higher up the page. So perhaps start back on page 72 towards the bottom of the page, 'Cases in which restraint and charging orders may be made'.

"16. (1) The powers conferred on the High Court by sections 17(1) and 18(1) are exercisable where

(a) proceedings have been instituted against any person for an offence to which this Act applies."

So you can get an interim freezing order effectively once you commence prosecution for money laundering. And then there is an extension over the page back on page 73, if you look at subsection (3) in the middle of the page:

"The powers conferred on the High Court by sections 17(1) and 18(1) are also exercisable where the Court is satisfied that —

(a) a person is to be charged with an offence to which this Act applies or an application of a kind mentioned in subsection (1)(b) is to be made."

So the Crown would be unable to satisfy those conditions to get effectively pre-emptive freezing relief either. There is no prosecution, there is no suggestion that a prosecution is reasonably in prospect. So the upshot of this analysis is that effectively by seeking winding up orders for the purpose of investigating crime and freezing property, the Applicant is effectively using this court as a proxy by means of which to sidestep the requirements

for relief in the legislation. And as we've said in our skeleton, not only is that a good reason for saying that these applications are not in the public interest because they undercut the statutory scheme in the legislation, but we go further than that. We say this amounts to an abuse of process in the classic Hunter and Commissioner of Police of the West Midlands sense with which Your Lordship will be very familiar. We've reminded you in the skeleton the point hardly needs to be made that to make good an allegation of abuse of process, I do not need to make, and I most certainly do not make, any allegation of bad faith or impropriety on the part of the Attorney. It's no part of my case. The question is simply whether the court's process is being used in a way or for a purpose which most right thinking members of the public would regard as being outside the spirit for which they were conferred.

And we go further than that and we say that the abuse is compounded here for a reason that we set out in our skeleton argument, if I can ask you to get that out now, please, and turn to paragraph 33 through 35. So I've been looking up to now at the provisions of the PCCA. In this portion of our skeleton, we were considering a different point. Because the vice here is not simply that the Applicant

is sidestepping the statutory requirements for relief under the PCCA. It is that she is doing it quite specifically for the purpose of transmitting material onwards to foreign authorities, including the US. And just to make that point good by reference to the draft order which Your Lordship is being invited to make, if you get out Bundle 1 and within that go to Tab 7, the draft order starts at bundle page 451 and I want to show My Lord page 454. So the top half of page 454 you can see with it starts with a little Roman xvi. It's a long list of powers conferred by paragraph 3 of this order. You don't need to have a look at any of them with the exception of the last of them which is paragraph xxi:

"Power to cooperate and communicate with law enforcement and regulatory authorities in the Virgin Islands and in other jurisdictions, including but not limited to the United States Department of Justice, the United States Department of the Treasury's Office of Foreign Assets Control," so that's the sanction authority, "the United Kingdom Government, and other relevant authorities."

So the purpose of the application is quite avowedly to permit the Attorney to give mutual assistance to overseas bodies, including handing over

documents that are given to her by the Joint Provisional Liquidator, pursuant to the Mithani Protocol, both to the United States Department of Justice, presumably for the purposes of the US criminal proceedings and the forfeiture action, and also in addition to OFAC, the sanctions body.

Now the reason I make this point to My Lord, looking back at our skeleton argument, the point here is that there is a means by which the Attorney could in fact have made material available to the United States. And I am of course referring to the Mutual Assistance Treaty which in our Authorities Bundle, perhaps we can get that out again, it's at Tab 2 at bundle page 31. That's the Treaty with which My Lord may be familiar. But to make an obvious point, the first thing that has to happen for this Treaty to be engaged at all, is that the United States Requesting Authority has to make a request pursuant to Article 4, and there is no suggestion anywhere in the material before Your Lordship that any such request has in fact been made. But it's nevertheless relevant to notice that had the Treaty process been followed, as we pointed out in our skeleton, there would have been some important protections for the targets of action which would have included what you see, for example, in

Article 7 on bundle page 35. So Article 7, 'Limitations on use'. This is effectively a provision aimed at preventing collateral use and cutting back the purposes for which the receiving party, in this case the United States, may use material which is given to it pursuant to a Treaty request.

"1. The Requesting Party shall not use any information or evidence obtained under this Treaty for any purposes other than for the investigation, prosecution or suppression in the territory of the Requesting Party of those criminal offences stated in the request without the prior consent of the Requested Party."

So the United States has to make a request. The United States has to say what the offence is that springs the request. And once it has been granted information or material pursuant to that request, there is effectively a prohibition on collateral use, which means anything that is other than the subject of the original request.

So it would not have been open to the Attorney to share the material she stands to get under the Mithani Protocol with the United States sanctions authorities; still less with all authorities in other jurisdictions with which she does not even have

assistance treaties at all.

And there is then of course the question of who pays the costs of all of this.

THE COURT: Yes.

MR. GLEDHILL: Neither the PCCA nor the Treaty has the effect of lumping the Applicant's costs on to the subject of the investigation. But of course that is precisely the order which the Applicant got at the ex parte hearing before Mr. Justice Mithani on the 9th of January. And if I can take My Lord to that, that is in Bundle 2 at Tab 9, at bundle page 465, please. And within that, it's paragraph 8 which My Lord finds at bundle page 469. Paragraph 8 at the top of the page:

"The costs of the provisional liquidation, including the proper fees and disbursements of the Joint Provisional Liquidators and the Applicant's costs of complying with the Protocol be paid out of assets of the Company in priority to all other claims."

So not only are the Applicant's and the JPLs' costs of implementing the Protocol payable out of the Respondents' assets, but they are payable in priority as a first charge to all other claims against the estate.

So if these companies turn out to be insolvent, they come out in full before creditors get a penny. Now, that is on any view a very striking order to have sought and got on an ex parte application and I note that we have now twice asked the Applicant's lawyers in correspondence to explain the jurisdictional basis there might have been for an order giving priority as a first charge to the Applicant's costs, in circumstances where it appears to us to be flat contrary to the statutory scheme of priorities prescribed by rule 199 of this jurisdiction's Insolvency Rules. I am not going to take you to the letter, but for your note it's at Bundle 7, Tab 81, page 891.

So we've asked that question twice, we reiterated it in fact a couple of days before this hearing. That is another point on which we have simply been stonewalled in the correspondence. So to the extent it's relevant or necessary, I'm going to submit that there was no basis for that costs order and it should never have been sought.

Be that as it may, the key point for your purposes is that by getting it, the Applicant has ensured that the very substantial professional costs likely to be involved in capturing and then

interrogating the Campbells Respondents' data for relevant material, are borne by the Campbells Respondents themselves, rather than falling on the Crown as they would have done, had it employed the other statutory techniques that I have identified. And once again, we say that is an abuse of the winding up jurisdiction. And, in fact, I say it is in excess of the winding up jurisdiction, because if I am right that there is no jurisdiction to make that order, it should never have been sought or made.

Where all of that takes us to, I suggest, is this. It is a very serious thing for the Crown to take the documents of a private citizen, freeze its property or appoint receivers prior to conviction, but there are statutory mechanisms in the Criminal Code by means of which the Crown may do that. But those mechanisms however come with preconditions. The Crown bears the burden of satisfying the Court that the preconditions are established and it has to bear its own costs of the exercise. By gaining access to our documents and appointing JPLs in effect to act as interim receivers without satisfying those preconditions, the Applicant, we respectfully submit, is abusing the process of this court. It is not the function of either liquidation or provisional

liquidation to facilitate the investigation of crime or the interim freezing of criminal property pending conviction. The legislation has provided the remedies for those things and it is not for the Attorney, whether deliberately or not, to circumvent the preconditions and restrictions embedded in the legislation by invoking this court's jurisdiction to wind up.

My Lord, those are the submissions I was proposing to make in application of what we said about abuse of process in our skeleton argument.

Going back to Sir James' skeleton argument, I was on paragraph, those remarks came off page 4 of his skeleton, paragraph 11. So that's what I have been addressing for the last few minutes.

I'm now moving on in my learned friend's skeleton to paragraph 12. And there you see in the first instance the Attorney says this:

"The appointment of liquidators will enable an orderly process to be undertaken."

So far as that is concerned, I respectfully suggest there is no question on the evidence of there being some disorderly process from which the Campbells Respondents needed to be saved. There is no suggestion anywhere in the evidence that

the Campbells Respondents are insolvent. Their assets are effectively mobilised as a result of UK and BVI sanctions. My Lord has seen evidence that Mr. Chen, to the extent he was a director of these companies, has been imprisoned in China, but that Mr. Borrelli has been appointed by the shareholders under a power of attorney and is now consequently in effect in the saddle running these companies. And Your Lordship hasn't been taken to it yet, and we may yet have to come on to this, but in Mr. Borrelli's witness statement, he in fact offered undertakings to the Attorney to dispose of these proceedings in relation to the future conduct of these companies by way of a middle ground effectively between the nuclear options of do you wind up or do you dismiss the petitions. There has never been any acceptance of those undertakings that have been offered, no engagement with them. They simply effectively have been declined by silence.

And to the extent the suggestion against us is that there needs to be what's described as an orderly process, as we pointed out in our skeleton argument, liquidation will in fact interfere with the operation of the sanctions legislation. Because that legislation provides important protection for creditors

and in particular, for Crown creditors. And to make that point good, if I can take My Lord back to the GHRSR again. So in our Authorities Bundle we are at page 268, Tab 10.

THE COURT: Yes.

MR. GLEDHILL: And if you turn on within it until you get to bundle page 285, you should have a section 18A, 'Finance: exception from prohibitions for required payments'.

"(1) This regulation applies to required payments within the meaning of paragraph (2).

(2) A required payment is a payment which -

(a) a designated person is required to make under or by virtue of any enactment to," and then you see a list of effectively Crown creditors, including at little Roman (ii), the Commissioner for His Majesty's Revenue and Customs. And in (b), as long as they are not an excluded person.

And then (3):

"The prohibitions in regulations 11 (asset-freeze in relation to designated persons) and 13 (making funds available for benefit of designated persons) are not contravened by a person making a required payment."

So Crown creditors in effect can still be paid promptly after sanctions imposed without the need for anybody to apply for a license or anything of that sort. But once you overlay liquidation on top of sanctions, their rights are fundamentally undercut. They are at that point caught by the insolvency moratorium. They have to stand in queue with everyone else and at the very least, on the optimistic assumption the insolvency turns out to be a solvent one, they will be significantly prejudiced by a considerable period of delay until they've received payment by way of dividend.

But if the relevant company later turns out to be balance sheet insolvent, then manifestly they will be even more substantively prejudiced because at that point, subject to whatever preferential claims they may have, they are going to rank pari passu with other ordinary unsecured creditors. So instead of being paid out on the button even after the imposition of sanctions, they are waiting for a number of years to eventually rank for a dividend.

Now I accept that on the facts of this case there is no evidence that there were any particular 'required payments' that needed to be made which could have been prejudiced in this way, but

that's not the point, because the point at this stage of the argument is a point of principle. By doing what has been done, the Attorney has yet again undercut other statutory provisions in this case potentially, if this model were adopted in other subsequent cases to the significant detriment to the Crown.

The liquidation that the Applicant wants to bring about will not fortify the sanctions that have been imposed by the United Kingdom and BVI authorities. It will cut across them with potentially significant detriment to Crown creditors. And whether or not it does so on the facts of this case, it may well do so in future if others use the order which is made here as a template for similar applications.

Going back again to the Applicant's skeleton argument, I've now looked at paragraph 12 and looking at my learned friend's paragraph 13, you will see that there is a section which she makes her submissions as to why she says she is under no obligation to prove that the underlying allegations of wrongdoing are correct. That's the key question which I've already addressed Your Lordship on. So turning on then please to page 6 of the skeleton, I did want to pick up a point at -- did I lose Your Lordship for any point?

THE COURT: No, you didn't. I've been here listening.

MR. GLEDHILL: I did want to pick up however a point arising on page 6 out of paragraph 14.3. My learned friend says:

"The nature of the allegations is thus that assets were generated by the massive fraud, they were then laundered through a variety of companies and businesses around the world, and after that had been done the 'washed' assets were used in ostensibly legitimate companies and businesses. All of this was done through a series of complex corporate and other structures, and using associates and other companies assisting around the world."

Then this:

"Where a company forms part of that network, through ownership or control by Chen or his associates, the inference that it was available to and used for those purposes is a proper and available one on the present evidence."

Now, I want to make three points by reference to that, if I may. The first is that I've already addressed the suggestion in this paragraph that the Campbells Respondents' assets represent the proceeds of crime. I've made the point to Your

Lordship that there is no evidence to that effect before you. And it is precisely for that reason that the Applicant is driven to submit in this passage that it would be proper for you to infer that that is the case from the evidence that you have. The only reason that the Applicant is inviting you to draw this inference is because the evidence simply doesn't say that.

The second point to make is that the inference suggested here is, with all respect, not available to you. All of the evidence before you about criminal wrongdoing and money laundering is inadmissible, multiple hearsay. There are cases that say a court may draw inferences from evidential points which are not themselves proven. As far as I am aware, there is no case however that says that a court can do it from evidential points that are inadmissible.

Third, even were that not the case, there is simply no basis upon which you could reach the inferential conclusion which the Applicant suggests that you should. As I've explained, it is common ground in the US Proceedings that the Prince Group had very significant, legitimate business activities. It consequently does not follow that simply because Mr. Chen owned or controlled the Campbells Respondents

that their assets must be Crown proceeds.

My Lord, the final point that I wanted to make by reference to this skeleton emerges out of something which is said in the penultimate paragraph. We are over at page 7 now, and I am looking at paragraph 18. My learned friends say this:

"It is also to be noted that there is an absence of any form of substantive response from or on behalf of the Companies to the allegations made, eg in the US Complaint. There is no evidence before the Court even seeking to maintain that some or all of the Companies were in fact legitimate businesses with no connections back to the criminal activities of Chen and his associates."

This of course was a point which my learned friend Mr. Dennis made to you a number of times during the course of his submissions yesterday afternoon, and I have two points to make about that.

First, the reason that the Campbell Respondents haven't filed any evidence in these proceedings in response to the substantive allegations in the US Proceedings is, I repeat, because no allegations are actually made against us in the US Proceedings. We are not obliged to reply to allegations that are not made against us and

allegations whose truth the Applicant herself does not even seek to maintain.

