# EXHIBIT 13

## May 15, 2026 Closing Summary of the BVI Attorney General

Case Number :BVIHCOM2026/0027

FILED
HIGH COURT
TERRITORY OF
THE VIRGIN ISLANDS

Submitted Date:15/05/2026 15:47

Filed Date:15/05/2026 15:47

Fees Paid:0.00

**IN THE EASTERN CARIBBEAN SUPREME COURT**

**IN THE HIGH COURT OF JUSTICE**

**BRITISH VIRGIN ISLANDS**

**COMMERCIAL DIVISION**

**CLAIM NO BVIHC (COM) 2026/0027, CLAIM NO BVIHC (COM) 2026/0001, CLAIM NO BVIHC (COM) 2026/0002, CLAIM NO BVIHC (COM) 2026/0003, CLAIM NO BVIHC (COM) 2026/0004, CLAIM NO BVIHC (COM) 2026/0005, CLAIM NO BVIHC (COM) 2026/0006, CLAIM NO BVIHC (COM) 2026/0007, CLAIM NO BVIHC (COM) 2026/0008, CLAIM NO BVIHC (COM) 2026/0009, CLAIM NO BVIHC (COM) 2026/0010, CLAIM NO BVIHC (COM) 2026/0011, CLAIM NO BVIHC (COM) 2026/0012, CLAIM NO BVIHC (COM) 2026/0013, CLAIM NO BVIHC (COM) 2026/0014, CLAIM NO BVIHC (COM) 2026/0015, CLAIM NO BVIHC (COM) 2026/0016, CLAIM NO BVIHC (COM) 2026/0017, CLAIM NO BVIHC (COM) 2026/0018, CLAIM NO BVIHC (COM) 2026/0019, CLAIM NO BVIHC (COM) 2026/0020, CLAIM NO BVIHC (COM) 2026/0021, CLAIM NO BVIHC (COM) 2026/0022, CLAIM NO BVIHC (COM) 2026/0023, CLAIM NO BVIHC (COM) 2026/0024, CLAIM NO BVIHC (COM) 2026/0025, CLAIM NO BVIHC (COM) 2026/0026, CLAIM NO BVIHC (COM) 2026/0028, CLAIM NO BVIHC (COM) 2026/0029, CLAIM NO BVIHC (COM) 2026/0030**

**BETWEEN:**

**IN THE MATTER OF SURE TYCOON LIMITED AND TWENTY-NINE OTHER COMPANIES**

**AND IN THE MATTER OF THE INSOLVENCY ACT, 2003 OF THE LAWS OF THE VIRGIN ISLANDS**

**THE ATTORNEY GENERAL**

**Applicant**

**-v-**

**SURE TYCOON LIMITED AND**

**TWENTY-NINE OTHER COMPANIES**

**Respondents**

---

**CLOSING SUMMARY OF APPLICANT'S SUBMISSIONS**
**(Filed pursuant to post-hearing direction issued on the 17th of April, 2026)**

---

**INTRODUCTIONS**

1. This summary of the Applicant's submissions is filed pursuant to the direction of the Honourable Justice Wallbank K.C. issued on April 17, 2026 following a two day hearing of the Applicant's originating applications to appoint liquidators over the Respondents.

**PUBLIC INTEREST**

**The correct approach in principle to the appointment of liquidators on public interest grounds**

2. The legislation provides the basis for the Court's jurisdiction. This is the Virgin Islands Insolvency legislation which should therefore be approached on the basis that, despite similarities, it is not the same as English insolvency legislation. The key features of the Virgin Islands legislation for present purposes are as follows.

3. **First,** it includes an express, separate basis for the Court to appoint a liquidator on the ground that "*the Court is of the opinion that it is in the public interest for a liquidator to be appointed*". This is therefore a freestanding basis on which the Court can act.

