# EXHIBIT 14

## Transcript of April 16, 2026 BVI Hearing

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
BRITISH VIRGIN ISLANDS
COMMERCIAL DIVISION


CLAIM NO. BVIHC (COM) 2026/0027, CLAIM NO. BVIHC (COM) 2026/0001, CLAIM NO. BVIHC (COM) 2026/0002, CLAIM NO. BVIHC (COM) 2026/0003, CLAIM NO. BVIHC (COM) 2026/0004, CLAIM NO. BVIHC (COM) 2026/0005, CLAIM NO. BVIHC (COM) 2026/0006, CLAIM NO. BVIHC (COM) 2026/0007, CLAIM NO. BVIHC (COM) 2026/0008, CLAIM NO. BVIHC (COM) 2026/0009, CLAIM NO. BVIHC (COM) 2026/0010, CLAIM NO. BVIHC (COM) 2026/0011, CLAIM NO. BVIHC (COM) 2026/0012, CLAIM NO. BVIHC (COM) 2026/0013, CLAIM NO. BVIHC (COM) 2026/0014, CLAIM NO. BVIHC (COM) 2026/0015, CLAIM NO. BVIHC (COM) 2026/0016, CLAIM NO. BVIHC (COM) 2026/0017, CLAIM NO. BVIHC (COM) 2026/0018, CLAIM NO. BVIHC (COM) 2026/0019, CLAIM NO. BVIHC (COM) 2026/0020, CLAIM NO. BVIHC (COM) 2026/0021, CLAIM NO. BVIHC (COM) 2026/0022, CLAIM NO. BVIHC (COM) 2026/0023, CLAIM NO. BVIHC (COM) 2026/0024, CLAIM NO. BVIHC (COM) 2026/0025, CLAIM NO. BVIHC (COM) 2026/0026, CLAIM NO. BVIHC (COM) 2026/0028, CLAIM NO. BVIHC (COM) 2026/0029, CLAIM NO. BVIHC (COM) 2026/0030


BETWEEN:


IN THE MATTER OF SURE TYCOON LIMITED AND TWENTY-NINE OTHER COMPANIES

AND IN THE MATTER OF THE INSOLVENCY ACT, 2003 OF THE

LAWS OF THE VIRGIN ISLANDS

THE ATTORNEY GENERAL                                          )
                                                             )
                                          Applicant          )
V                                                            )
                                                             )
1) AMBER HILL VENTURES LIMITED                               )
2) AUSPICIOUS TYCOON LIMITED                                 )
3) BRIGHT TEAM GLOBAL LIMITED                                )
4) DELIGHTFUL THRIVE LIMITED                                 )
5) EVEN SINCERITY LIMITED                                    )
6) FULAM INVESTMENT LIMITED                                  )
7) GIANT VICTORY HOLDINGS LIMITED                            )
8) GOLDEN ASCEND INTERNATIONAL LIMITED                       )

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

2

9) HARMONIC STATE LIMITED                                        )
10) JUMBO HIGH LIMITED                                           )
11) LATERAL BRIDGE GLOBAL LIMITED                                )
12) LUMINOUS GLOW LIMITED                                        )
13) MIGHTY DIVINE LIMITED                                        )
14) NOBLE TITLE LIMITED                                          )
15) ORIENTAL CHARM HOLDINGS INVESTMENT LIMITED                   )
16) PACIFIC CHARM HOLDINGS INVESTMENT LIMITED                    )
17) PRAISE MARBLE LIMITED                                        )
18) PRINCE GLOBAL GROUP LIMITED                                  )
19) PRINCE GLOBAL HOLDINGS LIMITED                               )
20) RESPECTFUL STEED LIMITED                                     )
21) RETAIN PROSPER LIMITED                                       )
22) ROBUST HARMONY LIMITED                                       )
23) SIMPLY ADVANCED LIMITED                                      )
24) SOUTHERN HERITAGE LIMITED                                    )
25) STAR MERIT GLOBAL LIMITED                                    )
26) STARRY BLOOM LIMITED                                         )
27) SURE TYCOON LIMITED                                          )
28) SWORD RIVER LIMITED                                          )
29) TOWARDS SUNSHINE LIMITED                                     )
30) UNITED RICHES GLOBAL LIMITED SURE TYCOON LIMITED )
                                                                 )
                                              Respondents  )
_____)


             TRANSCRIPT OF OPEN COURT PROCEEDINGS



                 Tuesday, 16th April, 2026
                  10:00 p.m. to 4:30 p.m.




BEFORE:  HON. MR. JUSTICE GERHARD WALLBANK, K.C., Judge



                  Court Reporting Unit
                Government of the Virgin Islands
                   Road Town, Tortola
                 British Virgin Islands

3

APPEARANCES:          O'NEAL WEBSTER
                      Chambers
                      Road Town, Tortola
                      British Virgin Islands
                      BY: SIR JAMES EADIE, K.C.,
                      MR. PAUL DENNIS, K.C.,
                      MRS. NADINE WHYTE LAING and
                      MS. KOYA RYAN
                      For the Applicant

                      KOBRE & KIM
                      Chambers
                      Road Town, Tortola
                      British Virgin Islands
                      BY: MR. PETER TYERS-SMITH
                      and MR. TIMOTHY DE SWARDT
                      For the KOBRE & KIM Respondents

                      CAMPBELLS
                      Chambers
                      Road Town, Tortola
                      British Virgin Islands
                      MR. ANDREAS GLEDHILL, K.C.,
                      MR. TOBY BROWN, MR. GRANT CARROLL,
                      MR. PAUL KENNEDY and
                      MR. DAN GRIFFIN
                      For the Campbell Respondents

                      WALKERS
                      Chambers
                      Road Town, Tortola
                      British Virgin Islands
                      MR. OLIVER CLIFTON and
                      MS. ALANNA-J JOSEPH
                      For the JPLs
                           * * *

                     P-R-O-C-E-E-D-I-N-G-S

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

**4**

* * *

(Matter convenes at 10:00 a.m.)

THE COURT:                    So, yes.  Good morning, learned Counsel, ladies and gentlemen.

Ms. Alexander, if you'd like to call the matter, please.

THE CLERK:                    Yes, My Lord.

BVIHCM 0001 through 00030/2026 - In the matter of the Attorney General versus Bright Team Global Limited and Others.

Appearances, please, for the records.

SIR EADIE:                    My Lord, I'm James Eadie, and I appear with Mr. Paul Dennis, and Mrs. Nadine Whyte Laing, and Ms. Koya Ryan for the Applicant, the Attorney General.

THE COURT:                    Yes.

SIR EADIE:                    Mr. Peter Tyers-Smith, and with him Mr. Timothy de Swardt of Kobre & Kim, Kobre & Kim Companies.

Mr. Andreas Gledhill, K.C., and with him Mr. Toby Brown, Mr. Grant Carroll, Mr. Paul Kennedy, Mr. Dan Griffin for the Campbell Companies.

Mr. Oliver Clifton, with him Ms. Alanna Joseph of Walkers for the JPLs, the Joint Provisional Liquidators.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

5

Ms. Fiona Forbes and Mr. Stephen Grayson from the Attorney General's Chambers will also be attending.  As I understand it, so too will the Attorney General herself.

And I think all three JPLs, Mr. James Drury, Mr. Paul Pretlove, Mr. David Standish are also on the call.

So I hope that I haven't missed anyone out.  If I have, many apologies.

THE COURT:                    Yes.  Thank you, Sir James.

Can somebody please email in a list of those appearances because I obviously didn't catch all of them in the very fast delivery which you so ably did just now.

SIR EADIE:                    My Lord, I apologies.  I'll ask Ms. Nadine Whyte if she were to send into the court that list so you have them all on email hopefully.

THE COURT:                    Perfect.

So I've read your skeleton.

SIR EADIE:                    Yes.

THE COURT:                    And I've read parts of the Respondents' skeletons.  I haven't had time to read all of them.  And this is obviously a

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

6

fairly unprecedented and I think probably the first application of its type in this Territory.  And I anticipate, therefore, that it will have some scrutiny, wider scrutiny afterwards, and I anticipate that I might need to write a judgment as well.

SIR EADIE:                    Yes.

THE COURT:                    So I would be very grateful if those who prepare transcripts would kindly ensure that (a) the transcript is as accurate as it can be, and (b) that I can please have it after the hearing.

Now, before we get into the meat of the matter, maybe it's, maybe I should just be quiet and let you speak, but it seems to me that perhaps I should put on the table one or two preliminary observations for you to concentrate on.

I've read obviously the background that you put in your skeleton, Sir James, and I understand where the A.G. is coming from.  In modern parlance, I get it.

That said, what I'm, what I think I'm seeing is, on the one hand, an allegation of fraudulent behaviour on the part of Mr. Chen and his various associates, allegation which has formulated itself into criminal indictment in the U.S. and various other

7

possibly criminally related proceedings in various jurisdictions.

So there's an allegation of fraudulent conduct, fraudulent use of companies.  There is, however, a sliding, it seems to me from recognising that there is an allegation out there, into describing the various things that happened as the fraud as if it is already there.

Now, of course, it may well be there. You have evidence for it, but there's one thing it being alleged, and there's another thing to say in bald terms that there is a fraud here.  And you might have to bridge that gap in your presentation.

Now the other thing which strikes me is that, if I understand correctly, you already have in place currently a provisional liquidation order, correct?

SIR EADIE:                    Yes.

THE COURT:                    Yes.

And as things stand, that order subsists. And I have yet to hear of course how effective that has been.  It may not have been effective at all.  I don't know.  We're all hear on that, but because it seems to me that at this stage the wrongdoing is very much at the allegation stage, would it not be going a little

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

8

bit too fast to kill these Companies through a liquidation on account of what is said that there is an allegation of fraud when at the end of the day either those allegations of fraud might not be able to proceed because, for example, Mr. Chen could never go to the United States to face the charges or for whatever other reason the allegations might never get off the ground, in which case haven't we literally jumped the gun and killed off companies which might otherwise not need to be killed off, or might not, or should not be killed off.

That's one thing.

The other thing is, what's wrong with keeping the JLs, the Joint Provisional Liquidators in place?  Technically if they're controlling these Companies that might be good.  We all know that a provisional liquidation in the BVI is reversible.  We all know it's a prelude, it's meant to be a prelude to full-blown liquidation, but very often there is some kind of restructuring which allows the Company to come out of provisional liquidation and continue if, for example, underlying problems have been solved.

So I'm bound to ask:  Why is it that you want or need, reasonably need to convert this provisional liquidation into a full-blown liquidation,

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

9

and what is it that a full-blown liquidation could achieve that the provisional liquidation cannot achieve?  And why can't it achieve it in circumstances where this Court has very wide discretion to adjust the terms of the provisional liquidation order to render it effective and basically to make sure it works?

So those are some of my preliminary thoughts, and I'll be very interested to hear what you have to say on that.

I have read sufficient I think in the skeletons to have picked up that the Respondents are making what could be described as technical points, but there may be substantive points as well, maybe.  What is it that these Companies have actually done to warrant being liquidated?  But I'll hear you on all those matters.

So those are some of the things which I'd like to put on the table before you start.

As I've said, I get it.  If it's right that what's been said about the Chen situation, it's absolutely appalling, and it's quite right that law enforcement authorities in both civil and criminal do something about it.  Where I'm sitting, I don't want to obviously put a spoke in the wheels or a spanner in the works of any investigation and process to justice

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

10

whatsoever.  In fact, my job would be to make sure that

justice is done all around for both the victims, the

law in general and, of course, the alleged

perpetrators.  I have to make sure that's done.  But

then, you know, so I do get it, and it's pretty

horrendous what I'm being told has actually happened.

At the same time I've got to apply the law.

SIR JAMES.  Over to
you.

SIR EADIE:                     My Lord, I'm

very grateful.  That's extremely helpful.

I can deal with the first point first.

I mean, just to make it absolutely clear,

for the purpose of this hearing we are not seeking to,

and we would not be in a position, to prove the

allegations.  So I'm very conscious of the fact that at

least in some of the documentation as adrift as you put

it from one to the other, but that I suspect is being

shorthand if I have to put allegation in every time a

fact that is asserted is asserted, but I make it

absolutely clear we are not seeking to prove the

underlying allegations.  They are at this stage simply

that.  So that point can be dealt with.

I'll pick up, if I may, as we go through,

the other two points which you raised, including, in

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

11

particular, the final one about the Joint Provisional Liquidators, wouldn't that be sufficient at this stage. And perhaps that relates to the second one as well, which is a bit fast to be killing these companies and what else do we get. So can I come back to those. But I certainly take on board that first point.

THE COURT: And possibly, before you get into the meat of it, Sir James, just for our records, we're of course in open court. We've dispensed with robes because we are virtual and it is obviously not temperature controlled in some of our spaces where we're zooming in from. We do need to basically know who we've got in the courtroom.

I see somebody calling himself "Tommy" with nothing else here. Does anybody claim to be with Tommy or is he just a member of the public?

SIR EADIE: I don't think he's one of my team.

THE COURT: And we've got somebody called "NS" and a "Leo".

I mean, they're quite welcome because it's open court, but we do need to know who we're talking about, because there is a protocol whereby you normally have to put in your first name and your last name, so that we're not dealing with, you know, people

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

12

who (a) shouldn't be here, or could be excluded for

good grounds.  So could, please, somebody tell me who

these shorthanded named persons are, please?

(No answer.)

So is that Tommy Chan?  We're talking

about "Tommy Chan" now, as Tommy Chan, Tommy Chan?

Hello.

So that's -- one moment.

So is "Tommy "Tommy Chan"?

Somebody, please.

(Silence.)

Okay, well, while Tommy works out how to

communicate who he is to the Court, who is "NS",

please?

(Silence.)

Nothing from "NS", all right.

Who is "Leo"?

(Silence.)

And who is "Tom"?

Okay, well, anybody who doesn't sign in

with a full, with a first name and a last name is going

to be excluded in 15 minutes' time.  So you get your

act together, please.

MR. GLEDHILL:                My Lord, just

before we go further, apologies for cutting across.  I

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

13

should explain you have me -- I'm Andreas Gledhill, King's Counsel. I'm for the Campbells' Respondents. And you have me I think as Blackstone Chambers Meeting Room. Do you want us to try to adjust that or is that sufficient for your purposes?

THE COURT:                    That's sufficient for my purposes.

MR. GLEDHILL:                    Thank you.

And I should just mention I have in the room with me my junior who is admitted to the BVI Bar, Toby Brown, and my instructing solicitor, Mr. Carroll, of Campbells.

THE COURT:                    Perfect, perfect. Very good. Thank you very much, Counsel.

So, all right. So anybody who isn't identified with a first name and a last name, and a family name, last name within 15 minutes, that's by half past 10:00 BVI time, will be mechanically excluded, okay.

So over to you again, Sir James.

SIR EADIE:                    Thank you.

I'm going to split the opening of the application with Mr. Dennis. I'm going to open it now, and I'm going to leave to him the issues relating to what occurred at the hearing before Justice Mithani

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

14

about which some points arose in Mr. Gledhill's helpful skeleton. And he's also going to deal with some issues which arose in the latter part of that skeleton to do with abuse of process at Paragraph 29 and following. That's going to be from Mr. Dennis who will follow me directly, if that's acceptable to the Court.

I think other skeletons have been filed for the purpose of this hearing, but for the purpose of this hearing you should have three skeletons, one from Mr. Gledhill on behalf of the Campbells Companies, one from Mr. Tyers-Smith on behalf of Amber Hill and Lateral Bridge, and one short one from us which refers back to an earlier skeleton --

THE COURT:                Yes.

SIR EADIE:                -- of the 2nd of March.

THE COURT:                Hmm-mm.

SIR EADIE:                And for the purpose of this hearing, if you can have to hand our skeleton argument.

THE COURT:                Yes.

SIR EADIE:                And it's going to lead me into the bundles now there done, but just so you note, if you would, that there are some references there that are given to page numbers in things called

15

AB and SAB and CSAB.  I asked overnight whether we could, I'm afraid it's rather belated, but whether we could actually just numerically deal with the files. And I'm hoping you should now have eight electronic bundles --

THE COURT:                    Yes.

SIR EADIE:                    -- numbered 1 to 8.  And you should have some authorities from us, Applicants' Authorities.  You should have some Campbells' Authorities, and you should have some Amber Hill and Lateral Bridge Authorities.

THE COURT:                    Yes.

SIR EADIE:                    From my perspective I'm not going to need to go to very many of them, although there will be a couple that I'll take you to, if I may.  But that's the range of the bundles. And so for the purpose of our skeleton for this hearing, when we refer to AB, that is a reference to Bundle 2.

THE COURT:                    Yes.

SIR EADIE:                    SAB is a reference to Bundle 4.

CSAB is a reference to Bundle 5.

THE COURT:                    Okay.

SIR EADIE:                    And I just want

16

to do one housekeeping, if you still have that skeleton to hand. I just wanted to give you some references because they're not terribly clear where you get to the, how you get to the documents that are referred to. I just wanted to give you some references, if you would, right next door to Paragraphs 17(3) and 17(4) of the skeleton for this hearing.

17(3) deals with an affidavit in substantially similar form to the affidavit I'm sure you will have seen earlier in the main proceedings, if I can put it that way, the first affidavit of the Attorney General in the Lateral Bridge case. That's 17(3). That affidavit, which is called in 17(3) Paragraph 45(a) of Smith 1 as put there, that is in Bundle 8, page 455, the paragraph that's referred to, and the paragraph referred to in the line down is at Bundle 8, page 446.

THE COURT:                Yes.

SIR EADIE:                And in that skeleton at 17.4 that next subparagraph deals with Amber Hill. And again there's a reference to Paragraph 7(1) of Smith 1. That's a different affidavit. It's the first affidavit the Attorney General made in the Amber Hill case, and that reference, that affidavit is at Bundle 8, Paragraph 7, Bundle 8, page 16. And the

26-10769-mg   Doc 49-14   Filed 05/21/26   Entered 05/21/26 15:29:05   Exhibit 14 -
Transcript of April 16 2026 BVI Hearing   Pg 18 of 193

17

references thereafter are to that affidavit in those proceedings.  So four lines down it's Bundle 8, page 25.

And then, finally, in 17.5 to add to the confusion, there's a reference to Paragraph 27 of the Attorney's Second Affidavit.  That is, for your note, in Bundle 4, page 163.

THE COURT:          Yes.

SIR EADIE:          I'm sorry there's rather now corrections and additions to some offerings, but at least it might give you the shape of what we've got by way of bundles.

THE COURT:          Yes.

SIR EADIE:          The issue for the purpose of today is whether it is either just and equitable or in the public interest that the Company should be wound up under section 162.  You have section 162, if you need it, in the Applicant's Authorities Bundle --

THE COURT:          Yes.

SIR EADIE:          -- at page 4 behind Tab 1, if you can bookmark them, but otherwise it's page 4.  And you see the structure of 162, if you have that to hand.

The structure of it is that the Court is

18

given the power on application by a person specified in (2) to appoint a liquidator on any of the three grounds in sub (1).

THE COURT:                    Yes.

SIR EADIE:                    So insolvency, just and equitable, and public interest.  Those are the three routes.

THE COURT:                    Yes.

SIR EADIE:                    And you see in sub (2) the people who are listed as being capable of making those applications, and they include relevantly for present purposes at 2(h) the Attorney General.

THE COURT:                    Yes.

SIR EADIE:                    And you will note also that the Commission, the Financial Services Commission can make applications itself under 1(c).

If you look down to sub (5) of 162, you will see that the Commission can make an application under 1(c) on the public interest ground if the company concerned is, and then there are five specified things that the company might be doing which would lead to the Commission, the Financial Services Commission making an application under the public interest ground.

THE COURT:                    Yes.

SIR EADIE:                    And the only

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

26-10769-mg   Doc 49-14   Filed 05/21/26   Entered 05/21/26 15:29:05   Exhibit 14 - Transcript of April 16 2026 BVI Hearing   Pg 20 of 193

19

reason I refer you to that is because it gives you some, at least some idea of the flavour of the public interest that the legislation is driving at.

If you look particularly at sub (e) the company is otherwise, at 5(e), the company is otherwise engaged in an activity which the Commission considers not to be in the best interest of the Territory's financial service industry or generally in the public interest.

THE COURT:                    Yes.

SIR EADIE:                    So it's got that breadth, and those grounds can be relied on for the purpose of asserting and establishing a public interest.  Of course it remains for the Court to judge whether that is the case.

These are preconditions that have to be met by the Applicant to the Court for the exercise of its power, but that is of some interest in terms of providing at least an indication of what the public interest is that Parliament is driving at, or the Legislative Assembly is driving at and how wide that goes.

It's clear from the authorities, which I'll come to in a moment, that once an application has been made by one of the appropriate people, the

20

judgment about the public interest, if that's the ground relied on about the justice and equity, of putting a company into insolvency is for the Court to make.

As it is, we submit, these are of some significance that the legislation has seen fit to limit the people who can make those sorts of applications and has included the Attorney General who is, of course, the guardian of the public interest anyway, unsurprisingly perhaps, as one of the people specifically empowered to invite the Court to do that. And in this case that's precisely what has happened.

The categories themselves that concern us, the just and equitable and the public interest categories, and I think all I want to say about those for the moment is that, as was indicated in our skeleton of the 2nd of March -- that's to be found, if you need it, in Bundle 5 at page 32 and following.

THE COURT:                    Hang on.

SIR EADIE:                    And what is from that, if you go to Paragraph 44 of that March skeleton, if I can call it that, and you go to page 41 of Bundle 5 --

THE COURT:                    Yes.

SIR EADIE:                    -- you will see

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

21

the citation from Justice Farara in <u>Wang Zhongyong</u>. And that was cited in our skeleton at Paragraph 44. And the reason for going there conveniently is that, as that quote from that case indicates, the breadth of the matters that can be taken into account under the just and equitable head is wide, and for obvious reasons the same applies in relation to the public interest.

