# EXHIBIT 15

## April 13, 2026 Skeleton Argument of the Campbells Respondents

Case Number :BVIHCOM2026/0002

FILED
HIGH COURT
TERRITORY OF
THE VIRGIN ISLANDS

Submitted Date:14/04/2026 17:32

Filed Date:15/04/2026 08:30

Fees Paid:78.01

**IN THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**BRITISH VIRGIN ISLANDS**
**COMMERCIAL DIVISION**
**BVIHCOM 2026/0001-2026/0030**
**IN THE MATTER OF BRIGHT TEAM GLOBAL LIMITED & 29 OTHERS**
**AND IN THE MATTER OF THE INSOLVENCY ACT 2003**

**B E T W E E N:**

**ATTORNEY-GENERAL OF THE VIRGIN ISLANDS** Applicant

-- and –

**BRIGHT TEAM GLOBAL LIMITED *and 29 others*** Respondents

---

**SKELETON ARGUMENT ON BEHALF**
**OF THE CAMPBELLS RESPONDENTS**
*(for hearing on 16-17 April 2026)*

---

**Andreas Gledhill K.C.**
Blackstone Chambers
Temple, London

**Toby Brown**
South Square
Gray's Inn, London

Instructed by:

**Grant Carroll, Paul Kennedy and Dan Griffin of**
**Campbells Legal (BVI) Limited**
Floor 4, Banco Popular Building
Road Town, Tortola VG1110
British Virgin Islands
Ref: 20785-45687

**(A) Introduction.**

1. On 5 January 2026, the Attorney-General of the Virgin Islands (the "**Applicant**") applied to appoint liquidators to 30 companies (the "**Respondents**") pursuant to s.162 of the Insolvency Act 2003 ("**IA03**"). The Applicant has standing to seek that relief pursuant to IA03 s.162(2)(h), and her applications invoked both the s.162(1)(b) just and equitable ground and the s.162(1)(c) public interest ground, on the basis that the Respondents were connected to Chen Zhi ("**Chen**"), a Chinese/Cambodian national under indictment in the US, and subject to sanctions in the US, UK, and BVI.

2. On 9 January 2026, the Applicant applied without notice to Mithani J. to appoint joint provisional liquidators to each of the Respondents, and he duly appointed three partners of Interpath (the "**JPLs**"). The order conferred expansive powers on the JPLs, and directed them to implement a protocol scheduled to the order (the "**Protocol**") which set out the terms on which the JPLs were to "*facilitate effective cooperation*" with the Applicant "*in the public interest, including in relation to potential and ongoing regulatory or criminal investigations and prosecutions connected to the affairs*" of the Respondents.

3. By the start of March 2026, 25 of the 30 Respondents were represented by Campbells LLP (see the list at <u>Appendix 1</u> hereto: the "**Campbells Respondents**"), a further 2 were represented by Kobre & Kim (BVI) LP (the "**Kobre Respondents**"), and the Campbells Respondents had filed both Notices of Opposition to the liquidation applications {3/1/1}, and applications to discharge the order appointing the JPLs {3/2/4}. At a hearing on 2 March 2026, the court gave directions for evidence, down to a final disposal of the s.162 applications at this hearing.

4. The Campbells Respondents oppose liquidation on the basis that these proceedings disclose no proper basis for winding-up, and are in fact an abuse of process. The relevant background is summarised in section (B) below, and the Campbells Respondents' submissions are set out in section (C). References hereafter in the format {*bundle/tab/page*} are to tabs/pages in the hearing bundles ("1" being the Applicant's bundle for the 9 January hearing; "2" the Applicant's bundle for the 2 March hearing; "3" the Campbells Respondents' bundle for the 2 March hearing; "4" the Applicant's supplemental bundle for this hearing; "5" the Campbells Respondents' supplemental bundle for this hearing. A reference is also made to a bundle of inter parties correspondence filed by the Campbells Respondents). References in the format (**tab [ ]**) are to the accompanying authorities bundle.

**(B) Relevant background.**

*(B)(i) The US proceedings.*

5. On 8 October 2025, Chen was indicted in the US District Court for the Eastern District of New York (the "**Criminal Proceeding**") {1/4/41}:

5.1 The indictment alleged that Chen was the founder and Chairman of the "**Prince Group**", "*a Cambodian-registered corporate holding company that operated more than 100 business entities in over thirty countries*" {§13 at 1/4/43}.

5.2 It alleged that the Prince Group "*engaged in schemes to defraud victims round the world through cryptocurrency investment scams and other fraudulent schemes*", and that it "*laundered the proceeds … through professional money laundering operations and through Prince Group's own network of ostensibly legal business enterprises*" {§28 at 1/4/47}.

5.3 Reflecting those allegations, it charged Chen with two counts of conspiracy, being Wire Fraud Conspiracy contrary to Title 18, United States Code, Section 1343 {§54 at 1/4/59.} (**tab [12]**), and Money Laundering Conspiracy contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i) {§56 at 1/4/60} (**tab [13]**).

6. On 14 October 2025, the US government commenced civil proceedings *in rem* (the "**Forfeiture Action**") to forfeit ~127,271 bitcoin (the "**Defendant Cryptocurrency**") with a value of approximately US$15bn at that time (Smith 1 §8 {1/3/20}). The verified complaint stated the Defendant Cryptocurrency was "*currently in the custody of the United* States" (§6 at {1/4/67}), and that it was liable to be forfeited as "*property, real or personal, which constitutes or is derived from proceeds traceable to … wire fraud*" (§61 at {1/4/103}), and/or "*property involved in or traceable to property involved in a transaction or attempted transaction of money laundering*" (§64 at {1/4/104}).

7. Chen and the Prince Group are represented in the Criminal Proceeding and the Forfeiture Action by US attorneys Boies Schiller Flexner LLP ("**BSF**"), and on 18 March 2026, the Campbells Respondents filed a witness statement in these (BVI) proceedings from Dan G. Boyle, a partner in BSF. So far as the Criminal Proceeding is concerned, that statement explains that:

7.1 Chen has been in detention in the People's Republic of China (the "**PRC**") since being taken from Cambodia on about 7 January 2026. "*BSF does not know what the basis for Mr. Chen's current detention is, and has received no notice of any charges being made against Mr. Chen while he remains detained*" (§9 at {4/9/42.}).

7.2 Under US law, save for limited exceptions which are unlikely to apply, a criminal case cannot proceed without the defendant present (§8 at {4/9/42.}). In practical terms this will either require Chen to be extradited from the PRC to the US, or Chen to come to the US voluntarily, if and when released from custody in the PRC (§10 at {4/9/42-43.}).

7.3 Unless and until Chen is convicted in the Criminal Proceeding, as a matter of US law, he is presumed innocent (with that presumption being "*the bedrock, axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our* [*i.e.* US] *criminal law*" (§7, FN1 at {4/9/42.}).

8. Turning to the Forfeiture Action, Boyle 1 §13 {4/9/43-44.} states that on 9 March 2026, BSF filed the following two motions on behalf of Chen and the Prince Group within those proceedings, both of which are as yet undetermined:

8.1 A motion to dismiss, on grounds (among others) that the government has failed to plead facts establishing that the Defendant Cryptocurrency represents the proceeds of fraud, and has also failed sufficiently to plead money laundering (the "**Motion to Dismiss**" {4/10/53-54}).

8.2 A motion for a more definite statement pursuant to Rule 12(e) of the Federal Rules of Civil Procedure, seeking an order requiring the government to disclose, at a minimum, how, where, and when it first obtained custody of the Defendant Cryptocurrency (the "**Rule 12(e) Motion**" {4/10/85-86}).

9. Pausing there in the narrative, for the purposes of this hearing, it is relevant to draw out the following points from BSF's memoranda in support of those two motions:

9.1 Until late 2020, the Defendant Cryptocurrency was held in wallets of LuBian.com (a cryptocurrency mining pool) for Chen, the Prince Group, and others. On 28 December 2020, unidentified hackers committed "*the largest theft of digital assets in history*", by

exploiting a software weakness to transfer it to wallets evidently controlled by them. The government of the PRC has stated that this was a "*state-level hacker operation*" conducted by the US government, being (until 20 January 2021) the first Trump administration {4/10/60}.

9.2 The US government accepts it was in possession of the Defendant Cryptocurrency by at latest 23 July 2024, but has not explained how that happened. It is unknown "*whether the government executed lawful process and seized it, whether someone else turned it over to the government voluntarily, or whether the government had it all along*" {4/10/91}. For almost 5 years after the original theft, nothing further happened. Following President Trump's return to office in January 2025, however, the US government began the Forfeiture Action, and only then was it first alleged that the Defendant Cryptocurrency represented the proceeds of fraud {4/10/91}.

9.3 As the Motion to Dismiss points out {4/10/62-63}, the US government accepts in the Forfeiture Action that the Prince Group had substantial <u>legitimate</u> business activities. The government's complaint describes it as "*focussed on real estate development, financial services and consumer services*" (§15 at {1/4/69}), and notes it also had interests in "*online gambling and cryptocurrency mining*" (§38 at {1/4/84}). It states that as at January 2024, the annual revenues from these "*legitimate business operations across Prince Group's holdings*" amounted to "*several hundred million dollars*" (§57 at {1/4/102}), and it follows that <u>even on the US government's own case</u>, not all Chen's (or the Prince Group's) assets are referable to alleged criminality.

9.4 This forms part of the basis for the Motion to Dismiss, and as the Rule 12(e) Motion also points out, while the Forfeiture Action is still at an early stage, there are already indicators that it is premised on unreliable material. Specifically, the indictment in the Criminal Proceeding (which is incorporated in the civil complaint) features five photos {1/4/50-54}, which are said to have been found on Chen's phone, which are said to demonstrate his personal knowledge of the phone farms used to commit wire fraud, and of the brutal mistreatment of those who worked there. But as the memorandum in support of the Rule 12(e) Motion explains:

9.4.1 A reverse image internet search shows that a photograph allegedly of a Prince Group phone farm was taken from a Chinese-language news article discussing the use of cell phones to inflate viewership of e-commerce live streams {4/10/97-98}.

9.4.2 A second photograph showing a man on a hospital bed which was said to illustrate "*Prince Group's violent methods*" was in fact taken from another news article about a man who had suffered an unusual medical emergency {4/10/98-99}.

9.4.3 A third, showing someone with distinctive parallel marks on his torso, appears to show a man who had undergone *gua sha*, a "*traditional Chinese therapeutic practice that involves 'scraping' the skin with a smooth-edged tool*" {4/10/100}.

*(B)(ii) Sanctions against Chen and the Prince Group in the US and UK.*

10. On the same day the Forfeiture Action was commenced (14 October 2025), the indictment in the Criminal Proceeding was unsealed {§59 at {1/4/102}}, and the US and UK governments "*announced coordinated actions targeting the Prince Group*" (Smith 1, §7 {1/3/19}). Starting with the position in the US:

10.1 The US Department of the Treasury announced in a press release on that date that its Office of Foreign Assets Control ("**OFAC**") had sanctioned 146 targets within the Prince Group {1/4/134}. 18 of those targets were individuals, including Chen, and a woman named Zhou Yun ("**Zhou**").

10.2 The remaining 128 targets were companies, and included all 25 of the Campbells Respondents (23 of them sanctioned "*for being owned or controlled by, or having acted or purported to act for or on behalf of, directly or indirectly*" Chen {1/4/139}, with the remaining 2 (Bright Team Global Limited and Mighty Divine Limited) for being likewise linked to Zhou {1/4/148, 152}).

11. Turning to the position in the UK, the Applicant's evidence to Mithani J. was that on the same day OFAC announced sanctions in the US, "*the United Kingdom Government also imposed sanctions on Chen, the Prince Group, and its related entities and companies*" (Smith 1 §12 {1/3/21}). That might have been taken to suggest that the scope of UK sanctions was broadly

equivalent to those imposed by OFAC. The correct position was in fact different, in the following two respects:

11.1 First, the sanctions announced by the UK's Foreign, Commonwealth & Development Office (the "**FCDO**") on 14 October 2025 were made under the Global Human Rights Sanctions Regulations 2020 ("**GHRSR**") (**tab [10]**). Their rationale consequently differed from the wire fraud/money laundering allegations underpinning the US sanctions, because as its name would suggest, the GHRSR empowers the Secretary of State to sanction persons she "*has reasonable grounds to suspect*" of being involved in serious human rights violations (*e.g.* violations of the right to life, and the rights to freedom from torture and slavery (GHRSR regs 4-5A).

11.2 Second, the FCDO sanctions designated Chen, five other individuals (although not Zhou), and six companies of whom, only one is a party to these BVI proceedings (Prince Global Group Limited ("**PGGL**"), one of the Campbells Respondents)[1]. None of the other 124 companies on OFAC's list was designated by the UK. But because the GHRSR prohibits third parties not only from dealing with or making funds *etc.* available to a designated person ("D"), but also, to persons "*owned or controlled directly or indirectly*" by D (GHRSR reg. 7), in practical terms, the assets of companies owned or controlled by the 12 persons designated by the FCDO were immobilised too (see *e.g.* GHRSR reg. 12(1) and (4)).

*(B)(iii) The events in the BVI, following the imposition of sanctions.*

12. As Smith 1 §39 {1/3/27} notes, the BVI implements all international sanctions that the UK extends through orders in council, and on 15 October 2025, the BVI Financial Services Commission issued a circular {1/4/413} in substantially the same terms as the one released the previous day by the UK authorities (see footnote 1 above), giving notice that Chen and the 11 others sanctioned by the UK were now on the consolidated list. Immediately thereafter, on the evidence in these proceedings, the position arrived at so far as the Respondents were concerned may be summarised as follows:

12.1 PGGL was subject to sanctions in the UK and the BVI, on the basis that the UK Secretary of State had concluded there to be "*reasonable grounds to suspect*" it of being a person

[1] https://assets.publishing.service.gov.uk/media/68edf4d5e7b6794c076bbdc1/Notice_Global_Human_Rights_141025.pdf

involved in serious human rights violations (presumably, by reason of GHRSR reg. 6(2)(a), read with reg. 6(3)(d)-(e)).

12.2 The Secretary of State had not similarly concluded there to be "*reasonable grounds to suspect*" any of the 24 other Campbells Respondents of having been involved in human rights violations, but all or most of them had assets frozen because they were "*owned or controlled directly or indirectly*" by a designated person (*e.g.* Chen).

12.3 All 25 of the Campbells Respondents were also subject to sanctions in the US because OFAC had concluded them to be owned or controlled, or to have acted or purported to act, whether directly, or indirectly, for either Chen or Zhou (see paragraph 10.2 above).

12.4 There was no allegation in the Criminal Proceeding or the Forfeiture Action (or in any other proceedings, that the evidence discloses) that any of the Campbells Respondents held, or ever had held, monies attributable to the alleged illegal aspects of the Prince Group's wider business activities.

12.5 The only asset of either Chen's, or the Prince Group's, in fact alleged in the US proceedings to represent the proceeds of fraud was the Defendant Cryptocurrency, and the maintainability of that allegation has (since 10 March 2026) been squarely in issue in the Motion to Dismiss {4/10/64-66}.

12.6 Neither of the two Kobre Respondents (being Amber Hill Ventures Ltd and Lateral Bridge Global Ltd) had been sanctioned. Unlike the Campbells Respondents, they had, however, been alleged to have been used for money laundering in the Forfeiture Action (see *e.g.* §40 at {1/4/84}).

13. It was against this background that on 5 January 2026 the IA03 s.162 applications now before the court to appoint liquidators were issued {1/6/437}, with the Applicant applying *ex parte* four days later, on 9 January 2026, for appointment of the JPLs {1/2/7}. For the purposes of what follows, there are a number of points to make about those applications. Starting with the s.162 applications:

13.1 Applications to wind-up are governed by the ordinary rules of civil procedure, including the rules as to pleading. The respondent is entitled to know at the outset (*i.e.* in the

application/petition) the case it has to meet, and absent permission to amend, the applicant is confined to that case at the eventual substantive hearing: see *In re Wear Engine Works Co.* (1875) LR 10 Ch. App. 188, at 191 (**tab [14]**) ("*a winding-up petition must allege facts which justify a winding-up order … it is not enough for a sufficient case to be shown in evidence*"); and *In re St. Piran Ltd.* [1981] 1 W.L.R. 1300, at 1307H-1308E (**tab [15]**).

13.2 At the heart of the Applicant's pleaded case is her contention that the Respondents should be liquidated because they stand publicly accused by the US and UK governments of being party to a "*fraudulent scheme*" (§32 at {1/6/446}), and complicit in human rights abuses. This underpins her case for winding-up on both the just and equitable, and public interest, grounds: "*BVI companies … <u>are alleged to have been used</u> as vehicles in what <u>has been described by international law enforcement authorities</u> as one of the largest fraudulent investment schemes in recent history … They are <u>alleged to have been used</u> to launder and/or hold the proceeds of the horrific crimes committed by Chen and his associates*" (§36 at {1/6/447} (underlining added).

13.3 As those underlinings show, however, the Applicant neither has, nor purports to have, any personal knowledge of whether a "*fraudulent scheme*" has been perpetrated by the Prince Group from Cambodia, whether "*horrific*" practices have been used there in furtherance of it, or of which persons may be party to those practices and the offences alleged in the US Criminal Complaint more generally. She is entirely reliant for all those matters on (1) the public pronouncements of the relevant US/UK authorities, and (2) the six online news articles she exhibits at {1/4/38-217}, which represent the totality of what she knows about the events in "*other jurisdictions*" to which she deposes in Smith 1 §16-§20 {1/3/11}.

14. Turning to the *ex parte* application, the Campbells Respondents accept that their applications to discharge the JPLs (see paragraph 3 above) are now moot, to the extent the court's decision on the IA03 s.162 applications will terminate the JPLs' appointment either way. The circumstances in which the JPLs came to be appointed nevertheless remain relevant to the determination of the s.162 applications, and may also go to the form of order that should be made, if the court refuses to wind-up the Respondents (*e.g.* because issues may then arise as to whether the

Applicant is entitled to retain material passed to her by the JPLs pursuant to the terms of the Protocol).

15. That being so, the following points are in order:

15.1 It is common ground that on her *ex parte* application, the Applicant bore the usual duties of full and frank disclosure and fair presentation, as most recently summarised in *Astor Asset Management 3 Ltd. v. Pliego* [2025] EWCA Civ 1060, at §13 (**tab [36]**). This obligation is of particular importance in the context of an application by a law officer, because (as is in fact the case here) the respondent will not usually have the protection of a cross-undertaking in damages.

15.2 It will (or should) also be common ground that to the extent such an application turns on allegations of jeopardy to assets pending the substantive hearing of the application to wind-up, the onus is on the applicant to adduce "*solid evidence*" of that risk, separately in respect of each respondent. It is not enough to allege generalised dishonesty, or the use of offshore structures: *Mex Group Worldwide Ltd. v. Ford* [2024] EWCA Civ 959, [2025] 1 W.L.R. 975, at §61 (**tab [34]**).

15.3 Before Mithani J., it was the Applicant's case that there was a "*real and substantial risk*" of asset dissipation and document destruction (see §61(c) of the skeleton argument {5/1/15}), because "*the Companies continue to be under the control of Chen and his associates/co-conspirators*". This fell far short of the standard of evidential specificity prescribed by *Mex* (to which Mithani J. was not referred), and was in fact seriously misleading, for the following reasons:

15.3.1 It is not possible to say with certainty that <u>all</u> the Campbells Respondents are subject to asset freezes under BVI sanctions, because the GHRSR reg. 7 test for direct/indirect ownership/control poses factual questions, the answers to which are not in all cases apparent, on the evidence adduced at this hearing (see in particular the GHRSR reg. 7(4) control test).

15.3.2 It is, however, clear that all 14 of the Campbells Respondents of which Chen is the sole shareholder, plus the further 6 of which the shareholder is a company of

which Chen is the sole shareholder in turn (see Appendix 1), were "*owned or controlled directly or indirectly*" by a designated person (*i.e.* Chen), and so already subject to an asset freeze in January 2026.

15.3.3 There was consequently no basis for telling Mithani J. that there was a risk of the Campbells Respondents dissipating assets. 20 of them were "*owned or controlled directly or indirectly*" by designated persons, and as such, already unable to deal with their assets in the BVI, and as to the remaining 5, there was no evidence either way.

15.4 This is a point on which Mithani J. would surely have benefitted from adversarial argument. The reason he had none, however, was because the Applicant told him it was "*essential that the joint provisional liquidators be appointed on an urgent basis*", in order to "*remove control from Chen and his associates*" (§61 at {5/1/15}). There are two points to make about that:

15.4.1 First, there was no proper basis for telling the judge that "*Chen and his associates*" were still in control of the companies in any meaningful sense. This could only have been so to the extent any of the Campbells Respondents were not "*owned or controlled directly or indirectly*" by Chen or some other designated person, but the Applicant advanced no case to that effect.

15.4.2 Second, on the Applicant's own case, Chen and those associated with him had been aware that the UK/US authorities were coming for them since the indictment in the Criminal Proceeding was unsealed, and the OFAC/FCDO sanctions announced, on 14 October 2025:

15.4.2.1 If Chen had wanted to dissipate, he had consequently had almost three months in which to do it by the time the Applicant got around to applying for JPLs. Nowhere in Smith 1, however, was it suggested that the Respondents' assets (or indeed, records) had been compromised during that period.

15.4.2.2 This point was not drawn to Mithani J.'s attention, and nor was any explanation given for why the application was urgent, despite the

Applicant herself having delayed since 14 October 2025 before making it. The evidence disclosed no true grounds for urgency, nor anything warranting an *ex parte* application.

15.5 It is fair to say that the Applicant <u>did</u> draw the judge's attention to the fact that her application was unusual, in that instead of affirmatively alleging wrongdoing on the part of the Respondents, it relied solely on the fact of such allegations having been made by overseas governmental agencies (*e.g.* OFAC and the FCDO) (see §66 of the skeleton at {5/1/17}). Her treatment of that point, however:

15.5.1 Failed to draw Mithani J.'s attention to the principles and authorities set out in section (C)(ii) below, or to discuss the implications of the fact that the evidence of substantive wrongdoing by Chen and the Prince Group in Smith 1 (such as it was) was multiple hearsay (see generally as to which part XII of the Evidence Act 2007, Revised Edition 2013 (**tab [8]**)).

15.5.2 Sought to brush the problem aside with the perfunctory assertion that in the Applicant's view, "*The chances of the steps taken in the US Proceedings being proven as erroneous and/or inappropriate are remote*" (Smith 1 §71 {1/3/36}), but without drawing the court's attention to the fact that this was inadmissible opinion evidence.

15.6 On an *ex parte* application for provisional liquidation, the applicant is obliged to explain why the risks said to be inherent in the status quo cannot adequately be addressed by some other less intrusive (and costly) interim remedy: see *In re City Vintners Ltd.* ([2001] 12 WLUK 207, unreported, 10 December 2001), at §73-§76 (**tab [18]**). The Applicant failed to address that duty at all on her application to Mithani J., however:

15.6.1 For example, although she suggested there was an urgent need to preserve and collect documentary material which "*may provide crucial support for law enforcement authorities, both in the BVI and internationally*" (see §62(c) of the skeleton at {5/1/16}), she omitted to explain why this material could not be secured by other, more conventional, means.

15.6.2 This was a point of some significance for the purposes of deciding on 9 January 2026 whether it was "*likely that a winding up order will be made*" at the eventual hearing of the liquidation applications (*Secretary of State v. New Horizon Energy Ltd.* [2015] EWHC 2961 (Ch), [2017] B.C.C. 629, at §23 (**tab [26]**)). This is because as explained in more detail in section (C)(iv) below, the reasons those means were <u>un</u>available were highly relevant to whether that was in fact "*likely*" or not, and remain relevant to whether an order should now be made in favour of the Applicant on her s.162 applications.

15.7 Nor (finally) was there any discussion before Mithani J. of either the terms of the Protocol, or what justified seeking the wide-ranging relief it conferred at an urgent without notice hearing, <u>even if</u> it were otherwise appropriate to apply *ex parte* for the JPL appointments:

15.7.1 This is particularly surprising, given paragraph 8 of the order the judge was asked to (and did) make {2/9/465}, which provided that not only the costs of the JPLs, but also, the Applicant's <u>own</u> "*costs of complying with the Protocol be paid out of the assets of the Company in priority to all other claims*" {*2/9/469*}.

15.7.2 This was, on any view, an unusual provision which ought to have been specifically drawn to Mithani J.'s attention, not least where it is unclear what legal basis there may have been not only for saddling the estates with the Applicant's costs of giving voluntary assistance to foreign authorities, but giving those costs priority over "*all other claims*" at the outset of the insolvency: see rule 199 of the Insolvency Rules, Revised Edition 2020 (**tab [07]**).

15.8 On 8 April 2026, Campbells wrote to the Applicant's lawyers, O'Neal Webster ("**ONW**") ({Campbells Respondents' inter-parties correspondence bundle/8/886-889}), inviting them to explain the legal basis for that order before skeletons were due to be exchanged and filed, so the point could be addressed in submissions. At the time of writing, no response to that letter has been received by Campbells.

**(C) Submissions.**

*(C)(i) Issues for decision on these applications.*

16. Against that background, the Campbells Respondents suggest that the first two issues for the court's consideration at this hearing are as follows:

16.1 Would it be appropriate for the Respondents to be wound-up, having regard to the serious, but as yet unadjudicated, allegations of criminality and wrongdoing publicly made against Chen and the Prince Group by foreign governments and governmental agencies?

16.2 Does it make a difference that as the result of those allegations, Chen and the Prince Group are subject to sanctions in the US, UK, and BVI, and the Criminal Proceeding and Forfeiture Action have been commenced in the US?

17. It should be noted at the outset that although the Applicant seeks winding up on both the public interest <u>and</u> just and equitable grounds, she has not suggested that if she loses on one basis, she can still succeed on the other. The Campbells Respondents submit that she fails on both, and further, that for the additional reasons developed in sub-section (C)(iv) below, these applications in fact represent a serious abuse of this court's winding-up jurisdiction.

*(C)(ii) The allegations of criminality/wrongdoing against Chen and the Prince Group.*

18. The leading BVI authority on IA03 s.162(1)(b) just and equitable winding-up is *Lau v. Chu* [2020] UKPC 24, [2020] 1 W.L.R. 4656 (**tab [27]**) a decision of the Privy Council on appeal from the Eastern Caribbean Court of Appeal. As Lord Briggs pointed-out in that case, because the BVI's winding-up legislation is modelled on UK statutes dating back to the mid-19th century, "*UK case law is the primary source of authority for the scope of the jurisdiction, and for the principles upon which it is to be exercised*" (at §9). The same comments apply equally, to the extent the Applicant is also relying here on the s.162(1)(c) public interest ground.

19. The principles applicable to the determination in England of just and equitable winding-up petitions brought by the Secretary of State on public interest grounds were summarised by the Court of Appeal in *Secretary of State v. PAG Asset Preservation Ltd.* [2020] EWCA Civ 1017, [2020] B.C.C. 979, at §39-§40 (**tab [28]**), which passage the court will wish to read in full. Among other relevant matters, the court will note the reference there to the point that to wind-up a solvent company "*is a serious step, and the Court must be satisfied that reasons of sufficient weight have been advanced to justify taking that course*" (*PAG*, at §39(j)). This reflects (among other things)

the fact that such orders may harm third parties not before the court, who are not themselves accused of wrongdoing.

20. Whether it is appropriate in any given case to wind-up a company on either the just and equitable or public interest grounds often (and perhaps, usually) turns on disputed questions of fact which can only be resolved following a trial: see *Lau* itself (a just and equitable petition, tried over 6 days (at §5)), and *Secretary of State v. Amway (UK) Ltd.* [2008] EWHC 1054 (Ch), [2011] 2 B.C.L.C. 716 (**tab [23]**) (a public interest winding-up petition, tried over 10 days). This will particularly be so where the petitioner makes allegations of dishonesty or impropriety, which, if denied by the respondent, on ordinary principles, will have to be clearly spelt-out in the petition/application and squarely put to relevant witnesses in cross-examination before the court will make adverse findings.

21. The "*general rule governing civil proceedings*" is that at the fact-finding stage, courts and tribunals decide facts in issue on the balance of probabilities (*U3 v. Secretary of State* [2025] UKSC 19, [2025] A.C. 1510 (**tab [35]**), at §48). Where this is so, the "*judge or jury must decide whether or not it* [*i.e.* the fact in issue] *happened. There is no room for a finding that it might have happened. The law operates a binary system in which the only values are zero and one. The fact either happened or it did not. If the tribunal is left in doubt, the doubt is resolved by a rule that one party or the other carries the burden of proof. If the party who bears the burden of proof fails to discharge it, a value of zero is returned and the fact is treated as not having happened. If he does discharge it, a value of one is returned and the fact is treated as having happened*" (*In re B (Children) (Care Proceedings: Standard of Proof)* [2008] UKHL 35, [2009] 1 A.C. 11 (**tab [22]**), at §2 (*per* Lord Hoffmann)).

22. There are exceptions to this general rule. In some situations, for example, a decision-making body (judicial or otherwise) may face insuperable difficulties reaching a concluded view on the balance of probabilities, *e.g.* because of the limitations to what can be proved in the given context: see *R (Pearce) v. Parole Board* [2023] UKSC 13, [2023] A.C. 807 (**tab [31]**), at §72-§78. As appears from §73 in that passage, where the decision-making process takes place against a statutory backdrop, the nature of the exercise the decision-maker is required to conduct is "*at all times*" a question of *"statutory interpretation*". Thus in *In re H (Minors) (Sexual Abuse: Standard of Proof)* [1996] A.C. 563 (H.L.) (**tab [17]**), the relevant statute (which concerned child care orders), by necessary implication, itself supplied the answer to whether the trial judge had

to make hard-edged findings on a balance of probabilities about parental abuse, or whether something lesser sufficed: see at 590D-591D.

23. In the context of just and equitable winding-up petitions by contributories, it has never been doubted that the petitioner bears the ordinary burden of proving what he relies on to found the relief he seeks on the balance of probabilities, save where the statute otherwise requires (see *Lau* at §20-§21), and the same goes for creditors' petitions to wind-up on grounds of insolvency (see *BNY Corporate Trustee Services Ltd. v. Eurosail-UK 2007-3 BL plc* [2013] UKSC 28, [2013] 1 W.L.R. 1408 (**tab [24]**), at §37). It would consequently be surprising if something less were enough in the case of petitions to wind-up on public interest grounds, and there is clear Court of Appeal authority that has stood unchallenged now for over 30 years in the UK saying that it does not: see *Re Walter L. Jacob & Co. Ltd.* (1989) 5 B.C.C. 244 (**tab [16]**), at 252D.

24. Where the petitioner/applicant for winding-up founds on allegations about the respondent's conduct, it is consequently for him to prove those allegations in the usual way, by admissible evidence. Absent statutory provision to the contrary (see *e.g. In re St. Piran* (see paragraph 13.1 above) at 1304H-1306D, discussing the forerunner to s.124A(1) of the (UK) Insolvency Act 1986 (**tab [1]**)), it is not open to him to refer to complaints made by third parties who are not themselves before the court, praying them in aid on the basis there is a chance those complaints <u>may</u> later be vindicated. The underlying allegations have to be put in issue and proven by evidence, if they are going to be relied upon: cf *In the matter of A (a child)* [2015] EWFC 11, [2016] 1 F.L.R. 1 (**tab [25]**), at §11 ("*Failure to understand these principles … can lead, as here, to the unwelcome realisation that a seemingly impressive case is, in truth, a tottering edifice built on inadequate foundations*").

25. Consistently with this analysis, there are at least three recorded instances in which UK courts have rejected attempts by the UK Secretary of State to found a public interest winding-up on the basis of allegations made against the respondent company by a third party, but which the Secretary of State did not himself seek to make good substantively at trial: see (1) *In re Derek Colins Associates Ltd.* ([2002] 7 WLUK 832, unreported, 31 July 2002) (**tab [19]**), at §12 ("*The existence of complaints by themselves, without alleging and proving their substance, can hardly be a justification for winding up in the public interest*"); (2) *In re Portfolios of Distinction Ltd.* [2006] EWHC 782 (Ch), [2006] 2 B.C.L.C. 261 (**tab [21]**), at §42; and (3) *Secretary of State v. Amway (UK) Ltd.* [2009] EWCA Civ 32, [2011] 2 B.C.L.C. 716, at §44-§47 (**tab [23]**) ("*complaints

*made against Amway worldwide*" which the Secretary of State did not seek to make good were discounted by the Court of Appeal as "*irrelevant, hearsay evidence of unsubstantiated complaints*").

26. The Applicant's case is not that the Campbells Respondents <u>have</u> been parties to wire fraud and money laundering, or human rights abuses in Cambodia: the Applicant has no knowledge of any of those matters, beyond the allegations she has read in court documents, press releases, and online news articles. All her s.162 applications assert, and all she consequently seeks to prove, is that <u>such allegations have been made</u> by foreign governmental agencies, and to the extent she seeks to shore up that case by asserting that the "*steps taken in the US Proceedings*" are unlikely to turn out to be "*erroneous and/or inappropriate*" (Smith 1 §71 {*1/3/36*}), that is, with due respect, inadmissible opinion evidence, and evidentially worthless in any event. This court does not wind-up companies on the basis of allegations of misconduct which applicants do not offer to prove, and it makes no difference to the analysis that a law officer (*i.e.* the Applicant) may say she chooses to believe them.

*(C)(iii) The relevance of the UK sanctions and the situation in the US.*

27. If the court accepts the argument to this point, the next stage of analysis is to determine whether (1) the sanctions against Chen and the Prince Group in the US, UK and BVI, and/or (2) the Criminal Proceeding and Forfeiture Action in the US <u>of themselves</u> afford a proper basis for this court to direct winding-up. Taking them in turn, and starting with the sanctions in the UK and BVI:

27.1 PGGL is the only one of the 25 Campbells Respondents actually to have been sanctioned there, and all those sanctions establish is that in October 2025, the UK Secretary of State determined herself to have "*reasonable grounds to suspect*" it of complicity in human rights violations for GHRSR purposes (see paragraph 11.1 above). The fact of that determination plainly does not prove on the balance of probabilities that PGGL was so complicit (see *LLC Synesis v. Secretary of State* [2023] EWHC 541 (Admin), [2024] K.B. 81, at §73 (**tab [32]**)), and accordingly, it affords no proper basis for winding up PGGL.

27.2 So far as the other 24 Campbells Respondents are concerned, the fact that they were <u>not</u> designated for sanctions purposes by the UK/BVI suggests that the UK Secretary of State

concluded she did not even have "*reasonable grounds to suspect*" them of involvement in human rights abuses. There is consequently no basis for winding them up merely because of the sanctions imposed by the UK/BVI, and to the extent the suggestion before Mithani J. was that it was necessary to do so to preserve the Campbells Respondents' assets, this was misconceived, for the short reason explained in paragraph 11.2 above. Their assets were already effectively frozen, and could not be disposed of or dealt with, subject to the provisions relating to "*exceptions and licences*" in GHRSR part 5 (as to which, see further section (C)(iv) below).

28. So far as the events in the US are concerned:

28.1 There is no expert evidence of US law before this court as to the evidential threshold that had to be crossed for OFAC to impose sanctions, and even in the improbable event it was equivalent to the English law civil standard (*i.e.* a balance of probabilities, rather than the GHRSR "*reasonable grounds to suspect*" threshold), that would still not justify liquidating the Campbells Respondents. All it would establish is that in the opinion of OFAC in October 2025, they were "*owned or controlled by*" Chen or Zhou, or had (in ways not particularised in OFAC's sanctions announcement) "*purported to act for or on behalf of*" them, either "*directly or indirectly*" (see paragraph 10.2 above).

28.2 The US sanctions consequently neither establish, nor imply, that the Campbells Respondents were complicit in wire fraud, money laundering, or human rights violations, and the same comment applies equally to the US proceedings. Following an "*extensive blockchain tracing*" exercise by the FBI (see §45 at {1/4/89}), the Kobre Respondents <u>are</u> alleged in the Forfeiture Action to have been involved in money laundering, because they are said to have been party to transactions in the Defendant Cryptocurrency (see §47(a) at {1/4/91}). But the US has made no such allegations against the Campbells Respondents. They consequently stand accused of nothing, and the US proceedings furnish no basis for winding up either.

28.3 The only further point needing to be addressed in this context is the assertion in Smith 1 §45(f) {1/3/28} that each of the Respondents "*<u>is alleged</u> to be a shell company which was used solely as a vehicle for the fraudulent scheme*" (underlining added). The UK authorities have made no such allegation, and to the extent it has any foundation in the

documents exhibited to Smith 1 concerning events in the US, it is a mischaracterisation of what they say:

28.3.1 The verified complaint in the Forfeiture Action does indeed refer to crime proceeds being passed through "*shell companies that served little purpose other than to launder funds*" (§40 at {1/4/84}). As pointed-out above, however, there is no suggestion that the Campbells Respondents participated in that alleged money laundering, or consequently, that they were among the "*shell companies*" being referred to.

28.3.2 The US Department of the Treasury's 14 October 2025 announcement stated that of the "*network of 117 Price Group TCO-affiliated businesses*" sanctioned by OFAC on that date, the "*vast majority*" were "*offshore shell companies that engage in no apparent real commercial or business activity*" {1/4/136}. This does not support the allegation in Smith 1 §45(f), and even if it did, it is simply a generalised comment in a press release, without any detail to support it.

*(C)(iv) Abuse of process.*

29. For the reasons set out above, the Campbells Respondents submit that these applications disclose no proper basis for winding-up, whether on the just and equitable or public interest bases. They go a stage further, however, and advance the additional points made in this sub-section (C)(iv) both in amplification of that primary submission, and in support of a more specific argument that these applications are an abuse of this court's winding-up jurisdiction. There are two broad topics to address in that regard:

30. <u>(1) The sanctions context.</u> The point has already been made in paragraph 15.3 above that the appointment of the JPLs was superfluous, to the extent the Campbells Respondents' assets were already frozen by UK and BVI sanctions, and the same will be true, by extension, of any winding-up order the court now makes. But the problem here is not simply that provisional liquidation/liquidation was/will be redundant:

30.1 The GHRSR is applicable in the BVI, subject to limited modifications, by reason of the Global Human Rights Sanctions (Overseas Territories) Order 2020 (the "**GHRS(OT)O**") (**tab [11]**). GHRSR part 5 sets out a range of exceptions from the prohibitions contained in the

regulations (see regs. 18-19), and enables persons affected by those prohibitions to apply to HM Treasury for licences (see regs. 20-20B). So far as material for present purposes:

30.1.1 Reg. 18A(2) excepts payments which are not "*excluded*" payments (see reg. 18A(2)(b)) made by a designated person to (among others) the registrar of companies, HM Revenue and Customs, and local authorities.

30.1.2 Regs. 20-20B confer a discretion on HM Treasury to grant either a general or particular licence to an affected person for one or more of the purposes specified in sch. 2, including the payment of legal fees (sch. 2 para. 3), and the discharge of qualifying pre-existing obligations (sch. 2 para. 8).

30.1.3 In this jurisdiction, that discretion is vested in the Governor, but is exercisable by him "*only with the consent of the Secretary of State*" (see GHRS(OT)O para. 13).

30.2 The practical consequences of the appointment of the JPLs, which will be perpetuated if the final winding-up orders now sought by the Applicant are made at this hearing, was and will consequently be twofold:

30.2.1 First, the operation of the mandatory exemptions from the sanctions regime contained in GHRSR will effectively be precluded. For example, it will not be possible for payments to be made that would otherwise have been perfectly lawful pursuant to reg. 18A.

30.2.2 Second, the protections for affected parties inherent in the GHRSR part 5 licensing provisions have been similarly nullified. Irrespective of whether the Governor/Secretary of State would have been prepared to grant such licences, there is no longer any point in seeking them, because the Campbells Respondents will henceforth be subjected to an insolvency process, with the statutory distribution scheme for which that provides.

30.3 It is not only PGGL (as the only formally "*designated person*") and the other 24 Campbells Respondents that are prejudiced by the proceedings the Applicant has instigated. Third parties, including the Crown and other *bona fide* creditors, are potentially harmed, and

even though there is no specific evidence of such detriment in this case, the point of principle still holds good. The Applicant has effectively invoked the fact of UK/BVI sanctions in these proceedings to justify the inception of a collective winding-up process that negates important protections for affected parties embodied in the statutory sanctions regime.

30.4 Whether payments that might otherwise be facilitated by GHRSR reg. 20 licences should or should not be made, furthermore, is not (with appropriate respect) a matter for this court to decide in exercise of its winding-up jurisdiction, and still less for the Applicant or the JPLs to determine. The legislation confers decisions as to designation and licensing on the executive (see *Shvidler v. Secretary of State* [2025] UKSC 30, [2025] 3 W.L.R. 346, at §56-§59 (**tab [33]**)), and the courts recognise that in reaching such decisions, the executive (being here, in effect, the Secretary of State) has both "*special constitutional responsibilities*" and a "*superior institutional competence*" (*Shvidler*, at §127-§130).

30.5 Importantly, there are also limits to the deference which the courts accord to the executive's decisions as to sanctions. A decision not to grant a licence is amenable in principle to judicial review (see *e.g. R (Fridman) v. HM Treasury* [2023] EWHC 2657 (Admin) (**tab [30]**)), and on any such review, a highly relevant consideration will be the applicant's right to the peaceful enjoyment of possessions. In England, that right takes effect through Article 1 of Protocol 1 to the Convention for the Protection of Human Rights and Fundamental Freedoms: in this jurisdiction, it does so under art. 25 of the Virgin Islands Constitution Order 2007 (**tab [9]**).

31. The Applicant's bid to wind up the Respondents in the name of giving effect to UK/BVI sanctions in effect overrides the statutory and common law protections they, and third parties not before this court, enjoy under the UK/BVI sanctions regime. At lowest, the Campbells Respondents submit that makes it neither just and equitable, nor in the public interest, to wind them up in light of those sanctions. At worst, it renders these applications an abuse of process, because they will have the effect of creating prohibitions on asset disposals, and restrictions on the court's public law supervisory jurisdiction, that have no basis in the statutory sanctions regime.

32. Subject to a reservation noted in paragraph 35 below, the Campbells Respondents make clear they are <u>not</u> making any suggestion of conscious impropriety on the part of the Applicant. They

do not need to, for the purposes of their abuse argument. What matters here is whether the insolvency process is being invoked by the Applicant "*in a way which, although not inconsistent with the literal application of its procedural rules, would nevertheless be manifestly unfair to a party to litigation before it, or would otherwise bring the administration of justice into disrepute among right-thinking people*" (*Johnson v. Gore Wood* [2002] 2 A.C. 1 (H.L.), at 22E (**tab [20]**). Bad faith, if present, would be relevant, but it is not a precondition for a finding of abuse (*ibid*., at 31B).

33. <u>(2) Evidence preservation and onward transmission.</u> Matters get no better for the Applicant if the court turns to consider the Protocol and the other provisions in Mithani J.'s order concerning the preservation of evidence by the JPLs and its onward transmission. Again, the Applicant proposes similar orders be made by the court at this hearing, and it will be noted that their purpose is avowedly to facilitate onward transmission both to the US Department of Justice (*i.e.* for the purposes of the US Criminal Proceeding and Forfeiture Action), and to "*the United States Department of the Treasury's Office of Foreign Assets Control and the United Kingdom government*" (*i.e.* for sanctions purposes: see §3(xxi) of the draft order at {1/7/454}).

34. This seeks to achieve by means of winding-up ends which do not feature anywhere in IA03, and that is, again, abusive, to the extent it circumvents limitations on the other powers which already exist to address the need identified by the Applicant (*i.e.* to supply evidence to overseas sanctions/prosecuting authorities). Specifically:

34.1 As a starting point, in circumstances where the Applicant's evidence nowhere suggests that the Campbells Respondents are, or ever have been, under investigation in this jurisdiction for an offence under BVI law, none of the powers otherwise available to the Crown under the Proceeds of Criminal Conduct Act, Revised Edition 2020 (as amended: the "**PCCA**") (**tab [3]**) could have been used against them, because in all cases, their availability turns on criminal proceedings either being instituted, or in prospect (*e.g.* PCCA s.16(3)), or on there being a relevant police investigation.

34.2 For example, the BVI police can seek an order for production under PCCA s.36(1) if investigating "*money laundering … whether any person has benefitted from any criminal conduct or into the extent or whereabouts of the proceeds of any criminal conduct*". But to succeed, they have to show both that there "*are reasonable grounds for suspecting*

*that a specified person*" has been involved in such activities (s.36(4)(a)), and that the material sought "*is likely to be of substantial value … to the investigation*" (s.36(4)(b)(i)), and on the evidence before this court, it is not obvious how either precondition would have been satisfied in this case.

34.3 It would also have been possible for the US government to make a request to the Applicant for assistance in connection with the US Criminal Proceeding, in her capacity as the "*Mutual Legal Assistance Authority*" for the purposes of the 1986 treaty (the "**Treaty**") scheduled to the Mutual Legal Assistance (United States of America) Act, Revised Edition 2020 (as amended) (**tab [2]**). Pursuant to such a request, the Applicant could, in principle, have given assistance by "*providing documents, records, and articles of evidence*" (Treaty art 1(2)(b)), "*immobilizing criminally obtained assets*" (art. 1(2)(g)), assisting "*proceedings related to forfeiture*" (art. 1(2)(h)), and more generally, "*any other steps deemed appropriate by both Central Authorities*" (art. 1(2)(i)).

34.4 But to begin that process, the US government would have had to make a Treaty art. 4 request, and there is no suggestion that it ever did. The specifics of <u>why</u> that was so do not matter for present purposes, although it may be relevant to point out that on the strength of Boyle 1 §10 {4/9/42}, it appears vanishingly unlikely that the US criminal proceedings against Chen will ever move forward. Be that as it may, the key point to note is that by "*providing documents, records and articles of evidence*" within Treaty art. 1(2)(b) to the US <u>pursuant to the Protocol</u>, the Applicant infringed Treaty art. 17(2) (headed: "*exclusivity*"), which, subject to an inapplicable exception provides that "*a Party needing assistance as provided in Article 1 … <u>shall request assistance pursuant to this Treaty</u>*".

34.5 Nor does the vice stop there, because the Treaty contains various limitations and safeguards for those who are subject to the exercise of its powers which have been circumvented by the Protocol. Identifying only the two principal points:

34.5.1 Under art. 6, the costs associated with any request under the Treaty are in broad terms borne by the requesting party. This contrasts starkly with the order made by Mithani J. (see paragraph 15.7 above), under which the Respondents are made responsible for the costs of the Applicant, the JPLs, and their legal advisers.

34.5.2 Under art. 7, material supplied pursuant to an art. 4 request can only be used for "*civil or administrative proceedings*" in the limited situations identified in art. 7(4)(c). To the extent the Protocol enables the Applicant to remit material to sanctions authorities in the US and UK, it blatantly subverts that restriction.

35. The letter Campbells sent ONW on 8 April 2026 asked what materials the JPLs had passed over to the Respondent pursuant to the Protocol, and what materials she had transmitted onwards to overseas agencies. As noted in paragraph 15.8 above, there has been no response to that letter, at time of writing. As things stand, it is currently unclear what the position may be in that regard, and in particular, whether the Applicant has continued to pass evidence over to foreign authorities, even after the Campbells Respondents applied on 1 March 2026 to discharge the JPL appointments {3/2/4}. If she has, the Campbells Respondents' rights in that regard are fully reserved.

**(D) Conclusion.**

36. In her evidence to Mithani J., the Applicant made the point that the operation of "*a large-scale international fraudulent scheme*" through the BVI "*causes significant reputational harm to the BVI as a financial centre and threatens confidence in BVI incorporated companies and the BVI's regulatory framework*" (Smith 1 §51 {1/3/30}). None of this is in doubt. But these comments beg the question (<u>has</u> a "*fraudulent scheme*" in fact been run through the BVI?), and of more fundamental importance still to the BVI is its international reputation as a stable jurisdiction governed by the rule of law, of which a fair trial process is the "*cornerstone*" (*Popoviciu v. Curtea De Apel Bucharest* [2023] UKSC 39, [2023] 1 W.L.R. 4256, at §73 (**tab [29]**).

37. No right-thinking person reads the allegations made in the US proceedings against Chen and the Prince Group without considerable disquiet, pending hearing their substantive response to them. But hard cases make bad law. The grave nature of those as yet unproven allegations does not relieve the Applicant from the necessity of making her case for liquidation of the Campbells Respondents by reference to probative and admissible evidence, and nor does it allow her to abuse this court's winding-up jurisdiction in order to circumvent the limitations on the statutory remedies available to her and other government agencies under the sanctions legislation, the PCCA, and the Treaty.

38. These applications represent a novel, and (as far as the writers are aware) hitherto unprecedented attempt to invoke this court's winding-up jurisdiction at best, to supplement perceived gaps in sanctions law and international criminal law enforcement, and at worst, to load substantial professional and other enforcement costs onto the targets in a way that nothing obviously allows. If acceded to, they will likely set a dangerous precedent of which others will in due course take note. They should be dismissed with costs, and consequential relief granted to deprive the Applicant of the fruits of the JPL appointments, which (for the reasons set out in paragraph 15 above) were obtained *ex parte* from Mithani J. by egregious non-disclosure.

13 April 2026

**Appendix 1.**

<u>The Campbells Respondents:</u>

Note that Chen is also the sole shareholder of the companies marked below with an *asterisk:

| | *Case no:* | *Company:* | *Shareholder:* |
|---|---|---|---|
| 1. | 0002 | Auspicious Tycoon Ltd | Chen |
| 2. | 0001 | Bright Team Global Ltd | Zhou |
| 3. | 0004 | Delightful Thrive Ltd | Chen |
| 4. | 0005 | Even Sincerity Ltd | Prince Group Holdings Ltd* |
| 5. | 0006 | Fulam Investment Ltd | Ample Luck Investment Ltd* |
| 6. | 0007 | Giant Victory Holdings Ltd | Deluxe Heaven Ltd* |
| 7. | 0008 | Golden Ascend International Ltd | Chen |
| 8. | 0009 | Harmonic State Ltd | Chen |
| 9. | 0012 | Luminous Glow Ltd | Chen |
| 10. | 0013 | Mighty Divine Ltd | Zhou |
| 11. | 0014 | Noble Title Ltd | Retain Prosper Ltd* |
| 12. | 0015 | Oriental Charm Holdings Investment Ltd | Li Caiyun |
| 13. | 0016 | Pacific Charm Holdings Investment Ltd | Chen |
| 14. | 0018 | Praise Marble Ltd | Geotech Holdings Ltd |
| 15. | 0017 | Prince Global Group Ltd | Chen |
| 16. | 0019 | Prince Global Holdings Ltd | Chen |
| 17. | 0020 | Respectful Steed Ltd | Prince Group Holdings Ltd* |
| 18. | 0021 | Retain Prosper Ltd | Chen |

| | | | |
|---|---|---|---|
| 19. | 0023 | Simply Advanced Ltd | Chen |
| 20. | 0024 | Southern Heritage Ltd | Chen |
| 21. | 0025 | Star Merit Global Ltd | Chen |
| 22. | 0026 | Starry Bloom Ltd | Zhang Fan |
| 23. | 0027 | Sure Tycoon Ltd | Chen |
| 24. | 0029 | Towards Sunshine Ltd | Prince Group Holdings Ltd* |
| 25. | 0030 | United Riches Global Ltd | Chen |