# EXHIBIT 21

# Transcript of May 14, 2026 BVI Hearing

1

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
BRITISH VIRGIN ISLANDS
COMMERCIAL DIVISION


CLAIM NO. BVIHC (COM) 2026/0027, CLAIM NO. BVIHC (COM)
2026/0001, CLAIM NO. BVIHC (COM) 2026/0002,
CLAIM NO. BVIHC (COM) 2026/0003, CLAIM NO. BVIHC (COM)
2026/0004, CLAIM NO. BVIHC (COM) 2026/0005,
CLAIM NO. BVIHC (COM) 2026/0006, CLAIM NO. BVIHC (COM)
2026/0007, CLAIM NO. BVIHC (COM) 2026/0008,
CLAIM NO. BVIHC (COM) 2026/0009, CLAIM NO. BVIHC (COM)
2026/0010, CLAIM NO. BVIHC (COM) 2026/0011,
CLAIM NO. BVIHC (COM) 2026/0012, CLAIM NO. BVIHC (COM)
2026/0013, CLAIM NO. BVIHC (COM) 2026/0014,
CLAIM NO. BVIHC (COM) 2026/0015, CLAIM NO. BVIHC (COM)
2026/0016, CLAIM NO. BVIHC (COM) 2026/0017,
CLAIM NO. BVIHC (COM) 2026/0018, CLAIM NO. BVIHC (COM)
2026/0019, CLAIM NO. BVIHC (COM) 2026/0020,
CLAIM NO. BVIHC (COM) 2026/0021, CLAIM NO. BVIHC (COM)
2026/0022, CLAIM NO. BVIHC (COM) 2026/0023,
CLAIM NO. BVIHC (COM) 2026/0024, CLAIM NO. BVIHC (COM)
2026/0025, CLAIM NO. BVIHC (COM) 2026/0026,
CLAIM NO. BVIHC (COM) 2026/0028, CLAIM NO. BVIHC (COM)
2026/0029, CLAIM NO. BVIHC (COM) 2026/0030


BETWEEN:


IN THE MATTER OF SURE TYCOON LIMITED AND TWENTY-NINE
OTHER COMPANIES

AND IN THE MATTER OF THE INSOLVENCY ACT, 2003 OF THE

LAWS OF THE VIRGIN ISLANDS

THE ATTORNEY GENERAL                               )
                                                   )
                                       Applicant   )
V                                                  )
                                                   )
1) AMBER HILL VENTURES LIMITED                     )
2) AUSPICIOUS TYCOON LIMITED                       )
3) BRIGHT TEAM GLOBAL LIMITED                      )
4) DELIGHTFUL THRIVE LIMITED                       )
5) EVEN SINCERITY LIMITED                          )
6) FULAM INVESTMENT LIMITED                        )
7) GIANT VICTORY HOLDINGS LIMITED                  )
8) GOLDEN ASCEND INTERNATIONAL LIMITED             )

 COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

2

```
 9) HARMONIC STATE LIMITED                                  )
10) JUMBO HIGH LIMITED                                      )
11) LATERAL BRIDGE GLOBAL LIMITED                           )
12) LUMINOUS GLOW LIMITED                                   )
13) MIGHTY DIVINE LIMITED                                   )
14) NOBLE TITLE LIMITED                                     )
15) ORIENTAL CHARM HOLDINGS INVESTMENT LIMITED              )
16) PACIFIC CHARM HOLDINGS INVESTMENT LIMITED               )
17) PRAISE MARBLE LIMITED                                   )
18) PRINCE GLOBAL GROUP LIMITED                             )
19) PRINCE GLOBAL HOLDINGS LIMITED                          )
20) RESPECTFUL STEED LIMITED                                )
21) RETAIN PROSPER LIMITED                                  )
22) ROBUST HARMONY LIMITED                                  )
23) SIMPLY ADVANCED LIMITED                                 )
24) SOUTHERN HERITAGE LIMITED                               )
25) STAR MERIT GLOBAL LIMITED                               )
26) STARRY BLOOM LIMITED                                    )
27) SURE TYCOON LIMITED                                     )
28) SWORD RIVER LIMITED                                     )
29) TOWARDS SUNSHINE LIMITED                                )
30) UNITED RICHES GLOBAL LIMITED SURE TYCOON LIMITED )
                                                            )
                                         Respondents  )
_____)
```

TRANSCRIPT OF OPEN COURT PROCEEDINGS

Thursday, 14th May, 2026
(10:00 a.m. to 4:59 p.m.)

BEFORE:  HON. MR. JUSTICE GERHARD WALLBANK, K.C., Judge

Court Reporting Unit
Government of the Virgin Islands
Road Town, Tortola
British Virgin Islands

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

26-10769-mg   Doc 49-21   Filed 05/21/26   Entered 05/21/26 15:29:05   Exhibit 21 - Transcript of May 14 2026 BVI Hearing   Pg 4 of 222

3

```
APPEARANCES:          O'NEAL WEBSTER
                      Chambers
                      Road Town, Tortola
                      British Virgin Islands
                      BY: MR. PAUL DENNIS K.C.,
                      MRS. NADINE WHYTE LAING and
                      MS. KOYA RYAN
                      For the Applicant

                      KOBRE & KIM
                      Chambers
                      Road Town, Tortola
                      British Virgin Islands
                      BY: MR. PETER TYERS-SMITH
                      and MR. TIMOTHY DE SWARDT
                      For the KOBRE & KIM Respondents

                      CAMPBELLS
                      Chambers
                      Road Town, Tortola
                      British Virgin Islands
                      BY: MR. ANDREAS GLEDHILL, K.C.,
                      and MR. TOBY BROWN,
                      For the Campbell Respondents

                      WALKERS
                      Chambers
                      Road Town, Tortola
                      British Virgin Islands
                      BY: MR. MICHAEL GIBBON, K.C.
                      MR. OLIVER CLIFTON and
                      MS. ALANNA-J JOSEPH
                      For the JPLs
                           * * *
```

4

P-R-O-C-E-E-D-I-N-G-S

* * *

(Court convenes at 10:00 a.m.)

THE CLERK:                    BVIHCOM 001 to 0030 of 2026 - The Attorney General v. Bright Team Global Limited et al.

THE COURT:                    Yes, good morning, learned Counsel, ladies and gentlemen.  Can we have the appearances for the record please.

MR. GLEDHILL:                    Hello.  My Lord, yes.  So I'm Andreas Gledhill, Kings Counsel and I appear with my learned friend Mr. Brown on behalf of the Campbells companies.

Your Lordship has Mr. Michael Gibbon King's Counsel and with him Mr. Colclough and Mr. Clifton appearing on behalf of the Joint Provisional Liquidators.

MR. GIBBON:                    May I interrupt just briefly.  I'm sorry, Mr. Gledhill.  Unfortunately Mr. Colclough is detained in another matter which has overrun and he sends his apologies to the Court.

THE COURT:                    Okay.  Thank you very much, Mr. Gibbon.

MR. GLEDHILL:                    For the Kobre Respondents My Lord has Mr. Peter Tyers-Smith, who will

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

5

be speaking.  With him Mr. deSwardt, Mr. Watson and Mr. Lowe.

And then last but most certainly not least for The Attorney General of the British Virgin Islands, Your Lordship has Mr. Paul Dennis King's Counsel, with him Ms. Laing and MS. Ryan.

THE COURT:                Yes.

Okay, first things first.  Am I supposed to have a skeleton from the Kobre and Kim Companies?

MR. TYERS-SMITH:        My Lord, with a hung head hearing that, the answer is that, yes, you are.  And it was filed yesterday morning early.

THE COURT:                Okay.  Within which matter was it filed please?

MR. TYERS-SMITH:        My Lord, in the Amber Hill and Lateral Bridge matter.  So that is 003 and 0011.

THE COURT:                Okay.  Let me have a quick look at that.

(Pause.)

Okay.  All right, I'll find it once my assistant catches up.  Thank you, Mr. Tyers-Smith.

So, hang on, where are we?  Skeleton -- hang on, no.  What I'm seeing in, sorry to be boring, I'm looking in number three, okay, 2026, number three.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

6

And the last filings in number three was a Supplemental Authorities Bundle filed by somebody called Kandy James. And then Kandy James also filed a Supplemental Hearing Bundle, that's on the, both of them on the 14th, which is today. And then Kayla Creque filed a skeleton on behalf of the AG today, 8:30 apparently or at 5:00 o'clock yesterday.

And then we have an Authorities Bundle from the AG again filed technically today by Kayla Creque and an Authorities Bundle by Kandy James yesterday. And then there is something filed yesterday at 9:05 a.m. called the AHV and LBG skeleton on CH15 Standing. And that's filed by Kandy James.

So, Mr. Tyers-Smith, is that your skeleton?

MR. TYERS-SMITH:      My Lord, yes, it is. Thank you for taking the tour to get to it, but yes, that's right.

THE COURT:               Okay, very good. I'll download that.

Okay, so we need to probably define what we're dealing with today. I see that there was some discussion in the skeletons about dealing with the Cosimo Borrelli issue of his position. And I saw on one hand I think an insistence that it should be dealt

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

7

with and on the other hand something from the, I think
it's the JPLs, saying that there's agreement that it
shouldn't be dealt with.

So are we dealing with Cosimo Borrelli
today?

MR. GLEDHILL:              My Lord, if I
can perhaps start with the answer to that question.
Mr. Gibbon will correct me if I'm wrong.

So I think the position on the skeletons
was that we were proposing that Your Lordship should
deal with what we refer to as our Strike Out
Application.  The Joint Provisional Liquidators were
proposing that you shouldn't deal with anything to do
with irregularity of Mr. Borrelli's point.

We've given that matter some further
thought.  We think Your Lordship already has a lot on
your plate given the time available to you today
dealing with the one issue that everybody agrees has to
be dealt with which is the issue about Residuary
Powers.  So I'm not going to invite Your Lordship to
hear submissions in relation to our Strike Out
Application.

So I think's common ground then on behalf
of everybody that the one issue that does need to be
dealt with is what I'm going to call the residual

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

8

powers issue.  Because that is an important point to have determined before the hearing in the United States on the 9th of June when there is going to be a very pressing question as to whether or not the various companies before you can appear in their own right and in their own name to oppose.

So the short answer to your question is there was a difference on the skeleton; there isn't one anymore.  And as far as we are concerned, the only issue that we're inviting Your Lordship to determine today is the question of whether or not as the Order of Mr. Justice Mithani currently stands, those instructing me are entitled to appear in the US proceedings.

Your Lordship knows that if we're wrong about that, we are then going to say as a backup that we have an application to vary Mr. Justice Mithani's Order, but we are certainly not asking you to deal with that today either.  We haven't filed any evidence in relation to that.  The issue only arises if we lose today.  So that may be an issue for another day.  But for today it's simply the question of Residuary Powers.

THE COURT:                Yes, very well.

Are we all agreed then that's what we're dealing with, that one issue?

MR. GIBBON:          Agreed.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

9

THE COURT:                    Mr. Dennis?

MR. DENNIS:                   Yes, My Lord.

THE COURT:                    Very good, excellent.  All right, okay.

So basically what's in front of the Court then, we're still probably on what you could call loosely housekeeping in what we're dealing with.  I think what we have before the Court are three applications.  One is an ordinary application filed by the JPLs on the 4th of May and for various declarations I think mainly.

Then we have a Campbells Company Application, so-called Amended Ordinary Application dated the 7th of May.  And then we've got the two K & K Companies' application dated the 1st of May, 2026.  So they all address and they all go to the question of residual powers, don't they?

MR. GLEDHILL:                 My Lord, yes, that's right.  And just so Your Lordship appreciates, so our original application was issued on the same date as the Kobre application.  So the first two applications issued were the ones by us and Kobre.  The reason that you've got the 7th of May as the date is because that's the date on which we amended to say if we are wrong about residuary powers, we are also

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

10

looking for an order in the alternative that the Order

be varied.  In point of time ours and Kobre's came

first.

THE COURT:                Okay, one

moment.  I'm just looking to the Court Reporter who's

asking a question.

(Brief pause.)

All right.  Okay, one moment, we just

need to overcome a logistical difficulty.

(Pause.)

While we're overcoming this logistical

issue, just for clarification purposes, on the Zoom

obviously we can see Blackstone Chambers meeting room.

I take it that, just for the record, that under that

moniker we have Mr. Andreas Gledhill KC and Mr. Toby

Brown, is that right?

MR. GLEDHILL:            My Lord, that's

right.

THE COURT:                So you're both

in the same Blackstone Chambers meeting room?

MR. GLEDHILL:            We are.

THE COURT:                Very good.

Thank you.

Right, we're ready to go ahead then.

So the last issue then is who is going

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

11

first.

MR. GLEDHILL:          My Lord, I don't want to be too dog in a manger about this, but I am going to propose that I do.  Ours was first in point of time.  And we, the cross-application issue by the Joint Provisional Liquidators effectively asked for exactly the same point to be determined a few days later.  And it will be a slightly curious position if I lost my right of reply because my learned friends have issued an application days later seeking exactly the same thing.  So I was proposing to go first.  Obviously Mr. Gibbon may have other views.

MR. GIBBON:          Only to say this, My Lord, we are entirely in the Court's hands.  I don't think, if I may so expressing a personal view, that it's going to matter which order Counsel speak in for Your Lordship to reach a view.  So entirely in the Court's hands.  I'm content for Mr. Gledhill to go first.

THE COURT:          Mr. Dennis.

MR. DENNIS:          I have no contrary view to that position, My Lord.

THE COURT:          Mr. Tyers-Smith?

MR. TYERS-SMITH:     My Lord, no,

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

12

only to say then that if that works, I would propose to follow Mr. Gledhill to make any additional points arising on my application before handing over to Mr. Gibbon.

THE COURT:                Yes, very well then, we will let Mr. Gledhill go first so he has the benefit of his reply so he doesn't complain that he doesn't have a reply.  So we'll let Mr. Gledhill go first.

MR. GLEDHILL:            My Lord, I'm very grateful for that.  I'm also very grateful for my learned friends as well for being able to deal with that matter in that consensual way.

So I've already referred to the issue which is live before Your Lordship today as the residual powers issue.  And that question for practical purposes is whether my client in the case of the 25 Campbells Companies, Mr. Borrelli, includes those companies to oppose the Joint Provisional Liquidators' application for Chapter 15 recognition in the United States.

And as a very point first, it is important to say at the outset that potentially quite a lot turns on that.  Because it not only determines who is entitled to appear at the final hearing in the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

13

United States at the Chapter 15 Application on the 9th of June, it may also be relevant to whether by entering an appearance at the hearing in New York on the 22nd of April, which we did, which scheduling and interim measures were discussed, the Campbells Companies have already fallen into contempt of court, unless they really go on to say that that is in some sense an unrealistic hypothetical scenario.

Can I start by asking Your Lordship to look in Bundle 2 --

THE COURT:                Yes.

MR. GLEDHILL:                -- Tab 19.  And it's Bundle page 1231 please.

THE COURT:                Yes.

MR. GLEDHILL:                My Lord has that -- you'll have in front of you a copy of the transcript of the New York proceedings on the 22nd of June.  You can see that from about a third of the way down the page.  And in the middle of the page you can see that the foreign representatives, so that's the Joint Provisional Liquidators, were represented by Mr. Dietderich of Sullivan & Cromwell.

And if you turn on within this until you get to Bundle page 1330 --

THE COURT:                Yes.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

14

MR. GLEDHILL:                -- and looking at line 11, you're in the middle of Mr. Sullivan's [sic] opening address to His Honour Judge Glenn.

And he says at line 11:

"The first is we want to be very clear that although the internal governance question is one of BVI law, it is a threshold question that needs to be resolved."

Then if My Lord goes over the page to Bundle page 1331 --

THE COURT:                Yes.

MR. GLEDHILL:                -- picking it up at line seven, the Judge says:

"Is that", in other words this preliminary question, "is that teed up in the BVI Court?"

And Mr. Dietderich says this:

"Well, it's not teed up yet in the BVI Court.  We do think, and this is related, that it's not merely a violation of BVI law.  We think this violates the bold text penal notice.  So, in our view, it's contempt of" this "BVI High Court.  We don't know what we will be doing in response to that..."

So the suggestion is already being made in the US Chapter 15 proceedings that we are in

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

15

contempt of court, of this court by virtue of the appearance which we've issued.  So as I've indicated, this is an issue of some significance to those who are instructing me.

Now as Your Lordship knows, we are perfectly, we say we are perfectly entitled to do what we have done to date in the United States.  We say we are perfectly entitled to continue to do it on the true construction of Mr. Justice Mithani's Order of the 9th of January.  And I'm going to come on to the terms of that Order in a moment.

But before I do, may I start by setting the scene by showing you three provisions in the Insolvency Act that are relevant for this purpose.

THE COURT:                Yes.

MR. GLEDHILL:                My Lord has our Authorities Bundle.  And turn within that to Tab 2.

THE COURT:                Yes.

MR. GLEDHILL:                Within that we have a little run of material provisions from the Act.  And if you go on to bundle page 6, the first of three provisions to look at is section 171 entitled, 'Rights and Powers of Provisional Liquidator'.

171(1):

"Subject to subsection 2, a provisional

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

16

liquidator has the rights and powers of a liquidator to the extent necessary to maintain the value of the assets owned or managed by the company or to carry out the functions for which he or she was appointed."

Sub (2):

"The Court may limit the powers of a provisional liquidator in such manner and at such times as it considers fit."

So in broad terms the provisional liquidator has the powers of a liquidator which are set out, of course, in Schedule 2.  And I'll come on to Schedule 2 with Your Lordship in a moment.  But that's subject to two qualifications.

The first is the one that you see in subsection (1), the final line, final couple of lines.  So those Schedule 2 powers are only exercisable for the interim conservatory function which a provisional liquidator has, that's the force of the words, to the extent necessary to maintain the value of the assets and so forth.

And then the second qualification is what you see in subsection (2), so the Court can, if it thinks fit, cut back the section (2) powers upon appointment.

For the second relevant provision, if My

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

17

Lord turns on to bundle page 7 --

THE COURT:                     Yes.

MR. GLEDHILL:                  -- you should have there section 175 entitled "Effective Liquidation".

"175(1):  Subject to subsection 2 with effect from the commencement of the liquidation of a company..."

And just pausing there, we don't have it in this Bundle, but it's in fact in the Kobre Bundle, commencement of liquidations defined in section 160 to mean the time at which the liquidator is appointed.

So "with effect from the commencement of the liquidation of the company", (b), "the directors and other officers of the company remain in office but they cease to have any powers, functions or duties other than those required or permitted under this part or authorised by the liquidator".

And this is an interesting provision because it's, in fact, different to the provisions of the English Statute which we quoted in our skeleton. The English Statute in very broad terms says that directors only have such powers post-liquidation as the liquidator or general meeting permits.  Under the BVI legislation, they retain their powers "to the extent

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

18

required or permitted" under Part 6.  But of more
immediate relevance for Your Lordship's purposes is the
point that what you see here, of course, is that it's
only upon the appointment of liquidators that the
directors lose any powers at all pursuant to statute.

So when provisional liquidators are
appointed, if the directors lose any of their
preexisting powers at all, they do so only because of
the terms of the Order appointing the provisional
liquidators, it's not pursuant to anything in this
statute.  It's not a matter of statute, it's not a
matter of case law, it's purely a question of
construing the relevant order.

And then the third relevant provision for
Your Lordship's purposes you see if you turn on to
bundle page 9.  And you see there at paragraph, section
472, "authorisation of insolvency officer to act in a
foreign country".

472:  "The Court may on the application
of an insolvency officer, authorise him or her to act
in a foreign country on behalf of the Virgin Islands
insolvency proceeding as permitted by the applicable
foreign law."

So this provision has nothing to do with
director powers.  Effectively what it means is that

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

19

before an officeholder can go off and seek recognition

overseas, he or she has to come and get an order from

the BVI Court first.

Now, I'll come back to the statute again in a moment with Your Lordship if I may. So if you can keep that in whatever way is convenient so that you can readily refer back to it.

THE COURT: Yes.

MR. GLEDHILL: But at this point I'm going to take you to the Mithani Order as I'm going to call it, without intending any discourtesy to the learned Judge I hope, which is in the Hearing Bundle at Volume 1 at Tab 12. Within that it starts at bundle page 113.

THE COURT: Yes.

MR. GLEDHILL: Now, this is the Order which appointed the Joint Provisional Liquidators on the 9th of January. And it's the Order which defined their powers. And we made the point in our skeleton argument that there are in effect two, if I can put it this way, buckets of powers conferred by this Order. And in our submission to Your Lordship it is extremely important to distinguish clearly between them.

The first of those two buckets Your

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

20

Lordship sees if you go to bundle page 114 and start by looking at paragraph 2.

Paragraph 2 at the foot of the page:

"The Joint Provisional liquidators have the rights and powers of a liquidator to the extent necessary to maintain the value of the assets owned by the company and to carry out the functions for which they are appointed."

So this in very broad summary tracks section 171 which I showed Your Lordship a moment ago. It confers the powers of a liquidator on the JPLs but only for the interim conservatory purpose pending the hearing of the Winding Up Application.  And as I said a moment ago, those powers are contained in Schedule 2 of the Act.  So if we can get that back out again now, that's our Authorities Bundle at Tab 2.  And this time please we're looking at bundle page 10.  So our authorities, Tab 2, page 10.

THE COURT:                Yes.

MR. GLEDHILL:             And if My lord has that, you see a third of the way down Schedule 2, "pursuant to section 186, powers of a liquidator".  And for your purposes, the key provision is paragraph 4, "power to commence, continue, discontinue or defend any action or other legal proceedings in the name and on

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

21

behalf of the company".

So subject to the qualification that Your Lordship has seen in paragraph 2 of the Order, Joint Provisional Liquidators have the power both to commence and discontinue proceedings in the company's name pursuant to Schedule 2, paragraph 4.  But My Lord now looks back at Mr. Justice Mithani's Order, so we're back in Hearing Bundle 1, Tab 12, and this time please moving on to bundle page 117 --

THE COURT:                Yes.

MR. GLEDHILL:             -- you see paragraph 10:

"Save as provided in paragraph 3 above", I'm going to come on to that next, "save as provided in paragraph 3 above the Joint Provisional Liquidators may not exercise any of the powers set out at Schedule 2 to the Insolvency Act, 2003 without" the "sanction of the court."

So subject to what I'm about to say, JPLs can only exercise their power over proceedings in the company's name by first getting an order for sanction. And until they get that order for sanction, the directors retain their preexisting power over proceedings.  And that's the consequence of section 175(2)(b) which I showed Your Lordship a moment ago.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

22

But there is a refinement of that position and that brings me on to the second of the two buckets of powers which this Order vests in the JPLs.  And My Lord sees that if you turn back to bundle page 115.

THE COURT:                Yes.

MR. GLEDHILL:                And on that we're now looking, of course, at paragraph 3.  So it starts, paragraph 3 at the top of the page:

"In addition to the powers outlined in 2 above, the JPLs shall have the following specific powers which may be exercised without further sanction or intervention of this Honourable Court."

So in contrast to the powers I just showed you at paragraph 2, these powers are expressly exercisable without full control; without sanction. And for Your Lordship's purposes, the two relevant provisions are the ones that you see at (c) and (d).

So starting off with (c), there's the power:

"To seek the recognition (or its equivalent) to the appointment of the JPLs in the United States..."

Just pausing there, notice that the United States is specifically the Court's contemplation.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

23

"...United Kingdom, Singapore, Hong Kong, Taiwan, Thailand and Cambodia or elsewhere for the purposes of securing, realising and remitting assets to the control of the JPLs and for the purpose of obtaining access to and control of the records of the Company."

So just pausing there, that's nothing to do with the question of whether proceedings can or cannot be brought by them or by anybody else in the name of the company.  What this provision does is to allow the JPLs themselves, the individual officeholders to go off overseas and make an application in their own names to have themselves recognised.

That separate question of who can then bring proceedings or not in the name of the company is the one that's dealt with in the next following sub-paragraph, sub-paragraph (d).

"D", the power "to commence, continue discontinue or defend, including by way of counterclaim or similar response, any action or other legal proceedings in the name and on behalf of the Company in so far as necessary to protect the assets and information of the Company..."

So this paragraph, paragraph (d), overlaps with the power to bring or discontinue

24

proceedings which Your Lordship saw a moment ago in Schedule 2, paragraph 4. But there is an obvious and important difference. First of all this power, unlike the Schedule 2 power, is exercisable without sanction. That's the first three lines of paragraph 3.

But, secondly, it's exercisable only in a limited sub-category of cases being those where litigation in the company's name is necessary, looking at the last line of that passage that I read, to protect the assets and information of the company.

I'll come back to that. But say for the moment that we are in a situation, hypothetically, where litigation is necessary for the purpose stipulated in paragraph 3, 3(c), the next question is what powers do the companies' directors still have in that regard. And the answer to that question for your purposes you derived from bundle page 117 again. We looked on that page a moment ago at paragraph 10, we're now looking at paragraph 9:

"The powers set out in paragraph 3 above", so that's what I've just read, "are to the exclusion of any power exercised or purported to be exercised by any existing director of the Company in so far as such power concerns the affairs of the Company and its assets within the jurisdiction of the Virgin

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

25

Islands."

So the directors are prohibited, where this provision is engaged, from exercising their own powers to bring proceedings if you're in a case that falls within paragraph 3(d) of this Order if the liquidators' power without sanction under paragraph 3(d) is exercisable. But even in a case where 3(d) applies, the prohibition which Your Lordship sees in paragraph 9 only extends to where the 3(d) power concerns the affairs of the company and its assets within the jurisdiction of the Virgin Islands. So even in a case otherwise within 3(d), the directors still retain their power to cause the company to litigate in matters that do not concern the affairs of the company and its assets within the jurisdiction of the Virgin Islands.

So that, in our submission, is how we say the Order of Mr. Justice Mithani works. But before I draw out the implications of the explanation I've just given, I just wanted to make one more preliminary point if I may. If you keep Mr. Justice Mithani's Order to hand but now go to the skeleton arguments. I don't know what form you have those in, but I am going to ask My Lord to have a look at the skeleton argument from my learned friend Mr. Gibbon on behalf of the Joint

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

26

Provisional Liquidators.

THE COURT:                    Yes.

MR. GLEDHILL:                 And within that if you please turn on to the second page.  And we're looking please at paragraph 4.

And my learned friend says this:

"The directors of" the "27...Companies do not want the JPLs to be recognised in the US."  They "contend that they can (or should be able to) oppose the JPLs' recognition... in the name of the companies over which the JPLs have been appointed.  What the directors envisage is a contested recognition hearing in the US between, on the one hand the JPLs and, on the other hand, the Companies themselves...  This would be an unusual state of affairs."

So the suggestion by my learned friend is that if we are right in what we say the legal analysis is, it leads to the absurd position where the debtor companies would be opposing the JPLs' application for Chapter 15 recognition.  And that's, in fact, a point which is made at a number of separate junctures in this skeleton.

To pick up on another instance of it, if you go on until you get to skeleton page 6 and look at paragraph 18.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

27

THE COURT:                    Yes.

MR. GLEDHILL:                    Then my learned friend is talking about what happened at the hearing before Judge Glenn in April and he says:

"The JPLs found themselves in the extraordinary position that they were facing objections to their applications for recognition of their own appointment apparently from the very companies over which they were appointed."

But, My Lord, as you've seen from our skeleton argument, we say that the suggestion that there is anything unusual about a debtor company resisting a Chapter 15 application in the United States for recognition is quite mistaken.  And the reason for that, Your Lordship gets if you go now to our Authorities Bundle again please.  And this time within that go to Tab 4.

THE COURT:                    Yes.

MR. GLEDHILL:                    My Lord has here an extract as you can see from the front page, bundle page 18 of the Federal Rules of Bankruptcy Procedure.  It's a very short point.  It emerges from page 19 over the page.

Rule 1012 at the bottom of the page, 'Responsive Pleading in Cross-Border Cases':

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

28

"(A)  Who may contest the petition.  The debtor or any party in interest may contest a petition for recognition of a foreign proceeding."

So far from it being, to quote my learned friend, extraordinary that the companies should resist the Chapter 15 application, there are, in fact, specifically identified in the Federal Bankruptcy Rules of the party primarily entitled to do precisely that. And against that background, if My Lord now goes back to Mr. Justice Mithani's Order.  So we're now back in the Main Hearing Bundle at Volume 1, Tab 12 and looking at bundle page 115.  Apologies for making you jump around.

THE COURT:                Yes.

MR. GLEDHILL:                Focusing again on that (d), that paragraph 3(d), the core question for Your Lordship today becomes whether the exercise of the procedural right of the debtor companies conferred by the US Bankruptcy Rules to oppose an application for Chapter 15 recognition was, in the wording of this paragraph and the last two lines, requiring to be exercised, 'to protect the assets and information of the company'.

Because if it was necessary to oppose the Joint Provisional Liquidators' application in the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

29

United States, "to protect the assets and information of the company", it would follow from that that opposition could only be mounted by the Joint Provisional Liquidators.  Because 3(d), as Your Lordship has seen, confers exclusive standing on them to litigate or discontinue in the company's name.

Contrary wise, if opposing the liquidators' application is not necessary for the purpose of "protecting the assets and information of the company", it's our proposition to Your Lordship that that power had stayed with Mr. Borrelli.

Now, that factual question, is it or is it not necessary to protect the assets and information is, of course, a factual question.  And the first thing to say to Your Lordship about it is that there is no suggestion in the Joint Provisional Liquidators' evidence of this hearing, which is Mr. Drury's witness statement, that the Joint Provisional Liquidators have concluded that it is or indeed have ever even addressed their minds to that issue.  And that is, of course, we say entirely unsurprising because they are themselves the Applicants in the United States proceedings.  They could not possibly take the position before the United States Court that their Recognition Application should be granted, while maintaining in this court that

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

30

resistance to that application in the name of the companies is nevertheless "necessary to protect the assets and information of the companies".

And if that is so, then in our respectful submission to Your Lordship, that is the first of two reasons why Mr. Borrelli is perfectly entitled to do as he has.  His powers are not excluded by paragraph 9 of Mr. Justice Mithani's Order which I showed you.  That was at bundle page 117.  Because opposing the Chapter 15 Recognition Application squarely in line with what the US Federal Bankruptcy Rules contemplate is simply not within the scope of paragraph 3(d) of this Order.  And if that's right, Mr. Borrelli retains the power to control who directs the company to litigate or not.

But there is a second point which is this.  That quite independently of that, by doing what he is doing Mr. Borrelli is not interfering either with the administration of the affairs or assets of the company within the Virgin Islands in any event.  Just to remind you of the relevant language in that regard, it was back at bundle page 117.

It was paragraph 9 which reads again:

"The powers set out in para 3 above are to the exclusion of any power exercised or purported to be exercised by any existing director."

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

31

Then importantly this:

"Insofar as such power concerns the affairs of the company and its assets within the jurisdiction the Virgin Islands."

What Mr. Borrelli is doing is not interfering with anything within the jurisdiction of the Virgin Islands.  It is not interfering with the affairs of the company or its assets for precisely the reason that the whole focus of the United States application is to gain recognition for the Joint Provisional Liquidators within the jurisdiction of the United States Courts so that they can safeguard assets and information enjoyed by the companies within that jurisdiction and not within the BVI.

So, My Lord, that is in very simple form how we put the argument on construction and why we say for two separate reasons it is simply incorrect to suggest, as the Joint Provisional Liquidators have done, that Mr. Justice Mithani's Order in some way prevents Mr. Borrelli from causing the companies to appear in the US Bankruptcy Court.

I am going to come on in a moment to the submissions I have to make in relation to the case law. But before I did that, can I deal with one point which arises out of the skeletons both for the Joint

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

32

Provisional Liquidators and for the Attorney General.

THE COURT: Yes.

MR. GLEDHILL: And going back in the Order of Mr. Justice Mithani, there's one provision that which is important which I haven't yet shown you which you see on the first page which is bundle page 113.

THE COURT: Yes.

MR. GLEDHILL: And, of course, you see it's endorsed with a penal notice. And the first paragraph says this:

"The effect of this order is that the directors, former directors, officeholders and former officeholders of the respondent local title are replaced by the Joint Provisional Liquidators and that the directors, former directors, officeholders and former officeholders are prohibited from taking any action in relation to the company's affairs without prior consent of the Joint Provisional Liquidators."

Now, both my learned friends Mr. Gibbon and Mr. Dennis seek to rely on that paragraph in their respective skeleton arguments as fortifying the submission that Mr. Borrelli cannot cause the companies to do what he has done presumably on the basis that that is an infringement of that paragraph.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

33

Just start by noting in point of fact that that paragraph does, in fact, purport to direct anybody to do anything.  On its face it's simply a statement of fact about the effect of the provisions which follow in the Order.

I have other things to say about that though and the first of all is this.  That the penal notice is not, in fact, part of the Order nor is it relevant to interpret it.  And there are a couple of cases that it's helpful to show Your Lordship in that respect.  Back in our Authorities Bundle, the first point you find at Tab 10 --

THE COURT:                Yes.

MR. GLEDHILL:             -- it's a decision of His Honour Judge Paul Matthews sitting as a Deputy Judge of the High Court.  My Lord doesn't need to know anything about the facts.  If you just turn on to the last page, bundle page 92.

THE COURT:                Yes.

MR. GLEDHILL:             I can show you what's being discussed just by reading out the first couple of lines at paragraph 50.  The second point was about the penal notice:

"It appears from e-mails that were passing between the Defendant's Counsel and the Court

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

34

on the 26th July after the order of Judge which had been made, and it was the Judge himself, that it was the Judge who had decided to attach the penal notice that he would himself even though it hadn't been sought in the application by the Claimant."

And then that feeds into the discussion which you see at paragraph 51 where the Judge says this:

"I only add this:  That, in my judgment, it is not actually a matter for the judge at all as to whether a penal notice is attached, because, as I understand the matter, a penal notice is not part of the order.  The penal order is necessary", I think that should be penal notice, "the penal notice is necessary because a party obtaining the order wishes to be able to enforce that order by committal, but you cannot enforce a court order by committal without a penal notice being attached.  And that is why, if you look in the Chancery Guide at" para "16.30 to 16.33, you will see the explanation given that it is always the party that wants the penal notice added that has the burden of saying so or doing it if that party is drafting the order or supplying it to the court, if the court is drafting the order.  I have never understood that it was part of the judge's function actually to insert a

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

35

penal notice, certainly, against the wishes of the parties.  That concludes my judgment."

So the scope of the penal notice is neither here nor there.  And if Your Lordship wanted more authority for that, you find that in a case which you find at the preceding tab in our Authorities Bundle at Tab 9 at bundle page 73.

THE COURT:               Yes.

MR. GLEDHILL:               This was a case about child care proceedings.  And on the facts the grandfather in this case had custody of the child, but the child had been taken out of the jurisdiction by his father.  So the grandfather brought proceedings against the father or the mother to compel the child's return.  You can see it's before a strongly constituted Court of Appeal comprising Lord Aker and Lord Mustill as they subsequently became, plus Lord Justice Nourse.

And if My Lord turns on to bundle page 75, you can see towards the bottom of the page, about two-thirds of the way down, you can see the order which the grandfather initially got.  Do you see the sentence starting, "at the conclusion of the hearing"?

THE COURT:               Yes.

MR. GLEDHILL:               "At the conclusion of the hearing, Judge Gill made an order

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

36

which was reduced to writing in the following terms:

1.  The First Defendant" -- so importantly that's the mother, "the First Defendant", the mother, "be committed to prison for contempt of Court suspended for twenty-one days..."

And then:

"2.  The child (...) be returned to the jurisdiction of this Court within ten days of the date of this order."

And paragraph 2 is important because it's not clear on its face whether that order, whether that mandatory order was addressed to the mother, to the father who had taken the child away to, as it happens, Italy or to both of them.  And one of the points relied upon by the grandfather, there was a further set of committal proceedings after there was no return during the currency of the suspended sentence of imprisonment. You see in that paragraph one.  And the grandfather then applied to commit the mother to prison for breach of paragraph 2 of this order.  And one of the points that he relied on in those committal proceedings was that that paragraph 2 that I've just read out to you failed to be construed by reference to the penal notice which had been expressly directed to the mother.  And you see that if you just glance up the page, it's in

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

37

fact the first two lines.

So this was the relevant penal notice. Take notice -- sorry, in fact, you have to go back one page to page 74 at the foot of the page:

"The order was endorsed with a penal notice in the following terms to the mother."

And back over at paragraph 75:

"Take notice that unless you obey the directions contained in this order you will be guilty of contempt of Court and will be liable to be committed to prison."

So the submission on behalf of the Applicant grandfather was paragraph 2 at the bottom of page 75 may have been unclear who it was directed at. But when you read it together with the penal notice, it was quite clear that paragraph 2 was directed at the mother.  That point is treated by Lord Mustill whose judgment we are in at bundle page 79.  And My Lord can see about a third of the way down there's a passage that's entirely consistent with the discussion of His Honour Judge Matthews that I've just read out to Your Lordship.

"Turning to the second part of the order, we find a requirement that 'The child be returned to the jurisdiction of this Court within ten days...of

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

38

this order'.  This formula is open to objection on two grounds.

1.  It is not clear whether the order was directed to both defendants, or to one alone, and if so to which defendant."  These are the important words. "The penal notice is not part of the order, and cannot be used to construe it."

So we suggest to Your Lordship that that is about as clear as you could wish in terms of authority.  The terms of the penal notice to Mr. Justice Mithani's Order are irrelevant to the question which Your Lordship have to decide.

If we go back now to the penal notice and have a look at that.  So we're back in the Hearing Bundle, Volume 1, Tab 12 at page 113.  I've already made the point.  If you look at that opening paragraph, "the effect of this Order", all it's even purporting to do is to summarise the terms of what follow.  And in our submission to Your Lordship, the terms of that first paragraph go far beyond the terms of the Order they purport to summarise.  They are, in fact, completely inconsistent with the limited displacement of the directors' powers in paragraph 10 which we showed Your Lordship earlier on.

And I make this further point, that this

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

39

purported summary of the effect of the Order is inconsistent even with the Joint Provisional Liquidators and the Attorney General's own analysis of how this order works.  Because both of them accept that at the very least, Mr. Borrelli did have the power to cause the Campbells Companies to oppose winding up and to seek removal of the Joint Provisional Liquidators most recently at the hearing before Your Lordship which I appeared on on the 16th and 17th of April.

But on its face, even that is contrary to the first paragraph of this penal notice.  There's no carve out for that.  So, My Lord, in our respectful submission we've seen the authorities.  The penal notice is irrelevant to the question of construction you have to decide.  And on any view it is a complete mischaracterisation of the operative [inaudible] of the order which follow on from it.

My Lord, that's all I was going to say about construction.  I'm now turning to what we say you get out of the authorities.  And it's important to stress that this is an alternative submission.  We only get to this question if contrary to the submissions that I've been making up to this point Your Lordship reaches the conclusion that the Mithani Order does create a prima facie bar to Mr. Borrelli causing the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

40

Campbells Companies to appear in the United States.

And the first thing to say is that as we point out in our skeleton argument, it is common ground between the parties that even if Mr. Justice Mithani otherwise creates a blanket prohibition, there is a residual class of powers which directors are usually regarded as having specifically to oppose winding up to seek to displace provisional liquidators.  We say other things as well.  And so by this stage of the argument, the question for Your Lordship is simply how wide does that accepted class go.  It's common ground that there is a class, the question is simply as to how wide it goes.

Now, for Your Lordship's purposes, we suggest that the starting point is to go back into our Authorities Bundle and to look at a case which you find at our Tab 8, bundle page 70.

THE COURT:                Yes.

MR. GLEDHILL:                It's a case of Mr. Justice Plowman dating from 1971 called Union Accident Insurance.  And it is, I think, common ground that this is the leading authority in relation to the question of what the powers of provisional liquidators are -- just forgive me, what the powers of directors are after the appointment of provisional liquidators.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

41

My learned friend Mr. Gibbon has helpfully set out the facts in detail in his skeleton argument so I'm not going to trouble Your Lordship with that.  It's sufficiently summarised there.  And I'll take you straight to the material passage which you find on the last page of the Report at bundle page 72.

THE COURT:                Yes.

MR. GLEDHILL:                And if you have that, by letter 'B', do you see a sentence starting, "no doubt that is so"?

THE COURT:                Yes.

MR. GLEDHILL:                Can I invite you to read that, just to save my reading voice, to read from that sentence, "no doubt that is so", down to the end of the judgment please.

THE COURT:                Yes.

(Thereupon, the Court peruses paragraph.)

Yes.

MR. GLEDHILL:                So the skeletons before Your Lordship, there are two suggested approaches.  We take a wider approach.  We say that the question in any given case is whether the provisional liquidator could appropriately give instructions on behalf of the company.  So that's referencing the words Mr. Justice Plowman uses between letters D and E of the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

42

extract that you've just read to yourself.

Mr. Gibbon and Mr. Dennis take a narrower approach and they say in effect that the class-accepted cases confine to resisting the petition and applying to discharge the appointment of the Provisional Liquidators.

Now, as Your Lordship will see from Mr. Gibbon's skeleton argument, the JPLs rely on a body of Commonwealth authority which say, which they say supports their narrower approach.  We say in response to that the cases decided under different category of schemes are not of any assistance to Your Lordship. But we also say more fundamentally that those cases prove nothing.  Because the facts before you have no parallel in them or indeed in any previous case that we are aware of.

The problem with which Your Lordship is specifically concerned here is where proceedings in the United States for recognition are in being in circumstances where the Rules quite specifically contemplate the situation which the officeholder will be the applicant and the debtor company will be the respondent.  None of the cases relied on by my learned friends concerns a situation remotely like that.  None of them says that where a provisional liquidator makes

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

43

a Chapter 15 application, the company is not, without the consent of the provisional liquidator himself, entitled to the exercise, to exercise the right to appear to oppose which the US Federal Bankruptcy Rules expressly confer on it.

In the language of Mr. Justice Plowman, which I showed Your Lordship a moment ago, we say it cannot possibly be "appropriate for the provisional liquidator to give instructions on behalf of the company" to oppose his own application.  And none of the cases upon which my learned friends rely says anything different to that.

But we do have a further submission going forward from that and developing that point.  Just assume against me for the moment that my learned friend is correct and that the position is confined to this, that the only circumstances in which the directors of the company can cause the company to resist proceedings is in the case of the petition to wind up or an appeal from the petition, or in seeking to supplant or replace or remove the provisional liquidators from office.  Even if that is the case, I say that we still get through.

Postulate this hypothetical case.  I'm a director of a company, provisional liquidators are

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

44

appointed and I cause the company to apply to discharge that appointment maybe, as here, for allegations for serious failings in the obligation of full and frank disclosure.  My learned friends are constrained to accept that I am perfectly within my rights to do that.

Now take the analysis a stage further. Assume that the original order appointing the provisional liquidators didn't give them a power to sell assets.  So with my application to discharge outstanding, the Provisional Liquidators go back to court seeking a variation of the original order to allow them to sell things.  Can I oppose that?  Can I cause the companies to oppose that?  Of course I can. Be nonsense if the residual powers principle allowed me to challenge the original order but didn't permit me in the meantime to object to an attempt to augment the scope of that order.

And if I'm right about that, we say can't make any possible difference that the application, as here, is an application made to a foreign court to which it heard at the hearing on the 16th and the 17th of April we maintain that the Joint Provisional Liquidators should never have been appointed in the first place.  We say that they only were so because of egregious breaches of the disclosure duty at the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

45

hearing before Mr. Justice Mithani on the 9th of January, for example, claiming that there was a risk of dissipation warranting a without notice hearing when there was plainly no such risk given to the subsistence of sanctions.

As Your Lordship will see from the skeleton, the Joint Provisional Liquidators, in fact, applied for Chapter 15 recognition full well knowing that that challenge to the validity of their appointment was in being that those points were going to be run.  And they issued their application for Chapter 15 recognition about a week before the hearing on the 16th and 17th of April well knowing that those issues would be ventilated at that hearing.  Why they chose to do that at that time and against that background has never been explained but it's certainly a point which those instructing me are going to be making vigorously at the hearing for recognition in the United States.

Be that as it may, the Joint Provisional Liquidators' position today amounts to say that if we continue to do that in the United States, we fall foul of the Order.  Because while we are entitled to seek to set the Order aside in the BVI, until it actually is set aside we're not entitled to try to stop the Joint

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

46

Provisional Liquidators from gaining further powers for themselves in reliance on that impugned order.  We say that cannot possibly be right.  And we also say that the fact that there is no previous case that we can point to, which my learned friends are able to point to which consider that situation, does not constrain you to reach the conclusion that the Joint Provisional Liquidators can proceed in that, I submit, thoroughly oppressive way.

My Lord, that takes me to the last point that I was going to make, mindful of the time.  It's a short point.  It's one I've trailed in my skeleton and it's this.  Your Lordship has just seen that the Order of Mr. Justice Mithani is endorsed with a penal notice. Pointed out at the start of my submissions that the suggestion has already been made in the United States proceedings that we face the possibility of committal proceedings further having the temerity to enter an appearance in the United States.  In those circumstances, Your Lordship will no doubt have well in mind the principle that orders featuring penal notices have to be clear and unequivocal and thought to be strictly construed.

And if I can show Your Lordship what Mr. Gibbon and I both cited as the controlling authority on

47

this point, it's in our Authorities Bundle at Tab 11.

THE COURT:                Yes.

MR. GLEDHILL:             And it's a decision of the Court of Appeal in a case called Pan Petroleum.  See, it dates from 2017.  And the judgment I am about to show you is a passage in the judgment of Lord Justice Flaux as he was at that point.  You don't need to know anything about the facts of this.  You can just turn on until you get to bundle page 107.

THE COURT:                Yes.

MR. GLEDHILL:             You have a heading towards the bottom of the page, "the applicable legal principles".  Can I just ask you to read that paragraph 41 with its three sub-paragraphs continuing over the page.  Can I ask you to read that to yourself.

THE COURT:                Yes.

(Thereupon, the Court peruses paragraphs.)

Okay.

MR. GLEDHILL:             My Lord, for all the reasons I've given, we say that we are clearly right on the question about the extent of Mr. Borrelli's residual powers.  But even if Your Lordship is in doubt about it and considers that the matter is one of difficulty and ambiguity, we do say

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

48

that the clear principle is that we should not be exposed to the risk of having committed a contempt of court on the basis of ambiguous provisions.  And that any ambiguity consequently falls to be resolved in our favour.

My Lord, unless I can assist you further those were the submissions I was proposing to make.

THE COURT:                    Yes, thank you, Mr. Gledhill.

So, Mr. Tyers-Smith, please.

MR. TYERS-SMITH:        My Lord, yes.

You may have seen or at least you will have heard in opening that the applications as between my client Amber Hill and Lateral Bridge are materially similar, if not identical, to those that are made on behalf of the Campbells Companies.  I don't need to take you to it, but it's in Volume 1 at page 72, and effectively seeks the same declaratory relief in the resolution of this issue.

So it's for that reason as it was at the final hearing of the liquidation applications that I will gratefully adopt the submissions made by Mr. Gledhill on behalf of his director clients, and I will say that those submissions apply equally to the incumbent directors of both Amber Hill and Lateral

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

49

Bridge.

There are two points then that I come to by way of amplification or augmentation.  And the first relates to the matter of displacement which I accept that Mr. Gledhill has already touched upon.  But I do just want to show you the full suite of the relevant provisions of the Act just so it's made clear that there is no statutory displacement of powers in the British Virgin Islands under the 2003 Act.  And there will be a point of distinction that I will draw from that in respect of one of the cases that my learned friend Mr. Gibbon relies upon, which is the objective case and the Australian authority that he relies upon for the proposition that any residual powers can only be exercised in the interest of justice.  But as an Australian case, as My Lord would appreciate, is based on the Australian Statute, which again is materially different to the 2003 Act.  So I'll make that point first.

And the second point that I will then come on to is really just to develop the hypothetical point that Mr. Gledhill made a few moments ago about the absurdity of the proposition that this power to object to Chapter 15 can only be vested in the very people that have exclusive power to make and pursue

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

50

that Chapter 15 proceeding in the first place.

So, My Lord, if I can deal with the first point of augmentation on the law first.  Can I ask you please to turn up our Bundle of Authorities.  And it's under Tab 13.

THE COURT:                  Yes, one moment.

MR. TYERS-SMITH:        And it's page 168.

THE COURT:                  One moment.

Okay.

MR. TYERS-SMITH:        So, My Lord, the starting point, as did Mr. Gledhill, was section 175.  So you can see that this provision deals with the effect of the liquidation.  You'd already been taken to section 175(1)(b).  But before looking at (b), again just to seize upon the fact that the provisions under this section take effect from the commencement of liquidation of the company.  And then you see at (b) that there is a statutory displacement of powers as set out there.  And that then engages the question, well what is the commencement of the liquidation.  And I know that My Lord will know the answer to this question, but if I can ask you please to turn back in our Authorities Bundle and find page 161 again under

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

51

Tab 13.

THE COURT:                    Yes.  Yes.

MR. TYERS-SMITH:          And it's section 160 headed "Duration of Liquidation".  Does My Lord see that?

THE COURT:                    Yes.

MR. TYERS-SMITH:          Yes.  So the liquidation of the company commences at the time at which a liquidator is appointed as provided in section 159 and continues until termination.

So, My Lord, this shows you that the displacement of the fact of section 175(1)(b) only occurs in the context of the appointment of a liquidator under section 159.

And finally then just to complete this, if My Lord can just look at section 159 and you'll see section 159(1)(a).  Obviously that talks about an application made to appoint a liquidator of a company on an application under section 162 which, of course, was the application made by the learned Attorney General at the hearing over the 16th and 17th of April.

So what My Lord can take from that very clearly is that there is no statutory displacement of my clients Amber Hill and Lateral Bridge's incumbent directors' powers as a matter of statute.  And I said

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

52

that I would just alight upon a point of comparison in

respect of one of the authorities relied upon by my

learned friend Mr. Gibbon.  And perhaps I can ask you

please to take up his Bundle of Authorities.  And it is

page 72 --

THE COURT:                One moment.

MR. TYERS-SMITH:          -- under Tab 4.

THE COURT:                Okay.

MR. TYERS-SMITH:          My Lord should

have the case of Object Design v. Object Design

Australia.

THE COURT:                Yes.

MR. TYERS-SMITH:          Now this is

cited by Mr. Gibbon at paragraph 29.2 of his skeleton

argument for the proposition that the residual power

rule, so the question of whether displacement gives way

to residual powers is really focused on what is

required in the interest of justice with which I don't

really materially disagree.  But I do want to show you

the differences in the Australian legislation on which

this case was based.  And if My Lord can please have a

look at page 72.  And it's about a third of the page,

third of the way down the page where reference is made

to, Counsel for the Applicant relied upon section

47(1)(a)(2) of the Australian Corporations Law.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

53

Does My Lord see that?

THE COURT:            Yes.

MR. TYERS-SMITH:            And if My Lord please, can you just read to yourself what appears to be sub-section 2 starting, "(1), provisional liquidator of a company".

THE COURT:            Yes.

(Thereupon, the Court peruses paragraph.)

Okay.

MR. TYERS-SMITH:            So, My Lord, unlike other jurisdictions where the statute does have an automatic displacement of powers, that is not so in the BVI.  Because as you've seen, section 170 and 171, which are the two provisions that deal with the appointment of provisional liquidators, do not have any such effect.  And they don't incorporate any like provisions to the ones that you see in the Australian Corporations Law.

So, My Lord, really what that establishes is that, the question of whether my clients' incumbent directors powers to cause other companies to appear in the Chapter 15 proceedings has been displaced is purely one of interpretation of your Brother Judge, Mr. Justice Mithani's Order appointing the provisional liquidators.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

54

So, My Lord, that's all I need to say about that, because at this stage I adopt Mr. Gledhill's submissions on why it is that it is not to be said that the power to oppose a Chapter 15 proceedings have been assumed to the Joint Provisional Liquidators to the exclusion of the incumbent directors of Lateral Hill and Amber -- sorry, Amber Hill and Lateral Bridge.

Now, the final point that I just want to alight upon is why in practice that is so important. And this isn't a hypothetical even though it derives from the way that Mr. Gledhill explained why it would be an absurd outcome.  For my clients, I say it's more fundamental.  What I intend to do is show or give an illustration as to how this can cause real injustice to Amber Hill and Lateral Bridge.  What I'd like to do is just start with a respectful reminder of the principles that govern the role of provisional liquidators.  And I won't take long because I know very well that My Lord will be familiar with these principles.

But can I start with the authority which is found under Tab 1 of our Bundle of Authorities, and it's a case called Carapark.

THE COURT:              Yes.

MR. TYERS-SMITH:       So My Lord,

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

55

this is a decision of Justice Street, as he then was, of the Supreme Court of New South Wales.  And this concerned -- you don't need to be too concerned -- the facts -- in summary, the question was whether a provisional liquidator have the power and was, therefore, required to make a payment out of a sum of around 10,000 pounds that he had secured to the Deputy Commissioner of Taxation.  And the powers of the provisional liquidator in this case are set out or recorded on page 383.  So it's page 2 of our Authorities Bundle.  And again it's around two-thirds of the way down this passage starting with the paragraph, "the section under which the provisional liquidator".

Does My Lord see that?

THE COURT:                No, I don't.  I mean, I'm in Carapark, am I?

MR. TYERS-SMITH:          Yes, I'm sorry, yes, you are.

THE COURT:                Yes.  I'm in Carapark in your Authorities Bundle.  And the internal Law Report page number is what, sorry?

MR. TYERS-SMITH:          338.

THE COURT:                Ah, yes, the second page, 338.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

56

MR. TYERS-SMITH:          Yes, I'm sorry.

THE COURT:               Okay.  And, yes, all right.

MR. TYERS-SMITH:          Tracking --

THE COURT:               Tracking what?

MR. TYERS-SMITH:          I am sorry, I beg your pardon.  Tracking down to the start of the paragraph where it says, "the section under which the provisional liquidators are appointed".  Does My Lord see that?

THE COURT:               There are no numbers or anything and this is a nice old fashioned page.  So let me find it.

Oh, yes, that's right.  About a quarter up from the bottom.  I see --

MR. TYERS-SMITH:          Yes.

THE COURT:               Yes.

MR. TYERS-SMITH:          Indeed.  So My Lord can see there that the power of the provisional liquidator in this case derived from section 231 of the Companies Act.  And you can see on its face it's quite broad.

And so the Court may appoint an official liquidator provisionally at any time after the presentation of a winding up petition and before the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

57

making of a winding up order.  And the provisional liquidator shall have and may exercise all the functions and powers of a liquidator subject to such limitations and restrictions as may be prescribed by the Rules or by the Court.

So it's a broad provision on its face, but it's not dissimilar to section 171, sub (1) or indeed sub (2) which on its face appears to be a broad provision but actually when considered in the context of the role of a provisional liquidator is narrow.  And the way that that plays out in this case is, if I can ask My Lord to turn over now please to the page, it's page 5 of our Authorities Bundle and it's page 341 of the Law Report.

THE COURT:                Yes.  Okay.

Yes.

MR. TYERS-SMITH:        And can I invite My Lord please just to read the paragraph.  It's actually the third paragraph starting, "I am of the view".

THE COURT:                Yes.

MR. TYERS-SMITH:        If My Lord can read that paragraph down to -- you can see the numbers on the left-hand side, at 25 ending "inconsistent with the nature of his office as a provisional liquidator".

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

58

THE COURT:                    Okay, let me read that.

(Thereupon, the Court peruses paragraph.)

Yes.

MR. TYERS-SMITH:          So, My Lord, what My Lord can take from this provision is that actually whatever is said in an apparently broad provision conferring broad powers one has to look at that in the light of the restricted and conservatory function of provisional liquidators.  And My Lord will have seen in particular the provision of this or part of this paragraph was that it says:

"The primary duty is to preserve an existing status quo with the least possible harm to all concerned so as to enable the Court to decide a proper and final hearing whether or not the company should be wound up."

So, My Lord, that is a statement of principle which has been applied in the British Virgin Islands.  And if My Lord can now turn over, and this is the final authority on this topic, Carapark has been applied in the BVI in the case of Kensington v. Montrow which is at page 7 of our Authorities Bundle under Tab 2.

THE COURT:                    Yes.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

59

MR. TYERS-SMITH:          And, My Lord Kensington v. Montrow is another case that is cited by my learned friend Mr. Gibbon for the proposition that provisional liquidators are officers of the court and they will comply with the Court's orders as to their role and their function.  And that is set out at paragraph 34 of their skeleton argument.

But the case or authorities I'm citing to is the same case but it's the sequel.  And this judgment is a judgment of Hariprashad-Charles, Indra Hariprashad-Charles and it is a judgment on an application to discharge Mr. Tacon as a provisional liquidator for cause.  And what I'd like to do is just start with why it was because he was removed for cause. Why it was he was removed for cause is set out in paragraph 117 at page 22 of our, of the Authorities Bundle references.

THE COURT:          Okay.  So I have to go to page -- sorry, where do you want me to go?

MR. TYERS-SMITH:     It's paragraph 117 of the judgment, and it's page 22 of the Authorities Bundle.

THE COURT:          Yes.

MR. TYERS-SMITH:     Starting

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

60

"Mr. Tacon's lack of independence".

THE COURT:                    Yes.

MR. TYERS-SMITH:              So one can see in this case Mr. Tacon considered that he was appointed not just to preserve assets, but to gather documents and information in order to build a case.

Now, that's why he was removed.  But that is against what was said in respect of the Carapark case at paragraphs 88 and 89.  So if I can just ask you to track back to those paragraphs.  You can see the paragraph starting "provisional liquidators"?

THE COURT:                    Yes.

MR. TYERS-SMITH:              Yes.  So in particular one can see from paragraph 88 that it is vital that a provisional liquidator does not align himself with the interest of the party pursuant to whose application he was appointed.  The primary role of a provisional liquidator is to preserve the status quo.  It's not part of the function to pursue directors of the company.

And then as you see from paragraph 89, the point about doing the least possible harm to all concerned is something else which is pervasive in the limited role of a provisional liquidator.

So, My Lord, with those points in mind I

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

61

just want to now take you to three examples which show why having access to the Chapter 15 recognition proceeding is vital as a matter of balance and justice. And, My Lord, if I can ask you now please to look at the transcript of the Chapter 15 proceedings and the hearing that took place in the Southern District of New York. It's in Volume 2 and it's at page 1335.

THE COURT: Yes. Okay, 1335. Yes. Okay.

MR. TYERS-SMITH: So, My Lord, if you can just pan down, this is paragraph 15 of the transcript. So this is Mr. Dietderich who acts on behalf of the provisional liquidators. And if you start at line six, you can see that My Lord is quoted to Judge Glenn in this way.

And I should be absolutely clear that in fairness to Mr. Dietderich what he said is, well, this is the way that you summarised the Attorney General's application on the 16th and 17th of April. He said that you summarised the Attorney General's application as being the worst.

And you might recall saying this:

That "we have come across some pretty un-prepossessing and unattractive conduct before this Court, obviously, but it has never got as colorful as

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

62

this and as abysmal and infernal as this."

Now, as far as it goes, that is an accurate recitation of what My Lord said on the first day of trial to an extent. But can I ask you now please to have a look at page 1563.

THE COURT:                    1563. One moment.

MR. TYERS-SMITH:        So this is the transcript, My Lord, if you've got it.

THE COURT:                    Yes.

MR. TYERS-SMITH:        The transcript of the first day of the final hearing. And if My Lord scans down to line 15, you can see that this is where My Lord interposed an observation whilst Sir James Eadie Kings Counsel was making his opening submission.

And you can see that, My Lord, your observation in its totality was:

"...I suppose part of your case is as well, is that although this is a first, as it were, for the BVI, this is, if I understand you correctly, this scheme that's being presented before the court, is it looks like the worse of the worst...conduct that has certainly come before this Court."

And then you see the quotation starts, "we have come across some pretty unprepossessing and

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

63

unattractive conduct...".

So when one compares that to how it was put before Judge Glenn, you can see that the full context wasn't given and that tends to leave it hanging as to whether or not that was not only an observation that My Lord was making at trial, but whether that was somehow an instinctive view of the merits of the case.

Now, because I've just shown you the approach to the role of provisional liquidators in this Territory being conventionally that they are independent neutral officeholders who are supposed to approach matters with an open hand without doing or with doing the least violence to all parties concerned, what Mr. Dietderich might have done is then said well it's also fair to say, Judge Glenn, that whilst the learned Judge, Mr. Justice Wallbank KC in the Virgin Islands made this observation, it is also fair to say that by the end of the trial he did have some countervailing concerns.

For example, if My Lord can just please reach for the Supplemental Hearing Bundle that we filed. It's 400 pages, but it's only because it contains day two of the transcript. You've only got day one as part of this application so I just want to show you one or two extracts from day two. And it's

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

64

Tab 3 of the Supplemental.

THE COURT:                Yes.

(Brief pause.)

Carry on.

MR. TYERS-SMITH:      So looking at page 243 in particular nine, line nine, does My Lord have that?

THE COURT:                Well, hang on. Let me get there first.

MR. TYERS-SMITH:      Sorry.  I'm so sorry.

THE COURT:                Yes, 243.  One moment, 243.

(Brief pause.)

Yes.

MR. TYERS-SMITH:      So, My Lord, this followed some submissions on an alternative case for the provenance of certain photographs and materials that were set out in the indictment.  And My Lord can see that the observation My Lord made was, of course:

"I'm very concerned, very concerned to note that apparently once again, and I say once again, it is not the first time that I have seen this U.S. attorney seem to think that they need to embellish the record."

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

65

THE COURT:                Yes.

MR. TYERS-SMITH:          And, My Lord, that is the first, if I may say, of a cascade of further observations that My Lord made.  And I don't want to take you to all of them, but I want to show you one that starts please at page 295.

THE COURT:                Yes.

MR. TYERS-SMITH:          And starting at line 12.  My Lord, this might jog My Lord's memory but this was a boat analogy of what might have been a drug smuggling boat sitting in the Gulf told to stop but doesn't stop.  Question arises, well, are you a drug running boat or shall we just blow it up is effectively what My Lord says at line 17 and 18.  And you say, "well, that might be all right in that circumstance, but", line 20 is the material one, "but we are a court of law.  We have to be careful because we are dealing with fundamental rights.  It's not a question of kind of covering for the bad guys and getting them off the hooks, et cetera, and making it difficult for the good guys to get justice".

And then My Lord goes on to make a rampallian observation, if I may put it that way, that you basically can't make bricks without straw.  And as you see over the page at 296, "well, I'm not seeing any

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

66

straw here; that's the problem".

Now may I say at once, I don't suggest that it was incumbent upon Mr. Dietderich to take Judge Glenn through all of that, but he might have said, and just to show you how the learned Judge was looking at this, by the end of the trial he made these observations.  But because we are provisional liquidators, we're staying out of that; we're not getting involved.  But as I've shown you, what was said at the Chapter 15 hearing or what was quoted was that isolated part of the transcript from day one.  That's the first point.

Now the second point or second example that I want to give you please is if we can go back to page 1340 of Volume 2.

THE COURT:                1300?

MR. TYERS-SMITH:          340, My Lord.

THE COURT:                Okay.

(Brief pause.)

Okay, yes.

MR. TYERS-SMITH:          And starting at line four, you can see that Mr. Dietderich was talking about the approach to making distributions.  And he drew upon the now infamous case of FTX as an analogy and he was discussing the centralized distribution of

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

67

the scheme and how that was overseen by courts of

multiple jurisdictions.

He then goes on at line nine to say:

"So, we don't know how we will coordinate

with...asset seizures but what we do know is we don't

think" -- or "we think that the seizure of an asset in

reliable custody of a government around the world

and...taking of an asset into the custody of the JPLs

away from the bad guys are both steps forward.  And

what we do with it after" that "we will have to work"

it "out."

So My Lord can see that Mr. Dietderich is

talking about the role of the provisional liquidators

and what they're proposing to do probably much further

down the line if they get appointed.  But materially

you can see that Counsel for the JPLs has characterised

presumably all of the debtors, including my clients, as

the bad guys.  So that's the second illustration.

Now the third and final one is, sticking

with this transcript and working down to line 23:

"The debtors and their assets are subject

to comprehensive sanctions imposed by the Office

of...Asset Control in the United States..."

Over the page to page 21, line two:

"These OFAC sanctions are very broad,

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

68

they restrict all US persons", and so on.  And the remainder of these submissions focus on sanctions.

Now if, My Lord, casts his mind back to the submissions that I made at the final hearing, the two points of contextual difference that I alighted upon in my opening was that Amber Hill and Lateral Bridge are not sanctioned contrary to the pleaded case of the Attorney General.  And it is now accepted and has to be accepted that we are not so sanctioned.  And if anything, any further proof is required of that, that was a concession made by the Attorney General at trial and it was accepted that we weren't sanctioned.

So it was propounded before Judge Glenn that again we were sanctioned as part of the Prince Group in circumstances where we are not and it is clear that we are not.

So, My Lord, where am I going with these points.  Well, where I'm going is this.  Now these are not jury points.  Taken together in my respectful submission unfortunately regrettably shows the degree to which the provisional liquidators appear to have been taken by the same unproven allegations that are relied upon by the Attorney General.  And as I showed you by reference to the case of Kensington and Carapark, the approach at this stage is one of even

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

69

handedness and neutrality.  And that is not, as you can see from the transcript of the hearing before Judge Glenn in my respectful submission quite how it was put.

Now the upshot of that for the purposes of the issue that you have to decide today is that this is a practicals example of why the point that was made by my learned friend Mr. Gledhill about having access to Court, and he drew upon the decision of Mr. Justice Plowman in the Union case, how having access to the Court is a question of fairness.  Because if the JPLs are right on their analysis, there is no one or the companies rather, so Amber Hill and Lateral Bridge, are not entitled to appear in front of Judge Glenn and they are not entitled to say, well, you are only being told part of what happened at trial.  And in my respectful submission that is a fundamentally misconceived approach to the question of first of all the companies' right to access the Court and, secondly, to make submissions that are consistent with their position in this jurisdiction that the Order should never have been made.

So, My Lord, those are the only two points that I wanted to make in addition to the points that I've now adopted by Mr. Gledhill.  And unless My Lord has any questions, I'll hand over who I think -- I

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

70

think Mr. Gibbon is next.

THE COURT:                    Yes.  And we're just coming up to 11:30 here in the Territory of the Virgin Islands, which is mid-morning break time for 15 minutes.  So we'll take a quick recess.  Thank you very much.

(Break taken at 11:29 a.m. to 11:45 a.m.)

THE COURT:                    So, yes, learned Counsel.  I think we are now with Mr. Gibbon.

MR. GIBBON:                   Yes, My Lord. May I begin by saying what I didn't have a chance earlier that all three of the Joint Provisional Liquidators are in attendance remotely today and clearly they will be able to aid the Court as appropriate.

I'd like to start, in the light of the submissions made by my learned friends, by way of context by taking you to Paragraph 50 of Mr. Drury's statement.

THE COURT:                    Okay.  One moment.

MR. GIBBON:                   Hearing Bundle 1 at page 42, and by way of explanation, I do wish to show you what my clients are seeking to do in pursuit of their obligations under the order that was granted

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

71

in January to an adjournment.

THE COURT:                    So, page 42.

MR. GIBBON:                   Page 42, and

Paragraph 50 says this:

"Against this background, and having

regard to (i) the absence of meaningful cooperation

from the directors of the Companies; (ii) the

obstruction encountered from Campbells, BSF and

others purporting to the act in the name of the

Companies; (iii) the substantial US nexus of the

Prince Group's alleged criminal conduct (including

the pending DOJ criminal indictment of Mr. Chen, the

civil forfeiture proceedings, and the alleged

laundering of more than US$18 million of victim

funds through a Brooklyn-based money laundering

network) and (iv) the need to obtain records,

communications and transactional documentation held

by U.S. financial institutions and other U.S.

counterparties in order to trace and preserve the

Companies' assets, the JPLs concluded that

recognition of the BVI proceedings under Chapter 15

was required to enable them properly to discharge

the duties imposed by the Appointment Orders."

And he goes on in 51, this is where I

would stop:

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

72

"If granted, recognition in the U.S. would result in the JPLs having powers to obtain information and documentation concerning the Companies and their assets in the U.S."

So that's what my clients are seeking to do in pursuit of their obligations, and I stress that.  And I would respectfully submit, My Lord, that that is entirely as the Court will expect its officers to do and I am going to come back to the detail of the order in due course, but also respectfully submit that it's entirely in line with the manifest intentions of the judge in making the order in the terms he did.

I also, in the context of that, just want to pick up one brief observation.  It's found in the Kensington case which my friend referred to in his authorities bundles, Mr. Tyers-Smith.  That's within Divider 2, I believe, of, no I think I may be -- let me doublecheck because I may have the wrong with reference here.

THE COURT:                Kensington and Montrow International?

MR. GIBBON:                Yes.  There are two Kensington decisions, which unfortunately pose a little bit of complication, one is in my bundle and one

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

73

is in my friend's bundle.  Yes, it is this bundle.  It

is at page 15.  No, I apologize, it is in the other

bundle.  I'll come to it straightaway, so I'll take

you, My Lord, to my bundle.

THE COURT:                One moment.

MR. GIBBON:               It is exactly

the same paragraph, but unfortunately it causes a

difficulty.

THE COURT:                Let me pull up

your Authorities Bundle.  Okay.

MR. GIBBON:               It's at Divider

9 of that.

THE COURT:                Yes.  Okay.

Paragraph?

MR. GIBBON:               And within

that, Paragraph 68, I believe, if I have got my

reference correct this time.

THE COURT:                Let me have a

look.

MR. GIBBON:               No, I

apologize.  I will make the point later, if I can, by

reference to the correct reference, but I've missed it.

The short point is --

THE COURT:                Hang on.  Let

us bottom this out, okay, because this is important.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

74

The starting points are important, so let's bottom this out right now.  Let's take the time to square this up so we don't come back to it.  The point is what?

MR. GIBBON:                The point I was going to make and I don't believe it's controversial is that a liquidator needs to know where the assets are to preserve them, and for that purpose, it's all I wanted to go to.  There was a reference in Kensington and for whatever reason, and it's entirely my responsibility, my note of that paragraph reference isn't correct.

THE COURT:                Okay.  So basically your point is that the liquidators, the provisional liquidators need to know where the assets are?

MR. GIBBON:                Yes.  I have found it now.  It is within 68 in my friend's copy, so page 15.

THE COURT:                Okay.  One moment.  Let me go back to his bundle, page 15.

MR. GIBBON:                And it's the third line.

THE COURT:                Of Paragraph 68?

MR. GIBBON:                Yes.

..."for him to function effectively in

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

75

order to preserve these assets as the Provisional Liquidators, he needs to know the whereabouts of those assets."

THE COURT:                Yes.

MR. GIBBON:                So that's by way of preliminary remarks, if I may put it that way, My Lord, and I was going to go straight into the question of what the rights and duties of a Provisional Liquidator are and how they are identified.  You have already been shown by my friend Mr. Gledhill Section 171(1), I'd simply ask you to turn that up.  It's within the Campbells authorities at page 6 within Divider 2.

THE COURT:                Yes, 171?

MR. GIBBON:                171, My Lord, indeed.  So:

"Subjection to subsection (2), a provisional liquidator has the rights and powers," et cetera, et cetera, "to carry out the functions for which he or she was appointed."

So what that identifies is the primacy of the order.  It also identifies the functions of whatever is needed, i.e., if you need it, you have it for the purposes of the order.  And also I identify this point, the natural meaning in relation

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

76

to the provisional liquidator is that the provisional liquidator alone has those rights and powers.  So it's the provisional liquidator has them, no one else does.

Now I'll come back in due course to the general order in relation to the effect of appointing a PL, but I'll deal with construing a court order first.

THE COURT:                Hang on.  Let me get the point.  Two points so far you have got.  You say Section 171(1) basically predicates the primacy of the order and you get there presumably because it talks about to the extent necessary to maintain the value of the assets owned or managed by the company or to carry out the functions for which he was appointed, so basically you have to look at what the order says in order to ascertain those things, yes?  So that's the primacy of the order.

Your second point was that the Provisional Liquidator alone has those rights and powers.  If he has them, nobody else does.  That's your second point and I think you had a third point.

MR. GIBBON:                I'm afraid that was my third point and if I allied the second, I'll repeat it.  It's if you need powers, you have them.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

77

That's the effect of using the word necessary.  To fulfill the functions you have been given, you need those powers, you have them.

THE COURT:              Yes.  Okay.

MR. GIBBON:              So that's all I wanted to say about Section 171(1), other than the points already made by Mr. Gledhill.  The JPLs are under the control of the Court as in subsection (2).

I was next going to move to the Pan case and I've got a copy of that in the JPLs' bundle, Authorities Bundle, which I will just pull up on my iPad.

THE COURT:              So hang on. JPLs' bundle?

MR. GIBBON:              Yes.  And Pan is found in that at Divider 8, page 165.

THE COURT:              Pan Petroleum, yes.

MR. GIBBON:              Yes.  And in light of my friend's explanations, I'm going to go straight to page 176 which is where the relevant paragraphs are found.  And as Mr. Gledhill says, he and I are agreed that these are the relevant materials. Rather than read them again, simply to summarize what you see there.  It's not about whether the order should

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

78

have been made.  It's about what the order means.

Now, I pause briefly over that because there was a degree to which it seemed to me that Kobre & Kim submissions to Your Lordship earlier were beginning to stray into questions about whether the order should have been made, and speaking on the part of my clients today, that is an area into which I do not propose to stray or to make any submissions.  So the focus in line with Pan is on what the order means.  And I accept the point being made by Mr. Gledhill that where there are penal consequences for breach, one should be careful about the existence of the penal order, but I only accept it as far as it goes, and I'll come back to what I'm saying on that shortly.

"Words are to be given their natural and ordinary meaning and to be construed in their context, including historical context and with regard to the object of the order."

And also, and this is important, this is the Sans Souci point:

"The reasons given by the Court for making the Order are admissible and interpretation may be critically affected by what the Court considered to be the issue which its order was supposed to

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

79

resolve."

Now before turning to the words used, we know that this was an ex parte application brought because of an alleged egregious international criminality on a large scale and you have been reminded by my learned friend for the Kobre & Kim Parties of some of the observations you made if it were to be the case that those allegations were made out.

So when the order was made, Mr. Chen and persons associated with him were considered to be the directors of each of the companies. There is no reason to think that the Court expected a Mr. Borrelli, or any other party, to appear as a director subsequently. The question of the Court's intention while making the order is not, therefore, to be assessed against Mr. Borrelli. It applies to anybody as a director, but the individuals primarily in mind, the acting individual indeed was Mr. Chen and those who were associated with him. And in this context the fact that he was disqualified by reference to the regulation that my learned friend Mr. Gledhill referred to, would not, I respectfully submit, lead to the assumption that those in charge at the time of the order were unconnected to it or

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

80

on the allegations, without blemish.  But we can go further on the material available to the Court, it was the very purpose of the application on which the order was made to take the Companies out of the hands of the directors who were considered to be Mr. Chen and his associates.  Within Hearing Bundle 1, if I can ask you to turn to that, can I ask you to turn to page 109.

So this, this is the application put to the Court.  This is the context by which one is to understand what was done because the nature of these hearings done at great [unclear] as Your Lordship is fully aware, can be that the judgment itself is an encapsulation of what is accepted obviously own the basis that it's no more than a preliminary finding, but on the basis of the allegations put, that is why the order should be made.  And you'll see under the heading which is just caught at the end of the previous page, the appointment of JPLs:

"It is essential that Joint Provisional Liquidators be appointed over the Company immediately (without notice to it and its principals) and before the originating application is heard and determined for the following reasons:" and I'll highlight in particular (a):

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

81

"The Company continues to be under the control of Chen and his associates and as a result they can use or continue to use it to further the criminal enterprise thereby continuing to inflict public harm."

And: "(b)(i) immediately take full control of the Company.

(b)(iii) take control of its books and records."

And I can add to that by taking you within the same bundle to page 33, and no doubt this is something on which Counsel for the Attorney General, Mr. Dennis, can you assist you further, if needed, but Paragraph 12 cites the submissions that were made in writing to Justice Mithani. The Attorney General cited various reasons in support of the immediate appointment of the JPLs.

And you see:

"There is a real substantial risk that, absent the immediate appointment of provisional liquidators, assets held by or through the Companies will be transferred, concealed or dissipated, and documents will be destroyed or concealed."

And then more importantly, potentially:

"The appointment of PLs will immediately

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

82

remove the control for Chen and his association and place the Companies under the supervision and control of officers of this Court, thereby protecting the integrity of any investigation and preserving assets for the benefit of the victims of Chen and Prince Group's fraudulent and criminal activities."

So, as I have indicated, Mr. Justice Mithani understand that given the busy nature of the list and no doubt he was going straight on to something else, didn't write a detailed reserved judgment, but one does see what he concluded based on the material.  And that can found, I believe in Bundle 2 for the hearing and I believe the correct reference is 719.

THE COURT:                One moment.

MR. GIBBON:                But on the material that's presented by the Attorney General, the case for the appointment of Provisional Liquidators is overwhelming, subject, of course, to any disclosure matters that you would like to bring to my attention.

So, in effect, he is saying, well, that's my judgment, based on what you said to me or what you submitted to me, subject to any full and frank disclosure that you want to draw to my attention.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

83

So we have seen there, in summary, the precise basis on which Provisional Liquidators was sought to be appointed, how those were amplified in submissions to the Court and how the Court responded.  And right at the heart of that was removing the Companies from the control of directors, that being the consequence of appointing Provisional Liquidators.

Now it's here I return to the question of penal notice.

THE COURT:                Before you do that, let me understand what you are saying, Mr. Gibbon.  What I think you are saying is that, you have taken me a case, let me see what case it was, that was the Pan Petroleum case --

MR. GIBBON:               My Lord, yes.

THE COURT:               -- which said that the sole question for the Court is what the order means, and, that's at (i) and (iii) in the general principles:

"Words of the order are to be given their natural and ordinary meaning in order to be construed in their context, including their historical context and with regards to the object of the order".

In other words, you can't construe the words of the order in a vacuum, you know, collaging

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

84

various provisions together and pausing them as if that's the only thing that that the Court has in front of it so you can get to a result which happen to be the complete opposite of what the Court had originally intended.  And what I think you are saying is that it was certainly not the intention of the Court that Mr. Chen should be allowed to exercise residuary duties as a director in a way which could scuffer the JPLs' attempts to safeguard the assets of the Company or to obtain information about the assets of the Companies.

MR. GIBBON:                My Lord, yes, and structuring that way, one can see what they expected the consequences, what the Court expected the consequence of the order to be was that it would prevent the directors, whoever they might be, from continuing to be in control.

So to recap, if I may, that's also in the context of the point I made about Section 171, namely, if you give powers to provisional liquidators, it's given to them and not to anybody else.

THE COURT:                Now I think you made your point in your skeleton that it will make no sense if, on the one hand one set of people, the JPLs, could purport to speak on behalf of the Company to take

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

85

legal steps, but, on the other hand, the Company should fight against itself to prevent those steps from being taken?

MR. GIBBON:            My Lord, indeed.  And perhaps this is slightly out of my sequence, but if I could ask you to look at it, I believe this is in the Second Hearing Bundle, first at page 1097, I hope you will see there a draft order headed "Order Granting Recognition of Foreign Main Proceedings and Related Relief."

THE COURT:            One moment, 1097.  That's right.  This is a United States order.

MR. GIBBON:            My Lord, yes, and I should stress it's a draft order because it's a part of the JPLs' application in New York --

THE COURT:            Okay.

MR. GIBBON:            -- dated the 8th of April, as you'll see at the top of the page, but this is to put in context what my learned friend's clients are seeking to do.  They are seeking to oppose this order and this is the order recognising the proceedings which the Court has on foot in this country, pursuant to the order in January.

"Upon consideration of the Verified Petition of the Authorized Foreign Representatives for

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

86

the debtors requesting entry of an order (this "Order")

(i) recognizing the BVI Proceedings as "foreign main

proceedings", and (ii) recognizing each of the

Authorized Foreign Representatives," et cetera, "and

granting certain relief".

And then going forward to page 1100,

eleven hundred, you can see there the following

recitals, the active part of the order, the

operative part of the order is under the heading,

"it is hereby ordered".

THE COURT:                Yes.

MR. GIBBON:                And that's what

been sought.  So one has got to be absolutely clear

what the Defendants are submitting to you.  They are

saying that albeit, and I'll come to this in due

course, are challenges in the BVI, have to be on the

basis of appealing the order or winning on the

Liquidation Application.  We are entitled to go to the

United States to instruct the Companies, cause the

Companies to oppose the JPLs' application for the

recognition of this very order.

THE COURT:                Yes.

MR. GIBBON:                So I have taken

that slightly out of the sequence, but I think it is

important just really to be absolutely clear what is

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

87

being said by the Companies in that context.

Now I touch on the penal notice. For reasons I'm going to come to shortly, we say as a matter of general law, it is the overwhelmingly clear position that the appointment of provisional liquidators does indeed remove powers from directors other than the residual powers, but before I get there, just touching on penal notice.

What you will have seen, first of all, is that the penal notice does no more than confirm that general proposition that the directors no longer have powers, which is in line with the very purpose for which the order was granted in January, as I have shown Your Lordship. I accept entirely that it is a thing that is in the nature of something endorsed. In fact, nowadays it tends to be included in the drafting, rather than being stamped on subsequently by somebody, but it does stand in a slightly different situation to the words of the order itself. But I do question the reliance, the heavy reliance on Re C in the light of the subsequent Pan authority which says that all orders need to be construed in context.

And to be clear about what my submission is there, I simply say about the penal order, it

88

simply confirms what you have already got as the clear meaning of the order, the clear effect of the order, both as a matter of its terms, and as I'll come to, as a matter of the general law.

So for today's purposes, all I need to say to Your Lordship is it's entirely consistent with the established general law of the effect of the appointment of a PL, and beyond that, questions of contempt, et cetera, which have been dangled before Your Lordship by my friends are of no particular relevance or assistance to the Court.  It's the case that we are relying on the words of the order which are in no way undermined by the words of the penal notice.

Now, this is where I move on to the general law about the effect of the appointment of a PL.  There was extensive material that we put for Your Lordship's assistance in our skeleton.  It's not because we want to take you through the detail of every single set of legal provisions in every jurisdiction we have referred to, but it's to show that the general principle that the appointment of a PL is entirely standard when we say that it removes powers from the directors other than residual powers.  That BVI position is consistent with the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

89

English and Welsh law, Australian law, Malaysian law, et cetera.

And the distinction between a liquidation and a provisional liquidation in this regard is, in fact, of very little significant because of the width of powers that provisional liquidators will always need to hold the ring and protect assets. And that's why the law in relation to residuary and residual powers is just as much in relation to Provisional Liquidators as it is in relation to Provisional Liquidators.

So, for example, is that my friend Mr. Gledhill drew your attention to, the case that crops up all the time is Union Accident and it's found in various places in bundles, but one has got to be absolutely clear, that was a provisional liquidation case and it was not, and is not the case in England that there is any expressed provision in the legislation saying what happens to directors' powers.

Now I regret to say I haven't got Section 135 of the Insolvency Act [1986] from England and Wales, from UK generally in the bundle, but I have turned it up here, and the relevant provision, I'll read them out, subparagraph (4):

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

90

"The provisional liquidator shall carry out such functions as the court may confer on him."

And (5):  "Where the liquidator is provisionally appointed by the court, his powers may be limited by the order appointing him."

It doesn't say anything else, but it is consistently understood, I'd respectfully say at bar and the bench that that deprives the directors of powers other than residual powers, subject always to the possibility that there might be a specific carve out relevant to a particular order.  So I've also since  Mr. Gledhill's submission about what the position was under Companies Act 1948 and all I can say now and I can't place huge reliance on it because I haven't got it before in a form I can send to you easily.  Sections 237 and 238 of the Companies Act 1948 which were the relevant provisions when Union Accident was decided again simply say that a company can have a liquidator appointed provisionally over it.  It doesn't go on to deal with the consequences of that.

So respectfully say that it's not the case that the position is at large simply because there's no statutory provision in the BVI which says in terms that the appointment of a provisional

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

91

liquidator makes directors functus officio in most

of their capacities.

Also, I should draw your attention to one

passage in a textbook that was cited by my friend

Mr. Gledhill in his skeleton argument.  It's found

at tab 13 of the Campbells' Authorities Bundle and I

believe it's 187.

THE COURT:                This is page?

MR. GIBBON:                Page 187 in the

Campbells' Authorities Bundle.

THE COURT:                One moment.

Yes.

MR. GIBBON:                So my friend

had cited passage that said that the powers of the

directors come to the end with the appointment of a

permanent liquidator, but the passage before that is of

relevance to Your Lordship.  Page 187 is the last

paragraph at the bottom of the page:

"As far as compulsory liquidation is

concerned, there is no provision in the Act which deals

with the powers of directors in such a winding-up.

However in Re Oriental Bank Corp, Ex p. Guillemin, Mr.

Justice Chitty applied the rule covering voluntary

liquidation to the appointment of a provisional

liquidator, and it seems that it has been universally

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

92

accepted that in winding-up by the court the powers of

the directors come to an end with the appointment of a

permanent liquidator."

So it's that prior passage I wanted to

draw your attention to, but I respectfully say that

has been the universal view as a matter of English

authority.

Now, I do want to show you briefly the

Union Accident case, and I happened to mark it up in

my bundles, so if you don't mind looking at the JPLs

Authorities Bundle, tab 1.

THE COURT:                    Yes.

MR. GIBBON:                    And my learned

friend, Mr. Gledhill invited you to save his voice to

read to yourself, a passage on page 642 within the

decision.

THE COURT:                    Yes.

MR. GIBBON:                    And you'll see

the second sentence of the paragraph beginning at C,

says this:

"I think that it may sometimes be helpful

to test the matter by considering the other side of

the coin, namely, to inquire whether the power which

is the board is said to have lost is one which can

be said to have been assumed by the liquidator."

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

93

Now what I want to stress to Your Lordship is that that is not a universal test.  It's clearly pertinent as regards the right of appeal, but the reason why it is not the universal test is straightforward to demonstrate.

Now if a power is expressly given to a provisional liquidator, the order plainly will not give the provisional liquidator power to oppose his own exercise of the power, but it would be an absurdity if that were to be regarded as having the consequence that the directors were able to oppose all such steps because they had the residual power to do things the PL hadn't been given the power to do.  And we say that that is precisely the absurd situation that my learned friend Mr. Gledhill presses on you.

THE COURT:                 Let me understand this.  Can you explain this to me again.  I have read that passage where the, Plowman J., as he then was, has said that it may sometimes, i.e., not all the time, but sometimes be helpful to test the matter by considering the other side of the coin:

..."namely, to inquire whether the power which the board is said to have lost is one which can be said to be assumed by the liquidator.  If the answer

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

94

is that it cannot, that may be a good reason for saying

that the board still retains it."

Okay.  And then he goes on:

"Clearly, for example as I have already

indicated, the power to instruct solicitors and counsel

on the hearing of the winding-up petition is not a

power which anyone could suggest has passed to the

provisional liquidator and therefore the board retains

it."

Okay.  I have read that part now.  Now

you're saying clearing this is not a universal test.

In fact, Plowman makes it clear that it is not a

universal test.

MR. GIBBON:            It is not that

Plowman makes it clear, but I am giving you an example,

My Lord, which makes it clear.

THE COURT:            Even Plowman

says that it is not a universal test.

MR. GIBBON:            It didn't.

THE COURT:            But you have

given an example that makes it clear, and the example

you've given so far, I've got the first half of it,

which is that if a power is expressly given to the

liquidators, the order will not give the liquidators

the power to oppose his own power?

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

95

MR. GIBBON:                    Indeed.

THE COURT:                     And then you were going on to explain that rather kind of obscure concept to make it more simple for people like me who need to get his head around it.  So can you explain this to me, please?

MR. GIBBON:                    Let's give an example.  Let's say there is a power to enter the company's property to acquire the records.  Now, plainly, the order is not going to say we give the provisional liquidator a power to oppose himself. That's a nonsense, isn't it in?  But the argument being put by the Companies appears to amount to this, well, because the Provisional Liquidators can't have that power to oppose and they need to be policed, it must mean the Company is able to do that.  There is no difference, in principle, I respectfully say, between that and saying that when the JPLs go to New York, as they are entitled to do without the further Court permission to enforce the order by getting recognition, we are entitled to turn up and police that.  We are entitled to turn up because the Provisional Liquidator can't have been given power to oppose, that would be a nonsense, therefore, it's a power that must be still residing in us and we need to exercise it, Mr.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

96

Tyer-Smith puts it this way, because there's all sorts of things that we are concerned about that might be said, but respectfully that's wrong.  The order cannot be working in that way and it is unworkable, because effectively it means every specific power that is given to the Provisional Liquidators can be opposed in a disruptive way, not just in this way case, but in any other case, that in the normal and sensible way says JPLs, here are your powers.

Now, we respectfully say the true principle is much more limited than has been put by my learned friends in their submissions to date. First, by reference, this is to some very old case law, but it was referred to by my learned friend Mr. Gledhill in his skeleton argument.  There is the Diamond Fuel case, and the list of these is one part of the true rational for what's called a residual power.  Within the Campbell's Authorities Bundle at pages 25 to 26, one sees the submissions that were made to the Court and more than, the Court the colloquy with Lord Justice James that led to the decision that it was the  residual power existed in the directors and so Mr. Pearson, Queen's Counsel, for the Company said at the bottom of 25:

"The order is made against the company,

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

97

and the company must have a right of appeal from it. No doubt the liquidator is the only person to act if the winding-up order was valid, but that is the point in dispute.  Everybody has a right to appeal from the order made against him and a company cannot be in any different position."

And you will see a couple of interventions by Lord Justice James.  In particular:

"The second arm of the powers of the director is suspended."

And Counsel responded:

"I submit for this purpose they are not; the company must have a right to be heard to say that the winding-up order is wrong.  The functions of the directors can only be suspended sub modo," so in a qualified way, "provided the order can be maintained."

So we say that -- go back to the nineteenth century, but that's part of the underlying rational because you see that what Lord Justice James said immediately after this:

"As the present appeal has been presented in conformity with the usual practice, we will hear it on the merits."

And as Mr. Gledhill has pointed out, since

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

98

then that usual practice has continued.  There is a
rational for it there which you see expressed which
we say has good sense, but it also ties in very
closely with the right of appeal, and relatedly,
what I was going to show you was a case called Hin
Leong.  It's a Malaysian case, but it has
observations which we respectfully say are of real
assistance to Your Lordship.  That's in the JPLs'
Authorities Bundle at Divider 7 and I believe it's
page 156.  So if Your Lordship has that, there is a
subheading, in italic, Our Views, and you can see it
is talking about residuary powers the line of Re
Union Line cases, and it's the context of a specific
provision in Singaporean legislation, Malaysian
legislation.

"In substance," in 56, "In substance, an
application challenging the making of a judicial
management order would challenge the very juridical
basis on which such management powers of the
directors have been removed, ie, upon the
appointment of an interim judicial manager, judicial
manager, provisional liquidator and/or liquidator.
As such, it would appear attractive to hold that it
would remain open for directors to challenge the
very basis upon which their powers have been

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

99

divested..."

And we say respectfully say that's of great assistance to Your Lordship as a way of analyzing the nature of the residual powers as they are referred to in and across the full gamut of the authorities that we have identified, regardless of specific provisions found in particular countries legislation.  That's an operative principle, we say, which encapsulates, very successfully, why the residual jurisdiction is there.  And that what points to in the direction, we say entirely properly, is that you can't go around other jurisdictions purporting to represent the Company as far as the BVI court is concern.  And I'll stress this, we are addressing this for BVI purposes.  What the American court does in due course with the order, is, of course, a matter for the American court, but for BVI purposes, you can say, well, the directors have been divested of their powers.  What they are allowed to do is to challenge the making of the provisional liquidation order.  They can appear at the hearing of the Liquidation Application.  They can challenge the making of any order on that application and indeed they can challenge, by way of appeal, the making of the liquidation order and the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

100

matters ancillary to those matters.  So in the case of Union Accident, there was the appointment by the official receiver as PL of a special manager, so it's part of the functions of the PL.

THE COURT:                So let me just get you on this one, what you are basically saying is that there is a broad, certainly in the Commonwealth jurisdictions, a body of jurisprudence and I think we all know this really, that there is a broad body of jurisprudence which says that going back to the end of the nineteenth century that upon the making of a liquidation order and by extension, a provisional liquidation order, and we have seen the authorities on that extension, what that means is that the appointment of the officeholder, the liquidator, or the provisional liquidator, that displaces the directors from acting on behalf of the company.  However, that would obviously create the anomalous situation that there would be nobody to challenge the making of a liquidation order or a provisional liquidator order at all, and so in order to enable the interest of justice to be done and to allow effectively a challenge to happen, then the law is interpreted to be that the directors, although their powers to do things on behalf of the Company have been divested from them, they retain a residuary power

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

101

which is limited to basically opposing or appealing the making of the liquidation order or the provisional liquidation order, yes?

MR. GIBBON:                My Lord, yes.

THE COURT:                And what that means, and what you are saying now, what that means is that the directors of course in the present case, whoever the director or directors might be, whether it's Mr. Chen or Mr. Borrelli, those directors can challenge the making of the provisional liquidation order but it cannot oppose an application by these provisional liquidators in the U.S. for recognition of the BVI proceedings and their appointment in the U.S.

And what I think you are saying, and this is the nub of my question, if you are with me so far on how I phrased your submissions which I think I have got it correctly, the nub of is that what the directors should be doing and can only do, in the present context, is if they don't like anything in the provisional liquidation order, for example, the fact that these provisional liquidators can go off to a foreign jurisdiction and seek recognition without this Court's sanction, they could and should be applying to this Court, either to discharge the provisional liquidation order or pending its complete discharge, at

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

102

least vary it or stay a certain part of it so that this Court can change the terms of the order.

What they can't do is to go to the U.S. and just oppose everything that the JPLs are trying to do in the U.S. because they are not bound to do that. So I think what you are saying is that they need to come to this Court, if any, and oppose the making of, or oppose the provisional liquidation order that this Court made, either on a full basis or have it varied, pending a full opposition so that, that would fall entirely within their rights to challenge or appeal the making of this order which is inherently something before this Court. I think that's what you are saying.

MR. GIBBON:              It is. Just to add by way of clarification, I am sure Your Lordship had in mind, the critical thing is appear in the U.S. court in the name of the very companies in respect of which their powers have been put to one side by the order.

THE COURT:              Yes.

Now, I think Mr. Gledhill took me, you're probably going to come to this so I don't want to take you out of your stride, but he pointed out some federal rules provision which basically said that the Company

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

103

should be allowed to appear on something.  Now I can't
remember what the something was, and, in fact, when
that something is, in fact, a recognition application.

MR. GIBBON:               My Lord, it's
not expressly put in those terms, but the simple point
is this, based of my instructions, all that provision
does is identify that a debtor can oppose an
application.  It does not say who that debtor is to be
identified as and the question on that front, and it's
a matter for American lawyers, but it would appear to
be if they look to the BVI, it's the BVI can give them
the answer on that.  And the logic of why the BVI can
give them the answer to that is the very point that
Your Lordship has just summarized a couple of minutes
ago.  In the BVI, the order has been made and the order
has certain consequences.  If they don't like the
consequences that flow from the BVI order, they have
the right to appeal it or challenge it in some other
way, but that is the nature of the order from the BVI
perspective.  What the American subsequently do with, I
am not in a position, for obvious reasons I don't have
expert evidence to say, but those are my instructions,
as to the position.

THE COURT:               Okay.  Now that
American provision I was taken to, obviously it has got

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

104

a lot of words in it and, but you just summarized it to the, I think by saying that the U.S. provision only says that a debtor can oppose an application.  If we can go back to that document and see what kind of applications it has in mind there because what I am focusing on right now is that what the JPLs want to do in the U.S. is apply to have these BVI proceedings recognised in the U.S. and have their offices recognised in the U.S.  That is the JPLs' application in the U.S., is it not?

MR. GIBBON:                It is.

THE COURT:                It's not for something more fancy.  It is just for recognition, or at least that's part of it.  And then the question is, is that the sort of application that that provision in the U.S. has in mind?

MR. GIBBON:                There are different elements to it clearly, but if I could ask you to turn within my friend, Mr. Gledhill's bundle, to page 18, which is Divider 4.

THE COURT:                When you say his bundle, this is his --

MR. GIBBON:                So the Campbells' Authorities Bundle.

THE COURT:                Campbells'

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

105

Authorities Bundle, page 18, okay.

MR. GIBBON:               And All I can say because I am not a qualified American lawyer and I don't have expert evidence is this is the federal rules of bankruptcy procedure and he showed you, in particular rule 1012 on page 19 to say that:

"The debtor or any party in interest may contest a petition for recognition of a foreign proceeding."

But beyond that, I don't think Mr. Gledhill or myself would properly be in a position to say precisely what the full ambit of the Rules are. The instructions I have is simply that who is the debtor is a separate question to be identified.

THE COURT:               Yes.

MR. GIBBON:               And there may, as I say, we have already put in our skeleton argument, we have no objection, should the American court, so be minded, to the directors making these points in their personal capacity and it hasn't been suggested to us they can't to do that.

What we object to, we object to that for the reasons that we have given about the proper interpretation of BVI order is that as a matter of BVI law, we consider that is not permitted, and if the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

106

directors are unhappy with that, their remedy lies under the residual powers that we have just discussed. So to that extent, in my example earlier, I hope I began to convey this, the fact that this is overseas is a bit of a red herring, with respect, because the same question arises in relation to a power of entry to a building or power to collect the documents.

THE COURT: Well, the power comes from who? The power comes where? I mean, in relation to a BVI liquidation or a provisional liquidation, the power comes either from BVI statute or a BVI order and the foreign law can't give power where we don't give it.

MR. GIBBON: Well, as I say, I am trying to keep it as brief as possible, but just to imagine the domestic example if the order is in place, the Court does not want to see the directors of the Company popping up at every stage where the Provisional Liquidators try to exercise the powers they have been given to say, well, we challenge that because who else is going to challenge it if we don't. So that is the essence of the argument in relation to the U.S., which is why I say it's a slight red herring to see this through the prism of do we need to consider a U.S. bankruptcy law. Exactly the same logic would apply to

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

107

the steps being taken in this jurisdiction as well.

THE COURT:                    Okay.

MR. GIBBON:                    So, My Lord, you have our points, the final area I wanted to cover and cover really very briefly is putting the interpretation of the order in the case law together and both my learned friends have very attractively put elegant and elaborate submissions about looking through various provisions of the law about what is or is not to be understood at different points.  We respectfully say that the position is much more straightforward.  If you look at the order and I'd ask you to turn within Hearing Bundle 1 to page 113.  You have seen the penal notice which we say simply summarizes the effect in general law and the clear intention of what was sought to be done.

"The JPLs have been given rights and powers to the extent necessary to maintain the value of the assets owned by the Company and to carry out the functions for which they were appointed."

And in (3), in addition they have got powers without further sanction or intervention to take certain steps, and we are focusing today on (c):

"To the seek the recognition (or its

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

108

equivalent) of the appointment of the JPLs,

specifically anticipated that," that would be the

United States "for the purposes of securing,

realising and remitting assets to the control of the

JPLs and for the purposes of obtaining access to and

the control of the records of the company."

Well, that's the application which I

showed Your Lordship earlier.  Those are the steps

that my clients are trying to take and the order is

to be understood in the way that we have suggested.

It's to be looked at in the common sense way, what

is the order seeking to achieve?  And we say the

position is not just clear, it is manifestly clear

and to suggest that somehow that's intended to leave

a residual right, whether as a matter of

interpretation or as a matter of the general law on

residual rights to appear in a foreign court, in the

name of the Company to challenge what the Court has

said they should do, we respectfully say is simply

not correct.

THE COURT:                So hang on.  So

what you are saying, I think, Mr. Gibbon, is that the

order is manifestly clear that Paragraph 3 of the order

expressly in writing gives the JPLs specific powers

that they may exercise without further sanction of this

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

109

Court, including to seek recognition of their appointment in various spaces, including the U.S., "for the purpose of securing, realising or remitting assets to the control of the JPLs and for the purposes of obtaining access to and the control of the records of the company."

So that's a power expressly given to the JPLs in this order, right?

MR. GIBBON:                My Lord, yes.

THE COURT:                And then you are saying that it simply can't be correct that this would leave a residual right in the directors to come in to oppose such an application overseas, correct?

MR. GIBBON:                Correct.  And they are remediless because the answers I have already submitted to Your Lordship is that they can come under the residual powers to challenge the order in this jurisdiction which is the correct place to challenge it, as indeed has been recognised by Judge Glenn in the United States.  So we submit that in saying in the first instance, it's a matter for the BVI, you haven't reached a final conclusion, but we respectfully say that is the correct conclusion as a matter of BVI law. These are matters that the BVI Court has dealt with in its order.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

110

THE COURT:                Let's walk his path, shall we, and see where he goes wrong with that. or is that the wrong approach?  You are saying there should be common sense approach, you look at what the terms of the order says, it just can't mean, particularly when you marry it up with the authorities, this simply can't mean that these directors, or director still have anything more than the classical residual power of challenging in this jurisdiction, that's all they've got and that's clearly what this order means.

And Mr. Gledhill's imaginative way through that is not the way to look at it from a common sense point of view.  I think that's basically the gist of what you are saying?

MR. GIBBON:                I respectfully do say that to do the walking back through it would be to get bogged down in the very point, which very seductively my friend has put you, which lead you to astray, or seek to, it's matter of submissions obviously, which seek to lead the Court down a primrose path of dalliance to a result, which plainly wasn't, we respectfully say, either the intention of the Attorney General when seeking the order as you've seen, nor could it be the intention of the judge when agreeing

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

111

with the prima facie case, prima facie reasons for

appointing PLs in the way that Mr. Justice Mithani did.

My Lord, I am very conscious I have taken

up a lot of Your Lordship's time and indeed Mr.

Dennis' right to reply also.

THE COURT:                Well, we

clearly -- subject to any kind of your own commitments,

which I know you might have in the evening in London

and in the past they have included test matches at

Lord's and theater performances, et cetera and evenings

thereby ruined if you have to be here virtually, we are

going to carry on after lunch and so we will make the

time to deal with this.  I am sorry.  Okay.  So however

much time we need to deal with it within reasons, we

are going to commit to it and we will carry on after

lunch.  We haven't finished with Mr. Gibbon yet, I

don't think, so basically his last point is that we

have to look at what the intention was of the judge

when making the order.  And Mr. Gibbon, I think, is

suggesting that the extremely nuanced points of Mr.

Gledhill, the primrose path point, was certainly not in

the intention of Justice Mithani when he made his

order.  That's what you are saying.

MR. GIBBON:                Yes.  And the

one thing I should make clear, when I say intention,

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

112

the objectively to be construed intention from the wording of the order, seen against the background of the general law and the submissions made to the judge, the reasons to judge came to the conclusion he did.

THE COURT:                    Yes.  Let me just try this; what Mr. Gledhill was doing was he first, and I am not going down this path, okay, I am going to step off it actually.  I am just giving you a spoiler alert that I am going to be stepping off this path and I wanted to explore whether the stepping off of the path is a valid way of going about it.

What Mr. Gledhill is doing is he first of all asked me to bear in mind that there is a distinction between a liquidation order and a provisional order and that distinction is the fact that the, it is upon the making of a liquidation order that directors powers are divested from the directors.

In the case of a provisional liquidation order on the other hand, what he is saying there has not yet been a final liquidation order, so, in principle, the directors' powers have not been divested.  They are divested to the extent of the order that is made and there is, of course, the general principle recognised in the authorities on

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

113

different statutory bases, admittedly, that, to a large extent, provisional liquidations are to be treated for the purposes of residual powers like liquidation orders, but nonetheless, there is as yet no final liquidation order so in principle directors' powers have not been divested by the making of a provisional liquidation order.

So he then says what you have got to do is you have got to look at the terms of order and in this case, the terms of the order and indeed the BVI statute allows JPLs to act on behalf of the Company with a view to preserve, identifying and preserving assets and obviously obtain information about them, but other than that, other than that, the directors' powers remain in place. And because these directors' powers remain in place, ergo, he says, that means being allowed to act on behalf of the Company in, and instruct them basically to their company, to oppose recognition proceedings in the U.S. I think that's what he is saying or something to that effect. He'll correct me if I'm wrong about this in due course.

But my stepping off of this path is this: He's going somewhere where the order doesn't go. The order doesn't actually talk about who has the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

114

right to oppose, who if anybody has the right to oppose an application for recognition elsewhere.

Now he would say, I think, that on, in his view, this means that the directors retain a power to oppose in the name of the Company.  You, I think, would say, is that actually the order does envisage what happens and it just gives one power and that one power is for the officeholders to seek the recognition.  So the difference is that you are saying that the Court order is already expressed in specific as to who can do this.  Mr. Gledhill is saying that actually there is a silence as to who can oppose and so the directors should be assumed to retain the power.  Is that the contrast that I have to be worried about here, the difference between the parties?

MR. GIBBON:              In a sense, yes, My Lord, if I can respectfully say that because Mr. Gledhill invites you to look down the opposite end of the telescope to the one that we respectfully say has been used by all the judges in the cases we referred to.  And the starting point, if it was simply put in the McPherson quote I showed to you is that the view was reached by Mr. Justice Chitty, that the effect of the appointment of provisional liquidator was just

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

115

as much to remove the powers of a director as the making of a voluntary liquidation was.  And that's important because at the very first step on my friend's path to this analogy as cited, summarized by Your Lordship, he says, well, anything that's not given to the liquidators can't have been divested.

Now, we respectfully say this is per the terms of the order, but the starting point is if you are putting a company in provisional liquidation, the reason it is a very powerful thing to do, when you look through these powers, what they are allowed to do under the Act, under the specific provision, that's effectively everything that the Company does and that's why the authorities speak with one voice about the need for residual powers, if you like, it's not summarized and it doesn't need to be summarized in the penal notice, but there are certain things left over which could only be done by the Company personally; appealing the order, challenging the order and anything directly to do with those matters.  And as it was put by counsel in the late nineteenth century case I showed you, you can see the logic to that because the Company should be entitled to appeal, every person who is allowed to appeal.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

116

But as you say, that first step on the path seems to be saying, well, you should construe narrowly, anything that isn't expressly taken, should be regarded as left for the directors, and then he says, by way of next step, then that must include the power to oppose.  But that's to send the order on its head, with great respect.  The order is precisely intended in the standard way and Your Lordship will, like me have seen many, many of these orders in the past, in the standard way to remove powers from directors.  What they are left with will only be certain, narrow things that will either be appealed or conceivably specific areas that the Court chose to leave with the directors.

So it's a very long way of saying a yes, I agree with respect with Your Lordship's contrast of our respective permissions, but then following into why I say in the light of general authorities, general experience at the bar and the bench, I respectfully submit that the submissions proposed to you by the Joint Provisional Liquidators are the correct ones.

THE COURT:                Okay.  We will rise now for lunch for an hour and, so we will see you again at 2:00 o'clock, BVI time.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

117

Thank you very much, learned Counsel.

(Thereupon, this matter breaks for the luncheon adjournment at 1:02 p.m.)

* * *

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

118

AFTERNOON SESSION

* * *

(Court reconvenes at 2:02 p.m.)

THE COURT:                Yes.  So good afternoon, learned Counsel, ladies and gentlemen.

Ms. Hodge, if you'd like to call the matter again, please.

THE CLERK:                BVIHCOM 001 to 0030 of 2026 - The Attorney General versus Bright Team Global Limited, et al.

THE COURT:                Yes.  So good afternoon, learned Counsel.

By way of appearances I think I have Mr. Andreas Gledhill, K.C., together with Mr. Toby Brown on the Campbells Companies.

We have Mr. Peter Tyers Smith, Mr. Merrick Watson, Mr. Timothy de Swardt for the Kobre & Kim Companies.

We have Mr. Michael Gibbon, K.C., together with Mr. Jon Colclough and Mr. Oliver Clifton for the JPLs.

And then we have Mr. Paul Dennis, K.C., together with Ms. Nadine Whyte Laing and Ms. Koya Ryan for the Attorney General, I think.

Is that right?

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

119

MR. GIBBON: My Lord, I'm afraid to say that Mr. Colclough has been unable to attend this morning so his name will have to be stricken from the record, as they say in New York.

THE COURT: Okay. All right. Very good. Fine.

Okay. Now, you're still on your feet, Mr. Gibbon, and just so that we don't forget one of the stations that Mr. Gledhill alighted at, can we, please, have a look at Clause 9 of the JPL order. Let me take you to it.

Where are we? It would be Bundle 1.

Yes. It's on page, pdf page 122, page 117.

MR. GIBBON: My Lord, I have it.

THE COURT: Yes. Okay.

Now, I remember Mr. Gledhill taking me to it. It may be that I wasn't paying sufficient attention, but certainly the way he spoke the provisions of this clause or paragraph, he was referring to the affairs of the company and its assets within the jurisdiction of the Virgin Islands.

And the full paragraph, of course, reads:

"The powers set out in Paragraph 3 above

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

120

are to the exclusion of any power exercised or purported to be exercised by any existing director of the Company in so far as such power concerns the affairs of the Company and its assets within the jurisdiction of the Virgin Islands."

Now, first of all, the way he said it was that it could be construed as this, what this paragraph concerns, are the affairs of the Company within the jurisdiction of the Virgin Islands as well as its assets within the Virgin Islands.  And one of the things that he could be suggesting, although I'm not sure he did, is that, well, actually, what's happening in the U.S. here does not concern the affairs of the Company within the jurisdiction of the Virgin Islands, but rather the affairs of the Company within the U.S. Consequently, the directors' powers have not been divested in respect of them.  They can continue to do whatever they want in the U.S.

Maybe I'm wrong in reading too much into it, but I'm possibly thinking that's what Mr. Gledhill meant.

MR. GIBBON:                 So, My Lord, a few points in relation to that.

I think it can certainly be suggested there is an infelicity to 9, in that it raises the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

121

question that Your Lordship has asked.

Certainly, Mr. Gledhill, when making submissions before Your Lordship in April, I made a note of it here, what he said was, I won't take you to transcript, it's page 183, the way he said it was that:

"So the effect of Mr. Justice Mithani's order is to disentitle the directors in effect to do anything which interferes with the Liquidators' enjoyment of the powers that are conferred upon them."

So I certainly hadn't taken it prior to today that he was placing any reliance on 9 as suggesting, ah, well, the order only applies to matters in the BVI.

And, with respect, it would be an illogical reading, again in the context of the submissions I made earlier, about construing the order in its context.  And the context is that it was an order that was sought expressly against the background that the Attorney General was trying to remove the powers of the directors.

So to suggest that this somehow means that in relation to anything outside the BVI the directors can cause the Company to challenge what was done, we say the words here don't bear the weight that's necessary for that submission to succeed.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

122

The starting point is, I won't use the Latin, but there's also the general proposition that the special -- well, the special is what you concentrate on rather than the general.

THE COURT:                Okay.  Right.  Yes.

MR. GIBBON:               I told you earlier in my start, but I'm not going to attempt it because I haven't got it at my fingertips.

THE COURT:                Okay.  Yes.

MR. GIBBON:               But in circumstances where it is very clear that without further permission they can undertake various steps, then we respectfully say that in accordance with section 171, if you give the powers to the provisional liquidator, then that's sufficient.

Now there may be a degree of simply wanting by reference to a provision of an earlier draft just to put something beyond doubt in Paragraph 9, but we respectfully say that the focus should be on what the Court has said the Joint Provisional Liquidators are entitled to do, and indeed should do, if they consider it appropriate for guarding the Company's assets and gathering information in relation to it.

And I don't want to repeat submissions

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

123

I've made this morning, but an interpretation which says that on an issue which is quintessentially an issue for the BVI Court somehow somebody can turn up in the name of the company, because he's allowed the claims by the BVI Court, to argue a point which really is a BVI point to argue, we say cannot make any sense.

THE COURT:                Okay.

Thank you, Mr. Gibbon.  Anything else from you?

MR. GIBBON:               I've reflected over the short adjournment.  Your Lordship has heard from me.  I don't propose to amplify any further, and I'd simply pass over to Mr. Dennis, subject to Your Lordship.

THE COURT:                Okay.  Thank you very much, indeed.

So, Mr. Dennis.

(Pause.)

Hello, Mr. Dennis.  Are you speaking?

MR. DENNIS:               My Lord, I was just making sure I was not muted.

THE COURT:                You are not muted.

MR. DENNIS:               Very well, My Lord.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

124

My Lord, the applications before you raise issues squarely joined between the Joint Provisional Liquidators on the one hand and the Respondent Companies on the other.  And so technically the Attorney General, whom I represent, is not really a party to these applications.

However, My Lord, as we indicated in those skeleton submissions which were filed on behalf of the Attorney General, we believe that we should, to the extent that we are able, provide whatever assistance we can to Your Lordship with a view to giving you, Your Lordship, the benefit of anything which we may be able to provide by way of assistance in resolving the issue which is now squarely before you, having been placed before you by the Liquidators, the Joint Provisional Liquidators and the Companies.

Having provided those written submissions, My Lord, I do not propose to repeat submissions which we've already made in those written submissions.  Indeed, My Lord, nor do I propose to cover ground which has already been covered by my learned friend, Mr. Gibbon, K.C., for the Joint Provisional Liquidators, save to say, My Lord, that we are in complete agreement with the submissions which he has made on the issue which Your Lordship has before

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

125

you to determine.

I will confine myself, My Lord, in the circumstances to additional points beyond those which Your Lordship has already heard, which I believe are worth making to the extent that not having had the benefit of the Companies' submissions prior to providing our written submissions to Your Lordship, we would not have had the benefit of addressing those, and to the extent that they have hitherto not been addressed in the oral submissions which Your Lordship has already heard.

The first of these points which I would like to make has to do, My Lord, with submissions made by my learned friend, Mr. Gledhill, for the Campbells Companies, and I believe that these submissions were also adopted by Mr. Tyler (Sic) Smith.  And that, My Lord, has to do with a construction argument which was made by Mr. Gledhill.  And he took Your Lordship in particular to section 175(1) of the Insolvency Act dealing with the effect of liquidation, and section 171 which deals with the rights and powers of a provisional liquidator with reference to section 175.  And Your Lordship may turn that section up at page 7 of the Campbells Authorities Bundle.

THE COURT:                Yes, I'm there.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

126

MR. DENNIS:                He points to section 175 and, in particular, section 175(1)(b), which speaks to the fact that the directors and other officers of the Company remain in office but cease to have any powers, functions or duties other than those required or permitted under this part or authorised by the liquidator.

He then took Your Lordship to section 171 which says:

"Subject to subsection (2), a provisional liquidator has the rights and powers of a liquidator to the extent necessary to maintain the value of the assets owned or managed by the company or to carry out the functions for which he or she was appointed."

And his argument was, that because there is no similar provision to 175(b) in section 171 which deals with the rights and powers of provisional liquidator, the curtailment of the directors' powers as they appear in 175(b) do not apply to provisional liquidators.  That is his argument.  And so, the directors are free, as it were, to exercise their powers because those powers cannot be said to have been curtailed, having regard to the interplay between those two sets of provisions which I took Your Lordship to.

I believe my learned friend, Mr. Gibbon,

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

127

described these submissions as seductive.  I would rather describe them, My Lord, as specious.  They are clever.  It's an argument which is clever, but it's an argument which is false.

It is false, My Lord, because when section 171 properly construed speaks about provisional liquidators having the rights and powers of a liquidator, to the extent necessary to maintain the value of the assets, et cetera, it must be speaking about the powers of a liquidator as understood with reference to what the Act stipulates are the liquidators' powers.  And when one has regard to section 175, the fact that 175 subsection (1)(b) make it clear that once a liquidator is in place the directors cease to have any powers, functions or duties other than those required or permitted under the Act or authorised by the liquidator, then it must stand to reason that when section 171 speaks about powers of the liquidator, it's the powers of the liquidator which exists in circumstances where the directors are divested of all power save for those residuary matters which they can properly exercise powers in relation to.

This point, My Lord, is buttressed by subsection (2) of section 171 which says that the Court may limit the powers of a provisional liquidator in

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

128

such manner and at such times as it considers fit.

So, firstly, we have section 171 speaking about provisional liquidators having the powers of a liquidator, which has to be understood as they are expressed in 175(1), including 175(1)(b), and then that has to be viewed in the context of subsection (2) of 171, namely, what, if any, limits have the Court placed on the powers of the provisional liquidator which it has appointed.  And so in order to determine that, My Lord, one now has to look at the terms of the order appointing the provisional liquidators and what the Court says in that order about their power and authority.

That then takes us squarely, My Lord, to Paragraph 9 of the order which Your Lordship may turn up at page 117 of that same Campbells Authorities Bundle.  And that Paragraph 9 says:

"The powers set out in paragraph 3 above are to the exclusion of any power exercised or purported to be exercised by any existing director of the Company insofar as such power concerns the affairs of the Company and its assets within the jurisdiction of the Virgin Islands."

So that Paragraph 9 is underscoring the fact that the powers conferred upon the liquidator are

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

129

to the exclusion of any power exercised or purported to be exercised by any director insofar as such powers concerns the affairs of the Company and its assets within the Virgin Islands.

Now, my learned friend, Mr. Gledhill, suggested what I can only characterise, My Lord, as a most abhorrent interpretation of section 9.

I'm sorry, of Paragraph 9.

Paragraph does not, as he suggests, mean that the directors of the company can exercise powers which would involve they being able to procure the Company's opposition to the recognition of the provisional liquidators.

He submits before Your Lordship, and this is how I interpreted his submissions, that because what is happening in the U.S. proceedings concerns assets and affairs of the Company outside the Virgin Islands, that gives the directors the residuary power to interfere to oppose those proceedings because these relate to assets and affairs of the Company outside the jurisdiction.  But that is simply not what section 9 means.

When section 9 uses the language describing assets of the Company, "affairs and assets of the Company within the jurisdiction of the Virgin

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

130

Islands", that language, My Lord, is simply out of a recognition of the fact that orders of the BVI Court do not, without more, have extra territorial reach, and so its orders can obviously have, and only have, effect within the jurisdiction of the Virgin Islands.  That is all that that language in section, in Paragraph 9 of the order means.  And that is precisely why, My Lord, when liquidators or provisional liquidators are appointed in the BVI, in order for them to be able to exercise their full powers, and in order for them to benefit from the provision at section 175(1)(b), which ousts the powers of the directors of the Company, they have to seek the recognition of the relevant foreign jurisdiction, and then armed with the recognition of the foreign jurisdiction they can then fully exercise their powers, and they can then fully avail themselves of the provision which says that the powers of the directors are ousted once they have been appointed in the BVI, and insofar as the foreign jurisdiction is concerned, once they have been recognised in that foreign jurisdiction.

That, My Lord, we submit, is how Paragraph 9 of the order are properly to be understood, and it cannot, as my learned friend, Mr. Gledhill, submits, it cannot possibly mean that because the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

131

proceedings in the U.S. relates to the affairs of the Company in that jurisdiction, and because it also is dealing with assets outside the jurisdiction, then in those circumstances the provision which ousted directors' powers cannot apply.

That is simply, we submit, My Lord, not a sustainable argument.

Taking the matter of residuary powers further, My Lord, it was further submitted on behalf of the, both sets of Companies, and there is no dispute about this, really, that residuary powers in the directors have been recognised by the Courts and exercised by directors to cause the companies formally within the control of directors to do a number of things, which include to defend substantive winding up proceedings, to vary or discharge any order appointing joint provisional liquidators, to apply for interim relief and to file an appeal against final winding up orders.

We join our issue with that proposition as a matter of law.

They submit further that in all the scenarios there is no expectation or likelihood that the JPLs would cause the Company to take legal actions in question and relying on the Re Union case they

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

132

submit doing so would be adverse to their own interests and authority, and it will be inappropriate for them to give instructions on behalf of the Companies on such matters.

However, My Lord, it is important to bear in mind that that is not the scenario which is before Your Lordship. What Your Lordship has before you, arising out of the U.S. proceedings, is not a situation involving the defence of the substantive winding up proceedings or varying or discharging any order appointing the JPLs, or applying for interim relief in the sense contemplated here of filing any appeal against any filing of order.

This is a different case. This is simply a case in which what is before the U.S. Court doesn't fall in any of those categories. It is simply an application by the BVI appointed joint provisional liquidators for recognition in that jurisdiction. And the Companies have not been able to point to a single authority which would support the proposition that in the circumstances of this case where what is before the foreign Court is simply an application for recognition, allowing them thereby to be able to take steps to protect the assets which is a part of its mandate, that in a situation such as this, the directors have the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

133

residual power to challenge or oppose that recognition.

As a matter of fact, My Lord, if that were the case, it would make absolute nonsense of the very specific powers which have been conferred upon the joint provisional liquidators.  Because if the directors had the power and authority to, and were to be allowed to oppose the recognition proceedings in the way contended for by the Respondent Companies, that would undermine the very order which this Court has made for the Joint Provisional Liquidators to apply for recognition to allow them to do precisely what the joint provisional liquidation order and the powers conferred upon the officeholders contemplate, which is to identify, protect and preserve the assets pending the substantive hearing of the application for liquidators.

Recognition abroad of the Joint Provisional Liquidators, we say, My Lord, is an absolutely necessary corollary of the appointment of the Joint Provisional Liquidators in this jurisdiction. And so to challenge it in a foreign Court or to purport to challenge it in the foreign Court is tantamount to an attack upon, or a challenge to, the very appointment of these officeholders, the very appointment itself.

That, My Lord, is untenable because any

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

134

challenge to the appointment of the Provisional Liquidators, whatever guise it takes, is quintessentially a matter, not for some foreign Court, but is quintessentially a matter for the BVI Court and, in particular, My Lord, either by way of an appeal of the BVI order, which has hitherto not happened in this case, because indeed, the continuation of the provisional liquidation was never opposed by any of the Companies, or in the absence of such appeal by some other approach to the BVI Court that made the order in the first place for some kind of variation of the order.  That has hitherto not been done.  And because this is quintessentially a matter for the BVI Court, that is precisely why, My Lord, the learned judge in the recognition proceedings in the U.S., astutely recognised and proceeded on the basis that the question of whether or not the directors could properly oppose the recognition proceedings was, again, quintessentially a matter not for him but for the BVI Court, and that is why he said I'm not going to get into this; go back to the BVI and have the BVI Court determine that.

And so, My Lord, it cannot in those circumstances be sustained that the directors are now in a position where they can take the steps which they

135

are purporting to take in the foreign proceedings in the U.S.

Further, My Lord, such an outcome would be wholly inconsistent with the appointment of the Joint Provisional Liquidators in the BVI and with the powers conferred on the Joint Provisional Liquidators, and for the Court to do what the Companies are submitting the Court should do, which is to allow them to continue to mount this opposition, would be tantamount to the proverbial cow, as my grandmother would describe it, who stands there and allows you to milk it, and then you having procured a pail of milk from that cow, that cow then kicks the pail of milk over.

I'm not suggesting that this Court is a cow, My Lord, but I'm sure Your Lordship gets the analogy.

That is what the Companies are, in essence, asking this Court to do. That, My Lord, we say is entirely untenable.

Your Lordship raised an issue in relation to certain submissions made by my learned friend, Mr. Gledhill, where he adverted to certain federal rules, and I believe it was being suggested that those rules themselves contemplated allowing the Companies to

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

136

oppose those proceedings.

My learned friend, Mr. Gibbon, did take Your Lordship to extracts from the relevant rules of Court in the U.S. Court, but those rules did not speak to this issue.  And so we do not know the full ambit of what that contemplates, but the very fact that the judge in New York has said that this is a matter for the BVI Court to determine can only be interpreted and taken as meaning that whatever the rules are that would ordinarily be applicable in New York, whether or not at the end of the day the Company is allowed to oppose those recognition proceedings, will need to be determined on the basis of BVI law after a determination by the BVI Court.

So, it is no surprise at all that the New York judge has sent the whole shebang on that issue back to the BVI.

So, My Lord, however clever the argument of the Companies were this morning, whatever calisthenics of construction was sought to be applied in order to arrive at the result which they seek, we say, My Lord, that the provisions of the Insolvency Act, properly construed, the provisions of Justice Mithani's order, properly construed, neither of those provisions in the Act nor the order bear the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

137

interpretation which they are contending for.  And there is nothing in the point, or in the points which have been advanced to Your Lordship to suggest that somehow residual powers continue to be enjoyed by the directors which would allow them, in effect, to obstruct and frustrate the clear purpose and intendment of the appointment of the Provisional Liquidators and of the specific powers conferred upon them to seek recognition in relevant foreign jurisdictions.

Those in a nutshell, My Lord, are the points which I wish to commend for Your Lordship's consideration, and unless Your Lordship has any specific questions for me, I'd be content to leave matters there, My Lord.

THE COURT:                 Yes.  Thank you, Mr. Dennis.

Now I suppose we need to take the reverse order and go back to Mr. Tyers Smith, I think, before we go back to Blackstone Chambers Meeting Room.

MR. TYERS SMITH:        My Lord, I'm very happy to take it that way.

All I will say is, obviously as you heard from my opening submissions, I sought not to repeat those opening submissions that dealt with the forensic analysis on construction and residual powers that

138

Mr. Gledhill had made.  So insofar as he makes his reply to deal with those issues as they've been addressed by both my learned friend, Mr. Gibbon, and, Mr. Dennis, I will preemptively say that I will adopt those as well for the sake of both brevity and efficiency.

My Lord, there are, therefore, two points that I wanted to address in reply.  The first, again, is context, and context was deployed by Mr. Gibbon in two ways.  First, he used it to explain to My Lord why Chapter 15 had been pursued in the way that it have by the Provisional Liquidators.  And the second part of context, I think the way he put it was that it was irrelevant to the issue of construction based on the Sans Souci case.

In particular, I think he submitted to you that the real question is what was the issue that was before your brother judge, Mr. Justice Mithani.  And that is the guiding principle to determine what the order means.

So I want to just deal with those points, and then, secondly, I will just spend a bit of time on displacement.

So, My Lord, first of all on context, Mr. Gibbon showed you Paragraph 50 of Mr. Drury's

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

139

affidavit, and that is in bundle, the Hearing Bundle, Volume 1 at page 42. And can I ask My Lord to please turn that up.

THE COURT:                Yes.

MR. TYERS SMITH:          Thank you.

THE COURT:                Yes.

MR. TYERS SMITH:          So, My Lord, Mr. Gibbon said that Paragraph 50, as you can see, it's got sort of various enumerated components to why the JPLs proceeded in the U.S. You can see from the first one, little Roman (i), that it's said that there's been an absence of meaningful cooperation from the directors of the Companies.

So from that I take it that we are included in that criticism.

My Lord, can I just ask you to flick back, please, in this statement and find Paragraph 26.

THE COURT:                Yes.

MR. TYERS SMITH:          So, My Lord, insofar as Amber Hill and Lateral Bridge is concerned, we've actually received very little correspondence. So you can see that Mr. Drury speaks of the letters, 36 letters that were sent out back in February. And I think he's exhibited an example of one of those letters, which I don't need to take to you, but it is

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

140

in fairly standard form, you know, enclosing the order and setting out what their responsibilities are.

But there don't appear to be anything else in Mr. Drury's affidavit that really focuses upon Amber Hill or their incumbent directors as to why they haven't cooperated.  So I would simply invite a degree of caution when accepting that there has been meaningful absence of cooperation on the part of my clients.

And the way that that then unpacks is if one transitions back to Paragraph 50 of Mr. Drury's affidavit, it goes on to Roman numeral (ii).

Does My Lord see that, "the obstruction encountered from Campbells"?

THE COURT:                    Yes.

MR. TYERS SMITH:         And so on.

So (ii), (iii) and -- well, (ii) and (iii).  (iii) is rather long.

My Lord, those matters simply don't concern us.  I would accept that Roman numeral (iv) it is said, I think by the Provisional Liquidators, that they want to seek discovery from, using their Chapter 15 powers, from a financial institution that My Lord might recall was referred to in the complaint, the Civil Asset Forfeiture Complaint, where there was some

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

141

mention of a bank account held by, I think it was Amber Hill.

So we accept that is something that they want to do, but the rest of the points made in Paragraph 50 simply don't apply to us as a point of context, as Mr. Gibbon put it.

My Lord, moving then on to context as it relates to the proper interpretation of the order, can I ask you to have a look at the Sans Souci case which is in our bundle of authorities.  It is under Tab 5 at page 41.

THE COURT:                 Yes.

MR. TYERS SMITH:           My Lord, so this is the judgment of Lord Sumption particularly at Paragraph 13.  I think you were taken to this paragraph, so I don't want to repeat it, but this just enunciates the approach to the proper interpretation of an order, and is to be treated like any other legal instrument.  And I think you were shown the part of this extract that says:

"The reasons for making the order which are given by the Court in its judgment are an overt and authoritative statement of the circumstances which it regarded as relevant," and therefore they're admissible.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

142

But then in the final sentence it says this:

"In particular, the interpretation of an order may be critically affected by knowing what the Court considered to be the issue which its order was supposed to resolve."

And that then led to my learned friend's submissions that really what this order was concerned with was director divestment.

Now, My Lord, that then takes us to a point which has been pervasive, and I feel somewhat sheepish and hesitant in repeating it again, that we are not, or I should say, my clients are not part of the Prince Group and they are not owned and controlled by Mr. Chen.  And to make that good so that it's pellucid, can I ask My Lord, please, to turn up Hearing Bundle, Volume 2 and have a look at page 1498.

(Pause.)

My Lord, have that?

THE COURT:                   Yes.

MR. TYERS SMITH:         So this is transcript from Day 1, 16th, and rounding up opening submissions from Sir James Eadie.  And if one looks at page 1498, and takes it from line 23 -- actually if one looks at line 12, one can see there that Sir James is

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

143

making clear that the Campbells Companies are said to have been accepted as beneficially owned by Chen.

And then moving down to line 23:

"The K&K people are slightly different, which is no doubt why they have been split off and are separately represented, but they say, well, we are not designated, we are not sanctioned, what's it got to do with us, we are not part of the Prince Group, they say."

And the answer to that is, "well, you may not be part of the Prince Group..."

And I accept that that's somewhat hedged, but again in the light of the fact that there is not a jot of evidence that we are part of the Prince Group and certainly we have not been sanctioned by the Prince Group as part of being part of the Prince Group, that is, we would say, plainly the case.

They then go on to say, well, yes, but you were directly involved in the activities, and then that brings into play what was set out in the Civil Asset Forfeiture Complaint, to which we are not party either.

But then the interesting point, My Lord, is this at line 8 on page 1499.  Sir James then went on and said:

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

144

"And moreover, as we have seen from the Attorney's Second Affidavit, there is evidence ... that appears directly to link you with the actual person."

My Lord might recall that this was the Zhou connection that was explored at trial.  But critically, if it is Mr. Gibbon's case that, well, it's important to understand the issue that was before Mr. Justice Mithani, it can't possibly have been right that learned Attorney General's Second Affidavit form part of that analysis.  And the reason for that is because it was signed on the 8th of April, many months after the hearing on, the 1st of January.

So there is nothing that can be said that when the Attorney General moved Mr. Justice Mithani for the ex parte order that it was to be obtained to deal with the issue of my directors of the, sorry, the directors of my clients being associated with Mr. Chen or being sanctioned.  The sole basis on which the application was ultimately moved was that we had been referenced in the Civil Asset Forfeiture Complaint, not as Mr. Gibbon said, as a reason to divest directors' powers.

THE COURT:                Are you saying that somehow or other your clients might have actually got a claim to a different treatment from this Court

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

145

than the Campbells Companies?

MR. TYERS SMITH:        Well, I mean,
it is a real point of divergence because, My Lord, if I
can respectfully remind you that, so much emphasis is
placed on two matters.  First is the sanctions regime.
And if you can remember from the 68 or 69 pages of the
Attorney General's pleadings, almost all of them were
dedicated to those two issues, and none of them concern
us, and that requires a process of distillation to
understand, well, what it is the issues are against us
at all.  And the only issues that emerged at trial were
what was said in the Civil Asset Forfeiture Complaint,
and, secondly, that it had been belatedly discovered
that there was some link to another company called
Maple Bliss which was not sanctioned and is also not
controlled, owned or controlled by Mr. Chen.

So that's really where it comes out, and
if we need to have a look at how the case was put
before Mr. Justice Mithani, then we can do that, but it
would require just having a quick look at the
transcript.

THE COURT:              No.  I mean,
are you trying to tell me that Justice Mithani
basically intended to apply a different regime or a
different type of order to your Companies than he did

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

146

to the Campbells Companies?  Are you trying to tell me that?

MR. TYERS SMITH:          No, no.  Not at all, My Lord.  What I'm saying is --

THE COURT:                I mean, whether he's lumped them all together, rightly or wrongly, I mean, isn't there authority that I was taken to earlier today to say that when you interpret an order we're not looking at whether an order should have been made or not, but we're looking at interpretation, mainly the context, historical context in which it was made.

What I'm saying is that one order seems to have been applied to both the K&K Companies and the Campbells Companies.

MR. TYERS SMITH:       My Lord, no, because what the San Souci case says is that the interpretation of the order is critically affected by knowing what the Court considered to be the issue.  And I can show you, just to round off the point, if one was to just briefly look at what was said to Mr. Justice Mithani on the day.  It's in Volume 2 of the Hearing Bundle at page 711.

THE COURT:                Yes.  711, okay.

MR. TYERS SMITH:       Yes.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

147

THE COURT:                Okay.

MR. TYERS SMITH:          So these were submissions made at the ex parte hearing starting at line 7.

"The targets, My Lord, include all of the Companies which are the subject of the application before Your Lordship..."

The references are made to target.  It's the target of sanctions in the international effort.  But then it goes on to say:

"...with the exception of Amber Hill and Lateral Bridge Limited.  Even though they are not targeted in the same way as the others..., the very important link to them ... in the context of the concerns and the allegations raised in these proceedings, as I've just indicated, that the cryptocurrency, which is the subject of forfeiture proceedings..."

So it's not -- it wasn't put on the basis of, well, this company is part of the Prince Group and then the common ownership.  It's because of what was said in the Civil Asset Forfeiture Proceedings.  That's the point that I want to make and take out from what the issue was before Mr. Justice Mithani.

THE COURT:                Are you saying

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

148

-- I need to get what you're trying to say here.  Are you saying that whatever the case might be in respect of the Campbells Companies, then in respect of Amber Hill and Lateral Bridge, then you have this, you don't have this intention to divest directors of their powers in the same way as it might be for the Campbells Companies?

MR. TYERS SMITH:          No, no, no.  That would be taking it too far.  I'm just simply saying, the premise on which it was said that provisional liquidators should be appointed was by reference to the evidence that was put before the judge on the day, which was they're relying upon the pleading, the pleaded case in the U.S., forfeiture proceedings.

I don't make the point of distinction because the point of context was put on the basis that this was all engineered towards directing divestment from those connected with the Prince Group, and we just say that is not, that can't possibly be true of Amber Hill and Lateral Bridge.

THE COURT:               Where does that take you next then?  I mean, in the vernacular, that phrase is, so what.  Where does it take your argument?

Because the argument is, Mr. Gledhill was

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

149

saying, Mr. Gledhill was saying, no, no, no, no, no, no, no; you've got all these directors who have got powers, and residual powers, and the residual powers are quite broad because when you construe the order, then certainly in relation to things that were done overseas in relation to the Companies' affairs, they retain the powers for that.  They retain the powers because there hasn't been a full-blown liquidation yet, and this is only provisional liquidation.  And so there's all sorts of ways in which they retain their powers.  And the context is basically you have to ignore all that, you just have to look at the wording of the order.  And so he gets to the end of the road, as Mr. Gibbon put it, this sort of primrose walk, I think, of getting to this idea that the directors retain very broad residual powers.  Mr. Gibbon says that's nonsense when you look at the context.  The whole point is being to strip these directors of their powers in order to (a) find the assets and preserve them on these Companies in circumstances where the Companies to which this order applies seemed to have had strong links to, and indeed many of them being run by Mr. Chen who apparently is this real awful man who has done all sorts of dreadful things in many jurisdictions.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

150

MR. TYERS SMITH:        Yes.

My Lord, I don't disagree with that save to say that the point of distinction is that our Companies are not connected to Mr. Chen in the same way.  I mean, if that doesn't take the matter further forward, then I'll move on, but it is, we would say, relevant to the question of whether the issue was solely to divest or whether it was something else, and for us it was down to the reference in the complaint.

THE COURT:               Okay.

MR. TYERS SMITH:        My Lord, I'll just spend then a few moments on displacement.  I realise it's getting somewhat late.

My Lord, it was said to you that the judge made practice, or the judge made rule which is to the effect that all director powers become automatically displaced upon the commencement of a joint, of a provisional liquidation applies in the BVI, and I simply say that can't be correct.  And the reason for that is the BVI is different, and the legislature have considered it appropriate to enact a specific provision that deals with the circumstances in which directors' powers are suspended.

Now I think what Mr. Dennis said is, well, section 175(1)(b) is to be regarded as appoint

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

151

provisional liquidations, and I simply say that is wholly incorrect.  It can't possibly be right for the reasons I alluded to in my opening submissions, that one has to track that through to the commencement of the liquidation.  And the short point there, My Lord, is, well, there may never be a full liquidation, because as My Lord knows, the question of whether liquidators should be appointed on a final basis is now before the Court.

And that's not an offensive interpretation of the position in the BVI because I would say it is consistent with the limited purpose, the conservatory function of provisional liquidators, and I took you to the case of Carapark earlier, and particularly the part of the case where it says the provisional liquidators ought to do the least, not the most harm.

So I say that that is inconsistent with Mr. Gibbon's submission which he said, well, the powers are there if and when you need them.

My Lord, the final point that I want to make concerns the meaning of Paragraph 9 of the order.

Can I just ask My Lord to take up the Authorities Bundle and look at section 171(2) again, please.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

152

THE COURT:                    Yes.

MR. TYERS SMITH:              That's under Tab 13.

THE COURT:                    Yes.

MR. TYERS SMITH:              So, My Lord, it's a provision you've now become very familiar with, of course.  Section 171(1) deals with the necessary restriction on the exercise of those powers, and I don't want to trouble you again with that.  But section 171(2):

"The Court may limit the powers of the provisional liquidator in such manner and in such time as it considers fit."

Now the way that that works in respect to Paragraph 9, I would submit, is not that it is, simply be treated as an infelicitous provision that's made its way into the order.  If a general rule that this application of director powers applies, then Paragraph 9 modifies it.  And that, of course, is problematic because it begs the question of why is Paragraph 9 then there at all.  I would say that the answer to that, My Lord, is because the qualification in Paragraph 9 of the order is because it is a statutory restriction that has been imposed through 171(2) by the Court.  And it makes it clear that the difference between the powers

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

153

that remain with the directors, and the powers that do not, are those confined to Paragraph 3 of the appointment order, and My Lord has seen that those concerned powers that are to be dealt with territorially within the BVI insofar as they relate to the assets and affairs of these Companies.

And, My Lord, just to make good on that final point, it's that it is part of the application in Chapter 15, supported by an expert declaration of Mr. Chissick at Paragraph 68, which is at page 1199.  I don't ask you to turn it up, but Paragraph 68 specifically talks about the reason that they are in the United States is because they want to have their powers recognised insofar as they relate to the assets and affairs of the Companies in the United States.

My Lord, and for those reasons Paragraph 9 is a territorial restriction on the fetter placed on the directors' powers.

My Lord, just in passing, I think you've heard a lot that all of this is designed somehow to interfere with the exercise of the JPL's proper powers, but it is accepted in Mr. Drury's evidence, specifically that he does not oppose, or he does not say that no one can object to their appointment in the United States.  And, My Lord, in those circumstances,

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

154

what does it matter?  Because no one is saying anything other than, for the purposes of this application, someone has to be able to appear in the name of the Company to say this relief should not be granted and the Court needs to have the full picture.

My Lord, those are my submissions in reply.  I'll hand over to Mr. Gledhill, unless you have any questions.

THE COURT:                    Yes.  Thank you very much, Mr. Tyers Smith.

So, Mr. Gledhill.

MR. GLEDHILL:               My Lord, I'm not going to be too long in reply.  It's just that Your Lordship has had lunch, and I take the view that nobody should be subjected to a strenuous exercise of callisthenics on a full stomach.  So I'm going to be relatively succinct in the comments that I make in reply.

If I can start by inviting Your Lordship to take out Mr. Justice Mithani's order again, that, of course, is in Bundle 1, Tab 12.  And if you turn on to page 117, you have Paragraph 9.

THE COURT:                    Yes.

MR. GLEDHILL:               There is a striking feature of my learned friend, Mr. Gibbon's

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

155

submissions that he didn't address Paragraph 9 at all until Your Lordship raised it with him shortly before the lunch break.

For reasons Your Lordship has already heard, this is, we say, the critical provision, and the reason this is the critical provision, is that this is the provision which the judge quite expressly addresses the question of what residual powers the directors do and do not have after the joint provisional liquidators have been appointed.

The submission is made by my learned friend, Mr. Gibbon, well, the broad contemplation of the judge, the broad intention of the judge on the 9th of January was to sweep away Mr. Chen because he was a wrongdoer and sweep him away from any form of control over the Company.

That's not what the order says.  What the order says is it affects a limited dispossession of the directors' powers in accordance with the provisions of Paragraph 9.

I've made the point to Your Lordship that there are two buckets of liquidator powers, those provided for in Paragraph 2.  Those require sanction. Those provided for in Paragraph 3.  Those don't require sanction.  And it is only and specifically the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

156

provisions of Paragraph 3 when those powers are exercisable that the powers of the directors abate.

And, as Your Lordship has also seen, Mr. Tyers Smith just addressed Your Lordship on this point already in the course of his reply submissions. It also contains territorial limitation, that that dispossession of directors' powers does not apply to the extent that the liquidators are acting, the Joint Provisional Liquidators are exercising a section 3 power which concerns the affairs of the Company and its assets, other than where it is -- forgive me. It does not apply unless the Joint Provisional Liquidators are exercising a power which concerns the affairs of the Company and its assets within the jurisdiction of the Virgin Islands. And the short point is Mr. Tyers Smith has just made by reference to Mr. Chissick's witness statement is that an application for recognition overseas in the United States, par excellence, is an example of a power that is not being exercised for the purposes of the jurisdiction of the British Virgin Islands. It's being exercised quite specifically in relation to the assets and the affairs of the Company in the United States.

So that really is the starting point and, we respectfully suggest, the ending point for Your

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

157

Lordship's analysis.  It turns upon Paragraph 9.  And when you go back to Paragraph 3 which sets the parameters of the powers which the JPLs have without sanction, and the corresponding dispossession of the directors' powers, again, looking at bundle page 115, you see (c) and (d).  (c) is not about directors' powers at all.  (c) is an order pursuant to section 472 of the Act.  It's an order that the Joint Provisional Liquidators are enabled to go forth to the United States and seek recognition.  That's not something the directors could do.  They're not the officeholders.  There's nothing that the directors can do to interfere with the exercise of that power.  The Liquidators have that power, but what that section, section, subsection (c) does not tell Your Lordship is, what the extent to which the directors of the Company can continue to use the name of the Company for the purposes of pursuing proceedings.  The answer to that question is found and found only in subsection (3)(d).

I've made the submission to Your Lordship, if you ask yourself the question does opposing the Chapter 15 application in the United States within the meaning of 3 sub (d), "is it necessary to protect the assets and information of the Company", and I've made the submission to Your Lordship

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

158

that it cannot possibly be, and no submissions to the contrary was advanced by my learned friends, Mr. Gibbon, or by Mr. Dennis.

And if that's correct, the simple point is that the Liquidators do not have the power under (3) sub (d) to litigate against themselves in the United States funds, unsurprisingly, and the corollary of that, and the plain language of section 9, Paragraph 9 of this order, is that the directors do.

Now, my learned friend, Mr. Gibbon's answer to that point as it emerged in the course of submissions and particularly in the discussion with Your Lordship just before lunch, was that a further unwritten or not expressed on the face of this order narrowing of the powers of the directors was implicit in the very fact of the making of a provisional liquidation order, and there were two principal submissions that my learned friend advanced in support of that.  The first was to make the point that some of the English authorities, and this is mirrored in some of the Commonwealth cases as well, have referred to the board being functus upon the appointment of a provisional liquidator.  And the second point was to say that the interpretation for which we contend cannot possibly have been intended by Mr. Justice Mithani,

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

159

given that he thought that Mr. Chen was an egregious wrongdoer.

Now taking those points in turn, and starting with the first, we don't, in fact, accept that in England the position is as clearcut as my learned friend suggested that upon the appointment of a provisional liquidator the board is functus.  And the simple reason for that is the reason that we gave in our skeleton argument, and this point is true both of the BVI and of England, that there is no such thing as a standard form provisional liquidation order.  The powers that the provisional liquidator has are the powers which he asks for and he gets when he makes the appointment.  Those powers may or may not entail a corresponding diminution in the powers available to the directors.  It entirely depends upon the functions with which the provisional liquidator is clothe.

So even as a matter of English law, I do not accept the proposition that the appointment of a provisional liquidator in England entails the consequence that the powers of the board are from by virtue of that fact alone dispossessed.

So far as the BVI is concerned, I've made the submission to Your Lordship that the position in this jurisdiction is, in any event, different, because

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

160

the 2003 Act contains in section 175, subsection (1)(b), which Your Lordship has gone to now on a number of occasions, it contains the provision that the English Insolvency Code doesn't.  It tells the Court, firstly, that the directors remain in office even after liquidation.  It tells the Court, secondly, that although they remain in office they lose their powers save to a reserved exception which Your Lordship has seen a number of times.  We don't need to go back to it.  But there's no corresponding provision to that in the English Insolvency Act.

And I made the point, Your Lordship, that the corollary of that inevitably is that that loss of powers does not take effect upon the appointment of provisional liquidators.  And my learned friend, Mr. Dennis, in the course of his submissions during the earlier part of this afternoon attempted to suggest to Your Lordship that it must do, as a matter of implication, because the Court is enabled effectively to give the Joint Provisional Liquidators the Schedule 2 powers if it chooses to go down that route.  But that, with great respect to my learned friend, that is an impossible submission because that is, in effect, flatly contradicting the express provision of the Act. The Act says in terms that the diversity occurs and

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

161

only occurs on the appointment of a liquidator.

And, secondly, that submission fails to take account of the fact that even under the terms of section 171 there is no such thing as a standard form order.  Subsection (2) provides that the Court may or may not grant the provisional liquidator the full slate of Schedule 2 powers.

So the position that Your Lordship is left with is that there is, as a clear matter of BVI law, no anchor for the proposition that the board is functus upon appointment of provisional liquidators. And the fundamental point, in any event, is that it would turn on the terms of the order appointing them. And as Your Lordship has seen, whatever else Mr. Justice Mithani was or wasn't asked to do, he was asked to make an order which drew a bright-line distinction between the powers which the directors lost and the powers which they didn't lose, and the simple fact of this application is that both the Joint Provisional Liquidators and the Attorney General are now wishing that the line had been drawn in a different place.  But as you've seen from the authorities in relation to the construction of Court orders the principles in relation to construction are broadly the same.  They are to be construed as any other legal document, and there is no

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

162

basis for going behind clear and express provisions of paragraph 9, read with paragraph 3, and saying that although paragraph 9 brings about only a limited removal of the powers of the directors, somehow the order in some unexplained way must have brought about a far more radical wholesale removal of directors' powers.  Because to make the obvious point, if it had done, paragraph 9 would simply have been redundant. There's no need to say that the powers of directors a, b and c have been removed, if in fact by some other process that hasn't yet been properly explained, powers A through Z would have been removed in any event.

So as a matter of construction, it's simply unsustainable.

And to the extent my learned friend Mr. Gibbon's subsidiary point was well, this must have been what Mr. Justice Mithani contemplated when he made the order on the 9th of January, I start by making the point Your Lordship has no reasoned judgment or effectively a few lines of transcript.  I intend no criticism and certainly no disrespect to Mr. Justice Mithani when I say this.  It's a busy list, it was an urgent matter, or said to be an urgent matter.  But Your Lordship has no reasoned judgment in relation to the making of the order.  There was no point at which

163

Mr. Justice Mithani was taken paragraph by paragraph through the provisions of the order, saying are you content to make this, or are you content to make this order.  He was effectively presented with it as a block and made the order without any amendment.

And so the suggestion that -- the question before Your Lordship is, is not did Mr. Justice Mithani think Mr. Chen was a bad man or not.  Nobody is in much doubt about the answer to that question.  The question before Your Lordship is, did Mr. Justice Mithani have in contemplation a specific issue in relation to the removal powers, and more specifically than that, did he have it in contemplation that the directors should not be able to exercise the right which the US Bankruptcy rules expressly confer upon the Company, of causing the Company to go and resist the recognition application which he contemplated.  And when the question is framed in those terms the answer is, there is nothing.  Your Lordship has absolutely no means of what Mr. Justice Mithani thought about that, because in all likelihood the reality is that the point never occurred to him or anybody else in the context of that application back on the 9th of January.

So with respect, we suggest to Your

164

Lordship that it is simply impossible to say that there is any proper construction or basis for resisting the submissions which we've advanced to Your Lordship, and they all point, and point only in one direction.

And I did just want to make one other point, if I may.  Just if Your Lordship still has that paragraph 3 at Bundle page 115 open.

THE COURT:                Yes.

MR. GLEDHILL:                The suggestion was made by Mr. Gibbon, and this echoes a point which is in fact made by Mr. Drury in his witness statement. The suggestion is made by Mr. Gibbon that if we are right about this, when you look at paragraph 3(a) you see that the Liquidators, the Joint Provisional Liquidators have the power to gain entry to the Company's premises and take possession of and preserve the books and records of the Company.

And the suggestion was made by Mr. Gibbon well, is the submission against me by Mr. Gledhill, that the Companies can be caused by the directors to oppose any attempt by the Joint Provisional Liquidators to exercise that power.  That's not the submission that I make.  The point that I am making is not that the Liquidators don't have the power in subsection 3(a) or (b), or in fact in any other place.  The question is

165

whether the power in section 3(2) is exercisable in circumstances where we are seeking to exercise it by opposing recognition in the United States. And as I've indicated, the narrow confine for that power is the one that you see in the third and fourth lines which is that under paragraph 3, the Liquidators only have the power to litigate in the Company's name insofar as necessary to protect the assets and information of the Company.

So my point is not the Company's name can be used by the directors willy-nilly to oppose anything that the Joint Provisional Liquidators want to do under paragraph 3. It is more simply that they do not have the subsection 3(d) power.

My Lord, those were the submissions that I was going to make. I was just going to close, if I may, by repeating the point with which I opened.

A suggestion is made by Mr. Drury in his witness statement that well, the Joint Provisional Liquidators would be perfectly content for all of these points to be run by the shareholders or by the directors. That is neither here nor there. The Liquidators either have the powers they have as a matter of BVI law, or they don't. But the more fundamental point to reiterate where I began, is that

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

166

the suggestion has already been made in the United States proceedings, that those instructing me are culpable of contempt of court for having done what they have done.  And whatever else may be unclear to Your Lordship, I suggest that it is manifestly clear that there is a seriously difficult legal issue here and the suggestion that we should effectively be penalized, because on Mr. Gibbon's account we could have applied in the BVI to stop them.  Having not done that, we were in contempt of court by applying to oppose in the United States, it's one that Your Lordship should, with the very greatest of respect, strive very hard to avoid.

Unless I can assist Your Lordship further.

THE COURT:                    Yes.  Thank you very much, learned counsel.

Is there anything new in what either Mr. Tyers-Smith has said, or Mr. Gledhill has said which the other parties think they need to respond to?  Bearing in mind that there are three sets of Applicants before the court today and we can't all of them start them off on the same basis that has been given to Mr. Gledhill, namely, of going first, waiting for the other side and then having a reply.  We've had to take it in

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

167

a particular way for efficiency reasons.

So if there is anything new, this is an opportunity to say something.

MR. GIBBON:                Simply to confirm, My Lord, there is nothing further I want to add.

THE COURT:                Thank you, Mr. Gibbon.

Mr. Dennis, anything from you?

MR. DENNIS:                Nor do I have anything to add, My Lord.  Thank you.

THE COURT:                Very good.

What we will do now, we will rise for the mid-afternoon break for 15 minutes.  So we will come back at 25 to, which is more like ten minutes and a bit more, and then I will deliver the Court's ruling.

So we will see you shortly.  Thank you very much.

(Break taken at 3:23 p.m. to 3:55 p.m.)

THE COURT:                Good afternoon ladies and gentlemen, once more.

So, this is the Court's ruling in relation to three applications which have been placed before the Court.

The matter today is important.  There is

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

168

some urgency attached to it, in that there is to be a hearing on the 9th of June in the United States and essentially, there are ongoing proceedings in the United States whereby Provisional Liquidators appointed by this Court are seeking recognition of these BVI legal proceedings in a court in the United States, in the context of, what I believe are called Chapter 15 Bankruptcy Proceedings.  And a question there has arisen whether or not the incumbent directors of various companies, which are subject to this Court's provisional liquidation orders, are allowed to oppose the application for recognition.  And this raises some very important questions, obviously, and they are questions we have to deal with quickly because we are today the 14th of June, which is only half of June left, sorry, 14th of May, we've only got half of May left and then only about a week or so of June, so we need to get on with giving judgment in this court, and I am going to do that today, even though it may not be very tidy.

So, the applications that I've had to deal with come from three quarters, although they cover substantially the same ground.

The first application in time was filed by what we know in these proceedings as Campbells

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

169

Companies.  Now Campbells is of course a law firm here, and Campbells represent these companies and there are some, I think it is 25 companies, I believe, and we will have a look at their application first.  That's the first application that was in time, and so we deal with that one first.  And those Applicants which the lead company is Bright Team Global Limited and 24 other companies, they applied for the following orders and directions, and I summarize, I don't set them out in full:

"1.  Where the powers of the directors have been displaced by the appointment of joint provisional liquidators with respect to the affairs of the companies, the directors' residual powers are not solely limited to opposing the making of a liquidation order.  The directors retain the power to cause a company to appear in foreign recognition proceedings to challenge any application by the joint provisional liquidators for recognition and associated relief from the foreign court."

There is another declaration which they seek which we don't need to get into now, I don't think.

And the grounds for their application were as follows:

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

170

There was a provisional liquidation order made in respect of Bright Team Global Limited and those 24 related entities known as the Campbells Companies or Campbells Respondents, and what had happened was that on the 5th of January 2026, the Attorney General of the BVI commenced proceedings pursuant to sections 162(1)(b) and (c) of the Insolvency Act 2003 as amended, for the appointment of Joint Liquidators over each of the Campbells Respondents.  And at the same time, in parallel, the Attorney General filed applications in these proceedings pursuant to section 170 of the Insolvency Act, for the appointment of Joint Provisional Liquidators pending the determination of the Liquidation Applications.

And then by orders dated the 9th of January 2026, continued on the 29th of January 2026, this Court appointed Joint Provisional Liquidators to each of the Campbells Companies.

And a question has arisen in the US Chapter 15 recognition proceedings commenced by the Joint Provisional Liquidators in the United States Bankruptcy Court for the Southern District of New York, as to the scope of the residuary powers of the directors of the Campbells Companies, following the BVI orders appointing the Joint Provisional Liquidators.  I

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

171

might just refer to them as the JPLs for short going forward.

And the question is raised in the declaration that has been made by a BVI lawyer as an expert, Mr. Andrew Barrington Chissick, filed on the 8th of April 2026 in support of the recognition proceedings.  Now Mr. Chissick is a BVI legal practitioner of, I would add, many years standing, and he is a partner of Walkers (Europe), who serves as the partner primarily responsible for the matter at Walkers and who acts as legal counsel to the JPLs in connection with these proceedings.

Now, at the hearing of the JPLs' motion for interim relief in those US proceedings on the 22nd of April 2026, presiding Judge Glenn commented that the extent of the residuary powers is a matter of BVI law.  And the Campbells Parties say that this question is suitable for determination by the BVI Court as a discrete single issue, since its resolution will clarify the procedural and substantive rights of the directors and the JPLs.  And the issue they frame is as follows:

"Where the powers of the directors have been displaced by the appointment of joint provisional liquidators with respect to the affairs of the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

172

companies, are the directors' residual powers limited to opposing the making of a liquidation order or do they extend further including the power to cause a company to appear in foreign recognition proceedings to challenge any application by the JPLs for recognition and associated relief from the foreign court."

Now, the Campbells Companies submit that section 170 of the Insolvency Act empowers the Court to appoint provisional liquidators on such terms and with such powers as the Court considers appropriate, including where such appointment is necessary to maintain the value of assets owned or managed by the company, or is otherwise required in the public interest.

They point out that section 171 of the Act provides that the provisional liquidator has the rights and powers of a liquidator to the extent necessary to maintain the value of the assets owned or managed by the company, or to carry out the functions for which he or she was appointed, subject to the terms of the order of appointment, and any subsequent amendments as ordered by this Court.

Pursuant to the BVI orders, the JPLs, jointly and severally, possess the rights and powers of a liquidator to the extent necessary to maintain the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

173

value of the Campbells Respondents assets, and to carry out the functions for which they are appointed.

They say that the BVI orders confer upon the JPLs authority to, amongst other things, investigate the Campbells Companies' affairs, preserve assets, and seek assistance and co-operation in foreign jurisdictions.  Additionally, they provide, in material part, that the powers expressly granted to the JPLs are to the exclusion of any power exercised or purported to be exercised by any existing director of each of the Campbells Companies.

They say that consistent with the terms of the BVI Orders, the directors and other officers of each of the Campbells Companies remain in office but have ceased, in material part, to have any authority to exercise any powers, functions or duties in relation to the affairs of the Campbells Companies, such powers having been conferred on the JPLs pursuant to the BVI Orders, save for the Residuary Powers.

They go on to say that the JPLs advance a narrow construction of the Residuary Powers, contending that following the terms of the BVI Orders which expressly confer the powers of the directors exclusively upon the JPLs, the only Residuary Powers retained by the directors are the power to challenge

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

174

the liquidation and/or the appointment of the provisional liquidators themselves.  On this construction, the directors have no standing or authority to take any other action in respect of the Campbells Companies, including, but not limited to opposing foreign recognition proceedings, absent the prior consent of the JPLs or an order of this Court.

And the Campbells Companies contend that the BVI Orders do not support the JPLs' construction of the Residuary Powers and that, as a matter of law, the directors retain Residuary Powers that extend beyond the mere right to challenge the JPLs' appointment and/or the making of a liquidation order in the BVI, and encompass other forms of legal challenge to the acts of the JPLs such as opposing foreign recognition proceedings on behalf of the Campbells Respondents.

Now, there is a couple of other things which the Campbells Companies applied for which again I don't think are before the Court today.  They may come before the Court, but they are not, they weren't encompassed in the submissions I heard, so I won't deal with them.

The second application before the Court is one brought by two other companies called Amber Hill and Lateral Bridge, which are also the subject of the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

175

provisional liquidation order.  That application was brought by the law firm, the legal practitioners Kobre & Kim, so we will call them the K&K Companies, and that application made on the 1st of May 2026.  And in essence, they are seeking a declaration that the Order dated the 9th of January appointing the JPLs over the K&K Companies, does not prevent those companies' directors from exercising residuary powers extending to appear in foreign recognition proceedings to challenge any application by the JPLs for recognition of these proceedings and associated relief from the foreign court.

In other words, exactly the same issue.  And, in fact, the grounds put forward by the K&K Companies are materially the same and in fact almost identical, in many respects completely identical to the Campbells grounds, so I won't repeat them here.

Then the third application before the Court is an application dated the 4th of May 2026 by the JPLs.  And there the JPLs, Mr. Paul Pretlove and Mr. David Standish, they applied as Joint Provisional Liquidators of all those various companies, seeking directions and orders from the Court pursuant to various provisions of the Insolvency Act as well as paragraph 3(L), I think it is, of the Appointment

176

Orders, for various things to be clarified.  And they are basically as follows:

1.  The directors of each of the Companies do have authority in the name of the Companies to oppose or interfere with the exercise by the JPLs of the powers granted to them pursuant to paragraph 3 of the Appointment Orders, including:

(a)  The JPLs' powers under paragraph 3a of the Appointment Orders to take possession of and preserve the books and records of each Company;

(b) the JPLs' powers under paragraph 3b of the Appointment Orders to take such steps as may be necessary to protect the assets of the Company from removal or dissipation;

(c) the JPLs' powers under paragraph 3c of the Appointment Orders to seek recognition (or its equivalent) of the Applicants' Appointment in the United States, the United Kingdom, Singapore, Hong Kong, Taiwan, Thailand and Cambodia or elsewhere for the purposes of securing, realising and remitting assets to the control of the JPLs and for the purpose of obtaining access to and control of the records of each Company;

(d) the JPLs' powers under paragraph 3g of the Appointing Orders to take all necessary steps to

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

177

obtain from any person documents or copy documents

which belong to the Companies or have been created or

maintained on their behalf or which the Company has a

right to obtain or inspect; and

(e) the JPLs' powers under 3i of the

Appointment Orders to investigate the affairs of the

Company so far as necessary to protect and, if

necessary, retrieve the assets and records of the

Company."

And then a number of other provisions,

including that Mr. Cosimo Borrelli does or does not

have the ability to exercise the powers of a director

on behalf of the various Campbells Companies, and

various other orders, consequential orders such as

costs.  Nobody has addressed me on costs and we won't

deal with that today, but doubtless we will get into

that in due course.

I heard submissions from very eminent and

learned counsel, persuasive submissions, excellent

submissions from three sets of KCs and Mr. Tyers-Smith,

also excellent, so I've had the opportunity to consider

those submissions, including what they have written in

their skeleton arguments.

Now, Mr. Gledhill, KC, he stressed a

number of things and I want to just highlight these in

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

178

the highest possible form.

There are three basic matters that I have to be wary of.

The first is that ultimately, the meaning of the, or the extent of the Residuary Powers of the directors, they are a matter of construction of the Appointment Order only.  That's his main point.

His second point is that the various case law authorities which have been brought to my attention in relation to English and other common law jurisdictions, they all touch and concern different statutory regimes.

Thirdly, he was at pains to anticipate some kind of contempt proceeding and he urged that for contempt orders to proceed, then penal provisions need to be clear, unambiguous, and various submissions of that nature.

Let me just say, we are not going to get into contempt today.  It is certainly not before the Court today.  Whether contempt is something that needs to be looked at later is something that can be looked at later.  Of course, pegs need to be placed on the map, as it were, in terms of contempt, but they are not really issues for today at all.

Now, Mr. Gledhill took me to the JPL

179

Order and he argued very persuasively, that in essence, what the effect of that order all up is, seen in the round, is that in terms of the affairs of the Company and its assets, both of which are outside the jurisdiction of the BVI, then the JPLs do not have power.  Therefore, he says, the directors retain power.  And in essence, what he is saying there is that the directors' powers were never curtailed in relation to their ability to appear in US proceedings on behalf of the Company.  So, if it is that the JPLs are seeking recognition of these BVI proceedings and of their appointment as office holders in the United States, what that means is that the directors continue to be entitled to act on behalf of the Company to oppose those recognition proceedings.

That is what he says in the round and he draws heavily upon paragraph 9 of the Appointment Order to make good that argument.  And just for the record, paragraph 9 was in the following terms:

"The powers set out in paragraph 3 above are to the exclusion of any power exercised or purported to be exercised by any existing director of the Company, insofar as such power concerns the affairs of the Company and its assets within the jurisdiction of the Virgin Islands."

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

180

So he considers that to be a pivotal provision of the Appointing Order.

Now, as we will see, that's not really the be all and the end all, however.  And Mr. Gledhill also points out that there is a distinction between, under BVI statute there is a distinction between a liquidation order and a provisional liquidation order.  And he says that in relation to a liquidation order, such a liquidation order divests directors of their rights as directors and vests them in a liquidator with the directors then only retaining residual powers as recognised by the Act.

So the effect of liquidation is spoken to in section 175(1) of our Insolvency Act.  Now by liquidation, we mean when a company is placed into liquidation.  And by that, what we have is it says that:

"Subject to subsection (2), with effect from the commencement of the liquidation of a company," which is we all know the date of appointment of a liquidator --

"(a) the liquidator has custody and control of the assets of a company;

(b) the directors and other officers of the company remain in office but they cease to have any

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

181

powers, functions or duties other than those required or permitted under this Part or authorised by the liquidator."

And there are a few more provisions in 175, but that is the key one.

So basically, what it is, is that the directors remain in office, the directors and officers remain in office, but they cease to have powers, functions and duties, except those required or permitted under this Part, or authorised by the liquidator.

Now, leaving aside the 'authorised by the liquidator', which is of course an exception, statutory exception, it is, I think, common ground that one of the other powers that they have is to challenge, that is, to apply to set aside or vary or appeal from, a liquidation order.  So it's very clear that they have those, liquidation order, that is what happens and the directors' powers and functions and duties are divested at that point.

Now, he says that is different from when a company is placed in provisional liquidation. Because in section 171, it provides there that:

"Subject to subsection (2), a provisional liquidator has the rights and powers of a liquidator to

182

the extent necessary to maintain the value of the assets owned or managed by the company or to carry out the functions for which he or she was appointed."

In subsection (2):

"The Court may limit the powers of a provisional liquidator in such manner and at such times as it considers fit."

So what it's basically saying is that this is very much a limited remit to provisional liquidators, and the remit is essentially limited to the powers that the Court vests in the provisional liquidator by the appointment order, and then it is only on a very narrow basis that those powers are for the maintenance of the value of the assets owned or managed by the company, and to carry out the functions for which he was appointed, in other words, as designated by the court order.

So he is saying it's very much more limited.  And the corollary of that is, and it's important for his analysis, is that the directors retain all other powers.  So on his view, the directors retain more powers than just appealing a JPL appointment order, or challenging it, or varying it, but they can carry on doing a lot of things in the name of the company.  And they can do that, and what they

183

don't need to tread on or trespass on is the very narrow remit of the JPLs. They remain in office and they remain functioning as directors and officers. That's his case.

And he says in fact, section 9 of the court's Appointment Order here, basically underlines that and it restricts, in fact, the functions of the JPLs to dealing with the affairs of the Company and the assets of the Company in the BVI. So the affairs of the Company in the BVI and the assets of the Company in the BVI. That's what he says. He says otherwise it wouldn't make any sense, because you wouldn't need it otherwise, it would be redundant. If it's just stipulating a position as a matter of law, then you wouldn't need paragraph 9. So it is doing something more than just stipulating a position. And it's stripping down, constraining the powers of a liquidator further.

So that is a very powerful and persuasive argument which Mr. Gledhill advanced.

Now, Mr. Gibbon described this as a seductive, I may be misusing his words, a seductive primrose path which he said was wrong. And Mr. Dennis described it as specious and I was taken to various reasons why that was the case. So let us have a quick

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

184

look at those.

Mr. Gibbon pointed out that you don't just look at what the order has to say.  He took me to a case called Pan Petroleum and Yinka, where provisions or principles for the construction of orders are summarised.  And two of those main principles are as follows.  It says:

"The sole question for the Court is what the Order means, so that issues as to whether it should have been granted and if so in what terms, are not relevant to construction."

Nobody disagrees with that here.  In relation to the K&K Companies, they were suggesting that actually, the rather strong basis upon which the JPL Order was made in respect of the Campbells Companies doesn't apply to them.  And I challenged him twice, I think, to take me to the logical conclusion of what he wanted say about that.  He didn't actually want to say anything apart from that his clients are in a slightly different position.  He didn't take me further.  He wouldn't go so far as to say that the order shouldn't have been made or in fact that a different regime was carved out in the JPL order, from the Campbells Companies.  He accepts that a single regime applies to both the Campbells Companies and the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

185

K&K Companies.  And we are not worried here about whether or not the order should have been made at all. It was made and we just have to worry about what it means.

So that's the first principle.  The sole question for the Court is what the order means.

And the second principle, in that case it was actually stated as the third but for present purposes it remains our second principle.  It says:

"The words of the Order are to be given their natural and ordinary meaning and are to be construed in their context," now that's important, "in their context, including their historical context and with regard to the object of the Order."

So we can't just look at the terms of the order and walk up a primrose path into some golden sunset of meaning which is convenient to one party, because that's what they want it to mean.  We have to look at the context, including the historical context and with regard to the object of the order.

And so Mr. Gibbon said what's the context of the order.  And the order was this.  When the order was made, there was an assumption that Mr. Chen was a director of the Campbells Companies.  Not Mr. Borrelli. Now Mr. Borrelli we all know in this jurisdiction, he's

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

186

an insolvency practitioner of very long standing and high repute, and he is a go-to man for lots of things related to insolvency, but like this one, not exactly in insolvency, so we shouldn't be surprised to see Mr. Borrelli in this position that he has as a director under some kind of power of attorney, which there are question marks about, okay, okay, we don't have go there now.  But then it's not Mr. Borrelli, not the good, clean Mr. Borrelli.  What we were dealing with was when Mr. Justice Mithani made the JPL Order, there was Mr. Chen as the director of these Campbells Companies.  And what we have there was that Mr. Chen is supposed to be, or this is the allegation anyway, and Mr. Gledhill slipped in that nobody was really arguing that Mr. Chen is a terrible person, or evil man, or something of that nature.  He let that slip but I don't take that as a formal concession at all.  But basically, what the allegation is, is that Mr. Chen is the point man, the leader, the driver behind an appalling network of scam operators, operating ten or so scam compounds of forced labour in Cambodia, in which they indulge in the nefarious activities known as pig slaughtering, which is basically leading innocent people on on scam phone calls and other nasty tricks to empty their wallets of money on pretexts, romantic

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

187

pretext, business pretext, any pretext along well plotted and carefully enacted conversation chains across the world.  And of course, this is all rather a gray industry in Cambodia doubtless because there is no actual offence being committed in Cambodia, because whatever offences are being committed are abroad.  But anyway, apparently this man Chen has been incarcerated in the PRC as a result of his activities, which also included forced labour and incarceration basically, the deprivement of liberty in compounds and forcing people to operate scams; and torture, apparently.  And there are very many, very lurid allegations out there against Mr. Chen.  And apparently scams that he has been running, they have been mixed in with quasi-legitimate enterprises, or certainly in the Far East legitimate like casinos and gambling, but other and more legitimate activities like banking activities, and other activities.  But of course Mr. Chen has apparently got a whole string of companies, including BVI companies, around the world, through which vast sums of money have been laundered, which is again of course also terrible and wrong, bad.  But he's been mixing this money up with legitimately made money, all part of a laundering, and he has also been spraying this money in such a way to paint it in a different

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

188

light, which is apparently a different activity in laundering.

So this is all at the forefront of very nefarious activities of which he has been alleged.  And what is more, Mr. Chen has found himself the object of sanctions proposed by OFAC in the US, and I think it's called OFSI in the UK, whereby basically it prevents other people dealing with the assets linked to Mr. Chen.  So the Campbells Companies, for example, are apparently caught in the sanctions although Amber Hill and the other K&K Company apparently are not sanctioned because they apparently are not owned by or controlled by Mr. Chen, although their activities had, at least in one respect in one of these companies, been linked to them in terms of cryptocurrency activities.

So what we have here is a lot of allegations made against Mr. Chen of the strongest, most egregious kind of really the worst of the worst conduct you could ever expect to see on the international commercial stage.  And it's also very rare for such conduct to see this level of sanctions being applied.

I have to say here, of course, that sanctions are a political measure imposed by the Executive.  And the Executive executes and it does so,

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

189

and it does so within parameters.  But those parameters are, generally speaking, not judicial parameters. Those are political steps which are taken.  The court of laws remit is slightly different.  A court has to act judiciously.  That is, on the basis of evidence and the balance of probabilities, and the rules of evidence.  So just because somebody is thought to be a terrible person and allegations abound against him, and just because he is sanctioned doesn't of course mean that the court is sufficiently satisfied that it can use its own powers against that individual.

Nonetheless, what has happened here with the terrible background of Mr. Chen placed before the Court, then the JPL Order was made appointing the JPLs. So the context was, was an assumption that Mr. Chen was a director or indeed the sole director of at least the Campbells Companies.  Not the good, clean Mr. Borrelli but Mr. Chen.  That was the context.  So we then have to look at what was going through the mind of the Court, what was the Court's intention objectively seen when it made the JPL Order.  And Mr. Gibbon submitted that the very purpose of the JPL Order of the Court was to take those companies out of the control of the directors of those Companies.  That is, away from Mr. Chen and his associates.  And his point is the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

190

order cannot be construed in a vacuum.  Now that's very important because Mr. Gledhill, and to again adopt Mr. Gibbon's description of a primrose path, Mr. Gledhill walks a primrose path through that order, actually from the back of the order to the front, when you think about it, as Mr. Gibbon also said looking at it from the wrong end of the telescope.  But he walks this primrose path ignoring the context of Mr. Chen being this apparently dreadful fraudster, criminal mastermind, pig slaughtering, scam operating individual who is sanctioned.  He wants to leave all that out of the equation and the context and just look at the terms of the order.

Well, I know which is the more protracted line to take, and that is Mr. Gibbon's line.  You can't construe an order in a vacuum.  And his case Pan Petroleum is the authority for that.  No authority has been laid in front of me to show that that's wrong.

Then Mr. Gibbon also pointed out that, and again this is so trite but he has an authority to back him up on this, the Kensington and Montrow case, is that a liquidator, presumably a JPL as well, for him to function effectively in order to preserve the assets, he needs to know the whereabouts of those assets.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

191

We live in a world where sometimes basic things need to be stated. We don't only now live in an upside down world. It has been with us for a very long time. In fact, we need only turn into the opening act, Scene 1 of Macbeth in Shakespeare where the three witches say "fair is foul and foul is fair, hover through the fog and filthy air."

Now that applies to daily life of the BVI Commercial Court. Everything is upside down. Well, yes, they need to know the whereabouts of the assets. They need to have the Companies taken out of the control of the directors who are suspected of doing wrongdoing, and they need to find out where the assets are. So they need various powers.

So Mr. Gibbon therefore goes to the provisions of section 171(1) of the Insolvency Act, and he says there that it is made plain as day, not fog, not filthy air, plain as day that:

"The provisional liquidator has the rights and powers of a liquidator to the extent necessary to maintain the value of the assets owned or managed by the company or to carry out the functions for which he or she has been appointed."

He says you can get from that, that the Appointing Order for JPLs, is prime, that order has

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

192

primacy.  It's important.

The other thing which you get from it is the effect and necessity.  And he says that if the provisional liquidators need powers, they have them. And he makes a further point which comes out of 171(1), that the provisional liquidator alone has those powers and rights.  If he has them, nobody else does.  That's a strong thing to say.  It's true.  It's obvious. Because otherwise it's a bare recipe for confusion.

Then he goes on to say that in 171(2) it says:

"The Court may limit the powers of the provisional liquidator in such manner and at such time as it considers fit."

In other words, the powers of the provisional liquidator are under the control of the Court.  Now that's also very important.

And then what we have to do is we have to think what is it that the JPLs are really trying to do in New York.  All they are doing is they are trying to get these BVI proceedings recognised so that their appointment as JPLs is also recognised so that they can take steps in New York to investigate the assets and dealings of the Company, and so that they can get in those assets and secure them.  That is all that they

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

193

want to do.  And they do that in the context where, as the Attorney General has made before Justice Mithani, there was a need to take immediate control of the Companies including that there is a real and substantial risk that, absent the immediate appointment of provisional liquidators, assets held by or through the Companies will be transferred, concealed or dissipated, and documents will be destroyed or concealed.  And the appointment of provisional liquidators will immediately remove control from Mr. Chen and his associates, and place the Companies under the supervision and control of officers of this Court, thereby protecting the integrity of any investigation and preserving assets for the benefit of the victims of Mr. Chen and the Prince Group's fraudulent and criminal activities.

That's the point of the JPL Order.  And as Justice Mithani thought on the material presented by the Attorney General, the case for the appointment of provisional liquidators is overwhelming, subject of course to any disclosure matters that the AG might like to bring to the Court's attention.

Now I have to say, of course, that whether or not at the end of the day when you look at all the evidence the case for the appointment of a

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

194

liquidator is overwhelming, that's another matter.  But certainly from the case of the appointment of provisional liquidators, that appears to the Court, Justice Mithani, to be overwhelming.

Now, what this means is right at the heart of the Court's consideration when it made the JPL Order, was removing control of those Companies from their directors.  The Court expected the directors, whoever they might be, to be prevented from continuing to be in control of the subject Companies.  And as Mr. Gibbon says, that if you give power to the JPLs it was to be given to them and not to anybody else.

So what we had is the Defendant saying that they are entitled to go to the US to instruct the Companies, the directors are saying this, to instruct the Companies to oppose the recognition of this Order.  And they say they are allowed to do that on Mr. Gledhill's interpretation, which Mr. Tyers-Smith has adopted as well.  And Mr. Gibbon strongly disagrees with that.  And he says that not only do you have to look at the context of the Order, and we will get on to some of the powers in a minute of the Order referred to, but he also looked at the general treatment of similar provisions in England and other Commonwealth jurisdictions.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

195

Now, of course Mr. Gledhill is right that those statutory regimes are slightly different and their provisions are slightly different.  But the overall scheme, it has to be said, is very similar and the Court can look at it for instruction.  So for example, the first case we can look at is a decision in 1972, a case called re Union Insurance in the English Chancery Division by Plowman J, as he then was, where the English Court accepted, or said this:

"The respondent's submission was that the appointment of a provisional liquidator automatically put an end to the authority of the company's directors to instruct solicitors and counsel to represent it and that the solicitors purporting to act on its behalf were therefore liable to pay the respondents' costs personally.  It is of course well settled that on a winding up the board of directors of a company becomes functus officio and its powers are assumed by the liquidator.  My attention was drawn to In re Mawcon [1969] where Pennycuick J stated in effect that the appointment of a provisional liquidator had the same result.  No doubt that is so, but it is common ground that notwithstanding the appointment of a provisional liquidator, the board has some residuary powers, for example it can unquestionably instruct solicitors and

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

196

counsel to oppose the current petition and, if a winding-up order is made, to appeal against it.

The issue is to the extent of those residuary powers and, in particular whether they extend to the launching of the present motion.  I think that it may sometimes be helpful to test the matter by considering the other side of the coin, namely, to inquire whether the power which the board is said to have lost is one which can be said to have been assumed by the liquidator.  If the answer is that it cannot, that may be a good reason for saying that the board still retains it.  Clearly, for example, as I have already indicated, the power to instruct solicitors and counsel on the hearing of the winding-up petition is not a power which anybody could suggest has passed to the provisional liquidator and therefore the board retains it."

Now pausing there, first of all, what we have from that passage is that the appointment of the provisional liquidator has the same result as the appointment of a liquidator, i.e., that the appointment automatically puts an end to the authority of the company's directors to instruct solicitors and counsel to represent it.  So basically, it automatically ends the authority of the company's directors to do acts on

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

197

behalf of the company.  That's the first thing.  That's the general principle.

The second thing is that the board, the directors, retain residuary powers and the example that they come up with is to oppose a winding up application or to appeal a winding up order made.  They leave open, or the board there left it open that there could be other things which the residuary powers could include.  And then they postulated a test which they said 'sometimes' might be helpful.  Not all the time, but sometimes.  And they give this example that if a power has, well the example they gave is if, for example, the power to instruct solicitors on the hearing of the winding up petition has been retained by the directors, that means that it hasn't passed the provisional liquidator.  Fine, that's one example.

Mr. Gibbon says this particular test is not a universal test and he said that if the power has expressly been given to a liquidator, the order will not give the liquidator power to oppose his own power.  So for example, if the order gives the power to provisional liquidators to enter a building belonging to the company, it will be nonsensical to say that the power gives the liquidator the power to oppose himself.  By extension, it will make no sense to say the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

198

directors have retained the power to oppose the provisional liquidator's exercise of that power to enter the property.  And he went on to say that if that was what was meant, it will mean that any power can be opposed in a disruptive way.

And that's got to be right when you think about it.  And what we seem to have on the authorities is a problem and a solution.  The problem is that a liquidation order and a provisional liquidation order, takes the powers away from a director, from the board, to act on behalf of the company.  And that's a very wide-ranging power which has been removed from the board.  But in order to enable the justice of an appointment order or a winding up order to be adjudicated by the Court, you necessarily need two sides.  And the best people to argue against it are obviously the directors.  So it would basically prevent justice from taking place if nobody could step up to oppose such an application, and that would simply be a ridiculous result.  So pragmatically, and for the reasons of both procedural and substantive justice, it is necessary conceptually that somebody should retain the power on behalf of the company to oppose the application.  And the logical solution that has been found is to say that the directors have it.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

199

Now, I've spent a paragraph or so talking through that. But what it comes down to is this, and there is an authority for this and this is one of the Commonwealth authorities which Mr. Gibbon was referring to. I think it's the case of Diamond Fuel, that might not be Commonwealth, it might be English, the Diamond Fuel case. And also the case of Hin Leong, I think it is, from Malaysia, and in particular the phrase used there at paragraph 56, read as follows:

"In substance, an application challenging the making of a judicial management order," for that read 'JPL Order', "would challenge the 'very juridical basis' on which such management powers of the directors have been removed, i.e., upon the appointment of an interim judicial manager, judicial manager, provisional liquidator and/or liquidator."

So basically, the residual power enables the directors on behalf of the company to challenge the very juridical basis upon which the JPL Order was made. It doesn't allow the directors to challenge the exercise of all and sundry powers that the order has granted. The residuary power is there to challenge the very juridical basis upon which the order was made in the first place.

Now, when you look then at the order of

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

200

the Court, I said we will come to the Order of the Court. Basically, what we had -- let's go to that Order, shall we. The operative provisions are to be found in paragraph 2 and paragraph 3 of the order. Paragraph 2 is short. So paragraph 2 says:

"The Joint Provisional Liquidators have the rights and powers of a liquidator to the extent necessary to maintain the value of the assets owned by the Company and to carry out the functions for which they are appointed."

Okay, so this tracks the wording in the Act, but it also sets out not only what the powers are, the rights and powers are, but it also sets out an interpretative hermeneutic, in other words, how do you read this order. And you read this order that the JPLs are to have these powers so that they can maintain the value of the assets in the Company and to carry out the functions which the Order has given them.

Those are specific powers. Then we have additional powers, because it says so. In addition to the powers outlined in 2, in 3 you have more powers. And those powers are a very standard list of things which include to gain entry to the Company's premises. Those premises don't necessarily have to be in the BVI, they could be anywhere. To take possession and

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

preserve the books and records of the company.  Again, they could be anywhere.  They've got the power to do that.  They could exercise that power.  They might not, for example, be able to knock on a warehouse in New York and say we are the directors or we are the JPLs, we have to come in and that pile of books and records in the corner are ours and we are taking it.  They can't do that necessarily under New York law.  They've got the power to do it under our law, our Act, they might not be able to do that under New York law.  But we come down to what happens then.

The next power is to identify assets.  And then the third one is to seek the recognition or its equivalent, of their appointment in the US, UK, Singapore, Hong Kong, Taiwan, Thailand, Cambodia or anywhere else, for the purposes of securing, realizing and remitting assets to the control and for the purpose of obtaining access to and control of the records of the Company.

So they are again given an express power to seek recognition.  It's obvious why.  They need to get recognised elsewhere so that they can exercise the powers they have been given.

And then more powers in (d), to commence, continue, etc, legal proceedings in the name and on

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

202

behalf of the companies.  And to vote shares in the companies.  To carry on the business of the companies.  To take all steps to obtain documents from people; to appoint agents; investigate the affairs.  A whole long list, retain and operate bank accounts.  They could draw down payments.  They could apply to this Court for directions.  That's (l), by the way, so I will come back to (l).  So that's the one they are coming to this Court under.  And do any other things, all other things as may be incidental to the exercise of legal functions and powers.  And they can co-operate with law enforcement and regulatory authorities here and in other jurisdictions.

So they can do an enormous amount of things.  Those are big powers which they have been given.  It has obviously been said that paragraph 9 cuts these powers down only to the affairs of the Company in the BVI and the assets in the BVI.  Well frankly, that is a most unattractive proposition and it could only possibly be seen as coming from somebody who doesn't really deal with BVI companies on a regular basis.  I can understand that it might be said that a company in England might have such narrowness attached to it with the powers, etc.  But BVI companies are almost invariably used for holding assets which do

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

203

things abroad and which operate abroad.  We do not have widget factories here in the BVI.  They are all somewhere else.

So saying that the JPLs' powers are only limited to the affairs of the Company within the jurisdiction of the BVI is to constrain the powers of the JPLs to the top of a pin.  It makes no sense.  It is an insanitary interpretation of this Court's order.

And we have to come back to the whole point and this is really what it all comes down to. The whole point of the JPLs Order is to take powers away from the directors of these Companies.  That is the whole point.  It is not an incidental accident of the power.  It is not some interesting ancillary effect of some pleasant complicated order which transfers the management of the company from one sensible person to another.  No.  This is asymmetric warfare, to be blunt about it.  It's to rip these Companies away from those directors and give them into the hands of JPLs so those directors cannot harm those companies any more.  And we make no bones about it and we make no apology for it either.

That's the lens through which this has to be looked.  And the lens which was applied by Mr. Paul Dennis most ably when he said what you have to do is

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

204

you have to read section 171 together with 175.  You have to see where it says that the JPL has the powers of a liquidator, you have to look at what the powers of the liquidator are, which are to be found in 175, with its little cut out for the remaining residuary powers of the directors.  Well that's precisely it, isn't it?  You have to read the two together.  And the lens is that what you've got is you've got powers being given to the JPLs by this court's order.  They can't necessarily use those powers because something else might need to happen, but they've got those powers.  And they have those powers to the exclusion of the directors.  The directors retain the residuary powers to challenge the very juridical basis for the Appointment Order itself, and no more.

Now, what they can do is that those directors can apply to this court and they might say no, no, no, no, the recognition power is too broad for such and such a reason.  This Court must vary its order.  This Court must say that recognition should not be granted in such and such a case, or whatever, but what they can't do is to say we are going to oppose this in the US.  We don't, because they don't have the power to do it.  They've got the power to come here and persuade this Court to vary its order, but that is it.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

205

They don't have a residuary power to go and obstruct,
obstruct, obstruct, obstruct.  I read out, how many
powers did I read out?  It went down from letter A to
O, I think it was, did I say that, yes?  I am sure I
did, from letter A to O, I don't know how many letters
that is, I can't count.  It's an enormous amount of
letters.

If their interpretation is right, then
what their interpretation would have is, on most or all
of them, then it would still have the directors being
allowed to come and object to the use of those powers,
not just in New York, but in Cambodia, Taiwan,
Thailand, UK, anywhere else and obstruct, obstruct,
obstruct, obstruct, and litigate until, Mr. Dennis used
the milking analogy, until the cows come home and all
the litigation funds dry out.  That's what unending
directors' powers to obstruct will entail.

Now the directors will love, Mr. Chen
will love to be able to do that, of course, because he
doesn't want this to come to its natural conclusion.
But that's not how things work.  These Companies have
been ripped out of those directors' control purposely.

Now, so what then of this point which is
taken are, the US bankruptcy provisions themselves
allow a debtor company to appear on an order for

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

206

recognition.  Well yes, it does.  I've been taken to a provision, a US provision which says something to that effect.  I am trying to look it up, I am trying to scroll down to it.  It says:

"Rule 1012.  Responsive Pleading in Cross-Border cases.

(a) Who may contest petition."  And that is both in capital letters, capitalized capital letters, in a very clear way.  It says:

"The debtor or any party in interest may contest a petition for recognition of a foreign proceeding."

Not just a debtor, but any party in interest.

Now, what this Rule 1012 cannot do, it cannot give the directors more power than this Court gives them or allows them to have.  Can't do that.  The only entity which gives directors powers, two things, either it's BVI statute or it's this Court once we are in the insolvency context, forgetting the memo and arts of the company for the present purposes, which is like statute.  So it's just statute or it's this Court. It's not the New York Court.  It's not some federal set of rules.  All they can do is say who would be allowed to appear in front of their Court under their system.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

207

So who is a debtor?  Well we have no US law on who comes in under their Rubric of a debtor, nor do we have evidence of New York law or US law on who is a person of interest.  Mr. Gibbon made that point, we don't have US law on that point.  We have no evidence.  So it doesn't help us.  But just on the face of it, then even if the company by its directors can't appear in the US Court to oppose it, that apparently is not the end of it on the face of Rule 1012, because any party in interest can do that.  And as Mr. Gibbon has pointed out, the JPLs have got no problem with the directors as individuals or some other kind of interest, or maybe shareholders, going after the US Court and explaining why the recognition should not be granted.  But what he does have a problem with, and I am with him on it, is that the Company can't on the one hand speak through the JPLs and on the other hand, janus-faced, speak against it through directors.  That would make a nonsense of the proceedings and would be a recipe for complete chaos, which is, of course, what Mr. Chen would want.  But we are not going to allow complete chaos to take hold.

So the Rule 1012 is neither here nor there.  It is not a source of power.  The source of power is BVI statute and the BVI Court's Orders.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

26-10769-mg   Doc 49-21   Filed 05/21/26   Entered 05/21/26 15:29:05   Exhibit 21 - Transcript of May 14 2026 BVI Hearing   Pg 209 of 222

208

Now coming back to this notorious paragraph 9, I don't read paragraph 9 as only limiting the JPLs to the affairs of the company in the BVI and the assets within the BVI.  The way I read that is that of course JPL can only do things with the powers it has, where it is allowed to do so; and the only place where it is allowed to do so is the BVI.  It still got those powers.  By having those powers, it has them to the exclusion of the directors.  It would need to get recognition from foreign courts to be able to use those powers.  That is the distinction.

So where does this take us?  It means, put simply, that the directors do not have the power to go in and oppose the recognition proceedings in the US if it is that they are doing so on behalf of the company.  If they have some other kind of interest and they can come within Rule 1012, fine, but they can't do it on behalf of and in the name of the Company.

I think that answers the question, doesn't it learned Counsel?

MR. GIBBON:                 My Lord, I am very much obliged and I am sure, speaking for my learned friends, in likewise saying that they are too.

I should stress, Your Lordship raised one point that costs might be for another day.  On the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

209

papers as far as I am aware, nobody was seeking costs anything other than in the provisional liquidation, I would be corrected if I am wrong about that.  So that's one consequential that you might ordinarily be expecting to hear, but I don't anticipate there would be any arguments about that.

THE COURT:                    Okay.  Maybe what I need to do is frame my conclusion in terms of the actual question which was put.  You can all work it out, you are going to be liaising with each other on this and you are not going to come to any agreement, because lawyers don't agree on important things.  So maybe I ought to just look at the issue which has been defined in, I think it was paragraph 7 of the Campbells Notice of Application and the grounds.  And the issue was framed as follows:

"Where the powers of the directors have been displaced by the appointment of joint provisional liquidators with respect to the affairs of the companies, are the directors' residual powers limited to opposing the making of a liquidation order or do they extend further including the power to cause a company to appear in foreign recognition proceedings to challenge any application by the JPLs for recognition and associated relief from the foreign court."

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

210

That's the question.  The way I would answer that is first of all, no, the directors' residual powers are not limited to opposing the making of the liquidation order because they also extend to the opposing of making a provisional liquidation order and to seeking its variation; and they also extend to appealing decisions in respect of those applications.

So that is how I answer that first power.

And then the second part:

"... or do they extend further including the power to cause a company to appear."

I would say they extend further to the extent that I've just indicated, but not including the power to cause a company to appear in foreign recognition proceedings to challenge any application by the JPLs for recognition and associated relief from the foreign court.

That's how I would answer that one.  So that power to cause the company to appear to challenge recognition proceedings, etc, no, the powers do not extend to that.

I don't think I have to answer any of the other formulations in the other Notice of Application, but if I am wrong on that, can counsel please point it out so I can answer the question now for finality's

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

211

sake.

MR. GIBBON:                To make the position clear in relation to our application which you read out at an early stage of your judgment, My Lord, if I ask you to turn to page 13, it's simplest to look at it there in the Hearing Bundle.

THE COURT:                Okay.

MR. GIBBON:                As you recall, we had set out a number of paragraphs including 3c.  It was really for the avoidance of doubt, but I should make the point clear, I have focused my submissions on 3c.  I didn't address you specifically on the other points.  While I respectfully submit that the other points would follow based on what Your Lordship has said, I should in fairness and propriety say that that's not something any of the parties specifically addressed their comments on.  And indeed, Mr. Gledhill in his skeleton argument, as I understand it, said those points aren't contested.  Well that's not the same as whether it would be helpful to have reference to those made because it might well be helpful for reasons you will recognise.  But I suspect his point is well, I haven't got a final view yet as to whether or not I've got anything to say about them until I know what the JPLs want to say about them.  And he will tell

212

me if I paraphrased that incorrectly, but just fairly to put the positions of the parties before you straight away.

THE COURT: Very good. I need to deal therefore specifically with the orders and directions sought by the JPLs in their application.

So in terms of, and I am looking at the, for clarity sake, I am looking at the draft order for directions which is to be found starting at page 12 of Hearing Bundle 1, and then going on to page 13 where we have paragraph 1. So the orders sought at paragraph 1, orders and directions sought at paragraph 1, namely, that:

"The directors of each of the Companies do not have authority in the name of such Company to oppose or interfere with the exercise by the JPLs of the powers granted to them pursuant to paragraph 3 of the Appointment Orders," including various this and that.

That order is granted. That order and direction is granted in those terms.

In relation to paragraph 2 which was that, draft paragraph 2 was that:

"Mr. Cosimo Borrelli does/does not have the ability to exercise the powers of a director on

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

213

behalf of the 25 BS/Campbells Companies," yes.

MR. GIBBON:              That's the one I haven't moved, My Lord, and the parties are agreed, as Mr. Gledhill mentioned, that that wasn't being moved in any respect today.

THE COURT:              Isn't it covered by the powers of the director?

MR. GIBBON:              Well there is an element of it, quite.  It gets into different issues, I will say that straight away, because there's factual questions about the circumstances which Mr. Borrelli was appointed.  It's sufficient for the purposes of the 9th of June that you make the directions in 1, and I think being practical, I am sure if I started making further submissions targeted at Mr. Borrelli, Mr. Gledhill in particular would find himself in a position of having to make responses to that and we will be here longer.

THE COURT:              Paragraph 2, the application reflected by paragraph 2 of the draft order, that will remain on the file.

MR. GIBBON:              Yes.  We will find a formulation, but in essence, yes.

THE COURT:              Yes, that remains on the file.  That is basically adjourned sine

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

214

die with liberty to restore.

MR. GIBBON:                Very grateful.

THE COURT:                So the order that you are getting on your application, Mr. Gibbon, is the one formulated in paragraph 1.  Then does anybody oppose the third one, which is the JPLs costs of the JPLs Application re Standing be costs in the provisional liquidation of the Companies?

MR. GLEDHILL:             In light of Your Lordship's decision we can't make any submissions to the contrary.

MR. TYERS-SMITH:        My Lord, the same is the true of Amber Hill and Lateral Bridge.

THE COURT:                I don't understand, you are saying you are making those submissions?

MR. TYERS-SMITH:        Yes, My Lord, sorry, the same position as applies to Amber Hill and Lateral Bridge.

THE COURT:                Mr. Gledhill, you had a rather nuanced submission in relation to costs there.  At this time of the afternoon, you mentioned earlier that I did have lunch.  I also spent some of my lunch preparing this rather impromptu judgment.  Consequently, my brain at least has been

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

215

filled with other things, so I didn't get what you are saying.

MR. GLEDHILL:         I am so sorry if I wasn't clear.

In the light of the decision which Your Lordship has kindly rendered, we can't resist the proposal made in paragraph 3 of the Joint Provisional Liquidators draft minute of order.

THE COURT:         So that means, Mr. Gibbon, you have 3 in your draft order.

MR. GIBBON:         I am obliged, My Lord.

Just one last question, it may be that the answer to this is clear.

Kobre & Kim had their own separate application which is more or less in the same terms and that will formally have to be resolved by way of court order.  I suspect the answer is whatever is said can simply be the reflection of what you've said should happen in relation to the declaration sought by Mr. Gledhill's clients.

THE COURT:         Let's have a look, because they sought a slightly different declaration.

MR. GIBBON:         Very slightly

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

216

different formulation, yes.  It's page 81.

THE COURT:                    They sought a declaration that:

"The order dated 9th of January 2026 appointing," these JPLs over the K&K Respondents, "do not prevent those directors from exercising residuary powers extending to appear in foreign recognition proceedings to challenge ..."

Essentially drafted rather cleverly. It's on the assumption that they do have residuary powers and they can't stop them using them.  So basically, not residuary powers to do that.  So I think that declaration, I think the way they phrase it is that the Court declines to make the declarations sought by the K&K Companies' application.

MR. TYERS-SMITH:        My Lord, we are happy with that.

THE COURT:                    I think that's all we need to do.  The K&K Application is refused, or something along those lines.

MR. TYERS-SMITH:        Yes.

THE COURT:                    Okay.

MR. GLEDHILL:            My Lord, before we rise, may I just raise one point with Your Lordship, and before doing that, just echoing Mr. Gibbon's

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

217

comment in relation to the speedy dispatch with which Your Lordship has dealt with the matter.

When we were last before you on the 15th and 16th, sorry, the 16th and the 17th of April, that was before the initial Recognition Application was heard in the United States which then set the deadline of the 9th of June for the final hearing of that. I am obviously very conscious of the work pressures on Your Lordship, but I did just want, if I may before we rise, to inquire whether it's your anticipation whether it's likely that you will be able to have a judgment on the substantive application that you heard four weeks ago, before the 9th of June.

THE COURT:                I'm supposed to be receiving your written submissions tomorrow, aren't I?

MR. GLEDHILL:              Final closing submissions are coming to Your Lordship tomorrow, that is correct.

THE COURT:                Right. It depends how simple it will all appear to me when I read your final submissions. Frankly, one of the reasons I ask for those closing written submissions is because it seems to me there is a bit of a difference. I think I have alluded to it already, I deliberately alluded to

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

218

it earlier.  There is a difference between what the Executive does in terms of sanctioning people and the grounds upon which they sanction people, which could be rather gung ho sometimes, and for good reason gung ho. And what a Court is supposed to do when it puts companies into liquidation.  There is a difference between acting judicially and acting executively.  And one of the difficulties that I have is that, you know, I have to weigh up whether the so-called evidence in front of me is strong enough to move the Court, whether there is any evidence at all in a strict sense and if there is, if it's strong enough to move the Court to wind the Companies up.  That's the main problem that I have and I need to get my head around that.

MR. GLEDHILL:            My Lord, that's very helpful.  We entirely understand the fact that the decision which Your Lordship has to take is a difficult one, having heard some important submissions in relation to some important policy questions during that hearing.  So we are grateful to Your Lordship for that indication.

THE COURT:             Very good. Anything else, learned counsel?

MR. TYERS-SMITH:        My Lord, no.

THE COURT:             Thank you very

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

219

much.  We will take the adjournment now.  Have a pleasant evening.

(Hearing ended at 4:59 p.m.)

* * *

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

220

REPORTERS' CERTIFICATE

WE, STACY GLASGOW, JAILANN WILLIAMS, PETULA v. STOUTT and MONIQUE M. GRAHAM, Certified Court Reporters, do hereby certify:

That on the 14th day of May 2026, the foregoing proceedings were taken down by us in machine shorthand, consisting of 220 pages herein; that the foregoing is a true and correct transcript of the proceedings had.

That we are not attorneys, relatives or employees of any party hereto, or otherwise interested in the events of this cause;

IN WITNESS WHEREOF, we have hereunto affixed our signatures at Road Town, Tortola, British Virgin Islands, this 15th day of May, 2026.

_____      _____
STACY GLASGOW                 JAILANN WILLIAMS
Certified Court Reporter      Certified Court Reporter


_____      _____
PETULA V. STOUTT             MONIQUE M. GRAHAM
Certified Court Reporter      Certified Court Reporter


COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT