# EXHIBIT 1

**Transcript of the Remote Deposition of Cosimo Borrelli**

**Page 1**

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

————————————————————————————————————

In Re:

PRINCE GLOBAL HOLDINGS LIMITED, et al.,

Debtors in Foreign Proceedings.

Chapter 15

Case No. 26-10769 (MG)

————————————————————————————————————

REMOTE VIDEO-RECORDED DEPOSITION

OF

COSIMO BORRELLI

Reported by:  Robin LaFemina, RPR, CLR

**Page 2**

June 3, 2026

10:13 a.m.

REMOTE VIDEO-RECORDED DEPOSITION of COSIMO BORRELLI, held via Zoom, with all parties appearing from their respective locations, before Robin LaFemina, a Registered Professional Reporter, Certified LiveNote Reporter and Notary Public within and for the State of New York.

APPEARANCES:

(ALL PARTIES APPEARING REMOTELY)


SULLIVAN & CROMWELL LLP

Attorneys for the Authorized Foreign

Representatives

    125 Broad Street

    New York, New York 10004

BY:  CHRISTOPHER DUNNE, ESQ.

    dunnec@sullcrom.com

    SAMANTHA ROSENTHAL, ESQ.

    rosenthalsam@sullcrom.com

    ALEXANDRA LI, ESQ.

    lial@sullcrom.com

    SOPHIA BROWN, ESQ.

    brownse@sullcrom.com


(Continued on following page)

Page 4

APPEARANCES: (C'td.)

(ALL PARTIES APPEARING REMOTELY)


BOIES SCHILLER FLEXNER LLP

Attorneys for Objector and Witness

Cosimo Borrelli

    5 Hudson Yards

    20th Floor

    New York, New York 10001

BY:  PETER SKINNER, ESQ.

    pskinner@bsfllp.com

    MATTHEW SCHWARTZ, ESQ.

    mschwartz@bsfllp.com


ALSO PRESENT:

    JACQUE COVAS, Legal Videographer

Page 5

THE VIDEOGRAPHER:  Good morning.  We are going on the record at approximately 10:13 a.m. on June 3, 2026.

Please note that this deposition is being conducted virtually.  Quality of recording depends on the quality of camera and internet connections of participants.  What is seen from witness and heard on screen is what will be recorded.  Audio and video will continue to take place unless all parties agree to go off the record.

This is media disk 1 of the video-recorded deposition of Cosimo Borrelli taken by Sullivan & Cromwell in the matter of In Re: Prince Global Holdings Limited, et al.  This case is filed in the United States Bankruptcy Court, Southern District of New York, Case No. 26-10769(MG).

Page 6

This deposition is being conducted remotely using virtual technology.

My name is Jacque Covas. I am the legal videographer. The court reporter is Robin LaFemina. We are both from Veritext New York.

All counsel consent to this video arrangement and waive any objections to this manner of recording.

If there are any objections to the court reporter swearing in this witness remotely and this video arrangement, please state them now.

I am not hearing any objections.

Counsel will now state their appearances and affiliations for the record beginning with the noticing attorney. Then will the court reporter please swear in the witness.

Page 7

MR. DUNNE: Christopher Dunne, Samantha Rosenthal, Alexandra Li, and Sophia Brown for the Authorized Foreign Representatives.

MR. SKINNER: Peter Skinner for Objector, Cosimo Borrelli, who is the witness today.

THE COURT REPORTER:

Mr. Borrelli, would you raise your right hand, please.

Do you swear the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, and do you acknowledge that although I am not physically present in the room with you, that this oath is administered with the same force and effect as though I were?

THE WITNESS: I do.

THE COURT REPORTER: Thank you. You may put your hand down.

Please state your full name for the record.

THE WITNESS: Cosimo Borrelli.

Page 8

Borrelli

THE COURT REPORTER:  Thank you.

Counsel, you may begin.

MR. DUNNE:  Thank you.

COSIMO BORRELLI,

called as a Witness, having been

first duly sworn by Robin LaFemina,

a Notary Public within and for the

State of New York, was examined and

testified as follows:

EXAMINATION BY

MR. DUNNE:

Q.    Good morning, Mr. Borrelli.

A.    Good morning.

Q.    My name is Chris Dunne, I'm

with Sullivan & Cromwell, and I represent

the Joint Provisional Liquidators.  You

know who I'm referring to when I say

Joint Provisional Liquidators, do you not?

A.    I do, sir.

Q.    Thank you.

We have a court reporter

obviously on the line here for this

deposition who is taking down everything

that is said, so let's please both try

Page 9

Borrelli

our best to speak clearly and answer verbally.  Hand gestures, nods, etc. are not possible for the court reporter to take down.

Okay?

A.    Yes, sir.

Q.    If you don't understand a question, please let me know.  Otherwise, I will move on assuming you have understood.

We'll take breaks every hour or so, but if you need a break at any time, please just let me know.  Your counsel may object to questions from time to time, but if he objects, please answer unless you are instructed not to do so.

Is there any reason you are not able to provide truthful and accurate testimony today?

A.    No, sir.

Q.    Okay.

No medication or anything that might impair your memory or judgment?

A.    No, sir.

Page 10

Borrelli

Q.    Okay.

Have you been deposed before, sir?

A.    Yes, I have.

Q.    How many times?

A.    Dozens.

Q.    In U.S. litigation?

A.    I think that's the only place that takes depositions.

Q.    Okay.

And where are you physically located right now?

A.    Vancouver, Canada.

Q.    Okay.

Are you familiar with the term Prince Group, sir?

A.    I know it's used, yes.

Q.    Okay.

What is your understanding of the general use of that term?

A.    It is a group of companies that are broadly the subject of investigations and legal proceedings, most of which seem to have Mr. Chen Zhi

Page 11

Borrelli

as their controller or ultimate beneficial owner.

Q.    Got it.  All right.  I have the same understanding, so if I refer to the Prince Group or Prince companies, you'll understand what I mean by that?

A.    Well --

MR. SKINNER:  Object to form.

Q.    You can answer, sir.

MR. SKINNER:  You can answer, Mr. Borrelli.

A.    The Prince Group from what I can tell is substantially larger than the 25 companies that I'm involved with.

Q.    I understand that, and we'll talk about those 25 companies at some length, but when I refer to the term Prince Group, I will use that term in the way that you've used it which is to refer to a group of companies that have been the subject of law enforcement attention and are associated with or beneficially owned by Chen Zhi.  Does that make sense?

A.    It does make sense, but I

Page 12

Borrelli

only used it because of the question you asked, so when I actually use Prince Group, I refer to something else, but I understand what you want to do for the purposes of today and I'll try and stick to it.

Q.   All right.  Thank you.

If there's ever a time when you're using it in a different way than I'm using it, will you let me know?

A.   I'll try.

Q.   Okay.

How had you intended to use the term?  I don't want to create a confused record.

A.   When I'm dealing with my work, I refer to the Prince Group.  I appreciate that in these proceedings or in the wider proceedings, you refer to the larger group.

Q.   Got it.  All right.

So we'll talk about -- we'll get into this terminology in just a minute here, but you have used the term

Page 13

                    Borrelli

Borrelli Debtors in certain of your papers to refer to the 25 entities over which you purport to be appointed; is that right?

          A.    Yes, sir.

          Q.    All right.

                And were you just saying that you often use the term Prince Group to refer to those 25 entities?

          A.    Yes, sir.

          Q.    Okay.

                For the sake of consistency, let's both try to use the term Borrelli Debtors to refer to those 25 entities.

                Okay?

          A.    Yes, sir.

          Q.    All right.  Good.

                Mr. Borrelli, let's -- as I foreshadowed before we went on the record, we're going to mark as Exhibits 1 and 2 to your deposition an affidavit that you submitted in the BVI proceedings, and that's going to be Exhibit 1, and as Exhibit 2, the declaration that you have

Page 14

Borrelli

submitted in connection with your

objection in these Chapter 15 proceedings.

(Borrelli Exhibit 1,

Affidavit of Cosimo Borrelli,

marked for identification, as of

this date.)

(Borrelli Exhibit 2,

Declaration of Cosimo Borrelli,

marked for identification, as of

this date.)

MR. DUNNE:  And Pete, I hope

you have those documents at your

fingertips there.

MR. SKINNER:  We have them.

I can only -- we can only look at

one at a time --

MR. DUNNE:  Understood.

MR. SKINNER:  -- we only have

one screen.

MR. DUNNE:  All good.

MR. SKINNER:  So we have them.

you let us know what you want us

to do with them.

MR. DUNNE:  Great.  All right.

Page 15

Borrelli

Q.    Mr. Borrelli, you're aware, I take it, that there is litigation concerning the provisional liquidation of 30 Prince Group related entities ongoing in the British Virgin Islands at this time; correct?

A.    I do, sir.

Q.    And you are also aware, of course, that the Joint Provisional Liquidators of those entities have sought recognition in the United States Bankruptcy Court of that BVI proceeding; correct?

A.    I do, sir.

Q.    Okay.

And you have appeared and taken various positions in the BVI; is that right?

MR. SKINNER:  Objection.

You can answer.

A.    Yes, sir.

Q.    And likewise, you have filed an objection to Chapter 15 recognition in the United States; correct?

Page 16

Borrelli

A.    Yes, sir.

Q.    Is it your understanding, Mr. Borrelli, that the BVI Court appointed the Joint Provisional Liquidators on January 9, 2026?

A.    Yes, sir.

Q.    And you were appointed to your position in the first instance -- well, let me back up.

You were appointed to a position with 25 companies on February 13 of 2026; is that correct?

A.    Yes, sir.

Q.    Okay.

And you were appointed as a director of 25 particular Prince Group related entities; is that correct?

A.    Yes, sir.

Q.    And those are identified at paragraph 9 of Exhibit 1 to your deposition, which is your BVI Affidavit from on or about March 6; is that right?

A.    Yes, sir.

Q.    Okay.

Page 17

Borrelli

So you were not appointed as a director of all 30 Debtors that are in provisional liquidation in the BVI and are the subject of these Chapter 15 cases; correct?

A.    I've only been appointed to the 25 you see in paragraph 9.

Q.    Right.

And as I said earlier, we'll refer to those 25 as the Borrelli Debtors. That's the term you've used as well.

All right?

A.    Yes, sir.

Q.    Now, I'm going to (inaudible) and you tell me if that's your understanding, Amber Hill Ventures Limited, Lateral Bridge Global limited, Robust Harmony Limited, Jumbo High Limited --

MR. SKINNER:  Chris, can I just interrupt you?

MR. DUNNE:  Yes.

MR. SKINNER:  Can you just restart that question?  We didn't

Page 18

Borrelli

hear the beginning part, it broke up and we just started hearing a list.

MR. DUNNE:  Okay.  Well, thank you for not letting me finish reading them before you interjected.

MR. SKINNER:  Yes.

MR. DUNNE:  I was just clarifying that the five entities that are Debtors here as to which Mr. Borrelli was not appointed are the following:  Amber Hill Ventures Limited, Lateral Bridge Global Limited, Robust Harmony Limited --

THE COURT REPORTER:  We can't hear you again.

We heard that.

MR. DUNNE:  Yes.  I'll try moving the microphone closer and see if that helps.

All right.  Let's try this again.

Q.    The five Debtor entities as

Page 19

Borrelli

to which you were not appointed as a director are the following, Amber Hill Ventures Limited -- we'll do them one at a time. You're not a director of Amber Hill Ventures Limited; right, sir?

A.   I don't think so.

Q.   Okay.

And you are not a director of Lateral Bridge Global Limited; right?

A.   I don't think so.

Q.   Okay.

Nor are you a director of Robust Harmony Limited?

A.   I don't think so.

Q.   Okay.

You are not a director of Jumbo High Limited?

A.   I don't think so.

Q.   Okay.

And, finally, you are not a director of --

THE VIDEOGRAPHER:   You went silent again.

MR. DUNNE:   Okay.

Page 20

Borrelli

Q.   The last entity was Sword River Limited.  You are not a director of Sword River Limited; correct?

A.   I don't think so, sir.

Q.   Okay.  I'll refer to those five entities as the non-Borrelli Debtors.

Okay?

A.   Yes, sir.

Q.   All right.

And I will refer to the 25 Borrelli Debtors and the five non-Borrelli Debtors as the Debtors or the JPL entities.

Is that okay?

A.   Yes, sir.

Q.   All right.

Am I correct, sir, that you had no involvement of any kind with the Borrelli Debtors before February of 2026?

A.   That is correct.

Q.   Okay.

And your first role with the Borrelli Debtors was not that of a

Page 21

Borrelli

director; correct?

A.    My first role was as a Special Manager, sir.

Q.    Okay.

What is a Special Manager?

A.    Special Manager is a title given to someone who may conduct the affairs of a company in a particular manner.

Q.    Okay.

And you were appointed as a Special Manager on or about February 13 of 2026?

A.    About that date; yes.

Q.    Okay.

Who first contacted you about taking on any role with respect to any Prince Group-related entity?

A.    BVI-based legal advisors.

Q.    Would that be Campbells?

A.    That will be, sir.

Q.    Okay.

And when did that occur?

A.    Towards the beginning of

Page 22

Borrelli

February.  I don't recall the exact date.

Q.    Okay.

A.    It might have been the end of January.

Q.    All right.

And other than Campbells, before accepting your role as the Special Manager, who, if anyone, did you communicate with concerning the potential role?

A.    Before I was contacted by Campbells?

Q.    No.  Before accepting your position.  So other than Campbells, did you communicate with anyone else concerning potentially accepting a role with the Prince Group?

A.    To a representative of Lee Law Firm.

Q.    Okay.

Would that be Jacqueline Lee?

A.    That would be.

Q.    Okay.

And do you have any

Page 23

Borrelli

attorney-client relationship with
Jacqueline Lee?

A.    I don't; no.

Q.    Was that you don't know or
you do not have such a relationship?

A.    I do not have such a
relationship.

Q.    And I take it for the sake of
clarity, you are represented by
Campbells; am I correct about that?

A.    I am represented by Campbells.

Q.    Okay.

What did Jacqueline Lee tell
you about this potential assignment?

MR. SKINNER:  Objection.
Instruct the witness not to answer
on the grounds of privilege.  We're
asserting a common interest
privilege.

MR. DUNNE:  Okay.  You're
asserting a common interest
privilege with whom?

MR. SKINNER:  With -- over the
conversations that he had with

Page 24

Borrelli

Jacqueline Lee who represents the shareholders of the companies that Mr. Borrelli is a director of.

MR. DUNNE:  Okay.  The shareholders being Chen Zhi?

MR. SKINNER:  He's one of them; yes.

MR. DUNNE:  Okay.  All right.

Q.    Other than Jacqueline Lee, were there others that you spoke with?

A.    No.

Q.    Now, in your declaration that you filed in this case, which is Exhibit 2, in paragraph 9, you describe your February 13 appointment as a Special Manager, which you describe at the end of that paragraph as a stop-gap measure while your director appointments were being prepared.

Do you see that?

MR. SKINNER:  Sorry, Chris, you said paragraph 9?

MR. DUNNE:  Yes.  Of the declaration in the Chapter 15 case.

Page 25

Borrelli

MR. SKINNER: Oh, the declaration. Hold on a second. Let me get that one up.

MR. DUNNE: I think the same words are at paragraph 13 of his BVI Affidavit, but either way.

MR. SKINNER: One moment so we can get to the right one.

MR. DUNNE: Sure.

MR. SKINNER: So we are now looking at the --

MR. DUNNE: The declaration, which is Exhibit 2.

MR. SKINNER: Declaration of Cosimo Borrelli, paragraph 9.

Are you able to see that?

I am just going to -- is it a problem if I turn my video off so I can move my computer closer to Mr. Borrelli?

MR. DUNNE: I don't have a problem with it, Peter. It's fine with me.

MR. SKINNER: All right.

Page 26

Borrelli

Hold on.  One sec.

MR. DUNNE:  And we'll start trying to screen share also.

Do you want to start screen sharing, Alex?

(Borrelli Exhibit 2 displayed on the shared screen.)

MR. SKINNER:  That's fine. I just wanted to make sure I got this closer to him.

All right.  We have paragraph 9 where he can see it.

MR. DUNNE:  Okay.  Great.

Q.    So at the end that paragraph, you mentioned that your appointment as a Special Manager was a stop-gap measure while your director appointments were being prepared; correct?

A.    That's right, sir.

Q.    Okay.

Did you exercise any powers or take any actions on behalf of the companies in your capacity as a Special Manager?

Page 27

Borrelli

A.    Not that I recall, sir.

Q.    Okay.

And am I correct that your director appointments occurred between February 23 and February 27 of 2026?

A.    I think it's set out in the subsequent paragraph, so yes.

Q.    Okay.

And those appointments were made while the Borrelli Debtors were already subject to provisional liquidation orders; correct?

A.    That is my recollection, sir.

Q.    Okay.

Do you believe that the orders of the BVI Court appointing the Joint Provisional Liquidators had any effect on the ability of existing directors to appoint you?

MR. SKINNER:  Objection. You can answer, Mr. Borrelli.

A.    Was I appointed by directors or shareholders?

Q.    I'm sorry.  You're right.  I

Page 28

Borrelli

meant shareholders.

A.    No, I don't.  I don't think the appointment of the Joint Provisional Liquidators prohibited or impacted my appointment as a director.

Q.    Okay.

You were then -- let's clarify this.

You were appointed by persons acting on behalf of the shareholders of the 25 Borrelli Debtors?

A.    Yes, sir.

Q.    Okay.

You were not appointed by the BVI Court; right?

A.    I was not appointed by the BVI Court.

Q.    Right.

And you were not appointed by the JPLs obviously?

A.    I was not appointed by the JPLs.

Q.    Okay.

You were appointed by persons

Page 29

Borrelli

acting under powers of attorney from

Mr. Chen Zhi; is that correct?

MR. SKINNER:  Object to form.

A.    For some of the companies,

yes.

Q.    And what about for the other

companies?

A.    I was appointed by the

shareholders I think.

Q.    Okay.

For -- so you -- just to be

clear, for certain companies you were

appointed by persons with a grant of

authority given to them by Chen Zhi and

for others it was by existing shareholders

who did not receive -- people who did not

receive powers pursuant to grants of

powers of attorney; is that what you're

saying?

MR. SKINNER:  Objection.

A.    So that question is a bit

confusing, but for some of the companies,

I was appointed by people holding a power

of attorney provided to them by

Page 30

Borrelli

Mr. Chen Zhi.  For other companies, I was appointed directly by their shareholders who were not Chen Zhi.

Q.    Thank you.  That's what I was getting at.

Approximately how many companies fell into the first category, which was persons with powers of attorney from Chen Zhi?

A.    I don't recall the exact number, but a majority.

Q.    Yeah.  Okay.

And you refer to the persons who received powers of attorney from Chen Zhi and used those to appoint you as attorneys-in-fact in your declaration and in your BVI Affidavit; is that right?

MR. SKINNER:  Is there a particular paragraph you want to refer us to, Chris?

MR. DUNNE:  Sure.  I think it's paragraph 8 of his declaration in the Chapter 15 proceedings.

MR. SKINNER:  Okay.

Page 31

Borrelli

MR. DUNNE:  He may not use that term there, but if not, it's paragraph 12 of his BVI Affidavit.

A.   I can see that, sir.

Q.   Okay.

And am I correct that you have not identified those attorneys-in-fact to the JPLs?

A.   I have not identified those attorneys-in-fact to the JPLs.

Q.   And you have not provided any information about their identity to the United States Bankruptcy Court?

A.   I have not, sir.

Q.   And you have not provided any information about their identity to the BVI Court; correct?

MR. SKINNER:  Object to form.

A.   I offered to, but I haven't.

Q.   Okay.

Will you tell us the identity of those attorneys-in-fact today?

A.   No, sir.

Q.   Why not?

Page 32

Borrelli

MR. SKINNER:  Objection.
Instruct the witness not to answer
on the grounds of privilege.

MR. DUNNE:  He won't explain
why he's not telling us the names
on grounds of privilege?

MR. SKINNER:  Well, let me
put it this way.

Mr. Borrelli, if you're able
to answer that question without
revealing privileged communications,
go ahead.  If not, I counsel you,
you are not to reveal privileged
communications with your attorneys.

A.    Mr. Dunne, I think going
beyond what I've already said in
paragraph 12 would be venturing into
privileged conversations, so I'm not
going to share them with you.

Q.    Okay.

So let's focus for the moment
on your declaration in the Chapter 15
proceedings, which is Exhibit 2.

In paragraph 8 of that

Page 33

Borrelli declaration, you wrote, Mr. Chen gave a full power of attorney to certain individuals prior to his being taken into custody in China.  Those individuals have not been subject to any allegations or charges --

THE COURT REPORTER:  We lost you again.

MR. DUNNE:  Yes.  I am moving the microphone, but in the meantime, I am going to try to do this in a way that doesn't involve me speaking in long sentences which seems to lose me.

Q.    I am just going to direct you to paragraph 8 in your declaration filed in the Chapter 15 proceedings.

Are you there?

A.    I am, sir.

Q.    And there you wrote, Mr. Chen gave a full power of attorney to certain individuals prior to his being taken into custody in China; right?

A.    Yeah, that's not the middle,

Page 34

                    Borrelli

but I can see it.

     Q.     All right.  We're getting to
the middle, I guess.

          And then the next sentence,
you wrote, those individuals have not
been subject to any allegations or charges
in connection with any of the matters
alleged --

          THE COURT REPORTER:  Lost you
     again.

          We can't hear you.

          MR. DUNNE:  Let's take a break
     and address this microphone issue.
     I apologize.

          MR. SKINNER:  Okay.  Going
     off the record?

          MR. DUNNE:  Yeah.

          MR. SKINNER:  All right.

          MR. DUNNE:  Thank you.

          THE VIDEOGRAPHER:  We are
     going off the record.  The time is
     10:40.

          We are off the record.

          (Whereupon, a brief recess

Page 35

Borrelli
was taken.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 10:48 a.m.

Please proceed.

CONTINUED BY MR. DUNNE:

Q.   All right.  Apologies for that digression, Mr. Borrelli.  Welcome back.

A.   Thank you.

Q.   We were just talking about paragraph 8 of your declaration, and we were -- you had mentioned a moment ago, I think, that you were not going to reveal the identity of the attorneys-in-fact who appointed you; is that correct?

A.   That is correct, sir.

Q.   Okay.

And in paragraph 8 of your declaration, you wrote that Mr. Chen gave a power of attorney to certain individuals prior to his being taken into custody in China; is that correct?

A.   Yes, sir.

Page 36

Borrelli

Q.      You then wrote that those individuals have not been subject to any allegations or charges in connection with any of the matters alleged against Mr. Chen and are professional people within the Prince organization; is that correct?

A.      Yes, sir.

Q.      Your declaration then states that the Chinese authorities have not -- have made threats against parties associated with Mr. Chen; correct?

A.      Yes, sir.

Q.      And in the next sentence, you write about a case in Myanmar unrelated to Prince Group where certain individuals associated with scam centers were allegedly executed; is that right?

A.      Yes, sir.

Q.      All right.

And then your declaration goes on to state, for those reasons, the attorneys-in-fact wish to remain anonymous and that you are respecting those wishes;

Page 37

Borrelli

correct?

A.    Yes, sir.

Q.    And that is all you are willing to tell us about why you won't reveal their identities; am I right about that?

MR. SKINNER:  Object to form.

A.    Yes, sir.

Q.    Okay.  We'll come back to that.

All right.

So as we've discussed, there are 30 JPL entities or Debtors in this Chapter 15 proceeding; correct?  You're aware of that?

A.    I'm aware of that, sir.

Q.    Okay.

And you were appointed only over the 25 Borrelli Debtors; correct?

A.    Yes, sir.

Q.    Were you ever asked to become director of the other five entities?

A.    I don't recall.

Q.    Okay.

Were you ever asked to become

Page 38

Borrelli

a director of any other Prince Group affiliated entity?

MR. SKINNER:  Object to form.

A.    I don't recall.

Q.    Do you hold any other role of any kind with any other Prince Group affiliated entity?

MR. SKINNER:  Objection.

Q.    You can answer, Mr. Borrelli.

A.    No, I don't think so.

Q.    Okay.

You say you don't think so. Is there some reason you're not answering to say -- you're not able to say for certain?

A.    I don't think so.

Q.    Okay.

You're not aware of any other role that you have with any Prince Group entity other than the 25 Borrelli Debtors?

A.    Not aware of any other role.

Q.    Okay.

Have you declined any request

Page 39

Borrelli

to be appointed to any role with any Prince Group entity?

MR. SKINNER:  Objection.

A.    No, sir.

Q.    Did you review any documents relating to the 25 Borrelli Debtors before accepting your appointment?

A.    No, I don't think so.

Q.    Do you claim any authority to object to Chapter 15 recognition on behalf of the five non-Borrelli Debtors?

A.    I have no role other than in respect of the Borrelli Debtors.

Q.    Okay.

A.    No position in respect of any other company.

Q.    All right.

So you are not in fact objecting to Chapter 15 recognition with respect to the non-Borrelli Debtors?

A.    I'm not objecting to anything in respect of the non-Borrelli Debtors.

Q.    Now, according to you, Mr. Chen was appointed -- Mr. Chen

Page 40

Borrelli

appointed the attorneys-in-fact before he was taken into custody in China; correct?

A.    That is my understanding.

Q.    Okay.

You were not present when Mr. Chen executed any power of attorney; correct?

A.    I was not present, sir.

Q.    You didn't witness, therefore, any execution of any power of attorney?

A.    Of course not.

Q.    Okay.

Have you ever communicated with Mr. Chen?

A.    No, sir.

Q.    Okay.

You stated at paragraph 10 of your declaration in this matter that you saw and verified documentation relating to your appointment and that you are satisfied that those appointing you had the power to do so; is that right?

A.    Which paragraph did you refer to, sir?  The last paragraph -- last

Page 41

Borrelli

sentence of paragraph 10.  Yes, sir.

Q.    Okay.

Why are you satisfied?

A.    Because I have seen and I have verified all the relevant documentation and I'm satisfied.

Q.    Okay.

And what documentation did you review specifically?

A.    I reviewed the power of attorney and other documents I think that were also registers of members if I remember correctly.

Q.    Okay.

Are you familiar with Chen Zhi's signature?

A.    I am I think; yes.

Q.    Okay.

You believe you're able to verify Mr. Chen's signature?

A.    I think I'm able to recognize it.

Q.    Are you (inaudible) enough with Mr. Chen's signature to verify that

Page 42

Borrelli

the documents granting power to the attorneys-in-fact were in fact legitimate and properly executed?

MR. SKINNER:  Objection. Chris, can you just repeat that question?  You cut out for a moment.

MR. DUNNE:  Okay.  Let's hope that's not starting again.

Q.    Did you take any steps other than looking at the documents appointing the attorneys-in-fact to ensure that those documents are effective and were properly executed?

A.    No, sir.

Q.    Okay.

And you have not provided copies of those powers of attorney to this court or any other court; correct?

A.    I have offered them to the BVI Court.  I have not provided them to any court.

Q.    And you cannot testify from personal knowledge about which the circumstances under which your appointment

Page 43

Borrelli

documents -- I'm sorry -- the appointment documents for the attorneys-in-fact were signed; correct?

A.    I think I already let you know that I wasn't there at the time, so. . .

Q.    You, therefore, cannot verify based on your own personal knowledge whether they were in fact executed by Mr. Chen before he was taken into custody; is that correct?

A.    I did not witness Mr. Chen sign those documents or any other documents.

Q.    Now, those attorneys-in-fact then signed shareholder resolutions appointing you as a director; correct?

A.    Yes, sir.

Q.    That is the source of your appointment here?

A.    Yes, sir.

Q.    Okay.

And you have not provided unredacted copies of the resolutions appointing you to the JPLs?

Page 44

                    Borrelli

A.    That's right, sir.

Q.    And you have not provided unredacted copies of the resolutions appointing you to the United States Bankruptcy Court; is that correct?

A.    That's correct, sir.

Q.    Nor have you provided them to the BVI Court; correct?

A.    That is correct, sir.

Q.    Okay.

Mr. Borrelli, before accepting your appointment, you knew that serious criminal allegations had been made against Mr. Chen and the Prince Group; correct?

A.    Yes, sir.

Q.    You knew that those allegations were serious enough that the BVI Attorney General had sought provisional liquidation of 30 of Mr. Chen's companies; right?

MR. SKINNER:  Objection.

Q.    You can answer, Mr. Borrelli.

A.    Well, I don't think those two -- two parts of your sentences were

Page 45

Borrelli

actually connected.  I obviously knew that serious allegations had been made against Mr. Chen and the Prince Group.  I don't think they'd been made against those 25 companies.

Q.    Okay.  All right.  But you were aware that allegations had been made against Mr. Chen and the Prince Group; right?

A.    Yes.

Q.    And you were aware that 30 of Mr. Chen's companies were placed into provisional liquidation?

MR. SKINNER:  Objection.

A.    Yes, sir.

Q.    And you're aware, I take it, that certain of the companies are sanctioned entities by the United States and the United Kingdom?

A.    I am aware, sir.

Q.    Okay.

And you are aware, I take it, that Mr. Chen had been stripped of his Cambodian citizenship by royal decree?

Page 46

Borrelli

A.    I am aware of it now.  I can't pinpoint when I became aware of that.

Q.    Okay.

And you are aware that Mr. Chen and you were aware at the time you accepted that Mr. Chen was extradited to China and taken into custody by Chinese authorities?

A.    Probably.  Again, it's difficult to pinpoint my knowledge of that now, but probably.

Q.    Okay.

And as far as you are aware, Mr. Chen is not able to communicate with the outside world?

A.    That is my understanding, sir.

Q.    Okay.

What is the basis for that understanding, sir?

A.    I don't actually recall.  Probably my legal advisors.

Q.    Okay.

Have you attempted to make contact with Mr. Chen?

Page 47

Borrelli

A.      No, sir.

Q.      Why not?

A.      I don't think -- I haven't had any need to nor do I think it would be possible.

Q.      Do you believe that Cambodian authorities acted unlawfully or improperly in stripping Mr. Chen of citizenship?

A.      I have no idea, sir.

Q.      Do you believe that Chinese authorities acted unlawfully in taking custody of Mr. Chen?

A.      I have no idea, sir.

Q.      Do you believe that Mr. Chen is being held under unlawful or improper circumstances?

A.      I don't know the answer to that, sir.

Q.      And do you believe that the Chinese criminal investigation into Mr. Chen is illegitimate in some way?

A.      I have no way of being able to answer that question, sir.

Q.      I take it as you sit here

Page 48

Borrelli

today, you are not contending that either
the Cambodian or Chinese investigations
or actions against Mr. Chen were improper
in any way?

MR. SKINNER:  Objection.

A.    I don't have any way of being
able to answer that question.

Q.    Okay.

But you're not taking a
position that those actions were improper;
right?

MR. SKINNER:  Same objection.

A.    I'm not able to answer that
question one way or the other.

Q.    Okay.

A.    There are investigations afoot.

Q.    You're aware, I take it, of
the actions and allegations taken against
Mr. Chen by U.S. authorities; right?

A.    I am, sir.

Q.    And you -- are you aware of
any relevant actions taken by UK
authorities?

MR. SKINNER:  Objection.

Page 49

Borrelli

A.    I am aware of some UK sanctions.

Q.    Are you aware of any other nations that have taken action against Mr. Chen or the Prince Group?

A.    I'm only aware of U.S., BVI, Hong Kong, UK.

Q.    How about Cambodia?

A.    I understand he was arrested -- Mr. Chen was arrested in Cambodia.

Q.    And you understand that he was stripped of citizenship?

A.    I do now; yes.

Q.    How about Singapore?  To your knowledge, have Singapore authorities taken any action against Mr. Chen?

MR. SKINNER:  Objection.

Chris, please repeat the question.

MR. DUNNE:  Sure.

Q.    To your knowledge, have Singaporean authorities taken any action against Mr. Chen?

A.    I don't know.

Q.    How about Taiwanese

Page 50

Borrelli

authorities?

A.    I don't know.

Q.    Okay.

And I take it that you're not contending that any of the various nations that have taken action against Mr. Chen have done so in a way that was unlawful or violates any of his rights?

A.    I'm not able to make a decision about those actions one way or another.

Q.    Okay.

We spoke earlier about the statement in paragraph 8 of your declaration about threats made by Chinese authorities.

Do you remember that?

A.    Yes, sir.

Q.    Okay.

Have you personally received any threats from Chinese authorities?

A.    In respect of this matter?

Q.    In respect of this matter.

A.    No, sir.

Page 51

Borrelli

Q.    Have you received threats in respect of some other matter, Mr. Borrelli?

A.    I have in the past; yes.

Q.    Okay.

Are you personally aware of any threats made by Chinese authorities to persons associated with the Prince Group or Mr. Chen?

A.    I'm only aware of what I've said in paragraph 8, sir.

Q.    Well, in paragraph 8, you said the Chinese authorities have made threats against parties associated with Mr. Chen.

Can you explain what those are?

A.    There is a footnote I think in the BVI Affidavit that identifies the documents.  I think there's a -- there are some press releases and some announcements from the Public Security Ministry.

Q.    I see.  All right.

Other than those, are you aware of any threats?

Page 52

Borrelli

A.     No, but they're not surprising.

Q.     Why do you say that?

A.     So if you're involved in this sort of work in China or in Myanmar or in the region, and I have been there for 30-odd years, the fact that those threats were made and the fact that the attorneys-in-fact are concerned about them are not strange or unusual developments, they're quite common and quite real.

Q.     All right.

Before accepting your appointment, did you review any books and records for any of the Borrelli Debtors, sir?

A.     I may have seen the register of members.

Q.     Okay.

A.     In the preparation of the resolutions, but nothing beyond that.

Q.     Understood.  All right.

And so for the sake of clarity, when I refer to books and records, which

Page 53

Borrelli

I'll do a few times today, I'm simply referring to any documents of the corporation.  I'm not trying to use that in a way that refers only to certain centrally maintained files or anything like that.

A.    I'm familiar with the term, sir.

Q.    Okay.

Before accepting your appointment, I take it you did not conduct any investigation of your own into the allegations against Mr. Chen?

A.    No, sir.

Q.    In paragraph 8 of your declaration in the Chapter 15 proceedings, you wrote that the individuals with power of attorney who appointed you have not been subject to any allegations or charges in connection with any of the matters alleged against Mr. Chen; is that right?

A.    Yes, sir.

Q.    Okay.

Page 54

Borrelli

But you yourself did not undertake any efforts to investigate whether those individuals were in fact involved in Mr. Chen's alleged crimes, did you?

A.    I did not undertake any specific investigations in respect of those individuals.

Q.    And you have no idea whether those individuals are currently under investigation by any nation's law enforcement?

A.    I'm not aware of any investigations.

Q.    And so you do not know one way or the other whether they were part of any of the scams or human trafficking or other crimes in which Mr. Chen has alleged to have been participant in?

MR. SKINNER:  Objection.

A.    Nothing I've seen would indicate that they were.

Q.    We'll come to that.  Thank you.

(Inaudible) questions, it's

Page 55

Borrelli

not my intention to invade any privileges.
i want to understand something about the
relationship between --

THE COURT REPORTER:  You broke
up at the beginning of that
question.  I was trying to unmute
myself.

MR. DUNNE:  All right.

Q.    To your understanding, does
the Lee law firm or Jacqueline Lee have
any attorney-client relationship with any
of the JPL entities?

MR. SKINNER:  Objection.

A.    I'm not aware of any client-
attorney relationship between the Lee Law
Firm and the Borrelli Debtors.  I can't
speak for the others.

Q.    Fair enough.

How (inaudible) do you
communicate with Jacqueline Lee?

A.    I'm sorry?

Q.    How often do you communicate
with Jacqueline Lee?

A.    Infrequently.

Page 56

Borrelli

Q.   Mr. Borrelli, are you being compensated for your work relating to the Borrelli Debtors?

A.   I am, sir.

Q.   Okay.

Do you have a written engagement agreement or compensation agreement?

A.   I do, sir.

Q.   Okay.

A.   Or my firm does.

Q.   And have you issued invoices for your work?

A.   I have, sir.

Q.   Okay.

To whom were those invoices issued?

A.   My legal advisors.

Q.   Would that be Campbells?

A.   Yes, sir.

Q.   Have those invoices been paid, Mr. Borrelli?

MR. SKINNER:   I instruct the witness not to answer.

Page 57

Borrelli

MR. DUNNE:  On what basis?

MR. SKINNER:  Based on privilege.

MR. DUNNE:  Whether he's been paid is privileged?

MR. SKINNER:  Well, let me put it this way, Chris.  We're willing to answer those questions if you'll state on the record that you'll answer the same questions with regard to Sullivan Cromwell and Walkers when it comes to the JPLs.

MR. DUNNE:  I am not stipulating anything with you right now.  I just want to understand the basis for your objection, and it sounds like the basis for your objection is that Mr. Borrelli's -- whether Mr. Borrelli's been paid is the subject of attorney-client privilege.

MR. SKINNER:  Correct.  And also, you know, all of the other objections that we put into our

Page 58

Borrelli

responses and objections to your document request seeking the same information.

MR. DUNNE: Okay. Well, what -- Peter, I'm not going to pull those out right now, but with respect to whether Mr. Borrelli has to answer questions at a deposition and leaving aside whether the production of documents might be warranted, what is the basis for your objection?

MR. SKINNER: The basis is privilege, the basis is burdensome, the basis is relevance. And, as I said, we are willing to stipulate that we will answer those questions if you'll stipulate that you'll provide the same information back to us.

Q. Mr. Borrelli, do you know who is funding your work?

MR. SKINNER: Objection.

MR. DUNNE: Are you

Page 59

Borrelli

instructing him not to answer?

MR. SKINNER:  No.  It's an
objection because it's in a form
that assumes facts that are not yet
the subject of this deposition, but
he's welcome to answer the question.
If you don't want to clean up the
form, that's up to you.

Q.    Mr. Borrelli, are you aware of
who is paying your invoices?

A.    I have that -- my firm has
that information; yes.

Q.    And are you aware of the
ultimate source of funds for your
payments?

A.    Yes, sir.

Q.    Okay.

And who is that?

A.    I don't recall the name now.

Q.    Is it an individual or a
company?

A.    I think it's both.

Q.    And is that individual or
company someone associated with Mr. Chen?

Page 60

Borrelli

A.    It's my understanding that that person is not associated with Mr. Chen.

Q.    Do you have an understanding as to why that person is paying your bills?

A.    No, sir.

Q.    Have any of the funds used to pay your bills come from the assets of any Borrelli Debtor?

MR. SKINNER:  Objection. Instruct the witness not to answer. We've already covered that we're not answering whether the funds have been paid or not, but if you want to rephrase that so that it doesn't assume that funds have been paid, go ahead.

MR. DUNNE:  I don't need to rephrase the question.  Campbells has written letters indicating that Mr. Borrelli has been paid, we don't need to drag those out right now.

Page 61

Borrelli

Q.    My question is, have you been paid, Mr. Borrelli, out of the assets of any Borrelli Debtor?

A.    Mr. Dunne, those same letters make it pretty clear that I haven't been paid by any Borrelli Debtor.

Q.    So you're aware of them. Okay.

And have you been paid out of the assets of any JPL entity?

A.    Of course not.

Q.    Okay.

Does your compensation depend in any way on whether the JPLs are discharged?

A.    No.

Q.    Okay.

Does your compensation turn in any way on whether Chapter 15 recognition is granted or denied?

A.    No.

Q.    And have you received a retainer in connection with your work?

MR. SKINNER:  I'll allow a

Page 62

Borrelli

yes or no to that.

A.     Yes.

Q.     And where is that retainer located?

MR. SKINNER:  Object to form. You can answer.

A.     In Hong Kong.

Q.     At which bank?

MR. SKINNER:  Object and instruct the witness not to answer.

MR. DUNNE:  On what basis?

MR. SKINNER:  Relevance.

MR. DUNNE:  You know full well that's not a valid basis to instruct a witness not to answer at a deposition, Peter.

MR. SKINNER:  I know full well that at a certain point we go beyond the relevance as permitted in a deposition if the questions become unduly burdensome and invasive, and that's the line we're drawing right now, so I'm instructing the witness not to answer.

Page 63

Borrelli

MR. DUNNE: You think there's a burden in identifying a bank?

MR. SKINNER: It's invasive and it's unnecessary to this litigation.

Q. Mr. Borrelli, have you taken any steps to determine whether the funds used to pay your fees were subject to sanctions?

A. Yes, sir.

Q. Okay.

And what were those steps?

A. I am satisfied that the funds have not come from an entity that's associated with any sanctions or the subject of any sanctions.

Q. That's an analysis you did yourself?

A. In part, yes.

Q. Okay.

A. Sorry. I should rephrase that. There are people in my office who have done that.

Q. Okay.

Page 64

Borrelli

I want to talk to you about your role as a director of the Borrelli Debtors.

On a day-to-day basis, what do you do in connection with being a director of the Borrelli Debtors?

A.    I do everything that you would expect a director to do in order to meet his duties and obligations.

Q.    Do you have any employees working under you or at your direction?

A.    None of the Borrelli Debtors have any employees.

Q.    Have you held any Board meetings for any Borrelli Debtor?

A.    As the only director, no, that would be pretty pointless.

Q.    Have you passed any resolutions since your appointment?

A.    I don't recall.

Q.    Have you communicated with any current or former Prince Group employees?

MR. SKINNER:  Objection.

Page 65

Borrelli

A.    No, sir.

Q.    Have you made any material business decisions for any Borrelli Debtor?

A.    No, sir.

Q.    Have you approved any transfer of assets by any Borrelli Debtor?

A.    No, sir.

Q.    Have you given any instructions to any bank on behalf of any Borrelli Debtor?

A.    No, sir.

Q.    Have you communicated with any commercial counterparty on behalf of any Borrelli Debtor?

A.    No, sir.

Q.    Have you communicated with any subsidiary or affiliate on behalf of any Borrelli Debtor?

A.    No, sir.  I think you're also aware, Mr. Dunne, that I'm not actually able to.  So you can keep going through the list, but the answer's the same.

Page 66

Borrelli

Q.   Is it fair to say that your principal activity as a director has been managing litigation in the BVI and in the United States?

A.   That has been one of my tasks.

Q.   What other tasks have you undertaken?

A.   I have been completing statements of affairs to the benefit of the JPLs.

Q.   Are there any other tasks?

A.   Those are the only two material tasks at this stage.

Q.   Okay.

Have you visited the premises of any Borrelli Debtor?

A.   No, sir.

Q.   Are you aware that any of the Borrelli Debtors have physical premises?

A.   As in office premises where they operate, it is not my understanding that any of them do.

Q.   Okay.

I have seen images of Mighty

Page 67

Borrelli

Divine's office space.  I take it you have not visited Mighty Divine's office space?

A.    I have not visited Mighty Devine's office space.

Q.    Okay.

Have you secured any books and records of any Borrelli Debtor?

A.    I have secured some books and records.

Q.    Okay.

And are there any books and records of any Borrelli Debtor that you have secured that you have not provided to the JPLs?

A.    I don't think so.

Q.    Okay.

And your counsel provided some books and records last night, I believe.  Is that your understanding?

A.    I know that process was in China.  I'm not quite sure when that happened.

Q.    Understood.  Okay.

But I take it that that

Page 68

Borrelli

production is, to your understanding, the complete set of -- that and prior productions, perhaps, are the complete set of books and records of the Borrelli Debtors that you have possession of?

A.   I think your latter formulation is correct; yes.

Q.   Okay.

Have you identified any assets of any Borrelli Debtor?

A.   Whatever assets I've identified are in the statements of affairs that have been provided to the JPLs.

Q.   Okay.

Just to be clear, have you had any communications with any former employees of any Borrelli Debtor?

A.   No, I don't think so.

Q.   Okay.

And just to broaden that question a bit, have you had any communications with any current or former employee of any Prince Group entity?

Page 69

                    Borrelli

MR. SKINNER:  Objection; but you can answer.

A.    I don't think so.

Q.    Have you taken control of any servers containing information relating to any Borrelli Debtor?

A.    No, sir.

Q.    Okay.

Have you obtained access to e-mail or messaging or document management or similar systems for any Borrelli Debtor?

A.    No, sir.

Q.    Are you aware of such systems?

A.    No, sir.

Q.    Have you taken any action with respect to any bank accounts of any Borrelli Debtor?

A.    No, sir.

Q.    Are you aware of any computers or phones or other devices that may contain information or documents relating to any Borrelli Debtor?

A.    No, sir.

Page 70

Borrelli

Q.    Have you seen balance sheets for any of the Borrelli Debtors?

A.    I don't think so.

Q.    (Inaudible.)

THE VIDEOGRAPHER:  You went mute again.

Q.    Do you have any understanding as to whether any of the Borrelli Debtors is solvent or insolvent at this time?

A.    My understanding is that none of them actually have any material liabilities and that they are all solvent.

Q.    And the assets that you are aware of, you said those are reflected on the statement of affairs that you recently provided?

A.    As are the liabilities.

Q.    Okay.

Have you investigated whether any Borrelli Debtor or Prince Group entity has assets located in the United States?

MR. SKINNER:  You cut out at the end there.  Was the end of

Page 71

Borrelli

the question just in the United States?  Mr. Dunne, why don't you just reask the question.

MR. DUNNE:  Yes.  I'll reask it.

Q.    Have you investigated whether any Borrelli Debtor has assets in the United States?

A.    Yes, I have, sir.

Q.    Okay.

And are you aware of any such assets?

A.    I am not aware of any such assets or, in fact, any dealings in the United States.

Q.    Have you investigated whether any other Prince Group entities have assets in the United States?

A.    So I haven't done anything of that -- anything of any significance in respect of any entity other than the Borrelli Debtors.

Q.    And are you aware of any assets of any Prince Group entity in the

Page 72

Borrelli

United States?

MR. SKINNER: Objection.

A.    Same answer, so. . .

Q.    (Inaudible.)  I just don't
understand your answer, Mr. Borrelli.

MR. SKINNER: Sorry.  Is
there a question pending?

MR. DUNNE: Yeah.  I was
asking him to explain his answer.

Q.    Could you please explain your
answer?

MR. SKINNER: Okay.
Objection.  Go ahead.

A.    I'm sorry, I don't remember
the question.

Q.    Sure.

Are you aware of any Prince
Group assets in the United States?

MR. SKINNER: Objection.

A.    No.  And I have no way of
knowing.

Q.    All right.

A.    Sorry.  I should clarify that.
No way of knowing beyond the Borrelli

Page 73

Borrelli

Debtors.

Q.    Thank you.  Okay.

Now, with respect to the five non-Borrelli Debtors, you've never held any office with the non-Borrelli Debtors; correct?

A.    That's correct, sir.

Q.    Never been a director of the Borrelli Debtors, for example?

A.    I am a director of the Borrelli Debtors.

Q.    I'm sorry.  If I said Borrelli, I meant non-Borrelli Debtors.

A.    Correct.

Q.    Okay.

A.    I am not a director of the non-Borrelli Debtors.

Q.    Okay.

And you do not claim any ownership interest in any non-Borrelli Debtor, I take it?

A.    That's correct, sir.

Q.    And I think we discussed earlier, you are not taking any position

Page 74

Borrelli

at all with respect to recognition under Chapter 15 for the non-Borrelli Debtors?

A.    That's correct, sir.

Q.    You filed your objection in these Chapter 15 cases in your asserted capacity as a director of the Borrelli Debtors; is that correct?

A.    Yes, sir.

Q.    Okay.

You are not appearing as a -- you are not objecting -- sorry -- as a creditor or shareholder or in any other capacity of the Borrelli Debtors; correct?

A.    That's correct, sir.

Q.    Okay.  Let's mark as Exhibit 3 to your deposition your objection, which is --

MR. SKINNER:  What number is that?

MR. DUNNE:  It's Document Number 24.

MR. SKINNER:  Okay.  You want us to open it up?

MR. DUNNE:  Yes, please.

**Page 75**

Borrelli

(Borrelli Exhibit 3,
Cosimo Borrelli'S Corrected
Objection to Verified Petition
Under Chapter 15 for Recognition
of Foreign Main Proceedings and
Related Relief, marked for
identification, as of this date.)

MR. SKINNER:  All right.
So Exhibit 3 is the objection.
We have it open on our screen now.

(Borrelli Exhibit 3 displayed
on the shared screen.)

Q.     All right.
I'd like to direct you to
paragraph 30 of your objection, sir.

MR. SKINNER:  Give us one
moment.

MR. DUNNE:  Of course.

MR. SKINNER:  Hold on.  I
think what we have open is not the
right document.

THE WITNESS:  Paragraph 30 is
here.

MR. SKINNER:  All right.

Page 76

Borrelli

What I opened up for some reason doesn't have paragraph numbers. This is number 24, Chris?  Now I see it.  Okay.

MR. DUNNE:  I'll let you get it, Peter.  Go ahead.

MR. SKINNER:  Yeah.  And we can see it on the screen, too.

MR. DUNNE:  Okay.

MR. SKINNER:  Okay.

MR. DUNNE:  All right.

Q.    Paragraph 30 of your objection, Mr. Borrelli, states that as an objector of each of the Borrelli Debtors, you have authority to run the companies, but that or the is subject to the BVI Orders; is that right?

A.    That's what it says, sir.

Q.    Okay.

And then it goes on to say that the relief sought here by the JPLs in these Chapter 15 cases will further impair Mr. Borrelli's authority to do his job.

Page 77

Borrelli

It is in that capacity that you object; is that right?

A.     Yes, sir.

Q.     Okay.

Is that statement a correct statement of the capacity for your objection, the capacity in which you object?

MR. SKINNER:  Objection; but you can answer.

A.     Yes, I think so.

Q.     How will the relief sought by the JPLs in these Chapter 15 cases further impair your authority to do your job?

A.     The broad nature of the relief being sought will impair my ability to do my job.

Q.     How so?  Sorry.  Please continue.

A.     No, I don't want to go into the detail because that's privileged.

Q.     Well, what specific acts do you contend that you will be unable to take if recognition is granted?

Page 78

Borrelli

A.     That's privileged, sir.

Q.     Okay.

What rights do you have that will be impaired if Chapter 15 is granted?

MR. SKINNER:  Object on the grounds of privilege, but allow the witness to answer to the extent that it doesn't reveal privileged communications with his attorneys.

A.     So I have duties and obligations to the company, including -- including to protect its interests, including by objecting to the JPLs, or the -- including by objecting to the petition of one of the companies and the application of one to appoint the provisional liquidators.

Q.     Why do you believe that your duties to the companies require you to object to Chapter 15 recognition?

MR. SKINNER:  Same objection and instruction with respect to privilege.

A.     If I don't think that those

Page 79

Borrelli

steps are in the best interests of the company, then I should object to them.

Q.    Why do you believe that seeking Chapter 15 recognition is not in the best interest of the companies?

MR. SKINNER:  Same objection and instruction.

A.    Well, firstly they're based -- they're being taken by provisional liquidators who I don't think are validly appointed and they seek powers in respect of assets which are not at risk and steps which I think are disproportionate and where any actions that they think need to be taken can actually be taken in a more straightforward, simple, and cost effective manner, for example.

Q.    Is there any specific action that you are presently permitted to take under the BVI orders that you contend you would not be permitted to take if Chapter 15 recognition were granted?

A.    I think I just answered that question, sir.

Page 80

Borrelli

Q.    I don't think so.  Could you please answer?

A.    I think I answered that question, sir.

Q.    I don't understand your answer then.  Could you explain it better?

A.    No, I don't think so.

Q.    Okay.

Well, what actions can you currently take that Chapter 15 would prevent you from taking?

MR. SKINNER:  Same objection as before and instruction.

A.    I think I have answered that question, sir, and it's set out in my declaration.

Q.    Can you direct me to where that's set out?

A.    Not here and now; no.

Q.    Okay.  I don't know what your answer is to that question, so could you please remind me then if you've answered it?

A.    No.  I think I've answered

Page 81

Borrelli

the question, sir.

Q.    Well, I'm entitled to ask the question.  I don't understand what you're saying your answer is.

A.    So I don't think the steps that the provisional liquidators have taken or are being taken on their behalf are either warranted or valid, and getting down to the level of detail that you're seeking to is just gamesmanship and I really don't want to get into it.

Q.    Okay.  I wasn't asking for your opinion on what the JPLs are doing.  What I was asking is whether you believe there's something that you're entitled as a director to do today, but if Chapter 15 recognition were granted, you would not be able to do.

MR. SKINNER:  Object to the form.  Further object on the grounds that -- on privilege grounds of the witness and just instruct the witness to keep in mind privileged communications in formulating your

Page 82

Borrelli

response.

A.     I don't have an answer beyond what I've said and without venturing into privilege.

Q.     Okay.

And in your capacity as a director, you are acting on behalf of the companies; is that correct?

MR. SKINNER:  Objection.

A.     I'm acting in my capacity as a director, sir.

Q.     And as a director, you are purporting to exercise your powers to protect the companies; is that what you're doing?

MR. SKINNER:  Objection.

A.     I have a duty to do so, sir.

Q.     Okay.

And that is what you believe you are doing, is protecting the Borrelli Debtors?

MR. SKINNER:  Objection.

A.     Amongst other things.

Q.     What else?

Page 83

Borrelli

A.    I'm fulfilling my duties as a director of the company.

Q.    And that duty being to protect the companies from what you believe to be improper actions by the JPLs?

MR. SKINNER:   Objection.

A.    That is one of them; yes.

Q.    What else?

A.    I think that -- I think and I think as I say so in one of my declarations that the steps that are being taken by the JPLs will impair my authority to do my job, and that's the basis upon which I've objected.

Q.    That job being to protect the assets of the companies.

A.    To protect the assets of the companies, to not incur costs unnecessarily, to not create risk unnecessarily.  We can do the whole gambit of director's duties for a BVI company.

Q.    Okay.

But it is those -- it is the

Page 84

Borrelli

exercise of the duties to the company to which you refer?

MR. SKINNER:  Objection.

A.    I don't think I understand the question.

Q.    Let's do it this way.

You don't own any shares in any Borrelli Debtor; correct?

A.    Of course not.

Q.    You're not the beneficial owner of any shares indirectly either?

A.    Correct.

Q.    Okay.

And you don't hold any option or warrant or right to acquire shares of any debtor?

A.    Correct.

Q.    Okay.

You don't expect to receive any distribution of funds from any Borrelli debtor, do you?

A.    No, sir.

Q.    And you don't claim ownership in any asset of any Borrelli Debtor;

Page 85

Borrelli

correct?

A.    Correct, sir.

Q.    You don't hold a lien on any
assets of any Borrelli Debtor; correct?

A.    Sir, I'm only here as a
director.

Q.    Okay.

You're not a creditor of any
Borrelli Debtor?

A.    I'm only here as a director,
sir.  I'm not a creditor.  No, I don't
have any other capacity.

Q.    Okay.

You have no contractual
relationship with the Borrelli Debtors
aside from your director appointments?

A.    I'm not sure that's
contractual, but my only --

Q.    Yeah.

A.    -- my only capa -- well, I
don't think it is contractual.  The only
capacity in which I'm here is as a
director of those entities.

Q.    Okay.

Page 86

Borrelli

You do not personally stand to lose or (inaudible) --

THE COURT REPORTER:  We lost you again.

THE VIDEOGRAPHER:  We lost you.

MR. DUNNE:  This is great.

Q.    You do not personally stand to lose or receive money depending on whether Chapter 15 recognition is granted or denied?

A.    No, sir.  I think I've answered that already, but no.

Q.    You may have.

And no asset that you personally own has been restrained by the U.S. Bankruptcy Court; correct?

A.    Ever?

Q.    In connection with your role as a director of the Borrelli Debtors.

A.    No.

Q.    You're not seeking the return of any personal asset from the JPLs, I take it?

A.    No, sir.

Page 87

Borrelli

Q. (Inaudible.)

THE VIDEOGRAPHER: We've lost you again.

Q. You do not contend that Chapter 15 recognition will impair any claim that you personally have at all; correct?

A. Claim as a creditor?

Q. With respect to these matters -- this matter here, you don't contend that Chapter 15 recognition will impair any right or claim or property interest that you personally have; correct?

MR. SKINNER: Objection.

A. I think I've already answered, I don't have any property or creditor interest in respect of any of the companies.

Q. Okay.

MR. SKINNER: Chris, if we're changing subjects, at some point soon, can we take a brief break?

MR. DUNNE: Yeah. That's fine,

Page 88

Borrelli

Peter.  And I want to try and improve the --

THE VIDEOGRAPHER:  You've gone silent again.

MR. DUNNE:  -- improve the microphone situation.  So let's take a break.  A good idea.

MR. SKINNER:  Very well.  Off the record then?

MR. DUNNE:  Yes.

MR. SKINNER:  Thank you.

THE VIDEOGRAPHER:  This is the end of video media disk number 1.  The time is 11:41 a.m. and we are going off the record.

We are off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  We are back on the record.  This is video media disk number 2.  The time is 12:02 p.m.  Please proceed.

MR. DUNNE:  Okay.

CONTINUED BY MR. DUNNE:

Page 89

Borrelli

Q.   Just to recap, before we move on to another set of questions, Mr. Borrelli, I want to confirm, no property right or pecuniary interest of yours is directly affected by Chapter 15 recognition for the Borrelli Debtors; correct?

A.   Yes, sir.

Q.   Okay.

The only thing that you believe will be affected by Chapter 15 recognition is your ability to do your job as a director to protect the Borrelli Debtors' interests; is that right?

A.   To fulfill my duties and obligations as a director of the Borrelli Debtors.

Q.   And those obligations being to protect the company --

A.   Amongst --

Q.   -- companies?

A.   Amongst other things.

Q.   What are the other things?

A.   Safeguard its assets, not

Page 90

Borrelli

insuring incurred expenses necessarily. We could go on all day.

Q.    Okay, I don't want to go on all day.  I thought that fell into the category of protecting the companies, but I understand protect the companies, safeguard their assets, prevent unnecessary expense.  What other things?

A.    It's hard to say that in the abstract.

Q.    Okay.

Are there any others that come to mind right now?

A.    Avoid unnecessary risks, avoid unnecessary costs.

Q.    Okay.

Avoid unnecessary risks or costs for the companies; correct?

A.    Yes, sir.

Q.    Okay.

Turning back for a moment to the powers of attorney pursuant to which the attorneys-in-fact were given power by Mr. Chen Zhi, I have some questions about

Page 91

Borrelli

those.

Were there any limit -- you observed those powers of attorney documents; am I correct?

A.   I have read the power of attorney.

Q.   Okay.

And are there any limitations on the power of attorney that Mr. Chen granted?

MR. SKINNER:  Object to form.

A.   I don't recall everything --

Q.   Any --

A.   -- it says.  It is a substantial document.

Q.   Okay.

How many pages is it approximately?

A.   I don't recall.

Q.   Is it subject to revocation under any circumstances?

A.   I don't recall.

Q.   Are there any conditions or limitations placed on the power of

Page 92

Borrelli

attorney that you recall?

MR. SKINNER: Objection.

A. I don't think so.

Q. Okay.

I would like to direct you to paragraph 11, please, of your objection, which I think we marked as Exhibit 3.

MR. SKINNER: One moment.

MR. DUNNE: Sure.

MR. SKINNER: Paragraph 11. We're there.

(Borrelli Exhibit 3 displayed on the shared screen.)

Q. Mr. Borrelli, paragraph 11 states, since their appointment, the JPLs have engaged in repeated ex-parte contacts with the BVI Court.

Do you see that sentence?

A. I do, sir.

Q. The next sentence says, they have filed a report under seal that was not made available to the Borrelli Debtors despite multiple requests in both the BVI and the United States.

Page 93

Borrelli

Do you see that?

A.    I do, sir.

Q.    Okay.

So with respect to the first sentence, what are the ex-parte contacts that you are referring to other than the sealed report?

A.    I understand there's also been correspondence, but I don't recall the details now.

Q.    Okay.

Are you aware that the report that was filed under seal which is referenced in your -- in the second sentence there was sealed pursuant to an order of the BVI Court?

A.    I'm pretty sure.  That's the only way you can seal it.

Q.    So are you suggesting that there was anything improper about the filing of that report under seal?

A.    Yes, I think there is.

Q.    What is that?

A.    I don't think it's appropriate

Page 94

Borrelli

for JPLs in circumstances like this to be giving the judge the benefit of one-sided.

Q.    Even if the judge has instructed them to do so?

A.    Well, did the judge instruct them or did they apply?

Q.    We'll take a look at that.

Have you done anything in the BVI Court to seek the unsealing of that?

A.    I have not, sir.

Q.    Okay.

Why is that?

A.    Why is that.  I'm aware that steps were taken to do so and they were rejected.

Q.    Okay.

You're aware -- okay.  Understood.  Thank you.

So you believe that the sealing was not appropriate under the circumstances and you're aware that steps were taken to lift the sealing, but that the BVI Court has rejected that application?

Page 95

Borrelli

A.   My answer wasn't that broad.
My answer is I don't think it's
appropriate for judges to be making
decisions in the manner that we are
required to and having the benefit of
one -- of a one-sided story, and I'm
particularly concerned in this case given
the conduct of the JPLs more generally.

Q.   Okay.

And you're aware that steps
have been or steps were taken in the BVI
at your direction to seek the unsealing
of that report?

A.   I don't think that happened at
my direction, sir.

Q.   Okay.

At whose direction did that
happen then?

A.   Sir, I don't remember.  I
know it was dealt with and I refer -- I
remember either dealing with it or
reading about it, but I can't remember
who actually initiated it.

Q.   Understood.  But you

Page 96

Borrelli

understand that that matter was taken up with the BVI Court and the BVI Court has not unsealed the report?

A.     That is my understanding.

Q.     Okay.

And what were the actions of the JPLs that you referred to in your prior answer that gave you some concern?

A.     The manner in which they're dealing with the assets, the manner in which they're dealing with me.

Q.     What about the manner in which they are dealing with the assets concerns you?

A.     Well, for example, we've become aware of their attempts to try and sell assets which are not appropriate given the terms of their appointment.

Q.     Which business?

A.     The cigar business.

Q.     Your understanding is they have taken steps to sell the cigar business?

A.     Yes, sir.

Page 97

                    Borrelli

Q.     Okay.

       Are there any other actions
that you believe are inappropriate?

A.     Yes.  I think the manner in
which they've been dealing with me
including through their correspondence is
inappropriate.

       MR. SKINNER:  Mr. Dunne, could
we just pause for one sec?

       Mr. Borrelli, are you able to
turn up the volume on your computer?
It's a little hard to hear.

       THE WITNESS:  I actually just
turned it up as Mr. Dunne came back
quite faint, but I'm --

       MR. SKINNER:  Let's see if
that works.  Go ahead, Mr. Dunne.
Sorry to interrupt.

       MR. DUNNE:  No problem, Peter.
I'M going to try to turn my mic up
here, too.  I --

A.     Mr. Dunne, I don't think this
matters, but I have come back faint and
there's a clicking noise in the

Page 98

Borrelli

background, but --

MR. SKINNER:  Yeah, we -- it's fine.  We can still proceed.  I just wanted to see if we were able to make it a little bit louder.

MR. DUNNE:  Hang on.  I'm going to give it a try.  Is that any better?

THE VIDEOGRAPHER:  I hear everybody clearly, but I definitely hear a clicking sound.  It sounds like a fan or something.

MR. DUNNE:  Well, we will take that up with S&C technology after this.

MR. SKINNER:  It is a little better, Chris.

MR. DUNNE:  Okay.  Thanks, Pete.

Q.    What is the basis of your knowledge for the attempts to sell the Allied Cigar business?

MR. SKINNER:  Object and instruct the witness to be mindful

Page 99

Borrelli

of privilege, but you're welcome to answer that to the extent you have non-privileged information.

A.    I think we are going into privilege, but my legal advisors are the primary source.

Q.    Okay.  That's what I wanted to understand.

You learned of that through legal advisors?

A.    Yes, sir.

Q.    Okay.

Have you had any communications with any persons involved in the cigar business?

A.    No, sir.

Q.    Have you had any communications with any representatives of the other shareholders in the cigar business?

A.    No, sir.

Q.    Now, before our technology problems resumed again, you were identifying other things that the JPLs

Page 100

Borrelli

have done that give you concern.  Can we
backtrack?  Can you remind me, what
things other than the sale of the cigar
business?

A.   I think I've already mentioned
them before.  The rest are all set out in
the correspondence between Walkers and
Campbells.

Q.   Okay.

What others do you remember?

A.   For example, their
characterization of my work in respect to
the statement of affairs, their
characterization as what they say is me
withholding information from them, me
obstructing their work, which is just all
nonsense.

Q.   And are there any things that
the JPLs have done that you take issue
with that are not set forth in the
correspondence between Campbells and
counsel for the JPLs?

A.   I would think they would
probably all be covered.  I can't say for

Page 101

                    Borrelli

sure, but that's my understanding at the

moment.

        Q.      Could you please turn to

paragraph 61 of your objection, sir?

        A.      All right.  We're there.

        Q.      That section states, I'm going

to read a part of it, that paragraph

states, the Debtors' assets are already

subject to sanctions and freezing orders

in various jurisdictions.  The Joint

Provisional Liquidators' actions in the

U.S. and other foreign jurisdictions have

only served either to duplicate those

existing actions, at enormous expense to

the Debtors, or to work at cross-purposes

with them.  At the 1519 hearing, the JPLs

told this Court that their appointment

mandate, quote, includes a mandate to

cooperate with law enforcement, close

quote, and that, quote, the JPLs believe

it is in their financial interest, in the

financial interest of the Debtors.

                Do you see that?

        A.      Yes, sir.

Page 102

Borrelli

Q.    And it goes on to say it is not clear whether they are fulfilling that mandate or whether they are instead working at cross-purposes with law enforcement to serve their own interests.

Do you see that?

A.    Yes, sir.

Q.    Okay.

Please explain all the ways in which you contend that the JPLs are working at cross-purposes with law enforcement or other authorities.

A.    That answer is privileged, sir.

Q.    Okay.

You have no non-privileged basis to assert that the JPLs are working at cross-purposes with law enforcement or other authorities?

MR. SKINNER:  Objection.

A.    I'm finding it hard to segregate them.

Q.    Okay.

I'm not interested in any advice you got from counsel, but with

Page 103

                    Borrelli

respect to the simple facts of what the

JPLs are doing that you believe is at

cross-purposes with law enforcement or

other authorities, can you identify such

facts?

          MR. SKINNER:  Objection.

     Instruct the witness to be mindful

     of privilege in responding to that

     answer.

     A.    Mr. Dunne, I don't want to be

difficult, but I think I'm going to

struggle to separate the facts and the

advice.

     Q.    Okay.

          So you're not able to expound

any more on the sentences in that

paragraph with respect to how the JPLs

are working at cross-purposes with law

enforcement or other authorities?

     A.    Without crossing into

privilege, yes, sir.

     Q.    Okay.

          And have you or anyone working

at your direction had any communications

Page 104

Borrelli

with law enforcement in any jurisdiction in relation to this matter?

A.     Not that I'm aware of, sir.

Q.     Okay.

Have you or has anyone working at your direction provided information or documents to law enforcement in connection with this matter?

A.     Define law enforcement.

Q.     And for this purpose, I will reframe the question to be any government authority.

MR. SKINNER:  Objection.  But you can answer if you understand the question.

A.     Sorry, can I have the question again, sir?

Q.     Yes.

Have you or has anyone working at your direction provided any information or documents to any government authority in connection with this matter?

A.     I provided a submission to the Attorney General in BVI.

Page 105

Borrelli

Q.    Okay.

Any other government authorities?

A.    Not that I'm aware of, sir.

Q.    Okay.

MR. SKINNER:  Just to -- sorry -- just to clarify the question in my mind, government authorities doesn't include the Bankruptcy Court?

MR. DUNNE:  Sure.  That's fine for these purposes, Peter.

MR. SKINNER:  Okay.

Q.    And so I take it, just to tie that up, you know, it also -- you -- people working at your direction have, of course, made filings in the BVI Court; right?

A.    My legal advisors have.

Q.    Correct.

And in this Bankruptcy Court?

A.    And in this Bankruptcy Court; that's right.

Q.    Any other courts?

Page 106

                    Borrelli

A.      No, I don't think so.

Q.      Okay.  We are going to mark
another exhibit here.  It will be
Document Number 21.

          (Borrelli Exhibit 4,
     May 20, 2026 letter from
     Campbells to Walkers, marked for
     identification, as of this date.)

          MR. SKINNER:  Just to make
     sure, this is the Campbells
     May 20, 2026 --

          MR. DUNNE:  Yes.  Absolutely,
     Peter.  I will clarify that.   I
     will put it up on the screen here,
     too, Peter.

          MR. SKINNER:  Okay.

          (Borrelli Exhibit 4 displayed
     on the shared screen.)

Q.      So this will be marked as
Exhibit 4 to your deposition.

          Mr. Borrelli, this is a
May 20, 2026 letter from Campbells to
Walkers.  Campbells again is your
counsel, correct, in the BVI?

Page 107

Borrelli

A.      Yes, sir.

Q.      And the subject of this letter in the re line is Khoon Group Limited.

Do you see that?

A.      Yes, sir.

Q.      Are you familiar with Khoon Group?

A.      I recognize the name.

Q.      Okay.

What do you understand Khoon Group to be?

A.      I don't have any recollection of that at the moment.

Q.      Okay.

I will represent to you that it's a company that does sort of electrical engineering type work and is owned by a company called Southern Heritage, which is --

A.      I do recall that now that you've said it.

Q.      Okay.

What do you recall now that

Page 108

Borrelli

I've mentioned that?

A.    Just what you've said.

Q.    Got it.  All right.

So you're aware that Southern Heritage is one of the Borrelli Debtors?

A.    I am.

Q.    All right.

And you recall that Khoon Group is an operating company in the electrical industry generally?

A.    Yes.

Q.    Okay.

Can I direct you, please, to paragraphs 3 and 4 of the Campbells' letter, please?  Just take your time to read them to yourself.  I don't want to take the time to read 3 and 4 in their entirety, although I will if you need me to.

(Witness reviewing document.)

A.    Yes, sir.

Q.    Okay.

Do you agree with the statements in paragraphs 3 and 4 of this

Page 109

Borrelli

letter?

A.      I do, sir.

Q.      Okay.

In paragraph 4, the letter states that it is remarkable that the JPLs have not taken the obvious and most constructive step available to them: Namely, exploring the appropriately licensed divestment of a portion of Southern Heritage's 55% share holding in the Company so as to enable the Company to return to normal commercial life.

Do you see that?

A.      Yes, sir.

Q.      And the reason for that, that statement according to the letter, is that to do so would alleviate some of the sanctions pressure on Khoon Group; is that fair to say?

A.      Yes.

Q.      And you believe then that under these circumstances, it would be appropriate for the JPLs to sell that interest in Khoon Group?

Page 110

Borrelli

A.     I think it would be appropriate for the JPLs to investigate that option.

Q.     Do you believe it would be appropriate for them to investigate the option of divesting interests of the JPL entities in other companies so as to alleviate sanctions pressure?

A.     Not necessarily; no.

Q.     Okay.

What is it that's unique about Khoon Group that makes it appropriate for them to explore a sale?

A.     I think what's appropriate for Khoon Group is and what is a very common process in Hong Kong, if not southeast Asia, is that with a divestment of a very small percentage, you can allow the business to return to normality and maintain value while the issues surrounding the sanctions and everything else are dealt with.

Q.     And that divestment you're referring to, that relates to the effects

Page 111

Borrelli

that sanctions have on subsidiaries of a
sanctioned entity based on the percentage
of ownership?

A.    I don't understand what you're
saying.

Q.    Sure.

You stated that you thought
it made sense under the circumstances
present here to explore divestment of
some portion of the holding in order
to --

A.    A very small portion for
something that has a very liquid market.

Q.    Okay.

And can you just explain why
exploring that and potentially engaging
in that sale would potentially have a
beneficial effect on the company here?

A.    Then it's no longer subject
to sanctions.

Q.    And that's because if the
minority -- if the interest of the
sanctioned person drops below a certain
threshold, the sanctions no longer apply

Page 112

Borrelli

as a matter of law?

A.     Amongst other things.

Q.     Okay.

What other things?

A.     Just a general association
with the sanctions, for example.

Q.     Okay.

A.     I'm sure there are other
matters, but I'm not familiar with
them -- with all of them.

Q.     Under these circumstances --
I mean, the Cigar Group to which you
alluded to earlier is also subject to
sanctions in part due to the ownership
structure -- right -- and the percentage
holdings of Mr. Chen associated with them?

A.     I don't think --

MR. SKINNER:  Objection.

THE WITNESS:  Sorry.

MR. SKINNER:  It's all right.
Go ahead.

A.     I don't think you can
reasonably draw an analogy between those
two assets in business.  The Cigar Group

Page 113

Borrelli

is a huge privately held business.  What we're talking about here is selling 4 or 5% of a listed company, which you can do on a liquid -- which you can do on a liquid, transparent exchange.  What the JPLs have been doing in effect with the Cigar Group is far from that and far from transparent.

Q.    Okay.

So it's the nature of the way in which the shares could be sold here that makes you think that this -- that it would be appropriate to explore the sale?

A.    I didn't --

MR. SKINNER:  Objection.

THE WITNESS:  Sorry.

A.    I didn't say that.

Q.    Well, help me understand the distinction you're making then if I didn't get it right.

A.    I think I've already explained it.  One involved a very small percentage of a liquid asset that is tradable on a -- on a transparent market.  The other is a

Page 114

Borrelli

huge privately held and very valuable business which the JPLs are seeking to transact without any transparency, without any sale process, without any valuations, without any knowledge at all.  That's the difference.

Q.    Okay.

So, again, the difference being in one instance you have a publicly traded company where you believe price transparency is easy to see from the share trading price on the Stock Exchange, that's the case for Southern Heritage's interest in Khoon Group, and on the other hand, the cigar company being privately held means you think no sale should be explored there, even if it is for a small percentage?

A.    Mr. Dunne, that is -- that -- what you've just stated is just a mixed up concoction.  I didn't say anything like that, and if you go back to the transcript, you can see what I've said.

Q.    Okay.  It sounded to me like

Page 115

                    Borrelli

it was quite a bit like what you said,

but --

          MR. SKINNER:  Objection.

     A.    Yours was contrived.

     Q.    Okay.

          In what way do you believe it

was contrived?  I don't understand your

problem with my question.

     A.    If you --

          MR. SKINNER:  Objection.

          THE WITNESS:  I'm sorry.

     A.    If you go back to my earlier

answer, Mr. Dunne, you'll see I was pretty

clear.

     Q.    All right.

          So what about the nature of

the Khoon Group arrangement other than the

fact that the Company is publicly

traded --

     A.    I've explained --

     Q.    I'm not finished with my

question, Mr. Borrelli.

          MR. SKINNER:  Let's just wait

     for Mr. Dunne to finish and then

Page 116

Borrelli

give me a chance to object and then you can answer.

THE WITNESS:  Okay.

Q.    What about the nature of the investment -- of Southern Heritage's investment in Khoon Group other than the fact that it is Khoon Group -- that it is publicly traded differentiates it from the interest of a different entity in the cigar business?

MR. SKINNER:  Objection. Asked and answered.  Go ahead.

A.    You're missing the key part here.  In respect of the Khoon Group, we are talking about the sale of a very small percentage on a transparent liquid market.  That's not the case with the Cigar Group.

Q.    Okay.  So it's the --

A.    And the fact that the JPLs have gone as far as they have with that asset including in circumstances where their appointment is in jeopardy in the three or four decades that I've been

Page 117

Borrelli

doing it is quite shocking.

Q.    So I want to understand a
couple of pieces of your answer, but the
first piece I want to understand is
the -- you're talking about a small
percentage for Southern Heritage, and
that you believe is a significant part of
the reason why it might be appropriate to
sell because you could be talking about
selling, for example, 6% to get below a
50% threshold; right?  That's important
to you here?

MR. SKINNER:  Objection.

A.    That's one part of it.  You
can't unlink -- you can't not link that
to the fact that it can be done relatively
transparently on a liquid market.

Q.    Okay.

So it's the size of the
potential sale and the liquidity of the
market and the transparency associated
with that market, that's what makes the
difference to you?

A.    That's not quite what I said.

Page 118

Borrelli

Q.    How did I get it wrong?

A.    You can go back and read my transcript, Mr. Dunne.

Q.    I'd just like you to explain how what I said is incorrect.

A.    You've just generalized that what I'm talking about is selling a very small percentage of the equity in a listed business on a transparent market.

Q.    Okay.

So if the JPLs were to explore selling a very small percentage of the cigar business, would you have a problem with that?

MR. SKINNER:  Objection.  Form.

A.    I don't know enough about the cigar business to answer that with any confidence.

Q.    Okay.

And then you purported to get into what the JPLs have done with respect to the cigar business and you suggested at least that there was something wrong with that.  Without revealing advice from

Page 119

Borrelli

counsel, what steps, what actions do you believe the JPLs have taken with respect to the cigar business that are improper?

A.   They've tried to sell it.

Q.   They've tried to sell it.

What do you know about their efforts to sell it?

A.   That's privileged.

Q.   The facts are privileged?

MR. SKINNER:  Object to form.

Q.   I'm asking what specific acts beyond your general assertion that they have tried to sell it that you can point to to suggest that the JPLs have done something improper with respect to the cigar business.

MR. SKINNER:  I'm going to object and instruct the witness not to answer to the extent it would reveal privileged communications with counsel.

A.   For example, Mr. Dunne, the sale of a large privately held business warrants a sale process, an international

Page 120

Borrelli

well-planned sale process.

Q.     Have you reviewed the transcripts of any depositions taken in this matter?

A.     No, sir.

Q.     Okay.

So you did not review the transcript of Mr. Pretlove's declaration -- deposition?

A.     No, sir.

Q.     Okay.

Mr. Borrelli, in your declaration in support of your objection, you stated that you are the sole director of the Borrelli Debtors; is that correct?

A.     Yes, sir.

Q.     Okay.

I noticed that in some of the shareholder resolutions appointing you or a handful of the companies, you're referred to as an additional director in the appointment documents.

Do you know what I'm referring to?

Page 121

Borrelli

A.     Yes, sir.

Q.     Okay.

And I'll just list the companies as to which I saw that.  They were Noble Title, Mighty Divine, Bright Team Global, Starry Bloom, Even Sincerity, and Oriental Charm.  You're familiar with those companies; right?

A.     I am familiar with the companies.

Q.     Why were you appointed as an additional director of those companies?

A.     There are reasons which I now don't actually recall the detail where extra steps were required to remove the other directors to leave me as the sole director.

Q.     Okay.

And have those steps since been taken?

A.     Yes.  I think they've all been completed, but I can't be sure.

Q.     Okay.

So you don't -- sitting here

Page 122

                    Borrelli

today, you don't know if you're the sole director of those six entities?

        A.      Correct.

        Q.      And who are -- who were the other directors who might currently still be appointed of those companies?

        A.      I don't recall the details here, sir.

        Q.      Okay.

                Have you had any communications with those other directors?

        A.      No, I don't think so.

        Q.      And you don't know whether those other directors still wield any power with respect to the six companies?

        A.      I'm pretty sure I'm the only person undertaking any work in respect of any of those companies.

        Q.      Now, you say you're pretty sure, but you might not be, there might be other directors out there, I take it?

        A.      There might be.  I don't -- I'm pretty sure that no other directors are taking any steps in respect to those

Page 123

Borrelli

companies.

Q.    And you did not coordinate with those other directors in connection with filing your objection to the Chapter 15 recognition?

A.    Correct, sir.

Q.    Okay.

And you did not coordinate with those other directors in taking any action that you have taken in the BVI Court, I take it?

A.    Correct, sir.

Q.    Okay.

I noticed, Mr. Borrelli, that one of your affidavits that you filed in the BVI Court was notarized by an individual named Kevin So.  Do you know who Mr. So is?

A.    I do know Mr. So; yes.

Q.    Okay.

And who is he?

A.    He's a lawyer in Hong Kong. I think he's a partner at Karas So, if I remember it correctly.

Page 124

Borrelli

Q.    And do -- does Karas So have any relationship with you in connection with this matter?

A.    No --

MR. SKINNER:  Object to form.

THE WITNESS:  Sorry.

MR. SKINNER:  That's okay. You can answer.

A.    No, sir.

Q.    Do they represent -- they don't represent you in connection with this matter?

A.    No.  I don't -- actually I don't think he could have sworn or notarized that affidavit if we had any relationship with respect to this matter.

Q.    Okay.

And do you know the firm, I'm going to mispronounce the name probably, but you'll humor me I hope, Mishcon de Reya?

A.    I do know Mishcon de Reya; yes.

Q.    Okay.

And does that firm have any

Page 125

Borrelli

relationship with you in connection with this matter?

A.    No, sir.

Q.    Your -- the BVI Affidavit that we looked at, I think it's Exhibit 1 to your deposition, I noticed that that was not signed or dated before its submission to the Court.  Why was that?

A.    If I remember correctly, I was traveling at the time.

Q.    Okay.

And do you know whether a signed version of that has ever been filed with the Court?

A.    I can't say for sure; no.  I would be surprised if it hasn't, but I can't say for sure.

Q.    Okay.

There's been no reason that you didn't sign it other than that you were traveling?

A.    Correct.

Q.    Okay.

MR. DUNNE:  Why don't we take

Page 126

Borrelli

a short break, guys, let me look over my notes and consider whether I want to do anything else.

MR. SKINNER: Thank you.

THE WITNESS: Thank you, sir.

THE VIDEOGRAPHER: This is the end of media video disk number 2. The time is 12:38 p.m. and we are going off the record.

We are off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We are back on the record. This is video media disk number 3. The time is 12:56 p.m. Please proceed.

CONTINUED BY MR. DUNNE:

Q. Just a few more questions, Mr. Borrelli.

Turning back to those six companies as to which there may be additional directors, how do you know that you have the authority to act for those six companies without the consent

Page 127

Borrelli

of the additional directors?

A.    That's privileged.

Q.    Okay.

There's no information you can provide in answer to that question that's not legal advice?

A.    I'm confident that I'm able to conduct the company's affairs.

Q.    Okay.

But other than your statement that you are confident that you're able to do that, you're not offering any evidence to substantiate that?

A.    No, sir.  Not without breaching privilege.

Q.    You mentioned earlier that you didn't read any transcripts of any depositions.  I take it you also didn't listen to or watch any recordings of the depositions in this matter?

A.    No, sir.

Q.    Okay.

Earlier today you refused to answer questions about communications with

Page 128

Borrelli

the Lee Law Firm on the basis of common interest privilege.

Do you remember that?

A.     Yes, sir.

Q.     Okay.

The Lee Law Firm client with which you have a common interest is Chen Zhi; is that correct?

MR. SKINNER:  Objection.

A.     I think there's more than one.

Q.     Is Chen Zhi one of them?

A.     Yes, he is.

Q.     Okay.

And I will mispronounce the name, but is Sandy Zhou another one?

A.     I believe she is another one; yes.

Q.     Okay.

And who are the others that you remember?

A.     I'm sorry.  I don't -- they're Chinese names.  I don't recall them.

Q.     Understood.

Page 129

Borrelli

Have you entered into any conflict of interest waiver in connection with this matter?

MR. SKINNER:  Object to form; but you can answer if you understand.

A.    I don't think I know what that is, but I'm sure I'd know it if I'd done it, so I don't think so.

Q.    Okay.

Are you aware of whether Chen Zhi has entered into any conflict of interest waiver in relation to this matter?

MR. SKINNER:  Same objection.

A.    No, sir, I'm not.

Q.    Are you in connection with your role in this matter taking any instruction from anyone?

MR. SKINNER:  Objection.

A.    No, sir.  And, in fact, a key part, a key reason why I was first approached was the need or desire for someone independent as a director.

Page 130

Borrelli

Q.   All right.

So there is no one directly or indirectly directing your actions as a director?

A.   That's correct, sir.

Q.   We -- we may have covered this earlier, so apologies, but have you entered into -- I just want to know, I want to take this incrementally, I am not trying to invade privileged information here.

A.   Okay.

Q.   But have you entered into any contracts in connection with your role in this matter?

MR. SKINNER:  Object to form. You can give a yes or no to that.

A.   Contracts.  Only my engagement letter and engagement letters with attorneys.

Q.   Okay.  That was going to be my next question.  Thank you, Mr. Borrelli. I don't have any further questions at this time.

Page 131

Borrelli

A.     Thank you.

         MR. SKINNER:  Thank you.

         MR. DUNNE:  I think they want your transcript orders now, Peter.

         MR. SKINNER:  Yeah.  I'll -- can I have someone -- can I just get contact information for who I should have follow up on that and I'll have somebody from my office handle logistics?

         THE COURT REPORTER:  Yes. I believe --

         MR. SKINNER:  But, I mean, I guess what we want is a rush, you know, we want a copy of the transcript as soon as we can get it?

         THE COURT REPORTER:  Okay. So do you want a rough right after this?

         MR. SKINNER:  Yeah, if you could send us a rough and then send the, you know, send the final on a daily of -- Chris, I don't know what you guys have.

Page 132

Borrelli

MR. DUNNE:  Yes.  Peter, so I think we're both going to want the same here.  We want the rough basically as soon as we can get it and the final also as soon as we can get it.  You know, overnight, if possible.

THE COURT REPORTER:  Yes.  The order is for overnight.  Since we are ending early, you can have the final later today, which would be considered an immediate, but if you want it overnight, it can stay overnight.

MR. DUNNE:  No.  No.  No. Immediate is perfect.  That is great.  Thank you.

MR. SKINNER:  Same for us, please.

THE COURT REPORTER:  Okay. Thank you.

THE VIDEOGRAPHER:  And in the portal, Mr. Dunne, it says that you wanted the video with the sync

Page 133

Borrelli

with the transcript.  Mr. Skinner,
did you also want a video with
the sync with the transcript?

MR. SKINNER:  Yes, please.

THE VIDEOGRAPHER:  Okay.
Video with sync.  Perfect.

Okay.  This concludes today's
testimony given by Cosimo Borrelli.
The total number of media disks
used was three and will be retained
by Veritext New York.

The time is 1:02 p.m. and
we are going off the record.

We are off the record.

Page 134

A C K N O W L E D G E M E N T

I, COSIMO BORRELLI,
hereby certify that I have read
the transcript of my testimony
taken under oath in my deposition
of June 3, 2026; that the transcript
is a true, complete and correct
record of what was asked, answered
and said during this deposition,
and that the answers on the record
as given by me are true and
correct.

_____
COSIMO BORRELLI

Subscribed and sworn to

before me this _____ day

of_____, 20___.

_____
NOTARY PUBLIC

**Page 135**

**I N D E X**

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Cosimo Borrelli | Mr. Dunne | 9 |

BORRELLI

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Affidavit of Cosimo Borrelli | 14 |
| Exhibit 2 | Declaration of Cosimo Borrelli | 14 |
| Exhibit 3 | Cosimo Borrelli'S Corrected Objection to Verified Petition Under Chapter 15 for Recognition of Foreign Main Proceedings and Related Relief | 75 |
| Exhibit 4 | May 20, 2026 letter from Campbells to Walkers | 106 |

Page 136

CERTIFICATE

STATE OF NEW YORK        )

                         ) ss.:

COUNTY OF NASSAU      )

I, ROBIN LaFEMINA, a Registered Professional Reporter, Certified LiveNote Reporter and Notary Public within and for the State of New York, do hereby certify:

That COSIMO BORRELLI, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of June, 2026.

ROBIN LaFEMINA

**Page 137**

                    ERRATA SHEET
CASE NAME:   IN RE: PRINCE GLOBAL HOLDINGS
             LIMITED, ET AL., DEBTORS IN
             FOREIGN PROCEEDINGS
DATE OF DEPOSITION:  6/3/26
WITNESS' NAME:  COSIMO BORRELLI
PAGE/LINE(S)/    CHANGE            REASON
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____

_____
COSIMO BORRELLI

SUBSCRIBED AND SWORN TO
BEFORE ME THIS_____DAY
OF_____, 20__.

_____
    NOTARY PUBLIC
MY COMMISSION EXPIRES_____

**[& - access]**

**&**

**&**   3:4 5:20 8:16

**1**

**1**   5:17 13:21,24 14:4 16:21 88:14 125:6 135:8
**10**   40:18 41:2
**10001**   4:10
**10004**   3:8
**106**   135:16
**10:13**   2:6 5:4
**10:40**   34:23
**11**   92:7,11,15
**11:41**   88:15
**12**   31:4 32:18
**125**   3:7
**12:38**   126:9
**12:56**   126:17
**13**   16:12 21:13 24:16 25:6
**14**   135:8,10
**15**   1:8 14:3 15:24 17:5 24:25 30:24 32:23 33:18 37:14 39:11,20 53:17 61:20 74:3,6 75:5 76:23 77:14 78:5,21 79:5 79:23 80:11 81:17 86:10

87:6,12 89:6 89:12 123:6 135:13
**1519**   101:17
**1:02**   133:13

**2**

**2**   13:22,25 14:8 24:15 25:14 26:7 32:24 88:22 126:8 135:10
**20**   106:7,12,23 134:21 135:16 137:22
**2026**   2:5 5:5 16:6,13 20:21 21:14 27:6 106:7,12,23 134:8 135:16 136:23
**20th**   4:9
**21**   106:5
**23**   27:6
**24**   74:22 76:4
**25**   11:15,17 13:3,10,15 16:12,17 17:8 17:11 20:12 28:12 37:19 38:21 39:7 45:5
**26-10769**   1:9 5:25

**27**   27:6

**3**

**3**   2:5 5:5 74:16 75:2,10,12 92:8,13 108:15 108:18,25 126:16 134:8 135:11
**30**   15:5 17:3 37:13 44:20 45:12 52:7 75:16,23 76:13
**3970**   136:25
**3rd**   136:22

**4**

**4**   106:6,18,21 108:15,18,25 109:5 113:3 135:16

**5**

**5**   4:8 113:4
**50**   117:12
**55**   109:11

**6**

**6**   16:23 117:11
**6/3/26**   137:4
**61**   101:5

**7**

**75**   135:11

**8**

**8**   30:23 32:25 33:17 35:13,20 50:15 51:12,13 53:16

**9**

**9**   16:6,21 17:8 24:15,23 25:16 26:13 135:5

**a**

**a.m.**   2:6 5:4 35:5 88:15
**ability**   27:19 77:18 89:13
**able**   9:19 25:17 32:10 38:15 41:20,22 46:15 47:23 48:8,14 50:10 65:24 81:19 97:11 98:5 103:16 127:8,12
**absolutely**   106:13
**abstract**   90:11
**accepted**   46:7
**accepting**   22:8 22:14,17 39:8 44:12 52:14 53:11
**access**   69:10

**[accounts - appearances]** Page 2

accounts 69:18
accurate 9:19
acknowledge 7:15
acquire 84:16
act 126:24
acted 47:8,12
acting 28:11 29:2 82:8,11
action 49:5,17 49:22 50:7 69:17 79:19 123:11 136:18
actions 26:23 48:4,11,19,23 50:11 79:15 80:10 83:6 96:7 97:3 101:12,15 119:2 130:4
activity 66:3
acts 77:23 119:12
actually 12:3 45:2 46:21 65:23 70:12 79:16 95:24 97:14 121:15 124:14
additional 120:22 121:13 126:23 127:2
address 34:14

administered 7:18
advice 102:25 103:14 118:25 127:7
advisors 21:20 46:22 56:19 99:6,11 105:20
affairs 21:9 66:10 68:14 70:16 100:14 127:9
affected 89:6 89:12
affidavit 13:22 14:5 16:22 25:7 30:18 31:4 51:18 124:16 125:5 135:8
affidavits 123:16
affiliate 65:20
affiliated 38:3 38:8
affiliations 6:21
afoot 48:17
ago 35:14
agree 5:15 108:24
agreement 56:8 56:9

ahead 32:13 60:19 72:14 76:7 97:18 112:22 116:13
al 1:6 5:22 137:3
alex 26:6
alexandra 3:13 7:3
allegations 33:6 34:7 36:4 44:14,18 45:3 45:8 48:19 53:14,21
alleged 34:9 36:5 53:22 54:5,20
allegedly 36:19
alleviate 109:18 110:9
allied 98:23
allow 61:25 78:7 110:19
alluded 112:14
amber 17:17 18:13 19:3,5
analogy 112:24
analysis 63:18
announcements 51:21
anonymous 36:24
answer 9:2,16 11:10,11 15:21

23:17 27:22 32:3,11 38:10 44:23 47:18,24 48:8,14 56:25 57:9,11 58:9 58:18 59:2,7 60:13 62:7,11 62:16,25 69:3 72:4,6,10,12 77:11 78:8 80:3,6,22 81:5 82:3 95:2,3 96:9 99:3 102:14 103:10 104:15 115:14 116:3 117:4 118:18 119:20 124:9 127:6,25 129:6
answer's 65:25
answered 79:24 80:4,15 80:23,25 86:13 87:18 116:13 134:10
answering 38:14 60:15
answers 134:12
apologies 35:8 130:8
apologize 34:15
appearances 3:1 4:2 6:21

**[appeared - authority]** Page 3

**appeared** 15:17
**appearing** 2:11
  3:2 4:3 74:11
**application**
  78:17 94:25
**apply** 94:7
  111:25
**appoint** 27:20
  30:16 78:17
**appointed** 13:4
  16:4,8,11,16
  17:2,7 18:12
  19:2 21:12
  27:23 28:10,15
  28:17,20,22,25
  29:9,14,24
  30:3 35:17
  37:18 39:2,25
  40:2 53:20
  79:12 121:12
  122:7
**appointing**
  27:17 40:22
  42:11 43:17,25
  44:5 120:20
**appointment**
  24:16 26:16
  28:4,6 39:8
  40:21 42:25
  43:2,20 44:13
  52:15 53:12
  64:20 92:16
  96:19 101:18
  116:24 120:23

**appointments**
  24:19 26:18
  27:5,10 85:17
**appreciate**
  12:19
**approached**
  129:24
**appropriate**
  93:25 94:21
  95:4 96:18
  109:24 110:3,6
  110:14,15
  113:14 117:9
**appropriately**
  109:9
**approved** 65:7
**approximately**
  5:4 30:7 91:19
**arrangement**
  6:10,16 115:18
**arrested** 49:10
  49:11
**asia** 110:18
**aside** 58:10
  85:17
**asked** 12:3
  37:21,25
  116:13 134:10
**asking** 72:10
  81:13,15
  119:12
**assert** 102:17
**asserted** 74:6

**asserting** 23:19
  23:22
**assertion**
  119:13
**asset** 84:25
  86:15,23
  113:24 116:23
**assets** 60:10
  61:3,11 65:8
  68:10,12 70:14
  70:22 71:8,13
  71:15,19,25
  72:19 79:13
  83:17,18 85:5
  89:25 90:8
  96:11,14,18
  101:9 112:25
**assignment**
  23:15
**associated**
  11:23 36:13,18
  51:9,15 59:25
  60:3 63:16
  112:17 117:22
**association**
  112:6
**assume** 60:18
**assumes** 59:5
**assuming** 9:10
**attempted**
  46:24
**attempts** 96:17
  98:22

**attention** 11:22
**attorney** 6:23
  23:2 29:2,19
  29:25 30:9,15
  33:3,22 35:22
  40:7,11 41:12
  42:18 44:19
  53:19 55:12,16
  57:21 90:23
  91:4,7,10 92:2
  104:25
**attorneys** 3:5
  4:6 30:17 31:8
  31:11,23 32:15
  35:16 36:24
  40:2 42:3,12
  43:3,15 52:9
  78:10 90:24
  130:21
**audio** 5:13
**authorities**
  36:11 46:9
  47:8,12 48:20
  48:24 49:16,22
  50:2,17,22
  51:8,14 102:13
  102:19 103:5
  103:20 105:4
  105:10
**authority** 29:15
  39:10 76:16,24
  77:15 83:13
  104:13,22
  126:24

**[authorized - borrelli]** Page 4

**authorized** 3:5
7:4
**available** 92:23
109:8
**avoid** 90:15,16
90:18
**aware** 15:2,9
37:15,16 38:19
38:23 45:8,12
45:17,21,23
46:2,3,5,6,14
48:18,22 49:2
49:4,7 51:7,11
51:25 54:14
55:15 59:10,14
61:8 65:23
66:19 69:15,21
70:15 71:12,14
71:24 72:18
93:13 94:14,18
94:22 95:11
96:17 104:4
105:5 108:5
129:12

**b**

**back** 16:10
35:3,10 37:10
58:20 88:20
90:22 97:15,24
114:23 115:13
118:3 126:15
126:21

**background**
98:2
**backtrack**
100:3
**balance** 70:2
**bank** 62:9 63:3
65:12 69:18
**bankruptcy** 1:2
5:23 15:13
31:14 44:6
86:17 105:11
105:22,23
**based** 21:20
43:8 57:3 79:9
111:3
**basically** 132:5
**basis** 46:19
57:2,17,18
58:12,14,15,16
62:12,15 64:5
83:14 98:21
102:17 128:2
**beginning** 6:22
18:2 21:25
55:6
**behalf** 26:23
28:11 39:11
65:12,16,20
81:8 82:8
**believe** 27:16
41:20 47:7,11
47:15,20 67:19
78:19 79:4
81:15 82:20

83:5 89:12
94:20 97:4
101:21 103:3
109:22 110:5
114:11 115:7
117:8 119:3
128:17 131:13
**beneficial** 11:2
84:11 111:19
**beneficially**
11:23
**benefit** 66:10
94:3 95:6
**best** 9:2 79:2,6
**better** 80:7
98:9,18
**beyond** 32:17
52:22 62:19
72:25 82:3
119:13
**bills** 60:7,10
**bit** 29:22 68:23
98:6 115:2
**blood** 136:18
**bloom** 121:7
**board** 64:15
**boies** 4:5
**books** 52:15,25
67:7,9,12,19
68:5
**borrelli** 1:13
2:10 4:7 5:19
7:7,10,25 8:1,5
8:13 9:1 10:1

11:1,12 12:1
13:1,2,14,19
14:1,4,5,8,9
15:1,2 16:1,4
17:1,11 18:1
18:12 19:1
20:1,7,13,13,21
20:25 21:1
22:1 23:1 24:1
24:4 25:1,16
25:21 26:1,7
27:1,11,22
28:1,12 29:1
30:1 31:1 32:1
32:10 33:1
34:1 35:1,9
36:1 37:1,19
38:1,10,21
39:1,7,12,14,21
39:23 40:1
41:1 42:1 43:1
44:1,12,23
45:1 46:1 47:1
48:1 49:1 50:1
51:1,4 52:1,16
53:1 54:1 55:1
55:17 56:1,2,4
56:23 57:1
58:1,8,22 59:1
59:10 60:1,11
60:23 61:1,3,4
61:7 62:1 63:1
63:7 64:1,3,7
64:13,16 65:1

65:4,8,13,17,21
66:1,17,20
67:1,8,13 68:1
68:5,11,19
69:1,7,12,19,24
70:1,3,9,21
71:1,8,23 72:1
72:6,25 73:1,5
73:6,10,12,14
73:14,18,21
74:1,3,7,14
75:1,2,12 76:1
76:14,15 77:1
78:1 79:1 80:1
81:1 82:1,21
83:1 84:1,9,22
84:25 85:1,5
85:10,16 86:1
86:20 87:1
88:1 89:1,4,7
89:14,17 90:1
91:1 92:1,13
92:15,23 93:1
94:1 95:1 96:1
97:1,11 98:1
99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1,6
106:18,22
107:1 108:1,6
109:1 110:1
111:1 112:1
113:1 114:1

115:1,23 116:1
117:1 118:1
119:1 120:1,13
120:16 121:1
122:1 123:1,15
124:1 125:1
126:1,20 127:1
128:1 129:1
130:1,23 131:1
132:1 133:1,9
134:4,17 135:5
135:7,9,10
136:11 137:5
137:20
**borrelli's** 57:19
57:20 76:24
**borrelli's** 75:3
135:11
**breaching**
127:16
**break** 9:13
34:13 87:24
88:8 126:2
**breaks** 9:12
**bridge** 17:18
18:14 19:10
**brief** 34:25
87:24 88:18
126:12
**bright** 121:6
**british** 15:6
**broad** 3:7
77:16 95:2

**broaden** 68:22
**broadly** 10:23
**broke** 18:2 55:5
**brown** 3:15 7:4
**brownse** 3:16
**bsfllp.com** 4:12
4:14
**burden** 63:3
**burdensome**
58:15 62:22
**business** 65:4
96:20,21,24
98:23 99:16,21
100:5 110:20
112:25 113:2
114:3 116:11
118:10,14,18
118:23 119:4
119:17,24
**bvi** 13:23 15:13
15:18 16:4,22
17:4 21:20
25:7 27:17
28:16,18 30:18
31:4,18 42:21
44:9,19 49:7
51:18 66:4
76:18 79:21
83:22 92:18,24
93:17 94:10,24
95:12 96:3,3
104:25 105:18
106:25 123:11
123:17 125:5

**c**

**c** 134:2 136:2,2
**c'td** 4:2
**called** 8:6
107:20
**cambodia** 49:9
49:11
**cambodian**
45:25 47:7
48:3
**camera** 5:9
**campbells**
21:21 22:7,13
22:15 23:11,12
56:20 60:21
100:9,22 106:8
106:11,23,24
108:15 135:17
**canada** 10:14
**capa** 85:21
**capacity** 26:24
74:7,14 77:2,7
77:8 82:7,11
85:13,23
**case** 1:9 5:22
5:25 24:14,25
36:16 95:8
114:14 116:18
137:3
**cases** 17:5 74:6
76:23 77:14
**category** 30:8
90:6

**[centers - communications]** Page 6

| | | | |
|---|---|---|---|
| **centers** 36:18 | **charm** 121:8 | 30:21 42:6 | **clear** 29:13 |
| **centrally** 53:6 | **chen** 10:25 | 49:19 57:8 | 61:6 68:17 |
| **certain** 13:2 | 11:24 24:6 | 76:4 87:22 | 102:3 115:15 |
| 29:13 33:3,22 | 29:3,15 30:2,4 | 98:18 131:24 | **clearly** 9:2 |
| 35:22 36:17 | 30:10,15 33:2 | **christopher** 3:9 | 98:11 |
| 38:16 45:18 | 33:21 35:21 | 7:2 | **clicking** 97:25 |
| 53:5 62:19 | 36:6,13 39:25 | **cigar** 96:21,23 | 98:12 |
| 111:24 | 39:25 40:7,15 | 98:23 99:16,20 | **client** 23:2 |
| **certified** 2:14 | 41:17 43:10,12 | 100:4 112:13 | 55:12,15 57:21 |
| 136:7 | 44:15 45:4,9 | 112:25 113:8 | 128:7 |
| **certify** 134:5 | 45:24 46:6,7 | 114:16 116:11 | **close** 101:20 |
| 136:10,16 | 46:15,25 47:9 | 116:19 118:14 | **closer** 18:21 |
| **chance** 116:2 | 47:13,15,22 | 118:18,23 | 25:20 26:11 |
| **change** 137:6 | 48:4,20 49:6 | 119:4,17 | **clr** 1:17 |
| **changing** 87:23 | 49:11,17,23 | **circumstances** | **come** 37:10 |
| **chapter** 1:8 | 50:7 51:10,15 | 42:25 47:17 | 54:24 60:10 |
| 14:3 15:24 | 53:14,23 54:19 | 91:22 94:2,22 | 63:15 90:14 |
| 17:5 24:25 | 59:25 60:4 | 109:23 111:9 | 97:24 |
| 30:24 32:23 | 90:25 91:10 | 112:12 116:23 | **comes** 57:13 |
| 33:18 37:14 | 112:17 128:9 | **citizenship** | **commercial** |
| 39:11,20 53:17 | 128:12 129:13 | 45:25 47:9 | 65:16 109:13 |
| 61:20 74:3,6 | **chen's** 41:21,25 | 49:13 | **commission** |
| 75:5 76:23 | 44:21 45:13 | **claim** 39:10 | 137:25 |
| 77:14 78:5,21 | 54:5 | 73:20 84:24 | **common** 23:19 |
| 79:5,23 80:11 | **china** 33:5,24 | 87:7,9,13 | 23:22 52:11 |
| 81:17 86:10 | 35:24 40:3 | **clarify** 28:9 | 110:16 128:2,8 |
| 87:6,12 89:6 | 46:8 52:5 | 72:24 105:8 | **communicate** |
| 89:12 123:6 | 67:22 | 106:14 | 22:10,16 46:15 |
| 135:13 | **chinese** 36:11 | **clarifying** | 55:21,23 |
| **characterizati...** | 46:9 47:11,21 | 18:10 | **communicated** |
| 100:13,15 | 48:3 50:16,22 | **clarity** 23:10 | 40:14 64:22 |
| **charges** 33:7 | 51:8,14 128:23 | 52:24 | 65:15,19 |
| 34:7 36:4 | **chris** 8:15 | **clean** 59:8 | **communicati...** |
| 53:21 | 17:21 24:22 | | 32:12,15 68:18 |

**[communications - correct]**                                        Page 7

68:24 78:10 81:25 99:15,19 103:25 119:21 122:11 127:25
**companies** 10:22 11:6,15 11:17,21 16:12 24:3 26:24 29:5,8,13,23 30:2,8 44:21 45:6,13,18 76:17 78:16,20 79:6 82:9,15 83:5,17,19 87:20 89:22 90:6,7,19 110:8 120:21 121:5,9,11,13 122:7,16,19 123:2 126:22 126:25
**company** 21:9 39:17 59:22,25 78:12 79:3 83:3,23 84:2 89:20 107:18 107:20 108:10 109:12,12 111:19 113:4 114:11,16 115:19
**company's** 127:9

**compensated** 56:3
**compensation** 56:8 61:14,19
**complete** 68:3 68:4 134:9
**completed** 121:23
**completing** 66:9
**computer** 25:20 97:12
**computers** 69:21
**concern** 96:9 100:2
**concerned** 52:9 95:8
**concerning** 15:4 22:10,17
**concerns** 96:14
**concludes** 133:8
**concoction** 114:22
**conditions** 91:24
**conduct** 21:8 53:13 95:9 127:9
**conducted** 5:7 6:3
**confidence** 118:19

**confident** 127:8 127:12
**confirm** 89:4
**conflict** 129:3 129:13
**confused** 12:16
**confusing** 29:23
**connected** 45:2
**connection** 14:2 34:8 36:4 53:21 61:24 64:6 86:19 104:8,23 123:4 124:3,12 125:2 129:3,18 130:15
**connections** 5:10
**consent** 6:9 126:25
**consider** 126:3
**considered** 132:13
**consistency** 13:13
**constructive** 109:8
**contact** 46:25 131:8
**contacted** 21:17 22:12
**contacts** 92:18 93:6

**contain** 69:23
**containing** 69:6
**contend** 77:24 79:21 87:5,12 102:11
**contending** 48:2 50:6
**continue** 5:14 77:20
**continued** 3:18 35:7 88:25 126:18
**contracts** 130:15,19
**contractual** 85:15,19,22
**contrived** 115:5,8
**control** 69:5
**controller** 11:2
**conversations** 23:25 32:19
**cooperate** 101:20
**coordinate** 123:3,9
**copies** 42:18 43:24 44:4
**copy** 131:16
**corporation** 53:4
**correct** 15:7,14 15:25 16:13,18 17:6 20:4,19

**[correct - debtors]**                                              Page 8

| | | | **d** |
|---|---|---|---|
| 20:22 21:2 | 134:4,17 135:5 | 105:23 123:12 | **d**  134:2 135:2 |
| 23:11 26:19 | 135:8,10,11 | 123:17 125:9 | **daily**  131:24 |
| 27:4,13 29:3 | 136:11 137:5 | 125:15 131:12 | **date**  14:7,11 |
| 31:7,18 35:17 | 137:20 | 131:18 132:9 | 21:15 22:2 |
| 35:18,24 36:8 | **cost**  79:17 | 132:21 | 75:8 106:9 |
| 36:13 37:2,14 | **costs**  83:19 | **courts**  105:25 | 137:4 |
| 37:19 40:3,8 | 90:16,19 | **covas**  4:17 6:5 | **dated**  125:8 |
| 42:19 43:4,11 | **counsel**  6:9,20 | **covered**  60:14 | **day**  64:5,5 90:3 |
| 43:17 44:6,7,9 | 8:3 9:15 32:13 | 100:25 130:7 | 90:5 134:20 |
| 44:10,15 57:23 | 67:18 100:23 | **create**  12:15 | 136:22 137:22 |
| 68:8 73:7,8,15 | 102:25 106:25 | 83:20 | **de**  124:21,23 |
| 73:23 74:4,8 | 119:2,22 | **creditor**  74:13 | **dealing**  12:17 |
| 74:14,15 77:6 | **counterparty** | 85:9,12 87:9 | 95:22 96:11,12 |
| 82:9 84:9,13 | 65:16 | 87:19 | 96:14 97:6 |
| 84:18 85:2,3,5 | **county**  136:5 | **crimes**  54:5,19 | **dealings**  71:15 |
| 86:17 87:8,15 | **couple**  117:4 | **criminal**  44:14 | **dealt**  95:21 |
| 89:8 90:19 | **course**  15:10 | 47:21 | 110:23 |
| 91:5 105:21 | 40:12 61:12 | **cromwell**  3:4 | **debtor**  18:25 |
| 106:25 120:16 | 75:19 84:10 | 5:20 8:16 | 60:11 61:4,7 |
| 122:4 123:7,13 | 105:18 | 57:12 | 64:16 65:5,9 |
| 125:23 128:9 | **court**  1:2 5:23 | **cross**  101:16 | 65:13,17,21 |
| 130:6 134:9,14 | 6:7,14,24 7:9 | 102:5,12,18 | 66:17 67:8,13 |
| **corrected**  75:3 | 7:21 8:2,22 9:4 | 103:4,19 | 68:11,19 69:7 |
| 135:12 | 15:13 16:4 | **crossing**  103:21 | 69:13,19,24 |
| **correctly**  41:14 | 18:17 27:17 | **current**  64:23 | 70:21 71:8 |
| 123:25 125:10 | 28:16,18 31:14 | 68:24 | 73:22 84:9,17 |
| **corresponden...** | 31:18 33:8 | **currently**  54:11 | 84:22,25 85:5 |
| 93:10 97:7 | 34:10 42:19,19 | 80:11 122:6 | 85:10 |
| 100:8,22 | 42:21,22 44:6 | **custody**  33:5 | **debtors**  1:7 |
| **cosimo**  1:13 | 44:9 55:5 86:4 | 33:24 35:23 | 13:2,15 17:3 |
| 2:10 4:7 5:19 | 86:17 92:18 | 40:3 43:11 | 17:11 18:11 |
| 7:7,25 8:5 14:5 | 93:17 94:10,24 | 46:8 47:13 | 20:8,13,14,14 |
| 14:9 25:16 | 96:3,3 101:18 | **cut**  42:7 70:24 | |
| 75:3 133:9 | 105:11,18,22 | | |

**[debtors - distribution]**                                           Page 9

20:21,25 27:11 28:12 37:13,19 38:22 39:7,12 39:14,21,23 52:16 55:17 56:4 64:4,7,13 66:20 68:6 70:3,9 71:23 73:2,5,6,10,12 73:14,18 74:3 74:8,14 76:16 82:22 85:16 86:20 89:7,15 89:18 92:23 101:9,16,23 108:6 120:16 137:3

**decades** 116:25
**decision** 50:11
**decisions** 65:4 95:5
**declaration** 13:25 14:9 24:13,25 25:3 25:13,15 30:17 30:23 32:23 33:2,17 35:13 35:21 36:10,22 40:19 50:16 53:17 80:17 120:10,14 135:10
**declarations** 83:12

**declined** 38:25
**decree** 45:25
**define** 104:10
**definitely** 98:11
**denied** 61:21 86:11
**depend** 61:14
**depending** 86:9
**depends** 5:9
**deposed** 10:3
**deposition** 1:11 2:9 5:7,18 6:2 8:24 13:22 16:22 58:9 59:6 62:17,21 74:17 106:21 120:10 125:7 134:7,11 136:12,14 137:4
**depositions** 10:10 120:4 127:19,21
**describe** 24:15 24:17
**description** 135:7
**desire** 129:24
**despite** 92:24
**detail** 77:22 81:10 121:15
**details** 93:11 122:8

**determine** 63:8
**developments** 52:11
**devices** 69:22
**devine's** 67:5
**difference** 114:7,9 117:24
**different** 12:10 116:10
**differentiates** 116:9
**difficult** 46:11 103:12
**digression** 35:9
**direct** 33:16 75:15 80:18 92:6 108:14
**directing** 130:4
**direction** 64:12 95:13,16,18 103:25 104:7 104:21 105:17
**directly** 30:3 89:6 130:3
**director** 16:17 17:3 19:3,5,9 19:13,17,22 20:3 21:2 24:4 24:19 26:18 27:5 28:6 37:22 38:2 43:17 64:3,7,9 64:17 66:3 73:9,11,17

74:7 81:17 82:8,12,13 83:3 85:7,11 85:17,24 86:20 89:14,17 120:15,22 121:13,18 122:3 129:25 130:5
**director's** 83:22
**directors** 27:20 27:23 121:17 122:6,12,15,22 122:24 123:4 123:10 126:23 127:2
**discharged** 61:16
**discussed** 37:12 73:24
**disk** 5:17 88:14 88:22 126:8,16
**disks** 133:10
**displayed** 26:7 75:12 92:13 106:18
**disproportion...** 79:14
**distinction** 113:20
**distribution** 84:21

**district** 1:3 5:24

**divesting** 110:7

**divestment** 109:10 110:18 110:24 111:10

**divine** 121:6

**divine's** 67:2,3

**document** 58:3 69:11 74:21 75:22 91:16 106:5 108:21

**documentation** 40:20 41:6,9

**documents** 14:13 39:6 41:12 42:2,11 42:13 43:2,3 43:13,14 51:19 53:3 58:11 69:23 91:5 104:8,22 120:23

**doing** 81:14 82:16,21 103:3 113:7 117:2

**dozens** 10:7

**drag** 60:24

**draw** 112:24

**drawing** 62:23

**drops** 111:24

**due** 112:15

**duly** 8:7 136:13

**dunne** 3:9 7:2,2 8:4,12,15 14:12,18,21,25 17:23 18:5,9 18:20 19:25 23:21 24:5,9 24:24 25:5,10 25:13,22 26:3 26:14 30:22 31:2 32:5,16 33:10 34:13,18 34:20 35:7 42:8 49:20 55:9 57:2,5,14 58:5,25 60:20 61:5 62:12,14 63:2 65:23 71:3,5 72:9 74:21,25 75:19 76:6,10,12 86:7 87:25 88:6,11,24,25 92:10 97:9,15 97:18,20,23 98:7,14,19 103:11 105:12 106:13 114:20 115:14,25 118:4 119:23 125:25 126:18 131:4 132:2,16 132:24 135:5

**dunnec** 3:10

**duplicate** 101:14

**duties** 64:10 78:11,20 83:2 83:22 84:2 89:16

**duty** 82:18 83:4

**e**

**e** 69:11 134:2,2 134:2 135:2 136:2,2

**earlier** 17:10 50:14 73:25 112:14 115:13 127:17,24 130:8

**early** 132:11

**easy** 114:12

**effect** 7:19 27:19 111:19 113:7

**effective** 42:13 79:18

**effects** 110:25

**efforts** 54:3 119:8

**either** 25:7 48:2 81:9 84:12 95:22 101:14

**electrical** 107:19 108:11

**employee** 68:25

**employees** 64:11,14,24 68:19

**enable** 109:12

**enforcement** 11:22 54:13 101:20 102:6 102:13,18 103:4,20 104:2 104:8,10

**engaged** 92:17

**engagement** 56:8 130:19,20

**engaging** 111:17

**engineering** 107:19

**enormous** 101:15

**ensure** 42:12

**entered** 129:2 129:13 130:9 130:14

**entirety** 108:19

**entities** 13:3,10 13:15 15:5,11 16:18 18:10,25 20:7,15 37:13 37:22 45:19 55:13 71:18 85:24 110:8 122:3

**entitled** 81:3,16

**[entity - firm]** Page 11

entity 20:2 21:19 38:3,8 38:21 39:3 61:11 63:15 68:25 70:22 71:22,25 111:3 116:10

equity 118:9

errata 137:2

esq 3:9,11,13 3:15 4:11,13

et 1:6 5:22 137:3

everybody 98:11

evidence 127:14

ex 92:17 93:6

exact 22:2 30:11

examination 8:11 135:4

examined 8:9

example 73:10 79:18 96:16 100:12 112:7 117:11 119:23

exchange 113:6 114:13

executed 36:19 40:7 42:4,14 43:9

execution 40:11

exercise 26:22 82:14 84:2

exhibit 13:24 13:25 14:4,8 16:21 24:15 25:14 26:7 32:24 74:16 75:2,10,12 92:8,13 106:4 106:6,18,21 125:6 135:8,10 135:11,16

exhibits 13:21 135:7

existing 27:19 29:16 101:15

expect 64:9 84:20

expense 90:9 101:15

expenses 90:2

expires 137:25

explain 32:5 51:16 72:10,11 80:7 102:10 111:16 118:5

explained 113:22 115:21

explore 110:14 111:10 113:14 118:12

explored 114:18

exploring 109:9 111:17

expound 103:16

extent 78:8 99:3 119:20

extra 121:16

extradited 46:7

**f**

f 136:2

fact 30:17 31:8 31:11,23 35:16 36:24 39:19 40:2 42:3,3,12 43:3,9,15 52:7 52:8,9 54:4 71:15 90:24 115:19 116:8 116:21 117:17 129:22

facts 59:5 103:2,6,13 119:10

faint 97:16,24

fair 55:19 66:2 109:20

familiar 10:16 41:16 53:8 107:8 112:10 121:8,10

fan 98:13

far 46:14 113:8 113:8 116:22

february 16:12 20:21 21:13 22:2 24:16 27:6,6

fees 63:9

fell 30:8 90:5

filed 5:22 15:23 24:14 33:17 74:5 92:22 93:14 123:16 125:15

files 53:6

filing 93:22 123:5

filings 105:18

final 131:24 132:6,12

finally 19:21

financial 101:22,23

finding 102:21

fine 25:23 26:9 87:25 98:4 105:13

fingertips 14:14

finish 18:6 115:25

finished 115:22

firm 22:20 55:11,17 56:12 59:12 124:19 124:25 128:2,7

**[first - group]**                                                        Page 12

**first** 8:7 16:9
  20:24 21:3,17
  30:8 93:5
  117:5 129:23
**firstly** 79:9
**five** 18:10,25
  20:7,13 37:22
  39:12 73:4
**flexner** 4:5
**floor** 4:9
**focus** 32:22
**follow** 131:9
**following** 3:18
  18:13 19:3
**follows** 8:10
**footnote** 51:17
**force** 7:18
**foreign** 1:7 3:5
  7:5 75:6
  101:13 135:14
  137:4
**foreshadowed**
  13:20
**form** 11:9 29:4
  31:19 37:8
  38:4 59:4,9
  62:6 81:21
  91:12 118:16
  119:11 124:6
  129:5 130:17
**former** 64:23
  68:18,24
**formulating**
  81:25

**formulation**
  68:8
**forth** 100:21
  136:13
**four** 116:25
**freezing** 101:10
**fulfill** 89:16
**fulfilling** 83:2
  102:3
**full** 7:23 33:3
  33:22 62:14,18
**funding** 58:23
**funds** 59:15
  60:9,15,18
  63:8,14 84:21
**further** 76:23
  77:14 81:21
  130:24 136:16

**g**

**g** 134:2
**gambit** 83:22
**gamesmanship**
  81:11
**gap** 24:18
  26:17
**general** 10:21
  44:19 104:25
  112:6 119:13
**generalized**
  118:7
**generally** 95:9
  108:11

**gestures** 9:3
**getting** 30:6
  34:3 81:9
**give** 7:13 75:17
  98:8 100:2
  116:2 130:18
**given** 21:8
  29:15 65:11
  90:24 95:8
  96:19 133:9
  134:13 136:15
**giving** 94:3
**global** 1:6 5:21
  17:18 18:15
  19:10 121:7
  137:3
**go** 5:15 32:13
  60:19 62:19
  72:14 76:7
  77:21 90:3,4
  97:18 112:22
  114:23 115:13
  116:13 118:3
**goes** 36:23
  76:21 102:2
**going** 5:3 13:21
  13:24 17:15
  25:18 32:16,20
  33:12,16 34:16
  34:22 35:15
  58:6 65:24
  88:16 97:21
  98:8 99:5
  101:7 103:12

  106:3 119:18
  124:20 126:10
  130:22 132:3
  133:14
**good** 5:2 8:13
  8:14 13:18
  14:21 88:8
**government**
  104:12,22
  105:3,9
**grant** 29:14
**granted** 61:21
  77:25 78:5
  79:23 81:18
  86:10 91:11
**granting** 42:2
**grants** 29:18
**great** 14:25
  26:14 86:7
  132:18
**grounds** 23:18
  32:4,7 78:7
  81:21,22
**group** 10:17,22
  11:6,13,19,21
  12:4,18,21
  13:9 15:5
  16:17 21:19
  22:18 36:17
  38:2,7,20 39:3
  44:15 45:4,9
  49:6 51:10
  64:23 68:25
  70:21 71:18,25

**[group - individuals]**

72:19 107:4,9
107:13 108:10
109:19,25
110:13,16
112:13,25
113:8 114:15
115:18 116:7,8
116:15,19
**guess** 34:4
131:15
**guys** 126:2
131:25

**h**

**hand** 7:11,22
9:3 114:16
136:22
**handful** 120:21
**handle** 131:11
**hang** 98:7
**happen** 95:19
**happened**
67:23 95:15
**hard** 90:10
97:13 102:21
**harmony** 17:19
18:15 19:14
**hear** 18:2,18
34:12 97:13
98:10,12
**heard** 5:12
18:19
**hearing** 6:18
18:3 101:17

**held** 2:10 47:16
64:15 73:5
113:2 114:2,17
119:24
**help** 113:19
**helps** 18:22
**hereinbefore**
136:12
**hereunto**
136:22
**heritage** 107:21
108:6 117:7
**heritage's**
109:11 114:14
116:6
**high** 17:19
19:18
**hill** 17:17 18:13
19:3,6
**hold** 25:3 26:2
38:6 75:20
84:15 85:4
**holding** 29:24
109:11 111:11
**holdings** 1:6
5:21 112:17
137:3
**hong** 49:8 62:8
110:17 123:23
**hope** 14:12
42:8 124:21
**hour** 9:12
**hudson** 4:8

**huge** 113:2
114:2
**human** 54:18
**humor** 124:21

**i**

**idea** 47:10,14
54:10 88:8
**identification**
14:6,10 75:8
106:9
**identified**
16:20 31:8,10
68:10,13
**identifies** 51:18
**identify** 103:5
**identifying**
63:3 99:25
**identities** 37:6
**identity** 31:13
31:17,22 35:16
**illegitimate**
47:22
**images** 66:25
**immediate**
132:13,17
**impacted** 28:5
**impair** 9:24
76:24 77:15,17
83:13 87:6,13
**impaired** 78:5
**important**
117:12

**improper** 47:16
48:4,11 83:6
93:21 119:4,16
**improperly**
47:8
**improve** 88:3,6
**inappropriate**
97:4,8
**inaudible** 17:15
41:24 54:25
55:20 70:5
72:5 86:3 87:2
**include** 105:10
**includes** 101:19
**including** 78:12
78:13,14,15
97:7 116:23
**incorrect** 118:6
**incrementally**
130:10
**incur** 83:19
**incurred** 90:2
**independent**
129:25
**indicate** 54:23
**indicating**
60:22
**indirectly**
84:12 130:4
**individual**
59:21,24
123:18
**individuals**
33:4,5,23 34:6

35:22 36:3,17
53:19 54:4,9
54:11
**industry**
108:11
**information**
31:13,17 58:4
58:20 59:13
69:6,23 99:4
100:16 104:7
104:21 127:5
130:11 131:8
**infrequently**
55:25
**initiated** 95:24
**insolvent** 70:10
**instance** 16:9
114:10
**instruct** 23:17
32:3 56:24
60:13 62:11,16
81:23 94:6
98:25 103:8
119:19
**instructed** 9:17
94:5
**instructing**
59:2 62:24
**instruction**
78:23 79:8
80:14 129:20
**instructions**
65:12

**insuring** 90:2
**intended** 12:14
**intention** 55:2
**interest** 23:19
23:22 73:21
79:6 87:14,19
89:5 101:22,23
109:25 111:23
114:15 116:10
128:3,8 129:3
129:14
**interested**
102:24 136:19
**interests** 78:13
79:2 89:15
102:6 110:7
**interjected**
18:7
**international**
119:25
**internet** 5:10
**interrupt** 17:22
97:19
**invade** 55:2
130:11
**invasive** 62:22
63:4
**investigate**
54:3 110:3,6
**investigated**
70:20 71:7,17
**investigation**
47:21 53:13
54:12

**investigations**
10:24 48:3,17
54:8,15
**investment**
116:6,7
**invoices** 56:13
56:17,22 59:11
**involve** 33:13
**involved** 11:15
52:4 54:5
99:15 113:23
**involvement**
20:20
**islands** 15:6
**issue** 34:14
100:20
**issued** 56:13,18
**issues** 110:21

**j**

**jacque** 4:17 6:5
**jacqueline**
22:22 23:3,14
24:2,10 55:11
55:21,24
**january** 16:6
22:5
**jeopardy**
116:24
**job** 76:25 77:15
77:18 83:14,16
89:14
**joint** 8:17,19
15:10 16:5

27:18 28:4
101:11
**jpl** 20:14 37:13
55:13 61:11
110:7
**jpls** 28:21,23
31:9,11 43:25
57:13 61:15
66:11 67:15
68:15 76:22
77:14 78:14
81:14 83:6,13
86:23 92:16
94:2 95:9 96:8
99:25 100:20
100:23 101:17
101:21 102:11
102:17 103:3
103:18 109:7
109:24 110:3
113:7 114:3
116:21 118:12
118:22 119:3
119:15
**judge** 94:3,4,6
**judges** 95:4
**judgment** 9:24
**jumbo** 17:19
19:18
**june** 2:5 5:5
134:8 136:23
**jurisdiction**
104:2

**[jurisdictions - litigation]**  Page 15

**jurisdictions** 101:11,13

**k**

**k** 134:2
**karas** 123:24 124:2
**keep** 65:24 81:24
**kevin** 123:18
**key** 116:14 129:22,23
**khoon** 107:4,8 107:12 108:9 109:19,25 110:13,16 114:15 115:18 116:7,8,15
**kind** 20:20 38:7
**kingdom** 45:20
**knew** 44:13,17 45:2
**know** 8:18 9:9 9:14 10:18 12:11 14:23 23:5 43:5 47:18 49:24 50:3 54:16 57:24 58:22 62:14,18 67:21 80:21 95:21 105:16 118:17 119:7 120:24 122:2,14

123:18,20 124:19,23 125:13 126:23 129:8,9 130:9 131:16,23,25 132:7
**knowing** 72:22 72:25
**knowledge** 42:24 43:8 46:11 49:16,21 98:22 114:6
**kong** 49:8 62:8 110:17 123:23

**l**

**l** 134:2
**lafemina** 1:17 2:13 6:7 8:7 136:6,25
**large** 119:24
**larger** 11:14 12:21
**lateral** 17:18 18:14 19:10
**law** 11:22 22:20 54:12 55:11,16 101:20 102:5 102:12,18 103:4,19 104:2 104:8,10 112:2 128:2,7

**lawyer** 123:23
**learned** 99:10
**leave** 121:17
**leaving** 58:10
**lee** 22:19,22 23:3,14 24:2 24:10 55:11,11 55:16,21,24 128:2,7
**legal** 4:17 6:6 10:24 21:20 46:22 56:19 99:6,11 105:20 127:7
**legitimate** 42:3
**length** 11:18
**letter** 106:7,23 107:4 108:16 109:2,5,17 130:20 135:16
**letters** 60:22 61:5 130:20
**letting** 18:6
**level** 81:10
**li** 3:13 7:3
**liabilities** 70:13 70:18
**lial** 3:14
**licensed** 109:10
**lien** 85:4
**life** 109:13
**lift** 94:23
**likewise** 15:23

**limit** 91:3
**limitations** 91:9,25
**limited** 1:6 5:21 17:18,18,19,20 18:14,15,16 19:4,6,10,14,18 20:3,4 107:5 137:3
**line** 8:23 62:23 107:4 137:6
**link** 117:16
**liquid** 111:14 113:5,6,24 116:17 117:18
**liquidation** 15:4 17:4 27:13 44:20 45:14
**liquidators** 8:17,19 15:11 16:5 27:18 28:5 78:18 79:11 81:7 101:12
**liquidity** 117:21
**list** 18:4 65:25 121:4
**listed** 113:4 118:10
**listen** 127:20
**litigation** 10:8 15:3 63:6 66:4

**[little - missing]** Page 16

**little** 97:13 98:6 98:17
**livenote** 2:14 136:7
**llp** 3:4 4:5
**located** 10:13 62:5 70:22
**locations** 2:12
**logistics** 131:11
**long** 33:14
**longer** 111:20 111:25
**look** 14:16 94:8 126:2
**looked** 125:6
**looking** 25:12 42:11
**lose** 33:15 86:3 86:9
**lost** 33:8 34:10 86:4,6 87:3
**louder** 98:6

**m**

**m** 134:2
**made** 27:11 36:12 44:14 45:3,5,8 50:16 51:8,14 52:8 65:3 92:23 105:18 111:9
**mail** 69:11
**main** 75:6 135:14

**maintain** 110:21
**maintained** 53:6
**majority** 30:12
**make** 11:24,25 26:10 46:24 50:10 61:6 98:6 106:10
**makes** 110:13 113:13 117:23
**making** 95:4 113:20
**management** 69:11
**manager** 21:4,6 21:7,13 22:9 24:17 26:17,25
**managing** 66:4
**mandate** 101:19,19 102:4
**manner** 6:11 21:10 79:18 95:5 96:10,11 96:13 97:5
**march** 16:23
**mark** 13:21 74:16 106:3
**marked** 14:6 14:10 75:7 92:8 106:8,20
**market** 111:14 113:25 116:18

117:18,22,23 118:10
**marriage** 136:18
**material** 65:3 66:14 70:12
**matter** 5:20 40:19 50:23,24 51:3 87:11 96:2 104:3,9 104:23 112:2 120:5 124:4,13 124:17 125:3 127:21 129:4 129:15,19 130:16 136:20
**matters** 34:8 36:5 53:22 87:11 97:24 112:10
**matthew** 4:13
**mean** 11:7 112:13 131:14
**means** 114:17
**meant** 28:2 73:14
**measure** 24:18 26:17
**media** 5:17 88:14,21 126:8 126:16 133:10
**medication** 9:23

**meet** 64:9
**meetings** 64:16
**members** 41:13 52:19
**memory** 9:24
**mentioned** 26:16 35:14 100:6 108:2 127:17
**messaging** 69:11
**mg** 1:9 5:25
**mic** 97:21
**microphone** 18:21 33:11 34:14 88:7
**middle** 33:25 34:4
**mighty** 66:25 67:3,4 121:6
**mind** 81:24 90:14 105:9
**mindful** 98:25 103:8
**ministry** 51:22
**minority** 111:23
**minute** 12:25
**mishcon** 124:21,23
**mispronounce** 124:20 128:15
**missing** 116:14

**[mixed - observed]**                                           Page 17

**mixed** 114:21
**moment** 25:8
  32:22 35:14
  42:7 75:18
  90:22 92:9
  101:3 107:15
**money** 86:9
**morning** 5:3
  8:13,14
**move** 9:10
  25:20 89:2
**moving** 18:21
  33:10
**mschwartz**
  4:14
**multiple** 92:24
**mute** 70:7
**myanmar**
  36:16 52:5

**n**

**n** 134:2,2 135:2
**name** 6:5 7:23
  8:15 59:20
  107:10 124:20
  128:16 137:3,5
**named** 123:18
**names** 32:6
  128:23
**nassau** 136:5
**nation's** 54:12
**nations** 49:5
  50:6

**nature** 77:16
  113:11 115:17
  116:5
**necessarily**
  90:2 110:10
**need** 9:13 47:5
  60:20,24 79:15
  108:19 129:24
**never** 73:5,9
**new** 1:3 2:16
  3:8,8 4:10,10
  5:24 6:8 8:9
  133:12 136:3,9
**night** 67:19
**noble** 121:6
**nods** 9:3
**noise** 97:25
**non** 20:7,13
  39:12,21,23
  73:5,6,14,18,21
  74:3 99:4
  102:16
**nonsense**
  100:18
**normal** 109:13
**normality**
  110:20
**notarized**
  123:17 124:16
**notary** 2:15 8:8
  134:23 136:8
  137:24
**note** 5:6

**notes** 126:3
**noticed** 120:19
  123:15 125:7
**noticing** 6:23
**number** 30:12
  74:19,22 76:4
  88:14,22 106:5
  126:8,16
  133:10
**numbers** 76:3

**o**

**o** 134:2
**oath** 7:17 134:7
**object** 9:15
  11:9 29:4
  31:19 37:8
  38:4 39:11
  62:6,10 77:3,9
  78:6,21 79:3
  81:20,21 91:12
  98:24 116:2
  119:11,19
  124:6 129:5
  130:17
**objected** 83:15
**objecting** 39:20
  39:22 74:12
  78:14,15
**objection** 14:3
  15:20,24 23:16
  27:21 29:21
  32:2 38:9 39:4
  42:5 44:22

45:15 48:6,13
48:25 49:18
54:21 55:14
57:17,19 58:13
58:24 59:4
60:12 64:25
69:2 72:3,14
72:20 74:5,17
75:4,10,16
76:14 77:8,10
78:22 79:7
80:13 82:10,17
82:23 83:7
84:4 87:16
92:3,7 101:5
102:20 103:7
104:14 112:19
113:16 115:4
115:11 116:12
117:14 118:16
120:14 123:5
128:10 129:16
129:21 135:12
**objections** 6:11
  6:13,19 57:25
  58:2
**objector** 4:6
  7:7 76:15
**objects** 9:16
**obligations**
  64:10 78:12
  89:17,19
**observed** 91:4

**[obstructing - page]**                                                          Page 18

| | | | |
|---|---|---|---|
| **obstructing** 100:17 | 39:15 40:5,13 | 102:9,15,23 | **option** 84:15 |
| **obtained** 69:10 | 40:17 41:3,8 | 103:15,23 | 110:4,7 |
| **obvious** 109:7 | 41:15,19 42:8 | 104:5 105:2,6 | **order** 64:9 |
| **obviously** 8:23 | 42:16 43:22 | 105:14 106:3 | 93:17 111:11 |
| 28:21 45:2 | 44:11 45:7,22 | 106:17 107:11 | 132:10 |
| **occur** 21:24 | 46:4,13,18,23 | 107:16,24 | **orders** 27:13,17 |
| **occurred** 27:5 | 48:9,16 50:4 | 108:13,23 | 76:18 79:21 |
| **odd** 52:7 | 50:13,20 51:6 | 109:4 110:11 | 101:10 131:5 |
| **offered** 31:20 | 52:20 53:10,25 | 111:15 112:4,8 | **organization** |
| 42:20 | 56:6,11,16 | 113:10 114:8 | 36:7 |
| **offering** 127:13 | 58:5 59:18 | 114:25 115:6 | **oriental** 121:8 |
| **office** 63:23 | 61:9,13,18 | 116:4,20 | **outcome** |
| 66:21 67:2,3,5 | 63:12,21,25 | 117:19 118:11 | 136:19 |
| 73:6 131:10 | 66:15,24 67:6 | 118:20 120:7 | **outside** 46:16 |
| **oh** 25:2 | 67:11,17,24 | 120:12,18 | **overnight** |
| **okay** 9:6,22 | 68:9,16,21 | 121:3,19,24 | 132:7,10,14,15 |
| 10:2,11,15,19 | 69:9 70:19 | 122:10 123:8 | **own** 43:8 53:13 |
| 12:13 13:12,16 | 71:11 72:13 | 123:14,21 | 84:8 86:16 |
| 15:16 16:15,25 | 73:3,16,19 | 124:8,18,24 | 102:6 |
| 18:5 19:8,12 | 74:10,16,23 | 125:12,19,24 | **owned** 11:23 |
| 19:16,20,25 | 76:5,10,11,20 | 127:4,10,23 | 107:20 |
| 20:6,9,16,23 | 77:5 78:3 80:9 | 128:6,14,19 | **owner** 11:3 |
| 21:5,11,16,23 | 80:21 81:13 | 129:11 130:13 | 84:12 |
| 22:3,21,24 | 82:6,19 83:24 | 130:22 131:18 | **ownership** |
| 23:13,21 24:5 | 84:14,19 85:8 | 132:21 133:6,8 | 73:21 84:24 |
| 24:9 26:14,21 | 85:14,25 87:21 | **ongoing** 15:5 | 111:4 112:15 |
| 27:3,9,15 28:7 | 88:24 89:10 | **open** 74:24 | **p** |
| 28:14,24 29:11 | 90:4,12,17,21 | 75:11,21 | **p.m.** 88:23 |
| 30:13,25 31:6 | 91:8,17 92:5 | **opened** 76:2 | 126:9,17 |
| 31:21 32:21 | 93:4,12 94:12 | **operate** 66:22 | 133:13 |
| 34:16 35:19 | 94:17,18 95:10 | **operating** | **page** 3:18 |
| 37:10,17,24 | 95:17 96:6 | 108:10 | 135:4,7 137:6 |
| 38:12,18,24 | 97:2 98:19 | **opinion** 81:14 | |
| | 99:8,13 100:10 | | |

**[pages - power]**

**pages**  91:18
**paid**  56:22 57:6
  57:20 60:16,18
  60:23 61:3,7
  61:10
**papers**  13:2
**paragraph**
  16:21 17:8
  24:15,18,23
  25:6,16 26:13
  26:15 27:8
  30:20,23 31:4
  32:18,25 33:17
  35:13,20 40:18
  40:24,25 41:2
  50:15 51:12,13
  53:16 75:16,23
  76:3,13 92:7
  92:11,15 101:5
  101:8 103:18
  109:5
**paragraphs**
  108:15,25
**part**  18:2 54:17
  63:20 101:8
  112:15 116:14
  117:8,15
  129:23
**parte**  92:17
  93:6
**participant**
  54:20
**participants**
  5:11

**particular**
  16:17 21:9
  30:20
**particularly**
  95:8
**parties**  2:11 3:2
  4:3 5:15 36:12
  51:15 136:17
**partner**  123:24
**parts**  44:25
**passed**  64:19
**past**  51:5
**pause**  97:10
**pay**  60:10 63:9
**paying**  59:11
  60:6
**payments**
  59:16
**pecuniary**  89:5
**pending**  72:8
**people**  29:17,24
  36:6 63:23
  105:17
**percentage**
  110:19 111:3
  112:16 113:23
  114:19 116:17
  117:7 118:9,13
**perfect**  132:17
  133:7
**permitted**
  62:20 79:20,22
**person**  60:3,6
  111:24 122:18

**personal**  42:24
  43:8 86:23
**personally**
  50:21 51:7
  86:2,8,16 87:7
  87:14
**persons**  28:10
  28:25 29:14
  30:9,14 51:9
  99:15
**pete**  14:12
  98:20
**peter**  4:11 7:6
  25:23 58:6
  62:17 76:7
  88:2 97:20
  105:13 106:14
  106:16 131:5
  132:2
**petition**  75:4
  78:16 135:13
**phones**  69:22
**physical**  66:20
**physically**  7:16
  10:12
**piece**  117:5
**pieces**  117:4
**pinpoint**  46:3
  46:11
**place**  5:14 10:9
**placed**  45:13
  91:25
**planned**  120:2

**please**  5:6 6:16
  6:24 7:11,23
  8:25 9:9,14,16
  35:6 49:19
  72:11 74:25
  77:19 80:3,23
  88:23 92:7
  101:4 102:10
  108:14,16
  126:17 132:20
  133:5
**point**  62:19
  87:23 119:14
**pointless**  64:18
**portal**  132:24
**portion**  109:10
  111:11,13
**position**  16:9
  16:12 22:15
  39:16 48:11
  73:25
**positions**  15:18
**possession**  68:6
**possible**  9:4
  47:6 132:8
**potential**  22:10
  23:15 117:21
**potentially**
  22:17 111:17
  111:18
**power**  29:24
  33:3,22 35:22
  40:7,11,23
  41:11 42:2

**[power - purported]**                                          Page 20

53:19 90:24 91:6,10,25 122:16

**powers** 26:22 29:2,18,19 30:9,15 42:18 79:12 82:14 90:23 91:4

**premises** 66:16 66:20,21

**preparation** 52:21

**prepared** 24:20 26:19

**present** 4:16 7:16 40:6,9 111:10

**presently** 79:20

**press** 51:20

**pressure** 109:19 110:9

**pretlove's** 120:9

**pretty** 61:6 64:18 93:18 115:14 122:17 122:20,24

**prevent** 80:12 90:8

**price** 114:11,13

**primary** 99:7

**prince** 1:6 5:21 10:17 11:6,6 11:13,19 12:3

12:18 13:9 15:5 16:17 21:19 22:18 36:7,17 38:2,7 38:20 39:3 44:15 45:4,9 49:6 51:9 64:23 68:25 70:21 71:18,25 72:18 137:3

**principal** 66:3

**prior** 33:4,23 35:23 68:3 96:9

**privately** 113:2 114:2,16 119:24

**privilege** 23:18 23:20,23 32:4 32:7 57:4,22 58:15 78:7,24 81:22 82:5 99:2,6 103:9 103:22 127:16 128:3

**privileged** 32:12,14,19 57:6 77:22 78:2,9 81:24 99:4 102:14,16 119:9,10,21 127:3 130:11

**privileges** 55:2

**probably** 46:10 46:12,22 100:25 124:20

**problem** 25:19 25:23 97:20 115:9 118:14

**problems** 99:24

**proceed** 35:6 88:23 98:4 126:17

**proceeding** 15:13 37:14

**proceedings** 1:7 10:24 12:19,20 13:23 14:3 30:24 32:24 33:18 53:18 75:6 135:15 137:4

**process** 67:21 110:17 114:5 119:25 120:2

**production** 58:11 68:2

**productions** 68:4

**professional** 2:13 36:6 136:7

**prohibited** 28:5

**properly** 42:4 42:13

**property** 87:13 87:18 89:5

**protect** 78:13 82:15 83:4,16 83:18 89:14,20 90:7

**protecting** 82:21 90:6

**provide** 9:19 58:20 127:6

**provided** 29:25 31:12,16 42:17 42:21 43:23 44:3,8 67:14 67:18 68:14 70:17 104:7,21 104:24

**provisional** 8:17,19 15:4 15:10 16:5 17:4 27:12,18 28:4 44:20 45:14 78:18 79:10 81:7 101:12

**pskinner** 4:12

**public** 2:15 8:8 51:21 134:23 136:8 137:24

**publicly** 114:10 115:19 116:9

**pull** 58:7

**purport** 13:4

**purported** 118:21

**[purporting - register]** Page 21

**purporting** 82:14
**purpose** 104:11
**purposes** 12:6 101:16 102:5 102:12,18 103:4,19 105:13
**pursuant** 29:18 90:23 93:16
**put** 7:22 32:9 57:7,25 106:15

**q**

**quality** 5:8,9
**question** 9:9 12:2 17:25 29:22 32:11 42:7 47:24 48:8,15 49:19 55:7 59:7 60:21 61:2 68:23 71:2,4 72:8,16 79:25 80:5,16,22 81:2,4 84:6 104:12,16,17 105:9 115:9,23 127:6 130:23
**questions** 9:15 54:25 57:9,11 58:9,18 62:21 89:3 90:25 126:19 127:25

130:24
**quite** 52:11,12 67:22 97:16 115:2 117:2,25
**quote** 101:19 101:21,21

**r**

**r** 136:2
**raise** 7:10
**read** 91:6 101:8 108:17,18 118:3 127:18 134:5
**reading** 18:7 95:23
**real** 52:12
**really** 81:12
**reask** 71:4,5
**reason** 9:18 38:14 76:2 109:16 117:9 125:20 129:23 137:6
**reasonably** 112:24
**reasons** 36:23 121:14
**recall** 22:2 27:2 30:11 37:23 38:5 46:21 59:20 64:21 91:13,20,23 92:2 93:10

107:22,25 108:9 121:15 122:8 128:23
**recap** 89:2
**receive** 29:17 29:18 84:20 86:9
**received** 30:15 50:21 51:2 61:23
**recently** 70:17
**recess** 34:25 88:18 126:12
**recognition** 15:12,24 39:11 39:20 61:21 74:2 75:5 77:25 78:21 79:5,23 81:18 86:10 87:6,12 89:7,13 123:6 135:14
**recognize** 41:22 107:10
**recollection** 27:14 107:14
**record** 5:4,16 6:22 7:24 12:16 13:21 34:17,22,24 35:4 57:10 88:10,16,17,21 126:10,11,15 133:14,15

134:10,12 136:14
**recorded** 1:11 2:9 5:13,18
**recording** 5:8 6:12
**recordings** 127:20
**records** 52:16 52:25 67:8,10 67:13,19 68:5
**refer** 11:5,18 11:20 12:4,18 12:20 13:3,10 13:15 17:11 20:6,12 30:14 30:21 40:24 52:25 84:3 95:21
**referenced** 93:15
**referred** 96:8 120:22
**referring** 8:18 53:3 93:7 110:25 120:25
**refers** 53:5
**reflected** 70:15
**reframe** 104:12
**refused** 127:24
**regard** 57:12
**region** 52:6
**register** 52:18

**[registered - right]**

**registered** 2:13 136:6
**registers** 41:13
**rejected** 94:16 94:24
**related** 15:5 16:18 21:19 75:7 135:15 136:17
**relates** 110:25
**relating** 39:7 40:20 56:3 69:6,23
**relation** 104:3 129:14
**relationship** 23:2,6,8 55:4 55:12,16 85:16 124:3,17 125:2
**relatively** 117:17
**releases** 51:20
**relevance** 58:16 62:13,20
**relevant** 41:6 48:23
**relief** 75:7 76:22 77:13,17 135:15
**remain** 36:24
**remarkable** 109:6
**remember** 41:14 50:18

72:15 95:20,22 95:23 100:11 123:25 125:10 128:4,21
**remind** 80:23 100:3
**remote** 1:11 2:9
**remotely** 3:2 4:3 6:3,15
**remove** 121:16
**repeat** 42:6 49:19
**repeated** 92:17
**rephrase** 60:17 60:21 63:22
**report** 92:22 93:8,13,22 95:14 96:4
**reported** 1:17
**reporter** 2:14 2:14 6:7,14,24 7:9,21 8:2,22 9:4 18:17 33:8 34:10 55:5 86:4 131:12,18 132:9,21 136:7 136:8
**represent** 8:16 107:17 124:11 124:12
**representative** 22:19
**representatives** 3:6 7:5 99:19

**represented** 23:10,12
**represents** 24:2
**request** 38:25 58:3
**requests** 92:24
**require** 78:20
**required** 95:6 121:16
**resolutions** 43:16,24 44:4 52:22 64:20 120:20
**respect** 21:18 39:14,16,21,23 50:23,24 51:3 54:8 58:8 69:18 71:22 73:4 74:2 78:23 79:12 87:10,19 93:5 100:13 103:2 103:18 116:15 118:22 119:3 119:16 122:16 122:18,25 124:17
**respecting** 36:25
**respective** 2:12
**responding** 103:9
**response** 82:2

**responses** 58:2
**rest** 100:7
**restart** 17:25
**restrained** 86:16
**resumed** 99:24
**retained** 133:11
**retainer** 61:24 62:4
**return** 86:22 109:13 110:20
**reveal** 32:14 35:15 37:6 78:9 119:21
**revealing** 32:12 118:25
**review** 39:6 41:10 52:15 120:8
**reviewed** 41:11 120:3
**reviewing** 108:21
**revocation** 91:21
**reya** 124:22,23
**right** 7:11 10:13 11:4 12:8,22 13:5,7 13:18 14:25 15:19 16:23 17:9,13 18:23 19:6,10 20:11

**[right - sell]** Page 23

20:18 22:6
24:9 25:9,25
26:12,20 27:25
28:16,19 30:18
33:24 34:3,19
35:8 36:19,21
37:6,11 39:18
40:23 44:2,21
45:7,10 48:12
48:20 51:23
52:13,23 53:23
55:9 57:15
58:7 60:25
62:23 72:23
75:9,14,22,25
76:12,18 77:3
84:16 87:13
89:5,15 90:14
101:6 105:19
105:24 108:4,8
112:16,21
113:21 115:16
117:12 121:9
130:2 131:19
**rights** 50:9
78:4
**risk** 79:13
83:20
**risks** 90:15,18
**river** 20:3,4
**robin** 1:17 2:12
6:7 8:7 136:6
136:25

**robust** 17:19
18:15 19:14
**role** 20:24 21:3
21:18 22:8,11
22:17 38:6,20
38:23 39:2,13
64:3 86:19
129:19 130:15
**room** 7:17
**rosenthal** 3:11
7:3
**rosenthalsam**
3:12
**rough** 131:19
131:22 132:4
**royal** 45:25
**rpr** 1:17
**run** 76:16
**rush** 131:15

**s**

**s** 137:6
**s&c** 98:15
**safeguard**
89:25 90:8
**sake** 13:13 23:9
52:24
**sale** 100:4
110:14 111:18
113:14 114:5
114:17 116:16
117:21 119:24
119:25 120:2

**samantha** 3:11
7:3
**sanctioned**
45:19 111:3,24
**sanctions** 49:3
63:10,16,17
101:10 109:19
110:9,22 111:2
111:21,25
112:7,15
**sandy** 128:16
**satisfied** 40:22
41:4,7 63:14
**saw** 40:20
121:5
**saying** 13:8
29:20 81:5
111:6
**says** 76:19
91:15 92:21
132:24
**scam** 36:18
**scams** 54:18
**schiller** 4:5
**schwartz** 4:13
**screen** 5:12
14:20 26:4,5,8
75:11,13 76:9
92:14 106:15
106:19
**seal** 92:22
93:14,19,22
**sealed** 93:8,16

**sealing** 94:21
94:23
**sec** 26:2 97:10
**second** 25:3
93:15
**section** 101:7
**secured** 67:7,9
67:14
**security** 51:21
**see** 17:8 18:22
24:21 25:17
26:13 31:5
34:2 51:23
76:5,9 92:19
93:2 97:17
98:5 101:24
102:7 107:6
109:14 114:12
114:24 115:14
**seek** 79:12
94:10 95:13
**seeking** 58:3
79:5 81:11
86:22 114:3
**seem** 10:25
**seems** 33:14
**seen** 5:11 41:5
52:18 54:22
66:25 70:2
**segregate**
102:22
**sell** 96:18,23
98:22 109:24
117:10 119:5,6

**[sell - skinner]**

119:8,14
**selling**  113:3
  117:11 118:8
  118:13
**send**  131:22,23
  131:23
**sense**  11:24,25
  111:9
**sentence**  34:5
  36:15 41:2
  92:19,21 93:6
  93:16
**sentences**  33:14
  44:25 103:17
**separate**
  103:13
**serious**  44:13
  44:18 45:3
**serve**  102:6
**served**  101:14
**servers**  69:6
**set**  27:7 68:3,5
  80:16,19 89:3
  100:7,21
  136:13,22
**share**  26:4
  32:20 109:11
  114:13
**shared**  26:8
  75:13 92:14
  106:19
**shareholder**
  43:16 74:13
  120:20

**shareholders**
  24:3,6 27:24
  28:2,11 29:10
  29:16 30:3
  99:20
**shares**  84:8,12
  84:16 113:12
**sharing**  26:6
**sheet**  137:2
**sheets**  70:2
**shocking**  117:2
**short**  126:2
**sided**  94:3 95:7
**sign**  43:13
  125:21
**signature**  41:17
  41:21,25
  136:25
**signed**  43:4,16
  125:8,14
**significance**
  71:21
**significant**
  117:8
**silent**  19:24
  88:5
**similar**  69:12
**simple**  79:17
  103:2
**simply**  53:2
**sincerity**  121:7
**singapore**
  49:15,16

**singaporean**
  49:22
**sir**  8:20 9:7,21
  9:25 10:4,17
  11:10 13:6,11
  13:17 15:8,15
  15:22 16:2,7
  16:14,19,24
  17:14 19:6
  20:5,10,17,19
  21:4,22 26:20
  27:2,14 28:13
  31:5,15,24
  33:20 35:18,25
  36:9,14,20
  37:3,9,16,20
  39:5 40:9,16
  40:25 41:2
  42:15 43:18,21
  44:2,7,10,16
  45:16,21 46:17
  46:20 47:2,10
  47:14,19,24
  48:21 50:19,25
  51:12 52:17
  53:9,15,24
  56:5,10,15,21
  59:17 60:8
  63:11 65:2,6
  65:10,14,18,22
  66:18 69:8,14
  69:16,20,25
  71:10 73:8,23
  74:4,9,15

  75:16 76:19
  77:4 78:2
  79:25 80:5,16
  81:2 82:12,18
  84:23 85:3,6
  85:12 86:12,25
  89:9 90:20
  92:20 93:3
  94:11 95:16,20
  96:25 99:12,17
  99:22 101:5,25
  102:8,14
  103:22 104:4
  104:18 105:5
  107:2,7 108:22
  109:3,15 120:6
  120:11,17
  121:2 122:9
  123:7,13
  124:10 125:4
  126:6 127:15
  127:22 128:5
  129:17,22
  130:6
**sit**  47:25
**sitting**  121:25
**situation**  88:7
**six**  122:3,16
  126:21,25
**size**  117:20
**skinner**  4:11
  7:6,6 11:9,11
  14:15,19,22
  15:20 17:21,24

18:8 23:16,24
24:7,22 25:2,8
25:11,15,25
26:9 27:21
29:4,21 30:19
30:25 31:19
32:2,8 34:16
34:19 37:8
38:4,9 39:4
42:5 44:22
45:15 48:6,13
48:25 49:18
54:21 55:14
56:24 57:3,7
57:23 58:14,24
59:3 60:12
61:25 62:6,10
62:13,18 63:4
64:25 69:2
70:24 72:3,7
72:13,20 74:19
74:23 75:9,17
75:20,25 76:8
76:11 77:10
78:6,22 79:7
80:13 81:20
82:10,17,23
83:7 84:4
87:16,22 88:9
88:12 91:12
92:3,9,11 97:9
97:17 98:3,17
98:24 102:20
103:7 104:14

105:7,14
106:10,17
112:19,21
113:16 115:4
115:11,24
116:12 117:14
118:16 119:11
119:18 124:6,8
126:5 128:10
129:5,16,21
130:17 131:3,6
131:14,21
132:19 133:2,5
**small** 110:19
111:13 113:23
114:18 116:17
117:6 118:9,13
**sold** 113:12
**sole** 120:15
121:17 122:2
**solvent** 70:10
70:13
**somebody**
131:10
**soon** 87:24
131:17 132:5,6
**sophia** 3:15 7:4
**sorry** 24:22
27:25 43:2
55:22 63:22
72:7,15,24
73:13 74:12
77:19 97:19
104:17 105:8

112:20 113:17
115:12 124:7
128:22
**sort** 52:5
107:18
**sought** 15:11
44:19 76:22
77:13,17
**sound** 98:12
**sounded**
114:25
**sounds** 57:18
98:12
**source** 43:19
59:15 99:7
**southeast**
110:17
**southern** 1:3
5:24 107:20
108:5 109:11
114:14 116:6
117:7
**space** 67:2,3,5
**speak** 9:2 55:18
**speaking** 33:13
**special** 21:4,6,7
21:13 22:8
24:16 26:17,24
**specific** 54:8
77:23 79:19
119:12
**specifically**
41:10

**spoke** 24:11
50:14
**ss** 136:4
**stage** 66:14
**stand** 86:2,8
**starry** 121:7
**start** 26:3,5
**started** 18:3
**starting** 42:9
**state** 2:16 6:16
6:20 7:23 8:9
36:23 57:10
136:3,9
**stated** 40:18
111:8 114:21
120:15
**statement**
50:15 70:16
77:6,7 100:14
109:17 127:11
**statements**
66:10 68:13
108:25
**states** 1:2 5:23
15:12,25 31:14
36:10 44:5
45:19 66:5
70:23 71:3,9
71:16,19 72:2
72:19 76:14
92:16,25 101:7
101:9 109:6
**stay** 132:14

**[step - talking]**

**step**  109:8

**steps**  42:10
  63:8,13 79:2
  79:13 81:6
  83:12 94:15,22
  95:11,12 96:23
  119:2 121:16
  121:20 122:25

**stick**  12:6

**stipulate**  58:17
  58:19

**stipulating**
  57:15

**stock**  114:13

**stop**  24:18
  26:17

**story**  95:7

**straightforward**
  79:17

**strange**  52:10

**street**  3:7

**stripped**  45:24
  49:13

**stripping**  47:9

**structure**
  112:16

**struggle**  103:13

**subject**  10:23
  11:22 17:5
  27:12 33:6
  34:7 36:3
  53:20 57:21
  59:6 63:9,17
  76:17 91:21

101:10 107:3
111:20 112:14

**subjects**  87:23

**submission**
  104:24 125:8

**submitted**
  13:23 14:2

**subscribed**
  134:19 137:21

**subsequent**
  27:8

**subsidiaries**
  111:2

**subsidiary**
  65:20

**substantial**
  91:16

**substantially**
  11:14

**substantiate**
  127:14

**suggest**  119:15

**suggested**
  118:23

**suggesting**
  93:20

**sullcrom.com**
  3:10,12,14,16

**sullivan**  3:4
  5:19 8:16
  57:12

**support**  120:14

**sure**  25:10
  26:10 30:22

49:20 67:22
72:17 85:18
92:10 93:18
101:2 105:12
106:11 111:7
112:9 121:23
122:17,21,24
125:16,18
129:9

**surprised**
  125:17

**surprising**  52:2

**surrounding**
  110:22

**swear**  6:24
  7:12

**swearing**  6:14

**sword**  20:2,4

**sworn**  8:7
  124:15 134:19
  136:13 137:21

**sync**  132:25
  133:4,7

**systems**  69:12
  69:15

---

**t**

**t**  134:2 136:2,2

**taiwanese**
  49:25

**take**  5:14 9:5
  9:12 15:3 23:9
  26:23 34:13
  42:10 45:17,23

47:25 48:18
50:5 53:12
67:2,25 73:22
77:25 79:20,22
80:11 86:24
87:24 88:8
94:8 98:14
100:20 105:15
108:16,18
122:22 123:12
125:25 127:19
130:10

**taken**  5:19
  15:18 33:4,23
  35:2,23 40:3
  43:10 46:8
  48:19,23 49:5
  49:17,22 50:7
  63:7 69:5,17
  79:10,16,16
  81:8,8 83:13
  88:19 94:15,23
  95:12 96:2,23
  109:7 119:3
  120:4 121:21
  123:11 126:13
  134:7

**takes**  10:10

**talk**  11:17
  12:23 64:2

**talking**  35:12
  113:3 116:16
  117:6,10 118:8

**[tasks - true]**

**tasks** 66:6,7,12
66:14
**team** 121:7
**technology** 6:4
98:15 99:23
**tell** 11:14 17:16
23:14 31:22
37:5
**telling** 32:6
**term** 10:17,21
11:18,19 12:15
12:25 13:9,14
17:12 31:3
53:8
**terminology**
12:24
**terms** 96:19
**testified** 8:10
**testify** 42:23
**testimony** 7:12
9:20 133:9
134:6 136:15
**thank** 7:21 8:2
8:4,21 12:8
18:5 30:5
34:20 35:11
54:24 73:3
88:12 94:19
126:5,6 130:23
131:2,3 132:18
132:22
**thanks** 98:19
**thing** 89:11

**things** 82:24
89:23,24 90:9
99:25 100:4,19
112:3,5
**think** 10:9 19:7
19:11,15,19
20:5 25:5 27:7
28:3 29:10
30:22 32:16
35:15 38:11,13
38:17 39:9
41:12,18,22
43:5 44:24
45:5 47:4,5
51:17,19 59:23
63:2 65:22
67:16 68:7,20
69:4 70:4
73:24 75:21
77:12 78:25
79:11,14,15,24
80:2,4,8,15,25
81:6 83:10,10
83:11 84:5
85:22 86:12
87:17 92:4,8
93:23,25 95:3
95:15 97:5,23
99:5 100:6,24
103:12 106:2
110:2,15
112:18,23
113:13,22
114:17 121:22

122:13 123:24
124:15 125:6
128:11 129:8
129:10 131:4
132:3
**thought** 90:5
111:8
**threats** 36:12
50:16,22 51:2
51:8,14,25
52:7
**three** 116:25
133:11
**threshold**
111:25 117:12
**tie** 105:15
**time** 9:14,15,16
12:9 14:17
15:7 19:5
34:22 35:4
43:6 46:6
70:10 88:15,22
108:16,18
125:11 126:9
126:17 130:25
133:13
**times** 10:6 53:2
**title** 21:7 121:6
**today** 7:8 9:20
12:6 31:23
48:2 53:2
81:17 122:2
127:24 132:12

**today's** 133:8
**told** 101:18
**total** 133:10
**towards** 21:25
**tradable**
113:24
**traded** 114:11
115:20 116:9
**trading** 114:13
**trafficking**
54:18
**transact** 114:4
**transcript**
114:24 118:4
120:9 131:5,17
133:2,4 134:6
134:8
**transcripts**
120:4 127:18
**transfer** 65:8
**transparency**
114:4,12
117:22
**transparent**
113:6,9,25
116:17 118:10
**transparently**
117:18
**traveling**
125:11,22
**tried** 119:5,6
119:14
**true** 134:9,13
136:14

**[truth - video]**                                                   Page 28

| | | | |
|---|---|---|---|
| **truth** 7:13,14 7:15 | 92:22 93:14,22 94:21 109:23 111:9 112:12 134:7 135:13 | **unduly** 62:22 | 60:9 63:9 133:11 |
| **truthful** 9:19 | **understand** 9:8 | **unique** 110:12 | **using** 6:3 12:10 12:11 |
| **try** 8:25 12:6 12:12 13:14 18:20,23 33:12 88:2 96:17 97:21 98:8 | 11:7,16 12:5 49:10,12 55:3 57:16 72:6 80:6 81:4 84:5 90:7 93:9 96:2 99:9 104:15 107:12 111:5 113:19 115:8 117:3,5 129:7 | **united** 1:2 5:23 15:12,25 31:14 44:5 45:19,20 66:5 70:22 71:2,9,16,19 72:2,19 92:25 | |
| | | | **v** |
| | | **unlawful** 47:16 50:8 | **valid** 62:15 81:9 |
| **trying** 26:4 53:4 55:7 130:11 | | **unlawfully** 47:8,12 | **validly** 79:11 |
| | | **unlink** 117:16 | **valuable** 114:2 |
| **turn** 25:19 61:19 97:12,21 101:4 | | **unmute** 55:7 | **valuations** 114:5 |
| **turned** 97:15 | **understanding** 10:20 11:5 16:3 17:17 40:4 46:17,20 55:10 60:2,5 66:22 67:20 68:2 70:8,11 96:5,22 101:2 | **unnecessarily** 83:20,21 | **value** 110:21 |
| **turning** 90:22 126:21 | | **unnecessary** 63:5 90:9,15 90:16,18 | **vancouver** 10:14 |
| **two** 44:25,25 66:13 112:25 | | **unredacted** 43:24 44:4 | **various** 15:18 50:6 101:11 |
| **type** 107:19 | | **unrelated** 36:16 | **ventures** 17:17 18:14 19:4,6 |
| **u** | **understood** 9:11 14:18 52:23 67:24 94:19 95:25 128:25 | **unsealed** 96:4 | **venturing** 32:18 82:4 |
| **u.s.** 10:8 48:20 49:7 86:17 101:13 | | **unsealing** 94:10 95:13 | **verbally** 9:3 |
| | | **unusual** 52:10 | **verified** 40:20 41:6 75:4 135:12 |
| **uk** 48:23 49:2,8 | **undertake** 54:3 54:7 | **use** 10:21 11:19 12:3,14 13:9 13:14 31:2 53:4 | **verify** 41:21,25 43:7 |
| **ultimate** 11:2 59:15 | **undertaken** 66:8 | | **veritext** 6:8 133:12 |
| **unable** 77:24 | **undertaking** 122:18 | | **version** 125:14 |
| **under** 29:2 42:25 47:16 54:11 64:12 74:2 75:5 79:21 91:22 | | **used** 10:18 11:20 12:2,25 17:12 30:16 | **video** 1:11 2:9 5:14,18 6:10 6:16 25:19 88:14,21 126:8 |

126:16 132:25 133:3,7

**videographer** 4:17 5:2 6:6 19:23 34:21 35:3 70:6 86:6 87:3 88:4,13 88:20 98:10 126:7,14 132:23 133:6

**violates** 50:9

**virgin** 15:6

**virtual** 6:3

**virtually** 5:8

**visited** 66:16 67:3,4

**volume** 97:12

**w**

**w** 134:2

**wait** 115:24

**waive** 6:10

**waiver** 129:3 129:14

**walkers** 57:13 100:8 106:8,24 135:17

**want** 12:5,15 14:23 26:5 30:20 55:3 57:16 59:8 60:16 64:2 74:24 77:21 81:12 88:2

89:4 90:4 103:11 108:17 117:3,5 126:4 130:9,10 131:4 131:15,16,19 132:3,4,14 133:3

**wanted** 26:10 98:5 99:8 132:25

**warrant** 84:16

**warranted** 58:12 81:9

**warrants** 119:25

**watch** 127:20

**way** 11:20 12:10 25:7 32:9 33:13 47:22,23 48:5 48:7,15 50:8 50:11 53:5 54:17 57:8 61:15,20 72:21 72:25 84:7 93:19 113:11 115:7 136:19

**ways** 102:10

**we've** 37:12 60:14 87:3 96:16

**welcome** 35:9 59:7 99:2

**went** 13:20 19:23 70:6

**whereof** 136:21

**wider** 12:20

**wield** 122:15

**willing** 37:5 57:8 58:17

**wish** 36:24

**wishes** 36:25

**withholding** 100:16

**witness** 4:6 5:12 6:15,25 7:8,20,25 8:6 23:17 32:3 40:10 43:12 56:25 60:13 62:11,16,24 75:23 78:8 81:23,24 97:14 98:25 103:8 108:21 112:20 113:17 115:12 116:4 119:19 124:7 126:6 135:4 136:12 136:15,21 137:5

**words** 25:6

**work** 12:18 52:5 56:3,14 58:23 61:24 100:13,17 101:16 107:19

122:18

**working** 64:12 102:5,12,17 103:19,24 104:6,20 105:17

**works** 97:18

**world** 46:16

**write** 36:16

**written** 56:7 60:22

**wrong** 118:2,24

**wrote** 33:2,21 34:6 35:21 36:2 53:18

**x**

**x** 135:2

**y**

**yards** 4:8

**yeah** 30:13 33:25 34:18 72:9 76:8 85:20 87:25 98:3 131:6,21

**years** 52:7

**york** 1:3 2:16 3:8,8 4:10,10 5:24 6:8 8:9 133:12 136:3,9

**z**

**zhi** 10:25 11:24 24:6 29:3,15

**[zhi - zoom]**                                                    Page 30

30:2,4,10,16
90:25 128:9,12
129:13
**zhi's**  41:17
**zhou**  128:16
**zoom**  2:10

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**Case Number :BVIHCOM2026/0008**



**FILED**
**HIGH COURT**
TERRITORY OF
**THE VIRGIN ISLANDS**

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION

**Submitted Date:01/03/2026 15:20**

**Filed Date:02/03/2026 08:30**

CLAIM Nos: BVIHC (COM) 2026/0001; BVIHC (COM) 2026/0002; BVIHC (COM) 2026/0004; BVIHC (COM) 2026/0005; BVIHC (COM) 2026/0006; BVIHC (COM) 2026/0007; BVIHC (COM) 2026/0008; BVIHC (COM) 2026/0009; BVIHC (COM) 2026/0012; BVIHC (COM) 2026/0013; BVIHC (COM) 2026/0014; BVIHC (COM) 2026/0015; BVIHC (COM) 2026/0016; BVIHC (COM) 2026/0017; BVIHC (COM) 2026/0018; BVIHC (COM) 2026/0019; BVIHC (COM) 2026/0020; BVIHC (COM) 2026/0021; BVIHC (COM) 2026/0023; BVIHC (COM) 2026/0024; BVIHC (COM) 2026/0025; BVIHC (COM) 2026/0026; BVIHC (COM) 2026/0027; BVIHC (COM) 2026/0029; BVIHC (COM) 2026/0030

**Fees Paid:274.20**

IN THE MATTER OF THE INSOLVENCY ACT, 2003

ATTORNEY GENERAL

<u>Applicant</u>

and

|  |  |  |
|---|---|---|
| 1. | BVIHC (COM) 2026/0001 | BRIGHT TEAM GLOBAL LIMITED |
| 2. | BVIHC (COM) 2026/0002 | AUSPICIOUS TYCOON LIMITED |
| 3. | BVIHC (COM) 2026/0004 | DELIGHTFUL THRIVE LIMITED |
| 4. | BVIHC (COM) 2026/0005 | EVEN SINCERITY LIMITED |
| 5. | BVIHC (COM) 2026/0006 | FULAM INVESTMENT LIMITED |
| 6. | BVIHC (COM) 2026/0007 | GIANT VICTORY HOLDINGS LIMITED |
| 7. | BVIHC (COM) 2026/0008 | GOLDEN ASCEND INTERNATIONAL LIMITED |
| 8. | BVIHC (COM) 2026/0009 | HARMONIC STATE LIMITED |
| 9. | BVIHC (COM) 2026/0012 | LUMINOUS GLOW LIMITED |
| 10. | BVIHC (COM) 2026/0013 | MIGHTY DIVINE LIMITED |
| 11. | BVIHC (COM) 2026/0014 | NOBLE TITLE LIMITED |
| 12. | BVIHC (COM) 2026/0015 | ORIENTAL CHARM HOLDINGS INVESTMENT LIMITED |
| 13. | BVIHC (COM) 2026/0016 | PACIFIC CHARM HOLDINGS INVESTMENT |
| 14. | BVIHC (COM) 2026/0017 | PRINCE GLOBAL GROUP LIMITED |
| 15. | BVIHC (COM) 2026/0018 | PRAISE MARBLE LIMITED |
| 16. | BVIHC (COM) 2026/0019 | PRINCE GLOBAL HOLDINGS LIMITED |
| 17. | BVIHC (COM) 2026/0020 | RESPECTFUL STEED LIMITED |
| 18. | BVIHC (COM) 2026/0021 | RETAIN PROSPER LIMITED |
| 19. | BVIHC (COM) 2026/0023 | SIMPLY ADVANCED LIMITED |
| 20. | BVIHC (COM) 2026/0024 | SOUTHERN HERITAGE LIMITED |
| 21. | BVIHC (COM) 2026/0025 | STAR MERIT GLOBAL LIMITED |
| 22. | BVIHC (COM) 2026/0026 | STARRY BLOOM LIMITED |
| 23. | BVIHC (COM) 2026/0027 | SURE TYCOON LIMITED |
| 24. | BVIHC (COM) 2026/0029 | TOWARDS SUNSHINE LIMITED |
| 25. | BVIHC (COM) 2026/0030 | UNITED RICHES GLOBAL LIMITED |

<u>Respondents</u>

#3503725v1



**EXHIBIT**

Borrelli 1

**AFFIDAVIT OF COSIMO BORRELLI**

I, **COSIMO BORRELLI**, of Admiralty Asia Partners ("**Admiralty Asia**"), Suite 911, Level 9 One Pacific Place, Hong Kong, **MAKE OATH** and **SAY** as follows:

1.      I am the founder of Admiralty Asia, a firm with its headquarters in Hong Kong and focused on insolvency and restructuring, forensic and expert services internationally.  As I will further explain further below, I have been appointed director of the Respondent companies. As such, I am authorised to make, and do make, this affidavit in opposition to the Applicant's application to appoint liquidators dated 5 January 2026 brought against those companies, and to seek a discharge of the Court's order dated 9 January 2026 appointing provisional liquidators over the same companies.

2.      The facts and matters in this affidavit are either derived from my own personal knowledge and are true, or are based on stated sources and are true to the best of my information, knowledge and belief.

3.      There is now produced and shown to me and marked "**CB-1**" a paginated bundle of true copy documents to which I will refer in this affidavit. References to page numbers are references in CB-1, save where otherwise stated.

4.      I am submitting this affidavit in my position as director of each of the companies because I and the companies I represent intend to oppose the liquidation applications brought by the Applicant against them, and I respectfully invite this Honourable Court to discharge the provisional liquidators appointed pursuant to the order dated 9 January 2026. The liquidation applications are not warranted and are without basis – that is, the legal test for liquidation under the Insolvency Act, 2003 is not met. The grounds upon which the Applicant seeks liquidation do not, in my respectful view, satisfy the statutory requirements, and the circumstances of these companies do not justify the continuation of provisional liquidation or the making of a liquidation order.

5.      I have read the contents of the Application Notice filed herewith and confirm that the contents are true and correct.

#3503725v1

**My professional background**

6.    I am a chartered accountant with more than 35 years of experience working on behalf of and advising lenders and financiers, shareholders, distressed companies, secured and unsecured creditors, investors, courts and other stakeholders on restructuring, insolvency and related corporate advisory arrangements and solutions in distressed environments across a range of industries including oil and gas, shipping, manufacturing and commodities.

7.    Prior to founding Admiralty Asia, I was Managing Director and Head of Asia Pacific and Offshore Restructuring for Kroll, and before that the founder of Borrelli Walsh, both of which had offices internationally, including the BVI. Kroll acquired Borrelli Walsh Limited in 2020 and Borrelli Walsh was and Kroll remains a leading provider of insolvency and restructuring, corporate advisory, and forensic and expert services internationally, including throughout the Asia Pacific Caribbean regions. Much of my practice is based in Asia including the PRC and throughout the offshore business community, including the BVI.

8.    Throughout the years, my mandates have typically involved substantial, complex, cross border and contentious restructurings and insolvencies involving both out of court appointments as receiver, independent financial advisor and director and, often, as an officer of and under the supervision of courts as provisional, official liquidator and court appointed receiver in various jurisdictions. I have been appointed by courts in various capacities since approximately 1999. I am also often appointed by stakeholders to act as an executive, non-executive or independent director of publicly listed or large privately-owned groups and as legal representative of companies in the PRC.

**The factual background**

9.    The present proceedings concern the Attorney General's applications under sections 159 and 170 of the Insolvency Act 2003 ("**Act**") to appoint liquidators and provisional liquidators, respectively, over the following companies:

|  | Case no. | Respondent Company | Shareholder |
|---|---|---|---|
| 1. | BVIHC (COM) 2026/0001 | Bright Team Global Limited | Ms. Sandy Zhou ("**Ms. Zhou**") |
| 2. | BVIHC (COM) 2026/0002 | Auspicious Tycoon Limited | Mr. Chen Zhi ("**Mr. Chen**") |
| 3. | BVIHC (COM) 2026/0004 | Delightful Thrive Limited | Mr. Chen |
| 4. | BVIHC (COM) 2026/0005 | Even Sincerity Limited | Prince Group Holdings Limited |
| 5. | BVIHC (COM) 2026/0006 | Fulam Investment Limited | Ample Luck Investment Limited |

#3503725v1

| 6. | BVIHC (COM) 2026/0007 | Giant Victory Holdings Limited | Deluxe Heaven Limited |
|---|---|---|---|
| 7. | BVIHC (COM) 2026/0008 | Golden Ascend International Limited | Mr. Chen |
| 8. | BVIHC (COM) 2026/0009 | Harmonic State Limited | Mr. Chen |
| 9. | BVIHC (COM) 2026/0012 | Luminous Glow Limited | Mr. Chen |
| 10. | BVIHC (COM) 2026/0013 | Mighty Divine Limited | Ms. Zhou |
| 11. | BVIHC (COM) 2026/0014 | Noble Title Limited | Retain Prosper Limited |
| 12. | BVIHC (COM) 2026/0015 | Oriental Charm Holdings Investment Limited | Ms. Li Caiyun |
| 13. | BVIHC (COM) 2026/0016 | Pacific Charm Holdings Investment | Mr. Chen |
| 14. | BVIHC (COM) 2026/0017 | Prince Global Group Limited | Mr. Chen |
| 15. | BVIHC (COM) 2026/0018 | Praise Marble Limited | Geotech Holdings Ltd. |
| 16. | BVIHC (COM) 2026/0019 | Prince Global Holdings Limited | Mr. Chen |
| 17. | BVIHC (COM) 2026/0020 | Respectful Steed Limited | Prince Group Holdings Limited |
| 18. | BVIHC (COM) 2026/0021 | Retain Prosper Limited | Mr. Chen |
| 19. | BVIHC (COM) 2026/0023 | Simply Advanced Limited | Mr. Chen |
| 20. | BVIHC (COM) 2026/0024 | Southern Heritage Limited | Mr. Chen |
| 21. | BVIHC (COM) 2026/0025 | Star Merit Global Limited | Mr. Chen |
| 22. | BVIHC (COM) 2026/0026 | Starry Bloom Limited | Ms. Zhang Fan |
| 23. | BVIHC (COM) 2026/0027 | Sure Tycoon Limited | Mr. Chen |
| 24. | BVIHC (COM) 2026/0029 | Towards Sunshine Limited | Prince Group Holdings Limited |
| 25. | BVIHC (COM) 2026/0030 | United Riches Global Limited | Mr. Chen |

10. The Court appointed provisional liquidators on an *ex parte* without notice basis over each of the above companies on 9 January 2026.

#3503725v1

11.     The Attorney General has also brought related proceedings against five additional entities incorporated in the BVI - Amber Hill Ventures Limited, Lateral Bridge Global Limited, Robust Harmony Limited, Jumbo High Limited and Sword River Limited. I have not been engaged, instructed or appointed in any capacity by any or in respect of any of these five entities and do not make any representations on their behalf or in relation to them.   For convenience, I refer to the 25 companies listed above as the "**Respondents**".

**My appointments in relation to the Respondents**

*Appointment as a director*

12.     On or around 6 January 2026 Mr Chen was taken from Cambodia by the Chinese authorities and is being held in custody in China and as far as I am aware is not able to communicate with the outside world[1]. Mr Chen gave a full power of attorney to certain individuals prior to his being taken into custody in China. Those individuals have not been subject to any allegations or charges in connection with any of the matters alleged against Mr Chen and are professional people within the Prince organization. However, The Chinese authorities have made threats against any party associated with Mr Chen.[2] In another case in Myanmar (unrelated to Prince group) they executed a group of individuals accused of involvement in scam centres[3]. For those reasons the attorneys-in-fact wish to remain anonymous and I have committed to respect those wishes. I am instructed that their identities may be shared with Justice Mithani so that the Court may satisfy itself in that regard but I am not authorized to provide their details to any other party associated with this case.

13.     On 13 February 2026 Mr Chen's attorneys-in-fact appointed me as "Special Manager" authorising me to deal with any urgent issues arising on a day-to-day basis with respect to the Respondents as a stop-gap measure while my director appointments were being prepared. That appointment has since been terminated because it was superseded by my appointment as director. In the event I did not exercise any powers under that mandate.

14.     Pursuant to director and shareholder resolutions passed in writing and dated between 23 February 2026 and 27 February 2026 the boards of directors of the Respondents have been reconstituted, such that I am now the sole director[4] of those companies.  Copies of the relevant resolutions are exhibited at pages 7-176. In cases where Mr Chen is the shareholder of the relevant company I have been appointed by Mr Chen's attorneys-in-fact given that Mr Chen has been extradited to China. I have seen and verified all of the relevant documentation and am satisfied that those appointing me had power to do so.

---

[1] A press release from the Ministry of Interior of the Royal Government of Cambodia is exhibited at page 1.

[2] An announcement from the Ministry of Public Security of the People's Republic of China is exhibited at page 2.

[3] An article from AP News dated 2 February 2026 is exhibited at pages 3 to 6.

[4] Save in certain circumstances where the ability to remove the pre-existing directors is reserved to the provisional liquidators in which cases I am an additional director alongside Mr Chen.

**Appointment of provisional liquidators**

15.  I have considered the evidence upon which the provisional liquidators were appointed, and which was before the Court. The Attorney General applied to appoint provisional liquidators on the basis of public allegations made against *inter alia* Mr Chen in relation to so-called fraudulent activities, and based on sanctions currently in place with respect to Mr Chen and his associates. The appointment of the provisional liquidators was sought on the basis of an assumption that the Respondents may have been used to launder the proceeds of these fraudulent activities, although there appears to be no evidence before the Court of any involvement whatsoever by the Respondents in any activities which were either illegal or in any way objectionable, only innuendo drawn from the public allegations against Mr Chen. I have not been able to identify any evidence thus far linking the business of the Respondents to any wrongdoing or other objectionable activity and having read the evidence before the Court I am unable to find any there.

16.  I am also aware that the ultimate beneficial owners of the Respondents have been sanctioned by the US or UK or both, meaning that the assets of the companies themselves are frozen. I am not aware of any case where provisional liquidators have been appointed to prevent the dissipation of assets of a company whose assets are already frozen by international economic sanctions. Indeed, such a step would appear to be otiose. The information available to me (and which is before the Court) indicates that the appointment of provisional liquidators was neither necessary nor appropriate in light of the actual circumstances of the Respondents, and that the drastic step of appointing provisional liquidators ex parte, without affording the companies an opportunity to be heard, was disproportionate.

17.  I have now been appointed to the Respondents and I am prepared to ensure that their affairs are independently and transparently managed. In those circumstances, there is no justification for the continued appointment of provisional liquidators, and I respectfully request that the order appointing them be discharged with appropriate safeguards put in place (which I will address below).

18.  There are twenty-five distinct companies, and each has its own separate legal personality, corporate history, business activities, shareholding and assets. It would seem to me to be contrary to legal principles and precedent to make a winding up order on a blanket or omnibus basis without proper consideration of whether, in respect of each company, the test for liquidation is in fact met. If the Petitioner has particularized allegations and supporting evidence against any of these companies then that evidence should have been presented and the companies given an opportunity to respond.

**Dubious Sources of Allegations**

19.    Without waiving privilege, I understand from Boies Schiller Flexner LLP (the US attorneys of Mr. Chen) ("**BSF**") as follows:

19.1.    Between 5 February and 12 February 2024, Radio Free Asia ("**RFA**"), a US state-funded news outlet that was overseen by the US Agency for Global Media with oversight from the US Department of State, published a three-part feature containing allegations against the Prince Group and its beneficial owners ("**RFA Articles**"). The RFA Articles broadly alleged ties between the Prince Group and the Cambodian government, as well as purported illegal business practices, including allegations of money laundering and human trafficking. A copy of an article confirming that RFA received funding from the US government as well as the three articles produced by RFA in respect of the Prince Group is exhibited at pages 177 to 227.

19.2.    BSF understands that the UK government primarily relied on the RFA Articles and other media sources in connection with the UK sanctions case.

19.3.    An article published in The Times on 12 November 2025 (the "**Times Articles**") written by the same journalist who authored the RFA Articles explicitly identified Teo Kang-Yeow, also known as Cliff Teo, as a source for the reporting. In the Times Article, Cliff Teo is described as "*[a] former business associate-turned-whistleblower*" who "*has spoken for the first time*" about his allegations against the Prince Group. A copy of the Times Article is exhibited at pages 228 to 244.

19.4.    The statements attributed to Cliff Teo in the Times Article bear a strong similarity to quotes from an unnamed source in the RFA Articles, particularly with respect to allegations of money flows through offshore accounts. This similarity suggests that Cliff Teo was also the unnamed source in the RFA Articles.

19.5.    Cliff Teo is a former Prince Group associate who is accused of having stolen approximately USD 30 million from Prince Group-affiliated entities. In early-to-mid-2023, four companies overseen by Prince Group – Greenbay Properties Co., Ltd., Drew Properties Co., Ltd., Huntsman Investments Co., Ltd., and Binary Properties Co., Ltd. – filed both criminal and civil complaints against Cliff Teo in the Taiwanese courts.

19.6.    The criminal complaint alleges, among other things, that Cliff Teo was engaged to provide secretarial and administrative services for Prince Group's affiliates. Cliff Teo later worked as the personal assistant and liaison to banks for Mr Chen, though he was never an authorised signatory. The complaint details that Cliff Teo made a series of unauthorised transactions while serving in this role, including taking loans using company property as

collateral and the transfer of funds to accounts under his control.  The complainant companies requested that the prosecutor's office initiate criminal proceedings against the certain named defendants, including Cliff Teo, for breach of trust and business embezzlement, seize the defendants' assets in Taiwan to preserve the companies' rights and prevent asset dissipation, and investigate related bank accounts and transactions. Before the criminal proceedings could be completed, Cliff Teo fled Taiwan.

19.7. The civil proceedings focused on the same matters regarding Cliff Teo's unauthorised transfers and misappropriation of company funds.  The Taipei District Court heard oral arguments and concluded the proceedings on 19 July 2024.  On 2 August 2024, the court issued a judgment finding Cliff Teo jointly liable for damages and ordering him to compensate the plaintiff companies for approximately USD 18,698,969 (NT $570,318,554). A copy of the Taiwanese judgment and an English translation of the same is exhibited at pages 245 to 248.

19.8. Cliff Teo did not and has not satisfied the judgment owed to the Prince Group entities and is currently wanted by Taiwanese authorities.

20. It therefore appears that there are open questions as to question the reliability of the allegations against the beneficial owners of the the Respondents.  The sanctions designations appear to have originated, at least in part, from media reports the primary source for which was an individual who is himself a fugitive from Taiwanese authorities, the subject of adverse court findings for breach of trust and embezzlement in relation to Prince Group-related entities and may have motives to spread negative information about the Prince Group and its ultimate beneficial owner, Mr. Chen. I say all of this simply to state that there appear to be substantial open issues which will need to be resolved, including by Courts elsewhere, and not pre-judged.

21. My mandate as independent director shares substantially the same objective as the primary stated objective of the provisional liquidators, namely to maintain the status quo and to preserve the assets of the companies in question pending the resolution of any underlying issues and with commensurate reporting. I believe that my appointment as independent director represents a more appropriate and proportionate way of proceeding in the face of these allegations.

**Undertakings**

22. On 21 February 2026, Campbells wrote to the Attorney General's legal practitioners, O'Neal Webster, expressing concerns about the appointment of provisional liquidators. That letter is exhibited at page 249 to 251, and proposed a "collaborative route forward" whereby I, as director appointed over the Independent Companies, would agree undertakings in relation to the provision of information to the Attorney General and to coordinate action to preserve the value of the various companies and their assets.

#3503725v1

23. I confirm that I will cooperate fully with the Court and the Attorney General including by providing the Court and/or the Attorney General with any information and assistance as may reasonably be required by the Attorney General in the circumstances. I recognise that the Attorney General has a legitimate interest in ensuring that the affairs of the Respondents are properly managed and that any concerns regarding potential misconduct are appropriately addressed. Similarly, I recognise that the Court has a keen interest in understanding the nature of these companies' activities, particularly in light of the allegations that have been made.

24. I have set out below a list of specific proposed undertakings which I am prepared to give to this Honourable Court. These proposed undertakings are modelled on the information sharing provisions contained in the Protocols for Consultation and Information-Sharing annexed to orders appointing provisional liquidators in these proceedings, and are intended to provide the Court and the Attorney General with appropriate assurances whilst avoiding the expense and disruption of a full provisional liquidation.

25. I propose to provide the following undertakings to this Honourable Court in my capacity as director of the Respondents:

> ***Undertakings as to Information Disclosure***
>
> *(a) I undertake to provide the Attorney General, upon reasonable written request and subject to paragraphs (g) to (k) below, with access to corporate records of the Respondents, including constitutional documents, registers of members and directors, organisational charts, and officer and registered agent details.*
>
> *(b) I undertake to provide the Attorney General, upon reasonable written request and subject to paragraphs (g) to (k) below, with access to financial records of the Respondents, including bank statements, ledgers, invoices, loan agreements, asset registers, and records of related party transactions.*
>
> *(c) I undertake to provide the Attorney General, upon reasonable written request and subject to paragraphs (g) to (k) below, with access to selected communications, including emails and messaging data from corporate systems, to the extent relevant to any investigation.*
>
> *(d) I undertake to provide the Attorney General, upon reasonable written request and subject to paragraphs (g) to (k) below, with access to counterparty materials, including KYC files, contracts, and correspondence with intermediaries and fiduciaries.*

#3503725v1

*(e) I undertake to provide the Attorney General, upon reasonable written request and subject to paragraphs (g) to (k) below, with access to non-privileged investigation work product, including factual memoranda, forensic accounting outputs, and chain-of-custody logs prepared by me or under my direction.*

*(f) I undertake to provide the Attorney General, upon reasonable written request and subject to paragraphs (g) to (k) below, with non-privileged asset tracing materials, including tracing schedules, summaries, and information regarding restraints or recovery actions in respect of the Respondents.*

***Safeguards and Limitations on Disclosure***

*(g) Notwithstanding the foregoing, I shall not be required to disclose any material which is subject to legal professional privilege or litigation privilege. Any inadvertent disclosure of privileged material shall not constitute a waiver of privilege, and the Attorney General shall promptly return or delete such material upon notification.*

*(h) The Attorney General shall maintain any confidential information disclosed pursuant to these undertakings in confidence and shall use it solely for lawful law enforcement, regulatory, and public interest purposes.*

*(i) Where information is requested which, in my reasonable view, is unduly burdensome, oppressive, or disproportionate, or which may prejudice the integrity of any civil recovery efforts, I may propose reasonable narrowing, staging, or alternative formats, including summaries or redactions, to protect confidentiality, commercial sensitivity, or the interests of the Respondents.*

*(j) If any disagreement arises in relation to any request for information which cannot be resolved promptly by consultation, either party may seek directions from the Court on short notice.*

*(k) Any disclosure made by me in good faith pursuant to these undertakings shall not constitute a breach of duty, confidence, data protection obligations, or contractual restrictions binding upon any of the Respondents.*

***Undertakings as to Cooperation***

*(l) I undertake to cooperate fully with the Court and the Attorney General in the exercise of my director powers, and to provide such information and assistance as may reasonably be required by the Attorney General in the circumstances.*

#3503725v1

*(m) I undertake to cooperate and communicate with law enforcement and regulatory authorities in the Virgin Islands and in other jurisdictions, to the extent consistent with my duties as Director and subject to the preservation of privilege.*

*(n) I undertake to maintain a record of disclosures made to the Attorney General pursuant to these undertakings sufficient to evidence compliance, subject to privilege.*

***Undertakings as to Reporting***

*(o) I undertake to provide the Attorney General with quarterly consultation reports in respect of the Respondents, containing an executive summary and key developments, information regarding the asset position of the companies (including discoveries, realisations, restraints, and pending recovery actions), an update on any investigations being conducted (including factual findings and outstanding enquiries), a summary of any legal proceedings filed or contemplated, and an identification of risks and mitigants, together with proposed next steps and timetable.*

*(p) I undertake to notify the Attorney General promptly of any material developments in respect of the affairs of the Respondents which may be relevant to any ongoing investigation or regulatory enquiry.*

***Undertakings as to Preservation of Assets***

*(q) I undertake not to cause or permit the dissipation, disposal, or encumbrance of any assets of the Respondents otherwise than in the ordinary course of business, save with the prior consent of the Court or the Attorney General.*

*(r) I undertake to take all reasonable steps to preserve the books, records, and data of the Respondents.*

***General Provisions***

*(s) I shall have liberty to apply to this Honourable Court on short notice for directions, variation, or termination of any of the foregoing undertakings.*

*(t) The Attorney General shall have liberty to apply to this Honourable Court on short notice for directions in respect of the operation of these undertakings, or for such further or other undertakings as the Court may deem appropriate.*

26.    In my opinion, these proposed undertakings provide the Court and the Attorney General with substantial and meaningful protections, and that they are more proportionate and appropriate to the circumstances of this case than the continuation of provisional liquidation. The costs and

disruption associated with provisional liquidation are considerable, and in my opinion, the interests of all parties would be better served by permitting me to continue to manage the affairs of the Respondents as Director, subject to the undertakings set out above, pending the determination of the liquidation applications on their merits.

27.    The Respondent's legal practitioners, Campbells, wrote to the provisional liquidators on 24 February 2026 requesting *inter alia* a breakdown of the costs and expenses incurred to date in connection with the appointment of the provisional liquidators and that the provisional liquidators provide advanced notice of any proposed dealings with the Respondent's assets.  To date, the Respondents have yet to receive a response.  A copy of the letter to the provisional liquidators is at pages 252 to 255.

**Summary of Correspondence**

28.    Relevant correspondence between the Applicant's legal practitioners, O'Neal Webster ("**ONW**") and Campbells is exhibited at pages 249 to 251 and pages 256 to 269. That correspondence is summarised below.

29.    On 17 February 2026, Campbells sent an email to ONW seeking an adjournment and a continuation of the existing preliminary liquidation orders for a period of two months on the terms of the orders as currently drafted. ONW responded indicating that they were seeking instructions from the Attorney General in relation to the proposed adjournment (see pages 256 to 257).

30.    As aforementioned, on 21 February 2026, Campbells issued a letter to ONW setting out the Respondents' position in respect of the provisional liquidation application as well as proposing a collaborative route forward.

31.    On 24 February 2026, Campbells issued a further letter to ONW expanding upon the concerns raised in its letter of 21 February 2026 in respect of the appointment of provisional liquidators over the Respondents as well as the application to appoint liquidators over the Respondents (see pages 258 to 261).

32.    On 25 February 2026, Campbells sent an email to ONW seeking a response to the correspondence sent by Campbells to date.  On even date, ONW indicated that their expectation was that the forthcoming hearing on 2 March 2026 to be a directions hearing (see pages 262 to 264). Reliance was placed on this representation in preparing for the hearing accordingly.

33.    On 26 February 2026, Campbells sent an email to ONW attaching a draft order seeking the adjournment of the upcoming liquidation hearings as well as setting out proposed directions as to the filing of evidence in respect of the discharge of the provisional liquidators (see pages 266 to 267).  Thereafter, Campbells sent a further email to ONW seeking confirmation of the Applicant's

#3503725v1

position in respect of the draft order but to no avail as ONW indicated it was still seeking instructions (see pages 265 to 266).  As ONW had indicated on multiple occasions that they were seeking instructions from the Attorney General in relation to the proposed adjournment, the understanding was that the question of adjournment was under active consideration by the Applicant.

34.   It was not until 27 February 2026 that ONW confirmed that the hearing would not be a directions hearing and the adjournment was not agreed (see pages 269).  Campbells responded on the same day expressing surprise at this last minute change of position, noting that Campbells had relied on the Applicant's previous assertions that directions could be agreed (see page 268).

35.   On the same day, ONW issued a letter in response to Campbells' letter of 21 February 2026 which *inter alia* rejects the proposed collaborative route forward set out therein (see pages 272 to 273).

**Conclusion**

36.   For the reasons set out above, I will invite the Court to discharge the appointment of provisional liquidators over the Respondents, and to dismiss the extant liquidation application against them.

37.   This affidavit has been sworn in accordance with the law and procedure of the Special Administrative Region of Hong Kong.

**SWORN by the above-named**                          )
**COSIMO BORRELLI**                                   )
**this       day of March 2026**                      )
**at**                                                )   _____
                                                      )

**BEFORE ME:**

_____
**SOLICITOR / COMMISSIONER TO ADMINISTER OATHS / NOTARY PUBLIC**

**Name:**

**Address:**

#3503725v1

**IN THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**VIRGIN ISLANDS COMMERCIAL DIVISION**

**CLAIM Nos: BVIHC (COM) 2026/0001; BVIHC (COM) 2026/0002; BVIHC (COM) 2026/0004; BVIHC (COM) 2026/0005; BVIHC (COM) 2026/0006; BVIHC (COM) 2026/0007; BVIHC (COM) 2026/0008; BVIHC (COM) 2026/0009; BVIHC (COM) 2026/0012; BVIHC (COM) 2026/0013; BVIHC (COM) 2026/0014; BVIHC (COM) 2026/0015; BVIHC (COM) 2026/0016; BVIHC (COM) 2026/0017; BVIHC (COM) 2026/0018; BVIHC (COM) 2026/0019; BVIHC (COM) 2026/0020; BVIHC (COM) 2026/0021; BVIHC (COM) 2026/0023; BVIHC (COM) 2026/0024; BVIHC (COM) 2026/0025; BVIHC (COM) 2026/0026; BVIHC (COM) 2026/0027; BVIHC (COM) 2026/0029; BVIHC (COM) 2026/0030**

B E T W E E N:

**ATTORNEY GENERAL**

**Applicant**

-and-

| | |
|---|---|
| BVIHC (COM) 2026/0001 | **BRIGHT TEAM GLOBAL LIMITED** |
| BVIHC (COM) 2026/0002 | **AUSPICIOUS TYCOON LIMITED** |
| BVIHC (COM) 2026/0004 | **DELIGHTFUL THRIVE LIMITED** |
| BVIHC (COM) 2026/0005 | **EVEN SINCERITY LIMITED** |
| BVIHC (COM) 2026/0006 | **FULAM INVESTMENT LIMITED** |
| BVIHC (COM) 2026/0007 | **GIANT VICTORY HOLDINGS LIMITED** |
| BVIHC (COM) 2026/0008 | **GOLDEN ASCEND INTERNATIONAL LIMITED** |
| BVIHC (COM) 2026/0009 | **HARMONIC STATE LIMITED** |
| BVIHC (COM) 2026/0012 | **LUMINOUS GLOW LIMITED** |
| BVIHC (COM) 2026/0013 | **MIGHTY DIVINE LIMITED** |
| BVIHC (COM) 2026/0014 | **NOBLE TITLE LIMITED** |
| BVIHC (COM) 2026/0015 | **ORIENTAL CHARM HOLDINGS INVESTMENT LIMITED** |
| BVIHC (COM) 2026/0016 | **PACIFIC CHARM HOLDINGS INVESTMENT** |
| BVIHC (COM) 2026/0017 | **PRINCE GLOBAL GROUP LIMITED** |
| BVIHC (COM) 2026/0018 | **PRAISE MARBLE LIMITED** |
| BVIHC (COM) 2026/0019 | **PRINCE GLOBAL HOLDINGS LIMITED** |
| BVIHC (COM) 2026/0020 | **RESPECTFUL STEED LIMITED** |
| BVIHC (COM) 2026/0021 | **RETAIN PROSPER LIMITED** |
| BVIHC (COM) 2026/0023 | **SIMPLY ADVANCED LIMITED** |
| BVIHC (COM) 2026/0024 | **SOUTHERN HERITAGE LIMITED** |
| BVIHC (COM) 2026/0025 | **STAR MERIT GLOBAL LIMITED** |
| BVIHC (COM) 2026/0026 | **STARRY BLOOM LIMITED** |
| BVIHC (COM) 2026/0027 | **SURE TYCOON LIMITED** |
| BVIHC (COM) 2026/0029 | **TOWARDS SUNSHINE LIMITED** |
| BVIHC (COM) 2026/0030 | **UNITED RICHES GLOBAL LIMITED** |

**Respondents**

_____

**AFFIDAVIT OF COSIMO BORRELLI**
_____

#3503725v1

Campbells
Floor 4, Banco Popular Building
Road Town
Tortola VG1110
British Virgin Islands
Tel: (284) 494 2423
Ref: SDA/MCH/KCH/20785-45687
**Legal Practitioners for the Respondents**

#3503725v1

## EXHIBIT 2

**Declaration of Cosimo Borrelli**



**EXHIBIT**

Borrelli 2

---

**AFFIDAVIT OF COSIMO BORRELLI**

---

I, **COSIMO BORRELLI**, of Admiralty Asia Partners ("**Admiralty Asia**"), Suite 911, Level 9 One Pacific Place, Hong Kong, **MAKE OATH** and **SAY** as follows:

1. I submit this Declaration in support of the *Director's Objection to Verified Petition under Chapter 15 for Recognition of Foreign Main Proceedings and Related Relief* (the "**Objection**") to be filed in the chapter 15 cases (the "**Ch. 15 Cases**") commenced by Paul Pretlove, David Standish, and James Drury as the putative foreign representatives (the "**Joint Provisional Liquidators**" or "**JPLs**") of the ongoing provisional proceedings (the "**BVI Proceedings**") pending in the High Court of Justice, Commercial Division, of the British Virgin Islands (the "**BVI Court**") with respect to each of Prince Global Holdings Limited and 29 of its affiliates (together, the "**Debtors**").

2. I am the founder of Admiralty Asia, a firm with its headquarters in Hong Kong and focused on insolvency and restructuring, forensic and expert services internationally.  As I will further explain further below, I have been appointed director of the Respondent companies. As such, I am authorised to make, and do make, this affidavit.

3. The facts and matters in this affidavit are either derived from my own personal knowledge and are true, or are based on stated sources and are true to the best of my information, knowledge and belief.

4. Unless stated otherwise, capitalized terms used herein have the meanings set forth in the Objection.

**My professional background**

5. I am a chartered accountant with more than 35 years of experience working on behalf of and advising lenders and financiers, shareholders, distressed companies, secured and unsecured creditors, investors, courts and other stakeholders on restructuring, insolvency and related corporate advisory arrangements and solutions in distressed environments across a range of industries including oil and gas, real estate and construction, shipping, manufacturing and commodities.

6. Prior to founding Admiralty Asia, I was Managing Director and Co-Head of Kroll Global Restructuring, and before that the founder of Borrelli Walsh, both of which had offices internationally, including the BVI. Kroll acquired Borrelli Walsh Limited in 2020 and Borrelli Walsh was and Kroll remains a leading provider of insolvency and restructuring, corporate advisory, and forensic and expert services internationally, including throughout the Asia Pacific, the  Caribbean

and internationally. Much of my practice is based in Asia including the PRC and throughout the offshore business community, including the BVI.

7.      Over the last three decades, my mandates have typically involved substantial, complex, cross border and contentious restructurings and insolvencies involving both out of court appointments as receiver, independent financial advisor and director and, often, as an officer of and under the supervision of courts as provisional, official liquidator and court appointed receiver in various jurisdictions. I have been appointed by courts in various capacities since approximately 1999. I am also often appointed by stakeholders to act as an executive, non-executive or independent director of publicly listed or large privately-owned groups and as legal representative of companies in the PRC.

**My appointments in relation to the Borrelli Debtors**

8.      On or around 6 January 2026 Mr Chen was taken from Cambodia by the Chinese authorities and is being held in custody in China. As far as I am aware is not able to communicate with the outside world. Mr Chen gave a full power of attorney to certain individuals prior to his being taken into custody in China. Those individuals have not been subject to any allegations or charges in connection with any of the matters alleged against Mr Chen and are professional people within the Prince organisation. The Chinese authorities have made threats against parties associated with Mr Chen. In another case in Myanmar (unrelated to Prince group) they executed a group of individuals accused of involvement in scam centres. For those reasons, the attorneys-in-fact wish to remain anonymous and I have (reasonably) committed to respect those wishes. I was instructed that their identities may be shared with Justice Mithani of the BVI Court, but I am not authorised to provide their details to any other party.

9.      On 13 February 2026 Mr Chen's attorneys-in-fact appointed me as "Special Manager" authorising me to deal with any urgent issues arising on a day-to-day basis with respect to each of Prince Global Holdings Limited, Auspicious Tycoon Limited, Bright Team Global Limited, Delightful Thrive Limited, Even Sincerity Limited, Fulam Investment Limited, Giant Victory Holdings Limited, Golden Ascend International Limited, Harmonic State Limited, Luminous Glow Limited, Mighty Divine Limited, Noble Title Limited, Oriental Charm Holdings Investment Limited, Pacific Charm Holdings Investment Limited, Praise Marble Limited, Prince Global Group Limited, Respectful Steed Limited, Retain Prosper Limited, Simply Advanced Limited, Southern Heritage Limited, Star Merit Global Limited, Starry Bloom Limited, Sure Tycoon Limited, Towards Sunshine Limited, and United Riches Global Limited (together, the "**Borrelli Debtors**"), as a stop-gap measure while my director appointments were being prepared. That appointment has since been terminated because it was superseded by my appointment as director.

10.     Pursuant to director and shareholder resolutions passed in writing and dated between 23 February 2026 and 27 February 2026, the boards of directors of the Borrelli Debtors have been

reconstituted, such that I am now the sole director of those companies. In cases where Mr Chen is the shareholder of the relevant company, I have been appointed by Mr Chen's attorneys-in-fact given that Mr Chen has been extradited to China. I have seen and verified all of the relevant documentation and am satisfied that those appointing me had power to do so.

11. I have now been appointed to the Borrelli Debtors and I am focused on ensuring and will continue to ensure that their affairs are independently and transparently managed. My mandate as independent director shares substantially the same objective as the primary stated objective of the provisional liquidators, namely to maintain the status quo and to preserve the assets of the companies in question pending the resolution of any underlying issues and with commensurate reporting. I have gone to some lengths to try to work cooperatively with the provisional liquidators. Unfortunately, this is not something which the provisional liquidators wish to entertain. I believe that my appointment as independent director is appropriate and proportionate way of ensuring the good conduct if the affairs of the Borrelli debtors, including through cooperation with the provisional liquidators and others in the face of these allegations.

I certify under penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the

United States that the foregoing is true and correct.

Executed on this the twenty-first day of May, 2026, in the Hong Kong Special

Administrative Region of the People's Republic of China.

_____

**Cosimo Borrelli**

Admiralty Asia Partners
Suite 911, Level 9
One Pacific Place
Hong Kong

Matthew L. Schwartz
Peter M. Skinner
Gordon Z. Novod
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300

Laura Femino (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
401 E Las Olas Boulevard
Fort Lauderdale, Florida 33301
Telephone: (954) 377-0716

*Counsel to Cosimo Borrelli in his
capacity as the sole director of each
of the Borrelli Debtors*

Dan G. Boyle
**BOIES SCHILLER FLEXNER LLP**
2029 Century Park East
Los Angeles, California 90067
Telephone: (213) 995-5732

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PRINCE GLOBAL HOLDINGS LIMITED *et al.*,[1]<br><br>Debtors in Foreign Proceedings. | Re ECF Nos. 1, 2<br><br>Hearing Date and Time: June 9, 2026 at 10:00 AM ET<br><br>Objection Deadline: May 21, 2026 at 4:00 PM ET<br><br>Chapter 15<br>Case No. 26-10769 (MG)<br>(Jointly Administered) |

**COSIMO BORRELLI'S CORRECTED OBJECTION TO
VERIFIED PETITION UNDER CHAPTER 15 FOR RECOGNITION
OF FOREIGN MAIN PROCEEDINGS AND RELATED RELIEF**

---

[1]   The Debtors in these Chapter 15 Cases are incorporated in the British Virgin Islands and maintain their registered address at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, British Virgin Islands, VG1110. A complete list of the Debtors and their company numbers may be found at ECF No. 2-1. Notwithstanding the case caption, Cosimo Borrelli, in his capacity as the sole director of each of the Borrelli Debtors, disputes that each of these entities is the subject of a "foreign proceeding" within the meaning of 11 U.S.C. § 101(23).

i

**EXHIBIT**

Borrelli 3

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ......................................................................................................... iii

**PRELIMINARY STATEMENT** ................................................................................................ 1

**FACTUAL BACKGROUND** ...................................................................................................... 6

    A.    Criminal and Civil Forfeiture Actions Are Filed in EDNY, and Related Sanctions Are Imposed ................................................................................................................. 6

    B.    The BVI AG Relies on the Flawed EDNY Filings to Secure Ex Parte Orders in the BVI for Limited JPL Appointments ..................................................................... 8

    C.    Mr. Borrelli is Appointed Director of the Borrelli Debtors ....................................... 11

    D.    The JPLs Make Ex Parte Submissions and Stonewall the Director ........................... 12

    E.    The Borrelli Debtors Oppose the JPLs in the BVI ..................................................... 14

    F.    The JPL's Seek Greater Powers in Chapter 15 ........................................................... 15

    G.    Hong Kong Court Restrains Substantially All of the Debtors' Assets ....................... 19

    H.    The BVI Court Rules that the Director may Direct the Companies to Oppose the JPLs in the BVI but not in these Ch. 15 Cases ........................................................... 19

**OBJECTION** ............................................................................................................................ 19

    I.    Mr. Borrelli Has Standing to Object in his Capacity as a Director ............................ 19

    II.    The JPLs Have Failed to Establish Debtor Eligibility Under § 109(a) ..................... 21

    III.    The JPLs fail to meet their debtor-by-debtor evidentiary burden ............................. 23

    IV.    The BVI Proceedings are not "foreign proceedings" ................................................ 24

    V.    The Court should Deny Recognition on Public Policy Grounds ............................... 28

    VI.    Even if the Court Grants Recognition, it should Deny all Discretionary Relief ....... 30

    A.    Realization of Debtor Property Violates the Purpose and Scope of the BVI Orders and Risks Irreversible Damage to the Debtors ............................................... 31

    B.    The JPLs Have Been Wasteful with Debtor Assets .................................................... 32

    C.    The Court should not grant the Other Requested Relief ............................................. 34

**CONCLUSION** ........................................................................................................................ 35

## TABLE OF AUTHORITIES

**Cases**

*Collins v. Oilsands Quest, Inc.*,
484 B.R. 593 (S.D.N.Y. 2012) .................................................................................. 29

*In re Amatex Corp.*,
755 F.2d 1034 (3d Cir. 1985) .................................................................................. 20

*In re ARD Fin., S.A.*,
No. --- B.R. ----, 2026 WL 817458 (Bankr. S.D.N.Y. Mar. 25, 2026) (Glenn, J.) .............. 28, 29

*In re Ascentra Holdings, Inc.*,
657 B.R. 339 (Bankr. S.D.N.Y. 2023) ........................................................................ 20

*In re Ashapura Minechem Ltd.*,
480 B.R. 129 (S.D.N.Y. 2012) .................................................................................. 24

*In re Atlas Shipping A/S*
 404 B.R. 726 (Bankr. S.D.N.Y. 2009) ........................................................................ 34

*In re Barnet*,
737 F.3d 238 (2d Cir. 2013) .................................................................................... 21

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
389 B.R. 325 (S.D.N.Y. 2008) .................................................................................. 23

*In re British Am. Ins. Co. Ltd.*,
425 B.R. 884 (Bankr. S.D. Fla. 2010) ........................................................................ 26

*In re D.L.I.C., Inc.*,
120 B.R. 348 (Bankr. S.D.N.Y. 1990) ........................................................................ 22

*In re ENNIA Caribe Holding N.V.*,
594 B.R. 631 (Bankr. S.D.N.Y. 2018) ........................................................................ 24

*In re Fairfield Sentry Ltd.*,
2011 WL 4357421 (S.D.N.Y. Sept. 16, 2011),............................................................. 29

*In re Fleming Int'l Reinsurance Ltd.*,
No. 25-12353 (JPM) (Bankr. S.D.N.Y. Oct. 26, 2025) .................................................... 26

*In re Glob. Ocean Carriers Ltd.*,
251 *B.R. 31 (Bankr. D. Del. 2000)* .......................................................................... 23

*In re Gold & Honey, Ltd.*,
410 B.R. 357 (Bankr. E.D.N.Y. 2009) ........................................................................ 29

*In re Head*,
223 B.R. 648 (Bankr. W.D.N.Y. 1998) ........................................................................ 21

*In re Int'l Banking Corp. B.S.C.*,
439 B.R. 614 (Bankr. S.D.N.Y. 2010).......................................................................... 34

*In re InterCement Brasil S.A.*,
668 B.R. 802 (Bankr. S.D.N.Y. 2025).......................................................................... 24

*In re Metcalfe & Mansfield Alt. Invs.*,
   421 B.R. 685 (Bankr. S.D.N.Y. 2010)...................................................................................... 29

*In re Northeast Ins. Co. Ltd.*,
   No. 25-12275 (MEW) (Bankr. S.D.N.Y. Oct. 15, 2025) ........................................................ 26

*In re Ocean Rig UDW Inc.*,
   570 B.R. 687 (Bankr. S.D.N.Y. 2017)...................................................................................... 26

*In re Olinda Star Ltd.*,
   614 B.R. 28 (Bankr. S.D.N.Y. 2020)........................................................................................ 26

*In re Serviços de Petróleo Constellation S.A.*,
   600 B.R. 237 (Bankr. S.D.N.Y. 2019)............................................................................ 21, 23, 24

*In re Silicon Valley Bank (Cayman Islands Branch)*,
   658 B.R. 75 (Bankr. S.D.N.Y. 2024)........................................................................................ 21

*In re Siu-Fung Ceramics Holdings Ltd.*,
   2026 WL 382424 (Bankr. S.D. Tex. Feb. 10, 2026) ................................................................ 23

*In re Suntech Power Holdings Co.*,
   520 B.R. 399 (Bankr. S.D.N.Y. 2014)...................................................................................... 26

*In re Toft*,
   453 B.R. 186 (Bankr. S.D.N.Y. 2011)...................................................................................... 34

*In re Zhejiang Topoint Photovoltaic Co., Ltd.*,
   2015 WL 2260647 (Bankr. D.N.J. May 12, 2015).................................................................... 20

*See In re King*,
   392 B.R. 62 (Bankr. S.D.N.Y. 2008)........................................................................................ 22

*Webb Mtn, LLC v. Exec. Realty P'ship, L.P. (In re Webb Mtn, LLC)*,
   414 B.R. 308 (Bankr. E.D. Tenn. 2009)................................................................................... 35

**Statutes**

11 U.S.C. § 101 ....................................................................................................... 24, 26, 27

11 U.S.C. § 109 .............................................................................................................. 5, 21

11 U.S.C. § 1501 ................................................................................................................ 34

11 U.S.C. § 1502 ................................................................................................................ 23

11 U.S.C. § 1506 ........................................................................................................ 5, 29, 30

11 U.S.C. § 1507 .......................................................................................................... 30, 32

11 U.S.C. § 1515 ................................................................................................................ 24

11 U.S.C. § 1517 .......................................................................................................... 23, 28

11 U.S.C. § 1520 .......................................................................................................... passim

11 U.S.C. § 1521 ...................................................................................................... 29, 30, 34

11 U.S.C. § 1522 .......................................................................................................... 20, 34

**Other Authorities**

House Judiciary Committee, H.R. Rep. No. 109-31 (2005) ..................................................... 23, 27

Insolvency Act of 2003, § 162 (B.V.I.*)* ................................................................................. 8, 19, 26

UNCITRAL *Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation*, 42 (Jan. 2014) ...................................................................................... 24, 25

Cosimo Borrelli (the "**Director**"), in his capacity as the sole director of twenty-five of the Debtors,[2] by and through his undersigned counsel, hereby submits this objection (the "**Objection**") to the (1) *Chapter 15 Petition for Recognition of Foreign Proceeding* [ECF No. 1] and (2) *Verified Petition under Chapter 15 for Recognition of Foreign Main Proceedings and Related Relief* [ECF No. 2] (the "**Verified Petition**" or "**VP**")[3] filed in the above-captioned chapter 15 cases (the "**Ch. 15 Cases**") by Paul Pretlove, David Standish, and James Drury as the putative foreign representatives (the "**Joint Provisional Liquidators**" or "**JPLs**") of the ongoing provisional proceedings (the "**BVI Proceedings**") pending in the High Court of Justice, Commercial Division, of the British Virgin Islands (the "**BVI Court**") with respect to each of Prince Global Holdings Limited and 29 of its affiliates (together, the "**Debtors**").

In support, the Director relies upon the *Second Declaration of Peter M. Skinner in Support of Cosimo Borrelli's Objection to Verified Petition under Chapter 15 for Recognition of Foreign Main Proceedings and Related Relief* (the "**Second Skinner Decl.**"), the *Declaration of Riz Mokal* (the "**Mokal Decl.**"), and the *Affidavit of Cosimo Borrelli* (the "**Borrelli Decl.**"), included as Exhibits 1 and 2 to the Second Skinner Decl., and respectfully represents as follows:

## PRELIMINARY STATEMENT

In a few short months, the JPLs have taken unchallenged, *ex parte* allegations, turned them into "ring-holding investigations" in the BVI, and are now trying to leverage those unproven

---

2    Mr. Borrelli is the sole director of each of Prince Global Holdings Limited, Auspicious Tycoon Limited, Bright Team Global Limited, Delightful Thrive Limited, Even Sincerity Limited, Fulam Investment Limited, Giant Victory Holdings Limited, Golden Ascend International Limited, Harmonic State Limited, Luminous Glow Limited, Mighty Divine Limited, Noble Title Limited, Oriental Charm Holdings Investment Limited, Pacific Charm Holdings Investment Limited, Praise Marble Limited, Prince Global Group Limited, Respectful Steed Limited, Retain Prosper Limited, Simply Advanced Limited, Southern Heritage Limited, Star Merit Global Limited, Starry Bloom Limited, Sure Tycoon Limited, Towards Sunshine Limited, and United Riches Global Limited (together, the "**Borrelli Debtors**").

3    Capitalized terms used but not defined herein have the meanings ascribed to them in the Verified Petition.

1

allegations to obtain unfettered powers to seize and sell assets here in the United States. If the

Court grants those powers, the JPLs will use this Court's imprimatur to get to the rest of the world.

1519 Hr'g Tr. at 50:9–11 (MR. DIETRICH: "We intend to use the assistance of this Court to the

full extent we can to pursue assets outside of the United States.").

Justice Wallbank of the British Virgin Islands High Court of Justice aptly summarized the

danger of letting these unusual "public interest" liquidations, based on untested allegations with

zero underlying evidence, continue unchecked:

> It's obviously all very well to say that there has been an indictment put
> forward . . . and other steps taken by OFAC and the U.K., for example. . . . Do you,
> however, bring to this [c]ourt any of the evidence which informed those results?
> . . . .
> Do these [c]ompanies that are now being put up against the wall to be finished off,
> does the evidence stack up for finishing off those Companies? And just because
> somebody said in an overseas [c]ourt that there's a man called Chen out there who
> has been successfully indicted, then is that enough to finish these Companies off?
> Can't I see some of the underlying evidence, please?

Apr. 16 BVI Hr'g Tr. at 35:2–12; 38:9–16.

> I mean, it is so very easy for one little special agent in the FBI, or whatever his
> name might be, to write something up and embellish it, because he wants to succeed
> on a case or for whatever reason and then he verifies a complaint and even on the
> pain of perjury. And then everybody says, well, you know he is a special agent in
> the FBI, isn't he?
> . . . .
> And then you get the snowball effect and before you know it, the entire nations and
> jurisdictions operate on the fanciful fictitious mind of one little man in some field
> office in some semi-populated state and with no kind of check and balance of
> whether what he says is actually true.

Apr. 17 BVI Hr'g Tr. at 56:7–23.

Justice Wallbank's concerns are particularly well-placed because many of those underlying

allegations have already been proven false. For example, the indictment of that "man called Chen"

includes an image of a "phone farm"—"automated call centers used to facilitate cryptocurrency

investment fraud and other cybercrimes"—that Chen allegedly "maintained":

2



EDNY Indictment (defined below) ¶ 33; *see also* EDNY Forfeiture Complaint (defined below) ¶ 25. But that image actually comes from a March 2023 Chinese-language news article discussing the use of cell phones to artificially inflate viewership of e-commerce live-streams:



EDNY Forfeiture Action, ECF No. 317 at 8.

The EDNY Forfeiture Complaint and Indictment also cite photographs in support of the allegation that Chen used violence as part of his scheme. EDNY Forfeiture Complaint ¶ 31.



EDNY Indictment ¶ 40 ("CHEN possessed images illustrating Prince Group's violent methods, including those below").

But this photograph comes from an April 2020 article entitled "A man got his testicles stuck between plastic chairs during the lockdown. The situation got out of his control and he had to call an ambulance," which recounts the stories of several men injured from sitting naked on chairs with slats, and begins "Be careful, men! Never sit naked on a plastic chair!":



4

EDNY Forfeiture Action ECF No. 317 at 9. This is not what Chapter 15 is, or should be. Unproven—and provably, comically false—allegations should not be turned into a Court-approved mandate for a global campaign. The Court should decline recognition.

As a threshold matter, neither the Debtors nor the BVI Proceedings are eligible for U.S. bankruptcy relief. The JPLs cannot satisfy section 109(a) of the Bankruptcy Code because the Debtors have no U.S. property, as the JPLs have now admitted. They fail their evidentiary burden by presenting the Debtors as a corporate group, without establishing each element of recognition on an individual, debtor-by-debtor basis. And the BVI Proceedings are not eligible for recognition because, as the BVI Attorney General continues to emphasize, they have nothing to do with insolvency or winding up.

In addition to these obvious defects, recognition should be denied on public policy grounds under section 1506. By leveraging relief in one jurisdiction to amplify their powers in another, the JPLs have amassed powers they could not have obtained in one jurisdiction alone. The BVI does not nationalize private companies on the basis of unsubstantiated allegations. The United States does not force companies into chapter 11 when their alleged affiliates are indicted. Neither jurisdiction permits a state to unilaterally shut down a company that is not insolvent, or to liquidate a company in search of evidence justifying that liquidation.

As the BVI Court put it: "[W]here does it stop? I mean, is the whole edifice [teetering] on kinds of cheap journalism and cheap field office simplistic illustrative examples? I mean, it's not good enough in a court of law." Apr. 17 BVI Hr'g Tr. at 60:4–8. Justice Wallbank is exactly right. It's not good enough, and it should stop here: this Court should deny recognition while the BVI Court considers whether these provisional appointments were ever warranted to begin with.

5

If the Court does recognize the BVI Proceedings despite these plain failings, it should limit relief to that set forth in section 1520 of the Bankruptcy Code—chiefly, a territorial imposition of sections 362 and 363. The JPLs should not be permitted to administer, sell, or otherwise dissipate U.S. assets, nor to execute transactions outside the ordinary course without specific authorization. They should, in other words, be held to the limits that they themselves imposed in the BVI Court, and which were summarized by Justice Wallbank:

> THE BVI COURT: [W]e have to think what is it that the JPLs are really trying to do in New York. All they are doing is they are trying to get these BVI proceedings recognised so that their appointment as JPLs is also recognised so that they can take steps in New York to investigate the assets and dealings of the Company, and so that they can get in those assets and secure them. *That is all that they want to do.*

May 14 BVI Hr'g Tr. at 192:18–193:1 (emphasis added). If the Court recognizes the BVI Proceedings, that is all they should be permitted to do without obtaining further relief in the BVI.

## FACTUAL BACKGROUND

A.    **Criminal and Civil Forfeiture Actions Are Filed in EDNY, and Related Sanctions Are Imposed**

1.    On October 14, 2025, the United States Attorney's Office for the Eastern District of New York unsealed an indictment charging Chen Zhi with one count of wire fraud conspiracy and one count of money laundering conspiracy. *See Indictment* ¶¶ 54–57, *United States v. Chen Zhi*, No. 25-cr-312, ECF No. 1 (E.D.N.Y. Oct. 8, 2025) [Second Skinner Decl. Ex. 3] (the "**EDNY Indictment**"). On the same day, the EDNY commenced a civil action in the Eastern District of New York (the "**EDNY Forfeiture Action**" and, together with the EDNY criminal proceedings commenced by the Indictment, the "**EDNY Proceedings**") seeking forfeiture of approximately 127,271 Bitcoin (the "**Cryptocurrency**").[4] *See Verified Complaint In Rem* ¶¶ 5–12, *United States*

---

4    BSF also represents Mr. Chen in the EDNY Forfeiture Action. Mr. Chen, who is currently detained in China, has not appeared in the criminal action.

6

*v. Approximately 127,271 Bitcoin ("BTC") Previously Stored at the Virtual Currency Addresses Listed in Attachment A*, No. 25-cv-5745, ECF No. 1 (E.D.N.Y. Oct. 14, 2025) [Second Skinner Decl. Ex. 4] (the "**EDNY Forfeiture Complaint**"). The EDNY Forfeiture Complaint alleges that Mr. Chen is the founder and operator of the Prince Group, a Cambodian corporate conglomerate comprising dozens of business entities that operate in over thirty countries. *Id.* ¶¶ 15–16.

2.       The EDNY Indictment contains a number of allegations that are demonstrably wrong and cause for healthy skepticism of the way the government conducted its investigation and brought its case. *See Memorandum of Law In Support of Claimant Chen Zhi's Motion for a More Definite Statement*, Case No. 25-cv-5745, ECF No. 317 [Second Skinner Decl. Ex. 5] at 7–10. The EDNY Forfeiture Complaint is similarly flawed and, among other things, fails to account for when or how the government obtained the Cryptocurrency. *See Memorandum of Law in Support of Claimant Chen Zhi's Motion to Dismiss*, Case No. 25-cv-5745, ECF No. 316 [Second Skinner Decl. Ex. 6] at 5; *Memorandum of Law in Support of Claimant Chen Zhi's Motion for a More Definite Statement*, Case No. 25-cv-5745, ECF No. 317 [Second Skinner Decl. Ex. 5] at 5–7. The BVI Court has been troubled by these shortcomings. *See infra* ¶ 16; *Transcript of April 17, 2026 Open Court Proceedings* [Second Skinner Decl. Ex. 7] (the "**Apr. 17 BVI Hr'g Tr.**") at 6:9–13 (THE [BVI] COURT: "I am very concerned, very concerned to note that apparently once again . . . US attorneys seem to think they need to embellish the record.").

3.       Also on October 14, 2025, the United States and the United Kingdom imposed sanctions on Mr. Chen and certain Prince Group affiliates. In the United States, the Department of the Treasury's Office of Foreign Assets Control ("**OFAC**") designated 146 sanctions targets, including Mr. Chen and 128 corporate entities as sanctions targets alleged to be affiliated with or controlled by him or other Prince Group principals. *See Off. of Foreign Assets Control, Specially*

7

*Designated Nationals List Update, Transnational Criminal Organizations Designations; Issuance of TCO-Related General License* [Second Skinner Decl. Ex. 8]. Twenty-eight of the Debtors—and all of the Borrelli Debtors—are among the companies designated by OFAC. *See id.*; VP Ex. A (List of Debtors) [ECF No. 2-1]. The United Kingdom imposed separate sanctions under its Global Human Rights Sanctions regime on Mr. Chen and certain entities affiliated with the Prince Group, only one of which is a Borrelli Debtor—Prince Global Group Limited. *See Off. of Fin. Sanctions Implementation, HM Treasury, Financial Sanctions Notice, Global Human Rights* [Second Skinner Decl. Ex. 9]. The U.K. sanctions regime applies a lower statutory standard of "reasonable grounds to suspect" involvement in serious human rights violations. *See id.*

**B.    The BVI AG Relies on the Flawed EDNY Filings to Secure Ex Parte Orders in the BVI for Limited JPL Appointments**

4.    On January 5, 2026, the Attorney General of the British Virgin Islands (the "**BVI AG**") filed in the BVI Court *ex parte* originating applications as well as ordinary applications under Part VI of the British Virgin Islands Insolvency Act of 2003 seeking the appointment of provisional liquidators over each of the Debtors on public interest grounds and on just and equitable grounds. *See Jan. 2, 2026 Ordinary Application (Ex-Parte)* (*Company*) [Second Skinner Decl. Ex. 10] (the "**BVI Ord. App.**"); *Jan. 2, 2026 Originating Application (Company) Per Rule 14* [Second Skinner Decl. Ex. 11] (the "**BVI Orig. App.**" and, together with the BVI Ord. App., the "**BVI Ex Parte App.**").[5] Because the BVI AG did not seek appointment on insolvency grounds, there were no allegations of insolvency and in fact no inquiry into financial distress whatsoever. *See generally* BVI Ex Parte App.; Mokal Decl. ¶ 38.1. Nor has the BVI AG or any other party since contended in the BVI Proceedings that any of the Debtors is insolvent.

---

[5]    The BVI AG filed one BVI Ord. App. and one BVI Orig. App. for each of the 25 Debtors. The filings were identical in substance. As such, only one copy of each is exhibited to the Second Skinner Decl.

8

5.      The BVI AG sought appointment of the provisional liquidators to: (1) facilitate cross-border cooperation with enforcement authorities, regulators, and insolvency practitioners; (2) ensure a proper investigation and recovery of the Borrelli Debtors' assets; and (3) properly investigate how the Borrelli Debtors were used in the fraudulent scheme. BVI Orig. App. ¶ 39. In the BVI AG's view, "[t]he information and evidence gathered by the [JPLs] may provide crucial support for law enforcement authorities, both in the BVI and internationally," and "could materially assist in tracing assets and preserving evidence relevant to that and other actions." BVI Ord. App. ¶ 30(c). Those purposes have not changed since the JPLs were appointed. *See April 14, 2026 Skeleton Argument of the Applicant* [Second Skinner Decl. Ex. 12] (the "**Apr. 14, 2026 BVI AG Skel.**") ¶ 12.3; *May 15, 2026 Closing Summary of Applicant's Submission* [Second Skinner Decl. Ex. 13] (the "**BVI AG Closing Submissions**") ¶ 37.

6.      The BVI Ex Parte App. were premised on allegations set forth in the EDNY Indictment and the EDNY Forfeiture Complaint, the imposition of foreign sanctions by U.S. and U.K. authorities, and news reports concerning actions in Singapore, Hong Kong, Taiwan, and Thailand. *See, e.g.*, BVI Orig. App. ¶¶ 4–23, 31. Many of those allegations were premised on secondhand reports and statements—hearsay that the BVI AG has not supported with evidence.[6]

7.      On January 9, 2026 the BVI Court held an *ex parte* hearing to consider the BVI Ex Parte App. *See generally Transcript of January 9, 2026 Chambers Proceedings* [Second Skinner

---

[6]     *See, e.g.*, BVI Orig. App. ¶¶ 7–21; BVI Ord. App. ¶¶ 6, 8, 11–13, 15–16; *see also Transcript of April 16, 2026 Open Court Proceedings* [Second Skinner Decl. Ex. 14] (the "**Apr. 16 BVI Hr'g Tr.**") at 10:13–16 (COUNSEL TO BVI AG: "[J]ust make it absolutely clear, for purposes of this hearing we are not seeking to, and we would not be in a position, to prove the allegations."); Apr. 17 BVI Hr'g Tr. at 47:24–48:5; BVI AG Closing Submissions ¶¶ 19–20 (arguing that evidence is not needed to appoint JPLs over companies that "may" have been involved in wrongdoing); *April 13, 2026 Skeleton Argument on Behalf of the Campbells Respondents* [Second Skinner Decl. Ex. 15] ¶¶ 11, 12.2, 15.3.3, 15.4, 27, 28.3 (debunking specific claims set forth in the Ex Parte Applications); BVI AG Closing Submissions ¶ 16 (BVI AG acknowledging errors in the initial affidavits supporting the BVI Ex Parte App.); Apr. 17 BVI Hr'g Tr. at 59:23–60:1 (THE [BVI] COURT: "[Y]es, I am very attuned to the fact, particularly now you've point out there is embellishment, at least, or a kind of fictitious illustration going on here on the fact of things.").

9

Decl. Ex. 16] (the "**Jan. 9 Ex Parte Hr'g Tr.**"). The BVI AG and the JPLs were present. *See id.* at 3:4–4:16 (noting appearances of counsel for the BVI AG and of Paul Pretlove); *Transcript of May 13, 2026 Videotaped Deposition of Paul Pretlove* [Second Skinner Decl. Ex. 17] (the "**Pretlove Dep. Tr.**") at 55:16–57:18. The BVI Court then issued thirty separate orders appointing the JPLs on a provisional basis to preserve the status quo pending a future full hearing. *See Order on Application for Joint Provisional Liquidators* [Second Skinner Decl. Ex. 18] (the "**BVI Appt. Orders**"). The BVI Appt. Orders were later extended, still on a provisional basis, in extension orders dated January 29, 2026. *See Order for the Continuation of the Order Appointing Joint Provisional Liquidators* [Second Skinner Decl. Ex. 19] (the "**BVI Extension Orders**" and, collectively, with the BVI Appt. Orders, the "**BVI Orders**").[7]

8.      The JPLs were provisionally appointed for the purpose of identifying and preserving assets in order to maintain the status quo. Pretlove Dep. Tr. at 221:23–222:2 (MR. PRETLOVE: "[T]he purpose of my appointment . . . is to identify, secure, and maintain assets of the liquidation status."); *see, e.g.*, BVI Appt. Orders at ¶ 2 (granting the JPLs the rights and powers of a liquidator "to the extent necessary to maintain the value of the assets owned by the Company"); ¶ 3(b) (authorizing the JPLs to "take such steps as may be necessary to protect . . . assets from removal or dissipation"). This is consistent with the role of provisional liquidators, as opposed to full liquidators. *See* Mokal Decl. ¶ 40.2 ("The powers conferred on the provisional liquidators by section 171(1) [of the BVI Insolvency Act] are limited to what is necessary to maintain the value of the assets owned or managed by the company or to carry out the functions for which the provisional liquidators were appointed.").

---

[7]    The BVI Court entered one BVI Appt. Order and one BVI Extension Order for each of the 25 Borrelli Debtors. The filings were identical other than the name of the company. As such, only one copy of each is exhibited to the Second Skinner Decl.

9.      Other powers granted in the BVI Orders confirm that their provisional relief is investigatory in nature and has nothing to do with insolvency or reorganization. *See, e.g.*, BVI Appt. Orders ¶ 3(a) (power to take possession of and preserve books and records); ¶ 3(i) (power to investigate, so far as necessary to protect and, if necessary, retrieve the assets and records of the Debtors); ¶ 3(n) (power to share information with the BVI AG); *see also* Mokal Decl. ¶ 64 (explaining that the powers set forth in the BVI Appt. Orders "confirm that the JPLs' appointment is interim, provisional, and conservatory" as "expressions of what the BVI Court has sanctioned: the investigation, securing, and preservation of the Debtors' assets pending the determination of the pending liquidation applications."). They also reveal the *investigatory* nature of the appointment by requiring the JPLs to implement a detailed protocol to "facilitate effective cooperation" with the BVI AG "in relation to potential and ongoing regulatory or criminal investigations and prosecution" and contemplate transmitting information to "law enforcement and regulatory authorities . . . in other jurisdictions." BVI Appt. Orders ¶¶ 3(n)–(o).

## C.      Mr. Borrelli is Appointed Director of the Borrelli Debtors

10.      Between February 23, 2026 and February 27, 2026, Mr. Borrelli was appointed as the sole director of the Borrelli Debtors. *See Affidavit of Cosimo Borrelli* [Second Skinner Decl. Ex. 20] (the "**BVI Borrelli Aff.**") ¶ 14. For the debtors controlled by Mr. Chen, who was in detained in China at the time, the appointments were made by attorneys-in-fact whom Mr. Chen had granted full powers of attorney prior to his detention. *Id.* ¶¶ 12–14. In his capacity as Director, Mr. Borrelli has opposed the liquidation applications brought by the BVI AG. *Id.* ¶ 4. Mr. Borrelli's opposition to the BVI liquidation applications falls within the residual powers the BVI Court recognized as remaining with directors notwithstanding the BVI Orders. *Transcript of May 14,*

11

*2026 Open Court Proceedings* [Second Skinner Decl. Ex. 21] (the "**May 14 BVI Hr'g Tr.**") at 209:17–210:8.

> ### D.    The JPLs Make Ex Parte Submissions and Stonewall the Director

11.    Since their appointment, the JPLs have engaged in repeated *ex parte* contacts with the BVI Court. They have filed a report under seal that was not made available to the Borrelli Debtors despite multiple requests in both the BVI and the United States. *May 15, 2026 Letter from Walkers on behalf of the JPLs to the Registrar of the BVI Court* [Second Skinner Decl. Ex. 22] at 1 ¶ 2. Their counsel has also provided *ex parte* summaries to the BVI Court of these chapter 15 proceedings. *See Apr. 28, 2026 Letter from Walkers on behalf of the JPLs to the Registrar of the BVI Court* [Second Skinner Decl. Ex. 23] at ¶¶ 3–5 (disclosing that the JPLs had filed a sealed interim report with the BVI Court providing a "high-level summary" of matters arising from the April 22, 2026 hearing on the JPLs' requested 1519 relief). Campbells, in its capacity as counsel to the Borrelli Debtors, has been unable to review or verify the contents of these communications. *See Apr. 28, 2026 Letter from Campbells on behalf of the Borrelli Debtors to the Registrar of the BVI Court* [Second Skinner Decl. Ex. 24].

12.    The JPLs have similarly refused to provide notice or opportunity to object as to any proposed dealings with the Debtors' assets—notwithstanding that they are not yet generally authorized to sell assets as a matter of BVI law. For example, on March 11, 2026, Campbells wrote to Walkers to express concern that the JPLs were in advanced negotiations to sell an interest in Allied Cigar Fund L.P., but that no information had been provided to Mr. Borrelli concerning the proposed transaction. *Mar. 11, 2026 Letter from Campbells on behalf of Director to Walkers* [Second Skinner Decl. Ex. 25]. Walkers declined to engage. *See Mar. 17, 2026 Letter from Walkers on behalf of the JPLs to Campbells* [Second Skinner Decl. Ex. 26].

12

13.     The BVI AG, her counsel, and the JPLs have rejected attempts at compromise and cost-saving measures proposed by the Borrelli Debtors. On February 21, 2026, Campbells wrote to the BVI AG's legal counsel to propose a collaborative route forward in which the Director would provide any necessary information to the BVI AG and coordinate actions to preserve the value of the various companies and their assets. *See Feb. 21, 2026 Letter from Campbells on behalf of the Borrelli Debtors to O'Neal Webster* [Second Skinner Decl. Ex. 27] at 2; *see also Mar. 1, 2026 Notice of Opposition* [Second Skinner Decl. Ex. 28] (the "**Borrelli Debtors' Notices of Opposition**") ¶ 8. Mr. Borrelli explained that his mandate as independent director shared substantially the same objective as that of the JPLs: maintaining the status quo and preserving the assets of the companies pending resolution of the underlying issues. BVI Borrelli Aff. ¶ 21. The BVI AG rejected Mr. Borrelli's proposal. *See Feb. 27, 2026 Letter from O'Neal Webster on behalf of the BVI AG to Campbells* [Second Skinner Decl. Ex. 29].

14.     The JPLs have also refused to disclose information about the fees they and their counsel have accrued. *See Feb. 24, 2026 Letter from Campbells on behalf of the Borrelli Debtors to Interpath* [Second Skinner Decl. Ex. 30] (requesting the total professional fees charged); *Mar. 19, 2026 Letter from Walkers on behalf of the JPLs to Campbells* [Second Skinner Decl. Ex. 31] (declining to provide such information); *Transcript of May 14, 2026 Videotaped Deposition of Andrew Barrington Chissick* [Second Skinner Decl. Ex. 34] (the "**Chissick Dep. Tr.**") at 56:2–7 (acknowledging the Debtors have not seen Walkers' bills). Under the BVI Appt. Orders, the Borrelli Debtors are in principle responsible for paying the costs of the JPLs and their counsel (subject to BVI Court approval). *See* BVI Appt. Orders ¶ 8; Pretlove Dep. Tr. at 90:4–25. The JPLs' U.S. counsel has followed suit, asserting that the fees of both the JPLs and their U.S. counsel are privileged. *See Responses and Objections to Objecting Debtors' First Set of Requests for*

13

*Production* [Second Skinner Decl. Ex. 32] at 28–29, Request Nos. 23–24; Pretlove Dep. Tr. at 88:21–89:5; 109:9–110:7. That position leaves the Borrelli Debtors—and this Court—without visibility into the fees incurred by fiduciaries who claim authority to charge those expenses to Debtor assets.

### E.    The Borrelli Debtors Oppose the JPLs in the BVI

15.    On March 1, 2026, Campbells, on behalf of each of the 25 Borrelli Debtors, filed in the BVI Court Notices of Opposition to the liquidation applications, *see* Borrelli Debtors' Notices of Opposition, along with applications to discharge the January 9 Appointment, *Mar. 1, 2026 Ordinary Application (Company) Per Rule 14* [Second Skinner Decl. Ex. 33] (the "**Borrelli Debtors' Discharge Applications**").[8] The Notices of Opposition and Applications to Discharge contend that the Ex Parte Applications disclose no proper basis for winding-up, are not grounded in insolvency or creditor protection, and constitute an abuse of process designed to leverage foreign criminal and regulatory proceedings. *See, e.g., id.* ¶¶ 1–2.

16.    At a hearing held on April 16 and 17, 2026 on the Borrelli Debtors' Notices of Opposition and the Borrelli Debtors' Discharge Applications, the BVI Court echoed many of the concerns raised in the Borrelli Debtors' submissions—beginning with the questionable premises and nonexistent evidence filed in support of the BVI Ex Parte Applications. Apr. 16 BVI Hr'g Tr. at 35:2–12; 38:9–16. The Court went on to express skepticism that the BVI AG's view of the Debtors as the "worst of the worst" could somehow overcome these evidentiary failings to justify the extraordinary relief sought:

> What we have here is just sort of a press release and so almost journalistic quality statements that this is what happened, but we are not shown any of the underlying

---

[8]    The Borrelli Debtors filed one Notice of Opposition and one Discharge Application for each of the 25 Borrelli Debtors. Because the filings were identical in substance, only one copy of each is exhibited to the Second Skinner Decl.

material . . . . [W]e are a court of law. We have to be careful because we are dealing with fundamental rights. . . . You basically can't make bricks without straw. Well, I am not seeing any straw here.

*See* Apr. 17 BVI Hr'g Tr. at 57:17–20; 58:20–22; 58:25–2.

17.    The BVI AG argued in response that the Court should not be troubled by the dearth of evidence because the companies were not being "killed off"; no actual liquidation activities were taking place or were bound to take place. *See, e.g.*, Apr. 16 BVI Hr'g Tr. at 109:18–110:7; 111:5–112:10; Apr. 17 BVI Hr'g Tr. at 213:17–23. The provisional appointment, counsel stressed, was investigatory in nature; the JPLs were charged only with status quo preservation; and the companies could easily be restored to their pre-JPL appointment status if investigations came up empty. *See, e.g.*, *id.* The BVI Court's decision remains pending. *See* Apr. 17 BVI Hr'g Tr. at 218:11–20; 229:25–230:6.

**F.    The JPL's Seek Greater Powers in Chapter 15**

18.    The JPLs next retained Sullivan & Cromwell, LLP ("**S&C**") as U.S. counsel to the JPLs in order to seek chapter 15 relief. *See* VP ¶ 10; Pretlove Dep. Tr. at 10:6–16 (confirming that S&C represents the JPLs in the Ch. 15 Cases); Chissick Dep. Tr. at 54:10–22 (same). On March 31, 2026, the JPLs sent a wire transfer of $25,000 of Interpath's money to a client trust fund account at S&C. *March 31, 2026 Invoice for Advance Payment Retainer from Sullivan & Cromwell LLP to Paul Pretlove* [Second Skinner Decl. Ex. 35] (the "**S&C Invoice**"); Pretlove Dep. Tr. at 10:23–11:3. The JPLs contend that, although the $25,000 came from Interpath and was sent to the JPLs' client trust account with a law firm that does not represent the Debtors, that transfer created an undocumented U.S. property interest for 30 different Debtor companies. VP ¶¶ 16–17. On that basis for debtor eligibility, the JPLs on April 8, 2026 commenced these Ch. 15 Cases seeking recognition of the BVI Proceedings as foreign main proceedings.

15

19.     After commencement of the chapter 15 proceedings, there was a marked shift in how the JPLs described the BVI Proceedings. For the first time in the Verified Petition and supporting Chissick Declaration, the JPLs characterize the BVI Proceedings as insolvency proceedings commenced "for the purposes of liquidation," notwithstanding that BVI AG declined to move on those grounds. *Compare* Verified Petition ¶¶ 10, 20, 22, 32 (suggesting purpose of BVI Proceedings were for insolvency and liquidation), *with* BVI Orig. App. ¶ 39 *and* BVI Ord. App. ¶ 30(c) (identifying purpose of appointment to the exclusion of insolvency or liquidation).

20.     Along with their Verified Petition, the JPLs filed an *Emergency Motion for Entry of Orders Granting (I) Ex Parte Relief and (II) Provisional Relief, Pursuant to Section 1519 of the Bankruptcy Code* [ECF No. 7][9] (as re-filed at ECF 27, the "**1519 Motion**" or "**1519 Mot.**"). The Motion sought sweeping emergency relief, seemingly on an *ex parte* basis, based on alleged authority set forth in the BVI Orders. 1519 Mot. ¶¶ 14–17; Chissick Decl. ¶¶ 23–25. That relief included an ask for unmonitored authority to realize (i.e., sell) the Debtors' assets, on the grounds that the JPLs had already been granted "broad authority . . . to . . . realize assets" by the BVI Court. Chissick Decl. ¶ 23; *see also* 1519 Mot. ¶ 16. Those foreign law grounds were set forth in a foreign law expert declaration, submitted by Mr. Chissick of Walkers law firm in the BVI, the JPLs' BVI counsel in the BVI Proceedings.

21.     As Mr. Mokal explains, the JPLs have not, in fact, been granted "broad authority . . . to sell assets." Mokal Decl. ¶ 60 (explaining that the BVI Appt. Orders "d[o] not authorise the kind of open-ended, plenary realisation . . . which is the paradigm power of a (full) liquidator following a winding-up order."). They do not permit disposition or realization of assets,

---

[9]   The JPLs twice withdrew their pending section 1519 motion in favor of corrected versions. *See* [ECF Nos. 8, 9, 26, 27]. Citations to the Motion are to the corrected version.

16

much less a liquidation of the company, without explicit authorization of the BVI courts. BVI Appt. Orders at ¶ 10 (prohibiting sale of assets, distribution to stakeholders, and other realizations of value "without sanction of the [BVI] court"); *see also* Pretlove Dep. Tr. at 130:16–23; 219:19–220:5 (MR. PRETLOVE: "If I were to sell the shareholding in [the Allied Cigar Group] business, I would fully expect to go to the BVI court and get sanctions for a sale of that asset."). Mr. Chissick later clarified that what he meant by the word "authorized" was that the JPLs *could* exercise sale powers *if* they went back to the BVI Court and obtained a further order saying as much. Chissick Dep. Tr. at 106:2–6 (Q: "[W]hen you say broad authority, you include authority that requires further sanction?" MR. CHISSICK: "That's correct.").

22.    Mr. Chissick pointed, as one basis for this "broad authority . . . to realize assets," to paragraph 10 of the BVI Appt. Orders, which states in its entirety: "Save as provided in paragraph 3 above the [JPLs] may not exercise any of the powers set out at Schedule 2 to the Insolvency Act, 2003 without sanction of the Court." BVI Appt. Orders ¶ 10; Chissick Dep. Tr. 98:13–16. Pressed with how this prohibition could be conveyed to this Court as a source of broad authority, Mr. Chissick had the following explanation:

> Q: You mentioned 10 as another source in part of authority to realize assets. Explain that to me. [Paragraph] 10 reads to me like a limitation, like a prohibition, but I'm not a BVI lawyer. So explain to me how [paragraph] 10 grants some kind of authority.
>
> A: Well, in paragraph 10, in itself, recognizes that such powers vest with the JPLs.
>
> . . . .
>
> Q. So by saying they may not exercise those powers, what it's really saying is they have them?
>
> A. Correct.

Chissick Dep. Tr. at 100:7–101:9.

17

23.    On April 16, 2026, the Borrelli Debtors filed their *Objection to Motion for Provisional Relief Pursuant to* Section *1519 of the Bankruptcy Code* [ECF No. 17] (the "**1519 Objection**" or "**1519 Obj.**") challenging, among other things, the JPLs' request for asset-sale authority. 1519 Obj. ¶¶ 18–21. The JPLs promptly withdrew their request for asset-sale powers. *See Reply in Support of Corrected Emergency Motion for Entry of Orders Granting (i) Ex Parte Relief and (ii) Provisional Relief, Pursuant to Section 1519 of the Bankruptcy Code* [ECF No. 30] (the "**1519 Reply**") ¶ 8; *id.* Ex. B (Redline of Revised Provisional Relief Order Against Original Provisional Relief Order) at 5 (striking "and realization" from paragraph 11 of the proposed order).

24.    On April 22, 2026, the Court held a hearing on the Motion and 1519 Objection. At the outset, the Court noted that the question of the Director's ability to direct the Borrelli Debtors in these proceedings—raised by the JPLs in the 1519 Reply—was a question of BVI law best decided by the BVI Court, and the issue was accordingly deferred. *Id.* at 8:4–5; 8:20–21.

25.    In the introductory remarks that followed, the JPLs conveyed that they were considering a chapter 11 filing for the Debtors—an action that far exceeds the "ring-holding" mandate imposed by the BVI Appt. Orders and intended by the BVI AG and risks imposing significant costs. *See April 22, 2026 Hybrid Status Conference* [ECF No. 43] (the "**1519 Hr'g Tr.**") at 18:22–19:1 (MR. DIETDERICH: "[I]t may be possible that the right answer here is a Chapter 11 case . . . ."). Needless-to-say, the JPLs have not sought that authority from the BVI Court.

26.    On April 23 and April 30, 2026, respectively, this Court issued its *Memorandum Opinion Granting Provisional Relief* [ECF No. 38] (the "**1519 Opinion**") and its *Order Granting Provisional Relief* [ECF No. 44] (the "**1519 Order**") imposing, among other things, the section 362 stay with respect to each of the Debtors and their respective U.S.-located property. *Id.* at 4 ¶ 12.

18

G.    **Hong Kong Court Restrains Substantially All of the Debtors' Assets**

27.    On May 4, 2026, the Hong Kong High Court granted a restraint order freezing approximately HK$8.94 billion in assets alleged to be linked to Prince Group founder Mr. Chen and three associates, following an application by the Department of Justice (DOJ) under the Organised and Serious Crimes Ordinance against those four individuals and 38 companies (including 15 of the Debtors). *See generally Restraint Order Prohibiting Disposal of Assets in Hong Kong and Elsewhere* [Second Skinner Decl. Ex. 36] (the "HK Restraining Order"). The case, HCMP661/2026, is currently active, with a follow-up hearing scheduled for August 3, 2026, to review the status of the frozen assets and the ongoing investigation. It appears the vast majority of the Borrelli Debtors' assets, including the Allied Cigar companies, are now subject to the Hong Kong courts and are covered by the restraining order. *See id.*

H.    **The BVI Court Rules that the Director may Direct the Companies to Oppose the JPLs in the BVI but not in these Ch. 15 Cases**

28.    On May 14, 2026, the BVI Court heard arguments on whether the BVI Orders barred the Borrelli Debtors from objecting to the Ch. 15 Cases. The BVI Court concluded that the BVI Orders limited the Borrelli Debtors to certain "residual powers" that did not include challenging the Ch. 15 Cases. May 14 BVI Hr'g Tr. 210:9–21.

**OBJECTION**

I.    **Mr. Borrelli Has Standing to Object in his Capacity as a Director**

29.    Bankruptcy Rule 1012(a) provides that a "debtor or a party in interest may contest a Chapter 15 petition for recognition of a foreign proceeding." A party in interest in a U.S. bankruptcy proceeding generally is one whose rights, duties, or equitable interests may be directly affected by the bankruptcy proceeding or the relief sought in it. *See Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 277–78 (2024); *In re Ascentra Holdings, Inc.*, 657 B.R. 339, 353

19

(Bankr. S.D.N.Y. 2023). In chapter 15, where section 1522 mandates protection of "other interested entities," 11 U.S.C. § 1522(a), the standard may encompass those indirectly affected—especially if those parties have interests "not otherwise being protected by the entities that maintain the direct right" to participate. *In re Zhejiang Topoint Photovoltaic Co., Ltd.*, 2015 WL 2260647, at *3–6 (Bankr. D.N.J. May 12, 2015) (creditor of creditor had standing to object in chapter 15 where "its interests [were] not already being adequately represented" by other parties). The standing requirement is construed generously, "on a case by case basis" recognizing this Court's "'broad latitude to mold relief to meet [the] specific circumstances' of 'the persons potentially affected by [requested] relief.'" *Id.* (quoting *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985)).

30. Mr. Borrelli easily meets that generous standard. As director of each of the Borrelli Debtors, he has authority to run the companies, but that authority is subject to the BVI Orders. The relief sought here by the JPLs in these ch. 15 cases will further impair Mr. Borrelli's authority to do his job. It is in that capacity that Mr. Borrelli objects here.

31. The BVI ruling acknowledged this distinction when it recognized that the Debtors' remaining directors may appear here if they have "some other kind of interest," "but they can't do it on behalf of and in the name of the [Debtors]." May 14 BVI Hr'g Tr. at 208:16–18. In reaching that ruling, the BVI Court relied on the JPLs' counsel's representations that the JPLs did not oppose objections in the United States brought by the Director in his capacity as a director. *Id*. at 207:10–15 ("[A]s [counsel to the JPLs] has pointed out, the JPLs have got no problem with the directors as individuals or some other kind of interest . . . going after the U.S. [c]ourt and explaining why the recognition should not be granted."); *see also May 12, 2026 Skeleton Argument on Behalf of the JPLs* [Second Skinner Decl. Ex. 37] ¶ 19 ("The JPLs . . . do not oppose . . . the directors appearing and objecting to the petition to the extent permissible under US law. What the JPLs

20

oppose is the opposition purporting to come from the [Borrelli Debtors] themselves."). The Court

should consider Mr. Borrelli's objections on the merits, and in all events, this Court must

independently determine whether the JPLs have established the requirements for recognition. *See*

*In re Serviços de Petróleo Constellation S.A.,* 600 B.R. 237, 246 (Bankr. S.D.N.Y. 2019)

(explaining that the court is "require[d] . . . to analyze whether a proceeding should

be . . . recognized at all, regardless of whether objections have been raised.").

**II.    The JPLs Have Failed to Establish Debtor Eligibility Under § 109(a)**

32.    Section 109(a) provides that, "[n]otwithstanding any other provision of this section,

only a person that resides or has a domicile, a place of business, or property in the United States,

or a municipality, may be a debtor under this title." 11 U.S.C. § 109(a). Section 109(a) applies in

chapter 15 and imposes a mandatory precondition to recognition. *See In re Barnet*, 737 F.3d 238,

247 (2d Cir. 2013); s*ee also In re Silicon Valley Bank (Cayman Islands Branch)*, 658 B.R. 75, 87

(Bankr. S.D.N.Y. 2024) (describing § 109(a) eligibility as a "gating issue" to chapter 15 relief).

33.    The JPLs fail their 109(a) burden. They contend that each of the Debtors satisfied

the section 109(a) eligibility requirement through a "ratable interest in an advance payment retainer

of $25,000" (the "**S&C Retainer**"). VP ¶ 16. But as Mr. Pretlove admitted, not a single dollar of

the S&C Retainer came from any of the Debtors; the entire amount was funded by Interpath, the

JPLs' firm, and is now held by S&C, in its capacity as counsel *to the JPLs*. Pretlove Dep. Tr. at

99:15–102:3 (testifying that S&C's invoice was paid by wire transfer from an Interpath bank

account, with Interpath's own funds, and not with any property of the Debtors). As Mr. Pretlove

admitted, the $25,000 was neither a loan nor gift to the Debtors, but rather payment by Interpath

of a liquidation expense. *Id.* at 101:16–102:20; 111:23–112:22; 172:9–173:18. That gives Interpath

a tentative claim *against the Debtors*; but it does not create property *of the Debtors*. *See In re Head*,

223 B.R. 648, 652 (Bankr. W.D.N.Y. 1998) (rejecting asserted U.S. property interest that was "too

tenuous, too inchoate, and too contrived" and was not a claim of actual ownership). The JPLs also have failed to show how each Debtor came to hold a "ratable interest" in some portion of those funds, given that they are held in a single lump sum and there are no documents memorializing division thereof. Pretlove Dep. Tr. at 112:23–113:4 (funds held in a single account); 173:19–174:10 (identifying no documentation that governed the debtors' interests in that account).

34.    Moreover, regardless of whose property went into that account, it belongs to S&C now.[10] That's because S&C is holding an "advance payment retainer" rather than a security retainer. VP ¶ 16; *see also* S&C Invoice. While a security retainer remains client property until counsel earns the fees, an advance-payment retainer belongs to counsel upon transfer, unless the parties expressly agree that such funds will be held in trust or escrow. *See In re King*, 392 B.R. 62, 70–71 (Bankr. S.D.N.Y. 2008); *In re D.L.I.C., Inc.*, 120 B.R. 348, 350–51 (Bankr. S.D.N.Y. 1990). Mr. Pretlove testified that there is no such agreement. Pretlove Dep. Tr. 91:5–9; 104:20–105:9; 113:18–114:16.

35.    What is more, the JPLs could not have funded the S&C Retainer with Debtor property even if they wanted to. Mr. Pretlove testified that the JPLs have not yet accessed Debtor cash from which to pay themselves. Pretlove Dep. Tr. 172:12–173:18. Sanctions and OFAC prevented the JPLs from moving debtor property into the U.S. should they come to possess some. Pretlove Dep. Tr. 152:15–21 (testifying that, because of sanctions and the inability of the entities to move funds in U.S.-denominated accounts, in the United States, or from the United Kingdom, the entities were "pretty hamstrung"); 31 C.F.R. § 590.201.

---

[10] Funds in an S&C client trust account could also not belong to the Debtors, because they are not S&C's clients. *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 411–12 (Bankr. S.D.N.Y. 2014) (determining § 109(a) eligibility by applying New York ownership and agency principles to decide whether funds titled in another entity's name were actually debtor property). S&C represents the JPLs as foreign representatives; it does not represent any of the Debtors. *See* Verified Petition at 1 (identifying S&C as "Counsel to the Authorized Foreign Representatives").

36.     Finally, this defect cannot be cured, because eligibility under § 109(a) is measured as of the petition date. *In re Siu-Fung Ceramics Holdings Ltd.*, 2026 WL 382424, at *23 (Bankr. S.D. Tex. Feb. 10, 2026) ("[W]ith respect to using an undrawn retainer to satisfy section 109(a), the foreign representative must deposit that retainer with counsel into a [U.S.] bank account *before the petition for recognition is filed*.") (emphasis added); *see also In re Glob. Ocean Carriers Ltd.*, 251 *B.R. 31, 37 (Bankr. D. Del. 2000*) ("Debtors must have property in the United States at the time they actually file their bankruptcy petition."). Accordingly, this proceeding must be dismissed, and if the JPLs ever assert some new basis for U.S. property of the Debtors, they will need to file new chapter 15 petitions.

### III.    The JPLs fail to meet their debtor-by-debtor evidentiary burden

37.     The JPLs bear the burden of establishing each element of sections 109(a), 1502, and 1517 for each of the thirty Debtors. *See* 11 U.S.C. § 1517; H.R. Rep. No. 109-31, pt. 1, at 112 (2005) ("The ultimate burden as to each element [of 1517] is on the foreign representative"); *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 279 (Bankr. S.D.N.Y. 2019) (citing same).

38.     The Verified Petition does not do that. Instead, it relies on generalized allegations about the "Prince Group" and the "Debtors" collectively, repeatedly refers to a single "Debtors' COMI," and offers no entity-specific evidence about any particular Debtor's creditors, creditor expectations, financial distress, or foreign proceeding.[11] And discovery confirmed that the JPLs could not satisfy this burden: when asked about two claimants who had allegedly come forward,

---

[11]   Nor does the section 1516(c) COMI presumption cure that failure. *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 335 (S.D.N.Y. 2008) ("[S]ection 1516(c) creates no more than a rebuttable evidentiary presumption, which may be rebutted notwithstanding a lack of party opposition. . . . [It] at no time relieves a petitioner of its burden of proof/risk of non-persuasion."); *see* Fed. R. Evid. 301 (providing that a presumption shifts the burden of producing evidence to rebut the presumption, but does not shift the burden of persuasion).

26-10766-mg Doc 687-1 Filed 05/29/25 Entered 05/29/25 12:08:34 Main Document
Transcript of the Remote Deposition of Cosimo Borrelli Pg 220 of 237
Page 29 of 41 Pg 220 of 237

Mr. Pretlove could not identify which Debtor the claims were asserted against, recalling only that the claims were "quite general against the 30." Pretlove Dep. Tr. 233:19–234:4. This is insufficient to establish grounds for recognition of a "foreign main proceeding." *See In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 279 (Bankr. S.D.N.Y. 2019) (no 'group COMI'); *In re InterCement Brasil S.A.*, 668 B.R. 802, 821–27 (Bankr. S.D.N.Y. 2025) (same).

**IV. The BVI Proceedings are not "foreign proceedings"**

39. To qualify for recognition, the BVI Proceedings must be a "foreign proceeding." 11 U.S.C. § 1515(a). The Bankruptcy Code defines "foreign proceeding" as:

> a **collective** judicial or administrative proceeding in a foreign country, including an interim proceeding, **under a law relating to insolvency or adjustment of debt** in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, **for the purpose of reorganization or liquidation**.

11 U.S.C. § 101(23) (emphasis added).

40. Courts have read this definition to mean that a "foreign proceeding" must meet seven elements: "(i) [the existence of] a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation." *Cf. In re Ashapura Minechem Ltd.*, 480 B.R. 129, 135–36 (S.D.N.Y. 2012); *see also In re ENNIA Caribe Holding N.V.*, 594 B.R. 631, 638 (Bankr. S.D.N.Y. 2018). The BVI Proceedings fail at least three of these threshold requirements: they are not "for the purpose of reorganization or liquidation;" they are not being conducted "under a law relating to insolvency or adjustment of debt;" and they are not "collective." *Id.*

41. First, recognition must be denied because the BVI Proceedings are not "for the purpose of reorganization or liquidation" as required by Section 101(23). The UNCITRAL Guide

24

to Enactment of the Model Law[12] warns that proceedings are ineligible where they are not for that stated purpose, including proceedings designed only to prevent dissipation or waste, or where the foreign representative's powers are limited to preserving assets. UNCITRAL Guide ¶ 77. *Global Cord* denied recognition on that basis; the Cayman JPLs had no powers of reorganization or winding-up, but only powers to preserve assets and investigate suspected misconduct. *In re Global Cord Blood Corp.*, 2022 WL 17478530, at *10–13 (Bankr. S.D.N.Y. Dec. 5, 2022).

42.    So too here. The JPLs were appointed to aid the BVI AG's investigative undertakings and to further her efforts to cooperate with foreign law enforcement and sanctions authorities—not to reorganize the Debtors or liquidate assets for creditors. *See* BVI Orig. App. ¶¶ 31, 39; BVI Ord. App. ¶ 30(b)–(c); Apr. 14, 2026 BVI AG Skel. ¶ 12.3.

43.    Mr. Pretlove testified that, at this provisional stage, any creditor distribution would only occur "in the future, should we get to that stage." Pretlove Dep. Tr. 31:23–32:8. The BVI Court understood the proponents' own position the same way: although the BVI AG argued that appointing a liquidator did not "basically kill the company" because liquidation could be terminated, the Court observed that "what they want to use the liquidation for, having appointed the liquidator, is to investigate," and questioned whether that amounted to "using liquidation orders for . . . an investigative tool." Apr. 17 BVI Hr'g Tr. 172:10–173:10.

44.    The BVI AG's Closing Submissions confirm that purpose has not changed: appointment of liquidators does not necessarily entail winding up; the present focus is investigation and asset protection; and later distribution should not be assumed. BVI AG Closing Submissions ¶¶ 6.1–6.4, 17. These concessions mirror the defects identified in *Global Cord*: a proceeding that

---

[12] *See* UNCITRAL *Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation*, 42 (Jan. 2014) (available at https://digitallibrary.un.org/record/1487896/files/1997-model-law-insol-2013-guide-enactment-e.pdf).

may someday evolve into a liquidation is not, today, "for the purpose of reorganization or liquidation." *See Global Cord Blood*, 2022 WL 17478530, at *1, *10–12 (denying recognition where provisional Cayman proceeding aimed at fraud investigation was "most akin to a corporate governance and fraud remediation effort" rather than an insolvency proceeding); *see also In re British Am. Ins. Co. Ltd.*, 425 B.R. 884, 906 (Bankr. S.D. Fla. 2010) (foreign proceeding did not qualify for recognition where the foreign court "had ordered neither a winding up nor a reorganization of [the debtor]").

45.    Finally, the JPLs' limited powers confirm the same point. The operative provisions of the BVI Orders authorize preservation and investigation, not realization or distribution; the JPLs cannot sell assets, distribute value, or otherwise carry out the ordinary incidents of liquidation without further BVI Court sanction. *See* BVI Appt. Orders ¶ 10; Pretlove Dep. Tr. at 130:16–23; 219:19–220:5. A provisional proceeding designed to preserve assets while allegations are investigated is not transformed into a chapter 15-eligible liquidation merely because a later liquidation might someday occur.[13]

46.    Second, the BVI Proceedings also fail because they are not being conducted "under a law relating to insolvency or adjustment of debt." 11 U.S.C. § 101(23). The point is not the title of the BVI statute or the label "liquidator," but the authority invoked and the function the proceedings presently serve. Here, the BVI AG did not seek appointment on insolvency grounds, evident from the absence of reliance on BVI Insolvency Act § 8 which is mandatory when seeking the appointment of liquidators on insolvent grounds. *See* BVI Insolvency Act § 8. She proceeded

---

[13]    The provisional liquidations cited by the JPLs are inapposite: each involved either a comprehensive debt restructuring or a winding-up proceeding driven by financial distress. *See In re Olinda Star Ltd.*, 614 B.R. 28, 34 (Bankr. S.D.N.Y. 2020); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 689–90 (Bankr. S.D.N.Y. 2017); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 406 (Bankr. S.D.N.Y. 2014); *In re Fleming Int'l Reinsurance Ltd.*, No. 25-12353 (JPM) [ECF No. 2 at 3] (Bankr. S.D.N.Y. Oct. 26, 2025); *In re Northeast Ins. Co. Ltd.*, No. 25-12275 (MEW) [ECF No. 2 at 2] (Bankr. S.D.N.Y. Oct. 15, 2025).

only on public-interest and just-and-equitable grounds, and the record contains no allegation, finding, or inquiry that any Debtor is insolvent or in financial distress. *See* BVI Insolvency Act § 162(1)(a)–(c); Apr. 14, 2026 BVI AG Skel. at ¶ 10.3; Pretlove Dep. Tr. 28:22–30:15.

47.     That distinction matters because chapter 15 is directed to foreign insolvency and debt-adjustment proceedings—not public-interest investigations. The legislative history adding the words "or adjustment of debt" states clearly that two types of debtors are captured here: those that are "technically insolvent," and those who are "in severe financial distress." H.R. Rep. No. 109-31, pt. 1, at 118 (2005). The Debtors are neither. The BVI AG's counsel confirmed that the *prima facie* insolvency standard applicable to an ordinary insolvency liquidation is "completely different" from the public-interest inquiry. Apr. 17 BVI Hr'g Tr. 210:8–20.

48.     Were there any doubt, the BVI AG's own Closing Submissions confirm that no insolvency or debt-adjustment process is underway. They state that appointment of liquidators does not necessarily entail winding up, that any later distribution process should not be assumed, and that the current focus is investigation and asset protection. BVI AG Closing Submissions ¶¶ 6.1–6.4, 17. A proceeding that does not presently identify creditors, adjust debts, adjudicate claims, or distribute estate value is not being conducted under a law relating to insolvency or adjustment of debt within the meaning of section 101(23).

49.     Third, the BVI Proceedings do not satisfy the requirement that a qualifying foreign proceeding must be "collective." 11 U.S.C. § 101(23). That requirement asks whether the proceeding is directed to the creditor body as a whole, not merely whether a fiduciary has been appointed to investigate, preserve, or control assets. *See In re Ashapura Minechem Ltd.*, 480 B.R. at 136, 140 (a collective proceeding considers "the rights and obligations of all creditors" and is instituted for the "general benefit of the creditors"); *Global Cord Blood*, 2022 WL 17478530, at

*7–9 (denying recognition where the proceeding did not involve a process to identify creditors, classify debts, or distribute assets).

50.    For the reasons already discussed, the BVI Proceedings are directed to investigation, preservation, and public-interest oversight—not the adjustment of creditor claims or distribution of estate value. No claim-submission process, claim-adjudication process, distribution process, or restructuring process is underway. Pretlove Dep. Tr. 31:14–33:7 (testifying that no creditor distribution process is underway, no asset realizations have been made, no distribution mechanism has been proposed, and the JPLs have not moved to "anything like the distribution stage"). At most, the JPLs posit that a collective liquidation process might *someday* emerge. But *Global Cord* rejected recognition on materially similar facts: a proceeding that may later become collective is not presently a collective proceeding within the meaning of § 101(23). 2022 WL 17478530, at *7–9.

51.    In sum, recognition should be denied because the BVI Proceedings are not for the purpose of reorganization or liquidation, are not being conducted under a law relating to insolvency or adjustment of debt, and are not collective—each of which is an independent basis for denial.

## V.    The Court should Deny Recognition on Public Policy Grounds

52.    Section 1506 of the Bankruptcy Code provides that "[n]othing in [chapter 15] prevents the court from refusing to take an action governed by [chapter 15] if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. This includes recognition itself under section 1517, relief under section 1520 otherwise granted automatically at recognition, and any discretionary relief under section 1521 and section 1507. *See id.* (referencing "an action" under chapter 15); *see also* 11 U.S.C. § 1517 (subjecting otherwise mandatory recognition to § 1506); *In re ARD Fin., S.A.*, No. --- B.R. ----, 2026 WL 817458, at *17 (Bankr. S.D.N.Y. Mar. 25, 2026) (Glenn, J.) ("[A]ny relief that is appropriate under sections 1507, 1517,

28

1520, or 1521" must be denied if it "run[s] afoul of section 1506."); *see also In re Gold & Honey, Ltd.*, 410 B.R. 357, 371 (Bankr. E.D.N.Y. 2009) ("A petition for recognition should be denied if recognition would be manifestly contrary to the public policy of the United States.").

53.     Section 1506 is implicated by procedural unfairness in a foreign proceeding. *See, e.g., In re Fairfield Sentry Ltd.*, 2011 WL 4357421, at *8 (S.D.N.Y. Sept. 16, 2011), *aff'd*, 714 F.3d 127 (2d Cir. 2013); *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) ("The key determination required . . . is whether the procedures used in [the foreign proceeding] meet our fundamental standards of fairness."). *See also Collins v. Oilsands Quest, Inc.*, 484 B.R. 593, 597 (S.D.N.Y. 2012) (interpreting section 1506 to require that a foreign judgment be accorded comity only if "its proceedings are 'fair and impartial'" (citation omitted)).

54.     The JPLs' appointment was the result of an *ex parte* hearing before the BVI Court of which neither the Director nor the Borrelli Debtors received notice. *See generally* Jan. 9 Ex Parte Hr'g Tr. The JPLs have since admitted to regularly engaging in *ex parte* communications with the BVI Court, government agencies, and private stakeholders. *See* 1519 Hr'g Tr. at 25:4–16. This includes submitting multiple sealed reports to the BVI Court that the Director has been unable to review, even on an attorneys'-eyes-only basis. In this way, the BVI Proceedings, as they operate on these particular facts, "lack[] certain common elements of American practice." *In re ARD Fin., S.A.*, 2026 WL 817458, at *17. As such, recognition of the BVI Proceedings, as well as any automatic or discretionary relief under sections 1520 and 1521, would be contrary to the public policy of the United States within the meaning of section 1506.

55.     The Director does not contend that BVI laws are procedurally unfair as a general matter. Rather, the JPLs have operated in a way that violates U.S. policy considerations safeguarding legal due process and the right to be heard. As such, recognition of the BVI

29

Proceedings, as well as any automatic or discretionary relief under sections 1520 and 1521, would be manifestly contrary to the public policy of the United States within the meaning of section 1506.

## VI.    Even if the Court Grants Recognition, it should Deny all Discretionary Relief

56.    Subject to section 1506, the limited relief set forth in section 1520 is granted automatically at recognition. 11 U.S.C. §§ 1520 & 1506. That limited relief would, in sum, impose the automatic stay (subject to territorial limitations) and authorize the JPLs to conduct business in the U.S. on an ordinary course basis. § 1520(a)(1)–(3).

57.    The JPLs, however, request powers that go far beyond this automatic relief. Specifically, they ask this Court to grant the following discretionary relief under 1521(a):[14]

- entrust each of the JPLs with the administration or realization of all of the Debtors' property within the territorial jurisdiction of the United States pursuant to § 1521(a)(5);

- grant comity and full force and effect to all orders entered by the BVI Court prior to entry of the Recognition Order;

- authorize and empower the JPLs to take all actions necessary to implement the relief granted in the Proposed Recognition Order; and

- waive the 14-day stay of the Proposed Recognition Order once it is entered.

VP Ex. B (Proposed Recognition Order) [ECF No. 2-2] ¶¶ 18, 19, 23, 25. To obtain this relief, the JPLs must satisfy three requirements: (i) the relief must be "necessary to effectuate the purpose of [chapter 15]"; (ii) the relief must be "necessary . . . to protect the assets of the debtor or the interests of the creditors"; and (iii) "the interests of the creditors and other interested entities, including the debtor," must be "sufficiently protected." 11 U.S.C. §§ 1521(a), 1522. The discretionary relief sought here fails these three requirements.

---

[14]    To the extent the JPLs seek this relief under section 1507 of the Bankruptcy Code, they are barred under section 1507(b) for the same reasons. *Compare* Verified Petition ¶¶ 42, 47–49, *with id.* Ex. B ¶ 18; *see generally* 11 U.S.C. § 1507(b) (setting forth five mandatory considerations threshold to relief under section 1507).

**A.** **Realization of Debtor Property Violates the Purpose and Scope of the BVI Orders and Risks Irreversible Damage to the Debtors**

58.     The JPLs should not be authorized to "realize" or sell assets because such relief would be contrary to the purpose and scope of their BVI law appointment. As summarized by Dr. Mokal: "[T]he BVI Court has sanctioned . . . the investigation, securing, and preservation of the Debtors' assets pending the determination of the pending liquidation applications. . . . [F]or the JPLs to seek or to represent that they have authority to seek any broader relief would be inconsistent with BVI law." Mokal Decl. ¶ 64.

59.     The power to sell assets here in the U.S. allows the JPLs to turn these provisional BVI Proceedings into irreversible proceedings—contrary to the BVI Court's views and the basis for the BVI law relief it has granted. It is especially problematic because the BVI Court has also been made to understand, in requests to extend the JPLs' provisional appointment, that nothing in the chapter 15 proceeding or in the BVI relief will render the provisional liquidation irreversible:

> THE BVI COURT: "[Y]esterday we had some submissions from, I think it may be Mr. Dennis [counsel to the BVI AG], and they were powerful submissions I have to say, whereby he says, and Sir James [counsel to the BVI AG] as well, I think, in which they said, ah, no, an order appointing a liquidator doesn't basically kill the company because it can be revived, and the liquidation can be brought to an end and it can be resumed. . . . [T]he response was basically, no, that is a wrong analogy because the company isn't actually dead and because it can be, liquidation can be terminated, and what they want to use the liquidation for, having appointed the liquidator, is investigate.

*See* April 17 BVI Hr'g Tr. at 172:14–173:3; *see also* April 16 BVI Hr'g Tr. at 8:13–17 (THE BVI COURT: "We all know that a provisional liquidation is reversible."). It would also run contrary to the JPLs' characterizations of these chapter 15 cases made to the BVI Court that authorized them. *See First Affidavit of James Kenneth Drury* [Second Skinner Decl. Ex. 38] (the "**May 4 Drury BVI Decl.**") ¶ 7 (characterizing chapter 15 "as a platform for obtaining information to enable [the JPLs] to discharge [their] functions[.]"); *id.* ¶ 50 (the chapter 15 proceedings are needed "to obtain

31

records, communications and transactional documentation held by U.S. financial institutions and other U.S. counterparties in order to trace and preserve the [Borrelli Debtors'] assets[.]"). Where the requested relief runs counter to the BVI Court's views, discretionary relief is contrary to the stated purposes of chapter 15 and thus cannot be granted under 1521(a). *See* 11 U.S.C. § 1501 (chapter 15 is "to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of . . . cooperation between—(A) courts of the United States . . . and (B) the courts . . . of foreign countries involved in cross-border insolvency cases . . . .").

60.    As such, the Director respectfully submits that this Court refrain from issuing any blanket authorizations for asset sales pending a decision from the BVI Court on whether the JPLs are obtaining those powers as full liquidators as a matter of BVI law. At a minimum, the Director submits that, to ensure adequate protection of the interests of the Debtors and their stakeholders (including the Director), any asset sales should be made subject to the limitations of section 363 of the Bankruptcy Code, as required by section 1520(a)(2).

**B.    The JPLs Have Been Wasteful with Debtor Assets**

61.    The Debtors' assets are already subject to sanctions and freezing orders in various jurisdictions. The JPLs' actions in the U.S. and other foreign jurisdictions have only served either to duplicate those existing actions, at enormous expense to the Debtors,[15] or to work at cross-purposes with them. At the 1519 hearing, the JPLs told this Court that their appointment mandate "includes a mandate to cooperate with law enforcement," and that "the [JPLs] believe that . . . is in their financial interest, in the financial interest of the [D]ebtors." *See* 1519 Hr'g Tr. at 18:1–5.

---

[15]    The Director notes that the Borrelli Debtors fully intend to contest any applications for fees in the BVI. In his capacity as Director, he reserves all rights related thereto.

32

It is not clear whether they are fulfilling that mandate or whether they are, instead, working at cross-purposes with law enforcement to serve their own interests.

62.     The recent Hong Kong freezing order proves one example. The 165 bank and securities accounts frozen presumably overlap with the bank accounts the JPLs were hoping to seize for their own use. *See generally* HK Restraining Order; *see also* 1519 Hr'g Tr. at 50:9–11 ("We intend to use the assistance of this Court to the full extent we can to pursue assets outside of the United States[.]"); *id*. at 16:5–9 ("The [JPLs] have located over $300 million of cash in banks. . . . The largest accounts are in Hong Kong."). It renders Hong Kong another jurisdiction—along with the United States and the U.K.—in which the JPLs represent an unnecessary, costly interest competing with governmental authorities for a share of the Debtors' cash.

63.     Rather than working with law enforcement to *preserve assets*, per their mandate, the JPLs have admitted that they have taken multiple steps to sell assets, *see* 1519 Mot. ¶ 11 ("The [JPLs] have been actively seeking licenses in relevant jurisdictions to provide authorization for transactions or dealings with blocked or frozen assets," and on March 18, 2026, the JPLs obtained a temporary license with respect to the Allied Cigar companies)—despite the fact that the BVI Orders do not authorize the JPLs to sell, otherwise realize, distribute, or administer assets at this time. *Compare* BVI Appt. Orders at 5 ¶ 10, *with* 1519 Hr'g Tr. at 47:7–48:5 (THE COURT: "What does the [OFAC] license permit you to do?" MR. DIETDERICH: "The license allows us to do everything that we could think of that we needed to do in very broad language.").

64.     Discovery in these proceedings has revealed further plans to expand their mandate globally. On May 4, 2026, the JPLs told the BVI Court that they were already "in the process of issuing applications for recognition in Hong Kong and in England & Wales." *See* May 4 Drury BVI Decl. ¶ 91. No notice has been given to the Director, the Borrelli Debtors, or this Court of

33

such additional proceedings. At Mr. Pretlove's deposition, S&C instructed their witness not to answer questions about what other law firms the JPLs have engaged in those foreign proceedings or even how much money, in the aggregate, they have spent in expanding their reach to other jurisdictions. Nor would S&C give this information on an attorneys' eye only basis, asserting that "this questioning [is] designed to circumvent the BVI court's orders and to try to interfere with the liquidation process around the world." Pretlove Dep. Tr. at 92:17–25.

65.     Because the JPLs seek discretionary relief that would facilitate further dissipation of company value, that relief should be denied under section 1522(a), 1521(a), and 1501. *See* 11 U.S.C. § 1501(a)(4) (a stated purpose of chapter 15's enumerated objective of "protection and maximization of the value of the debtor's assets[.]").

### C.     The Court should not grant the Other Requested Relief

66.     The JPLs ask this Court to enforce unspecified BVI Court orders without submitting those orders to this Court or briefing whether comity should be extended to each. VP Ex. B (Proposed Recognition Order) [ECF No. 2-2] ¶ 19. This includes requested full force and effect for orders entered after the objection deadline for recognition. *Id.* Such relief is not "narrowly tailored" so as to "balance[e] the interests of the foreign representative" with the interests of "those affected by the relief," and as such fails to pass muster under 1522(a). *In re Toft*, 453 B.R. 186, 196 n.11 (Bankr. S.D.N.Y. 2011); *see In re Atlas Shipping A/S*, 404 B.R. 726, 739 (Bankr. S.D.N.Y. 2009) (Glenn, J.) (same); *see also In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 626 (Bankr. S.D.N.Y. 2010) (same).

67.     The Court should also exercise caution in granting the JPLs broad relief under the guise of incidental powers, as in the request to authorize the JPLs "to take all actions necessary to implement the relief granted in [the Proposed Recognition Order]." Proposed Recognition Order,

VP Ex. B ¶ 23. The JPLs have already demonstrated a propensity for overreading broad authority into incidental powers and should not be trusted to self-police the limits of incidental authority. *Compare* Pretlove Dep. Tr. 73:5–23 (claiming incidental powers granted to the JPLs in paragraph 3(m) of the BVI Orders), *with* Mokal Decl. ¶ 63.3 ("[A]ct is not '*incidental*' if it contradicts, circumvents, or goes beyond the functions and powers to which it claims to be subsidiary. . . . [P]aragraph 3(m) . . . cannot be used to sidestep restrictions or requirements that the [BVI Appt. Orders] . . . impose[] elsewhere.").

68.    Finally, the requested waiver of the 14-day stay of effectiveness waives a key procedural protection enshrined in the Bankruptcy Rules. VP Ex. B (Proposed Recognition Order) [ECF No. 2-2]; *See Webb Mtn, LLC v. Exec. Realty P'ship, L.P. (In re Webb Mtn, LLC)*, 414 B.R. 308, 341 (Bankr. E.D. Tenn. 2009) (Rule 7062 stays offer litigants a means of ensuring "meaningful time" to file post-ruling motions, such as a motion for a stay of the entered order pending a further dispute). Waiving it is neither necessary nor warranted, especially given that the BVI Proceedings may soon be drawing to a close because the scant evidentiary record cannot support conversion of the JPLs' provisional appointment into full-blown liquidation:

> THE BVI COURT: "[W]hat would be very unusual would be to say, ah, we haven't got [evidence]; we've just got all this second-hand material, press releases, you know, . . . no primary materials, no examples of what actually happened . . . and so all we've got is lots of second-hand material. . . . And it might be all right on an ex parte application for the appointment of provisional liquidators, but, you know, normally when you come for provisional liquidators you expect something better."

Apr. 17 BVI Hr'g Tr. at 161:11–23.

## **CONCLUSION**

For the foregoing reasons, Mr. Borrelli respectfully requests that this Court deny the JPLs' Verified Petition and decline to recognize the BVI Proceedings or, alternatively, deny the discretionary relief requested by the JPLs.

35

Dated: May 29, 2026
New York, New York

Respectfully Submitted,

**BOIES SCHILLER FLEXNER LLP**

*/s/ Peter M. Skinner*
Matthew L. Schwartz
Peter M. Skinner
Gordon Z. Novod
55 Hudson Yards
New York, New York 10001
Telephone: (212) 303-3646
mlschwartz@bsfllp.com
pskinner@bsfllp.com
gnovod@bsfllp.com

Dan G. Boyle
2029 Century Park East
Los Angeles, California 90067
Telephone: (213) 995-5732
dboyle@bsfllp.com

Laura Femino (admitted *pro hac vice*)
401 E Las Olas Boulevard
Fort Lauderdale, Florida 33301
Telephone: (954) 377-0716
lfemino@bsfllp.com

*Counsel to Cosimo Borrelli in his*
*capacity as the sole director of each*
*of the Borrelli Debtors*



**Campbells Legal (BVI) Limited**
Floor 4, Banco Popular Building| PO Box 4467
Road Town, Tortola VG-1110| British Virgin Islands
klogan@campbellslegal.com
**t.** +1 345 949 2648 |
**campbellslegal.com**

**By Email**

Walkers
171 Main Street
PO Box 92
Road Town
Tortola, VG1110
British Virgin Islands

20 May 2026

Dear Colleagues

**Re: Khoon Group Limited (the "Company")**

1. We refer to your letter dated 24 April 2026 and the previous correspondence between Campbells, Walkers, Oon & Bazul and Interpath in relation to Khoon Group Limited (the "**Company**").

## A. Preliminary Observations on the Approach of the JPLs

2. Before turning to the substantive issues, the Company considers it necessary to record its objection to the manner in which this correspondence has been conducted by the JPLs and their advisers. The tone and content of the correspondence from Walkers has escalated markedly, from information requests to accusations of "*deliberate campaign of delay, obstruction and obfuscation*" and suggestions that the Company's correspondence is "*aggressive and contentious*". The Company categorically rejects those characterisations.

3. What is striking — and deeply troubling from the perspective of the Company — is that the difficulties presently facing the Company are, on any objective analysis, a direct and proximate consequence of Southern Heritage's majority shareholding and the sanctions and law enforcement actions directed at Mr Chen Zhi and the Prince Group of companies, of which Southern Heritage forms a part. The Company's own interim report acknowledges that the sanctions imposed on the Company were a direct consequence of its links to Mr Chen Zhi through Southern Heritage. It is the existence and nature of Southern Heritage's majority shareholding — and not any act or omission on the part of the Board — which has caused the Company's revenue to decline by approximately 60.2%, resulted in the freezing of bank accounts, led to the termination of customer contracts, and precipitated the departure of the Company's auditor.

4. In those circumstances, it is remarkable that the JPLs have not taken the obvious and most constructive step available to them: namely, exploring the appropriately licensed

#7505860v1



# CAMPBELLS

divestment of a portion of Southern Heritage's 55% shareholding in the Company so as to enable the Company to return to normal commercial life. Instead, the JPLs appear to be singularly focused on point-scoring, on seeking to assert control over the Company's Board and management, and on generating professional fees — all at the ultimate expense and to the detriment of the very estate they are appointed to protect and, by extension, of the Company's other stakeholders. The Company asks that the JPLs reflect on whether their present course is consistent with the duties they owe to that estate.

5.   In this regard, the Company notes with particular concern the JPLs' requests (in Oon & Bazul's letter of 24 February 2026) that the directors confirm they will not frustrate the exercise of Southern Heritage's shareholder rights to "make changes to the Board of Directors" and/or to "*place [the Company] into a liquidation process (whether by voluntary liquidation or otherwise)*". These demands, taken together with the general tenor of the correspondence, suggest that the JPLs' true objective is to take control of the Company rather than to safeguard the value of Southern Heritage's investment. The Board is duty-bound to act in the interests of the Company as a whole.

## B. Fiduciary Duties and the Statutory Inside Information Regime

6.   Your letter of 24 April suggests that the Company has relied on the statutory inside information disclosure regime as "*a mechanism by which the Board of Directors of a listed company may avoid engaging with its majority shareholder*". This is a fundamental mischaracterisation of the Company's position.

7.   As stated previously, the directors of the Company owe their fiduciary duties to the Company as a separate legal entity and are bound to act in the best interests of the Company as a whole, having regard to all of its shareholders and stakeholders, and not in the interests of any particular shareholder. This is a well-established principle of both Hong Kong and Cayman Islands law, reinforced by HKEX Listing Rule 3.08. Part XIVA of the SFO and the SFC's Guidelines on Disclosure of Inside Information require disclosure to the market as a whole and prohibit selective disclosure of non-public, price-sensitive information to any person, including a shareholder or its representatives.

8.   Your letter of 24 April does not engage with the substance of the Company's concern in relation to its obligations. The Company is not imputing any improper motive to the JPLs; it is simply stating the legal position that the Board cannot, and will not, selectively disclose non-public financial or commercial information — including management accounts, contract asset details, and business strategy — in advance of or outside a public announcement, as the advice they have received is that to do so would likely constitute a contravention of the SFO.

# CAMPBELLS

9. Your letter of 24 April asserts that "*there are a number of ways in which the Company may engage with its shareholders … in a manner which is consistent with its fiduciary duties and applicable disclosure regimes*" but conspicuously fails to identify what those ways are.  If the JPLs or their advisers are in fact able to identify a specific mechanism by which the Company may lawfully share non-public information with a single shareholder without contravening Part XIVA of the SFO, they are invited to do so. Until then, the JPLs' reliance on unspecified "*ways*" is hollow, and the Board will continue to comply with the law.

## C. Provision of Information and Documents

10. The Company has already provided the documents and information to which Southern Heritage is entitled as a shareholder. Specifically, in our letter of 26 March 2026, we enclosed a copy of the Company's Memorandum and Articles of Association, directed your attention to the publicly available list of substantial shareholders and public announcements and reports on HKEX, and confirmed that the Company does not have any mortgages or charges.

11. As previously stated, Article 174 of the Articles expressly provides that no shareholder (not being a director) has any right to inspect any account, book or document of the Company except as conferred by the Companies Act, ordered by a court of competent jurisdiction, or authorised by the Board. The Company has complied, and will continue to comply, with its statutory obligations in this regard.

12. The Company notes the suggestion in your letter of 24 April that its responses have been "wholly inadequate" and appear to have been "*copied and pasted from similar correspondence in respect of Geotech Holdings Ltd*". Any inadvertent cross-referencing in prior correspondence is wholly immaterial. The substance of the Company's legal position is in no way affected by any such drafting, and the attempt to discredit the Company's responses on this basis is unwarranted.

## D. The Company's Financial Position and the Interim Report

13. The Company does not accept that the Interim Report contains any "*material deficiencies and omissions*". The Interim Report provides a substantive update to the shareholder and discloses, in full and frank terms, the severe impact that the sanctions have had upon the Company's business, including the decline in revenue, the termination or novation of customer contracts, the suspension of banking services, the reduction in headcount, and the departure of the Company's former auditor, RSM. The Company has not sought to conceal any of these matters from shareholders.

**C∧MPBELLS**

14. As to the specific requests in the Walkers Letter (which can be provided/responded to without breaching the various obligations set out above):

(a) **Going concern**: The Interim Report sets out the Company's financial position in considerable detail. The Board continues to monitor the Company's ability to continue as a going concern and will make such further disclosures as are required by the Listing Rules and applicable accounting standards. The Company is not obliged to, or able to, provide a running commentary to an individual shareholder on its going concern assessment outside the ordinary reporting cycle.

(b) **Replacement auditor/ suspension**: Any issues in relation to the Company's auditor/securing a replacement are a direct consequence of the sanctions attributable to Southern Heritage's connection with Mr Chen Zhi. If the JPLs are genuinely concerned about the risk of a suspension of trading and potential delisting, they should direct their efforts towards facilitating the removal of those sanctions — for example, by pursuing a licensed divestment of Southern Heritage's majority shareholding, rather than writing letters demanding explanations from the Board.

(c) **Steps to address sanctions**: The Board has taken and will continue to take all steps within its power to mitigate the impact of the sanctions on the Company's operations, but a permanent resolution necessarily requires action on the part of those who caused the sanctions to be imposed — not by those who are their collateral victims.

(d) **Paragraph 2.6/ Revenue decline and operational matters**: The Company has publicly disclosed in the Interim Report that revenue has declined from approximately S$44.2 million to approximately S$17.6 million, and that seven further projects were novated after 31 December 2025, reducing the Company's projects on hand to 11 with a notional contract value of approximately S$41.4 million. The Company will continue to comply with its disclosure obligations and keep the shareholders updated in the ordinary course.

## E. Allegations of Obstruction and Delay

15. The Company rejects in the strongest terms the allegation in your letter of 24 April that it has conducted "*a persistent and deliberate campaign of delay, obstruction and*

# CAMPBELLS

*obfuscation*". The Company, while also attempting to mitigate the various issues the sanctions have caused, has engaged with the JPLs' correspondence in a timely and measured fashion, has provided the documents and information to which Southern Heritage is entitled as a shareholder, and has explained clearly and repeatedly the legal constraints which prevent it from providing further information.

16. The suggestion that the Company's tone has been "*aggressive and contentious*" and "*not characteristic of the correspondence ordinarily exchanged between a company and its majority shareholder*" is rejected. Southern Heritage is in provisional liquidation; its directors have been displaced; it is controlled by court-appointed officers; and the sanctions which are devastating the Company's business flow directly from Southern Heritage's association with a sanctioned individual. The Company's correspondence has not been aggressive or contentious, and in the circumstances the Company is justified in responding with due caution and in ensuring that its directors do not expose themselves or the Company to liability.

## F. The Broader Position

17. The Company wishes to state clearly that the Board remains committed to acting in the best interests of the Company and all of its shareholders. The Board has at no point sought to obstruct any exercise of shareholder rights by Southern Heritage and will continue to co-operate with Southern Heritage as much as it is able to while complying with its obligations.

18. The reality that the present crisis is a direct consequence of the majority shareholding by Southern Heritage and the sanctions and allegations directed at Mr Chen Zhi and the Prince Group cannot be ignored. The Company invites the JPLs to explore the licensed divestment of a portion of Southern Heritage's shareholding to enable the Company to restore its banking relationships, re-engage its customers and rebuild its workforce. The JPLs' resources would be far better deployed in pursuing this constructive solution that would benefit all stakeholders — including Southern Heritage's estate.

## G . Reservation of Rights

19. All of the Company's and the Board's rights remain expressly and entirely reserved.

Yours faithfully,

**CAMPBELLS LEGAL (BVI) LIMITED**

---