Secondly, My Lord will remember that when I showed you Lord Nicholls' speech in the child care case in Re H, one of the points that he made was that if the local authority were allowed to run a case on the basis that the stepfather might have abused the eldest daughter, the consequence of that would be that the burden of proving that not to be so would have shifted to the stepfather. My Lord, that is exactly what you see in this paragraph 18. And it highlights the potential for oppression inherent in the Applicant's position. The corollary of the Applicant's submission on the central issue, is it enough to rely on unproved allegations, is that the burden of proof will, as Lord Nicholls pointed out, effectively be reversed if they are right. If Sir James' submission is correct, the Applicant will be able to come to this court in future saying serious allegations have been made against this company by third parties, so it falls to be wound up unless it comes up with evidence in rebuttal. I respectfully submit that those who framed the Insolvency Act are most unlikely to have intended to bring about that situation. If a reversal of proof was what they had in mind, I suggest they would have

used the clearest words in order to bring that about.

My Lord, I notice the time and I am happy to say I am very nearly end of what I was going to say. So I have now completed my submissions on effectively the substance of the question, should Your Lordship make winding up orders on the applications before you.

There was one other point that I wanted to make in conclusion and it's an important point on the basis of the discussion that My Lord had yesterday, both with Sir James and Mr. Dennis.

During the course of Sir James' submissions, Your Lordship, if I may put it this way, threw him something of a lifeline and floated the possibility that if you weren't prepared to make orders for winding up, you could nevertheless grant lesser relief by continuing the provisional liquidation appointments.

Now, I remind Your Lordship that we do actually have, we haven't in fact come to court prepared to address the question of whether or not the provisional liquidation should be continued. We did in fact make, and they're in fact on the bundle, it's at Bundle 3, Tab 2 at page 4, an application to discharge the provisional liquidator appointments. The reason they weren't ventilated before Your Lordship at this

hearing was because of the discussion before Mr. Justice Mithani at the beginning of March when the point was made that because this was effectively the final determination of the winding up petitions, one way or another the Provisional Liquidators were going to go, so it had become something of a spare wheel. In the light of the suggestion -- in the light of the suggestion that Your Lordship has made, I did want to come back on that and just outline what we say about that suggestion.

THE COURT: It does seem to me there is still a problem with the idea that we don't go into full blown liquidation, but stay and continue the provisional liquidation order. And the problem is this. If you can't, if the matter isn't ripe for a full liquidation order for various evidential reasons, it doesn't become ripe merely because it's provisional.

MR. GLEDHILL: That's exactly the submission I was going to make to Your Lordship. Can I just develop it. It's probably more probative than Your Lordship has just put it. That's exactly the point that I am getting at.

This hearing was fixed [unclear] the applications to wind up. And on those applications, there are two principal possibilities. You either

accede to the applications to wind up in which case the JPL appointments fall away. The JPLs will be replaced by liquidators; or you don't, in which case the JPL appointments also terminate. There is no free standing basis upon which to continue the JPL appointments if you reach the conclusion that you are not prepared to direct the appointment of liquidators. Because this is the critical point, provisional liquidation is not an insolvency process in its own right. It is an interim conservatory measure whose function is specifically to hold the ring pending determination of the petition.

And to make that good, just so that My Lord has it well in mind, if you go into the, yes, I think it's my learned friend's, it's Sir James Eadie's Authorities Bundle at Tab 1, page 9. If you are looking at the same thing that I am looking at, do you have the section 170 in front of you?

THE COURT: I am not looking at the right place. We are in the Attorney's authorities bundle?

MR. GLEDHILL: The Attorney's got two authorities bundle and I'm afraid I'm not sure which one is Bundle 1 and which is Bundle 2. One of them has a Tab 1 which has in a print of the Insolvency Act in it, so it must be the other one in the bundle

Your Lordship is looking at.

THE COURT: I am looking at the Insolvency Rules which is not the right place.

MR. GLEDHILL: It's at page 9. It's Tab 1, page 9. I can tell you now, it's the Bundle of Authorities that was prepared for the 9th of January hearing before Mr. Justice Mithani. So it's the original Bundle of Authorities which the Attorney filed, the first one.

THE COURT: Insolvency Act, interim relief, 170?

MR. GLEDHILL: Yes. And page 9, please. So appointment of provisional liquidators. So the submission I've just made to Your Lordship is that provisional liquidation is not an independent insolvency technique. It is an interim conservatory measure critically depending on the hearing of the petition. So subsection 170(1):

"Where an application for the appointment of a liquidator of a company has been filed but not yet determined or withdrawn, the Court may, on application by a person specified, appoint the OR or an eligible insolvency practitioner."

So the only basis following this effective hearing of the petition, the only basis upon

which the Applicant could have come to court today to continue the JPL appointment beyond today's date, is if she had made an application to adjourn the substantive hearing of the petitions before Your Lordship keeping the JPLs in place pending that adjournment. But there has never been any such application by the Applicant and in circumstances where the merits of the petitions have now been very substantially argued, I submit it would be wholly wrong to grant an adjournment now, because the truth of the matter is that the only reason the Applicant could conceivably have for adjourning this hearing midway through, is because she thinks she is going on lose on the hearing of the petition. But if that's the case, then the JPLs should never have been appointed in the first place.

And the reason I say that is by reference to an authority in our Authorities Bundle. So if I can take you back to that at Tab 26, bundle page 733, do you have a decision of Mr. Justice Norris in a case called Secretary of State against New Horizon?

THE COURT: Yes.

MR. GLEDHILL: If you do, if you turn on please to bundle page 738, this was an application for the appointment of a provisional liquidator by the Secretary of State within the context

of a public interest petition. And on bundle page 738, paragraphs 23 and 24 are the material ones for your purpose. And to save my reading voice, if I can just invite you to read 23 and 24 to yourself.

THE COURT: Yes, I will do that briefly then we will take the luncheon adjournment.

(Pause).

THE COURT: "Likely that, on the hearing of a petition, a winding-up order may be made."

MR. GLEDHILL: Yes.

THE COURT: Likely.

MR. GLEDHILL: Likely, effectively at the interim stage. So the position that would have been arrived at by the end of this if Your Lordship is of the view that winding up shouldn't be made, there is no basis for continuation of provisional liquidators.

THE COURT: Okay. It says that first of all you got to demonstrate the petitioner was entitled to present the petition. Obviously first of all there's no standing. And then obviously -- nobody loaded with whether or not there is at least enough material to get the application treated

seriously. Yes, and that the material parts of the petition was not capable of serious dispute.

MR. GLEDHILL: For Your Lordship's purposes, the point is simply this. Provisional liquidator appointment was only likely at the ex parte stage, was only justified at the ex parte stage but it was likely that there would be an order. Ex hypothesi by this point there has been a substantive hearing of the petition. If Your Lordship has determined that liquidation should not follow, the JPL appointments fall with it. There is no middle ground. It's either liquidation or nothing, subject of course to this important point. Your Lordship can only decide liquidation or nothing. But I reiterate we have made in evidence what I respectfully suggest is a credible offer by Mr. Borrelli of undertakings to address the concerns. The position going forward is that the companies are effectively under the control of Mr. Borrelli who is a respected and well-known insolvency practitioner who I am sure Your Lordship has come across before. And we have offered that by way of undertaking to dispose of this.

My Lord, that is all I was proposing to say and those are my submissions subject to any questions Your Lordship was proposing to ask.

THE COURT: I am not going to ask you any questions. Thank you very much for your presentation.

We will take the luncheon adjournment now and we will come back at 2 minutes past 2:00.

(Luncheon adjournment taken at 1:02 p.m.)

* * *

AFTERNOON SESSION

* * *

(Court reconvenes at 2:00 p.m.)

THE COURT: Ms. Alexander, if you'd like to call the matter again, please.

THE CLERK: Yes, My Lord.

BVIHCM 0001 through 0030 of 2026 - In the Matter of the Attorney General versus Bright Team Global Limited and Others.

THE COURT: Yes. Thank you very much.

I take it appearances are as before.

THE CLERK: Yes, My Lord.

THE COURT: Very good. All right. Very good.

So, yes. Who is next, please?

I can't hear you, Miami Conference Room.

(Silence.)

Hello.

(Pause.)

MR. WATSON: My Lord, it's Mr. Peter Tyers-Smith who is leading me and Mr. de Swardt today. I wonder if the Court could just rise for about five minutes so we can see what's going on with him. He's actually in Miami and where else was

situated.

THE COURT: Okay. Well, we will virtually rise, if you like, by letting you have the five minutes' time while we just sit here in the virtual room.

MR. WATSON: Very well, My Lord. Yes. Thank you so much.

THE COURT: Okay. Not a problem.

MR. TYERS-SMITH: My Lord, hello. Can you hear me now?

THE COURT: Yes, we can hear you, Mr. Tyers-Smith. Yes. Thank you very much. Absolutely.

MR. TYERS-SMITH: I'm so sorry for that. With all of the planning ahead, and given that we're so many years on from Covid and many hearings being conducted by court zoom, one would have thought that we would be used to it by now. But I'm so sorry that I caused that blip. But anyway I'm here.

So, My Lord, as you know, I appear for two of the 30 Companies that are the subject of the various applications to appoint liquidators in this case. Those two Companies are Amber Hill and Lateral Bridge.

I will be working from Bundle 8 which is the bundles that we submitted. And the reason for that is that those, Bundle 8 rather, is the only bundle which contains the evidence which is particular to those Companies.

You'll have seen by now that the way the Attorney General has formulated her applications are based on a very similar looking affidavit and a similar looking set of exhibits, but there are differences peculiar to each, so that is the reason for that. So hopefully you will have that handy.

My Lord, you will have seen that we have submitted a long skeleton argument, and given where we are in the day, I'm hoping to proceed with some pace, but not haste, given that I do or I am alive to the fact that I will need to cede the floor back to those that will have to respond to the submissions that have been made by Mr. Gledhill and those that I'm about to make. So I will go as quickly as I can, and I will do my best to avoid the trap of repetition.

Before I do that, can I just check that you have our bundle of authorities?

THE COURT: Yes.

MR. TYERS-SMITH: It's been updated overnight and it now has 36 tabs.

THE COURT: Yes. That's right.

MR. TYERS-SMITH: My Lord, thank you very much.

My Lord, so in the spirit of economy, may I start then by addressing the points of commonality with Mr. Gledhill that I will not repeat, and those of diversion that I will have to spend whatever time allocation I have addressing.

Before that, My Lord may recall from Sir James's opening yesterday when he addressed you on the scope of section 162 of the Insolvency Act, that the point came up which is a point that we have raised in our skeleton argument regarding the availability of section 162(1)(b) which is the just and equitable ground.

Now although we have spent some time addressing this in our skeleton argument, at the conclusion of Sir James's opening submissions on this point, the note that I have taken from it is that there is an acceptance that the distinction between the two for our purposes is light to non-existent.

And, My Lord, the reason that we took the point originally is because it wasn't clear to us whether it was going to be said that alighting upon the

use of one ground was going to be easier than alighting on another, and that was really the concern that we have. But in the circumstances where now, My Lord having heard the submissions, and it appears to be common ground that really what is central here is a showing that appointing liquidators is in the public interest and obviously subject to the question of well, all right, what does that mean as far as the burden and standard of proof is concerned, that's something I don't need to trouble My Lord with.

So clearing that away, the first point that we agree and adopt gratefully from my learned friend, Mr. Gledhill's submissions is that we agree that the burden and standard of proof on a public interest petition is the ordinary standard of proof which is, the Attorney General must prove her case on a preponderance of the evidence, and it is the evidence that she leads in support of the facts that she has asserted.

So we agree and adopt that the correct approach is that enunciated by Lady Justice Asplin in the PAG case which I don't need to take you to.

My Lord, the second point that we are at ad idem, if I may put it that way, with Mr. Gledhill, is that we agree and adopt the submission that reliance

upon unproven allegations is inadequate based on that burden and standard of proof.

My Lord, there are really two matters, two additional matters that we wish to develop in respect of that submission, and the first is that we would say that seeking to rely upon the United States' forfeiture complaint breaches the rule against the inadmissibility of foreign conclusory and evaluatory judgments. And really what we say there is, well, two things. First of all, the decision to verify the forfeiture complaint by Special Agent Charles Lee was an evaluative judgment on his part which does not bind us and should not be used to prejudice us, just in the same way that judgments of foreign Courts which concern strangers do not bind third parties.

THE COURT: Well, findings of fact you know don't.

MR. TYERS-SMITH: Well, findings of fact, and as I will show you, the rule in Hollington and Hewthorn is broader than findings of fact. It's actually the evidence, so things like depositions and other matters that are used in those proceedings. It's a broader rule, we would say, and I'll come to make good on and that when I take you to the authorities.

My Lord, the second point that we would

wish to develop is that if there is to be, if there is ever to be a judgment from the forfeiture proceeding, which again does not concern us, we are not party to it, we're not participating in it, if that were to ever result in a judgment, and I make the point again that a judgment would be reliant upon the proof of the underlying criminality that is alleged against Mr. Chen in the indictment, and again I make clear that we are not indicted, then the question arises, what is the status of that judgment under BVI law. And we would say that that judgment would never be capable of being used directly to found an application to appoint liquidators. And the reason for that is because it would not be capable of recognition at common law. And the reason it wouldn't be capable of recognition at common law is because it would be contrary to the public policy of the Virgin Islands based on the fact that it is of a penal nature, not of a compensatory nature.

So those are the two points that we will develop, and I will try to do so as briefly as I can without losing the relevant context and detail.

My Lord, notably, the last two points that we agree upon is that we agree and adopt the submission that the use of a, either a provisional

liquidation or indeed a final liquidation for the purpose of cross-border cooperation between law enforcement agencies is not an appropriate use of section 162 of the Insolvency Act.

And the final point on which we agree is that the continuation of a provisional liquidation would not be appropriate for the reasons effectively given by Mr. Gledhill in his submissions.

So, My Lord, with those agreed matters of law, I turn to the diversion on the facts or as Sir James put it, on the context.

My Lord, Amber Hill and Lateral Bridge stand apart from the other Companies for two broad reasons. The first is, and you heard yesterday from both I think Mr. Dennis and Sir James, that Lateral Bridge and Amber Hill are not sanctioned in the United States or the United Kingdom and nor are their directors or their owners.

My Lord, the fact that I'm alighting upon this is because although it was I think in fairness made clear that that is the case, that is not a position which can be readily reconciled with the evidence of the Attorney General. And if I can ask you, please, first to turn up page 445 in Bundle 8, you will see the familiar affidavit now of the learned

Attorney General, but this is an affidavit which is specific to Lateral Bridge.

Does My Lord have that?

THE COURT: Yes. 445, did you say?

MR. TYERS-SMITH: Yes, please. It's the bottom right-hand corner, the page numbers.

THE COURT: Yes.

MR. TYERS-SMITH: My Lord, so you can see from Paragraph 1 that this concerns Lateral Bridge and defined as "the Company". And if we work forward, please, to Paragraph 7, you will see that this was a paragraph that Sir James took you to yesterday as effectively the opening Paragraph 4 follows. And what is said here talks about the DOJ. It's the concerted effort point. So it's the DOJ, United States and OFAC acting together.

Paragraph 9 to 11, or 9 and 11 both deal with the designation of the 146 targets within the Prince Group as sanctioned targets.

At Paragraph 11 it's further said that the OFAC designated 117 entities and individuals, and you can see from the final sentence of Paragraph 11 that there is a list exhibited of those entities.

If we then move forward, please, My Lord,

to Paragraph 44 --

THE COURT: Yes.

MR. TYERS-SMITH: -- we can see how this then starts to set up. So you can see there's a great deal of background provided which includes the points around OFAC that I've just articulated. And that then really culminates in Paragraph 4 which talks about in somewhat elaborate language the serious and horrific international nature of the allegations, scanning forward, as set forth in the indictment, the U.S. Complaint and the sanctions, and the OFAC sanctions designation.

Now, if My Lord then just has in mind what you've been told, that we are not designated, it is a surprise, if I can draw My Lord's attention then to what is alleged as a ground for the just and equitable winding up of Amber Hill and Lateral Bridge at Paragraph 45(b).

May I just invite My Lord to read that?

THE COURT: Yes.

(Pause.)

MR. TYERS-SMITH: So, My Lord, it is put squarely in the evidence that Amber Bridge, sorry, Amberhill and Lateral Bridge have been designated and that is a reason, amongst the others,

for the just and equitable winding up of those companies.

Now you know, as you've been told repeatedly, that that is not correct.

Now there hasn't been any correcting evidence of that, and this is still on file. So it's still out there, and it is something which both Amber Hill and Lateral Bridge find deeply troubling. But there is another reason why it's deeply troubling if My Lord can fast forward now to Paragraph 65 of the evidence.

THE COURT: Yes.

MR. TYERS-SMITH: And again it might be quicker if you just read it to yourself, if that suits.

THE COURT: Yes.

(Pause.)

Yes.

MR. TYERS-SMITH: So My Lord can recognise, no doubt, as we did, the inconsistency that is evident from Paragraph 64 which sets out the rationale for not proceeding against sanctioned companies, that may have some connection with Chen, which again is something that we do not accept.

So on the face of this evidence we have

an inaccurate assertion that we're sanctioned, but then oddly you have this other paragraph which says, well, the Attorney General has made a decision not to pursue companies which might be associated with Chen that are not subject to sanction.

And, My Lord, that really comes as a stand-alone point, that when you of course have to consider the evidence and make determinations, you can see that this is not a paradigm example of clarity, with all due respect.

My Lord, what it means, really, is out of the 71 paragraphs in this affidavit, the three paragraphs which are left, and upon which my learned friends rely for the application they seek to move today, those set out in Paragraphs 29 to 31. So if can I ask My Lord just to backtrack and have a look at those.

THE COURT: Yes.

(Pause.)

MR. TYERS-SMITH: Sorry, My Lord. One thing that has just been pointed out. I think I invited you to read Paragraph 65 but it was 64.

THE COURT: Yes. I figured that one out.

You now want me to look at paragraph --

MR. TYERS-SMITH: Paragraph 29 to 30.

THE COURT: Okay. Yes.

MR. TYERS-SMITH: And so, My Lord, this is what we'd say is what is left of the allegations amongst a long document that specifically pertain to us. So Paragraphs 29, 30 and 31 all concern the allegations that are captured in really a single paragraph of the forfeiture complaint or at least in main substance. And I'll take you to that in a moment. But the reality is, we're really left with three points, and that is, for all of the propositions upon which the Attorney General relies for the just and equitable and public interest winding up of Amber Hill and Lateral Bridge, there are three paragraphs which really support that, because none of the OFAC stuff has anything to do with us, and as My Lord has now seen even though it is inaccurately put in the evidence.

So what that leaves, as I say, is the conclusory and the evaluative judgment of Special Agent Charles Lee when he signed off on the assertions made in the forfeiture complaint, which I said I'll return to that.

So, My Lord, that's the first matter of clearing out or at least applying some disinfectant.

The second point is the notion that we are an associate or the Companies and their owners are to be regarded as associates of Chen or the Prince Group or anyone else associated with them.

And, My Lord, can you have another look, please, at Paragraph 45(a) of the Attorney General's evidence?

THE COURT: Yes.

MR. TYERS-SMITH: And you can see there the assertion of what is said is that the available records reveal that Chen is the sole shareholder and director of the Company. But if My Lord, please, turns up page 709 --

THE COURT: Yes.

MR. TYERS-SMITH: -- you can see that this is the Register of Directors. And over the page is the Register of Members.

And if I could just invite My Lord's attention to the entry in the only column, you can see that Mr. Chen is not the sole shareholder and he is not the sole director of the Company.

Now it is right to say that that is inconsistent with what is said at Paragraph 6 which says, which actually talks about who the real, the true owner is. But, and the same applies, we say, to the

owner of Lateral Bridge. Sorry, Amberhill. I beg your pardon.

So what we're really left with, apart from the forfeiture complaint, is the other point that Sir James made yesterday which is, there is evidence of a link with the Prince Group, or there is some form of association. But what I want to do is show why that is an untenable position to adopt, with respect, in the light of the fact that it's directly contradicted by the findings of OFAC when it came to determine who should be designated as associates of either Chen or the Prince Group, or in fact Sandy Zhou.

And for that can I ask My Lord, please, to turn up page 135 of our bundle.

THE COURT: Yes.

MR. TYERS-SMITH: So, My Lord, this again, just to remind you, this is the announcement of sanctions, and its date is actually back on 131. It's the 14th of October, 2025. So this is the article that's referred to in Paragraph 7 of the Attorney General's evidence which I showed, which I took you through when I was going through the evidence. But if we go back to page 135 and scan to the bottom of the page where the heading you can see "Prince Group TCO Officials", does My Lord see that?

THE COURT: Yes.

MR. TYERS-SMITH: So this is the paragraph that deals with the designation of associates.

Can My Lord see from the second sentence starting "these associates"?

It's the second sentence.

THE COURT: Page 135, yes.

MR. TYERS-SMITH: Yes, please, yes.

THE COURT: Okay.

"These associates". "These associates oversee the operation".

MR. TYERS-SMITH: Yes, exactly.

So this is obviously a part of the announcement that deals with who has been designated as an associate in either Chen or the Prince Group. And one can see from the final sentence in the first paragraph:

"Today's action targets several Prince Group TCO members and associates," and then lists them.

And you can see that someone called Zhou Yun is there listed.

Now if we turn over to page 136 and we go to the last two paragraphs --

THE COURT: Hmm-mm.

MR. TYERS-SMITH: -- this sets out the rationale or the reasoning behind the designations. So you can see from the penultimate paragraph on page 136:

"OFAC is designating Chen Zhi..."

And several others there listed.

"...for being owned or controlled by or having acted or purported to act for or behalf or directly or indirectly, the Prince Group TCO."

And the second point is, OFAC is designating those individuals, including Zhou Yun, to be controlled or having acted on behalf of Chen Zhi.

So you can that the way that they have done this is they created a chain, if you like, that leads back to the Prince Group.

Now may I observe at this point that Amber Hill and Lateral Bridge are not there mentioned, and neither are any of their owners or directors.

Now, My Lord, there's another point to be made here because, if we turn then to page 158.

My Lord has that?

THE COURT: Yes.

MR. TYERS-SMITH: So this is a list of the designated Companies. So the first part of

the list are Companies directly or indirectly owned by Mr. Chen.

We turn over the page to 162. I should say that in that list Amber Hill and Lateral Bridge don't appear.

Page 162, you can go to near the bottom of the page. Can My Lord see the sentence starting "the following companies"?

THE COURT: Yes.

MR. TYERS-SMITH: "The following companies as amended for being owned or controlled, by or having acted on behalf of Zhou Yun."

So this is the Sandy Zhou person that Sir James said was the link or the bridge between the Prince Group and Amber Hill and Lateral Bridge. But in the Companies that then follow, starting Mighty Divine, these are various iterations of Mighty Divine, once again Amber Hill is not mentioned, nor is Lateral Bridge, but more importantly, neither is this new Company, Maple Bliss.

And, My Lord, I don't know if you remember. I'll take you to the documents when I can.

THE COURT: Yes.

MR. TYERS-SMITH: But the point that's being made is, well, you know, there's this

other company, Maple Bliss, of which Ms. Zhou appears to be the custodian of its business records and Ms. Zhou is being sanctioned. But, of course, we would say that is wholly inadequate to use and deploy as a basis to wind up my clients.

And really to make that good in brief, can I ask My Lord to take out our Authorities Bundle and turn up Tab 33?

THE COURT: Yes.

MR. TYERS-SMITH: And so this is an extract from French on Applications to Wind up Companies. And can My Lord, please, find Paragraph 9.46.

THE COURT: Oh, yes. One moment. Tab 33, you say?

MR. TYERS-SMITH: Yes.

THE COURT: French, okay. French, yes. Hmm-mm.

MR. TYERS-SMITH: Paragraph 9.46 headed "Associated Companies", My Lord see that?

THE COURT: Not yet.

MR. TYERS-SMITH: Sorry.

THE COURT: Yes. I'm seeing "associated companies".

"Having ordered the winding up"?

MR. TYERS-SMITH: Yes.

So:

"Having ordered the winding up of a company because its controller's use of it was contrary to public interest", which you'll see is not the case here, "it may be necessary to wind up an associated company to prevent it being used in the same way, even if it has so far been dormant. However, a case must be made for winding up of an associated company. A winding-up order cannot be made simply because of the association."

So, My Lord, taking a step back, the use of the evidence to which the Attorney General has exhibited to her Second Affidavit to show a link is really nothing of the sort. And that is augmented by the fact, as I've shown you, that all of the announcements on sanctions, none of them list our Companies, and none of them list their owners, which tends to suggest that OFAC is not satisfied that they are associates because otherwise presumably they would have been listed.

And, really, the KYC form, I mean, I don't want to spend too much time on it, but the KYC form that I think you were shown, as I've said, concerns an entirely separate company called Maple

Bliss, and Maple Bliss is simply nothing to the sort because it's not on the list. So to say that that is sufficient evidence of an association to appoint liquidators over these companies, in my submission, is fundamentally flawed, and you should have no hesitation in so finding.

My Lord, so those are the two points of diversion on the facts or the context which we say are material.

May I now move briskly on to the law?

THE COURT: Yes.

MR. TYERS-SMITH: So, My Lord, I think, as I acknowledged, we adopt the submissions of Mr. Gledhill about the burden and standard of proof of what must be proved subject to one observation, and that was yesterday My Lord asked Sir James a question about exactly this, which was, what is the burden of proof and what is the standard of proof. And it was at that stage that Sir James said, well, it is a process by which a myriad of factors, or it is a factorial approach, was I think what he said.

He also went on to say that it was not really a trial or an adversarial process.

Now, we obviously take exception with that, and no doubt for the same reasons that are

assimilated into submissions that had been made by Mr. Gledhill. But just again for the avoidance of doubt, the case of PAG is very clear on this. And My Lord may recall that in that case Lady Justice Asplin said it was common ground and then listed about ten factors. And the third one down was exactly this, that the civil burden and standard of proof applied. But not only that, it applies to the facts that have been asserted. So once those facts had been asserted they must be proved, and once they've been proved the second part of the process is to determine whether those facts proven are in the public interest. And that is not what is being proposed in this case. So we say that that represents a diversion from a conventional well-established approach.

May I ask you, please, to turn up our Authorities Bundle and in particular Tab 11.

THE COURT: Yes, "Equity and Provident".

MR. TYERS-SMITH: Yes.

This is a decision of Mr. Justice Patten. This is, this was a public interest winding up petition. I don't need to deal with the facts. I just need to make one point of principle which I think is relevant to the idea that the public interest

jurisdictional power is really amorphous and not particularly harshly defined as such.

But what one can see if My Lord turns to Paragraph 62, when approaching the headline question, whether these companies, whether the company should be wound up, you'll see that Mr. Justice Patten records the point that the power of the Court to wind up companies on public interest grounds needs to be excised sparingly, but more importantly for our purposes, with care. That is not to suggest that anyone that is making submissions before My Lord is not doing so with care, but we, what we say is that the approach that is being propounded here, that you can take into account allegations of a foreign law enforcement agency as a basis which are unproven and with there being no attempt to prove them, is not a careful approach. And really for reasons that My Lord identified in a number of exchanges yesterday with Sir James and Mr. Dennis, that is what if these allegations are not true, and, of course, the consequence of them not being true, but proceeding with a liquidation is to effectively put these companies to their death bed almost irretrievably, and I say almost irretrievably because I think what was said yesterday, well, there is a safe harbour in the ability to terminate a

liquidation. But based on our researches there are so few cases in which the Court has terminated liquidations. One can see when that happens, when liquidations start out on an insolvent basis, but by some miracle a skilled insolvency practitioner finds assets which turn the insolvent position into a solvent one. One can quite see how that can be a reason for reverse engineering it, but it is rare.

And, of course, the other vice in proceeding with the liquidation which is then terminated, because, for example, these allegations are baseless and are not made out, is that the company is returned to its owners, but with the companies being raided, if I may put it that way, by liquidators who are having their fees, expenses paid for at the expense of the company. And that, of course, would be a significant deterrent for anyone as My Lord pointed out, wishing to incorporate their company in the BVI.

My Lord, I think I'm making relatively good time. I'm going to keep going at this pace. I hope I'm not losing context and my submission is not coming across coherently.

I want to now move to two points of expansion.

THE COURT: Can you -- I

don't know. Something happened to your microphone. You're going suddenly rather faint. I don't know whether it's us or you. You say something.

MR. TYERS-SMITH: Indeed.

THE COURT: You're still faint.

Does anybody else have the same problem listening to Mr. Tyers-Smith?

MR. WATSON: Yes. You're fine, My Lord, but Mr. Tyers-Smith sounds like his mike has dropped out.

THE COURT: Okay.

Can do you some tinkering, please, with your buttons or move closer to the microphone, if that's possible

MR. TYERS-SMITH: What about now? Is that any better?

THE COURT: Yes. That's much better, much better. Thank you.

MR. TYERS-SMITH: Right, okay.

Now, My Lord, I was saying I was going to move on now to dealing with the two points of expansion on the submission that it is inappropriate to rely upon allegations made in the forfeiture complaint as a basis for winding up.

My Lord, this comes to the rule in Hollington and Hewthorn. If I can ask My Lord, please, to find our bundle of authorities and turn up Tab 1 --

THE COURT: Yes.

MR. TYERS-SMITH: So My Lord may well be familiar with this case. It is, it involved a conviction of a defendant which ended up being a party to a negligence claim. He was convicted of careless driving. The plaintiff sued on behalf of the estate of his son and sought to use a conviction for careless driving as a basis to prove negligence in a damages claim. And that was held to be inadmissible really for, well, several reasons, but part of the justification for it --

My Lord, can you hear me?

THE COURT: Yes.

MR. TYERS-SMITH: It's at page 596 of the report, so if My Lord can find the page number in the top left-hand side.

THE COURT: Yes.

MR. TYERS-SMITH: So it's about two-thirds of the way down the page here. So this is Chief Justice Goddard, and he said this:

"A judgment obtained by A against B ought not to be evidence against C, for, in the words of the

Chief Justice in the Duchess of Kingston's case it would be unjust to bind any person who could not be admitted to make a defence, or to examine witnesses, or to appeal from a judgment he might think erroneous: and therefore .... the judgment of the court upon facts found, although evidence against the parties, and all claiming under them, are not, in general, to be used to the prejudice of strangers."

So, My Lord, that represents a rule that has been applied for north of 80 years. And you can see that really at its heart what it is saying is, parties between strangers and findings of fact made in those proceedings between those parties cannot be used to the prejudice of the third party. And really what we say here is that the indictment doesn't concern us because that's against Chen, so even if there is ultimately a conviction, it can't possibly be admitted for any purpose against us, and the fact that allegations had been made against Chen cannot be used to prejudice our position.

THE COURT: When you say "for any purpose", what is the extent of the rule? You said that it goes beyond findings of fact.

MR. TYERS-SMITH: Yes.

THE COURT: Would it, for

example -- I mean, how -- let's test this, shall we?

Clearly a judgment speaks for itself of the things, of the fact that a Court has made a judgment and that a story was put to the Court which the Court then decided about. So it's there. You can see from the report that something happened out. Clearly that must be uncontroversial, yes?

MR. TYERS-SMITH: It must be what? Well, it would be incontroversial (sic) insofar as it creates an estoppel, or issue, or res judicata between the parties thereto, but as it relates to --

THE COURT: Well, there's nothing complicated about it.

First of all, what is uncontroversial is that there's a judgment in this case or something of this nature that somebody was guilty of reckless driving, yes? That's the first thing. We can -- anybody who look at the judgment see that's the case, yes?

Then, what you can't do is you can't say, ah, the conviction for reckless driving, or whatever it was, cannot be used to prove negligence in a civil suit in a different court, clearly different party.

MR. TYERS-SMITH: Indeed, even against the party that was convicted.

THE COURT: Yes.

Can it be used to raise the issue whether or not there has been negligence in the driving?

MR. TYERS-SMITH: No. My Lord, that is evident from what is said in respect of the Duchess of Kingston's case, because one has to have the opportunity to test the evidence. And if you're not party to something, how -- it can't be right that someone who doesn't have the ability to cross-examine, appeal an erroneous judgment because they're not party, it can't be right that anything that is said can then be deployed in separate proceedings against a third party.

THE COURT: Okay. No. But let us say, for example, that this person -- and this is important. I'm sorry I'm taking your time. This is important.

MR. TYERS-SMITH: No, no.

THE COURT: Let's say in that case somebody died, dropped dead in the street, yes, and some heir or whatever of that person wants to sue somebody to get some money out of whoever might have done it, yes?

MR. TYERS-SMITH: Yes.

THE COURT: He doesn't

know -- the only facts there seem to be that exist are that the person is found dead in the street; doesn't know anything else. But then he comes across a judgment of a court in which the Court has heard a claim, a criminal claim for negligent driving against somebody and it transpires in that judgment that it records that the driver drove recklessly down that road and mowed down that man and then drove off. Then what you have clearly is a finding of fact in that judgment that the man was driving, he hit him, and he drove off, and the conviction, that it was reckless driving. I mean, he proceeded in judgment. Obviously none of those things can be used, none of those things can be used as evidence for what happened --

MR. TYERS-SMITH: Indeed.

THE COURT: -- as to the man who was found lying dead in the street, yeah? It can't be used. But let's say nobody thought of there is a possibility that a car had driven down that road. Would it be permissible, having read that judgment, to ask one's self, did a car drive down that road and might that car have hit the person? Can it give you the idea of a line of inquiry?

MR. TYERS-SMITH: My Lord, I will say, no, it can't. The only thing that it can be --

well, the only thing that can be said about it is that an allegation was made and the judge made a decision. What can't then be said is, well, those findings can be transported into a separate set of proceedings for any purpose. It has to be proved from the start.

THE COURT: Okay. Let's say, for example, everybody is shaking heads now and has absolutely no idea why this man was found dead in the street, yes?

MR. TYERS-SMITH: Yes.

THE COURT: I'm sorry. This is important. They have no idea why the man was found dead in the street. There's a judgment out there which says, well, actually somebody else was driving down the road and hit him in the car basically are you then forced to say I am not allowed to asked whether he was hit by a car? I mean, that would be stupid, wouldn't it?

MR. TYERS-SMITH: Well, I think you're allowed to say, has it been alleged that he was hit by a car, but the fact that findings have been made that he was hit by a car cannot be used.

THE COURT: That cannot be used.

MR. TYERS-SMITH: Yes.

THE COURT: Okay. I think we're on the same page.

MR. TYERS-SMITH: I'm sorry --

THE COURT: Yes.

But it is very important, because there are often very big battles over the rulings, and so on.

MR. TYERS-SMITH: Yes.

I mean, My Lord, the passage that I took you to in the judgment I think is authority for the proposition that really what you're concerned with is prejudice. So if someone sees a judgment and isn't really able to accept for themselves -- if a judge in separate proceedings sees a judgment and says, well, you know, this was a very eminent judge, you know, sat in her trial, there must have been something in it. That's the problem, and I think that's the vice that we're really concerned with in our case as it relates to the complaint, because obviously we don't have a judgment yet. All we have are the pleadings. And the concern here is, well, if a judgment won't be admissible for that purpose because of the prejudice point, we say, how on earth could the pleadings be admissible for the same purposes. And really that's the proposition that we seek to draw from this matter.

My Lord, we've cited several other cases

in our skeletons. I'm not going to take you to them other than to --

THE COURT: Let us -- I don't want to take up your time, because I know it's short. But then -- okay.

There's a slight different, isn't there, between applying for a provisional liquidation and applying for a liquidation? In a -- as I think we've seen from Mr. Gledhill, when you apply for a provisional liquidation it suffices that a filed liquidation under, well, under our regime (a) must have been already filed or certainly is on the card very soon, and that there is a likelihood that the final liquidation order will be made. It has to be that likelihood when you apply for a provisional liquidation.

Now I can see, for example, in a practical, from a practical point of view that what that might translate it to is that if somebody was to come to the Court on an ex parte basis, and all that person had was these U.S. proceedings, the indictment, the OFAC thing in the U.S., the sanctions in the U.K., you might, we don't have to get into a debate about it now, but you might be satisfied that there's enough material there to assume that it is likely that a final

liquidation order might be made and that there is sufficiently serious questions which are likely to be, if those things are right, would be likely to point towards a final liquidation order being made.

I think that so much would be probably uncontroversial. However, when you actually come to applying for a final liquidation order or the liquidator be appointed, which is the wording of our Act, then normally what you would expect is to go beyond the evidence that has been alluded to at the JPL stage, and you would say, okay, in the U.S. in this indictment they've said Mr. Chen basically had all these scam centres and the scams worked like this, and then the monies were put back into companies, and they are washed and sprayed and cleaned and returned to legitimate use, everything like that. At least what you'd expect is some kind of fairly teamed example from the massive papers that have been looked into, which showed that some man or woman has lost their money and it's somehow being traced to Mr. Chen, or probably Mr. Chen, and probably Mr. Chen put it into such and such a company structure, or whatever, so even if you can't prove it in terms of, completely demonstrate it on a balance of probabilities, you've got an example of some kind of flow of money and communications which

somehow involved some very complicated network, probably, involves Mr. Chen, his companies and his structures, and maybe one other company that you're dealing with. And if that happens, then the Court in the very limited time available will probably take the view that on a balance of probabilities there is at least material with which material to think, ah, this company is sufficiently linked to a fraud and therefore we need to start thinking about winding it up in the public interest.

What I don't think, I'm not making a ruling right now, but what would be very unusual would be to say, ah, we haven't got that; we've just got all this second-hand material, press releases, you know, whatever else we have, no primary materials, no examples of what actually happened. Nobody has escaped, a victim, no victim seems to have escaped from these detention centres, and said I was working there and I nearly died because I was hit with a baton or a vice flare or something of that nature, an electric prod, or whatever it is these people might be using. Nobody has said that, and so all we've got is lots of second-hand material.

MR. TYERS-SMITH: My Lord, that's right.

THE COURT: And it might be all right on an ex parte application for the appointment of provisional liquidators, but, you know, normally when you come for provisional liquidators you expect something better.

MR. TYERS-SMITH: My Lord, that's right, and there's actually a good example of that in a case that you will have a great deal of familiarity with, and that is the Wang and Floreat case. I'm sure that that is relatively recent. I'm sorry to --

THE COURT: No. Tell me which bit about that case you --

MR. TYERS-SMITH: My Lord will recall you discharged an interim, you discharged an interim provisional liquidation on the basis of serious and deliberate failure to give full and frank disclosure.

THE COURT: Okay. Oh, yes.

MR. TYERS-SMITH: That was -- you recall.

And that went to the Court of Appeal where it was obviously challenged on the grounds of the evidence that was before the Court originally, but there was an attempt to put in further evidence under the test of Ladd and Marshall.

Now we put this decision in our bundle. Perhaps you could just turn it up. It's obviously a long decision, so I'm not going to spend much time on it. It's Tab 21.

THE COURT: Okay.

(Pause.)

Yes.

MR. TYERS-SMITH: Okay.

If we can just pause very briefly on Paragraph 6 of the headnote which is on page 7.

So you can see this is part of the Ladd and Marshall application. So there was an attempt to bring in new evidence, and that new evidence you can see from Paragraph 6 included -- because you recall, My Lord, that there are obviously various sets of proceedings and arbitral proceedings going on around the world in Floreat, and there were proceedings in the English Court. And one of the documents was the Amended Claim Form and the Particulars of Claim which the appellants sought to put in as new evidence.

And if we then just go forward, please, to Paragraph 54 which is on page 34 --

THE COURT: Okay.

(Pause.)

Okay. Yes.

MR. TYERS-SMITH: So this was just the contention of Floreat effectively. So Floreat said, well -- I should say in an addition to the claim form, because there was an attempt to put in an English judgment as well. And what Floreat said there was, well, you shouldn't look at the English judgment because it's neither evidence nor important; it's a judgment of another Court between different parties; it's not evidence of anything which relying on it would breach the principles in Hollington and Hewthorn.

And then Farara, Justice of Appeal, makes the observation, probably not fair to characterise it as a final finding, but he said:

"In my considered view there is much force to the submission."

So that's his instinct when it comes to whether the English judgment should go in, but then he goes on to make findings about both the English judgment and the Claim Form and Particulars of Claim at Paragraph 80 which, if I can just ask you to look at that.

THE COURT: Paragraph 80, okay.

MR. TYERS-SMITH: Yes.

(Pause.)

Is My Lord there?

THE COURT: Yes, I'm there, yes. "First..."

MR. TYERS-SMITH: So this, I just want to be clear, this concerned whether the Claim Form or Particulars of Claim should go in as new evidence under Ladd and Marshall, but the observations he makes I say are nonetheless still relevant here.

He said the English Claim Form, the English Claim Form is not evidence. It is a document by which proceedings were commenced on the 1st of September in England by the JPLs.

And if you scan forward:

"In my judgment this claim form cannot in any reasonable sense said to have had a likely important influence on the outcome of the three applications."

So just picking up My Lord's point about, well, would it be sufficient on an interim basis to have this kind of evidence before the Court - well, there is at least an indication the answer to that is no, and that is not inconsistent with My Lord's point, that, well, you normally have underlying documents which you don't have here.

So the English Claim Form was not

admitted in the Floreat case. And Paragraph 81, Justice of Appeal Farara went on and said that neither was the English judgment either. And if we can just look at the final paragraph, sorry, the final sentence of Paragraph 81, and I'll move on.

THE COURT: Yes. Quite right.

MR. TYERS-SMITH: So, My Lord, drawing those threads together, and I would just invite My Lord to read the other sections of our skeleton argument that deal with Bairstow, a case of Bairstow which was --

THE COURT: Before you go on there, how it could have done, I'm just thinking, I'm just thinking how it could have done, and I'm asking you, was it done like this, how it could have been done is that an affidavit could have been sworn in support of the winding up petition which -- well, it would be very difficult because you'll have to go around the hearsay rules. What you could have had is, you could have had an affidavit from somebody with knowledge of the investigation, let's say in England or U.S., and that person could say, look, I work in the OFAC office and I've been in charge of this dossier in relation to sanctioning Mr. Chen's organisation and I

can say, and I say on oath, that we've had 18 of a hundred people working on it, et cetera, and we've recovered 10,000 documents and we still have tons more to go, and we've got a whole lot of proceedings out there to go and get information, and everything, so it's a massive investigation; what we have found so far in summary is as follows. And then he could then explain what they found in summary form, and you say, if you want more information on this, we will be happy, subject to various constraints and conditions to make the information available. That way at least you know there is something out there. It's not just press releases, and then particularly when you've been shown photographs which turn out to be apparently, you know, charitably put, mistaken or erroneous, when in fact they seem to be something completely different or at least there's a big dispute over what they are really about. And so, you know, just going on press releases and the fact that there's been an indictment and the fact that there's been a this and a that, it doesn't actually tell you anything about the quality of the evidence or the situation. And I've seen it so many times where, in fact just in this seat that I'm kind of keeping warm from time to time, judges have come to decisions, factual decisions on what ultimately in

retrospect are shown to be extremely weak grounds and no grounds at all, but then our Court of Appeal refusing to upset the findings of fact because it's a finding of fact of a, you know, a trial judge, then the Privy Council saying that it can't interfere with the decision of the Court of Appeal, and there you've got an extremely weak and actually repeated erroneous decision of fact of the trial judge which outlives all appeals and there's the definitive thing that all the parties are then stuck with forever and all because of some little mistake or weakness in the evidence in the first place.

Now we all know there's a finality in litigation, and that's important, and that error is human, but at the same time then when you have an opportunity to get better evidence, i.e., to come with evidence and not just what somebody says about it in some kind of summary press release or whatever, it ought to be put before the Court because that's what the Court does. It hears primary evidence.

MR. TYERS-SMITH: My Lord, clearly we don't disagree with any of that, and I fear as the time ticks on that I may be taking unnecessary further technical points, but I do just want to make one other one quickly. And that is, just

fast-forwarding, what would happen, because of course the Attorney General says in her skeleton argument that, well, her point is, well, we have to wait for conviction before we can proceed. We're not saying that. We're not saying that we have to wait for the outcome of the forfeiture complaint to be on the end of some admissible evidence. What we're saying is, it's never going to permissible based on Hollington and Hewthorn. But, moreover, a civil in-rem forfeiture judgment is not going to be recognised in the BVI. And the reason for that, My Lord, is because, as you've seen it, it is an in rem proceeding and in rem judgments only take effect according to the whereabouts of the property. But they don't -- but in addition to that, if the nature of the judgment is of a penal character --

THE COURT: All right. Yes.

I don't think you need to trouble the Court with that one.

MR. TYERS-SMITH: Very well. I'll move on. We've made the points in our skeleton.

THE COURT: Yes.

MR. TYERS-SMITH: My Lord, that really comes to our submissions which I'll take quite

quickly. I think you've got the gist of where we're going with it.

So there are really only two points amidst the morass of papers that you've got. There are two points. First of all, is it enough for the learned Attorney General to rely upon, first of all, those three paragraphs in her affidavit which all depend on the asset, the civil asset forfeiture complaint. We say not, because, as we said, we adopt Mr. Gledhill's submissions on the adequacy of just putting in issue allegations about allegations. We say that that is not enough. We also say that they're not admissible because of the prejudice that they will cause in breach of the rule of Hollington and Hewthorn.

And allegations are all that they are at this stage, regardless of the serious character or superficially serious character of what they appear to say.

So, My Lord, we are not party to those proceedings, not party to the indictment. We're not party to the civil asset forfeiture complaint, and we say that that is a wholly inadequate basis to make an order for the appointment of liquidators over Amber Hill and Lateral Bridge.

That leaves the final point, and it is

the only residual point on which the Attorney General relies, and that is the point of association. I've already addressed that. So I don't want to repeat myself, and I took you to the passage from French that says, well, oh, right, there are some circumstances in which you wind up associated companies, but you still have to make a case.

And that really goes back to the point or points rather, that My Lord has already made about the adequacy of the evidence.

Association in and of itself is not adequate, and the evidence here undermines the relationship of an associate here because we are not sanctioned either through Chen or through this Sandy Zhou. As I've said, the high-water mark of the evidence about Maple Hill (sic) is really that she is the custodian of documents in respect of a non-sanctioned company, and that is really as far as it goes.

THE COURT: Okay.

MR. TYERS-SMITH: So, My Lord, those are my submissions. I realised I've done my best to take it at a fair clip, but unless you have any questions I'll cede the floor back to others.

THE COURT: Well, I do. I

have a question, and it may not just be a question for you, but maybe for Mr. Gledhill as well. And it is this. In some jurisdictions then you have what is squarely described as a winding up petition, yes. So when a person like A.G., for example, or a creditor comes to the Court seeking a winding up order, they make a winding up petition. In this jurisdiction then the statute speaks in terms of an order appointing a liquidator.

Now, I have to say that it's always been said to me by Counsel, and I've also always assumed that really there is nothing between the two descriptions, but suddenly yesterday we had some submissions from, I think it may be Mr. Dennis, and they were powerful submissions I have to say, whereby he says, and Sir James as well, I think, in which they said, ah, no, an order appointing a liquidator doesn't basically kill the company because it can be revived, and the liquidation can be brought to an end and it can be resumed.

Now we all know that, but the -- and I spoke in the sort of rather gruesome, colourful terms about quartering up the Court, as it were, but the response was basically, no, that is a wrong analogy because the company isn't actually dead and because it

can be, liquidation can be terminated, and what they want to use the liquidation for, having appointed the liquidator, is to investigate.

Now my understanding has always been that, yes, investigation is part of liquidation, but it's not the, it is not the main point about the appointment of a liquidator. It's a necessary adjunct. It could be kind of developing the doctrine, as it were, to suddenly start using liquidation orders for, as an investigative tool. My understanding has always been, once you make an order appointing a liquidator, is that the whole intention is for the company basically to be liquidated, that is, broken up and the parts sent off to the people that have an interest in it. That's what my understanding is.

Now do you see any kind of scope here for treating the BVI statute as something different from an application to wind up a company?

MR. TYERS-SMITH: My Lord, I'm happy to make two very quick points and then perhaps Mr. Gledhill can make his own.

First of all, I think this kind of notion creates a paradox which doesn't work because you make an order for the appointment of liquidators on a final basis to effectively investigate the very grounds upon

which it is alleged they should have been appointed. So what happens if they undertake those investigations and find that there were no grounds. That obviously is a paradox which is incompatible.

And the final point is --

Can I just ask My Lord very, very quickly to look at Tab 34 of our Authorities Bundle which is the RS case of Justice Bannister.

Now, I don't need to go too much into the background of this case because it concerns whether the loss of substratum is enough. Now, Bannister, Justice Bannister took a different approach to the Cayman Islands Court, and in so doing he had a very clear view on the rationale and objectives of appointing liquidators in the BVI. And if My Lord, please, can have a look at Paragraph 36 --

THE COURT: Yes.

MR. TYERS-SMITH: -- can I invite you, please, My Lord, to read from the second sentence starting "in my judgment" through to the end of that sentence which talks about stricken animals.

(Pause.)

THE COURT: Yes.

MR. TYERS-SMITH: So, My Lord, if that is a statement of anything, in my respectful

submission it is a statement of a conventional approach to really the purpose for putting a company into liquidation. But those are my two points. I don't know if Mr. Gledhill --

THE COURT: So basically to extend the analogy of the stricken animals, for example, if you have, for example, a drama queen animal like a malamute or a husky that's collapsed in the road, and then you move in to put him down and you send him off to the vet to put him down and the vet actually discovers that the animal isn't actually totally stricken on investigation, it's just playing out being a drama queen, then, of course, it can be put back on four legs and sent off back to the kennel. But whereas the point is that somebody has decided that the stricken animal ought to be put down. That's what Bannister is saying, yes?

MR. TYERS-SMITH: Well, he's saying that. And I think I would say the analogy is more like, well, if you start out with something that looks like a pedigree that is expected to be afflicted by rabies and is put in quarantine for three or four years and then turns out not to be but is effectively mistreated, then is returned to its owners in a fair less satisfactory state than it was taken away from

them.

So that's the point. As I said, unless I can help with anything else I'll hand over Mr. Gledhill to answer your question.

THE COURT: Yes.

Just while we're hovering on this paragraph though, where Justice Bannister talks about the company, the Court has decided that it ought to be put out of existence, that rather begs the question here, doesn't it: Do I have the material before me to decide that the K&K Companies, the Campbell Companies ought to be put out of existence?

MR. TYERS-SMITH: Yes.

THE COURT: That is the question that I have to ask myself. And the answer that I'm hearing from you is no.

MR. TYERS-SMITH: My Lord, that's right. But also just on the question of what is truly the purpose of a liquidation, as you can see from the start of the sentence at Paragraph 36, the only reason for which liquidators is to manage them in their final moments. So the premise is, we are in the territory of the final moments --

THE COURT: Yes.

MR. TYERS-SMITH: -- as well as

being stricken.

THE COURT: Yes. And the point on that I think you'd say is that these investigations against Mr. Chen, et cetera, are actually nowhere near their final moments.

MR. TYERS-SMITH: Indeed.

THE COURT: Very good. Okay. Thank you, Mr. Tyers-Smith.

MR. TYERS-SMITH: Thank you very much.

THE COURT: Okay.

Now going briefly back to Mr. Gledhill.

MR. GLEDHILL: My Lord, the distinction between the U.K. Statute providing for the Court to make a winding up order and the BVI Statute providing for the Court to appoint a liquidator I need to be slightly careful because I don't have either Your Lordship's or Mr. Tyers-Smith's familiarity with the BVI insolvency scheme than I do with the English scheme, but, in my respectful submission, the answer to that is that it is a distinction without a difference. And the key to it lies in understanding the purpose which the liquidator has.

In England under the Schedule to the Insolvency Act, as Your Lordship will be aware, the

liquidator has an extremely restricted power of trading. They can trade for the purposes of ensuring the realisation of the assets, but they do not have the ability to keep companies going. So on day one you dismiss the employees or any -- very unusual circumstances indeed. That's the whole reason that the legislature introduced administration procedure in 1986.

In this jurisdiction, in the Island's jurisdiction the key to the solution is looking at the, I have it in front of me; I don't know if Your Lordship has it, section 185 of the Act which provides that the principal duties of a liquidator of a company are (a) to take possession of, protect and realise the assets of the company; (b) to distribute the assets, the proceeds of realisation, and (c) to distribute any remaining surplus to those who may be entitled in the equity. It is a terminal process. That's the whole point of it.

THE COURT: I see.

MR. GLEDHILL: Unless I can assist Your Lordship.

THE COURT: That's very, very helpful. Thank you very much, Mr. Gledhill.

Okay, so -- now then, who are we looking

to? Who is going to speak next? I think we're back to Sir James.

SIR EADIE: I'm not entirely sure what the answer to that question is. I know the Joint Provisional Liquidators are here. I don't know if they wish to address the Court or to say anything to the Court.

THE COURT: Let's find out.

SIR EADIE: Now is probably their moment.

THE COURT: Now is probably their moment.

JPLs', do you have anything that you wish to say through your local Counsel, or any other Counsel you have here?

MR. CLIFTON: My Lord, Oliver Clifton for the Joint Provisional Liquidators.

My Lord, we're in attendance to assist with any questions that the Court might have, but I was not proposing to make any submissions independently.

THE COURT: Splendid. Very good.

So I think we're back with Sir James, yes?

SIR EADIE: My Lord, you

are.

THE COURT: Shall we take the mid-afternoon break now for 15 minutes?

SIR EADIE: Yes, if you wish.

THE COURT: I think that would be helpful. Good.

We'll be back at half past.

(Court breaks at 3:15 p.m. to 3:30 p.m.)

THE COURT: So I think we're back with Sir James, yes.

Okay, so, Sir James.

MR. CLIFTON: My Lord, before Sir James starts, My Lord, I thought to spare Your Lordship from having to hear me this afternoon. Two minor points or two points emerged over the short adjournment which I think it might be helpful for me to deal with before Sir James starts.

THE COURT: Yes.

MR. CLIFTON: My Lord, in no particular order, the first of those, in fact, comes from Miss Nicholson of Walkers who has very proudly just told me of Your Lordship's, the honour Your Lordship received both from the Governor of Anguilla and the Eastern Caribbean Supreme Court earlier this

week from which we send the congratulations of all members of the local Bar.

THE COURT: That's extremely kind of you, Mr. Clifton. I much appreciate it. Thank very much indeed.

MR. CLIFTON: And, My Lord, and the second point is that although I wasn't proposing to make any submissions at length, quite a lot of time has been spent on what the JPLs have not told the Court. Because, My Lord, the JPLs have produced two very detailed reports both of which are sealed. And as a result of some typically direct remarks from the Honourable Justice Mithani have not produced witness evidence or submissions for the purpose of this hearing. It's not the case that the JPLs have nothing to say on the issue of the incorporation [sic] of the companies, sanctions issues or many of the issues that have been ventilated today. It's simply that we have not been in a position to do so.

So, My Lord, we would simply say that what emerged over the short adjournment absolutely prepared [sic] us on the part of the JPLs to assist the Court as required. I'm not proposing to address Mr. Gledhill's submissions in any detail, but simply that

there are points which he flagged up which could be dealt with by reference to the reports or evidence, but we're not in a position to do so today.

THE COURT: Sure, okay. Thank you, Mr. Clifton.

Okay, Sir James.

SIR EADIE: My Lord, just to pick up that point first, it does leave us in a somewhat unsatisfactory position if the JPLs' position is that they do have relevant material and/or evidence that they might wish to assist the Court with but have felt in some way inhibited from doing so. I'm not entirely sure what process could be devised to enable them to feed in to assist Your Lordship in advance of your producing a judgment.

Anyway that is a comment rather than a submission of any kind. But I do flag that that's quite unsatisfactory.

THE COURT: Well park it there. Park it.

SIR EADIE: My Lord, I will.

THE COURT: We'll look at that in a minute. We'll see how we deal with that. I mean, I have the inkling of an idea, but we'll carry

on.

SIR EADIE: We'll let it mull for a moment.

My Lord, I was going to start very briefly with the facts. My learned friend Mr. Gledhill made a series of points, four I think in total, but one and two can probably be taken together.

The first of them was to draw attention to the fact, as he asserted it to be, that there was no allegation in the United States proceedings that the Campbells Respondents had been involved with the Prince Group in, I think he meant in taking any form of direct action. Because in his skeleton argument he contrasted their position with the position of Amber Hill and Lateral Bridge who were alleged in America to have taken part in one of the money laundering activities including by transferring large quantities of Bitcoin through various Bitcoin wallets.

But so far as that is concerned, as My Lord is aware, the fact of the matter is that the Campbell Respondents were sanctioned by OFAC as part of the Chen empire if I can put it that way. And all 25 are on the OFAC list as companies owned and controlled by Chen. And the fact that they are owned and controlled by Chen doesn't just sit in isolation. It

sits alongside all of the other matters that are dealt with in the complaint in the US proceedings that led to the sanctions, namely the description, which I won't go back over, of the base fraud, of the money laundering activities, of the way in which the money thing came to be washed back and so on. All of that provides a modus operandi that leads to a position in which the US authorities had surmounted whatever legal tests they have in that jurisdiction for the imposition of sanctions on the basis of the combination in effect of that modus operandi of the global criminal enterprise as they saw it to be and because those companies were owned and controlled by Chen.

So what my learned friend Mr. Gledhill then seeks to say is to say, yes well, that's all very well, but if they're not putting forward evidence in the US proceedings to demonstrate that we were actively participating, what that means is that the only thing that the material in America demonstrates is that they were owned and controlled by Chen. And that means, he says, well there must be parts of the business that were legal and parts that were illegal. I'm not sure that necessarily follows with the greatest of respect to him, but all that that does is to generate that possibility.

And what his submission sought to assert and/or imply was that they were, therefore, to be treated as being on the legal side of that debate and I respectfully submit that that simply doesn't follow. So we respectfully submit that you can't just take the fact that they aren't alleged to have been directly involved and treat that as a single thing. They were designated. They were designated for the reasons that I've just described and that is sufficient to cause the gravest concern about, in the Attorney General unsurprisingly in the BVI, about those companies or that set of companies' positions. And it doesn't matter for that purpose that they are not alleged to have been actively involved in the sorts of activities that Amber Hill and Lateral Bridge are alleged to have been involved in.

So that's the first and second point.

The third point related to the UK. And it was said that only Chen and PGGL had been the subject of sanctions or designation under the UK regime and that is correct. So far as the UK regime is concerned, my learned friend also sought to rely upon the fact that those sanctions were imposed on the basis of a reasonable suspicion, and so they were. That is the statutory test for the imposition of sanctions in

the UK and he was correct about that. But that I respectfully submit is a point that inures in our favour because it shows in the clearest possible terms that there is a public interest in the United Kingdom reacting on the basis of something less than proof. Those sanctions with all of their swingeing effects can be and are specifically permitted in the legislation to be taken on the basis of something less than proof. And that is because legislatures around the world recognise that public interest steps including, I may say, public interest steps which have the sort of effects that sanctions do, that had been the subject of repeated comments in a series of Supreme Court cases including the Shriddler [phonetic] case, about the severity of those effects. Those can be imposed on a reasonable suspicion. That is not proof of the underlying facts. They're just as much civil as any form of liquidation process. But in those circumstances, the legislature has permitted those very serious steps to be taken on something less than proof.

So my learned friend Mr. Gledhill's next point in relation to the UK sanctions was in effect to invite the Court to conclude that there is some serious question mark because of the august nature, and I suppose it was of Clare Montgomery, who we all regard

obviously as extremely august, but because there was a claim in the Judicial Review Court which you have seen at Bundle 5, page 163, I don't invite you to turn it up again, but that claimed on article six grounds that an entire sway of the regulations under which sanctions are imposed are to be treated as unlawful in principle.

And our short answer to that, I respectfully submit, is that there is nothing unlawful in those regulations. There has been nothing other than a claim launched. There hasn't even been permission granted on the basis that that claim is even arguable. And by the way, we note that no similar claim was made by Chen Zhi or PGGL or any other member of the group with which you are associated. So that's the answer to the points on the UK position.

Mr. Gledhill's fourth point was that the effect of designation was to freeze the assets of both PGGL and through them all of the companies, and sought to pray that in aid. That, of course, is true. And we recognise and accept as correct as acknowledgment that having sanctioned PGGL and Chen in the United Kingdom, the effect of that is to freeze the assets of all the other companies.

The point I made in opening and that I repeat in answer to that point is that that does not

exhaust the public interest and the public interest benefits that would flow from the appointment of liquidators, not least because sanctions are not always complied with. And sanctions are not always complied with, it might be thought a fortiori by those who are involved or alleged to have been involved in criminality.

That takes me to the JPL Reports, the Joint Provisional Liquidators Reports. What the Court does about those is, of course, a matter as between the court officer and the Court itself. But we do note with respect, if criticism is to be made of the Attorney General's position in relation to that, that that is precisely the position. That is a matter for the Joint Provisional Liquidators and the Court whose officers they are. But we do note that the Claimants could have made application themselves. There is a process enabling application for unsealing to be made. And for your note, that process is to be found in the Order that is at Bundle 2, page 481. Again, I don't invite you to turn it up now, I simply invite you to note the reference.

So Mr. Gledhill's point in relation to the JPL Reports as point of substance appear to be that they had been in for a very long time and they had

found nothing. And so in effect you should conclude that there was nothing to see here.

The fact of the matter is, however, that the Joint Provisional Liquidators are still investigating. That is made crystal clear and is stated in terms in paragraph 38 of Mr. Pretlove's affidavit to which you were taken, Bundle 5, page 207. And they will need in, as part of that investigation no doubt, to cooperate with other jurisdictions in the ordinary way if they are dealing with companies with these allegations, as it were, hanging over them and dealing with a conspiracy alleged of this kind. That does not lead to the position in which the suggestion or the inference is, nothing to see here. It simply leads to the position in which the Court has no option but to proceed on the basis that the JPLs are still investigating.

We would also invite you to note, if you would, in Mr. Pretlove's affidavit to which you were taken -- perhaps it is worth going back there very, very briefly. I'm sorry, I'm trying to keep the bore of going back to the documents to a minimum. But if you go back to Bundle 5, if you can get there relatively conveniently.

THE COURT: Yes.

SIR EADIE: Page 212.

THE COURT: One moment.

SIR EADIE: It's coupled with the point that I make about them still investigating. They're still investigating and have been investigating despite the efforts of some not to cooperate or indeed worse, actively to resist.

Can I just invite you to read paragraph 54.

THE COURT: Yes.

(Thereupon, the Court peruses document.)

SIR EADIE: So far as Amber Hill and Lateral Bridge are concerned, they are not designated. That they are not designated and that that was an error in the original affidavit of the Attorney General as acknowledged in the skeleton for this hearing that the Attorney General has put in at paragraph 17(1). And if you have that paragraph, if you could lay your hands on our skeleton for the purpose of this hearing, paragraph 17, you'll see what's said in 17(1).

But you'll also see what is said about the other error on which my learned friend sought to place some reliance in 17(3) and (4) which I gave you the references into Bundle A4 [sic] earlier on. So the

ownership position is corrected. And you will recall in relation to Amber Hill or Lateral Bridge that the substance of the case in relation to them is the combination of effectively two things.

The first of them is that there is an indication that they were both actively involved, see the complaint which I took you to before and I don't go back to, they were both actively involved in the money laundering process, a factor we note that the Campbells companies place positive reliance upon for the purpose of distinguishing their position.

And the second of them is the position of Zhou Yun which my learned friend described as being an inadequate basis for an application to liquidate. But the significance of that piece of material coming out of the liquidations already as it were is to demonstrate that not merely are they alleged to have been involved in those money laundering activities, but that Zhou Yun is connected through the forms I took you to and through the process of registering Maple Bliss and all the rest of it back to Amber Hill. And she was a direct link of Chen Zhi's. So the idea that these were as it were independent companies operating of their own volition innocently caught up in things is given a very serious doubt or concern by both of those

features.

Leads me to my final point on the fact which is that in relation to both the Campbells companies and Amber Hill and Lateral Bridge, I do repeat that there are, that there is and there has been silence in effect about what the true nature of their business activities was. It's perfectly possible to do or to take a position in which you say no one should reverse the burden of proof on me, no one should impose that burden upon me, but nevertheless when confronted with a threat which they then seek to present as a threat to their very existence, not to put in any evidence in the face of the allegations that have been made to explain and reassure the Court that the connections were innocent, that when they were involved in Amber Hill and Lateral Bridge's case in the activities, they either were or they weren't involved in those and if they were, they were innocent. Don't have any of that. We have nothing from the Campbell companies at all apart from evidence which goes to describe and seek to pick holes in the American processes. But that I respectfully submit is a matter of some significance.

And again it's a matter of some significance not because it proves anything, but

because it reinforces the thorough going [sic] nature degree and degree of the concerns which the Attorney General as guardian of the public interest in the Virgin Islands is properly entitled to have.

So that's all I wanted to say about the facts. So far as the public interest itself is concerned, our submission as you know is that the public interest and its engagement in the present exceptional circumstances is clear and compelling. These are allegations, true they're allegations, but they are allegations of extreme seriousness. And we do respectfully agree with My Lord's description of that as being the worst of the worst. I don't go back over them. First point.

Second point, there is substance to them even if they are not proved. It is evident that what we have and put before the Court, which is all that we have available at this time, it is evident from that that this is not just press reporting. This is not just one little FBI man or cheap journalism. These are serious investigations undertaken by the United States and by the United Kingdom together in relation to real concerns that their own citizens had been defrauded of a gigantic sum of money involving all the allegations that I've already been through and I don't repeat.

But it is not right, I respectfully submit, in trying to assess the concern in trying to see what the Court has before it to minimize that. The fact of the matter is that this was concerted action following serious investigation and it led to regulatory action in both jurisdictions which had to surmount the legal standards that the legislation that govern those actions imposed. In both cases I suspect reasonable grounds of suspicion at the least, the public interest acting on that basis. So that is what you have. And it is not good enough I respectfully submit for my learned friend Mr. Gledhill to say, well, where does that lead? What happens if suddenly a two bit jurisdiction, without naming any two bit jurisdiction, a two bit jurisdiction or a corrupt jurisdiction turned up and said what about this, there's been a fraud in our territory.

The fact is that if that happened, the Court would no doubt be entitled to take into account the fact and the source from which those allegations came. But that prospect, I submit, does not undermine the seriousness with which the authorities in the Virgin Islands needed to treat the situation that you have here where that is simply not the position. You have here investigations, concerted action, regulatory

action being taken which has to surmount a standard and did in their view, a complaint that is being proceeded with that was subject to a statement of truth on the bottom by whoever, but subject to a statement of truth in verification. You have all of that from two extremely grown up jurisdictions, if I can call them that, which respect the rule of law and understand what needs to be done in order to surmount legal standards.

So I respectfully submit that that trivialization gets one nowhere.

I must deal, because My Lord has returned to it on a couple of occasions, with the photographs and the forensic points that my learned friend Mr. Gledhill started with. And, of course, he is right, that in the American proceedings there is a question raised about that. I'm perfectly prepared to accept that, but that question has not been resolved in the United States. I don't know whether it's right, wrong or indifferent. What I do say is irrespective of the answer to that unresolved question, that those question marks about the photos take one only so far. What you have in the complaint and to some extent in the indictment as well, what you have as the basis no doubt for the sanctions in the United Kingdom too is a set of allegations that are detailed and extremely extensive

and extremely concerning.

And to produce one point where you say, well, there's a photograph of some question that might have been overstated, he may be right, he may be wrong about that; I have no idea. What it doesn't do is to undermine or call into question the entirety of the careful work that has led, and is evidently careful work and careful investigation, to the plethora of detail that you have in the documentation particularly coming out of the United States. So that's the second point. It does not mean proof, but it means that those allegations which the Court must take extraordinarily seriously and the Attorney General had to take extraordinarily seriously.

Third point, allegations and evidence of other State action in reaction call for effective action by the Virgin Islands to protect the values it holds dear and important, the rule of law, the protection of victims from organised crime, the integrity of its financial system so that they are not abused, so that the corporate veil is not used, so that the corporations set up in the BVI for whatever reason are not able to be used and should not be used for all these sorts of purposes. All of those are engaged by each of the elements of the criminal activities that

are alleged. And the Virgin Islands is deeply committed to that sort of effective action not merely to uphold values in such circumstances, but also to provide assistance to international partners.

International partners and the Virgin Islands recognise that this is not a jurisdiction by jurisdiction game. It used to be in the past and that route led to non-enforcement, totally ineffective cooperation, if any, and free charters for people who could find a jurisdiction that suited them. The recognition in the modern world is that you need that international cooperation. It is essential to the public interest that that happens.

And so I do submit that the public interest call for consideration of and an effective response to, within the law of course, allegations of this kind and multi-state action of this kind, particularly so perhaps if you are a jurisdiction that has been brought into the sphere of this alleged criminality because its laws and its corporations are being used.

And my learned friend Mr. Gledhill's answer to that, his first answer to that mirrored, if I can put it this way, and it was a point that my learned friend also raised for the Amber Hill Respondents, the

answer mirrored what I call the other side of My Lord's balance for identification of the optics yesterday, namely the public interest that balances it out in the businessman abroad considering investing in and using Virgin Islands corporations not thinking that the Virgin Islands would deprive him of his property at the drop of a hat or make draconian orders through liquidation.

But I say in answer to that submission adopted as it were or run with by my learned friends, that businessman would well recognise that this exceptional action by the Attorney General is being taken in reaction to circumstances of exceptional seriousness in circumstances in which there was, if not proof, a serious case for supposing that the companies were mixed up in this sort of criminal activity. No business would or would have any right to expect that if they were mixed up in something similar, they could or should be able to continue on regardless until proof was to hand. That hiatus would benefit the criminals and there is a real public interest in the protection at the very least and the investigation that a liquidation would provide in those circumstances.

So the businessman that is posed as the hypothetical could have total confidence that the

Virgin Islands is not an arbitrary state or a state which takes arbitrary action. That action could only flow from a sufficient basis for considering that they might be mixed up in it and that active steps were needed to protect, to investigate and if appropriate to regulate. All of that would happen, as the businessman would well appreciate, within the rule of law with all of the guarantees that would be well understood to underpin the protections of law in the Virgin Islands.

The second answer that my learned friend gave, my learned friends both gave and the main thesis that they had was that nothing could be done and nothing should be done unless crimes, laundering, circulation back end of semi legitimate money presented as legitimate when sourced from criminality could be proved. And I made submissions about that in opening and I don't want to repeat the detail, but I do want to make five short points by way of reply if I may.

Firstly, the allegations themselves as allegations, seriously made after that investigation, engage the public interest aspects that I have identified. The public interest can in principle be effected and action can be taken on the base of it because of serious concerns that cannot be proved at the time. There are many different contexts in which

steps protective of the public interest are taken on that basis. We've seen an example of them very much less than proof of the facts, and you can impose sanctions. That is in recognition, clear recognition of the fact the public interest might well be protected and indeed could only be protected by a factorial approach of the kind that the Courts have identified.

A statutory test based on public interest stands thoroughly against the idea, we submit, that the public interest should be rendered incapable of protection if only you cannot prove a serious allegation or set of allegations giving rise to the gravest possible public interest concerns. That's the first point.

The second point is that insistence on proof is entirely inimical to the public interest for precisely that reason. It would mean that the public interest could not be invoked unless you had proof and that would be to insist on an impossible condition, a point which is particularly to be made in the circumstances of alleged criminal activities of this kind where complexity lies at the heart of the criminal's enterprise and where cross-national cooperation and the complexity of investigation is of critical importance.

And with the greatest respect to the adoption of the point that My Lord put to my learned friend for Amber Hill in his submissions, there is not a way of doing this on the logic of my learned friend's case. They insist upon and their entire submission set is based upon a contention that only proof of the facts will do. It would not be enough, on their case, to turn up with a bit more evidence; a bit more is to be expected. Why isn't there an affidavit that says here's an example of someone who is beaten in the compound who has come forward? Here is an example that can be worked through. That on their case would be wholly insufficient. They insist upon proof of each of the allegations that are relied upon in founding the public interest.

So there is no easy halfway house or duck out for them on that route. They take the logic of the submission that they have made. That's the second point.

The third point is that the alternative to all of that, the alternative to the impossibility of protecting the public interest is, in our context, to deploy the very power that the legislation has placed into the Court's hands but which is to appoint liquidators in the public interest. And the contrast

is stark. To place the affairs of the company into the hands of independent professionals acting as court officers is precisely to protect the public interest. It enables affairs to be investigated, it enables an orderly process to be undertaken, if necessary, at the end of that process. All of that would happen under the direction of the Court.

And I do respectfully submit, and this is a thoroughly important submission I suggest, that the powers that the Court is given under the Virgin Islands legislation exist and are to be exercised and approached as permitting a staged approach. It is perfectly possible under the powers that you have been given to go by stages. It is perfectly possible to start with an investigation and the protection on the basis of those serious allegations of concerns; you protect; you investigate. Once you've investigated, the Joint Provisional Liquidators or the liquidator still after appointment if it's finalized report to the Court. No one is bound into any outcome, but what their investigations will reveal is unknown because they're still investigating.

But if at the end of that it appears that it's right to move to the collation and the distribution of assets, then so be it, that's what

happens. If the Court at any point thinks that's enough, it's gone on too long or there's some other reason for supposing that the good thing now would be to return it to the tender administrations [sic] of the ownership of Mr. Chen, then that can be done.

The Court has the powers; it can terminate. But my respectful submission is that whatever might have been the Court's experience in the past of windings up, it is not required to approach this scheme with its staged powers as if this was immediate death and really all one was doing was just dragging in the assets and distributing. That is not the way this works. And it might be thought that the legislation has been deliberately set up in that way because there is in this jurisdiction a specific provision which enables the public interest to form a basis for the Court's intervention. And that public interest is allowed to use the breadth of the powers that are accorded to the Court to protect it. That's the third point.

Fourth point is that the approach advocated by my learned friends which says prove it is not required, I submit, by the case law. I took you deliberately in opening to the Court of Appeal authorities all of which emphasized, and they don't use

the words lightly, they all emphasize that the approaching question involves identifying factors. And they deliberately use that word no doubt because in a public interest context that's what you're dealing with. The invitation to the Court, the raison d'etre, of this sort of application is to focus on the factors that bear on the public interest in winding up for and against. That's what the Court must be focused on. And the question is ultimately whether on all of the evidence before the Court reasons of sufficient weight, again not prescriptive, reasons of sufficient weight have been advanced to justify a winding up.

There is no, I submit, immutable requirement or principle that any factor that has a factual element must be proved to the civil standard. Such an approach would cut across the factorial approach to public interest and it would cut across the broad nature of the power conferred on the Court in section 162. And the cases do not say so. The burden of making out the public interest case is, of course, on the Applicant, here the Attorney General. But that is not the same at all as insisting on the proof of any fact or matter relied upon in such an application to the civil standard. That would be to restrict the jurisdiction, and as I've already submitted, confine it

so that the public interest would be impossible of protection because that standard could not be met at any particular point in time.

In any event, the cases themselves -- don't know whether the Judge has gone.

THE COURT: Yes. No, I'm not gone, I'm here, hello.

SIR EADIE: I'm so sorry, My Lord, your picture's gone from my screen, but it's probably my screen.

What emerges from the cases is of some interest. Even the English cases, and bear in mind you're dealing with Virgin Islands legislation which is to be approached in accordance with its own terms, but even the English cases do that do refer to proof on the balance of probabilities -- and some of them do. We've seen them, PAG and indeed Lord Justice Dillon in St. Piran that you were taken to by Mr. Gledhill, do you remember that, at 15, his Bundle of Authorities, Tab 15, page 383 Lord Justice Dillon, he simply described that as the general rule.

And I respectfully submit that I have no difficulty with that description. But what I do not accept is that approaching it in that way equates a general rule with an immutable rule when you are

dealing with public interest cases which you have to approach, as the Courts have told us, on a factorial basis. What is critical, I submit, as the cases make entirely clear, is that when applying that factorial approach, context is key. And that emerges as clearly as anything from the Supreme Court's analysis in Pearce to which my learned friend Mr. Gledhill helpfully took you, Tab 31 of his Bundle, page 848. I think the paragraph was 72, but the bit around there is worth a reread.

They emphasize, Lord Hodge and I think Lord Hughes, that the question is one of context and statutory interpretation. That's not an immutable principle. That means it's a question of context and statutory interpretation. That's the principled approach. But what emerges from Pearce is that the public interest can indeed call for something less than actual proof. I, of course, do not seek to present the Pearce case as factually analogous. It isn't. It was dealing with the risk posed by prisoners who might be released from prison to cause further harm to the public. So they were dealing with a very different contextual setup.

But the point that emerges is that the public interest can justify something less than proof

to the civil standard. The point is that the public interest is flexible enough to call, in appropriate cases, for a different approach. But what my learned friend Mr. Gledhill does in the light of Pearce is to seek to accept and confine, if I can put it that way. He says that the Court approaching a public interest application of this kind in liquidation has, in effect, a jurisdictional stage, one, and, two, a broad evaluative stage which he accepts ringingly. And he accepts at the latter stage there are a range of matters that could be taken into account; considerable flexibilities to be accorded. I suspect he says also not necessary to prove, but that's the implication, at least more flex at that stage.

The problem for him with that analysis is that it creates a false dichotomy. There aren't two stages. There is a single public interest test. And that single test has all the flexibility that is inherent in a test cast on the basis of the public interest. That's the lesson from Pearce. And we know that on many other different occasions, including Synesis as an example, it's really just an example of a sanctions context in which a different standard is set. But the public interest can be served by something less than proof.

And what that leads to is that reliance on cases like Hollington, which my learned friend for Amber Hill relied upon, really don't go anywhere. The fact that you have a set of rules which govern the mechanics and principles by which proof is made out, in other words relying on or not being able to rely upon foreign judgments or foreign pleadings or statements in proceedings to which the parties to these proceedings are foreigners, none of that goes anywhere. Because all of those rules, all of those principles determine how you go about proving facts if you have to. The question we're concerned with is, do you have to. And my submission is that as Pearce plainly demonstrates, in principle, you do not.

So my learned friend Mr. Gledhill then says, well, you get the same approach, the same principle from the H. case, the child care case. Do you remember the has there been harm, has there been likely to be harm, Bundle 17, page 429. That I respectfully submit was entirely different. It had nothing to do with the public interest at all. The public interest wasn't engaged; it wasn't invoked in any shape or form. It didn't form the basis for the Court's jurisdiction. It didn't require the Court to raise its eyes to the public interest hills if I can

put it that way. It was simply a legislative provision about how you go about determining and what tests have to be met in the child care context in an individual case.

And it's not remotely difficult to see why and how Lord Nicholls insisted on proof in that sort of context. But it is not a remotely analogous context in circumstances in which we all agree that context is key.

And a similar answer can be given to the two cases that Mr. Gledhill took you to referring to complaints by members of the public in relation to trading standards, matters or whatever else it may be and what their value was. That isn't remotely comparable to the context that we have here. They do not establish, which is where all of this appeared to be tending in his argument, a position that requires, irrespective of the context, proof of facts to that civil standard even if to do so would be to subvert the public interest not promote it. So that's the fourth point; not supported by the case law.

The fifth point is not supported by the legislation either. And so far as that is concerned, my learned friend's big point appeared to be that 162(3), as you will recall, referred to the concept of

prima facie. And so he says you can infer from that that the legislative policy and intendment was to require proof on the balance of probabilities in relation to all facts that might be relied upon to establish or engage the Court's public interest jurisdiction. And I respectfully submit that the one simply does not follow from the other.

The provision in 162(3) is simply dealing with a specific context, a context by the way relating to insolvency and not the public interest. But a specific context in which what is being done by the Legislature is to set rules for when a member can make an application. And in those circumstances, the Court will only do so and allow them to bring that sort of application for insolvency if satisfied that there is a a prima facie case that the company is insolvent. Completely different. That tells you nothing whatever about the approach intended by the legislation for the Court to take in relation to a public interest application.

And the same point applies in relation to the Financial Services Commission. All that the legislation is doing in those provisions is to set particular hurdles that have to apply before that body can apply. It is not constraining the Court's

jurisdiction or approach to what would be needed to found the public interest application on which we rely.

I turn finally then if I may before handing over, I think Mr. Dennis is going to reply on some of the abuse points, but turn finally if I may to the provisional verses appointment dilemma, that set of issues.

My submission is, my first submission is that it's perfectly possible for the Court on an application of this kind to make an order if it considers that's the appropriate and just course. Perfectly possible for it to make an order for the continuation of the Joint Provisional Liquidators.

167 deals with the Court's power on a hearing of an application for the appointment of a liquidator. And provides that the Court may, amongst other things, see 167(1)(d), make any interim order or other order that it considers fit. So as a matter of jurisdiction, that there is no constraint on what the Court can do if it considers that is a just outcome.

There is no doubt, of course, that the very concept of provisionality involves one throwing one's mind forward to a final order or to an end game but a continuation of a provisional order, if that was the Court's view, if that were what it thought the

rights and just outcome would be, would still be that. You would still have a provisional order leading, if appropriate and if not terminated, to a final order. It would still be, to track the language that appeared to be relied upon in 170(1) of the Act, it would still be not yet determined under section 170(1).

Now, no doubt if the Court's view on the primary issue of principle that we have been concerned with is that one cannot invoke the public interest jurisdiction unless one proves those facts, then that is likely to cause, at the very least, problems for both a continuation of the provisional liquidation and for any appointment of liquidators. But I do submit that as a matter of jurisdiction and power, both options are available to the Court under the statutory scheme that you are dealing with.

And it may well be that there are a set of advantages that would inure if you made the appointment of the liquidator at this point, that you turned it from a provisional into a final liquidation. There are various differences, there are various, no doubt issues that the provisional liquidators would face in foreign jurisdictions because of the provisional nature and the known provisional nature of their appointment. There may be other reasons in

favour of it being made final. But perhaps the critical point in all of this is that if you make it final, that does not, as it were, end the game. Making appointment the final, or making the appointment of the liquidators final at this stage as it were or moving to that stage still preserves all of the stages that the legislation envisages, protection, continuing investigation, continuing report to the Court, continuing, everyone including the Court, keeping an eye on things, if necessary to move to collecting assets, then that is what happens. The Court can give permission for that or not. Nothing effectively changes of substance other than to secure the benefit of having liquidators appointed rather than simply operating with the title 'provisional' before them. And that I respectfully submit is a benefit in itself.

So my submission is that all options are open to the Court and that our primary case is that that appointment should be finalized recognising that finalizing it will not mean killing the company or jumping to the end game and not following through the stages. But if you are concerned about that, you have every power to make it provisional.

My Lord, I'm sorry, I've gone a little bit longer that I thought I would, but those are my

submissions in reply. Can I hand over to Mr. Dennis unless you have questions for me.

THE COURT: I have no questions at this stage.

SIR EADIE: Thank you.

THE COURT: Thank you very much, Sir James.

Yes. So, Mr. Dennis.

MR. DENNIS: May it please you, My Lord. My Lord, I'm very conscious of where we are in terms of time, but I expect I can complete the very few remaining submissions in fairly short order.

THE COURT: Yes.

MR. DENNIS: And that is in relation to the abuse point which Your Lordship will recall I addressed preemptively. However, my learned friend did return to them in his oral submissions and placed some amount of emphasis in particular on the, on certain provisions of the Proceeds of Criminal Conduct Act.

THE COURT: Yes.

MR. DENNIS: And this was in support of the overall submission that the application for a winding up order in relation to these companies creates a situation in which the Attorney General is

seeking to circumvent the statutory requirements as also the mechanisms which are available to her under other regimes in order to pursue her objectives. And that it is an abuse to use the process of appointment of a liquidator over the companies for this purpose.

To the extent that I addressed that overall submission already, I do not propose to repeat those submissions in the interest of time. But, My Lord, insofar in particular as the Proceeds of Criminal Conduct Act is concerned, it is important for Your Lordship to bear in mind that it is somewhat misleading to suggest that the failure of the Attorney General, for example, to avail herself of the provisions under this legislation amounts to an abuse of process really cannot be sustained.

Because the fundamental flaw in that assertion, My Lord, is that it completely ignores the fact that the provisions of section 36 of the Proceeds of Criminal Conduct Act to which my learned friend points clearly contemplates circumstances in which criminal, either a criminal investigation has been launched or there are criminal investigations on foot having to do with money laundering. So those provisions would come into play only in the context of criminal proceedings whether by way of investigation or

by way of ongoing proceedings.

This is not the case which we have before Your Lordship. This is a case which involves the overarching public interest imperative for mechanisms to be employed which would allow the necessary steps to be taken under the Court's supervision to meet a two-fold purpose. One, protection of assets; two, to put its officers in place to carry out the necessary investigations to get to the bottom of these very serious allegations. And to the extent that there may be other mechanisms available to the Attorney General, they are not mutually exclusive. Because these circumstances warrant and dictate, I would submit, that the Attorney General avails herself of all mechanisms which are available to her and certainly of that or those mechanisms which would seem to be most effective in the circumstances.

And I already addressed Your Lordship as to why we say that the mechanism which has been launched by way of the application for appointment of liquidators is indeed the appropriate mechanism. And is indeed, all things considered, is at this point the most effective mechanism which could have been employed.

With reference to the protocol which

allows the sharing of information between the Joint Provisional Liquidators and the Attorney General and which also contains provisions which speak to the sharing of information by the Attorney General with overseas agencies, again it has been submitted that this also circumvents the mechanisms in place by which the AG could render assistance to foreign agencies, and that this also amounts to an abuse of process. But I already took Your Lordship, and I won't repeat that, to specific relevant provisions of the protocol which make it pellucidly clear that to the extent that there is to be any sharing of information by the Attorney General with foreign agencies pursuant to this protocol, the AG would be bound by the same strictures as indeed she would be bound regardless of whether such a protocol was in place. The information under the protocol would still have to be treated with circumspection. It would still have to be transmitted pursuant to the relevant statutory mechanisms which are in place precisely for the purpose of protecting the integrity of that process.

And so again, My Lord, we say there is absolutely nothing in that point to suggest that the protocol somehow facilitates circumvention of mechanisms and protections to which the subject

companies would otherwise have, the subject companies would otherwise have available to them.

And so, My Lord, we stand on the submissions previously made in relation to my learned friend's contention as to abuse of process and in particular, My Lord, we wanted to underscore those two points.

Unless Your Lordship has any questions of me that, My Lord, would be where I propose to end my further submissions.

THE COURT: Yes, thank you very much indeed, Mr. Dennis.

Okay. Very well, learned Counsel. Thank you very much for your submissions.

Usually at this stage in a hearing I would have a fairly strong idea of the right answer in a matter. However, somewhat unusually, and maybe because this is a first, I am not quite there yet mentally. So as far as I'm concerned, I still have to think about these matters further.

What I think I will be greatly assisted by, because we've heard a lot and not all of it is strictly necessary and some of it is descriptive and some of it is explanatory, et cetera, what I think I would be greatly helped by is if the three parties

before the Court could each summarise their positions or the key points of their positions. I don't want endless documents to wade through. I would like a summary from each side of what their position is and why they say they are right.

And by summary I mean a short document bearing in mind that this Bench is a busy Bench and the longer your document is, the longer it's going to be before you're going to get the judgment. So you have an interest in keeping it short and sweet. So if each side could please produce a summary of position paper, that would greatly help me so that I can look at all three positions and decide well that is right, that is wrong, I must go there, I must not go there, et cetera.

Now, so I would be grateful if you would kindly do that additional work. I am sorry to inflict further cost upon your respective clients, but I think it would help the Court.

In relation to the provisional liquidators position, Sir James mentioned that there was something that he felt somewhat awkward about. It will obviously give Sir James an opportunity to settle any awkwardness. And if it is that he feels that his side needs to put something further in in relation to the provisional liquidators or whatever, this is an

opportunity to raise that possibility in a properly case managed manner of course. But for now I think what I'm going to do is I'm going to direct that each of the three sides put in their summary position paper so that I have a, let's say, let's just call it an idiot's guide from each of you as to how this particular judge is supposed to take it from here. And I would be very much appreciative of your help in that regard. Is that okay, learned Counsel?

MR. GLEDHILL: My Lord, I was going to respectfully make a suggestion. Obviously anything that is of assistance to Your Lordship we will assist with. And we very much understand the need for brevity. Could I respectfully suggest that perhaps a page limit might be quite a helpful thing because it will help everybody to focus their thinking.

As somebody once said, I did not have time to write you a short letter so I wrote you a long one. I think everybody would be assisted by writing short letters to Your Lordship. And I was going to suggest five pages of A4.

THE COURT: And what sort of spacing, line spacing?

MR. GLEDHILL: Well I'm -- I notice that Sir James' skeleton is in single space and

mine is in one-and-a-half. But I think I was prepared to leave that to everybody's good sense and judgment. I'll do it in the conventional spacing and I'm sure that will be fine.

THE COURT: So you could do it within five pages.

Okay, Sir James, what about you?

SIR EADIE: My Lord, you've given your indication. You are not going to be assisted by people repeating stuff that's already before you. We will try and do it as shortly as we possibly can. And we note with great respect the five-page limit that Mr. Gledhill has imposed on himself. We'll try not to breach that ourselves.

THE COURT: Well, I think if you went up to 10 pages then, it's not going to be breaking the bank.

You've also got obviously Mr. Dennis, his subset of submissions to encapsulate as well. So if I was going to say to each of the three parties, 10 pages maximum please.

Good. And in terms of timing, well, you've probably got other things to do and so I don't want to impose an inhuman timetable upon you. What if we were to say a couple of weeks or something like

that? Would that work for you? Where are we now? We're now at 17th of April. If we were to say the 15th of May, whatever that is, middle of May, would that help?

SIR EADIE: It would from my perspective. I'd be very grateful for that time.

MR. CLIFTON: My Lord, I don't think the intention of Your Lordship's direction is that the JPLs would be putting in a position paper. What I have had update is that the role of their reports which in the normal, I should stress in the entirely normal way have been sealed from the parties but not the Court. It's a matter for the supervising judge of the liquidation to read them at their leisure.

My Lord, the reports peter out in early March and there is another report which has been started which is probably going to cover all, to the extent to which this matter with the JPLs to address them, all of the issues that have been ventilated that come out of the liquidation will be covered in that report because the liquidation is properly, a provisional liquidation is properly underway now.

My Lord, I'm told that it may be possible for that report to be filed by the 1st of May. My Lord, that report without further direction will be

filed sealed. But it may be that the parties can agree that the fate of the report, subject to the Court's blessing, in which case it will be possible for the position papers, as it were, to reflect such points as emerge from the Joint Liquidators, Provisional Liquidators Reports as the parties think is helpful.

THE COURT: Okay, maybe the way to do this is to, if you are going to be filing a JPL Report let's say by the, round about the end of the month, then if I was to read that report and anything else the JPLs might have produced before now, which I haven't read, then if there are any questions which come out of it from my point of view, then I can raise those questions and direct the parties to address the Court on them. Maybe that's the best way to do it.

Yes, carry on.

MR. GLEDHILL: Forgive me, may I say something about this. So the case that I showed you was a case in which one of the parties proposed to adduce evidence at the hearing. Neither of the parties have adduced these reports before this hearing. And if this evidence, if these reports were to be put in evidence, they had to be put in at a time in which we could deal with them in evidence. The suggestion that the Joint Provisional Liquidators should now

effectively put in evidence after both parties have closed their case, after both parties have filed their evidence and effectively now come in from the side and say, well, we wish to put in further evidence before the Court is, with respect, this is --

MR. CLIFTON: My Lord, I'm reluctant to interrupt Mr. Gledhill, and I fear I've got a terrible cold so it may be difficult to understand me.

The liquidators, as I have said and I will repeat myself intruding on the Court's time, the Joint Provisional Liquidators are not putting in evidence on this application. The Joint Provisional Liquidators have complied with normal practice and the Court's directions. The point which I was hoping to make simply, that the Joint Provisional Liquidators are going to put in a further report by the end of this month. The fate of that report is in Your Lordship's hands. The report may be sealed against the parties, but it is quite certainly not sealed against the Court.

So if it is suggested that this is some attempt to shoehorn evidence in after the hearing has come to a close is absolutely wrong. But --

MR. GLEDHILL: My Lord --

MR. CLIFTON: -- the further

report which we anticipate will assist the Court, it's a matter for the parties what they want to do with it, will come at the end of this month, and that that may impact the Court's approach to the timing of further submissions from the parties.

MR. GLEDHILL: My Lord, there cannot possibly be a position in which Your Lordship reads documents which we have not even seen. There cannot possibly be. If this is material which is relevant to Your Lordship's decision, it had to come in by way of evidence. It is simply not acceptable for the Joint Provisional Liquidators to propose that they send documents to the Court which Your Lordship reads, which we do not see and to which we have no right of response. That will be a fundamental breach of natural justice.

MR. CLIFTON: My Lord, I am sorry to cut across [inaudible] again. That is not what I have said. Whether the outrage is manufactured or sincere, My Lord, these reports are filed with the court sealed. The Judge can do with them as they wish. We're not proposing to send them to Your Lordship for Your Lordship to read. It was simply in my attempt to be of assistance to the Court. There will be a further report which will cover many of the issues that have

been ventilated which we anticipate being filed in the normal way in accordance with the JPLs' statutory duties by the end of this month. The fate of that report, My Lord, is as we have just said, very much a matter for the parties to agree and for Your Lordship to direct. But as a matter of fact, that's when it's going to come in.

THE COURT: All right --

MR. TYERS-SMITH: My Lord, I'm so sorry, may I just say, just to add to Mr. Gledhill's point about that. And that is, I think the suggestion Mr. Clifton has just made is that it may well affect the timing of your judgment and obviously it is tacit in that. That it can only affect the timing of your judgment if it is going to be read and, therefore, material to it. So I think we would like some clarity on whether, as Mr. Gledhill has pointed out, this is going to feature in the process of consideration. Because as he said, it may well have a very material impact on the arguments that have been made over the last two days.

THE COURT: Well, I mean, I can see the problem. The -- well, clearly anything that the JPLs might say now is not something which I can take into account in producing a judgment. Because

I've heard the parties at the hearing of this application to put these companies into liquidation. We've had the hearing, we've had the trial, if we can call it that, and the Court's job would be to produce a decision based upon the submissions and the evidence such as it is, factors as it's been put, such as it is at the trial.

All I'm asking for at the moment is because there are three parties before the Court and this is a new area and it is a very important area and it's a very important case. As you've said, it's the worst of the worst or I've said that you've adopted that terminology, it's the worst of the worst. So I have to be a bit careful. So all I'm saying is having heard these wonderful submissions from these extremely clever people, can they please be condensed into something which I can get my little mind around in the little time I have available, hence the summaries. And to be able to think about them and crystalize them carefully, you know, put the issues as starkly as possible so that a simple man can understand them simply. And so that's all I'm asking.

Now, if it is, of course, that the JPLs having sat here and listened to us they go and say well hmm hmm, okay, we've got some kind of investigative

brief and we've got all sorts of things that we'd like to say and we're going to slam [sic] them into a new report basically, if that happens and if I happen to read it, which you know being the Court supervise them as well, I probably suppose I ought to, then it will be my job to say either I shut it out from my mind or I have to say well hang on a minute, all this changes the entire picture and I'm going to have to somehow or other put issues to the parties for the parties to address the Court on.

Either way, what has to be very clear is as Mr. Gledhill has said and Mr. Tyres-Smith as well, there must be no breach of natural justice. That is vitally important. The Judge cannot take secret evidence into account. That is a fundamental rule of justice. And it's -- there is a secret evidence rule, of course, and it's not narrowly circumscribed to just evidence, it's, the Judge is not supposed to take, you know, secret material into account that he hasn't been able to take submissions on from the parties.

So, you know, this is not the first time that something like this has ever happened. And the Court knows what it's got to do if there's something that it reads that might change the perspective of things. So don't worry about it. Right now what I

want is I want those summaries. If having seen a further report come in it changes anything, then be rest assured I am not going to write a judgment based upon what I've read and then forget everything everyone has sent me. No. I'll look to you again for submissions in some kind of curated [sic] way such that you know the number of what you have to address the Court on. So the Court will just handle that problem as it comes. Okay.

SIR EADIE: Thank you.

MR. TYERS-SMITH: Thank you. I'm very grateful.

THE COURT: Very good. So middle of May please, whatever that middle of May date is, it's a weekday, limited to 10 pages for each of the three parties.

MR. DENNIS: My Lord, could we have some specificity in terms of a date rather than leaving it --

THE COURT: Let me look what -- I don't have a calendar in front of me, but let me see if I can Google one.

MR. CLIFTON: Your Lordship mentioned the 15th of May which is a Friday.

THE COURT: Okay, if it's a

Friday, that's even better. Let's say Friday, 4:00 p.m., 15th of May. 4:00 p.m. BVI time.

Okay. So thank you very much indeed, learned Counsel. Extremely interesting. Not that easy. And enjoy the rest of your evening or day.

Thank you very much. Bye-bye.

(Court adjourns at 4:42 p.m.)

* * *

REPORTERS' CERTIFICATE

WE, LISSA DONOVAN, MONIQUE GRAHAM, PETULA V. STOUTT and STACY GLASGOW, Certified Court Reporters, do hereby certify:

That on the 17th day of April 2026 the foregoing proceedings were taken down by us in machine shorthand, consisting of 231 pages herein; that the foregoing is a true and correct transcript of the proceedings had.

That we are not attorneys, relatives, or employees of any party hereto, or otherwise interested in the events of this cause;

IN WITNESS WHEREOF, we have hereunto affixed our signatures at Road Town, Tortola, British Virgin Islands, this 21th day of April 2026.

________________________ ________________________
LISSA DONOVAN — Certified Court Reporter
MONIQUE GRAHAM — Certified Court Reporter

________________________ ________________________
PETULA V. STOUTT — Certified Court Reporter
STACY GLASGOW — Certified Court Reporter