4. **Second**, the legislative precondition is that an application is made to the Court by a limited, and identified, number of public authorities, including the Attorney General ("AG"). The legislation no doubt made this provision because such public authorities, including the AG, are well placed to assist the Court in identifying factors sounding in the public interest; and it is appropriate that in a case such as the instant one, the first filtering judgment about matters affecting the public interest should be made by the AG.

5. **Third**, the public interest is a broad and evaluative concept.

   5.1. Multiple different factors can bear upon it.

   5.2. If a factor could bear on the public interest, it is both appropriate and necessary for both the AG and the Court to consider it.

   5.3. There is nothing to suggest that the legislator intended a narrower or more limiting approach.

   5.4. It is clear that the public interest can be affected by factors/matters/concerns that have not been proved as facts – see further below.

   5.5. That is clearly recognised by the fact that there is, as is recognised in a range of legislation both in the Virgin Islands and in other rule of law jurisdictions (such as the US and UK), the strongest public interest in taking effective steps against a range of conduct by 'bad actors' such as those who commit gross human rights abuses and those who cause the misery and damage that is inevitably attendant on criminal activities of the kind alleged here. That public interest acknowledges the difficulty (and at any point in time it may be the impossibility) of proving facts where such activities are complex, cross border and include steps specifically designed to conceal and obfuscate the facts (features that are inherent in money laundering, including reintroduction of assets into seemingly legitimate businesses). It does so by empowering state action (reviewable by the courts) which may have the most serious impact on property and personal rights and freedoms on the basis

of something far short of proof of the underlying criminality or other relevant facts. For example, sanctions regimes are often premised on action on the basis of reasonable suspicion – not proof.

5.6. The key point is that all of this reinforces the broad concept that the legislation has chosen to use in the present context. It empowers the Court to appoint liquidators in a wide range of situations. Those situations are characterised by any circumstances in which the public interest is impacted and would be served by the appointment of liquidators.

5.7. It is for the Court to exercise the public interest jurisdiction that the legislation has conferred on it. That fact, and the court's primary rather than supervisory jurisdiction, no doubt enhances rule of law protection. But it does not imply any intention to narrow the bases on which the public interest might be affected or impacted. It does not indicate that the Court should approach the substance of the issues bearing on that public interest in a way that is narrower than the approach that would be adopted by the public authority applicant (such as the guardian of the public interest, the AG).

6. **Fourth,** the legislation empowers the Court to adopt a staged approach. As to that:

6.1. As a general point, and for the reasons set out below, appointment of liquidators does not necessarily entail the winding up of the company. Such an appointment, with the consequent exercise of liquidators' powers, may themselves serve a vital public interest.

6.2. Liquidators have powers to <u>investigate</u>. The investigation of the affairs of a company is a key function of liquidation. Liquidators can examine and investigate the company's documents. Moreover, under s.284 they are allowed to apply *ex parte,* for an order that *"a person specified in subsection (2) appear before the Court for examination concerning the company, or a connected company, including the promotion, formation, business, dealings, accounts, assets, liabilities or affairs of the company or connected company".* They can also cooperate and liaise with those in other jurisdictions who might be able to assist in putting together pieces of a complex web specifically designed to obfuscate and conceal. These powers, and the ability to investigate, are of obvious importance in a public interest liquidation based on concerns that the company is mixed up in cross-border criminal activities of the kind alleged here [see ***Re Alpha Club (UK) Ltd*** [2002] 2 BCLC 612 at [39] and [46]] ***[AB/1/11-12]***.

6.3. Liquidators are able to <u>protect</u> the assets of the company pending investigation and any further appropriate steps. This power is also of obvious importance in the context of a public interest liquidation in circumstances of this kind. The importance is not undermined by the imposition of sanctions. Sanctions can be breached despite the penal consequences of non-compliance; a real concern in such circumstances.

6.4. Once a clear picture emerges, decisions can then be made about the next steps. Those steps may include an orderly process of identifying those with an interest in whatever assets the company has and a distribution. Such a process can take into account the interests of shareholders, for example, and also potentially those of victims. The public interest supports this sort of process, with all interests taken into account. However, importantly, the steps may also include termination of the appointment of liquidators – there is clear, express power to do so in s.233. That power can be invoked by those identified in s.233(2); but that provision is permissive, not necessarily exhaustive, so that for example it would plainly be open to the AG to invite this course if she considered it appropriate to do so.

6.5. Added to this array of powers to take matters in stages is the possibility (an alternative to the AG's primary case) of continuing matters on a provisional basis for the time being. The power to make such an order is not constrained. That is evident from s.167(1)(d) which specifically empowers the Court on an application to appoint liquidators to make "*any interim order or other order that it considers fit"*. That power can be read, consistently with s.170(1), to permit the continuation of a provisional liquidation. However, this is an unnecessary debate once it is recognised that the Virgin Islands legislation evidently permits a staged approach post appointment of liquidators (on the basis that the appointment can be terminated at any time.[1]

6.6. The staged approach happens at all times under the eye and direction of the Court.

6.7. This staged approach is both permitted and envisaged by the Virgin Islands legislation. The approach to the appointment of liquidators (provisional and otherwise) taken by the court demonstrates its flexibility, and its ability to be used to achieve a just outcome.[2] In this case, we say that, at the very least, the appointment of the JPLs ought to be continued to achieve the just outcome of protecting the public interest of the Virgin Islands.

7. There is no justification for simply assuming that upon the making of a liquidation order, later stages (for example, an orderly process of distribution etc) will necessarily follow. That is all the more so given the potential importance of the investigation stage in a public interest liquidation. Nor would it be right to approach matters on the basis that ordinarily a liquidation is fatal to a company and is really simply directed at distributing the company's assets in the usual way. It is for the Court to decide, in accordance with the broad powers conferred on it, what the public interest requires at each stage. Both at the outset and as it progresses, the public interest is the

[1] BVIHC (COM) 0083 of 2010 - **David Friedland v Xena Investments Limited and others** ***[AB/2/ 14-25]*** and BVIHCV2010/231 - **Slim Malouche v Registrar of Corporate Affairs** ***[AB/3/26-38]***

[2] BVIHC (COM) 2018/0206, 0207,0208,0210,0212 **Constellation Overseas Ltd and Others** ***[AB/3/ 39-65]***

loadstar – and the powers conferred by the legislation are plenty wide enough to accommodate any and all matters that might bear on it as the liquidation unfurls.

**Is there an immutable requirement in the present context to prove facts to the civil standard?**

8. The correct approach in principle identifies and then weighs **factors** bearing on public interest in the appointment of liquidators, for and against. It is on those factors that the Court is required to be centrally focused (the *raison d'etre*). That involves focusing on impact and effects of appointment compared to impact and effects if not. The question is ultimately whether, on all the evidence before the Court, reasons of sufficient weight have been advanced to justify the appointment of liquidators on public interest grounds.

9. In providing for a public interest basis in the legislation, it is evident that the legislature envisaged the Court being able to react in all circumstances in which the benefits of a liquidation to the public interest might justify that course. The myriad factors that might bear on the public interest strongly militate against a uniform approach; and also against any approach in which there is some sort of jurisdictional precondition to the Court's ability to take all such factors into account. It is emphasised that this is not a trial between private interests; it is an exercise in weighing the factors bearing on the public interest.

10. There are five particular reasons, when applying the public interest test, for it not being appropriate to require proof of involvement in criminal wrongdoing by the company.

***(1) The allegations themselves engage the public interest aspects identified***

11. The public interest can in principle be affected by, and action can be taken on the basis of, serious concerns that cannot be proved at a particular point in time. There are many different contexts in which steps protective of the public interest are taken on the basis of something much less than proof of facts (for example, suspicion or reasonable belief). Those contexts may nevertheless involve draconian measures by the state deeply affecting property and personal rights. Sanctions are a paradigm example. That is in recognition of the fact that the public interest might well need to be protected, and can only properly be protected, by an approach that does not require proof of facts.

12. The concerns raised in the present context are both powerful and evidently bear on the public interest. They sit in a context of international recognition of the need for effective action, including through international cooperation, to tackle and deal with criminal activities of the kind alleged here. The AG could not sit idly by; and neither should the Court. The setting of the test for liquidation by reference to the public interest, as already noted, itself plainly indicates that all

factors bearing on the public interest can and should be considered. Three key points are made in that respect.

13. **First,** these are allegations of extreme seriousness. The base conduct is appalling –scamming on an industrial scale with all the misery for victims that entails; rendered all the more appalling by the allegations of forced labour, human trafficking etc. The allegations are of orchestrated criminality on a global scale. They are also of concerted attempts to launder and reintroduce washed proceeds back into ostensibly legitimate = businesses – with all of the deliberate concealment and obfuscation and complexity that is positively designed to make ascertaining the full picture as difficult as possible, let alone its proof. These are not mere general allegations. They are highly specific and deeply concerning.

14. **Secondly,** there is substance to them, even if not proved. That is evident from the extensive investigations leading to action taken in a number of states. There have been sanctions imposed and action taken in respected, rule of law jurisdictions as the AG's first Affidavit indicates. For example, Prince Group has been designated a Transnational Criminal Organisation by the US Department of the Treasury (and Chen designated as the orchestrator of that organisation); and sanctions have been imposed in both the US and the UK. This is not to be trivialised by reference to the fact that matters have not yet been the subject of a civil trial. States governed by the rule of law and significant investigative resources have themselves concluded that the material they have gathered justifies the potentially draconian measures of sanctions – and thus that that material surmounts the applicable standard (in the UK reasonable suspicion). Moreover, the US has launched criminal process and it has through its authorised officers verified the facts it has set out in the *in rem* Complaint.

15. Moreover, the concerns apply to these companies. The Campbells companies ('CCs') attempts to distance themselves from this go nowhere.

15.1. All of the CC companies are beneficially owned and controlled by Chen. That is a key undisputed fact of critical importance to this application.

15.2. They say that there is no allegation in the US proceedings that they were involved; and they contrast their position in that respect with that of the Kobre and Kim companies ("KKCs"). However, all 25 of the CCs were sanctioned by OFAC on the basis of (a) the claims made/reasonable suspicion about the criminal activities of Chen and his associates, and their *modus operandi* (100's of companies involved in the laundering and reintroduction into seemingly legitimate businesses etc); and (b) the undisputed fact of ownership and control by Chen. They then say that in the <u>UK</u> only Chen and PGGL were sanctioned. That is true but also goes nowhere. All 25 were sanctioned in the <u>US</u>. Moreover the impact of

sanctioning Chen and PGGL has been sufficient to achieve the key effects of sanctioning over all of the 25 companies given the ownership and control of those companies.

15.3. It is also to be noted that the suggestion that the sanctions had rendered the appointment of liquidators otiose was virtually abandoned. The appointment of liquidators would bring powerful additional public interest benefits: enabling investigation and cooperation with other jurisdictions; providing an important additional layer of protection of the company's assets; ensuring that, if appropriate, a distribution of assets takes place after an orderly process in which the interests of all of those with an interest in the assets are properly taken into account.

15.4. The attempt to suggest that the JPLs had given the CCs a clean bill of health is untenable. They are still investigating; and have had to do so with some obstruction – as Mr Pretlove's Affidavit makes clear (see **§§38 and 54 at 5/207 and 212**).

16. The KKCs sought centrally to rely on errors in the initial AG Affidavits as they related to them. The errors were acknowledged: **see Skeleton for the hearing at §17.** However, they do not touch the concerns of involvement of these companies. Both are alleged to have been involved in specific, clearly set out ways in the laundering operations. Moreover, there is a direct link between them and the person identified as a key associate of Chen, Zhou – as indicated by the **AG's second Affidavit, §§25-27 (4/163; and exhibits at 226-227, 234-235)**.

17. The dangers of building tottering edifices, which come down under the examination of such trial, are well known and well understood[3]. However, the Court is not conducting such a trial. It is considering a very different question which is whether to take the first of the number of possible staged steps in a public interest liquidation - the first of those steps (merely) being to ensure the proper investigation of the facts and the protection of the assets of companies that might have been involved in this sort of criminality.

18. **Third**, allegations, and evidence of other state action in reaction, call for effective action by the Virgin Islands to protect values it holds dear and important – for example, the rule of law, the protection of victims of organised crime and the integrity of financial systems. All of those are engaged by each of the elements of the criminal activities alleged. The Virgin Islands is committed, in the public interest, to effective action not merely to uphold values in such circumstances but also to provide assistance to international partners. It is no coincidence that, in relation to the second part of the activities (money laundering), the Virgin Islands has emphasised its clear and

[3] So too is the possibility that those pleading cases may embellish (although it is emphasised that that issue has not been considered or determined by any court as yet in relation to the matters raised by the CCs).

powerful commitment to effective tackling in the Policy referred to and exhibited to the **AG's First Affidavit (§§32-38 at 2/37).** The public interest calls for an effective response within the law in the face of these allegations and this multi-state action. The state cannot and should not be neutral in protection both of interests of victims or of protection of integrity of business systems. That is particularly so for the Virgin Islands which has been brought into the sphere of this alleged criminality because its laws, and corporations, are being used. There is a very strong public interest in the effective protection of that; and being seen to ensure such protection. That is why the AG has made the application; and it is the basis on which she invites the Court to exercise the public interest jurisdiction accorded to it under the legislation.

***(2) Insistence upon proof is entirely inimical to the public interest***

19. A statutory test based on the public interest stands against the idea that the public interest should be rendered incapable of protection if the applicant cannot prove a serious allegation or set of allegations giving rise to gravest public interest concerns. It would mean that the public interest could not be invoked in such a case unless and until picture clear and capable of actual proof. That would be to insist on an impossible precondition – rendered impossible by the very concealment and laundering etc that lie at heart of criminal operations of this kind; and which still require investigation. It would also carry unacceptable risk of serious damage to the public interest. In the meantime, the companies would have to be returned to the control of the person alleged to be the prime orchestrator of the criminal empire, Chen. The risk is that the true facts can be rendered even more difficult to ascertain; and that the assets are dissipated.

20. It is, in short, an affront to public interest for companies that may well have been involved in money laundering and running businesses and that are directed and owned by the orchestrator of both that activity and the base fraud (with all of its appalling features) to simply be permitted to continue to operate with impunity. That is all the more so in circumstances in which other respected international partners have taken serious action already.

***(3) The alternative (and the effect of appointment of liquidators) by contrast would serve the public interest***

21. The effects as already noted would be to place the affairs of the companies into the hands of independent professionals acting as court officers. It would enable their affairs to be investigated, with all of the international liaison that might be appropriate and necessary. It would enable the Court to oversee and direct each of the possible stages in the liquidation. If considered appropriate, it would also enable an orderly process to be undertaken with the proper identification of assets and of those who have claims on them, including both shareholders and

victims. None of that can happen if a requirement to prove that which cannot be proved at this time is imposed in effect as a precondition to an order under s.162.

***(4) A requirement to prove is not supported by the legislation***

22. The legislation contains no such requirement in s.162. On the contrary, the single test is that the Court is of the opinion that it is in the public interest for a liquidator to be appointed.

23. The CCs suggested, no doubt in recognition of this difficulty for them (and indeed of the *Pearce* case dealt with further below), that built into s.162(1) there is a jurisdictional stage and a broad evaluative stage. The latter is accepted and asserted by the CCs; and it is also accepted by them that, at that latter stage, a range of matters can be taken into account without the need necessarily to prove facts (or at least a more flexible position). The acknowledgement that the public interest is a broad church involving evaluation of a range of factors, in this way, is correct. However, the contention for a jurisdictional precondition to prove the criminality is wrong. It creates a two-stage approach where none exists. The single test is whether appointment is in the public interest – and that single test has all the flexibility of approach (including in relation to factors) that is necessary to allow all public interest considerations to play their part.

24. The CCs contention that s.162(3) indicated a legislative intention that the public interest test required proof on the balance of probabilities is wrong. Section 162(3) refers to the need for a member seeking insolvent liquidation to demonstrate a *prima facie* case of insolvency before the member can apply to the court. It evidently does not follow from that that the Court in a public interest application must impose a requirement to prove. Section 162(3) is simply dealing with its own, specific context setting rules for when a member can make application for an insolvency liquidation. That tells one nothing whatever about the approach intended by the legislation to the Court's approach to a public interest application. The same answer applies in relation to the Financial Services Commission. The legislation is simply setting particular hurdles that are to be surmounted before they can apply; in provisions that are not even purporting to constrain anything else (for example an application by the AG).

***(5) A requirement to prove is not required by case law***

25. As already indicated, the correct approach in principle identifies and then weighs **factors** bearing on public interest in the appointment of liquidators. The question is ultimately whether, on all the evidence before the court, reasons of sufficient weight have been advanced to justify the appointment of liquidators. That is the principled approach appearing from ***Walter Jacob*** and ***PAG.***

26. There is no immutable requirement of principle that any factor that has factual element needs to be proved. That would be subject to all of the principled objections dealt with above. Such a requirement is not set out in the case law in England in any event.

27. That case law stresses the factoral approach. It indicates that the burden of making the public interest case is on the applicant, by the demonstration of sufficient reasons. That is not the same as insisting on proof of any fact or matter relied on in such an application in all cases. That is not to say that such an approach might not be appropriate in some, perhaps most cases. However, it is submitted that there may be some circumstances in which the public interest should lead to the appointment of liquidators even if, for example, criminality of a complexity and range that is alleged here cannot be proved to the civil standard at any particular point in time.

28. That is no doubt why the courts have emphasised the factoral nature of the analysis; and why the references to proving facts to the civil standard are references only to that being a "*general rule*" (the language used by Dillon LJ in ***St Piran*** **(15/383)).**

29. The key message from the English case law is that, when considering the public interest, <u>context</u> is critical. That emerges with particular clarity from ***Pearce*** **(31/848).** The question is one of context and statutory interpretation; not immutable principle. The context may indeed call for the public interest to react (and a test based on it be satisfied) on something less than proof of any fact relied on. The public interest is flexible enough to call for different approaches in appropriate cases. The context in ***Pearce*** was obviously different from the present context. But this point of principle is directly contrary to the assertion, in the context of a statutory public interest test, of an immutable principle (i.e., a principle that makes no allowance for the context).

30. The points about the present context, if they can be taken into account (as they can be, not least on the authority of ***Pearce***), have been dealt with above. They point very powerfully in favour of the Court's ability to appoint even if the underlying criminality cannot be proved at this time.

31. ***H*** **(17/429**) was entirely different to the present context. It did not involve a public interest test at all. The relevant provisions were simply about child care in an individual case. It is not difficult to see why insistence on proof in that context was the right answer. However, it is not a remotely analogous context, in circumstances in which context is key.

32. Substantially the same answer applies in relation to the CCs reliance on the three cases to which they refer at §25 of their skeleton. The two cases to which reference was made orally concerned complaints by members of the public and their value. That is not analogous to the present context.

They do not point to a position that requires proof of all facts irrespective of context, even if that would be to subvert the public interest, not promote it.

33. ***Hollingto****n* does not advance matters. That line of case law is designed to set the principles on the basis of which facts can be (and cannot be) proved, where there is a requirement to prove. It is thus directed at a subsequent stage in which the requirement to prove is the premise. Whether that premise exists in the present context and under the legislation applicable here is the very issue.

**Conclusion on the public interest**

34. The appointment of liquidators is an essential step to protect the public interest.

35. The CCs are owned and controlled by Chen and/or his associates. They are sanctioned in the US and effectively also in the UK. The KKs are alleged to have actively participated in the laundering and are linked to those associates.

36. The context involves international action across a range of states designed in various ways to protect the public interest against this sort of criminal activity.

37. It is strongly in the public interest that the benefits of the appointment of liquidators are brought to bear in that situation. Liquidators appointed by the Court are both independent and act as officers of the court. Placing them in control of the Companies ensures that the public interest is properly protected. Appointment of liquidators has a number of key benefits rendering it necessary, and in the public interest:

37.1. To ensure that the companies' affairs are properly investigated.

37.2. To facilitate and ensure proper cooperation with other partners.

37.3. To protect the assets of the companies.

37.4. If appropriate to conduct an orderly process in which assets and interests are properly identified and managed under the direction of the Court – with, again if appropriate, consequent distribution.

37.5. To disrupt what would otherwise be the ability of Chen and his associates to use the companies as they see fit.

37.6. Through all of that, to take steps that might provide protection for the rights of victims and protection of the integrity and standing of the Virgin Islands as a place in which business can be conducted within the rule of law.

38. The Court can make the appointment confident in the knowledge that matters can proceed, under its continued consideration and direction, on a step by step basis.

**ABUSE OF PROCESS**

**Appointment of Liquidators Superfluous**

39. The Campbells Respondents contend that any appointment of liquidators would be superfluous and therefore an abuse of process because the companies' assets are already frozen by UK and BVI sanctions. However, this argument ignores the context of the liquidation applications. In particular, it ignores the fact that these are not typical applications for the appointment of liquidators where the overarching or only concern is the preservation of the assets of the target companies for the benefit of an insolvent estate and ultimately for the benefit of creditors. As indicated above, an important objective of the present applications is for the affairs of the Respondents to be taken out of the hands of the alleged wrongdoers so that those affairs may be properly investigated by independent officers of the court, namely, the liquidators, in the public interest. This is not something which either the UK or BVI sanctions, without more, could accomplish.

40. The appointment of liquidators in pursuit of this objective is therefore eminently appropriate and justifiable in the circumstances and cannot be sustainably characterized as an abuse of process simply because of the pre-existence of the UK and BVI sanctions.

**Nullification of Protections under the Sanctions Regime**

41. The Campbells Respondents contend further that the practical consequences of the appointment of JPLs, which will be perpetuated by final liquidation orders, are that (i) the operation of the mandatory exemptions from the sanctions regime contained in the **Global Human Rights Sanctions (Overseas Territories) Order 2020 ("GHRSO")** will effectively be precluded and (ii) the protections for affected parties inherent in the GHRSO licensing provisions have been similarly nullified.

42. They argue further that, irrespective of whether the Governor/Secretary of State would have been prepared to grant such licences, there is no longer any point in seeking them, because the Campbells Respondents will henceforth be subjected to an insolvency process, with the statutory distribution scheme for which that provides.

43. The answer to these contentions is twofold: first, the case alleged against the respondent companies is clearly that they do not exist for any legitimate purpose. Yet, there has been no attempt on their part to adduce any evidence whatsoever to show otherwise - only deafening silence in the face of very serious and compelling allegations. Secondly and even more telling, is the fact that no application for licences under GHRSO was ever made by them during the three-month period between the imposition of sanctions on October 14, 2025 and the appointment of provisional liquidators on January 9, 2026. Their arguments built around the alleged impact of

liquidation on the protections which they would otherwise enjoy under the UK/BVI sanctions regime therefore ring completely hollow.

44. Furthermore, the point has already been made that there is no justification for simply assuming that upon the making of a liquidation order, later stages such as a process of distribution, will necessarily follow.

**The Protocol for Consultation and Information Sharing between the Liquidators and the AG ("The Protocol")**

45. The Campbells Respondents argue that the Protocol facilitates transmission of information to the US Department of Justice for purposes of criminal proceedings and forfeiture action, in circumvention of limitations on the powers which already exist to address the need for the AG to share information with overseas sanctions/prosecuting authorities.

46. There is nothing in the protocol to justify this assertion. To the contrary, it specifically contains safeguards around the use of the information shared by the liquidators with the AG. (See, in particular, **clause 17**.)

47. Furthermore, it is well known that information cannot simply be indiscriminately shared by local authorities with foreign authorities but rather, that there are strict bilateral protocols governing international mutual legal assistance involving the transfer of such information from one authority to another. There is therefore no credible basis for suggesting that information obtained from the liquidators would be indiscriminately shared by the applicant in these proceedings with foreign authorities.

48. There is accordingly nothing in the argument that the Protocol facilitates circumvention of established safeguards for the sharing of information with overseas sanctions/prosecuting authorities.

**Dated: May 15, 2026**

**Sir James Eadie K.C.**
**Paul B. Dennis, K.C.**
**Nadine Whyte Laing**
**Koya Ryan**
**O'NEAL WEBSTER**
**Legal Practitioners for the Applicant**

**IN THE EASTERN CARIBBEAN SUPREME COURT**

**IN THE HIGH COURT OF JUSTICE**

**BRITISH VIRGIN ISLANDS**

**COMMERCIAL DIVISION**

**CLAIM NO BVIHC (COM) 2026/0027, CLAIM NO BVIHC (COM) 2026/0001, CLAIM NO BVIHC (COM) 2026/0002, CLAIM NO BVIHC (COM) 2026/0003, CLAIM NO BVIHC (COM) 2026/0004, CLAIM NO BVIHC (COM) 2026/0005, CLAIM NO BVIHC (COM) 2026/0006, CLAIM NO BVIHC (COM) 2026/0007, CLAIM NO BVIHC (COM) 2026/0008, CLAIM NO BVIHC (COM) 2026/0009, CLAIM NO BVIHC (COM) 2026/0010, CLAIM NO BVIHC (COM) 2026/0011, CLAIM NO BVIHC (COM) 2026/0012, CLAIM NO BVIHC (COM) 2026/0013, CLAIM NO BVIHC (COM) 2026/0014, CLAIM NO BVIHC (COM) 2026/0015, CLAIM NO BVIHC (COM) 2026/0016, CLAIM NO BVIHC (COM) 2026/0017, CLAIM NO BVIHC (COM) 2026/0018, CLAIM NO BVIHC (COM) 2026/0019, CLAIM NO BVIHC (COM) 2026/0020, CLAIM NO BVIHC (COM) 2026/0021, CLAIM NO BVIHC (COM) 2026/0022, CLAIM NO BVIHC (COM) 2026/0023, CLAIM NO BVIHC (COM) 2026/0024, CLAIM NO BVIHC (COM) 2026/0025, CLAIM NO BVIHC (COM) 2026/0026, CLAIM NO BVIHC (COM) 2026/0028, CLAIM NO BVIHC (COM) 2026/0029, CLAIM NO BVIHC (COM) 2026/0030**

**BETWEEN:**

**IN THE MATTER OF SURE TYCOON LIMITED AND TWENTY-NINE OTHER COMPANIES**

**AND IN THE MATTER OF THE INSOLVENCY ACT, 2003 OF THE LAWS OF THE VIRGIN ISLANDS**

**THE ATTORNEY GENERAL**

**Applicant**

**-v-**

**SURE TYCOON LIMITED AND**

**TWENTY-NINE OTHER COMPANIES**

**Respondents**

---

**CLOSING SUMMARY OF APPLICANT'S SUBMISSIONS**
**(Filed pursuant to post-hearing direction issued on the 17th of April, 2026)**

---

O'Neal Webster

Legal Practitioners for the Applicant
2nd Floor Commerce House
181 Main Street
P.O. Box 961, Road Town, Tortola
British Virgin Islands VG 1110
Tel: (284) 393 5800 l Fax: (284) 393 5805
www.onealwebster.com