That's not to be taken as a narrow category of things.  It's a factual analysis which will look at all the circumstances that can be said properly to bear on the public interest.  So those are both, in my submission, broad categories.

I just wanted to pick on one, up on one point before coming back to the principles on which the public interest aspect of that is to be exercised.  I think the Amber Hill Respondents take a point or some point that the Attorney General is not competent to apply to the Court to invite it to invoke the just and equitable jurisdiction.  And if you still have section 162 to hand back in our Authorities Bundle at page 4 --

THE COURT:                Yes.

SIR EADIE:                -- you would see why I take issue with that.

The structure of 162, I submit, makes it entirely clear that the Attorney General is a proper

22

Applicant to invite the Court to exercise its jurisdiction on any of the three grounds mentioned in sub (1).  And that is because the structure of sub (1) is:

"The Court may, on the application by a person specified in sub (2) appoint a liquidator if..."

So any of the people in sub (2) can pray in aid any of the grounds in sub (1) is my submission under the structure of 162, the clear and obvious structure of 162.  And, of course, (2) includes the Attorney General at (h), as we saw.  There is no restriction, therefore, in 162, and you can't read a restriction into 162, the just and equitable ground, that requires, as it were, the demonstration by an applicant or some species of private interest.  It doesn't say so.  Indeed the language of 162 is directly contrary to that proposition, and there is no conceivable basis on which that sort of restriction could be implied.

In any event, the distinction, for present purposes, between the two is likely to be light to non-existent, I respectfully submit, and you could group the same points effectively under justice and equity as you could under the public interest in an application of this kind, so there's virtually nothing

23

to choose between them.  And, in any event, the point goes nowhere in reality because it's accepted, even by the Amber Hill Respondents, that the public interest application can properly be made by the Attorney General.

So that, I hope, relatively shortly deals with that point.

My Lord, more substantively, so far as the principles are concerned on the basis of which the public interest is to be exercised --

THE COURT:                Yes.

SIR EADIE:                If I can invite you to take up in the Authorities Bundle, the Campbells Authorities Bundle, if you would --

THE COURT:                Yes.

SIR EADIE:                -- and I'm after Tab 16, if you're bookmarked or page 388, in any event, which should take you, I hope, to the first page of <u>Walter Jacob</u>.

THE COURT:                Okay.  All right.

SIR EADIE:                So the Campbells Authorities you need.

THE COURT:                Yes.

SIR EADIE:                Tab 16 which

24

should be --

THE COURT:                    Yes.  Carry on.

SIR EADIE:                    I'm grateful.

So I'm just going here for the principles which are to be applied.  And you'll see from the headnote and the description before it that it's dealing with a public interest application, and it's a judgment of some weight, not least because the judgment was given, of the Court of Appeal was given by Lord Justice Nicholls, as he then was.  And you can see the nature of the facts just by way of introduction.  I won't read them out, but can I invite you to read to yourself.

On page 390 you will see the nature of what was in issue, 390, if you read the first full paragraph beginning "early in January 1987".

I'm going on the page numbers, in the electronic page numbers at the bottom, 390.  If you read that paragraph and the one below it that will give you perhaps all you need for present purposes on the facts.

THE COURT:                    Yes. Okay.

SIR EADIE:                    My Lord, so you have that.

And then if you go forward to 394 -- and

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

25

I'm really trying to draw out the principles that are to be applied, and one sees them most clearly from the two paragraphs that start just above the letter C on page 394, "Mr. Heslop criticised".

THE COURT:                Yes.

SIR EADIE:                And if you have a quick cast of your eye down that paragraph, if you would, and then the one below it, finishing between E and F, so just that short two-paragraph passage, if you would.

(Pause.)

THE COURT:                Yes.

SIR EADIE:                So you'll see that what is being set out as an approach is effectively a broad holistic approach examining, as he puts it, on the basis of all the material before the Court, the factors that bear on the public interest and the absolute laser focus of the Court should be on and only on the public interest.  That is, as he puts it, in the penultimate and final line of the paragraph below that, the very raison d'etre of the petition.

THE COURT:                Yes.

SIR EADIE:                So that's the basic approach.

And then over the page on page 395

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

26

electronically, the paragraph beginning by the letter B, again if I could invite you just to cast your eye down that paragraph which ends just by the letter E, so we're between B and D on page 395.

(Pause.)

THE COURT:                    Yes.

SIR EADIE:                    And so as you see there, the Court is again concerned with the whole of the evidence before it and the submissions made thereon by the parties, and the Court's task, picking it up between C and D, is "to carry out the balancing exercise described above having regard to all the circumstances as disclosed by the totality of the evidence before the court", and then weigh them up.

THE COURT:                    Yes.

SIR EADIE:                    So that's the, unsurprisingly perhaps, that's the basic approach.

And then, finally, in relation to this case, 396 between C and D there's a paragraph under the heading "Making out a case for a winding-up order".

THE COURT:                    Yes.

SIR EADIE:                    And you'll see what is said there.  The burden is on the petitioner to establish that it is just and equitable or in the public interest.  You've got to put forward an

27

established reason which have sufficient weight to justify the Court taking that step.

We're talking about the ultimate burden there to meet the statutory test in effect.

THE COURT:                Yes.

SIR EADIE:                Then the Court of Appeal in the PAG case, if I can go to that, that is a bit further on in the bundle, and that's in, behind Tab 28 starting on page 768.

THE COURT:                7-6?

SIR EADIE:                768.

THE COURT:                Yes.

SIR EADIE:                That should take you to Secretary of State for Business, Energy..."

THE COURT:                Yes.

SIR EADIE:                Against PAG Asset.

THE COURT:                Yes.

SIR EADIE:                That's Court of Appeal again.  You'll see the composition of the Court, 2020 case.  And that's a case, just so you have it for your note, that's the case which we've cited I think under a slightly different name.  I'm not quite sure how the name got slightly different, but that is the date we cite in Paragraph 49 of the March skeleton.

28

THE COURT:                    Yes.  Okay.

SIR EADIE:                    That's the one
that we're talking about.

THE COURT:                    Right.

SIR EADIE:                    The key passage
you see the context of in Paragraph 1 of Lady Justice
Asplin's judgment on page 770.

THE COURT:                    Okay.

SIR EADIE:                    But I think the
passages that my learned friend, Mr. Gledhill, and I at
least agree are the key ones for present purposes are
Paragraphs 39 and 40 to which I think My Lord was
directed by both of our skeletons.

THE COURT:                    Yes.

SIR EADIE:                    So those two
paragraphs --

THE COURT:                    Yes.  "The
principles to be applied are not in dispute".

SIR EADIE:                    Exactly.
That's always a promising start.

THE COURT:                    Yes.  Okay.

SIR EADIE:                    And so one's
got all of those.  He's taking those from the judgment
of Mr. Justice Norris below, but that helpfully
encapsulates all of the relevant principles.  And it

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

29

might be worth, My Lord, just casting a bit of an eye down those.  It's almost like two pages to the end of Paragraph 40.  I know it's quite a long passage, but it may help shape that, because I think we're all agreed that those are indeed the relevant principles to be applied.

          And I perhaps should draw your attention specifically, as I'm sure my learned friend, Mr. Gledhill, would wish me to, to 5(c) within the quote on page 779 dealing with the burden of proof.

          THE COURT:            Yes.

          SIR EADIE:            The principles more generally are those that are there set out if I can invite you to read those two paragraphs.

          (Pause.)

          THE COURT:            Yes.

          Priggish.

          SIR EADIE:            Yes, well, that may not trouble us much because those are cases where you're not terribly sure whether what people have done is illegal and is bad behaviour and immorality.  So some of that doesn't matter so much --

          THE COURT:            Yes.

          SIR EADIE:            -- unless it makes clear where they're on it.  It's not necessary to

30

have illegality involved.

THE COURT:                    Okay.

SIR EADIE:                    And then you see the basic approach which very much reflects Lord Justice Nicholls in Walter Jacob which indeed is cited in Paragraph 40.

THE COURT:                    Yes, yes.

SIR EADIE:                    But I suspect that, if you said to either of those Courts or indeed all three of those Courts, the Court of Appeal with Lord Justice Nicholls in it, the Court of Appeal constituted as it was in PAG, and/or Mr. Justice Norris, and you said that those intended to be setting, as it were, universal principles to be applied without reference to the context to any case, they might all of them naturally urge a little bit of caution with taking them too much as providing a straightjacket rather than helpful guide to the general approach to be applied, but I'll come back to that point, and I'll come back to this passage particularly when I'm dealing with one of the central points that I know My Lord has expressed interest in at the beginning of the hearing which is, where do we go in a case involving allegations in which we are not seeking, as it were, to have a full trial.

THE COURT:                    Yes.

26-10769-mg   Doc 49-14   Filed 05/21/26   Entered 05/21/26 15:29:05   Exhibit 14 - Transcript of April 16 2026 BVI Hearing   Pg 32 of 193

31

SIR EADIE:                    And I'm going to come back to that, including in particular whether or not it is necessary to prove, which is the central features advanced by these Companies, that they were involved in fraudulent activities, and/or criminal activities, and/or money-laundering.

So -- but those are the basic principles. I suspect you have all you need probably in those two paragraphs, but you have the derivation and the sort of, some of the key thinking on that from Lord Justice Nicholls in the earlier case.

THE COURT:                    Yes.

SIR EADIE:                    I wanted to move then from the principles into the context.

THE COURT:                    Yes.

SIR EADIE:                    And I wanted to show you basically the two affidavits that the Attorney General has sworn in these proceedings, and I bear strongly in mind that the Court, as you put it at the outset, has got it, as it were, but it may be at least helpful for you to see what the evidential basis is before --

THE COURT:                    Yes.

SIR EADIE:                    -- the Court and for me to take that a little bit.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

32

THE COURT:                    Yes.

I mean, I have to say, of course, in case people get alarmed when I say I've got it before I've even heard Counsel, that I don't want to jump the gun in any shape or form whatsoever.  Of course we have to bear in mind that the Court is moved by two things and only two things.  One is the law, and the one I think are the evidenced facts, i.e., law and fact.  And that's what the Court is going to be moved by.  So I'm not moved by submissions as such.  I'm not moved by emotions nor what might feel good.  I know there is a reference in one of the authorities to situations giving the judges a nasty feeling, but then feelings are deceptive.  So it's the law and the facts that I'm going to be focusing on.

SIR EADIE:                    Yes.

THE COURT:                    And Counsel's job is to present both in such a way that there are sufficient to move the Court to make the order that they want the Court to make.

I just want to put that on the record for everybody since we are in open court and people might be listening who might not understand the way --

SIR EADIE:                    My Lord, we're grateful.  Thank you for that.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

33

Can I then invite you to go to the Attorneys First Affidavit which is in Bundle 2, page 29?

THE COURT:                    Bundle 2, page 29.  Okay.  Yes.

SIR EADIE:                    Bundle 2, page 29, behind Tab 3 of the tab.

I'm going to pull together at the end of this some core propositions that we derive from what I'm going to take you through now, but just so you see the state of the evidence.

THE COURT:                    Yes.

SIR EADIE:                    This being evidence from the Attorney as the guardian of the public interest and the Applicant.

You see from page 30, Paragraph 7 --

THE COURT:                    Yes.

SIR EADIE:                    -- that on the 14th of October, and I should just set out some of this at least so that people can follow it who are listening, but the 14th of October 2025, para 7, both the United States and the U.K. announced coordinated actions targeting the Prince Group, and the Prince Group is effectively Chen and his associates.

THE COURT:                    Yes.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

34

SIR EADIE:                    If there is any dispute about that I'll come to the nature and structure of evidence in due course, but they take coordinated actions, obviously having done some pretty considerable investigation.

Then Paragraphs 8 through to the end of Paragraph 11 deal in some detail with the action that was taken in the United States.  And as My Lord alluded to at the beginning, effectively the product of that was, firstly, the release, as it were, of the U.S. indictment against Mr. Chen, which is the start of the criminal process in the United States obviously.  But they also launched a civil forfeiture complaint called the U.S. Complaint as we see from Paragraph 8, and you can see from Paragraph 8 the scale, thus the degree and nature of the concern to which those criminal and civil processes go, or related criminal and civil processes go.

The forfeiture claim is designed to forfeit the relatively small number of 127,000 odd bit coin, a relatively small number until you see how that translates into US dollars.  It becomes a staggeringly large number of US dollars, 15 billion.

THE COURT:                    Yes.

Can I stop you here, Sir James?

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

35

SIR EADIE:                    Yes.

THE COURT:                    It's obviously all very well to say that there has been an indictment put forward, and in fact a successful indictment put forward, and other steps taken by OFAC and the U.K., for example.  That's all very interesting.  And, of course, I can assume at a certain level that they must have some material to have reached the milestones that they have in terms of getting the indictment through and all that sort of thing.

Do you, however, bring to this Court any of the evidence which informed those results?

So, for example, it's one thing saying we've got an indictment against Mr. John Smith, for example.  You've got an indictment against him.  Well, yes, that's fine, but this Court would then think to himself, well, yes, there's a criminal proceeding overseas with their own processes; we don't know how, necessarily how rigorous those processes are, or how much evidence is needed to get through to a result on those processes, particularly if they're not opposed.  So we can't just say, oh, yeah, they did that and we're going to do the same thing, we're going to assume it's all good and strong.

Normally this Court would say, well, at

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

36

least if we're going to be doing a civil remedy like winding a company up, there surely must be some evidence of reasons why the company should be wound up. And the fact that an overseas Court has made an indictment is not the be all and the end all.

And I had one case in front of me not so long ago where this man who ran this insurance company was said to have squirreled away millions of dollars of misappropriated assets in BVI companies.  And what was presented to this Court was a very comprehensive private investigator's report which listed in minute detail a very large number of bank accounts over a whole swathe of different banks with sums of money that the private investigators had found apparently to be sitting in those bank accounts, and I was being asked to add two and two together to make four and find that this man had squirreled away all these millions of dollars here and to some terrible things to his companies, like wind them up.

The first thing I noticed was that nobody had actually said what the identity was of the private investigator.  So I asked, and I was given a name of the private investigator's company which didn't actually identify who was behind it.  Then I said, well, can I actually see some of the investigations

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

37

that the private investigator was supposed to have done, and I was reluctantly shown that. And it then transpired that there was no backup to what the private investigator had said at all. And I said, well, I want you to go off to these banks who you say have these bank accounts and ask them, do those bank account numbers tally with any of the accounts you have at the bank and are any of the details that you say, minute details exist, are they confirmed by any of these banks. Because normally what you'd expect to happen, if it's a proper investigation, you'd expect the private investigator, namely, to get it all right, or at least to get most of it right. But very interestingly not a single bank account corresponded in any of these banks with any bank account in any of these banks, not a single bank account number, not a single bank account name, not a single bank account balance corresponding with what the private investigator had said had existed. And I was driven to the conclusion that this has been a complete work of fiction just to nail this man. And, okay, he might not have been totally clean, but, nonetheless, this was a put-up job, and it went nowhere, and I had to throw it out.

So I'm very keen that when people say,

38

oh, yes, it's got an indictment, and everything like this, well, what about the underlying evidence for it then, please?  Can I see some of that?  Because the standard I have to apply here is a different standard. I can't just assume that the U.S. Courts have done their job properly.  They might have, but I can't assume.  I have to make an inquiry of my own account in this Court.

Do these Companies that are now being put up against the wall to be finished off, does the evidence stack up for finishing off those Companies? And just because somebody said in an overseas Court that there's a man called Chen out there who has been successfully indicted, then is that enough to finish these Companies off?  Can't I see some of the underlying evidence, please?

SIR EADIE:                    My Lord, the answer to that is I know that's a matter of a business concern to the Court.  I mean, my answer is going to be, and I'll come to the answer in due course, because it goes directly to the question, do we in principle at this stage and for the purpose of this application and/or the continuation of the JPLs, which is obviously the lesser step, but do we have to prove the allegations?  And my submission is going to be, without

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

39

going too far ahead of myself, my submission is going to be that it all depends on the context.

The difficulty that you have in a context like this, or the difficulties you have in protecting the public interest in a context like this are markedly different from the sort of issues that confront you when you're dealing with the sort of case that My Lord has described.  And I will need no persuasion at all that evidence is a jolly good thing and that if you're dealing with something which raises specific allegations about a specific company and the question is where is the source for the private investigator's, report, then that's all well and good.  And there are some cases in the United Kingdom which I think my learned friend, Mr. Gledhill, has cited which are along similar lines where you've had, I don't know, DDI inspectors going in, examining the books of the company and the question then is what is demonstrated by that.

The difficulty of course you've got here is that you are dealing with the public interest being engaged, not merely by the fact that other jurisdictions, respected rule of law jurisdictions have considered it appropriate and seen fit to take the steps that they have which are essentially protective against these sorts of criminal activities, but also

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

**40**

you have a situation of some parallel complexity in which the allegation is that there were scams of the kind I'm going to take you to briefly in a moment, and that there was then a vast global enterprise effectively undertaking as part of that criminal activity to launder the proceeds, to wash them through, to reinvest and reintroduce them into the apparently legitimate commercial markets and apparently legitimate commercial businesses doing apparently legitimate commercial things but with laundered money. You have that vast complexity. And to require each jurisdiction, as it were, to engage in the proof of that organisational criminal activity with that global reach is to ask for the impossible, because almost by definition if you're dealing with these sorts of allegations you are dealing with criminal activity, if it occurred, criminal activity in which the very essence of what they did involved them trying to conceal the true picture. It is not as easy as saying, show me the sort of the private investigator, or I can go to that bank account and I can see that I will then get the full picture. The accounts either will exist or they won't. They will show what they said they showed or they don't.

              The difficulty that you have here is that

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

41

you have these sorts of allegations about this scale of criminal conspiracy with its aftermath in terms of laundering and concealing assets and then reintroducing them to the deep prejudice of any commercial jurisdiction into which those funds come, and you have to couple that with the recognition that it is at the very least at this stage almost impossible to provide the sort of proof, if not impossible, to provide the sort of proof that My Lord is talking about in any one jurisdiction.  And the real question that that gives rise to, in my submission, is whether that should render the public interest powers.

THE COURT:                Well, maybe we should be careful about the words we're using here, the sort of proof, you say.  Obviously I'm aware that we're in a civil law context.  We're not in a criminal law context in this Court here and now in terms of winding up companies.  It's squarely a civil law situation and it's a squarely -- yes, there are certain presumptions, statutory presumptions which arise in the context of insolvency, but we can leave those aside for the moment about when payments are made, you know, for unlawful preferences and all that.  There are presumptions which arise, but leaving those aside, we're squarely in a situation of the ordinary civil standard and burden of

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

**42**

proof, aren't we, balance of probabilities, yes?

SIR EADIE:                My Lord, yes, balance of probabilities.  You've got to demonstrate factors of sufficient weight sanctioned by the Court.

THE COURT:                Exactly. Factors of sufficient weight, exactly.  So it doesn't have to be proof.  They have to be factors of sufficient weight.  That's the first thing.

The second thing:  Because we're dealing with a public interest, let me play devil's advocate for a moment here.  How, rhetorically I might ask myself, would it be in the public interest for this Court in this globally targeted offshore jurisdiction, the BVI, which is basically like the world's Channel Islands, if I can put it that way, the BVI, how does it look if the BVI Court is persuaded to shoot a company down while the questions are still being asked of the people who might possibly have been behind the Company. Doesn't that create the impression that we're being irrational, we're moving far too quick and we're not actually listening and investigating what's going on and we're slashing people's heads off before they've had a chance to explain themselves.  And that's pretty bad, isn't it, because what that would me is, who is going to incorporate here if they're going to be

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

43

summarily executed before they've had an opportunity to explain themselves properly?

SIR EADIE:                    Well, My Lord, at the moment, I'll answer that in this way, at the moment the prior question, it might be thought is, was the impression created to the world if this Court, as it were, does nothing in the face of those allegations from very serious jurisdictions following the intensity of investigation.

THE COURT:                    Well, it has done something.  It's put in place provisional liquidators, which is a temporary measure.  So it's a place-holding measure.

SIR EADIE:                    My Lord, it's a place-holding measure for the time being, but what will follow if liquidators are appointed is itself an orderly process conducted under the auspices of the Court by officers acting as officers of the Court.  And what they will do is they will hold the ring, they will control the affairs, they will see what has been going on, they will be able to report to the Court and tell them about that, and ultimately they will have the function of deciding under the Court's direction what to do about all of this.  So you don't just go to shooting the companies straight away.  You go to an

**44**

orderly process under which the assets are set ultimately against the claims on the companies' assets and a just and equitable distribution occurs if necessary. So before anything, as it were, terminal or like slashing someone's head off comes to pass, there will be an orderly process in which, for example, if there are to be claims by victims, if there has been this fraud, those claims can be mounted and can be dealt with in a sensible and appropriate manner.

So, of course, My Lord is right. If you cast it in terms of, as it were, the pejorative chopping off of heads, then one can see the force of it. But my submission is that the prior question is, does there need to be, as it were, Court control imposed on the back of what we've now got. The Court was previously satisfied that the provisional measure of JPLs was the appropriate course achieving all of those things, and I'm going to take some instructions, if I may, on what our position is in relation to a continuation of that. But the continuation of that is still Court intervention on the basis of what are effectively allegations, and I respectfully submit quite right too. So it's the final bit that is the chopping off of the head, and my answer to that is, it only proceeded, you only get to chop the head off if

45

you had a prior process first.

THE COURT:                    Yes.  But let's game-call a spade a spade.  What I think I'm not forgetting here is that once a company is put into definitive liquidation, not provisional liquidation, but liquidation, then what basically then happens is the company is dead, is dead and the Court has chopped up and bits of meat are flung in all directions on a pro rata basis.  So at that point the head is chopped off.

I don't want to be too gruesome about this, but it is chopped off when the corpse is already dead.  That's part of the problem, wheres with provisional liquidation what's been happening here is the company is basically taken into custody of provisional liquidators, and they look at the affairs of the company, control the company, questions are asked, and while the company is sitting there being controlled by the provisional liquidators, then the questions are asked and answered, if they are answered, and at the end of it if the questions are answered satisfactorily, the company is then returned to the people that owned it beforehand, and everything can just carry on.

There is no Court -- there is no divvying

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

**46**

up of anything and life carries on while the questions are being answered.  Whereas here, what we seem to have now, you're going to try and persuade me differently and I'm going to be all ears, but what we seem to have is we have a set of allegations, strong allegations apparently out there, or something that's horrible that's happened, and those allegations have still got to be tested.  And before those questions are answered, they are tested, what you want to have happened is that the underlying assets are carved out of these corporate vehicles and distributed to somebody, I don't know who, and/or held or something, but with the vehicles themselves effectively being killed off.  And so I need to be persuaded that is in the public interest.

SIR EADIE:                Well, My Lord, I'll come to the submissions in due course, but my submission is that the process of liquidation, stripping out all the gruesome analogies, the process of liquidation is an orderly one, and it does enable anyone who has interest in the companies to access the assets of the companies to the extent that they're legitimate, and it enables those who have claims on those assets, if they claim to be victims of a fraud if it occurred, to make claims.  All of that process can occur as part of the liquidation.  So whether the death

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

26-10769-mg   Doc 49-14   Filed 05/21/26   Entered 05/21/26 15:29:05   Exhibit 14 - Transcript of April 16 2026 BVI Hearing   Pg 48 of 193

47

occurs before or the death occurs after, that is an orderly process undertaken under the supervision of the Court.  And so if you have an interest because you're a shareholder or you have an interest in an asset, then your interests are protected as part of that process. But I don't want to lose sight of the fact that on the claim that is, on the case that is being made against me, I think the logic of the case that is being made against me is, you can't because it's simply allegations, even do the provisional liquidation thing, it's not appropriate even to go to that step to provide that protection, and my respectful submission therefore is it's both, or alternatively JPLs should continue anyway because they deliver real benefit and they protect and enable the picture to be more fully ascertained, but also that there is no particular reason why the Court should not take the further step of confirming the appointment of the liquidators in the confident knowledge that would lead to an orderly process before any irretrievable harm happens.

Now, of course, the irretrievable harm that might happen to the corporate vehicle is the ultimate end of this, but those corporate and personal entities that have interests in those companies will be protected by that orderly process.

26-10769-mg   Doc 49-14   Filed 05/21/26   Entered 05/21/26 15:29:05   Exhibit 14 -
Transcript of April 16 2026 BVI Hearing   Pg 49 of 193

48

So that's how we put the public interest, but, as I say, there are those two limbs, and it may well be that having taken instructions the absolutely key thing for present purposes is these Companies are not returned to those who are, to the control of those who are alleged to have been party to the sort of criminal activity, the sort of concealment, the sort of money-laundering that we've been concerned to put before the Court in the Attorney's affidavits.

THE COURT:                    Okay.

Now doubtlessly you're going to be doing this in some kind of orderly way, and I think, reading your skeleton, that you, I believe, want to take me to some photographs, for example, which is usually a good start, about some kind of force labour camp in Asia somewhere, and maybe something else that you might want to take me to by way of evidence, and then at some point presumably you're going to have to try and tie these Companies to the alleged perps.

SIR EADIE:                    My Lord, yes.

Can I go back to the Attorney's affidavit for all those purposes --

THE COURT:                    Sure.

SIR EADIE:                    -- which we have in Bundle 2, page 31, we got to.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

49

And you see from Paragraph 9 that the effect of the investigations in the State was the designation, so it was actual State action designating them in the Prince Group as a transnational criminal organisation with the effect that it has, that you see described in Paragraph 9.

So these aren't just, as it were, general allegations.  They aren't allegations that have been dreamt up.  They follow serious State investigation and they lead to actual State action in the U.S. designating them that way with those legal effects. And as part of that, those who are targeted include a number of BVI companies as you see from Paragraph 9.

THE COURT:                    Yes.

SIR EADIE:                    And they've got all of that on the basis of the evidence that you see collated and pulled together in the Complaint and in the indictment which I will come to.

Just so you know, in Paragraph 9, to take that as an example, the numbers for the pages that then follow in the exhibits, so if you take Paragraph 9, line 2, the reference given just after the "Prince Group" --

THE COURT:                    Yes.

SIR EADIE:                    -- you

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

50

basically have to add 50 to that number, so 96 is 146.

THE COURT:                    Okay.

SIR EADIE:                    And the same applies thereafter.

And so you see the basis on which the U.S. acted if you go forward to 146.  You'll see this is the U.S. announcement of the action that it has taken.  This is the Treasury statement of the action that it has taken.

So if you go to 146 in the bundle and you pick it up in the second paragraph, you'll see:

"OFAC has imposed sweeping sanctions on 146 targets within the Prince Group ... a Cambodia-based network led by Cambodian, Chen Zhi that operates a transnational criminal empire through online investment scams targeting Americans and others..."

And then you'll see the nature of the investigation and what led to that State action at the bottom of the page picking it up at the end of the third last line on page 146:

"Working in close coordination with federal law enforcement and international partners like the U.K., Treasury", and so on.

And then if you go over the page, you see the scale of the loss and the sort of volumes of money

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

51

we're talking about.  And of course underlying all of that, if accurate, are a very large number of victims and a very significant amount of money that has been taken from people.

Over on the next page 148 you see "The Designation", the title the "Designation of the Prince Group Transnational Criminal Organisation".  And you'll see the description that is there given, if I can invite you to cast an eye down that first paragraph under that heading.

THE COURT:                 Where this start?

SIR EADIE:                 Page 148, there's a title saying "Designation of the Prince Group".

THE COURT:                 Oh, yes. "Prince Group, TCO".

SIR EADIE:                 "...is composed of".  Could I just invite you to read that paragraph --

THE COURT:                 Okay.

(Pause.)

SIR EADIE:                 -- and then four or five lines into the paragraph that follows, because what they've effectively done is to target all of the corporate vehicles that their investigation

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

52

revealed were involved in one way or another, whether in the commission of the original scam fraud or in relation to the laundering of the proceeds or in relation to the apparently genuine pursuit of business using those funds.

And you'll see the laundering part of it picked up on the next page at 149 under the title "Laundering".

THE COURT:                    Yes.

SIR EADIE:                    And you'll see the way in which it works.

Look at the second sentence on that page:

"Chen Zhi, via the Prince Group TCO, commingles illicit revenues with the legitimate Cambodian economy, laundering these ill-gotten gains through a complicated network, over a hundred shell and holding companies all around the world."

And they've not merely done the laundering, but as usual with laundering, you then have ostensibly legitimate business ventures, most of which are through entities under the control of the Prince Group, including Prince Holding Group, Prince Bank, and so on.

Prince Bank is now in liquidation I think in Singapore, but we'll come to that in due course.

53

And you see the nature of the way in which the fraud was perpetrated, the alleged fraud was perpetrated in the first place, 149, second paragraph, profits from a litany of transnational crimes including sextortion, you see what that means, money-laundering, various frauds, rackets, corruption, and so on.

And then you can see the way in which that was done from what follows. And that's a point that was picked up obviously by the United Kingdom, because the United Kingdom's sanctions are based on gross violations of human rights.

But I emphasise the scale of it, and the nature of what was being done to support the difficulties of trying to call for a standard of proof of all of that at this stage or at all perhaps.

Then page 150, I can pick it up towards two-thirds of the way down page 150:

"Prince Group TCO Officials Coordinate Criminal Activities."

So what were being done effectively on the case, the American made, was to commit the fraud and then spend the money around, wash it through Bitcoin, and other processes, and then it ends up in seemingly legitimate businesses using a series of associates and corporate vehicles.

54

So that's the essential nature.  That's what's being talked about, and that's what's being referred to if you go back to page 31 in this bundle. That's Paragraph 9 of the Attorney's First Affidavit. And as she there summarises, just to flick on, because you've seen most of that, in any event, if you go back to page 31, go to Paragraph 11 of her affidavit, you'll recall the reference to the network of entities and individuals designated as part of that enterprise.

And then at the end of Paragraph 11 on page 32 you'll see that OFAC issued a list of those entities and individuals.

And then you see those collected.  Again that's exhibited if you go forward to page 173.  You'll see the various entities thereby identified as being connected with all of that myriad activity including a series of members of the Prince Group.

So that's the position in relation to the U.S., and that's the action that they've taken.

The Attorney then goes on at page 32 in Paragraphs 12 to 15, I won't take long with this, but to identify what the U.K. Government has been doing, and as you know that has a much more direct correlation into the Virgin Islands Territory because there's a process by which orders in Council, sanctions made by

55

the United Kingdom become applicable here, as it were. That's the process that's been going through here, and as I said earlier, I hope accurately, that's based on gross violations of human rights effectively and criminal activities asserted.  It's essentially, and it's the coordination between these two jurisdictions, it's essentially the same basis as the American action.

And they're not alone.  This isn't just U.K. and U.S.  This is global.  And that tells you both the reach of the alleged fraud, the complication of it, the myriad jurisdictions in which its tentacles have allegedly reached, and indeed the seriousness of the global reaction to it, including action as you see from Paragraph 16 of the Attorney's affidavit in Singapore, Hong Kong, Taiwan and Thailand.  So the center started in Cambodia as you know.

And you'll see then in the following paragraph the description of what they've done in those jurisdictions, essentially similar activity, seizing very considerable sums that appear to be linked into this global network.  And that go through to the end of Paragraph 20.

And the Attorney makes the point which I respectfully adopt on her behalf in Paragraph 21, that those "actions in multiple jurisdictions underscore the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

56

seriousness of the allegations against Chen and the Prince Group and demonstrate the coordinated international commitment to combating transnational organised crime, human trafficking, forced labour, and large-scale financial fraud".

And you see the scale of it from what has been done.

So we are dealing with a very particular context with all of that complication and all of the drivers into the public interest of the action, the effective action being taken by other States in relation to this.

So far as the allegation is concerned or the allegations are concerned, the allegations are then dealt with.  The nature of them is important for obvious reasons, but that's dealt with in the Attorney's affidavit at Paragraph 23 and following. And most of those come from the detail that one finds in the indictment and in the complaint.

I'm not going to go to the indictment because that basically replicates the complaint.  The Complaint is probably the place where there is the most detail given for these allegations, and that is the primary source of the matters that are summarised by the Attorney in Paragraph 23 to 27.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

26-10769-mg   Doc 49-14   Filed 05/21/26   Entered 05/21/26 15:29:05   Exhibit 14 -
Transcript of April 16 2026 BVI Hearing    Pg 58 of 193

57

So if you go forward into her exhibits in the same bundle to page 78, you will find the "Verified Complaint in Rem".  It's called the "Verified Complaint in Rem" because they're after forfeiture of a sum of money, and so the sum of money is itself the Defendant.

And if I can just spin briefly through that, you will see the headline allegations that are made in that forfeiture proceeding from Paragraph 15 of the Complaint on page 81.

THE COURT:                Yes.

SIR EADIE:                And you see from Paragraph 16 that they've got in relation to their investigation, they got to the stage of identifying particular individual people, and co-conspirators one to seven.  They've been tracing money and following cryptocurrency through various exchanges and trading platforms and indeed financial institutions.

And they identify, if you look over at page 83, you'll see in sub-paragraph (o) the reference to the Prince Group as a Cambodian registered corporate company operating more than a hundred business entities in over 30 countries.

Chen Zhi was the Founder and Chairman of the Prince Group, and as we now know is also the beneficial owners of that Group, or most of the

58

companies if not all the companies in that group.  But you'll see how they operated.

You'll see a specific reference to Amber Hill and to Lateral Bridge in subparagraphs (w) and (x) on page 84 about a third of the way down.

Page 84 gives you the reference to Amber Hill and Lateral Bridge, the two BVI Companies.

THE COURT:                  Yes.

SIR EADIE:                  Then they give a helpful description an uninitiated, what technical terms or otherwise are dealing with, including the primary fraudulent technique called "pig butchering", although, graphically, if you're on the blood and gory analogies.

So "pig butchering" is described at the bottom of page 84, and you see the nature of the scam that is alleged, or fraud that is alleged.

And if you flicker over the page to 85 you'll see the way in which that was ordinarily done in its four-stage approach.  Again, none of this comes as any great surprise.  It's a pretty common looking narrative in relation to the modus operandi of these sorts of alleged scams.

And then they give a bit of a description of crypto currencies, which I'm sure My Lord won't

59

need, on page 86, and described the process of "mining" which is of little importance if one goes through. That's in subparagraph (g) on page 86, halfway down if you need that.

And then a "virtual currency wallet" is described on the top of the next page, page 87, again as its title suggests.

And as they point out on page 88 when they come to describe the criminal scheme, this is not an unusual business.  It's unusual in terms of its scale, and it's unusual perhaps in terms of its complexity, but it's not an unusual thing as they point out at Paragraphs 18 and 19, and that is not an unusual thing has been pretty broadly detailed by both their investigations and indeed by others, including human rights organisations.

And then again, the way in which the various layers of activity that were alleged operated and were operated by Mr. Chen and the associates is described at Paragraph 20, if I can just invite you to cast an eye over that, page 89.

THE COURT:                Yes.

SIR EADIE:                The way in which the alleged fraud was perpetrated in the first place is the subject of description at Paragraphs 22 to

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

60

26 starting on page 90.  This is where the allegations of use of migrant workers, human trafficking, forced labour, scam compounds, and so on, the vast scale of it with dormitories and high walls and barbed wire, and all of that.  So they put it "functioned as violent forced labour camps" under 22.

And at 23, the allegation is that the Prince Group built and operated at least ten of those. So if the allegation is made out, it was fraud on an industrial scale.  And you'll see that there are records maintained, as it's put in Paragraph 24, by Chen himself tracking some of the profits generated by that.  So they're not operating on inference or whim. They were looking at documents from the horses mouth, if I can put it that way.

And you see in Paragraph 25 the reference to phone farms.  Again it's the same basic idea, and My Lord mentioned photographs.  You can see a photograph, if you will, because essentially Paragraph 25 is a replication I think in the indictment, and there are some photographs that give you at least an indication of what appears to have been going on.

If you look at page 130 in the same bundle --

THE COURT:                One moment.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

61

SIR EADIE:                    -- Paragraph 25
to page 130 --

THE COURT:                    Yes.

SIR EADIE:                    -- that's what
they mean by "phone farm".

THE COURT:                    I'm going to
read it.

(Pause.)

SIR EADIE:                    Just so you see
what's going on here, we're in the indictment here.  I
think they put the photographs in the indictment, not
in the Complaint, but Paragraph 33 of the indictment on
page 130 is essentially in the same terms as Paragraph
25 of the Complaint that we were looking at.

THE COURT:                    So that is a
phone farm, is it?

SIR EADIE:                    That's, I
think, a phone farm, yes.  I'm not sure precisely how
it worked, but you can see the range of number of
mobiles that had been utilised.

THE COURT:                    Right.  Okay.

SIR EADIE:                    Just to go back
to page 91, if you would -- so that's the way in which
it was being done at the base, and then a further
description of how they were able to do that.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

62

It's alleged above Paragraph 27 in the title "Use of Bribes and Violence in Furtherance of the Scheme".

I'll just give you just one example if you look at Paragraph 29:

"Chen maintained ledgers of bribes to public officials, including a ledger that tracked hundreds of millions of dollars in reimbursements to Prince Group and associates for bribes and luxury purchases."

And then the violence allegation by way of example, Paragraph 31 on page 93.

And again one has embedded in the indictment and not in the complaint in the self-same paragraph in the indictment, if you flick forward to 133.  I think those perhaps are the other photographs that My Lord had in mind, but Paragraph 40 on page 133 is again in the indictment, a replication of Paragraph 31 of the complaint, if that makes sense.

THE COURT:                    So hang on. I'm on page 133 at Paragraph 40.  And I'm looking at a couple of photographs there.  What am I supposed to be seeing in these photographs?

SIR EADIE:                    My Lord, I think these are photographs which are taken from Chen's

63

phone, "possessed images", as is put in the final sentence of Paragraph 40 before the photographs, "illustrating the Prince Group's violent methods, including those below."

And they're simply examples, I think, of the sort of treatment that was being meted out.

THE COURT:                Okay.

SIR EADIE:                But, as I say, Paragraph 40 in the indictment is the same essentially of Paragraph 31.

And then to flick forward, flick back to the complaint again to take it mainly from the complaint, the money-laundering schemes --

THE COURT:                -- aha.

SIR EADIE:                -- page 96 --

THE COURT:                Yes.

SIR EADIE:                And you see the basic mechanism, again not unfamiliar.  If you're money-laundering you tend to do it in roughly the same sorts of ways despite the technical difficulties between the various ways in which that can be done or people attempt to do it, but 38 you see the description, the scale of it.

39.

And you'll see the references to Amber

64

Hill and LBG, which is Lateral Bridge in the fourth line of Paragraph 40.

THE COURT:                Yes.

SIR EADIE:                Then by way of example of transfers, as it were, buzzing through bank accounts, so far as Amber Hill is concerned, they give an example on page 97.

About 7 or 8 lines down you'll see in the middle the reference to Amber Hill and it's the bit that follows that, including footnote 3.

THE COURT:                Yes.

SIR EADIE:                And again, you'll see further references to those two companies and another company called FTI in Paragraph 45 when they get into the connections, as it were, through the laundering into the Bitcoin, but is actually the subject of this claim.  127,000 Bitcoin, which is the subject of this claim.  And you'll see from Paragraph 45 to particular final two lines on page 102 --

THE COURT:                Yes.

SIR EADIE:                Those companies were involved in transfers of Bitcoin through Bitcoin wallets in the way that are there and are indicated.

And then there's a long and technical description of how that alleged laundering process

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

65

worked, including a description with some transactions involving Bitcoin being spun around and funneled, as it's put, at Paragraph 55 on page 110, involving again Amber Hill funneling and undertaking those activities.

THE COURT:                    Yes.

SIR EADIE:                    So that's in summary the complaint with the allegations being made in the U.S. forfeiture proceedings.

It's to go back then to the, and that's the source essentially of Paragraph 23 to 27 of the Attorney's First Affidavit.  If you go back to the role of the BVI Companies --

THE COURT:                    Yes.

SIR EADIE:                    -- it's the affidavit on page 36, if you would, Paragraphs 28 to 31.

THE COURT:                    Yes.

SIR EADIE:                    So you see the essential allegation is here you've got a, you've got a fraud being perpetrated on an industrial scale in these compounds.  The proceeds of that then have to be dealt with.  The way in which that is done is to effectively spin them through a series of corporate vehicles orchestrated by Chen and his associates around the globe in multiple jurisdictions for the purpose of

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

66

cleaning those criminal proceeds and then reintroducing them into seemingly legitimate businesses pursuing seemingly legitimate business activities, but the complexity and scale of that you will now understand and will have seen at least on the allegations in those --

THE COURT:                    Now, okay.

We're coming up to the mid-morning break for 15 minutes in about a minute's time.

So these compounds, these forced labour compounds in the Far East, Cambodia and maybe other places, have they been shut down by the local authorities?  I mean, one would think if there really is such a dreadful thing going on, then you would have thought that in the ordinary course the local law enforcement people would go in and shut them down.  I mean, even, maybe not because there's breaking any law, but for health and safety reasons, or whatever, you know.

Do we know what's happened to these compounds or they're still --

SIR EADIE:                    The short answer is we don't know what's happened to them, but we do know that, or we believe that Mr. Chen has been moved to China and one assumes that the activities are,

67

have come to the attention at the very least of the
Cambodian authorities.  What they've done about them
I'm not entirely sure.  The evidence doesn't reveal.

THE COURT:                Okay.  All
right.  Very good.

Ladies and gentlemen, we'll take the
mid-morning break now.  We're here at 11:30 a.m. here
in the Territory of the Virgin Islands.  We'll take it
for 15 minutes.  So thank you very much.

Just mute your microphones and cancel off
your videos but stay in the courtroom, please.

(Court breaks at 11:30 a.m.)

(Matter reconvenes at 11:46 a.m.)

THE COURT:                Sir James, are
you ready to proceed?

SIR EADIE:                I am.  I was
un-muting.

THE COURT:                Very good.

SIR EADIE:                My Lord, one
narrow point to pick up, if I may, on, you asked what
happened to the scam compounds and what's happened to
Chen and what the authorities are doing about it.  Just
to show you, if you would, briefly, Bundle 4.  It's a
press report.

THE COURT:                Okay, Bundle 4.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

68

SIR EADIE:                              Bundle 4, page 9, do you see the first full paragraph?

"Cambodia authorities said they arrested Chen and two other Chinese nationals and extradited them to China on Tuesday.

The operation carried out according to a request from Chinese authorities...," in that way, as you see.

And then you see, if you look at the page just above the recommended box:

"The "vast majority" of the dozens of scam compounds in Cambodia operated with "strong support" from the government, Sims told AFP, adding that a change in status quo could only happen if international pressure on the nations's "scam-invested" oligarchs was sustained.  Cambodian officials, "I am picking it up underneath the box that's marked 'Recommended':

"Cambodian officials denied Government involvement and so authorities are cracking down."

THE COURT:                              I see.

SIR EADIE:                              I think that's the best we have by way of current state of play so far as they are concerned.

So with that sidetrack, as it were, if we

69

could go back to Bundle 2 to the Attorney's

affidavit, page 37.

THE COURT:                    Yes.

SIR EADIE:                    We have dealt

with the nature of the allegations.  We have dealt with

the role of the BVI companies.

And then she comes to the National Policy

of the Virgin Islands in this sphere --

THE COURT:                    Yes.

SIR EADIE:                    -- and deals

with the importance and the force of that and what it

has led to, including, in particular, the publication

of the National Policy, and I'll take you to a couple

of bits of that in a second, but the Publication

National Policy which recognises, I'm in Paragraph 34

of the Attorney's First Affidavit on page 37:

"The National Policy recognises that as

an international finance centre, the BVI offers

products and services including complex corporate

vehicles that, while attractive to a legitimate

international clientele, may also attract bad actors

seeking to exploit the financial system to advance

their criminal agenda.  The National Policy identifies

key vulnerabilities, including the potential for

products and services to be used to conceal the source

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

70

of assets and identities of beneficial owners.  These vulnerabilities," the final sentence at Paragraph 34, "precisely described the alleged modus operandi of the Prince Group network, of which the Company forms a part."

And then you have that policy, if you need it, it may well be familiar to My Lord any way, but the reference, if you just take Paragraph 33, is an example, you'll see the reference at the end of 180. That should be 230.  Again, it's one of these add 50.

THE COURT:                    Yes.

SIR EADIE:                    So the 230 takes you to the beginning of that policy and it's of some importance because it emphasises the thoroughgoing international commitment nature and the thoroughgoing importance of trying to combat the very sorts of activities that are, at the very least, are clear to have been following [unclear] of the U.S. and the UK and been orchestrated by Chen, which, of course I fully accept are not proved.

And that public interest and its nature, if you go forward to page 236, which is the introduction to the policy, you'll see the global concern expressed in the very first paragraph, Paragraph 1.1, recognising the global concern regarding

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

71

the ongoing activities of MLTF and PF.  Those acronyms are effectively references to money laundering.  TF is financing of terrorism effectively and PF is proliferation financing, so we are really concerned with the ML bit and they've seen fit, accordingly, to develop that framework.  But it essentially reinforces and emphasizes the thoroughgoing commitment undertaken by the Virgin Islands to join, as it were, see 1.5, into what is described in relation to money laundering and those other two categories of mischief to join the coordinated global effort that recognising if the results are to be achieved, those pernicious activities permeate national borders.  That's something that has been approved, including by the Cabinet of the Virgin Islands as you've seen from the final paragraph on that page.

And then you have the various references that was set out and considered to be important to going forward into the body of the affidavit by the Attorney; 5.1 on page 243, 243, 5.1.

THE COURT:                    Yes.

SIR EADIE:                    Again emphasizes the same point.

And then on money laundering specifically, 245, was a description of money

72

laundering, and unsurprisingly, the definition, accurate as I'm sure it is, the processing of criminal proceeds to disguise their illegal origin.  So you've essentially got, in relation to this sort of alleged activity, you have got the three layers, you commit the fraud, you then launder the money and the very purpose of laundering the money is to conceal and to make the picture as difficult to establish for the authorities across the globe and as complex lender establishes is even possible.  And it then gets to the extent that it's been washed or whatever till people consider it's been appropriately washed, it then gets fed back into seemingly legitimate businesses and those are the three stages that are referred to at 6.7.  But again, that will be very well-known to My Lord.  The reason for emphasising it is to emphasise a certain thoroughgoing difficulty of getting a complete picture at any point in time or at all.

THE COURT:                  Yes.  On that, I think you mentioned earlier that this U.S. document, court document that you were taking me to verified something or other.  Was it a verified complaint or a verified --

SIR EADIE:                  It was a verified complaint, an interim complaint which is

73

essentially a forfeiture process, as I understand it.

THE COURT:                    Yes.  My
question is verified by who or what?

SIR EADIE:                    My Lord, well
--

THE COURT:                    You see one of
the things that go through my mind is this, this is all
very well for people to be telling lovely stories and
indeed acting on what people do in other jurisdictions,
but the foundation, and there has to be some kind of a
solid foundation for what is being said.  It's very
well to say, oh, people are saying that this man did
something or other in U.S proceedings and may be on the
back of that, shut down a bank in Cambodia and/or do
something else in Cambodia on what is, based on what is
being said, let's say in the U.S. and everybody then
moves forward as if what has been said in the U.S. is,
in fact, all perfectly well founded and true.  I mean I
am conscious because I don't live in a complete vacuum
and I have been living in the, not from the U.S.,
obviously in the BVI where you get a lot of exposure to
what happens in the U.S. and there's a lot of talk in
the very much divided U.S.  For example, somebody keeps
talking about the Russia, Russia, Russia hoax where
allegedly some kind of interested persons in high power

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

**74**

have used dodgy sources or whatever the word is that they used to come up with a story that Russia meddled in elections or something of this nature, and then for months they have peddled this story that there's been Russian election interference, when according to at least half the country all that was just a construct based on nothing.  Just based upon very bad sources and manipulated sources.

So, you know, when you have something as high profile as that coming up, when have you just have stories, even in front of courts and official bodies, I'm bound to sort of ask, well, do we have anything, any account from a victim of these alleged scams to say I was asked by, to an answer an e-mail or a voicemail or some other message, I went along with it to my folly and I paid a first amount of two cents on the dollar and then that basically led me to paying 10,000 dollars down to these people that I have never met but I have got to trust and I lost everything and they closed off as soon as they got all of money down the way and now I'm poor.  Do we have any kind of primary stories like that we can connect to, or is it just what other people are saying?

SIR EADIE:                My Lord, at the moment, all we have is what you have before you and

75

what I have taken you through, and, of course, I don't need any persuasion that there is a principle distinction between an allegation, which may turn out to be ill-founded and a proved fact so that is obvious and clear.  The thing that we have here is concerted state action, not just stories, as you put it, we have an actual state action designed to recover a gigantic sum of money, in order, no doubt, to compensate victims well and if they come forward, but to take that money out of circulation, this isn't just a story.  This is a set of allegations certainly, but following intensive investigation and having led to state action and state action has to surmount a burden.  In the United Kingdom, it's reasonable suspension and in America, we have got the allegations that underpin the verified complaint in rem.

THE COURT:                    Now, the verified complaint in rem.  Okay.  Verified by who or what, please?

SIR EADIE:                    Well, I don't know is the answer to that, but it's on the face of the documents and I don't imagine it's unverified if they've put it on the face of the document.  I just don't know what the formal process would be for that to be done, but presumably an official will have to say I

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

76

believe these facts to be true or something.

THE COURT:                    All right.
Then it, of course, depends what level of officials we
are talking about.  Is it just the clerk of the Court
or the clerk of the law firm, sorry, or the bookkeeper
at the fire station?  Or is it the, you know, somebody
high up in the U.S. Attorney General's Office?

SIR EADIE:                    Well, My Lord,
I think the answer to that, if you go to page 118, I
think that may be the answer.

THE COURT:                    Let me have a
look.  Which bundle are we looking in, please?

SIR EADIE:                    I'm looking
still in Bundle 2, 118 and that seems to be the last
page of the complaint form before you get to the
attachments.

THE COURT:                    Let me try
that.

SIR EADIE:                    Well it looks
remarkably like a statement of truth of which we are
all familiar.

THE COURT:                    Okay.  One
moment.  Bundle 2.

SIR EADIE:                    Page 118.

THE COURT:                    "Verification":

26-10769-mg   Doc 49-14   Filed 05/21/26   Entered 05/21/26 15:29:05   Exhibit 14 - Transcript of April 16 2026 BVI Hearing   Pg 78 of 193

77

"I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and, as such have knowledge of the facts underlying this action."

Who is this special agent?

"I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief" that somebody called Special Agent Charles Lee."

SIR EADIE:                Yes.

THE COURT:                I see.

SIR EADIE:                We don't know -- as I say, I don't go to us for the purpose of trying to make a case that these facts are proved. They are not.

THE COURT:                No.

SIR EADIE:                They are allegations, but they are serious allegations, following serious investigations, and at least to that extent and level, a state or authority official in America has been able to verify to that extent.  So these aren't just stories.  It's really the question of where one places them on the scale between allegation and proof.  They are not proof.  They haven't been proved.  There hasn't been a trial in which victims have been called or illustrative victims have been

26-10769-mg   Doc 49-14   Filed 05/21/26   Entered 05/21/26 15:29:05   Exhibit 14 -
Transcript of April 16 2026 BVI Hearing   Pg 79 of 193

78

called and documents have been produced to verify and actually prove all of the allegations that are contained in this complaint.

But likewise they cannot, from a public interest perspective, particularly given that this is a rule of law jurisdiction, as is the United Kingdom, they cannot simply be dismissed as stories.  They are serious allegations, following a serious investigation which appear to be replicated in the terms of state action globally and the reason for that is no doubt because, given the allegations that have been made, this looks like, if it's to be proved, these are allegations, at the very least, of a global fraudulent conspiracy with the three levels that we have identified.

THE COURT:                Do we have any material as to what the UK, that sort of a region that is good and fair, historically speaking, and accurate, anything from the UK here?

SIR EADIE:                We have an announcement of what the UK has done.

THE COURT:                Okay. Announcement by who?

SIR EADIE:                By the Foreign Office.  What happens in the UK, as you probably know,

79

which is under SAMLA, which is the Sanctions Act, there are certain powers to sanction individuals and entities and those are essentially based on the Secretary of State having a reasonable suspicion that the sort of conduct that triggers the jurisdiction has happened, and so in order for sanctioning to occur, you at least have to cross that hurdle.

There are then provisions in SAMLA, both in relation to the human rights jurisdiction and others and there have been lots of cases that have passed up to the Supreme Court, including the *Shvidler* case which is cited in some of the authorities that are before you in which I have acted, in which, in a Russian context, challenges can be made and indeed challenges can ordinarily be made under SAMLA.

THE COURT:                    Yes.

SIR EADIE:                    So as far as I'm aware, what's happened under in the United Kingdom is they have sanctioned, and accordingly the Foreign Office has concluded, the Secretary of the Foreign Office has concluded that there is, at the very least, a reasonable suspension.

THE COURT:                    Can you take me to that announcement, please?

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

80

SIR EADIE:                    My Lord, yes. I can't take you to the internal documents because what happens is, which is part of the reason for explaining the process, you don't see those internal documents unless there is a challenge.

THE COURT:                    Sure.

SIR EADIE:                    And if there is a challenge by any person affected, which as I understand it there hasn't been, we haven't heard one, there's a challenge by that person affected, then in the ordinary course of events, as happened in, for example, the Russian context in Shvidler, the internal FCDO documents are produced and there are witness statements on both sides and people join issue and the Court then look to see whether that standard has been met or not --

THE COURT:                    I see.

SIR EADIE:                    -- whether or not the thing has been, what is often said, it is a breach of people's human rights because it's an unlawful or disproportionate interference with their property rights.  That's normally the way the charge is put.  But at that stage, all the documents would come out from the Foreign Office, which are those that are actually necessary to comply with the duty of candor

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

81

and one would see the precise basis on which that is done. That we don't have because, I assume because that hasn't, it hasn't reached that stage. I am just looking for the UK announcement. I think it starts on page 179 on the gov.uk website. You simply have a description of what has been done.

THE COURT:                    Hang on a moment. And we are back in bundle --

SIR EADIE:                    We are back in Bundle 2, sorry, page 179.

THE COURT:                    Yes. Okay. Just one moment. Okay.

                "GOV.UK.

                UK and US take joint action to disrupt major online fraud network.

                Alongside the US Government, the UK has today sanctioned a network that operates illegal scam centres across Southeast Asia."

SIR EADIE:                    Yes. If you go to page 180, you see some of the details of that.

THE COURT:                    And it's got the name of two people there, the Right Honorable Yvette Cooper, MP and the Right Honorable Lord Hanson of Flint.

SIR EADIE:                    Yes.

82

THE COURT:                    They seem to be in charge of that.

SIR EADIE:                    She's the Foreign Secretary and he's the Home Office Minister in the Lords.

THE COURT:                    Scam networks disrupted.

SIR EADIE:                    He is described in the Attorneys affidavit at Paragraph 14 as the fraud minister.

THE COURT:                    Okay.

SIR EADIE:                    A rather grand title.  I am not sure of that title, but he's certainly a home office minister in the Lords and she was Foreign Secretary at the time.  I say foreign secretary, either foreign secretary or home secretary.

THE COURT:                    Yes.

"As part of the crackdown, a £12 million mansion in North London, owned by a multinational network responsible for using forced labour to conduct online scams, has been frozen.

Now, presumably that's --

SIR EADIE:                    That's the effect of a sanctioning designation being made.

THE COURT:                    I see.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

83

SIR EADIE:                    What happens under a sanctioning designation is that you freeze the assets, effectively, and shut them out from using the economy so that other economic actors can't deal with them.  That's the nature of UK sanctions.

And then you see the reference to the Chen Zhi and the Virgin Islands in the penultimate paragraph on page 180.

THE COURT:                    Yes.

SIR EADIE:                    We see Yvette Cooper was the Foreign Secretary from the top of page 181 at the time.  And you see the description over on page 181 of the entities that have been the subject of sanctioning or targeting as they put it.

THE COURT:                    Yes.  Okay.

SIR EADIE:                    At two-thirds of the way down, you see scam centres in Cambodia.

THE COURT:                    Yes.

SIR EADIE:                    Before you get to the politics of Lord Hanson, you might want to read those two paragraphs, emphasising the extensive investigations by FCDO and the United States Office of Foreign Assets Control.

THE COURT:                    Yes.  Okay.

SIR EADIE:                    And I say, and

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

84

I hope My Lord understands my position, and that again, it's about language, emotive language, as it were. These are not proof.

THE COURT:　　No.

SIR EADIE:　　They are allegations at this stage and they are likely, probably to remain allegations for a period of time because in order to get complete clarity on the picture, or indeed part of the picture, it may well be that there needs to be quite a lot of international cooperation because, precisely because of the nature of the fraud that is alleged and the three layers that it had; the layer in Cambodia where the scam centres are being operated, the layer in which the money is laundered, that's complex, that's global, that's designed to conceal and then the reintroduction of apparently wash money into apparently legitimate businesses.  That's the way this game works and we are dealing with allegations of that on an industrial scale, very, very complex attempts to wash it, the complexity increase by the use of Bitcoin and all that that brings with it --

THE COURT:　　Yes.

SIR EADIE:　　-- for a prolonged period of time and it is simply not going to be possible to get enough of the picture in view to do

85

the sort of thing that we were discussing in relation to some of the cases that have come before you and indeed to do with the sorts of things that have been done in the sort of cases that has occurred in the United Kingdom in the courts just because of the nature of the beast that you are dealing with.

But in terms of the public interest, those features, as I will come to submit, strongly support the public interest not sitting idly by and certainly not returning things to those who have been alleged to have been participating in these assets, but I emphasise these are allegations, I accept this is not proof, but they are certainly more than stories.  They are not general allegations that have been made there. It follow serious investigations across multiple jurisdictions.

My Lord, I am sorry, you have frozen in your picture, but I don't know if you can still hear me.

(Thereupon, Justice Wallbank dropped off the Zoom hearing.)

I am not quite sure what the protocol is. Maybe he'll come on and he'll come on again.

THE CLERK:                    Yes, thank you so much.  I think we lost him for a few minutes.

86

SIR EADIE:                    My Lord, hello.

THE COURT:                    Yes, the internet dropped.  I don't know whether we dropped, but I dropped off somewhere.

SIR EADIE:                    Well, you're back now.  Can you see and hear us?

THE COURT:                    Yes.  I can see and hear you.  Very good.

Okay.  Carry on.

I was mentioning there was a lot details in this foreign office annuncement, so that does rather suggest quite a degree of investigation have been taken, have been done, certainly in relation to properties in England and it's not just resting upon what Special Agent Charles Lee has been saying.

SIR EADIE:                    No.  Probably, My Lord, all of that is true, but again, I don't think the government are, in the United Kingdom do not have to and would not, as a matter of law, seek to prove or have to prove, to the civil balance of probability standard, these sorts of matters before imposing sanctions.  The legal test is one of reasonable suspicion.  So that's the way that works.  I don't know whether you have frozen again.  I'm so sorry.

(Thereupon, an internet break.)

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

87

THE CLERK:                We lost him again.

SIR EADIE:                My Lord, I'm sorry, you went for a little bit.

THE COURT:                Yes, I don't know where I went, but there seems to be something unsteady here in the network, but carry on.  All right. I am not going to interrupt you.

SIR EADIE:                I was agreeing with you and they say in terms that it followed extensive investigations in the paragraph towards the bottom of page 181 of Bundle 2 if you look at that government announcement.  But bear in mind this isn't just investigation into what property might be in the United Kingdom, it was the investigation into whether or not there was sufficient proper basis for the reasonable suspicion standard under that legislation.

THE COURT:                Yes.

SIR EADIE:                So that's a matter of some little importance.

That's all I want to take from the Attorney's First Affidavit.

I wanted, just before going to the second affidavit that she has sworn, to take a little bit of a detour into an affidavit, I'm not sure whether

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

88

it was finally sworn, I have only got a version

which is unsworn but I'm assuming it was, but it's

in Bundle 3.  It was filed, I think, on behalf of

the Campbell companies by a man called Cosimo

Borrelli.

THE COURT:                Yes.

SIR EADIE:                It's in Bundle

3 at page 10.  It starts at page 9 with a front piece,

but the body of it starts at page 10 of Bundle 3, do

you have that?

THE COURT:                I do, yes.

SIR EADIE:                An affidavit of

Cosimo Borrelli.  And you'll see who is from the first

paragraph.

THE COURT:                Well, Mr.

Borrelli is very familiar to this Court.  He's one of

the regular experts.

SIR EADIE:                You'll see how

he's appointed, as it were, at Paragraph 4, but the

reason for going to this statement at this point is

because, I think, he was, he had by that point been, at

that time this was made, this affidavit, he had been

appointed as the sole director of these various

companies, that appointment having been sorted, as it

were, by a person who is the attorney in fact, I think

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

89

is the way it worked of Mr. Chen.  And so if you look at Paragraph 12 on page 13 --

THE COURT:                    Yes.

SIR EADIE:                    -- and I'll invite you to read that.

THE COURT:                    Yes, one moment.

(Thereupon, a short pause.)

SIR EADIE:                    And then Paragraph 13.

And then Paragraph 14, for what it appears, appointment as sole director of the companies. Of course, by this point, the Joint Provisional Liquidators have already been appointed.  So all of this appears to have been going on after their appointment.

THE COURT:                    Yes.

SIR EADIE:                    But it appears that, in effect, Mr. Chen's interest is still being actively represented by the unnamed attorney in fact. And it's accepted in Paragraph 16 that the ultimate beneficial owners of the Respondents, that is all the companies apart from Amber Hill and Lateral Bridge which I'll come back to, had been sanctioned by the U.S. or the U.K. or both, meaning that the assets of

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

90

the companies themselves are frozen.  And the importance for our purposes of that is that it's accepted before you that the companies in question are all owned and controlled, in effect, by Chen or Chen's associates or companies.

And indeed we note that the attorney in fact is unnamed, appears to have been acting with a view to trying to get someone in as the sole director, Mr. Borrelli, as the sole director even after the Joint Provisional Liquidators have been appointed, but for present purposes, the really significant point is that all of the Campbell's companies are accepted to be owned or controlled, beneficially, by Chen and the Group.

THE COURT:                    Yes.

SIR EADIE:                    The position is rather more complicated in relation to the K & K companies and that is in part the subject of a, of the Second Affidavit of the Attorney.  They, as I understand it, are not designated themselves in the U.S. and they are not sanctioned in the U.K., but as we saw from the complaint, the allegations made in the complaint are that they were actively involved, actively involved in the laundering process.  You'll remember all of the references to Amber Hill and

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

91

Lateral Bridge in that complaint.

THE COURT:                     Yes.

SIR EADIE:                     Moreover, they have, it appears at least connections back into those who it's alleged have been acting as associates of Chen.  If you go to the Attorney General's Second Affidavit which is in Bundle 4.

THE COURT:                     Yes.

SIR EADIE:                     Her Second Affidavit is made on the 8th of April and it starts at page 157.

THE COURT:                     Okay.

SIR EADIE:                     Do you have that?

THE COURT:                     I do.

SIR EADIE:                     And there's quite a lot of stuff about services and so on which I don't think we'll need to trouble you with, but for the purpose of this point about the K & K Companies, you will see that she deals with that at Paragraph 25 and in more substance at Paragraph 26 and 27.

THE COURT:                     Hang on.  Okay.

SIR EADIE:                     If I can invite you to just cast an eye down on those.

THE COURT:                     Okay.  Let me

92

have a quick look.

SIR EADIE:                              Yes.  And the purpose of these paragraphs is simply to make a link, as it were, back to the associates of Chen.  It appears that Vistra is acting for all these companies and there's a link, as it were, between the Amber Hill position, the position of the new company that was being set up, which was apparently called Maple Bliss and critically Sandy Zhou who operates, or has various different names, as it were, that I have picked up, you will hear Sandy.

THE COURT:                              Yes.

SIR EADIE:                              But if you go forward into the exhibits, having read those two paragraphs and you just go to paragraph, I'm sorry to page 227, and that should be an e-mail from LLF Company Secretarial team at the top of the page.  And you'll see the references to, they are trying to set up this new company, it appears, and then it says:

"Please refer to the records of Amber Hill Ventures Limited, incorporated in the BVI for the identification documents of the BO."  The BO meaning the beneficial owner and refers to a KYC form.  And the KYC form, the know your client form, somehow ironically called that, is the form that you see

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

93

starting at page 234.

And you see there the reference to Maple Bliss in box 2.

THE COURT: Yes.

SIR EADIE: Maple Bliss in box 2.

And then in box 4, the companies sort of funds, capital injection by the beneficial owner at the top of page 235, and within box 4. And then you see the reference to the person responsible for the business record which is Ms. Sandy Zhou; do you see that?

THE COURT: Yes.

SIR EADIE: And then the name and jurisdiction and company number of prior company form. And then you see Amber Hill being referred to in box 5.

And Yang Fan being referred to as the details of the beneficial owner for Amber Hill in box 6.

And the connection back to Sandy Zhou, if you flip back to in the bundle to 226 under the OFAC Sanctions List Search which is, in part, designed to identify individual associates of the Prince Group and/or Chen. And you'll see in, on 226, that the OFAC

94

details list the Yun Zhou.  You see that in the first reference in the box.

And then you drop down in the box to about three quarters of the way down, this little thins saying 'aliases', do you see that?  And then you see 'Sandy Zhou'.

I think the judge has dropped off completely.

(Thereupon, the Judge has dropped off of Zoom call.)

Now, My Lord, I was about to take you to page 226, but if you want me to go back --

THE COURT:                    Okay.

SIR EADIE:                    You remember the form?

THE COURT:                    Yes, I do, the form.

SIR EADIE:                    I'm sorry, it's just you dropped off a little, but 226, I was taking you to show the two names under which Yun Zhou or Sandy Zhou, they are the same person.

THE COURT:                    Yes.

SIR EADIE:                    Right.  And then just to complete the picture, if you go back to Bundle 2, page 52 which are the exhibits to the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

95

Attorney's First Affidavit, you will see generated by OFAC after their investigations, a kind of persona gram if that's a proper thing to call it, but it should have some photographs on it.

Do you see that organizational chart on page 52?

THE COURT:                    Yes, I'm sorry. I am looking at this structure chart with the leader Chen Zhi.

SIR EADIE:                    Exactly.  And the book thing I wanted to draw attention to, this is created, as you, it's the Prince Group Transnational Criminal Organisation, as they put it.  It's an OFAC generated document.  This seeks, I think, to indicate how the connections work in relation to individuals and companies or at least, to some extent, in relation to companies, but more in relation to individuals.

And then if you go to the left, directly to the left additional of the leader, you get Yun Zhou, AKA Sandy Zhou, Financial Assistant and Wealth Manager.

THE COURT:                    Yes.

SIR EADIE:                    And the only purpose of going through those documents is to show you the link, as it were, the direct link, not just that they were involved in some of the, or alleged to be

96

involved in some of the money laundering activities as described in the complaint that there are these additional links, as it were, back into the group itself.

THE COURT:                    Yes.  Okay.

SIR EADIE:                    My Lord, to pull those features together, we submit that the context demonstrates that these are detailed allegations, not proof, but detailed allegations following serious investigation, both in the United States leading to the verified complaint that we've seen, leading to the indictment and leading to the State taking designated action in the U.S., equivalent to U.K. sanctions, and no doubt pursuant to a similar sort of regime.  And similar investigations in the United Kingdom identifying various property there and having to surmount the relevant test in the sanctions legislation over here which is reasonable suspicion or a reasonable case.

THE COURT:                    Yes.

SIR EADIE:                    And that's been done in the U.K. too.  So they are not proof, but they are more than stories.  They are more than general allegations.  So they had that degree of seriousness about them, as it were, and that is reflected in other

97

action that is evidently been taken or has been taken in multiple jurisdictions around the world of a pretty significant kind, almost all of it involving freezing of assets and the seizure of assets.

So that's the first point.

The second point is that the allegations and their nature is, I submit, important.  We have been through them in some detail.  Probably too much detail for My Lord's purposes, but in the First and Second Affidavits of the Attorney, and the allegations of criminal activity has or have the features that are, that you have seen from the documents.  There's some allegations of some pretty appalling behavior at sort in relation both to the criminality that is alleged, which is fraud on innocent victims through scamming, through mobile phones on an industrial scale, but also using people to conduct, through forced labor and modern slavery that activity.  The scale of the fraud is of some importance because it has generated not merely enormous sums, but has generated activity that is truly global, on the allegations that have been made, and it has then involved, perhaps unsurprisingly given that it's, the allegations are of fraud on that scale and of that nature, it has

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

98

then involved a concerted attempt to launder that money through an incredibly complex set of processes, Bitcoin, funneling and all of that, mining and all of that and also through very, very, complex corporate structures which is where it has touched the BVI.

And then after that laundering process has been taken, the recirculation of that now washed money and proceeds back into apparently legitimate businesses which are then, no doubt, being used to give the appearance of cleanliness to their activities and the profits that they are then able to generate, funded as source on that allegedly criminal money.  And all of that is effectively been orchestrated not by companies, but by individuals, Chen and his associates using corporate vehicles.

THE COURT:                    And all the corporate vehicles before the Court today, I mean, the Campbells companies and the K & K companies, would you say that you can show that they are all connected to this group?

SIR EADIE:                    My Lord, I can, in this way.  I mean, at the moment, what we have is an acceptance by those companies that they are owned and by Chen and that's the link.

99

THE COURT: Okay.

SIR EADIE: And the nature of the case that is there, the nature of the basic allegation is that, to the extent that there are companies that are owned and control, or were owned and control by Chen, he was conducting criminal activities to the extent that they appear to have been conducting legitimate business, that doesn't help him because the allegations are that the fraud generated the gigantic amount of cash, that was then laundered, that was then fed back into the system through legitimate business.

So the critical thing from my perspective that creates that link, it's slightly different for the K & K companies as compared to the other companies, the Campbells companies, but the Campbells companies are accepted to be beneficially owned by Chen and/or his associates. And that is enough for my purpose because there is, as it were, criminality at base in relation to all of those and the BVI companies that we are dealing with are in that sphere. Once it's accepted that they are owned by Chen and the associates, that is a sufficient link for me.

The K & K people are slightly different which is no doubt why they have been split off and are separately represented, but they say, well, we are not

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

100

designated, we are not sanctioned, what's it got to do with us, we are not part of the Prince Group, they say. And an answer to that is, well, you may not be part of the Prince Group and you may not have been sanctioned, but you are, on the allegations in the complaint, you were directly involved in the activities that sped the criminal proceedings through the laundering process.

And, moreover, as we have seen from the Attorney's Second Affidavit, there is evidence out there that appears directly to link you with the actual person, people or the people involved on behalf of Chen, in particular through Sandy, as you have seen Sandy Yun or Zhou. So that's how we say the link is established. This organization, the Prince Group and all the companies that are in it, are directly linked to Chen, that Chen is the last line orchestrator on the allegation that have happened and that is the link that is relevant. And it is, just finally on the facts or the allegations, it is of some significance that there isn't, as you may have noticed in the evidence on the other side, any substantive engagement with any of this. No one has come forward to say, no, no, we are an entirely marvelous and clean companies doing legitimate operations and we have since the 1850's. We haven't

101

got any evidence at all.  The only evidence that we have on behalf of the Campbells companies comes from Mr. Borrelli and a statement describing what some part of what has been going on in the American proceedings, but there is a total and deafening silence about what legitimate businesses were being operated in this way.

Now, I'm sure it will be said, well, that's because we don't have to do anything, it's for you to prove and for us to come back and put in a case when we see what you've said.  But it is of some significance given the detail and the level of investigation that led to that detail in both the U.S.  And the U.K.  It is of some significance that we have nothing, apart from, in effect, an acceptance that these companies were owned by and are owned by Chen.

THE COURT:                    Okay.  Yes. You obviously got in your own hands how much more in relation to the facts you intend to talk to me about in your opening submissions, but what I think would probably be helpful is for you to address the kind of threshold, legal threshold that you would need to satisfy to move the Court to wind up these companies. And let us -- because the door you are trying to go

**102**

through is a little bit different from the insolvency door. Usually, of course, when the Court is being asked to wind up a company because it is insolvent, then we are talking about two types of insolvency, either; balance sheet or cash flow/commercial insolvency and either one of those suffices for the Company to be put into liquidation. Obviously that's the usual way and there's quite a lot of law on the threshold that an Applicant would need to cross to show whether or not the Company is insolvent.

Equally, it's very normal for people to apply in this Court to have companies wound up on the just and equitable ground. Usually it's kind of a fallback catchall situation, usually in the context of disputes between shareholders or members, and when those disputes become intractable and there is no quasi-partnership, one of the remedies that the Court would apply usually as a last resort is the just and equitable winding-up of a company in the commercial context.

Here, of course, it's slightly different and I expect that you are going to be submitting to me that it depends upon all the circumstances.

SIR EADIE:                    I'm afraid --

THE COURT:                    And it's a

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

103

little bit like, you know, you can squeeze a sponge which, you know, the sponge might look massive when it's sponged, but you can squeeze it smaller and get it through a tiny little hole in the wall, for example, quite easily.  So it's a rather flexible mushy concept and it's all rather fairly easy for you to satisfy this Court that the Court should wind up a company just if it happens to be in the public interest for that to be done.

But then I am going to let you make those submissions, but I'd be very interested to understand what you say the threshold is, bearing in mind that, for example, as you have just taken me to, Cosimo Borrelli, who is no stranger to this Court, as I think I have already implied, he's trying to tell me now that, well, first of all, he doesn't think that you have crossed the threshold to get even a provisional liquidation because you haven't crossed the threshold to get a full-blown liquidation and he is saying basically the threshold is the same.  So that begs the question, what do you say the threshold really is?  Is there a threshold?

SIR EADIE:                   Yes.  I say the threshold is the public interest.  I mean I will come to the make the submissions on that.  I took you to the

**104**

two authorities we looked at earlier which identified the sort of factors and the sort of approach that the Court should take to the public interest.  But my submission is that the Parliament has deliberately or the Legislation has deliberately set the standard as being the public interest and that allows you to take into account any and all factors that bear on the public interest and enable you and require you to balance the factors for and against.  The sharp question perhaps, is the one that my learned friend Mr. Gledhill seeks to place most reliance upon which is the one that you touched on in your earlier questions at the outset and I know is a concern to My Lord, which is do we have to prove facts if we say the public interest is triggered by allegations of gross criminality, if the gross criminality was clear and obvious and proved and we were having a ten-week trial to sort that, that will be one thing, but do we have to prove that?  Do we have to prove the allegations of underlying criminality, or is something less required?  And what I was proposing to do, subject to My Lord inviting me to take a different course, will be to briefly sketch out the three essential grounds which we say found the public interest in our context.

THE COURT:                Okay.

105

SIR EADIE:                      And then to come very directly to the sharp question that my learned friend's skeleton has posed and that My Lordship has been taxing me about this morning, namely, is it necessary to prove the facts relied upon, and if it isn't necessary to go to proof on balance of probabilities or whatever it is, if it's not necessary to do that, what about our context, how do we do that?

So that's what I was proposing to do and I was proposing to be relatively quick on the grounds or whether they are obviously the centerpiece on this, and I was proposing to be relatively quick because we've set them out in a little detail in our skeleton argument for the purpose of this hearing.  So may be I just sketch out, but would that be a convenient and helpful stance because I am very prepared to take a different one if you prefer me to.

THE COURT:                      No, no, carry on.  That's good.

SIR EADIE:                      Well, I have done all that I'm going to do on the facts.  That will be a relief.  I have done all that I wanted to do on that.

So far as the grounds are concerned.  We say there are three effectively.  They all bear on and

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

**106**

directly go to the public interest.

The first is effective disruption.  I have already made this submission.  There's been extensive investigation into Chen, into the Prince Group, into those assisting them that has led to the concerted sanctioning and the concerted other action in multiple nations, all of which are governed by the Rule of Law on the basis that they, either have been, or are involved, or that there is sufficient evidence to surmount the various legal hurdles in those jurisdictions, sufficient basis for real concern about enormous criminal activity of the most serious kind.  So there is, as part of that as the first point, the effective disruption point, a serious basis for action and effective disruption of this sort of activity and the proper multi-jurisdictional steps to seek to protect those who have been the victims of it, we submit lies at the heart of the application.  It provides a key public interest and just and equitable foundation for it.

And it's important both in the public interest, it sounds both in the public interest in combating this sort of criminal activity effectively, but also because it's evident that

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

107

there have been, or at least the allegations are, that there have been vast sums of money involved with many victims around the world.  So effective disruption is our first plea to the public interest.

The second one is really a specific aspect of that first point.  The Virgin Islands have been brought into this and they have been brought into it because Chen and his associates --

(Thereupon, the judge dropped from the Zoom call.)

SIR EADIE:                    My Lord, I can see you back in the hearing.  You're on mute.

THE COURT:                    Yes, carry on. I keep flipping in and out.  I think we have a weather problem here as well.  There's some thunder and lightning been going on in the last hour or so in this corner of the islands, but carry on.

SIR EADIE:                    Thank you.

I have given you the first which is effective disruption.

The second point I was making which was that that has a specific aspect to it because the Virgin Islands have been dragged into this and they have been dragged into it because Chen and his associates have seen fit to use, or on the allegations

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

108

have seen fit to use, and set up as part of the Prince Group a series of companies in the British Virgin Islands and that is of, no doubt because they have formed a view that the British Virgin Islands is a suitable jurisdiction in which those sorts of companies can be set up.  What led to that, I don't know, but they have chosen to use Virgin Islands corporate vehicles for the purposes that you have seen summarized in the complaint.

And, of course, the Virgin Islands are, and this is the public interest that is of real significance, a leading financial, international financial center.  There is a very strong public interest, we submit, in the Virgin Islands being and being seen to be, a reliable international financial center and taking steps to tackle and to deal with the sort of criminality that is alleged in these cases and in which these businesses are said to be mixed up. That is both in the public interest.  Generally, it's specifically in the Virgin Islands' interest and it's in the interest of protecting the victims of those criminal activities if they occurred.  But there is a strong public interest in the being at the forefront, as it were, you mentioned this was the first of its kind, as it were, but being in the forefront of taking

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

109

effective steps to seek to protect the integrity of that system from use, particularly, it might be thought in circumstances in which those who are alleged to have been involved in this criminal activity have themselves chosen to use Virgin Islands companies for part of that purposes.

There is the somehow, and we respectfully submit, in the position which is taken by the companies accepted to be owned and controlled by Chen in seeking to balance or counterbalance by recourse to rule of law, considerations. No one, on this side of the Court, needs persuasion about the thoroughgoing benefits of the rule of law, but rule of law stands for proper legal processes in front of independent judiciary before interference occurs with property rights. All of that is preserved by precisely what we are doing now.

THE COURT: How would that be preserved by eliminating the existence of these corporate vehicles?

SIR EADIE: Well, My Lord, no company gets eliminated, as you've put it, or has its heads severed if one wants to go to those more gruesome analogies, but no one gets to that place, not telephone corporate vehicles without an orderly process

110

under which court officers investigate these companies, report back to the Court and the Court decides it's an appropriate thing to do.  As I understand it, under Virgin Islands Insolvency Legislation, I think, the section is 232, the Court always has the power to terminate the liquidation if that's what it choses to do.

THE COURT:                    Okay.

SIR EADIE:                    It's part and parcel of my point about this being an orderly process and it's part and parcel of the other part of this, which is that, on my learned friend's logic and indeed on the Borrelli logic that you identified a moment ago, it was inappropriate even to appoint Provisional Liquidators.  Well, that would mean that all of these companies would go back into the control of Chen and his associates to the extents that they are able to act, pursuant to --

THE COURT:                    All right. Let's have a little look at that provision in the statutory, can we?  I mean, we do occasionally, of course, terminate liquidations, but then -- with the understanding, of course, that usually a liquidation is terminated because it is completed or there is no more that can be done and at which point the Court can do a

111

number of things.  It's not generally used though to say, oops, we actually liquidated the company by mistake because everything has changed by facts which have come to the fore in the meantime.

SIR EADIE:                My Lord, there wouldn't be any oops about it, if I can respond in that fashion.  I mean the power of the Court, as I understand it, reading the legislation in 232 and 233, is one that is simply dictated by what the Court feels is just and equitable to do in the circumstances.  And so if the liquidation process, whether provisional or otherwise continues, that has the benefit of protection.  I am going to come to that under the third point, it has the benefit of orderly process.  The Court is not committed, irretrievably, by the appointment to the killing of the Company, to take that analogy, it continues to retain control and oversight and it can make judgments in accordance with what the liquidation process throws up.  And as I understand it at the moment we are all in, to some extent, we are all in the Joint Provisional Liquidators' hands because there are reports to the Court, as I understand it, and so that process is still ongoing, of investigating the facts surrounding these companies.  But there will be a process of investigation, there will be a process of

112

orderly management and the Court is not irretrievably committed to any particular course, as I understand the terms of the legislation and it's simply by confirming the appointment. But if that was a concern, and as I say, the alternative argument would be for goodness don't, as it were, take these companies out of the hands of the Provisional Liquidators to enable them to fulfill that thoroughly useful work and hand it back to the people who are subject to these most serious allegations.

THE COURT: Yes. Okay. You might need to help the Court a little bit on this aspect because I have obviously seen, because you have taken me to it, this OFAC and U.K. freezing of assets by basically blocking them and blocking people from dealing with them, liquidation, as this Court normally understands it, means that a court-appointed officeholder takes complete control over the company with the brief that the officeholder has to get in the assets of the company and then pay off its liabilities and then see how much is left and then conduct a pari passu distribution of the assets to, either its contributories, if it is a solvent company; or the assets to the creditors, if it's an insolvent company, whereupon the company is then usually dissolved and

113

finally put to bed as it were.  And that's what normally happens.

In this case, are you trying to use this liquidation to basically block the assets of the companies and prevent people dealing with them, i.e. put them in more or less the same kind of refrigerator as in the U.K. and what OFAC has done?

SIR EADIE:                    My Lord, that isn't the sole purpose of this liquidation.  I'll come back in due course, if I may, to the crossover between the U.K. and the U.S sanctions position, the position of the liquidation by contrast, but my short answer, before going into the detail on that submission later, my short answer is that that is not the sole or indeed the central purpose of this liquidation or the invitation to the Court to appoint liquidators.

We say, and this was going to be my third ground, as it were, because it may be that we -- I don't know what time we break.  Do we break in --

THE COURT:                    In one minute's time.

SIR EADIE:                    -- in one minute's time, may be I come back to the third point after lunch, but that is going to be the benefit to the liquidation and my submission will be that the benefits

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

**114**

are multiple.  And there are, of course, sanctions in place and the companies place reliance upon that, but we say that isn't a complete version of what needs to happen and the public interest has different facets that could be properly and seriously served by the process of liquidation, which will include investigative elements, finding out what's been going on in the Company, pulling that information together and reporting to the Court about it and then going through whatever orderly process is required, or under this Court's direction and management, but with a view, ultimately, to the endgame that My Lord has described, but the endgame, even if it were to happen, is an endgame in which all relevant interests, including those of the beneficial owners of the Company will be protected, but not only those because it may well be that by that stage, if there are significant assets here and they have been properly collected, victims' groups might have a word or two to say about how that distribution happens and would themselves make claims within that liquidation.  But all of that would happen as part of an orderly process and under the direction and supervision of the Court.  None of that is achieved by the mere act of freezing.

THE COURT:                Yes, I see.  So

115

what you are trying to do is use the liquidation process as a tool to achieve a globally, a holistic just and equitable solution that everybody can serve?

SIR EADIE:                     A holistic just and equitable solution and a solution which has multiple facets because of the powers of the liquidators under, operating under Court directions, the powers that that enables to be brought to bear at this stage.

THE COURT:                     Very well. We'll take the short adjournment now for an hour and we will come back at 2:00 o'clock.

SIR EADIE:                     My Lord, thank you.

THE COURT:                     Thank you very much.

(Thereupon, the luncheon adjournment is taken at 1:01 p.m.).

* * *

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

116

AFTERNOON SESSION

* * *

(Matter resumes at 2:00 p.m.)

THE CLERK:                BVIHCM 0001-0030 of 2026 - In the Matter of the Attorney General v. Bright Team Global Limited and Others.

THE COURT:                Thank you very much.  I take it the appearances are as before.

THE CLERK:                Yes, My Lord.

THE COURT:                Yes, very good. Excellent.

So, Sir James Eadie, K.C, please.

SIR EADIE:                My Lord, thank you.  I was on the third of the grounds.

THE COURT:                Yes.

SIR EADIE:                I took you to the first two.  The third of them is essentially a collection of points, but the headline is that it is evident, we submit, that the appointment of liquidators is an essential step to achieving those public interest ends.  There are serious allegations that the companies concerned are involved in those criminal activities that I have described.  It's accepted that the companies, at least the Campbells companies, and I have dealt with Amber Hill and Lateral Bridge already, but

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

117

the Campbells companies are owned and controlled by Chen and/or his associates and they are all alleged to be participants in that.

Despite the action taken in multiple jurisdictions, those companies continue to be or would be if returned and the liquidation were ceased, particularly the Joint Provisional Liquidators were called off as it were, they would be returned in effect to the companies and to the grouping which is said to be orchestrating that criminal and fraudulent activity, including for that purpose laundering, holding and concealing the proceeds of those activities. It's evidently stronger we submit in the public interest that that doesn't occur.

And the liquidators that are appointed by the Court and have been appointed by the Court on a provisional basis are both independent and act as officers of the Court. And placing the companies and their affairs in the control of those individuals is, we submit, strongly in the public interest.

And the appointment also has a number of key benefits, we submit, rendering it both necessary and in the public interest. It will ensure that the companies' affairs are properly investigated. That process has started and is ongoing. And that is of

26-10769-mg    Doc 49-14    Filed 05/21/26    Entered 05/21/26 15:29:05    Exhibit 14 - Transcript of April 16 2026 BVI Hearing    Pg 119 of 193

118

obvious and critical importance to ensure that appropriate steps are taken both to recover assets and to maximize returns and to enable claims to be made by victims if necessary and appropriate, including for that purpose participating as necessary in cross-border cooperation to those ends, including asset recovery and more broadly assisting potentially with victims' rights.  And to ensure proper cooperation with enforcement authorities, regulators and so on.  That is a feature, we submit, which is of a special importance and especially in the public interest given the multi-jurisdictional nature of what we're dealing with.

So those are the three core elements of the ground, the three core elements of the public interest that we rely upon.  And all of them, we respectfully submit, including those benefits, sound in the public interest.

The final point perhaps to mention is the one that I've already dealt with before the short adjournment, which was the orderly nature of the process that would then be followed by the liquidators. And that would enable all relevant interest to be properly protected and would enable the Court to supervise and control and manage that process.  It would be a public interest liquidation so it doesn't

119

necessarily need to track in all respects and in all parts of the process what would otherwise happen if it was a pure insolvency matter.

But the Court would ultimately have control and an orderly process could ensue and would ensue and, of course, at all times all the Court's powers are available to it. So, for example, on this application the powers that the Court has include a power under 167, under 167(1)(d) to make any interim order or other order that the Court considers fit. So it could, as you alluded to before the short adjournment, continue the liquidation on a provisional basis for the time being and keep an eye on it. That will plainly be within its power under 167(1)(d).

And as we were discussing before the short adjournment, there is a power in the insolvency legislation, particularly in 233(1), to enable the Court at any time after the appointment of a liquidator to make an order terminating the liquidation. And indeed that power can be exercised on application inter alia by the liquidator themselves, the liquidators themselves, see 233(2).

The broad point is that an orderly process can ensue, the matter can be protected, investigations can occur, all interest can be protected

and the Court can maintain control and maintains all the requisite powers to do whatever it considers just going forward. The one thing that we respectfully submit would be thoroughly antithetical to the public interest would be a return of these companies to the tender administration [sic] of those who are instructed to act by the person who is currently, the unknown person who is currently representing Mr. Chen's interest.

So that's how we put the public interest side of things. Can I turn then to the question whether it's necessary to prove the facts relied upon. My submission or my submissions are these.

Firstly we say, the correct approach in principle is to identify and then weigh, for the Court to identify and then weigh factors, and I emphasize factors, factors bearing on the public interest in the appointment of liquidators both for and against. You saw that from the two authorities, both Court of Appeal in England that I took you to at the beginning of the morning. It is those factors that the Court is required to be centrally focused on. To use Lord Justice Nicolls' words, the raison d'etre. And that involves focusing, we submit, on the impact and effects of an appointment of liquidators compared to the impact

121

and effects.  If not, that's central to the public interest.  What happens, what are the benefits and what are the disadvantages if you go one way or the other.  That's a factorial analysis which is required by the public interest test I submit.

And the question is ultimately whether applying that factorial approach on all the evidence before the Court, and you have the evidence of the Attorney General's affidavits and so on, the question is whether on all the evidence before the Court reasons of sufficient weight have been advanced to justify a winding up.  That's the way that the ultimate test is put and with good reason I submit.  And it is, of course, as we accept, for the Applicant, here the Attorney General, to bear the burden of persuading the Court that it would be in the public interest to take the course which is advocated.

The second submission is that where that correct approach leads is not to a uniform approach.  The factors may vary between cases and context.  They will be very likely to do so given the myriad factors that might bear on the public interest in any particular case or context.  But I keep coming back to the fact that the legislation has allowed for these sorts of public interest applications to be made.  This

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

122

is not a trial between private interests. It's an exercise in weighing the public interest. It's not to be treated, I submit, as an adversarial trial with disputed facts to be determined in the usual way in civil litigation of that kind. That is precisely because it's a factorial exercise based on all the evidence before the Court designed to weigh the public interest.

And what that means is, in our submission, that there is no immutable requirement of principle that any factor that has a factual element needs to have that factual element proved. That approach would be antithetical to the factorial approach to the public interest and it would cut across the broad nature of the Court's power under section 162. But that is, of course, not to say that in some context or in some cases, for example, where there's a narrow and central foundation for an application to the Court, the Court might not consider it appropriate in those circumstances on those facts to apply that more conventional approach. So I don't exclude that possibility. My submission is that it is not appropriate to treat that as a mandatory universal requirement in all cases and in all contexts.

And that leads to the third submission

123

which supports that, but which is that the public interest can in principle be affected and action can be taken on the basis of it if there are serious concerns that simply cannot be proved at a particular point in time.  There are many different contexts in which steps protective of the public interest are taken on the basis of something very much less than proof of the facts.  One can look at sanctions as a classic example of that.  You don't need to prove the facts in relation to sanctions despite the seriousness of their impact.  And that is because and that recognises the fact that the public interest might well need to be protected and could only be protected by a factorial approach of that kind.

So a statutory test based on the public interest, I submit, stands against the idea, positively against the idea that the public interest should be rendered incapable of protection if the party who seeks to rely upon it cannot prove a serious allegation or set of allegations which as allegations give rise to the gravest public interest concerns.  So we submit that there is no broad pre-conditional principle applicable across the board.  All depends on context.

And for good measure and finally on that part of the submissions, none of the cases that my

**124**

learned friend, Mr. Gledhill, has cited in his skeleton establish a universal required approach.  They at most set out general rules and those general rules or general principles are necessarily subject to context and to facts.  And indeed it might be thought to be surprising given the breadth of the public interest test, simply the public interest test set out in the legislation if a single rule or principle applied irrespective of the context.  We are not here dealing, of course, with a single or even a terribly contained set of allegations necessarily because of the nature of the fraud that is alleged and the nature of the actions that were taken it is alleged afterwards to launder the money and then revert the, apparently clean cash back into the hands of some vehicle companies.

The past cases which have considered these issues have been fundamentally different to that sort of situation.  They've involved, for example, situations in which a company's active examiner has been put in to look at the books of the company.  The question is in the light of the facts so ascertained, where does that leave one in relation to the allegations of either impropriety or wrongdoing or unease in the public interest.  One can quite see that in that sort of situation the Court would apply that

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

125

sort of strict term approach to that. But we're simply not in that situation.

And so I turn on the back of those three or four submissions in principle to our context and how that applies in the context of this principal debate. The context here is unusual. You're dealing with allegations of multi-national criminal activity which involve at their very heart steps taken after the fraud alleged to have occurred has initially occurred that are positively designed to cover the tracks, positively designed to obfuscate, positively designed to render the picture as complicated and as difficult to penetrate as humanly possible. That is the very essence of laundering money. So too is the attempt then to recirculate it back into legitimate seeming businesses and assets. And that is precisely the set of allegations which the serious investigations that have been undertaken in the US and the UK and indeed it appears in other jurisdictions have revealed. And I submit that that is critical in the present context and critical to the question whether or not it can truly be a precondition to require proof of all of those facts.

And I wanted to make three or four points in relation to that by way of context.

Firstly, it is perhaps forensically

**126**

unsurprising that these companies should seek as the center piece of their submissions to insist on proof of facts that simply cannot at this stage be proved. And cannot be proved because we are at the stage of continuing investigation in multiple jurisdictions and indeed we are still at the stage where there is examination by the Joint Provisional Liquidators of these companies' affairs. It is simply not possible at this stage to prove. As I say, one can quite understand where they would demand that because they know full well that it's an insurmountable hurdle and the result of that would be to return the companies to the hands of Mr. Chen and his associates.

But where that leads to secondly is that insistence upon proof would, we submit, be entirely inimical to the public interest. It would mean that the public interest could not be invoked in such a case unless and until the picture was clear and could be proved. And that is to insist on what may be, and in our case is currently, an impossible precondition. And all the more irony because rendered impossible by the very concealment of laundering and so on that lie at the heart of allegedly criminal operations of this kind. And that is likely to be because of the complexity because of the multinational elements and

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

127

jurisdictional elements of this for a prolonged period.

And in the meantime, what's the alternative?  Well on my learned friend's case, the alternative is that the companies continue in existence and in operation with the risks that are associated with that.  Assume for that purpose that the allegations of criminality and so on are well founded, what happens in that situation?  Of course, it's only a risk because they haven't been proved yet, but they will continue to operate.  They will continue to be able to obfuscate.  They will continue to be able to do whatever they were able to do.  And that is an affront to the public interest.  Because on the allegations made, those companies were actively involved in laundering money and in running businesses that were part of that attempt.

And the alternative to all of that, I submit, all of that set of consequences which would be thoroughly inimical to the public interest, the alternative, by way of appointment of the liquidators or at the very least carrying on the provisional liquidation, by contrast would be to place the affairs of the companies into the hands of independent professionals acting as court officers, or enabling the affairs of those companies to be investigated, or

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

128

enabling an orderly process to be undertaken with assets identified, chased down, protected with the ability, if it reaches that stage, to have claims considered including claims on those assets by victims dealt with in an orderly process and all of that happening under the auspices and under the direction of the Court.

I emphasize thirdly, this is not to advocate a free for all. The nature of the evidence before you includes the fact that there have been serious investigations by other nations that have led them to surmount the hurdles that they've had to surmount, to swear the complaint or to verify the complaint that you've seen in the US to enable the US to undertake sanctions, to enable the UK to do the same thing, to enable all the other jurisdictions to seize the assets that they've seized. This is not a free for all. These are not entirely general allegations. The evidence, including of those investigations, has unearth what is a deeply troubling picture short of proof, of course, but nonetheless extremely serious and, therefore, extremely engaging of the public interest in my submission.

So my submission is that there is no immutable principle and it all depends on the context

129

of the circumstances. And our context in circumstances are as I have described.

I wanted to touch briefly if I may, and I think finally from me, on the relevance of UK and US sanctions which is a subject I know My Lord expressed at least some interest in. I can deal with that relatively shortly I hope. It is an important fact is the first point to reiterate that following that detailed investigation sanctions have indeed been imposed by those jurisdictions that have done so that highlights the public interest in supporting the multi-national efforts to combat this sort of fraud across different nations. The fact that the US and the UK have imposed sanctions does not, if this is a suggestion, in any way undermine these applications. And that is for the simple reason that this application with all the benefits and effects that I've outlined, sits alongside and is complimentary to those sanctioning measures.

Sanctions, of course, as you know have an asset freezing effect and they have the effect of freezing someone out of the financial and economic markets so as to deprive them in that way of that opportunity. But it is trite that they are not always complied with despite the sanctions that exist for

130

non-compliance.  It might be thought they might be especially at risk of being not complied with by those who at their very least might be neck deep in criminality of this kind.  Imposition is not the same as compliance.

But leaving all that aside, that is a free-standing benefit, leaving all that aside, there are additional benefits and advantages that flow from the appointment that I've been through.  Further investigation, court officers taking control, orderly processes, none of that is covered by sanctions so these are generally, genuinely complimentary measures.

My learned friends also seek to say on the other side of the same coin that the fact that particular companies haven't been specifically sanctioned by the UK assist them.  And the short answer to that is firstly that to the extent that a chairman and PGGL, which is the holding company in effect of the Prince Group, were sanctioned achieves most, if not all, the beneficial effects of sanctions because of the way in which sanctions operates.

The Virgin Islands is not limited to taking action in relation to companies in its jurisdiction and if they appear to be connected to those behind this fraud in any event.  You've seen the

26-10769-mg Doc 49-14 Filed 05/21/26 Entered 05/21/26 15:29:05 Exhibit 14 - Transcript of April 16 2026 BVI Hearing Pg 132 of 193

131

nature of the allegations. The jurisdiction that is invoked, the public interest jurisdiction, depends at its heart not on whether another state has chosen or not chosen to go down a particular remedial route, but depends on demonstrating at least the arguable connection that we received from the material that is before the Court that these companies were involved in that criminal activity.

And it is significant in that respect that it's positively accepted by the companies that they were owned or controlled beneficially by those who have been sanctioned. In other words by Chen and his associates. I took you to Mr. Borrelli's affidavit in that respect. So the fact remains and the fact links all of the companies back directly to the person at the center of or who is alleged to be at the center of and to have been directing these criminal activities.

And so far as Amber Hill and Lateral Bridge are concerned, they are connected in all of the ways that the evidence has demonstrated, including on the material that you've seen in the complaint, active participation, alleged active participation in the money laundering of the Bitcoin.

And as you've seen from the later paragraphs of the Attorney's Second Affidavit,

132

connected directly to the, to Ms. Zhou who is the direct line associate of Chen as you saw from the personal chart that I took you to that was appended to her first affidavit.

So for all of those reasons, we submit, that the US and UK sanctions are an important part of the piece, but if anything they strongly assist the engagement of the public interest in continuing the appointment or in making the appointment. And they are no view, I respectfully submit, assist my learned friends.

My Lord, that was really all for me. It would have been evident I hope from my submissions that we, just to make it absolutely expressly clear, our position ultimately is that you have two proper options for you. One of them is that you make the appointment with all the powers to control that process and to exit from it if that's what the Court decides to do at a later date, that is our and remains our primary case. And it at least may have some advantages. Because as I understand it, I don't think this is in evidence, but as I understand it there may be some, at least foreign perception, with the provisionality of provisional liquidators that makes their life more or less difficult, but it may be that the JPLs can speak to

133

that if necessary.

So our primary case remains that that is the correct and appropriate course for the Court to take.  But alternatively if you're not satisfied about that, then our submission would be that the liquidation should continue on a provisional basis to enable all those benefits to flow pro tem.

And thirdly and as a corollary to all of that, the one thing that we strongly submit should not happen would be an exit from the liquidation process entirely with a result that everything as it were returns to the prior position with all the potential damage to the public interest that would thereby ensue.

So those are my submissions in opening. I would hand over to Mr. Dennis KC unless you have further questions for me, My Lord.

THE COURT:                No.  Thank you, Sir James.

So, Mr. Dennis, please.

MR. DENNIS:                May it please you, My Lord.

THE COURT:                Yes.

MR. DENNIS:                I am charged with the responsibility of addressing you in substance, My Lord, on the aspect of the Respondent companies'

134

submissions and in particular the Campbells companies where there have been various submissions suggesting that these proceedings for the reasons which they adumbrate in those submissions are an abuse of process.

There is one other aspect of their submissions upon which I may address Your Lordship but which I do not propose to do at this juncture because, in fact, that may turn out not to be necessary.  That, My Lord, deals with that aspect of their submissions where certain points were raised as to the way in which the ex parte application was presented before your Brother Judge, Justice Mithani.  And having reviewed those and on reflection, My Lord, it appears to us that those are matters which would be more appropriately raised in the context of an application to discharge an ex parte order on the usual bases, either that there has been a material non-disclosure or as appears to be the position in this case, that certain matters which ought to have been brought to His Lordship's attention were not.  And that those were so material as they, such that they should have an impact on whether that Order was continued.

To the extent, My Lord, that matters have moved beyond that, and Your Lordship is, in fact, dealing with the substantive application, I don't

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

135

propose to address those issues.  And that is, My Lord, without any comment at this juncture on the sustainability of the arguments which have been raised.

I would simply, My Lord, reserve our right to respond to those arguments if, notwithstanding what I've just said, they are maintained.

And on that basis, My Lord, I would if Your Lordship will permit me, go straight into the abuse of process contention.

Now, it would have been apparent to Your Lordship from the Respondent's skeleton and in particular the Campbells Respondents, that they contend broadly that to the extent that the assets of the company are already effectively the subject of UK and BVI sanctions or rather to the extent that the principal of these entities is under sanction, which would effectively trickle down to the companies which he controls and the assets which he ultimately thereby controls, the liquidation process which has been embarked upon is superfluous and an abuse.

There are certain specific submissions which are made in that broad context which I will deal with in turn.  But as a general response to the notion that these proceedings are an abuse of process for that broad reason which they posit, I should say at the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

136

outset, My Lord, that one has to bear in mind the context of this, these liquidation applications.  And particularly the fact that these are not your typical liquidation applications where the pivotal concern is simply the preservation of assets of the target companies for the benefit of the estate of the liquidation, whether it be solvent or insolvent.

The Court will by now fully appreciate that a pivotal objective of the applications, quite apart from the issue of protecting assets, is for the affairs of the company to be taken out of the hands of the alleged wrongdoers in the public interest so that its officers, ergo the liquidators, may be in a position to properly investigate their affairs with a view to getting at the bottom of what has been happening with these entities.

I am not sure if we've lost His Lordship again because I am no longer seeing him.

THE COURT:                I'm here.  Can you hear me?

MR. DENNIS:                Yes, My Lord.

Very well, My Lord, I will proceed.

THE COURT:                Yes, do, yes.

MR. DENNIS:                And in that context, My Lord, we speak to the whole purpose and

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

137

intendment of the application for the liquidation of these companies.  And if I could just remind Your Lordship as to where Your Lordship may find our submissions in that respect.  And that begins at paragraph 46, My Lord, of our skeleton argument which was submitted in respect of the March 2 hearing.

THE COURT:                Ah, yes, very well.

MR. DENNIS:               And then, My Lord, we pick that up also at paragraph 52 to 56.

THE COURT:                Yes.

MR. DENNIS:               And the imperatives which dictate the making of the application which the Applicants, which the Applicant seeks, are outlined in the context of the just and equitable ground and also in respect of the public interest ground.  And paragraph 46 deals in substance with the just and equitable matters.  And that discloses, My Lord, that to the extent that Mr. Chen is alleged to be the mastermind of the Prince Group, which, as we have seen, has been designated by the OFAC as a transnational criminal organisation.  The companies, excluding for the moment Amber Hill and Lateral Bridge, have been specifically designated as being part of that group which has been deemed a criminal organisation

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

138

based on the allegations which Your Lordship has heard about.  There is no dispute that those entities are owned and controlled by Chen and his associate.

Independent liquidators, it is the Attorney General's case, are necessary to ensure proper coordination with regulatory enforcement authorities having investigated the affairs of the companies to determine what precisely is going on.  And all of that would be in addition to their mandates if they are given that in the interim to preserve the assets of the company.  And given, My Lord, the scale and the complexity of the alleged international criminal conduct which has been occurring in which these companies are mixed up, that is the imperative which also underpins the public interest ground for the appointment of a liquidator.

And in addressing the public interest ground, My Lord, we deal specifically at paragraphs 52 onwards with what drives that ground.  Again, companies are alleged, and yes we accept that these are allegations for the time being, but my learned friend has dealt with how Your Lordship should address that notwithstanding that they are at this point mere allegations.  But very serious allegations which obviously cannot pass without some kind of response by

139

the Attorney General in her capacity as the guardian of the public interest of the BVI.  Because the use of the companies in that kind of large scale international criminal fraudulent scheme, if proven, would obviously cause significant reputational harm to the BVI as a financial services center and threatens the confidence in BVI-incorporated companies as well as the very BVI regulatory framework.

The appointment of liquidators in that context, My Lord, squarely aligns with the Territory's commitment to taking appropriate and decisive action where appropriate when BVI companies could potentially be involved in criminal or fraudulent activity.

THE COURT:                Okay, can I stop you there, Mr. Dennis, for one moment.  I'm sorry. This is an area that obviously interests me a lot as well.

You say that the liquidation of these companies aligns with this public interest which I think we're all familiar with here in the BVI, yes. Now let us say for one moment that out there somewhere in the world a massive fraud, an industrial scale fraud enterprise has been afoot.  Let us say that for one moment, yes.  And we happen to know that the alleged perpetrators of this massive industrial fraud, they own

**140**

BVI companies which presumably own assets or do business in some shape or form.  And let us say the BVI wants to investigate what those companies have been getting up to, yes.  Let's imagine that for one moment.

What options are there for the BVI authorities, the Government of the BVI if I can be very broad spectrum about it, what options would be there for the BVI Government to take?  Let's say these are companies, they are not necessarily regulated entities in the shape of banks or insurance companies or anything like that, but they might hold let's say real estate or other assets.  You know, paper mills or plastic food container manufacturing entities or hotels or something like that, something which globally is not regulated.  What are the legal options open to the "Government" of the BVI?

MR. DENNIS:                Well, My Lord, I think it would be right to acknowledge the fact that there are multilateral arrangements, international arrangements in place to facilitate, for example, the sharing of information through, for example, the existing mutual legal assistant regime which would allow the gathering of information for the purposes of such investigations.  The mutual legal assistance regime immediately come to mind, and there would

26-10769-mg    Doc 49-14    Filed 05/21/26    Entered 05/21/26 15:29:05    Exhibit 14 - Transcript of April 16 2026 BVI Hearing    Pg 142 of 193

141

perhaps be others.  But such arrangements and the availability of those arrangements are not mutually exclusive.  And to the extent that there are other resources or other options which may be available to the Government, and in this case to the Attorney General, to accomplish that objective, then given the nature of the current allegations before Your Lordship, it is right that the Attorney General avails herself of all possible options.

Now, in a context where, My Lord, it is absolutely important that one gets very quickly to the bottom of what has actually been happening with these companies in the context of these allegations --

THE COURT:                And maybe you would want to add to that, it is very important for the interest of the BVI to get very quickly to the bottom.  Because the MLAT regime that you've mentioned, that would help foreign investigations let's say in the US or UK or somewhere else, Cambodia or, you know where else, Taiwan, anywhere else in the world, but it wouldn't necessarily be used to satisfy the BVI's own interest in whether these companies have been used for an industrial fraud.

So then where we are at, obviously all the options, but what are all the options?  I mean,

**142**

you've come to court seeking the remedy of a liquidation, yes.  Now let us just -- and maybe what you're going to be doing, I don't know if it is what you're doing, but maybe you are going to eliminate various possibilities as not being -- you've already started I think.  I think I've heard it said that the sanctions regime which the BVI has extended in respect of these assets or apparent assets or something of that nature, that wouldn't, in fact, have the investigative element necessary attached to it.  So just sanctions alone are not going to be sufficient.

Then we have to think of what other legal steps might be sufficient to enable the AG on behalf of the Government to investigate how these companies have been used and what they're really doing.  You could, for example, apply for a receivership.  But then receiverships -- because that would give the Receiver two powers, one an investigative power and a power to control.  That would be very useful, but you wouldn't get a receivership unless you have some kind of underlying claim that a receivership would support.

So where are you then left really? Administration, we don't have an administration regime in terms of investigative administrations I don't think.  I have never come across one.  I've come across

**143**

an administration regime in an insolvency context, but not in the context of, or a shareholders context, but not an investigative context.  So what options do you really have?

MR. DENNIS:                Well, and, My Lord, that is precisely why it was felt, justifiably so, that the option which has been taken, which is to bring about a circumstance where appropriate investigations into the affairs of these companies could be made under the very close supervision of the Court, which as my learned friend took you to earlier, has wide powers in the context of the kinds of orders which the Court could make within the context of liquidation.  So that by that means the liquidators who would be officers of the court would be able to accomplish two things armed with the necessary authority.

One, to identify, preserve and protect the underlying assets of these entities and that, in the second respect, take advantage of the powers and resources available to them to investigate the company's affairs in order to get to the bottom of what is going on.

And so, My Lord, when it is suggested that this process is an abuse because there are other

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

**144**

options available, the reality is that such other options to the extent that they are available would not be necessarily as effective as liquidation under the close supervision of the Court would allow.

Now, in the context of some very pointed questions which Your Lordship made in your preliminary remarks this morning, in that context I would say, My Lord, that the Court has very wide powers in this respect. It could very well be, My Lord, that upon conducting the relevant investigations having been appointed, the liquidators could potentially find that the matters which are being complained of do not quite pan out to be as thought. And in those circumstances the Court has power, as my learned friend took you to, to terminate a liquidation.

The Court also has the option rather than making a final liquidation order to continue the provisional liquidation to allow those investigations to take place with periodic reports to the Court. And ultimately if it is determined that that is the appropriate course, it may be that ultimately a liquidation order is granted or it may be that ultimately the proceedings, you know, are terminated.

And so -- but what this approach and this, these applications allow, is for all of those

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

**145**

potential methods of dealing with what is a serious matter which now confronts the Attorney General can be dealt with and all of those options can be explored.

THE COURT: Yes. Now, Mr. Dennis, what about this? When people apply to put companies into liquidation in this court, invariably there are two elements to their application. One is investigative powers that is always said that the Court must appoint an officeholder to go and delve into the affairs of the company and find out what was going on and where assets are and where they should be and what should have been and what should not have been done and whether directors have been acting in accordance with their duties, all that sort of thing. So the powers of investigation, that's always pleaded. But usually that's secondary although it comes first in the actual physical way it rolls out. But it's secondary to a creditor usually saying I want some of my money please. I know I can't get all of it, but at least I want some cents on the dollar and I want a liquidator because I want the assets to be divided up and distributed pro rata. That's usually the second element.

Here what we seem to have is the purpose of the liquidation is more investigatory at this point with maybe provisionally the idea that the company be

146

wound up and dissolved in the usual course in the liquidation.

In a normal situation, I'm coming to my question in a moment, in a normal insolvent liquidation situation, then the directors usually, or the erstwhile directors of the company, they retain a right to address the Court, to make representations to the Court why the liquidation should be discharged or why a different officeholder should be conducting it or they retain a residual right limited to basically opposing the liquidation, yes. And usually what we see is that is like a one-bullet gun. They get one shot at it. And they come after a few months with a host of reasons why the liquidation should be ended or the particular officeholder should be changed or something like that, the Court hears it and makes an order and that's it.

Now in your situation that you're proposing where you heard the investigation first with it being kept open that the liquidation should be terminated, who is going to have the possibility of coming to the Court to say actually what the liquidators have found in their reports isn't that bad. All we've found is that these companies are being used for normal legitimate trade actually and so, therefore, they should be allowed to continue. However bad Mr.

147

Chen might be, he is allowed to make a legitimate living.  And if his living is cleaning windows or something, you know, having a window cleaning business, for example, then he should be allowed to do that.  And somebody needs to be able to come back to court to say we submit that the liquidation needs to be terminated because what has been found does not warrant the winding up and closure of the company.

Where do you envisage that process of representation to come into what you're proposing?

MR. DENNIS:                Well, the first thing I would say in response, My Lord, is that this is clearly not a typical case.  And in many respects it's a first.  However, My Lord, it does not seem to me that there is anything in this case which would preclude those kinds of representations being made in the context of the Court making an order which those interested in the affairs of the company or in respect of which those interested in the affairs of the company would wish to make such representations.  After all, My Lord, the companies are represented in the current proceedings before Your Lordship.

THE COURT:                Yes.

MR. DENNIS:                And there is no good reason why that avenue of representation or those

**148**

channels of representation could not within the wide powers which Your Lordship has in the context of a liquidation, there would be nothing to prevent those kinds of representations to be made by appropriate parties through Counsel in the same way in which it would be open to directors to do so in the context of your regular boilerplate liquidation to which Your Lordship referred.

And so one is not suggesting or proposing that those avenues would be closed.  And so, My Lord, to my mind there should not be any particular difficulty in accommodating that kind of process.  And that is entirely consistent with the fact that Your Lordship has powers to do a multiplicity of things and make a multiplicity of orders depending on what the justice and equity of the situation demands.  Because sections 233, 231, 232 and section 167(1) speak about the Court having the power to make such order as it deems, as are just and equitable.  And so there is that fraud power which would allow for that kind of intervention for want of a better word, My Lord.

THE COURT:                    What I think you're saying as well is that a liquidation or a provisional liquidation in, on such flexible terms which would allow for investigation, it is actually

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

149

potentially or it could be crafted in a way which is far less prejudicial to the owner of assets than a sanctions freezing order is.

I mean, let's say there's a house in London or I think I've read about a mansion in North London, I'm not sure that's a contradiction in terms, but a mansion in North London somewhere worth, what was it, 12 million pounds or something. Obviously if that's sanctioned and frozen, it prevents banks lending in respect of it. It prevents land registries changing the ownership of the piece of real estate, et cetera. So it really blocks it down and it prevents third parties dealing with it.

On the other hand if a company which is really basically a legal vehicle for doing things and holding property, if a company is basically being investigated by an officeholder, being controlled by an officeholder and it is possible entirely for the, those with an interest in the business of the company and its assets to come to the Court to make representations in relation to the needs of the company and its beneficiaries, then it is actually a far more flexible arrangement than having sanctions slapped on an asset or a company. It's actually quite a flexible one which safeguards the interests of both sides.

150

MR. DENNIS:                     That is indeed the case, My Lord.  And that again goes to negativing the suggestion that somehow this approach of a winding up application is somehow an abuse of process.  Because to the contrary, not only does it in a sense would be complimentary of whatever is being done in relation to the sanctions regime, but it offers the kind of flexibility with the Court's sanction to allow the objectives of the Attorney General as guardian of the public interest which imperative dictates that this kind of action be taken.  It allows that objective to be realised.

And so, My Lord, the notion of abuse in this context really is not one which is sustainable --

THE COURT:                     Let me test this.  To what extent, and I'll pose the question, to what extent do I have to take a view of what the public interests are?

Let me phrase the question, okay.  Because if it is said that I need to be the judge of what the public interest is, then that might make me as a mere judge distinctly uncomfortable because I'm not a politician and I don't have eyes on the side of my head or the back of my head and know what's going on in the world of the BVI and its political and commercial

151

setting.  I don't know that.  So for me to very quickly make myself an expert on what the public interest of the BVI really is, that would make me somewhat uncomfortable.  So that's the first question, to what extent would I have to judge what the public interest of the BVI actually is.  That's the first question.

The second question on the same topic is I can understand -- okay, put it a different way, optics, the section question is optics.  I can understand from a optical point of view that it looks bad for the BVI if somebody who is understood, upon investigation, understood to have been running a fraud, an industrial scale fraud including with its most obnoxious forms using forced labour and traffic human beings and violence, things of that nature, if the BVI were to be seen on the international stage with an AG who stands there folding her arms and says my hands are tied, I can do nothing, the optics are bad.  Now, surely the AG must be able to do something where it is understood that an alleged perpetrator of horrendous acts is using BVI corporate vehicles to further such very heinous set of activities.  So to have the AG standing there folding hands saying I can't do anything just doesn't look good for a start.

Equally, alluding to something I referred

152

to earlier in terms of optics, let's say your average South East Asian businessman, yes, who is looking for a reasonably well regulated, tax efficient, reputable jurisdiction where to incorporate a company which is going to make cardboard boxes or something of that nature and, for tax reasons maybe, and his next door neighbor has got a BVI and so he thinks he wants to be up with his next door neighbor and says very well, thank you very much, so he wants a BVI as well and he thinks well let me go and get a BVI.  And he goes and looks into it.

And he flicks on to the Eastern Caribbean Court website and he comes up with a judgment from the BVI Commercial Court.  And he sees that the BVI Commercial Court has fallen down in front of the Attorney General because the Attorney General has asked for companies to be liquidated, that is terminated and closed down before it has even been established that the owner of those companies has done anything wrong. He says well hang on a minute, do I really want to incorporate in such a trigger happy, knee jerk country where they don't even look to see whether it's properly justified to go and shut companies down.  Optically that seems to be rather strong as well and rather unattractive.

153

So that then maybe in a very roundabout way brings me to the third question.  Is there really in the present case any substantive difference between a provisional liquidation order and a liquidation order?  Because from an optics point of view, the optics might be better if it was a provisional liquidation classed as a provisional liquidation order rather than a final liquidation order.

MR. DENNIS:                Well, My Lord, the two sides of the coin in terms of the potential optics obviously gives rise, My Lord, to something of a dilemma.

THE COURT:                Yes.

MR. DENNIS:                Because in one sense damned if you do one thing and damned if you do the other.  And so Your Lordship is correct, it is untenable that the Attorney General should sit idly by while these allegations which are coming from ostensibly credible sources go completely unattended to.

But on the other hand there is the other optical aspect of matters which would dictate that those who find it convenient to operate through BVI companies should have some level of comfort that they will not find themselves in a situation where their

154

businesses are shut down in the absence of specific proof of certain allegations.

So Your Lordship asked how is the Court to deal with or can the Court make a judgment in relation to what enhances the public interest.

THE COURT:                    Yes.

MR. DENNIS:                    Because, My Lord, this is largely a public interest application. Your Lordship has to deal with the issue of public interest.  And I will say, My Lord, it may be a very delicate balancing act, but it's a balancing act nonetheless which the Court is constrained and is well placed to make.  And to the extent that there are a number of tools in the toolkit of the Court, some of which, you know, tangentially the Court has mentioned, it may be that the Court at the end of the day, even if the Court for the reasons which it has articulated, may not necessarily be with us that a liquidation order would be the most appropriate order.  Certainly, My Lord, there are other options.

And particularly the option of continuing the joint provisional liquidation with appropriate orders to facilitate a situation where the companies would not necessarily be shut down at this point, but it would allow for an orderly investigation, protection

155

of the assets pending how matters unfold, and under the supervision of the Court which could ultimately make a final order, one way or the other, as dictated by developing circumstances.

But what would be absolutely untenable, My Lord, is that at the end of the day we are in a situation where nothing is done.  Because ultimately I would submit, My Lord, that would be the worst optical perspective from an international perception point of view and how that would affect the standing of the BVI as an international finance center which the world can take seriously.

THE COURT:                I'm very conscious about not putting legal carts before legal horses as it were.  If one were to take the point of view, and I haven't heard the other side yet, but if one were to take the point of view that here is a situation which has at least been found by other legal authorities and state organisations are sufficiently credible and sufficiently significant to warrant sanction and indeed the start of the criminal process, wherever that might go if anywhere.  So there seems to be some material.

There also seems to be some quite wide publicity about the problem.  In the evidence that I've

156

been taken to, there's reference to Amnesty International even having got involved in these, I think, these Cambodian labour camps. And there is some evidence of, we're not here to test it, but which suggests violence up to death or just short of death is being used. So there are obviously very serious things that might want to be investigated. I understand that.

So the Court would start from the point of view, is there something here which needs to be or which calls for investigation. And if the Court was to ask itself that question as a starting question, I don't know whether this is legitimate to do so, you tell me, from what I've been shown so far, then it would seem to me that a sensible answer to that could be, not saying it is, but it could be, that yes, there is something which warrants investigation by the Attorney General, then the Court could agree with the Attorney General at that point, that much.

Of course, the Attorney General is coming to the Court by saying and I have a method for making that investigation by way of a receivership. Sorry, sorry, sorry, liquidation, by way of a liquidation. And the Court could say, well, the statutory regime is broad enough to allow a liquidation to be used for such an investigation. The Court could, I suppose, do that

157

and I think you're asking me to take that approach, aren't you?  I would, of course, have to put the horse before the cart by saying first of all I have to be satisfied that it is open to the Court to use this liquidation regime as an investigative tool.

MR. DENNIS:                Well, My Lord, I don't see that there would be a difficulty for the Court to use this regime as an investigative tool in the sense that in any liquidation in any event there is necessarily going to be an investigative aspect.  It just so happens that because of the context of this particular liquidation, the investigations, because of the international aspect of the case and the circumstances which have given rise to it, will necessarily have a larger compliant or a wider breadth of investigation than would ordinarily be necessary.

And, My Lord, I think that that is entirely consistent with what the legislation contemplates when it allows an application for winding up to be made in the public interest.  Because that in itself suggests that the Court will need to look at what those public interest imperatives are.

THE COURT:                Okay.  Can I stop you there.  Can I stop you there.

MR. DENNIS:                Yes, My Lord.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

158

THE COURT:                And I'm not looking from the point of view of my rather uncomfortable public policy judgment role which I might find myself in, but I'm retreating into my legal comfort zone here and I hope it is a legal comfort zone.  How is, from a legal point of view, how is the Court's jurisdiction structured?  Let me be clear.

My understanding is that in liquidation, there is a starting point.  And that starting point is - and it is such a trite starting point that I forget what the authority is under English law although there is an authority under English law, and I think I saw it something like 20 years ago, though I can no longer remember what it is - is that the court has the power, in other words the jurisdiction, to wind up any company.  That's a very important basic proposition. The court has power, jurisdiction, to wind up any company.

That might be the starting point, I think.

Secondly, once you realise that the court has the power to wind up any company, then the court has to ask itself, how can the court wind up a company. And there would seem to me to be two aspects that the court would need to be satisfied upon.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

159

The first is, is the court able to wind up a company of its own motion, i.e., are its powers so broad that it doesn't have to wait for an application to wind up a company; or does it have inherent jurisdiction to wind up a company.  And I think the answer is it has inherent jurisdiction, statutory jurisdiction, but a very broad one.  It doesn't have to wait for an applicant to make an application.  However, here, now that we have an application, an applicant for the winding up of the company, but is the court then narrowly constricted in how it winds up companies, i.e., the circumstances in which it winds up companies.

My understanding is that when you are dealing with the just and equitable winding up, that is an extremely broad jurisdiction to be exercised or available to be exercised in all the circumstances of the case.  But it must do, the court must do so judicially, namely, for a sensible reason, for good grounds, but it is not, the court is not straight-jacketed into inaction.  The court has a very broad jurisdiction to act.

So I suppose where I am going to is what are the outer limits of my jurisdiction to make a winding up order in these circumstances, in the just and equitable situation?  What are the outer limits of

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

160

my jurisdiction to do that?

MR. DENNIS:                    Well, I believe, My Lord, the answer to that would be found in the provisions to which Your Lordship was taken earlier, sections 167(1) and sections 231 to 233, which speak to the wide powers which the court has on the making of a winding up application.

I do not know, My Lord, whether one can articulate the limits of the court's power as far as that jurisdiction is concerned, because even the legislation leaves that flexible to say the court may make any order that it deems just and equitable.  And that has necessarily, My Lord, to be determined based on the specific factual circumstances which the Court faces.  And in the particular factual circumstances of this case, we would say yes, the court does have the jurisdiction, yes.  Having regard to what is before the court, this is a matter which absolutely invites the court in the same way, My Lord, that it demanded action by the Attorney General, the circumstances are such as to make it entirely appropriate for the court to consider whether or not in the circumstances these companies ought properly to be wound up; or at the very least, if they are not wound up, for the provisional liquidation to be continued to facilitate the

161

continuing protection of assets while the liquidators continue their investigations.

But, My Lord, in terms of saying specifically what are the limits of those powers, I don't know, My Lord, that one can identify those constraints except to say, and I believe Your Lordship adverted to that, the power to do what is just and equitable obviously has to be, is a discretion which has to be exercised judicially in accordance with principle. And I would not have thought, My Lord, that any such principle would preclude the court from making the kind of order which is being sought, or at the very least, a continuation of the joint provisional liquidation.

THE COURT:              In terms of, still on optics, it is often said, and it is, I don't know whether it's a criticism which is being made here, you are probably in a better position to tell me. But it is often said that when a draconian order like a liquidation order is made or a receivership order, or any order appointing an officer holder of the court, then it has serious ramifications on the business life and business capabilities of the company concerned. Particularly so, for example, if it's in receivership or liquidation. You only have to think of, let's say,

**162**

if you are to take any household name in Manhattan of apartment stores, Macy's or something like that, and then suddenly the news article comes out, 'Macy's in receivership, or Macy's in liquidation'.  Then people would think crumbs, it's gone down, it's in a terrible financial state; and suddenly banks shorten their terms, creditors demand payment in cash, supply lines shorten.  Everything becomes a lot more difficult.

Now, would I be right in thinking, I think I would be right in thinking, but according to you would I be right in thinking, that if a company is said to be in provisional liquidation and it has a legitimate business, for example, window cleaning or cardboard box making or something of this nature, then it is less reputational damaging to the company than an order which says the cardboard box making company is in liquidation.

MR. DENNIS:                  I believe, My Lord, that the answer to that has to be that an order for final, for liquidation of the company would have a greater negative impact than one for provisional liquidation.  I don't believe that there is any gainsaying that, My Lord.  But I believe one also has to bear in mind in this particular case, and in the context of these companies, that perhaps whatever

163

perceived harm could potentially flow from either the continuation of a provisional liquidation or an actual liquidation, to a large extent, precisely that kind of harm, if it were going to happen, has already happened, flowing from the highly publicized fact of the sanctioning of the principal of these companies and his association with the very horrific criminal activities and enterprises of which he is accused, and in respect of which it has been said in a highly publicized way, that entities associated with him, including the subject entities before Your Lordship, have been mixed up in all of that, are really entities which are not involved in any legitimate business except to launder the proceeds of these criminal activities.

Now, again, My Lord, we accept for the moment those are allegations. But the fact that sanctions are in place predicated on those premises against the principal which inevitably flows to the companies which have been in the spotlight in that negative way, and the fact that those companies are the subject of proceedings arising out of that from the US, sanctions in the UK, sanctions in the BVI; on one view, My Lord, it is difficult to see how that really, that perception which has now been created publicly and internationally, is really going to get any worse by

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

**164**

virtue either of a continuation of a provisional liquidation, or them being actually put into liquidation.

And so I believe, My Lord, that is something which has to be borne in mind in the context of trying to determine as a matter of perception what that may or may not do to the image of the companies and how that may affect their business.  Because they are sanctioned and the world knows that.  And the reason, you know, for the sanctions which come down to them, that's already public fodder.

And so, My Lord, I don't know that the sort of order which is being sought would necessarily make that any worse.

THE COURT:                 I see.  And I suppose part of your case is as well, is that although this is a first, as it were, for the BVI, this is, if I understand you correctly, this scheme that's being presented before the court, is it looks like the worse of the worst of conduct that has certainly come before this court.  We have come across some pretty unprepossessing and unattractive conduct before this court obviously, but it has never got as colourful as this and as abysmal and infernal as this.

I think you are saying that this really

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

**165**

is a very serious criminal industrial scale with very far reaching, with global reach, basically.  It's being conducted from the Far East and Cambodia and Myanmar and places like that.  They have reached into other countries like the UK, the US, elsewhere around the world.  It penetrates deep into the society.  It's very lucrative for those running it and equally the corollary is very detrimental for its global victims.

So I think what you are saying is that this is an extremely dangerous and extremely serious fraud network or alleged fraud network which is being unpacked at the moment.  And the BVI needs to take, needs to step up into line and investigate for its own reputation and to assist the victims and to make sure that the BVI isn't being used as a platform for such activities.

Is that more or less what you are saying?

MR. DENNIS:                   And, My Lord, that is precisely what the Attorney General's position has been and that is precisely how she puts it in the material before the court as guardian of the reputation of the BVI.

THE COURT:                   Now, we are just coming up to the mid-afternoon break and this may not be part of your brief to speak on, Mr. Dennis, but

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

**166**

in terms of the reputation of the BVI, my understanding is that there has been a concerted effort over a large number of years now, to have the BVI presented as a responsible and clean jurisdiction.  It is not a jurisdiction, as I understand it, which takes a line that it's none of our business where you get your money from and where you send it; and if you want to steal money from the taxpayer and hide it in our jurisdiction, we will give you a two-year limitation period, you are clear.  And it's certainly no crooks' haven, the BVI.  There is a hermeneutic, i.e. a spirit of interpretation of the BVI laws, which favours a responsible, regulated environment to have the BVI presented as a responsible vehicle for inward investment into industry which is tax efficient and sufficiently unregulated so as not to stifle enterprise, but certainly not a crook's charter.

Do I understand that to be the correct spirit behind the current BVI set of laws?

MR. DENNIS:                  That is precisely the correct spirit, My Lord.  I think that would be a fair interpretation.

THE COURT:                  Very well.

We will take the mid-afternoon break for 15 minutes now.  Thank you gentlemen.  You can stay in

167

the courtroom, but just take your videos off and your audio.

(Break taken at 3:30 p.m. to 3:45 p.m.)

THE COURT:               So good afternoon again, learned counsel, ladies and gentlemen.

Mr. Dennis.

MR. GLEDHILL:               My Lord, if I may, forgive me for interposing for a moment without intending any discourtesy to Mr. Dennis.

I just wanted to very politely, if I may, raise a flag in relation to timing.  So we have a total of eight hours of the hearing and my learned friends have taken four and a half already.  Obviously, it's entirely a matter for Your Lordship but there is quite a lot still to get through.  I have about three hours of submissions to make and, of course, Mr. Tyers-Smith also has to represent his own clients and there has to be time for Sir James to reply as well.  So if I may just very politely lay down that marker and then give the microphone back.

THE COURT:               You've laid down the marker and it's well noted.  We are in unchartered territory and I apologise for my many interjections.  If it is that we are going to need to find some more time after this, it will just be what it

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

**168**

is.  I do want to get this as right as I can in the interest of all the parties, because some of these issues are very important.

So thank you very much for that.

Mr. Dennis.

MR. DENNIS:                     Yes, My Lord. I can get through the other points I had on abuse as expeditiously as possible, My Lord, given the constraints of time.

My Lord, if I may just pick up on the question of, a point I believe I begun to make before I fielded Your Lordship's necessary inquiries.  I was going to make the point, My Lord, that one of the important reasons why this process was required, namely, the liquidation process, was to ensure that these entities are taken out of the control of those who are the subject of the allegations which have given rise to these claims.

And, My Lord, I believe that there is material before you which vindicates the Attorney General's concern that if orders are made which would effectively take these entities out of their control, then they are able to and will continue, to use the companies potentially in a way which would be inimical to what is sought to be accomplished here, which is to

**169**

prevent them being so used.  There is evidence before Your Lordship, and in the interest of time I am not going to go through the details of it, but I could just perhaps indicate to Your Lordship where you might find this evidence once I've summarised it.  But there is evidence before you, My Lord, that even after the provisional appointment of liquidators, and of course, My Lord, it is trite that once liquidators are appointed provisionally or otherwise, they step into the shoes of the directors and the directors are in that sense functus.  And except for the ability which they may continue to have to instruct their lawyers to oppose or deal with the applications as they see fit, really, their powers and functions in any other material respect ceases.  But there is evidence before you, My Lord, coming from Mr. Borrelli himself in the affidavit which he swore in respect of the March 2 hearing which Your Lordship can find at Bundle 3, Tab 3, which discloses that during that interim period after provisional liquidators were appointed, resolutions were passed appointing an interim manager who himself then purported to appoint a director in respect of each of the target entities; and in the background, attempted to influence the course of events arising from that provisional appointment.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

26-10769-mg   Doc 49-14   Filed 05/21/26   Entered 05/21/26 15:29:05   Exhibit 14 -
Transcript of April 16 2026 BVI Hearing   Pg 171 of 193

170

At paragraph 14 of his affidavit which can be found at page 13 of that Bundle 3, he says that:

"Pursuant to director and shareholder resolutions passed in writing and dated between the 23rd of February and the 27th of February 2026 the board of directors of the Respondents have been reconstituted, such that I am now the sole director of those companies."

He exhibited copies of the relevant resolutions where he was appointed by Mr. Chen's attorneys-in-fact, given that Mr. Chen has been extradited to China.  "I have seen and verified all of the relevant documentation," etc, etc.

And then this, My Lord, in my submission was quite an alarming development in the context of provisional liquidators having already been appointed. Because what this seems to demonstrate is that even within the context of an ongoing provisional liquidation, steps were being taken by Mr. Chen and his associates in an effort to maintain some kind of control of the Campbells Companies, without any reference to the Joint Provisional Liquidators, the court-appointed officers who were put in place to take over the control of the affairs of the companies.  And that, My Lord, we say is indicative of the

171

justification for the approach which the Attorney General has taken, and makes it all the more compelling that the companies be placed in liquidation.  And in the clear absence of any evidence from these entities providing any answer to any of the serious allegations which they made, because apart from opposing the application on technical grounds, there has been no evidence forthcoming from any of them in any attempt to show that they are in fact engaged in legitimate business.  When the assertion to the contrary is the very premise of the international processes which are being pursued against their principal, which is what has led to these entities being sanctioned.  And the silence is deafening about that.  They have not advanced any substantive response.

And it is in those circumstances, My Lord, that we say there is a compelling case for this application to be properly granted as earlier submitted.

My Lord, I will turn now to other aspects of this abuse point.

It has been submitted by the Campbells Respondents, My Lord, that the practical consequence of the appointment of liquidators, is that the mandatory exemptions from the sanctions regime contained in the

172

Global Human Rights Sanctions Regulations, which have been applied to the BVI by Order-in-Council, will effectively be precluded.  It is further suggested that the protections for affected persons inherent in those regulations, and in particular the licensing provisions in Part 5, will effectively be nullified.

Following that line of argument, it has also been suggested that irrespective of whether the Governor would have been prepared to grant such licenses, there is no longer any point in seeking them because the Respondents will be subjected to an insolvency process with the statutory distributions scheme.

Our response to this argument, My Lord, is two-fold.  First of all, as I just observed, the allegations against the companies on which these applications are based, have at their heart the premise that they do not exist for any legitimate purpose. Yet, there has been not one tittle or iota of evidence adduced by them to show otherwise.  That, we say, My Lord, is absolutely remarkable.

Even more telling, we say, My Lord, there is no evidence of any application for licenses under the Global Sanctions Regime.  Certainly, no evidence has been adduced or put before this court to show that

173

any such applications had at any stage been made between the date when these sanctions were imposed, and when the Attorney General applied for the ex parte order appointing the Provisional Liquidators.

In those circumstances, My Lord, this argument about they being deprived of the benefit of the protections of that regime, ring absolutely hollow in decibels.  There is nothing in that point we say, My Lord.

It has also been submitted that the Applicant's bid to wind up the Respondent Companies in effect overrides the statutory and common law protections that they and third parties enjoy under those very sanctions regime, that very sanctions regime.  Our answer is the same.  No evidence.  They have not found it prudent, they have not considered it necessary, to adduce any evidence that they are in fact engaged in legitimate business, and no evidence that they have sought to avail themselves of the protections available to them under the Sanctions Regime.  So that argument too rings hollow.

It is further contended by these entities, My Lord, that there has somehow been a usurpation by this very process, by the liquidation process, that would somehow lead to the usurpation of

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

174

the power of the Governor in the context of the granting of licenses because they would be deprived again of the protection that would be open to them for them to make applications for exemptions for licenses. The simple answer to that, My Lord, is that if the companies were put into liquidation, there would still be the option available to them of applying for the relevant licenses.  All that would differ is that the applications would then have to be made by the liquidators, who would in effect be in control of the affairs of the companies, stepping into the shoes of the liquidators.

So, My Lord, none of those arguments built around sanctions which they describe in their skeleton from paragraph 29 onwards, as the sanctions context, none of those arguments can stand up to scrutiny for the reasons which I have indicated.

Then, My Lord, they suggest abuse in what they describe as the evidence preservation context. Evidence preservation and onward transmission.  And here, the complaint is that the Protocol for the exchange of information between the Attorney General and the Joint Provisional Liquidators facilitates transmission of information to the US Department of Justice for the purpose of US criminal proceedings and

175

forfeiture action.  This they contend is abusive because it circumvents the limitations and the powers which already exist to address the proper application of the powers for the sharing of information.

We say, My Lord, there is no validity to this argument because there is nothing in the Protocol which justifies the assertion that they are deprived of any of the usual protections which they would otherwise have in the context of the sharing of information. Indeed, My Lord, we say that to the contrary, the Protocol around which this argument is being built specifically has provisions which recognise the need for the sharing of information to be constrained in the usual way to make sure that it is dealt with properly with the usual safeguards.

If Your Lordship will bear with me, I believe it would be helpful for me to take Your Lordship briefly to the Protocol and to take Your Lordship to the relevant provisions which make good the submission that I have just made.  Your Lordship will find a copy of the Protocol as an annex to the order of March 2, I am sorry, My Lord, the order of the 19th of January of 2026.  It can be found, My Lord, in Hearing Bundle 2.  The order is at page 465 and the actual Protocol is at page 471.

176

May I take you first of all, My Lord, to the first clause in that Protocol headed 'Purpose and Status', and it reads, My Lord:

"This Protocol sets out a consultative framework between the Liquidators and the Attorney General to facilitate effective co-operation in the public interest, including in relation to potential and ongoing regulatory or criminal investigations and prosecutions connected to the affairs of Sure Tycoon Limited (the 'Company')."

And the Protocol is identical for each of the companies which are subject of the proceedings before Your Lordship.

"For the avoidance of doubt, this Protocol is made pursuant to and with the approval of the Court, and disclosures made in good faith in accordance with this Protocol are deemed authorised by the Court."

And then if Your Lordship turns to Clause 7 at page 473, there is a provision 'Information requests by the Attorney General', and at 7.1 it deals with the scope in these terms:

"The Attorney General may request access to documents, data and information reasonably required in relation to the Company or related persons or

177

entities."

And then at Clause 8 on that same page towards the bottom:

"Court authorisation.  Subject to sections 9 to 12, the Liquidators are authorised by the Court to disclose confidential information to the Attorney General for the limited purpose of regulatory or criminal investigation and prosecution, restraint, confiscation, forfeiture, mutual legal assistance, and related protective measures, and to receive Confidential Information from the Attorney General for liquidation purposes."

And then finally, My Lord, the pivotal clause that I wish to take Your Lordship to in the context of those earlier provisions, is Clause 17 which deals with international co-operation.  And here it says, My Lord:

"Where the Attorney General is engaged in mutual legal assistance, or co-operation with foreign authorities, the parties shall consult in scope and timing to ensure that disclosure and steps taken are consistent with the Protocol and do not unduly prejudice the liquidation or foreign proceedings."

And here, My Lord, is the important part:

"The Attorney General shall take

178

reasonable steps where feasible to secure protective handling by foreign authorities of any confidential information."

So far from it being a situation where, as the Respondents would seek to have the Court believe, this contemplates a willy-nilly transmission of information to foreign authorities without safeguards, the Protocol itself specifically enjoins the Attorney General to do the complete opposite.

In any event, My Lord, it is well known that information is not indiscriminately shared with foreign authorities under any Protocol which exists for the sharing of information between jurisdictions. There are established protocols under every single piece of legislation, every Protocol which involves the sharing of information. And so there is nothing in the point which suggests that here again a liquidation order and the inclusion in it of this kind of Protocol is somehow going to deprive them of protections which they would otherwise have.

Finally in relation to the Protocol, My Lord, a complaint has been made by the Campbells Companies in this context, that information has been requested through the attorneys for the Attorney General requesting details of any materials which have

179

been shared by the Attorney General with overseas agencies.  And there is a complaint that as at the time of the skeleton there was no response.  Well, that has been overtaken by circumstances.  There has indeed since then been a response and counsel for the Respondent Companies will no doubt admit that there has been a response.  And in effect the response has been the sharing of information under any information sharing regime for obvious reasons is confidential.  And the target or subject of any such sharing of information is not entitled to have details of what information may or may not have been shared.  As a matter of fact, that would defeat the whole purpose of having such arrangements in place.

So there is nothing extraordinary about the fact that they would not have been made privy to the question of one, whether there has been any sharing of information by the Attorney General with foreign agents and if so, the extent of that information sharing, and details of the materials which were shared.  That is just not how the sharing of information under any information sharing protocol operates.  Indeed, that is simply how mutual legal assistance and bilateral arrangement for information sharing regimes work.  It is done completely in

180

confidence.  Otherwise, the whole purpose of such arrangements would be defeated.  And the Respondent Companies are simply not entitled to that information. And there is absolutely nothing in that point.

My Lord, unless Your Lordship has any specific questions arising from those more recent submissions since the break, that is all I intended to address Your Lordship on in respect of the allegations of abuse.

May it please you.

THE COURT:                Thank you, Mr. Dennis.

So who will we be hearing from next, please?

MR. GLEDHILL:                My Lord, my learned friend, Mr. Tyers-Smith, has very kindly allowed me to go next.  Mr. Tyers-Smith will follow me when I have completed my submissions.

I am anticipating taking somewhere in the region of three hours, so I will be able to make a start this afternoon and I will be talking for quite a bit of tomorrow morning during the morning session as well.

THE COURT:                In terms of timing left this afternoon, you've got about 15

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

181

minutes.

MR. GLEDHILL:                I'm aware.

My Lord, I will begin, if I may, by picking up on one point which Mr. Dennis has made to you whilst it's fresh in Your Lordship's mind and fresh in mine.

So the suggestion was made by Mr. Dennis during the course of his submissions a moment ago that there had in some way been an infraction of the joint provisional liquidation by reason of the fact that Mr. Borrelli had been appointed pursuant to a power of attorney as a director of the Campbells Respondent Companies.  That is a point of some importance to us, of course, because that is a basis upon which we are instructed.

My Lord, so far as that is concerned, the position is as follows:

No insolvency proceeding of itself terminates director appointments.  Insolvency proceedings give to the office holder certain powers and it is clearly established to the extent it gives those powers on the office holders, the pre-existing powers of the directors to that extent to terminate.  But it is equally clearly established, certainly by a consistent stream of English case law, that the

182

directors retain the power where Joint Provisional Liquidators have been appointed or indeed, where administrators have been appointed in a court process to instruct and to appear to oppose that application on the return date.  And to that extent, their powers continue.

Now, in any case of provisional liquidation, the extent to which the provisional liquidation order asks the powers of the directors of course turns on the terms of the exact order that was made, because there is no such thing as a standard form provisional liquidation order.

For Your Lordship's purposes, the material provision is in Bundle 2 at Tab 9, on bundle page 469.  In fact, My Lord needs to start at bundle page 467, please.  So we are about the second or the third page of the order which Mr. Justice Mithani made on the 9th of January.  And you can see paragraph 3 says:

"In addition to the powers outlined in paragraph 2 above, the JPLs shall have the following specific powers which may be exercised without further sanction or intervention of this Honourable Court."

And then there is a very long list that runs over on to the next page on to page 468, and I am

183

not proposing to take you through that.  But if you do please turn on to page 469 and have a look at that. And looking at paragraph 9, you can see it says:

"The powers set out in paragraph 3 above are to the exclusion of any power exercised or purported to be exercised by any existing director of the Company insofar as such power concerns the affairs of the Company and its assets within the Virgin Islands."

So the effect of Mr. Justice Mithani's order is to disentitle the directors in effect to do anything which interferes with the Provisional Liquidators' enjoyment of the powers that are conferred upon them.  It does not and did not stop the shareholders from appointing an additional director, and it does not prevent that additional director from be instructing Campbells, and through Campbells me and my learned friends, from opposing the application before Your Lordship today.  That's quite an important point, because the suggestion that there has in some way been impropriety or breach of the provisional liquidation order as a result of Mr. Borrelli's appointment is fundamentally mistaken.

My Lord, I just wanted to get that point out of the way at the beginning.  But as Your Lordship

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

184

knows, it's our position that at their heart, these applications raise in a stark form a simple but very important question.  We say that where it is asserted by a law officer that a company falls to be wound up on the public interest ground because it may have been implicated in wrongdoing, is up to the Applicant to plead the allegations of wrongdoing upon which she relies, and prove them at the eventual hearing by admissible evidence on the ordinary civil standard of the balance of probabilities.

The Applicant of course disputes that. And her position is neatly summarised in two paragraphs of my learned friend Sir James Eadie skeleton argument. And if I can take you to those please, wherever you have them most conveniently.

I am looking first please at paragraph 15 in the Attorney's skeleton argument.  And you can see that the basic position that is taken there, it starts by referring to the allegations that have been made in the US criminal and civil proceedings.  And then picking it up in the fourth line towards the end of the page it says:

"However, the Attorney is not seeking to admit the US documents to prove the truth of what is alleged in the documents.  They are introduced to show

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

185

that serious allegations have been made against the Companies, and are being proceeded with in the courts outside the BVI."

And skipping to the last sentence:

"The Attorney repeats her position that it is not necessary to prove in these public interest proceedings that the Companies are guilty of the matters alleged in the United States Documents."

So according to the Applicant, it is enough that applications have been made in the United States, but she doesn't have to prove the underlying truth of any of the allegations which are relied upon in those proceedings.

And then turning backwards a page, please, to page 5 of my learned friend's skeleton, we see another material passage, it is paragraph 13.4, if My Lord has that, where he says this:

"These facets of the public interest illustrate that it cannot have been the intent of the legislation to impose a requirement to prove the allegations of criminality, laundering, etc.  That would be to impose what in most cases would simply be an impossible burden.  It is also a burden which would put the cart before the horse, given that a key aspect of the public interest appointment is to assist in

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

186

ascertaining the factual position despite criminal efforts to conceal it."

So in other words, winding up here, on my learned friend's case, serves as a mechanism in order to get to the bottom of the question, has there been wrongdoing, such that the possibility of wrongdoing or the suspicion of wrongdoing is enough to bring this court's winding up jurisdiction into play.

And we emphatically disagree with all of that. And the first point to make to Your Lordship is that despite the fact that there is an established body of English case law stretching back to the 1850s in relation to the winding up of companies, and despite the very able representation that the Attorney General has been able to secure for the purposes of this hearing, my learned friend has been unable to identify a single authority in which a proposition along the lines of that which they are advancing to Your Lordship, has previously been put to another court and accepted. And we say that the reason for that is simple. Not only is there no authority that supports this approach anywhere in the case law, there is in fact authority and material within the statutory scheme which we say directly contradicts it, because it is fundamentally wrong in principle.

187

And the proposition for which the Applicant contends is also, we say, with due respect, not only wrong but it is dangerous.  The courts in this jurisdiction do not dispossess companies and shareholders in companies of their property on the basis of unproven allegations made by foreign states, however serious those allegations may be, how seriously they may have been put together and crafted.

And if I can just make one point at this early stage to Your Lordship just to back that up.  Can I ask My Lord to take out Bundle 4 and within that turn up Tab 10.  And within that, please, if you go to bundle page 98.

THE COURT:                    Yes.

MR. GLEDHILL:                    My Lord should have a page with, I hope, color photographs of a lot of mobile phones.

THE COURT:                    Yes.

MR. GLEDHILL:                    And My Lord will remember that during the course of my learned friend's submissions, he showed you the criminal complaint in the US Proceedings and he showed you this photograph and Your Lordship asked, is that a photograph of a scam factory, are these telephones in a scam factory.  And the answer that was given was yes,

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

188

and that's certainly the answer which the Department of Justice gives in the US criminal indictment.

The document Your Lordship has in fact open at the moment is an application settled by Boies Schiller who are representing Mr. Chen and the Prince Group in the United States Proceedings, and this is an application to strike out the forfeiture action, the in rem proceedings against the cryptocurrency.  And one of the points that they make in the course of that application is that of the photographs that are contained in the criminal indictment, three of them show absolutely nothing of the sort of what the Department of Justice has alleged they show.

Can I invite My Lord to go back one page. You should be on bundle page 97.

THE COURT:                    Yes.

MR. GLEDHILL:                 And about two-thirds of the way down the page at paragraph 13:

"To take one example, the Complaint alleges that 'Chen himself maintained documents describing and depicting 'phone farms' - automated call centers used to facilitate cryptocurrency investment fraud and other cybercrimes' and that those 'documents detailed the completion of two particular facilities staffed with 1,250 mobile phones', etc.  The attached

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

189

Indictment includes an image of a 'phone farm' —

'automated call centers used to facilitate

cryptocurrency investment fraud and other cybercrimes'

- that Mr. Chen allegedly 'maintained'."

          Then you go back over the page to where

you were a moment ago between the two photographs:

          "In fact, a reverse-image Internet search

reveals that this photograph was first published years

later, in March 2023, in a Chinese-language news

article discussing the use of cell phones to

artificially inflate viewership of e-commerce

live-streams."

          Then beneath that you have the original

photograph.

          And then can I ask you please, you see

the last two lines on this page, starting 'the

Complaint also cites'.  If I can ask to you read that

and over the next page and stop when you get to the

bottom of the next page.  Stop when you get to the

bottom of page 99.

          (Pause).

          THE COURT:                Yes.

          MR. GLEDHILL:             So the US

Proceedings is still only at a very early stage.  What

has happened so far is that a verified complaint has

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

190

been made and Boies Schiller have filed a motion seeking to dismiss it and also a motion seeking better particulars of the allegations.  But even at this stage there are credible objective grounds for querying the quality of the investigative work that has gone into document over these two proceedings, the criminal proceedings and the civil forfeiture action.  And that, in my respectful submission to Your Lordship, neatly illustrates the point that I made to Your Lordship a moment ago.  There is serious danger in creating a jurisdiction where it is said that this court is entitled to wind up companies on the basis of allegations that have only been put and have never even yet been tested in a foreign court.

There are, we are going to show Your Lordship, statutory routes by means of which the Crown in the British Virgin Islands is entitled to obtain documents and other material in which to investigate offences.  There are statutory routes which enable the Crown to freeze the possible proceeds of crime while that investigation takes place.  And I will come on to those as well.  But liquidation is not one of those routes.  And the attempt to invoke it as a proxy for those statutory mechanisms, we are going to suggest to Your Lordship, involves at best an attempt to bend

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

191

public interest winding up process out of shape and at worse, a straightforward abuse of process.

I am going to develop those submissions during the course of tomorrow morning.

My Lord, I suspect that that's probably a convenient moment to break, because I am now going to move on to a different point.

THE COURT:                         Yes, that's very good.

So thank you very much, learned counsel. We will take the adjournment for today and we will see you again tomorrow morning.  So have a pleasant evening.

(Hearing ended at 4:30 p.m.)

* * *

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

192

REPORTERS' CERTIFICATE

WE, PETULA V. STOUTT, JAILANN WILLIAMS, STACY GLASGOW and MONIQUE GRAHAM, Certified Court Reporters, do hereby certify:

That on the 16th day of April 2026 the foregoing proceedings were taken down by us in machine shorthand, consisting of 192 pages herein; that the foregoing is a true and correct transcript of the proceedings had.

That we are not attorneys, relatives, or employees of any party hereto, or otherwise interested in the events of this cause;

IN WITNESS WHEREOF, we have hereunto affixed our signatures at Road Town, Tortola, British Virgin Islands, this 20th day of April 2026.

_____          _____
PETULA V. STOUTT                 JAILANN WILLIAMS
Certified Court Reporter         Certified Court Reporter


_____          _____
STACY GLASGOW                    MONIQUE M. GRAHAM
Certified Court Reporter         Certified Court Reporter

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT