UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: | Chapter 15 |
| | Case No. 26-10769-MG |
| PRINCE GLOBAL HOLDINGS LIMITED AND PAUL PRETLOVE, | |
| | Courtroom 523 |
| | One Bowling Green |
| Debtor. | New York, New York 10004 |
| | Tuesday, June 9, 2026 |
| | 10:11 a.m. |

TRANSCRIPT OF:
HYBRID RECOGNITION HEARING

(RELATED DOC #1 TO 4, 6, 40, 41, 42, 49, 51, 52, 56, 57, 59 to 62, 64, 68, 70, 71, 73, 75 to 80)

BEFORE THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Andrew G. Dietderich, Esquire<br>SULLIVAN & CROMWELL, LLP<br>125 Broad Street<br>New York, New York 10004 |
| For Cosimo Borrelli: | Peter M. Skinner, Esquire<br>BOIES SCHILLER FLEXNER, LLP<br>55 Hudson Yards<br>New York, New York 10001 |
| Electronically Recorded By: | Jonathan/Karen |
| Transcription Service: | Reliable<br>1007 N. Orange Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 654-8080<br>E-Mail: gmatthews@reliable-co.com |

Proceedings recorded by electronic sound recording: transcript produced by transcription service.

INDEX


| MOTIONS: | | PAGE |
| --- | --- | --- |
| Matter No. 1: | Hybrid Recognition Hearing | 6 |
| | Court's Ruling: | -- |
| Transcriptionists' Certificate: | | 83 |

(Proceedings commence at 10:11 a.m.)

THE COURT: Please be seated. All right.

So I haven't had a large -- large a crowd in this courtroom in quite some time.

MR. DIETDERICH: Good morning, Your Honor.

THE COURT: Good morning.

MR. DIETDERICH: Andy Dietderich, Sullivan & Cromwell.

Your Honor, I'd like to make two introductions before I start today --

THE COURT: Please.

MR. DIETDERICH: -- because we have --

THE COURT: Let me -- the people in the jury box are my interns.

MR. DIETDERICH: Hello.

(Laughter)

THE COURT: So, usually, my interns sit in the back of the counsel table, but I usually don't have five, so anyway --

MR. DIETDERICH: Well, welcome.

THE COURT: -- that's explained.

Go ahead.

MR. DIETDERICH: I'm going to try to do a good job for you this morning.

(Laughter)

MR. DIETDERICH: Your Honor, just two quick introductions. So, two of the JPLs --

THE COURT: Did you put your name on the record?

MR. DIETDERICH: I did. Andy Dietderich, Sullivan & Cromwell.

THE COURT: Okay.

MR. DIETDERICH: So two of the JPLs are with me in the courtroom --

THE COURT: Okay.

MR. DIETDERICH: -- this morning, Paul Pretlove and David Standish.

THE COURT: Welcome.

MR. DIETDERICH: So I just wanted to introduce both of them this morning.

Your Honor, we have an unusual and hopefully an unusually convenient approach to the evidence this morning.

THE COURT: And I appreciate the fact that you were able to work out a stipulation on -- and you know, that we -- I've got all the exhibits up here in binders, as well as the deposition transcripts.

MR. DIETDERICH: Excellent.

THE COURT: And I appreciate that counsel was able to work that out.

MR. DIETDERICH: Okay. Excellent.

And Your Honor, you may have noticed that, in your

copies, we have highlighted some information --

THE COURT: Yeah.

MR. DIETDERICH: -- some citations. I believe we're yellow --

THE COURT: We are.

MR. DIETDERICH: -- and Boies Schiller, the client of Mr. Borrelli, blue; and by averaging the two colors, the joint submissions are green.

THE COURT: Okay.

MR. DIETDERICH: But those designations, I understand, that were not exclusive; they're just meant to be things that we think -- that each side thought was most relevant for the Court.

Your Honor, so I think we can proceed directly to our --

THE COURT: You can.

Is there -- are there any objections to exhibits?

MR. DIETDERICH: No. We have none on behalf of the foreign representative.

MR. SKINNER: (Not identified) No, Your Honor.

THE COURT: Okay. So all exhibits are admitted into evidence. They've all been pre-marked and I have them up here. And just so the record is clear, the exhibits are in evidence.

(Exhibits received in evidence)

MR. DIETDERICH: Excellent. Thank you, Your Honor.

So, Your Honor, for my argument, we have two questions before the Court, we have a question of the merits of our petition for recognition and we have a question of standing.

And I'd like to say that on behalf of the foreign representatives, standing is independently important, in our view, Your Honor. It is not mooted for us by a decision on the merits of recognition.

We stand here today already with one objection, not two. Kobre & Kim, who appeared originally on behalf of two of the objecting debtors, has complied with the BVI Court's decision on May 14th and did not file an objection on behalf of those debtors.

Mr. Borrelli did choose to continue his objection by repackaging that objection as an objection on behalf of himself as sole director of 25 of the debtors.

Now, Your Honor, the JPLs have incurred substantial expense defending against the efforts of Mr. Borrelli and whoever appointed him. Mr. Borrelli has refused to disclose in deposition the name of the person who appointed him.

THE COURT: And you never raised that issue with me because I might have had something to say on this issue of

whether or not Mr. Borrelli could refuse to disclose and provide copies of the powers of attorney that he purports to have.

MR. DIETDERICH: We did consider that, Your Honor, but we were -- we've been moving very quickly and we thought we would have an appearance in front of Your Honor today and, frankly, there was just a lot of things to do.

But Mr. Borrelli not only refused to disclose the name of the person who appointed him, also the source of that person's authority to appoint Mr. Borrelli or the source of funding for the efforts that he and various professionals --

THE COURT: I have a question regarding Mr. Borrelli's standing, and let me put it out there right now. Each of the petitions -- and there are many that initiated this Chapter 15 -- has attached to it the order of the BVI Court that commenced the BVI proceeding. And each of the -- has a penal notice at the start. And for the life of me, I don't understand how it doesn't apply to Mr. Borrelli.

Let me read the first paragraph. Quote:

"The effect of this order is that the directors, former directors, office holder" -- "office holders, and former office holders of the respondent" --

And then the name of the specific entity.

"-- are replaced by the joint provisional liquidators. And the directors, former directors, office

holders, and former office holders are prohibited from taking any action in relation to the company's affairs without the prior consent of the joint provisional liquidators."

And that identical language appears with each of the petitions.

MR. DIETDERICH: Correct. We share that view, Your Honor.

But I would perhaps speak in defense of Mr. Borrelli, at least until -- at least in the very early parts of the proceeding. A position was taken that, despite the clear language of that penal notice, there does exist, under BVI law, residual authority of pre-JPL appointment directors to contest the appointment of the JPL. And so there was a question --

THE COURT: Well, they can do that in the BVI.

MR. DIETDERICH: They can do that in the BVI. And that has been our consistent position. We articulated that position with Your Honor, at the provisional relief hearing. But Your Honor will remember we needed the provisional relief, and we did not want the abstract question of standing to stand in the way.

So we sought instruction from the BVI Court to confirm our view that that residual authority is limited under BVI law to appearing in BVI Courts. And on May 14, the BVI Court agreed with us. There was a separate hearing

because there was a fight about the terms of the order yesterday, and the BVI Court issued the order as requested by the JPLs. We don't have a copy of that order for Your Honor because it just happened yesterday. But we do stand here today, you know, clearly, we believe under BVI law --

THE COURT: And --

MR. DIETDERICH: -- and the provision --

THE COURT: And were you -- can you provide the Court with a copy of that order?

MR. DIETDERICH: We absolutely can, as soon as we have it.

THE COURT: Okay.

MR. DIETDERICH: So, Your Honor, we think the question of standing is very clear. We do not think that Mr. Borrelli can appear on behalf of the debtor, he can't appear in the name of the debtor, and he can't appear in a court vindicating the interests of the debtor.

We have said ourselves that if Chen Zhi, or even someone in that circle, let's call it, for lack of a better word, has an ability to appear as a shareholder or as a creditor in that capacity, not purporting to speak on behalf of the company to represent the company's interests. We have no objection to that person appearing in foreign courts, in this court or anywhere else in the world, to the extent that person has standing under the law of that jurisdiction.

But Mr. Borrelli has chosen not to appear as a creditor, and Chen Zhi and the Boies Schiller firm have decided not to appear as a shareholder. The only appearance being made is in the name of on behalf of the company.

And in the deposition matters that we cite, Your Honor, that's crystal clear because there is no separate allegation that Mr. Borrelli makes of his own personal stake in the matter. The only stake in the matter alleged is harm to the debtor itself. So, on that basis, we don't think he has authority to represent the debtor. And without authority to represent the debtor, we don't think he has constitutional standing.

THE COURT: Okay.

MR. DIETDERICH: Okay. Your Honor, I'm also prepared to address, if it pleases the Court, a separate problem with standing, which is the complete lack of evidence about how someone came to be in the position to appoint Mr. Borrelli director in the first place, but it's a subsidiary issue of the first.

But I do think it's important to note that -- give me just a second. I think it's important to note that the only thing we have seen is a very short letter from a redacted signatory --

THE COURT: From?

MR. DIETDERICH: From a redacted signatory

appointing Mr. Borrelli. And Mr. Borrelli testified at deposition --

THE COURT: Is that someone from the Campbells law firm?

MR. DIETDERICH: We do not know. We do not know. We don't know who appointed that person. We don't know the terms and conditions of the appointment. We don't know the compensation for the appointment. We know nothing at all.

We suspect that one reason for that redaction is to shield that person from discovery in this Court. Mr. Borrelli has actually --

THE COURT: Well --

MR. DIETDERICH: -- articulated a common interest --

THE COURT: -- should I credit that Borrelli has any residual authority pursuant to an appointment that he refuses to disclose the details of?

MR. DIETDERICH: Your Honor, Mr. Borrelli himself does not appear to be in possession of sufficient evidence of the chain of his own authority. He didn't have that at the time of the deposition. He testified that he would provide to us all of the information within his possession, we assume that he has. But we think that's convenient or perhaps willful ignorance of the basis of the appointment. And we think, under these circumstances --

THE COURT: How does he know --

MR. DIETDERICH: -- the absence --

THE COURT: -- he was properly appointed if he doesn't have copies of the appointment?

MR. DIETDERICH: I do not -- I do not know, Your Honor. But what I know for certain is that we do not know, and Your Honor doesn't know that he was properly appointed. And we think the refusal to provide that evidence can very much be read against Mr. Borrelli.

I have to make one other point, Your Honor, that this is not a situation in which this -- the doctrine of apparent authority seems particularly relevant. Mr. Borrelli also testified that he's not having board meetings, he's not meeting with customers or suppliers or employees. He testified in his deposition that he's conducting no activity whatsoever as a director, other than instructing counsel to oppose the JPLs in New York and in the BVI. So this is not an ordinary director holding himself out as a director of longstanding to which a doctrine of apparent agency might apply.

THE COURT: Did the judge in BVI obtain a copy of whatever it is that purports to appoint Borrelli?

MR. DIETDERICH: To our knowledge, the BVI Judge has not been provided a copy of the appointment documentation prior to the appointment of Mr. Borrelli or with the identity

of the undisclosed attorney. In fact, I should say that Mr. Borrelli has, I believe, offered to provide that information to the BVI Judge, or at least the identity of the appointing attorney. In fact, my colleagues can speak to that, but to our knowledge, that has not been provided.

THE COURT: Okay.

MR. DIETDERICH: And certainly we don't know anything about it.

So, Your Honor, for those two reasons, we don't believe Mr. Borrelli has standing today, and we believe each of them is independently important.

I can turn to the merits of recognition. I actually think those are comparatively simple on the facts of our case.

THE COURT: Well, the objection does not dispute that the center of main interest is in BVI.

MR. DIETDERICH: Correct.

THE COURT: Is that correct?

MR. DIETDERICH: Correct, correct.

The objection raises a couple arguments. It raises an argument about the insufficiency of U.S. property. We believe that the case law in this court is clear and that there are indeed 30 peppercorns in the United States held for the ratable benefit of the debtors. And I can confirm that's the basis on which Sullivan & Cromwell holds the property.

THE COURT: I'm not familiar. Are there cases that deal with the assignment of ratable interest among multiple debtors? I understand the argument that that has been made, but is there any authority that supports your position on that?

MR. DIETDERICH: Well, there's certainly a long convention in doing so. You know, we -- and I believe others have used that language in multiple cases, including other cases in front of Your Honor, where we've had various members of a corporate family, each one of which has to be a debtor. And clearly, each -- you know, the recitation of a ratable interest does create in each of those entities an entitlement of some sort to the property under appropriate circumstances.

THE COURT: Is there a document where Sullivan & Cromwell has acknowledged it -- that the retainer that it holds represents the ratable interest of each of the multiple debtors?

MR. DIETDERICH: Yes, there is, Your Honor.

THE COURT: Do I have that document?

MR. DIETDERICH: Give me just a moment to confer.

THE COURT: Sure.

(Participants confer)

MR. DIETDERICH: Your Honor, actually, there is a correspondence on top of the invoice, Your Honor, that confirms --

THE COURT: Okay.

MR. DIETDERICH: -- that it's being held for the ratable benefit.

THE COURT: Thank you.

MR. DIETDERICH: The other arguments, Your Honor, the foreign proceedings and liquidation proceeding, it's a collective proceeding.

THE COURT: It's brought under the BVI insolvency statute.

MR. DIETDERICH: Correct, correct. It's a liquidation proceeding, and it's preliminary relief in the context of a liquidation proceeding. But the definition of "foreign proceeding" in the Code, as Your Honor is aware, expressly includes an interim proceeding. So we don't believe that's relevant.

But I do believe it turns back to the standing question and also the nature of my next point, which is some of the relief we're requesting in the order, because we are facing -- even though we don't know who the signatories are and we don't know where there's money funding this effort, but we're facing a fairly concerted effort by secret people with secret money to stand in the way of the JPLs.

THE COURT: Have you been able to identify any assets within the United States of any of the foreign debtors?

MR. DIETDERICH: We may or may not have an interest to be determined in the Bitcoin. There's a very substantial amount of Bitcoin that's been seized.

THE COURT: That's the subject of the --

MR. DIETDERICH: Exactly. The subject of another proceeding.

THE COURT: -- of the U.S. Attorney's proceeding.

MR. DIETDERICH: Correct, correct. And we may have -- we may have rights against various U.S. people. Clearly, we have a client relationship with --

THE COURT: So the forfeiture action that has been brought by the U.S. Attorney's Office, have the Bitcoin actually exist within the United States, do they know that?

MR. DIETDERICH: The Bitcoin are within the custody of the Federal Government --

THE COURT: Okay.

MR. DIETDERICH: -- and they exist within the United States for that purpose. Where Bitcoin exists, I leave to better minds, Your Honor.

THE COURT: Yeah, okay.

(Laughter)

MR. DIETDERICH: But I think, from a jurisprudential standpoint, the forfeiture proceeding is an in rem proceeding, and so the property is probably deemed to be, as a matter of U.S. law, in rem in the United States, in

the custody of the Government.

But the short answer, Your Honor, is no. We have -- we are beginning a process of reaching out to U.S. financial institutions and U.S. counterparties. We know that one of our main subsidiaries, the Tabacalera business, has a closely related company, Tabacalera USA, that's owned and operated as a Delaware company and sells product in the United States. And there's any number of relationships --

THE COURT: What does it sell --

MR. DIETDERICH: -- between that company --

THE COURT: -- within the United States?

MR. DIETDERICH: -- and our company.

What's that?

THE COURT: What does it sell within the United States?

MR. DIETDERICH: Cigars, Your Honor, cigars and related products.

THE COURT: Thank you.

MR. DIETDERICH: But there's a business relationship between those subsidiary supply arrangements, et cetera. That entity has a minority interest that is not owned by one of the JPL debtors, but is owned by another BVI company that appears to be associated. But we don't have proof to you today, Your Honor, about anything related to those facts.

The other joint venture party of Tabacalera USA is our joint venture party in the Spanish Tabacalera business, it's the worldwide business. And so there's clearly an association with the U.S. business and some, at least, indirect interest in that U.S. property.

Otherwise, we, you know, continue to investigate and we're at the very early stages.

So, Your Honor, there's also, you know, arguments raised about public policy. I think the balance of public policy interest in favor of recognition tilts very heavily here in favor of the authorized foreign representative.

I'll answer Your Honor's questions on the basis for the merits of recognition. Of course Your Honor has an independent obligation to confirm those even if Your Honor decides with us on standing.

But I would like to turn, if it pleases the Court, to two specific things we asked for in the form of order --

THE COURT: Okay.

MR. DIETDERICH: -- and explain why.

THE COURT: The first, Your Honor, is the JPLs, at least provisionally and if Your Honor approves recognition, will have exclusive authority to represent the 30 JPL debtors in the United States. They control subsidiaries, including the Allied Cigar business, Tabacalera, but many other subsidiaries around the world.

We're asking the Court to include in the order language that third parties not be permitted to purport to represent these controlled subsidiaries absent authorization from the JPLs or this Court. And we believe this relief is appropriate and necessary in these circumstances. It's been narrowly tailored to solve the problem of other people showing up and purporting to represent the interests of the JPLs and the companies under their control. So that's the first additional --

THE COURT: Are there --

MR. DIETDERICH: -- relief provision in the order.

THE COURT: With each of the forms of relief that you're seeking, are there precedent where that form of relief has been granted?

MR. DIETDERICH: Your Honor, there are things that come very close to this. But we're trying to solve a particular, almost unique question of having other purported fiduciaries appear to represent the interests of the JPLs, and so we've tailored this narrowly for that particular problem.

I can't point you to a case that has given the relief that we're requesting. But I think, in some respects, it is analogous to the use of 105 to extend the stay to protect nondebtor subsidiaries of a debtor, just it's much narrower and focused only on this prevention of people

purporting to represent the companies who don't have the authority to do so. So I would -- I don't have specific precedent for Your Honor, but I think it's in the penumbra of the kinds of relief that this Court has given foreign insolvencies in the past.

The second piece, Your Honor, is -- relates in particular to the Boies Schiller firm, right? But we phrase it in general language because I think it's important to close, not just one door, but all the doors and all the windows on this particular issue.

The Boies Schiller firm has appeared in proceedings in the United States as a Prince Group and as Prince Holdings Group.

THE COURT: Well, your petition -- petitions, plural, referred to the Prince Group.

MR. DIETDERICH: Exactly correct.

THE COURT: And there is no legal entity that I'm aware of. Is there a legal entity that is named the "Prince Group"?

MR. DIETDERICH: Well, there are legal entities that are named Prince Group Holdings. They're a debtor or Prince Holdings Group, that's a subsidiary of the debtor. There is no legal entity simply called the "Prince Group," close quote. All right?

We don't know the authority under which the Boies

Schiller firm purports to represent the Prince Group. But I will note, Your Honor, this -- the representation in the forfeiture proceeding was filed prior to the appointment of the JPL. So we're not -- certainly not standing here making any accusation that this was done to circumvent the JPLs' authority. This appearance was made before the JPLs came onto the scene.

But there is no legal entity identified. And this ambiguity should, in our view, stop.

THE COURT: And what's the precise language that you're asking the Court to --

MR. DIETDERICH: So the language that we're asking, Your Honor, is that anyone subject to the jurisdiction of this Court be prevented from purporting to represent the Prince Group, Prince Holdings Group, or derivative names without the leave of this Court, the BVI Court, or the JPLs, with the clear exception that we're not preventing anyone from appearing for a natural person or an identified corporate legal entity.

THE COURT: Okay.

MR. DIETDERICH: So they can appear for any legal entity and any natural person; they just can't appear for the undefined term --

THE COURT: Well, they can't --

MR. DIETDERICH: -- the Prince Group.

THE COURT: I take it you're not agreeing that they can appear for any of the foreign debtors.

MR. DIETDERICH: With the exception of us, Your Honor. With the exception of the 30 foreign debtors and their subsidiaries, they cannot appear for those companies.

But if there's another company, if there is Prince Group Sri Lanka, and they establish a client relationship with Prince Group Sri Lanka, they're welcome to represent that interest in -- anywhere in the world that they so see fit.

Now, again, Your Honor, there is no precedent for this relief, I freely admit. But we're solving a problem that, frankly, the JPLs, in recognition of the nature of this case -- very few books and records, an international crime scene, the appointment by an Attorney General, not a creditor or a private actor -- we've been very deliberate in how we've approached this problem, as Your Honor's introductory remarks suggests.

But the continuation of this well-funded campaign to oppose the JPLs, not just here, not just in the BVI, but everywhere in the world, by any means necessary, by the very same indicted --

THE COURT: Well, I don't have the -- do I have the authority to prevent, whether it's Boies Schiller or anyone else, from taking a position outside the territorial

jurisdiction of the United States?

MR. DIETDERICH: You have the -- you have the authority, Your Honor, to prevent anyone subject to the jurisdiction of this Court from interfering with the BVI proceeding, as long as that relief is consistent with your powers under 15, which are very broad to that effect, and consistent with BVI policy.

And what we're proposing, very clearly, is something that effectively channels --

THE COURT: Do I have --

MR. DIETDERICH: -- the authority --

THE COURT: -- the authority from preventing anyone, whether it's Boies Schiller or any other lawyers, from bringing an action in -- because there are lots of allegations regarding Cambodia, for example -- from bringing an action in Cambodia, taking a position, whatever position they might take?

MR. DIETDERICH: Again, I believe you have the authority, Your Honor, if someone is subject to the personal jurisdiction of this Court, to the jurisdiction of this Court -- you have subject matter jurisdiction and personal jurisdiction and a grant of broad authority under the statute to issue orders in assistance of foreign proceedings. And if the order is recognizing the exclusive authority of the JPLs, outside of the BVI, consistent with the penal notice and the

other guidance of the BVI Court, you have the ability to channel, effectively, those kinds of actions to the BVI Court or this Court before they proceed and cost us even more money, at victim expense, defending this, really, craziness, Your Honor, all around the world.

Again, we're dealing with an unusual set of facts where there is somewhere -- we don't know where yet -- a secret war chest of money that has funded this effort. It's funded the Boies Schiller Firm, it's funded lawyers all around the world.

The steps to which they're taking, Your Honor, can be indicated by one small fact, which is that, at the provisional hearing, Your Honor made clear your view on, say, collective proceeding, and yet they have continued to contest that point --

THE COURT: Well --

MR. DIETDERICH: -- not cheaply. They -- it's their right --

THE COURT: I don't have the last word on whether the BVI proceeding is a collective proceeding or not.

MR. DIETDERICH: No, I understand, Your Honor. I understand. But we continue to have that issue contested, including --

THE COURT: But you know, counsel will disagree with any of my rulings and continue to assert before an

appropriate tribunal whatever their position is.

MR. DIETDERICH: Your Honor, that's absolutely true.

THE COURT: They're not bound by -- you know, they're certainly -- there's an issue of whether they're bound in my court from arguing the contrary position.

MR. DIETDERICH: Well, but -- Your Honor, but it goes back to the question of standing. We're not seeking to prevent anyone from doing anything other than impersonating the debtors or acting for the Prince Group in a way that's confusing to the debtors. This is very core to who the authorized representative is. We're not seeking them to -- we're not seeking to prohibit them exercising any other right, other than pretending to be us. And there could be nothing more core to the authorized foreign representative or, frankly, the integrity of the BVI proceedings.

And Your Honor is in a unique position, given the jurisdictional reach of this Court, to assist the BVI Court in making sure that happens. So that's why we believe, Your Honor, it's appropriate relief, and it's been very narrowly construed to that impersonation problem.

THE COURT: Okay.

MR. DIETDERICH: So I'll leave that to Your Honor's consideration and the remarks of my colleagues.

THE COURT: Okay.

MR. DIETDERICH: And absent other questions, I'll cede the podium. Thank you, Your Honor.

THE COURT: Is that the entirety of the relief that you're seeking?

MR. DIETDERICH: Well, we had a form of order that we were submitting.

THE COURT: Yeah.

MR. DIETDERICH: It was -- the other -- it otherwise --

MR. DIETDERICH: And the revised form of order.

The only other provision in the revised form of order goes to discovery and is express on the provisions of discovery. We believe that's, you know, a clarification as opposed to anything else.

THE COURT: Okay.

MR. DIETDERICH: The other substantive changes -- am I correct? The other substantive changes are limited to those in my remarks.

THE COURT: Thank you, Mr. Dietderich.

MR. DIETDERICH: Thank you, Your Honor.

MR. SKINNER: Good morning, Your Honor. Peter Skinner from Boies Schiller Flexner on behalf of Mr. Borrelli in his capacity as a director.

If I could take a moment, Your Honor, to just to introduce the folks who are with me.

THE COURT: Sure.

MR. SKINNER: I'm joined at counsel table by Laura Femino from my firm. And I'm also here with two other lawyers from the Boies Schiller firm, Michael Huerta and J.P. Shami.

Your Honor, before I begin to try to make perhaps a little easier for looking at documents and the like, we had prepared a much smaller binder that contains some of the deposition testimony that we think is important, as well as some of the more important exhibits, to try and avoid fumbling around. So, if it's okay with you, I'll pass them up to the Court to --

THE COURT: Please. And you've given --

MR. SKINNER: Yes. We gave --

THE COURT: -- Mr. Dietderich --

MR. SKINNER: -- one to --

THE COURT: -- a copy?

MR. SKINNER: -- Sullivan & Cromwell.

THE COURT: Okay.

(Participants confer)

THE COURT: Thank you very much.

MR. SKINNER: Sure.

(Participants confer)

MR. SKINNER: So, Your Honor, before we get into standing and the merits, if you will give me a little bit of

leeway, I would just like to take a brief moment to pause and take a step back and try to put this proceeding in context.

We are here for recognition of a foreign proceeding, something that happens with some regularity in this Court. But this particular Chapter 15 proceeding is by no means regular, this is not your ordinary Chapter 15 recognition. And there are --

THE COURT: I would agree with you that far.

MR. SKINNER: I'm glad we got started on the right foot.

There are two reasons for that.

First, the BVI Insolvency Act allows for the appointment of liquidators, not just when a company is insolvent, which is what Chapter 15 is designed to address, but also where it's just and equitable and in the public interest.

THE COURT: But the proceeding in BVI, you would agree is brought under their insolvency law.

MR. SKINNER: Well, Your Honor, I don't know if I would have -- I mean, yes. Is the top of the statute insolvency? Is insolvency a prong of that statute? Yes. But the parts of the statute that the BVI Attorney General is proceeding under don't concern insolvency, and I will be getting into that in the argument.

So proceeding under these prongs is unusual. It's

not unprecedented for this Court to consider recognition proceedings brought under equitable or public interest grounds, but it's unusual.

The second reason of what takes -- is what takes us into truly.

THE COURT: Let me take you back. I just want to be sure that I understand the extent to which you're agreeing that it is not unprecedented for an action to be brought under the public interest sections of the BVI law.

MR. SKINNER: Yeah, I agree, that is not unprecedented, Your Honor.

What is unprecedented and what takes us into unprecedented territory is that this was an action brought by the BVI Attorney General, and it is the first time the BVI Attorney General has sought JPLs for equitable or public interest reasons.

THE COURT: Does the BVI statute specifically authorize an action by the BVI Attorney General?

MR. SKINNER: I'd ask if -- in the binders that we have, Tab 12 has a portion of the -- relevant portion of the BVI statute. And I would like to direct your attention to Section 162 in the middle of the page. And it provides that the Court -- that means the BVI Court -- may, on application by a person specified in Subsection (2), which we'll get to in a moment, appoint a liquidator of a company under 159(1),

if -- and there are three reasons here:

If the company is insolvent;

If the company -- if f the Court is of the opinion that it's just and equitable;

And if the Court is of the opinion that it's in the public interest for a liquidator to be appointed.

And then Subsection (2) provides the list of entities and individuals that can seek that relief.

So, going back to the first question you're asked --

THE COURT: And the Attorney General specifically listed it in 162(2), Subsection (f).

MR. SKINNER: That's correct. There's no dispute that she is part of the statute and that she has the authority to do this. There's also no dispute that this is the first time she has ever done it.

THE COURT: You know, but the authority for her to do so is in the statute itself. It wasn't argued that there was some ancillary power. It was the statute itself, in 162(2)(f), authorizes the Attorney General to commence the action.

MR. SKINNER: It does. It does.

And my only point here, Your Honor, is what has taken -- what has made this proceeding so unusual, and not just unusual, but, in fact, unprecedented, is that the BVI

Attorney General has never sought to exercise this authority before. And as a result --

THE COURT: Has there been --

MR. SKINNER: -- this Court --

THE COURT: -- a case like this before in BVI?

MR. SKINNER: Well, for sure. For sure, Your Honor. There are many cases in the BVI and other jurisdictions around the world that concern allegations of underlying criminal conduct.

THE COURT: But the Attorney General decided that this was an appropriate case to bring an action as authorized by -- specifically authorized by the statute.

MR. SKINNER: For reasons that we're not sure what they are. We don't know what the catalyst was here.

We've tried to take some discovery on that from the JPLs and have been shut down. We have not received any information as to what started all of this. Was it started by lawyers and liquidators? Was it started by the BVI Attorney General, who then went out and looked for folks to do the job? We just don't know.

But Your Honor, my point, for purposes of emphasis right now, is not that she's not permitted to do this, the statute clearly contemplates it, but that it's never happened before; and, as a result, this Court has never been asked to recognize that type of proceeding.

THE COURT: I will agree with that statement.

MR. SKINNER: So, as a result, I think we can all agree that, because this is entirely novel, whatever the Court does here is going to break new ground. Now that's fine. Courts break new ground, it happens. But it should be done carefully, it should be done with deliberation, and it should not be done unnecessarily. And that's the issue with --

THE COURT: So you're asking me to disregard the section of the BVI law that authorized the Attorney General to bring the action under the insolvency law in the BVI. I'm going to override the legislative process in the BVI that authorized the Attorney General to bring the action in the BVI Court.

MR. SKINNER: That is not at all what I'm asking Your Honor to do.

In noting the unprecedented nature of these proceedings, what I'm asking Your Honor to do is pause and give the BVI Court, the judge that is best able to address the actions that have been taken on behalf -- by the BVI Attorney General --

THE COURT: Well --

MR. SKINNER: -- the opportunity to resolve the dispute that is pending in the BVI with respect to whether the provisional nature of that proceeding should be

transferred into final liquidation.

THE COURT: Should be transferred to what?

MR. SKINNER: Should become final liquidation.

THE COURT: Okay.

MR. SKINNER: As the Court well knows, we, the companies -- and there's no dispute from the table to my --

THE COURT: So the only thing I'm asked to do today is to recognize the BVI proceeding as a foreign main proceeding. The second phase of any Chapter 15 case is whether to recognize and enforce any plan or final relief that's authorized by the final -- by the foreign court, and we're not at that stage. We're at the recognition stage, whether I will recognize the BVI proceeding as a foreign main proceeding.

MR. SKINNER: I agree with that Your Honor.

And the point, I think, for the Court to take under consideration is what stage of the BVI proceeding we are at because I think that recognition of the preliminary stage, which is where we are right now, which is -- as we can get into at length -- is investigative, does not concern a real creditor identification process or distribution process, is entirely different than --

THE COURT: Do you have any authority that says that a U.S. Chapter 15 Court should not recognize a foreign proceeding that has not made it to a final stage?

MR. SKINNER: Well, not to a final stage Your Honor, but there's definitely authority. As Your Honor is well aware, I think you believe that we have slightly different facts here. But under the Global Cord Blood --

THE COURT: It's very different. It -- they expressly -- counsel expressly stated that it was not a proceeding brought for liquid -- purposes of liquidation. That distinguishes it. You did a good job presenting one side in your brief, and the foreign representatives' counsel did a good job in answering specifically the distinction between Judge Jones' opinion and this case.

MR. SKINNER: Well, Your Honor, I'm not going to belabor it. We think that this case is actually much closer to the facts of Global Cord Blood, clearly, than Your Honor does.

But to answer your question as to whether there's precedent, I'm not saying that the Court should never recognize a preliminary proceeding in a foreign court. Clearly --

THE COURT: The Court --

MR. SKINNER: -- that's incorrect.

THE COURT: And the statute specifically talks about preliminary proceeding. That language is in Chapter 15.

MR. SKINNER: For sure.

But what matters here is that the preliminary proceeding in the BVI doesn't come with the character of insolvency creditor rights that are typically in the mainstream of Chapter 15 proceedings.

And what matters, also, is that the BVI court may very well dismiss the BVI proceedings. It's --

THE COURT: In which case you'll come back; if I recognize this, you will move to dismiss the Chapter 15 case, and that has happened before.

MR. SKINNER: We will do that with all due speed.

But in the meantime, my colleagues are seeking, as they've acknowledged, unprecedented relief that they can't point to authority to, that we very well may not be able to unring the bell on it, and where Justice Wallbank has pointed out in his court that he's quite clearly worried about liquidating companies based on unsubstantiated allegations. And he really asked, and we have these quotes in our brief:

"Can't I see some of the evidence, please?"

That's what he's asking down there.

THE COURT: And at the point where, assuming he grants that relief and Mr. Dietderich and his colleagues come back here and ask that this Court recognize and enforce the plan that is approved by the BVI Court, that will be very much at issue, but that is not true at this stage of the case.

MR. SKINNER: But it's not -- I mean, Your Honor, the point that I'm trying to make is, if they have their provisional relief right now, they have ample protections, broad powers under the provisional order that Your Honor entered, and given the fact that the BVI Court has expressed real, sincere and profound --

THE COURT: Where --

MR. SKINNER: -- skepticism --

THE COURT: -- in the proposed order that Mr. Dietderich has submitted has he asked for this Court to approve liquidation of any assets of the foreign debtors?

MR. SKINNER: Well, Your Honor, I'm not entirely sure which order Mr. Dietderich is going to be proceeding with.

THE COURT: Well, let's deal with the most recent order that was filed.

MR. SKINNER: In the most recent order --

THE COURT: Specifically, what is it that you object to in the relief that he has sought?

MR. SKINNER: In the most recent order that was filed, Your Honor, he is seeking to authorize the JPLs to seek turnover of debtor property under Section 542, including property outside the territorial jurisdiction of the United States. That's in Paragraph 19.

He's asking to apply relief issued by this Court

to bar certain parties from participating in the BVI proceedings, which is contrary to the recent BVI Court ruling on this very issue. That's in Paragraph 21.

THE COURT: Well, I'll leave it to the BVI Court to decide who can participate in the BVI proceeding.

MR. SKINNER: He's ask -- well, he's asking for relief from this court to bar certain nondebtor parties from participating in the civil forfeiture proceedings. That's essentially what he was talking about before, when he was saying he's concerned that there are entities also using the Prince Group name.

THE COURT: Are there?

MR. SKINNER: Well, sure, Your Honor. There is a Prince Group writ large umbrella organization that is a Cambodian conglomerate that is much larger and contains much broader interests than the two Prince Group entities that are BVI corporations. We filed a claim on behalf of not either of these BVI corporate entities in the Eastern District forfeiture case, on behalf of the Prince Group, the global entity, and you know, to bar anyone from using the Prince Group name, which is effectively what they're seeking to do, so that -- I'm assuming that the next step in that would be to go in and try and take over the claim that we filed in the forfeiture proceeding, even though there is absolutely no link between the Bitcoin and any of the debtor companies. It

would be taking this way too far and, again, would be the kind of relief that they could act upon immediately, and we can't unring that bell down the road.

THE COURT: Well, assuming they're able to find the Bitcoin and take possession, custody, or control, they can't liquidate it without coming back to the Court and obtaining that additional relief.

And what is it that you think that they can and can't do?

MR. SKINNER: I think if Your Honor recognizes the BVI --

THE COURT: So --

MR. SKINNER: -- proceeding --

THE COURT: -- assume that I recognize each of the foreign debtors.

MR. SKINNER: Then I think that they can pursue, within the bounds of whatever order Your Honor enters, proper steps on behalf of those entities, and those entities do not have any interest in the Bitcoin that was forfeited by the United --

THE COURT: I don't know --

MR. SKINNER: -- States Government.

THE COURT: -- whether they do or don't.

MR. SKINNER: They don't know whether they do or don't. I actually have pretty good information that they

don't, but that's neither here, nor there; I'm not a witness testifying.

THE COURT: Who is --

MR. SKINNER: But they --

THE COURT: -- the forfeiture --

MR. SKINNER: What they can't --

THE COURT: -- proceeding pending before?

MR. SKINNER: The forfeiture proceeding is pending before Judge Kovner in the Eastern District of New York.

And if the JPLs have an interest, they haven't sought to file a claim on behalf of their own companies yet. Perhaps they will, and I'm not saying they can't.

THE COURT: What they're going to do -- assuming that I recognize -- that this proceeding is recognized as a foreign main proceeding, I don't know what they will do.

MR. SKINNER: I don't know either, Your Honor. But what -- if they want to proceed in the Eastern District with respect to assets they think are property of one of the debtors that they represent, then they can go, and there will be a judicial process to determine whether they can actually establish a claim to that Bitcoin or not.

What they should not be able to do is say we have complete, global, and universal right to use the name "Prince Group." I don't know if it still exists. When I was younger, I used to play tennis. There's a company called

Prince Racket. Are they going to now control and bar Prince Racket from using that name? "Prince," Your Honor, is a very common term. And I think what they're asking for takes things way too far.

But Your Honor asked what type of relief would be problematic if it was entered. Those are examples.

They're also asking to extend the relief granted by this Court to nondebtor subsidiaries. They're asking to extend relief issued by this Court globally to protect nondebtor, non-affiliated entities. It goes on.

And we can perhaps litigate with specificity exactly what it is they're seeking because they -- you know, they put in an order with their original application. After we filed their objection, they put in a new order. After we said, Your Honor --

THE COURT: Yeah, you asked that the hearing today be adjourned --

MR. SKINNER: Well, really, what I wanted --

THE COURT: -- right?

MR. SKINNER: -- was an opportunity to brief it.

THE COURT: And I refused to do that.

MR. SKINNER: Which is fine. I mean, we're here and we're happy to talk about it.

But we -- at this point, it's not entirely clear exactly what it is --

THE COURT: Have you sat down --
MR. SKINNER: -- they're going to --
THE COURT: -- with Mr. Dietderich --
MR. SKINNER: -- be seeking.
THE COURT: -- and tried to negotiate the form of an order, assuming that this Court recognizes these proceedings, the BVI proceedings, as a foreign main proceeding?
MR. SKINNER: We have not done that yet, Your Honor. Perhaps we were still optimistic that we might convince Your Honor to reconsider some of the rulings you made provisionally. But of course we will do that if that's where we end up after today.
THE COURT: Oka. Go ahead.
MR. SKINNER: Your Honor, I'd like to briefly address, if I may, some of the points that were raised by counsel: Standing, capacity, the 109(a) argument. And if Your Honor will hear me, it may not be necessary --
THE COURT: I will hear you. Go ahead.
MR. SKINNER: Well, if Your Honor will hear me, some of the issues with respect to the merits, which I know you've already expressed a view on, and I don't want to take time unnecessarily, but I would like to walk you through --
THE COURT: Now is the --
MR. SKINNER: -- what I think --

THE COURT: -- time to do it.

MR. SKINNER: Great, Your Honor.

So, first, with respect to standing, I must emphasize that Mr. Borrelli is not here on behalf of the company.

THE COURT: Do you have the power of attorney? Do you have the documents that grant --

MR. SKINNER: Sure.

THE COURT: -- him the power of attorney?

MR. SKINNER: So, first, Your Honor, those are two different things. And I'll -- and I'm happy to talk about that first.

THE COURT: Do you have it?

MR. SKINNER: Do I have it? Yes, I have it. And I don't have it with me today. But we didn't -- you know, we objected to producing it.

THE COURT: On what grounds?

MR. SKINNER: We objected on the grounds that it could be privileged, that it was --

THE COURT: Why is it --

MR. SKINNER: -- burdensome.

What?

THE COURT: Why is it privileged?

MR. SKINNER: Because it was, to the extent it's a document that we have, it was provided to us in the course of

seeking legal advice.

THE COURT: It doesn't -- that doesn't make it privileged.

MR. SKINNER: Well, Your Honor.

THE COURT: There's lots of documents that I have here that you have and --

MR. SKINNER: We also --

THE COURT: -- they're not privileged.

MR. SKINNER: Your Honor, we also -- putting it aside, we raised objections. They did not --

THE COURT: Don't switch the subject. I'm -- you can tell from some preliminary remarks, if this issue had been raised with me before today, I probably would have ruled already. Mr. Borrelli, in the absence of this Court being able to review the documents that purport to make him a director of some of the debtors, how am I to take your word for it? Ordinarily, I would see the proof, but you've refused to produce it.

MR. SKINNER: But, Your Honor, we raised objections. We believed they were valid objections.

THE COURT: Do you still refuse to produce them?

MR. SKINNER: I'm -- Your Honor, I'm prepared --

THE COURT: Do you -- will you produce them?

MR. SKINNER: I will give it to the Court for *in camera* review and --

THE COURT: Why is it privileged?

MR. SKINNER: It's -- Your Honor --

THE COURT: It purports to give Mr. Borrelli standing and you've asserted objections on behalf of Mr. Borrelli. The other side is entitled to see the evidence that purports to -- the whole chain of evidence that purports to assign -- to, you know, to provide Mr. Borrelli as a director of these companies.

MR. SKINNER: Your Honor, let's go back to the mechanism of how this happened.

THE COURT: No, answer my question: What is the basis for the refusal to produce those documents?

MR. SKINNER: The basis for the refusal to produce the power of attorney was that it actually is not directly relevant to the authority under which Mr. Borrelli was appointed, because it's derivative of, and the source of authority for, the corporate resolutions, which we did produce. If we had -- if there was a dispute to be had about this in response to our objections, as Your Honor notes, we could have had it, and Your Honor may have very well ruled in their favor.

THE COURT: Well, I'm raising it now.

MR. SKINNER: And I --

THE COURT: Obviously, I don't think that the naked assertion that Mr. Borrelli is a director sufficiently

establishes a basis for your assertion that he's a director of these --

MR. SKINNER: It's not --

THE COURT: -- companies.

MR. SKINNER: Your Honor, it's not a naked assertion. We have offered --

THE COURT: It is. You haven't -- what documents have you provided me that Mr. Borrelli is a director?

MR. SKINNER: We provided Mr. Borrelli -- we provided the corporate resolutions appointing him as a director, with the name of the person who signed those resolutions redacted off; the same documents that were provided to the BVI Court.

THE COURT: On what basis did you redact, to take the name of the person who signed the documents?

MR. SKINNER: On the basis that the individual who signed the documents fears for their personal safety for being associated --

THE COURT: Let me see unredacted documents right now.

MR. SKINNER: Your Honor, I don't have the unredacted documents with me, but I'm happy to provide the unredacted documents --

THE COURT: Will you provide it to Mr. Dietderich, pursuant to a protective order?

MR. SKINNER: Of course.
And we would have done that if this had been raised with us in response to our objections, but it was never raised.
THE COURT: They've been trying to get these documents for quite some time.
MR. SKINNER: Your Honor, I don't think that's --
THE COURT: Did you say, I will provide Mr. Dietderich and his colleagues with a copy, pursuant to a protective order?
MR. SKINNER: Your Honor, I raised objections and they never came back and said --
THE COURT: Well, I'm raising my own objections to what you've done.
MR. SKINNER: Your Honor, I -- to put this -- we raised objections to the request. They did not ask for a meet-and-confer on the objections. They've never once, since the start of this --
THE COURT: So, I have an absence of evidence of the appointment, the basis for the appointment of Mr. Borrelli and how it runs -- you know, how do you overcome the penal notice that the justice in the BVI --
MR. SKINNER: Your Honor, with --
THE COURT: -- answered, with respect to each of the petitions?

MR. SKINNER: All right. So, look, first, can I take those each in turn?

THE COURT: Yep.

MR. SKINNER: So, with respect to Mr. Borrelli, we offered to produce it confidentially in the BVI. Nobody took us up on it.

Up here, nobody pushed on our objections, asked for a meet-and-confer. A protective order was never raised.

We're willing to produce it to the other side --

THE COURT: And as it stands now, I'm not satisfied that you've established that Mr. Borrelli has any authority, period --

MR. SKINNER: But --

THE COURT: -- and how it runs -- how, in the face of what the BVI Court entered.

MR. SKINNER: We are willing to produce it, pursuant to a protective order that prevents the identity of the person signing the documents from being put up on the public docket and shared outside the scope of this litigation. But we will provide that and we will also provide the power of attorneys, and we will provide both to Your Honor, regardless of the other side, for an *in camera* review if you would prefer to proceed in that way.

But to say that there is no evidence, with respect to Mr. Borrelli's appointment, I respectfully disagree. He

testified both, in his declaration and at his deposition, that he reviewed the documents in their original form that appointed him. He testified that he --

THE COURT: And I should take -- just take his word for it because he -- you know, the documents that have not been provided, it establishes -- answer the question about how it is carved out of, somehow he has residual power that he can assert in this court in the face of the BVI order that made crystal clear and subjected him to possible contempt.

MR. SKINNER: Your Honor, well, first of all, with respect to the penal order, if you look at Dr. Mokal's declaration, the penal order is clearly not a part of the order itself, which is why we don't think anybody was in contempt when we brought these proceedings --

THE COURT: And did you raise --

MR. SKINNER: -- in the first place.

THE COURT: -- this issue in the BVI Court?

MR. SKINNER: I don't believe anybody has raised the issue yet in BVI Court, with respect to whether there's a contempt of the BVI order. It's been raised -- I think it has been raised as a possibility, but nobody has sought contempt.

The BVI Court and the representations that have been made by the JPLs in that court are clear that the only

thing that is forbidden is for the companies to oppose recognition here. They can oppose recognition in the BVI, but the companies cannot oppose recognition here. And there are ample statements cited in our brief from the BVI and the like. And, also, I believe Mr. Chissick conceded this at his deposition, that there's nothing preventing a director from appearing and -- for their own interest and purposes in this court.

As long as they're not --

THE COURT: What is his interest and purposes, aside from purporting to be a director of some of the entities?

MR. SKINNER: Well, Your Honor, he has the -- he has authorities and obligations as a director. We all know the directors are not the exact same thing as the corporations that they serve. You know, there's a corporate entity; it's a legal thing. There's a director. It's a separate thing.

He has authority and obligations to act as a director. That authority has been limited by the BVI orders, the relief requested here.

THE COURT: Including -- does the BVI order permit him to oppose recognition of each of these cases -- each of these foreign debtors as participating in a foreign main proceeding in the BVI?

MR. SKINNER: In his capacity as a director, it does. All the BVI order says is that the companies cannot oppose it. And he is not opposing it on behalf of the companies.

He's saying if the recognition relief in the U.S. is entered, which is going to give effect to the JPLs' assorted displacement of his powers --

THE COURT: The language is that the directors, officeholders, and former officeholders are prohibited from taking any action in relation to the company's affairs.

MR. SKINNER: On behalf of the company, Your Honor.

But he is saying, I have my own duties and responsibilities that will be impaired if the BVI Court order is recognized here. And I think probably the most vivid example of this is the recent restraining order that was entered in Hong Kong. It's a tab in Your Honor's binder. I believe it's Tab 14. That restraining order provides that anybody in Hong Kong will be in criminal contempt if they take any steps to assist in the transfer of assets that are the subject of that order.

And the recognition order here may very well lead to steps where Mr. Borrelli is being asked, in his capacity as a director, to assist in those steps, through information gathering, through other assistance to the JPLs, who now have

authority to control the companies, via the BVI order.

So clearly, Mr. Borrelli, in his capacity as a director, faces jeopardy in the future, faces the possibility of criminal contempt in Hong Kong if he finds himself between a rock and a hard place, with respect to --

THE COURT: I'm sure that his counsel acting in Hong Kong will assert his interests --

MR. SKINNER: Well, they may, but, Your Honor --

THE COURT: -- and argue it, but that doesn't answer what this Court should do in the face of the BVI -- what the BVI Court has done.

MR. SKINNER: The BVI Court has very clearly said that the directors are empowered to take action in this court and elsewhere, unless -- you know, unless it is on behalf of the companies themselves. Mr. Borrelli is taking action in his capacity as a director for the reasons that I just gave because he may find himself -- he's been injured already and he may find himself further injured in the future, given the contradictions of what some courts in different jurisdictions in the world may require him to do.

And really what we're talking about -- and that's -- what we're talking about here is standing. So, he is a party in interest.

THE COURT: What gives him standing to oppose recognition in this court?

MR. SKINNER: 1026(a).

THE COURT: Excuse me?

MR. SKINNER: He's a party in interest, Your Honor. As a director of the companies, he's a --

THE COURT: I think you --

MR. SKINNER: -- party in interest.

THE COURT: -- overstate what residual powers he may have, as authorized by the BVI Court.

MR. SKINNER: But, Your Honor, this is different than his residual powers. The residual powers that the BVI Court was talking about concerns the steps that he is able to take on behalf of the companies.

And the BVI Court is very clear, you can --

THE COURT: Read me the language of the BVI Court that makes it so crystal clear.

MR. SKINNER: One moment, Your Honor.

(Pause)

THE COURT: Yeah, I got a very different view when I read the last two briefs: your opposition and the reply.

MR. SKINNER: Your Honor, now, if you'll just excuse us awkwardly fumbling around, we will find the relevant portion for you.

(Pause)

MR. SKINNER: So, Your Honor -- and people who are experts in the BVI proceeding can correct me if I'm wrong --

I believe this -- the way this played out was when we were here last, Your Honor observed that the question of Mr. Borrelli's ability to speak on behalf of the BVI corporations was a question of BVI corporate law, properly addressed by the BVI --

THE COURT: And I still feel that way.

MR. SKINNER: -- courts. That issue was put in front of the BVI Court; it was briefed; it was argued. There was a hearing on May 14th, with respect to that.

We are still waiting for the entry of the final order that came out of that hearing. It is being litigated in BVI. I believe there was an argument on that yesterday.

But at the hearing, Justice Wallbank stated:

"And as Mr. Gibbon has pointed out --" and this was the JPLs' barrister down in the BVI, Mr. Gibbon -- "the JPLs have got no problem with directors as individuals or some other kind of interest, or maybe shareholders, going after the U.S. Court and explaining why the recognition should not be granted."

That was the JPLs' position in the BVI. That was the position that the BVI Court adopted. And that is why Mr. Borrelli is here in his capacity as an individual director and not here speaking on behalf of the corporations themselves.

THE COURT: What page of the transcript were you

reading?

(Pause)

MR. SKINNER: Your Honor, it's on page 207 --

And what exhibit is that?

And I'll get you the exhibit cite.

THE COURT: Okay.

UNIDENTIFIED FEMALE SPEAKER: Exhibit 21 to my declaration.

THE COURT: Go ahead.

MR. SKINNER: Further than that, Your Honor, if you looked at Tab 1 -- now, I had this in Tab 1. I could have directed Your Honor right to it -- if you just turn to the next page in Tab 1 is 208. So you had this -- 207 is what I was just referring to. In 208, he continues, lines 12 to 18:

"So, where does this take us? It means, put simply, that the directors do not have the power to go in and oppose the recognition proceedings in the U.S. if it is that they are doing so on behalf of the company. If they have some other kind of interest and they can come within Rule 1012, fine."

And that is exactly what we're saying we've done here. He has come in with some other kind of interest --

THE COURT: What interests are you asserting that he has?

MR. SKINNER: He as an interest, as I just explained, as a director. Because as a director, he has duties and obligations to the company.

But for the JPLs and but for the BVI orders, he would be running the companies right now. Because of the BVI orders and because of the recognition proceeding that these -- that the JPLs are seeking up here --

THE COURT: How do you square that with the language that directors are prohibited from taking any action in relation to the company's affairs and it is the company that the foreign representative is seeking recognition here. How do you square your argument, you know, if and when the justice in the BVI enters a written order -- I'm sure I will be sent a copy of it right away -- but I -- I am -- I'm having difficulty understanding how you square the language with -- that prevents directors, former directors, office-holders, and former office-holders are prohibited from taking any action in relation to the company's affairs. It's the company -- it is on behalf of the company that the foreign representative seeks recognition of the BVI proceeding.

MR. SKINNER: Sure. Your Honor, it's -- he is a director and he will continue to be a director, unless and until, he resigns or the companies are liquidated and no longer cease and no longer exist.

THE COURT: Well, that -- those may not be the

only choices, but --

MR. SKINNER: Sure. But those are probably the two most likely outcomes here. Either he's going to be replaced as a director, because the company has to have a director, or he is going to be -- or the companies are going to cease to exist.

For the period of time that we're in right now where the companies continue to exist and the BVI Court is trying to determine whether to authorize the JPLs to put them into final liquidation or not, at which point, they will cease to exist following some legal process, he is the director. The JPLs know this. They've gone to him and asked him for information. He's provided information back to them.

THE COURT: Except for the documents regarding his appointment --

MR. SKINNER: Well, he raised --

THE COURT: -- and the power of attorney.

MR. SKINNER: -- valid objections to those and they, perhaps, could have been worked out if those objections had been addressed prior to today, but they were not. And we've addressed them at this hearing. But he has responded to requests for information.

And as Your Honor -- as I explained earlier, he very well may be asked by the JPLs to assist in their efforts to locate, to investigate the company's affairs, to locate

assets, and the like. And he also --

THE COURT: And is he required to do so?

MR. SKINNER: As a director of the company, he is required to respond --

THE COURT: Or as a former director --

MR. SKINNER: -- to these --

THE COURT: -- is he required to do so?

MR. SKINNER: As I former director, I don't know, Your Honor.

THE COURT: You what?

MR. SKINNER: I don't know, Your Honor. I don't know, as a question of BVI law, whether a former director can be compelled to respond to requests from the joint provisional liquidators, if that were to fall within the scope of the court orders that are pointed to BVI. I suspect it would not, but I just don't know.

But the point is, he is an individual. He is -- he has a job to do. That job comes with duties, responsibilities, and fiduciary obligations. And he is appearing in his capacity as a director, with that job to do and with those obligations hanging over --

THE COURT: Well, I don't know --

MR. SKINNER: -- his head --

THE COURT: -- how you square that with the language that the Court entered.

MR. SKINNER: Your Honor, I square it by saying he's not seeking to take any steps on behalf of the company.
THE COURT: You know, if he was owed money --
MR. SKINNER: He's seeking to take steps --
THE COURT: -- a director's fee, and he was seeking to recover, and he had an individual interest in recovering director's fees that were unpaid; I can certainly see that.
MR. SKINNER: Well, he -- I mean, he may have --
THE COURT: I don't understand how he can take the position on behalf of the company in the face of the appointment of the JPLs.
MR. SKINNER: Your Honor, if I could direct -- a case that we found after we received the reply brief and the standing issues were presented to us -- I would draw your attention to -- is not in our briefing, but it's called In re Reyes. The citation to it is 2015 WL 4624156.
THE COURT: Give me the cite one more time.
MR. SKINNER: Sure.
THE COURT: 2015 WL --
MR. SKINNER: 2015 WL 462 -- sorry, I need my glasses -- 4624156, an August 2015 decision from this Court. Not Your Honor, but from the Bankruptcy Court.
THE COURT: What's the name of the case?
MR. SKINNER: In that case -- sorry, Your Honor?

THE COURT: The name of the case?

MR. SKINNER: In re Reyes, R-e-y-e-s.

THE COURT: And who wrote the opinion?

MR. SKINNER: Your Honor, I don't know which judge off the top of my head --

THE COURT: Okay.

MR. SKINNER: -- but we'll pull it off the decision for you.

Reyes concerned a dispute about real property in Manhattan, and the property was owned by a trust, and a bankruptcy debtor had claimed an equitable interest in the property. It had utilized an automatic stay that had been imposed after the debtor filed for bankruptcy, to stop the trustee from selling the property. And the trustee had, then, appeared in bankruptcy, as a party in interest and moved to dismiss the bankruptcy.

And the Court said, quote:

"Although a party in interest typically has a financial stake in the outcome of the bankruptcy case, courts have recognized in limited circumstances that someone with a legal, rather than a financial interest in the case may appear. Where a financial stake is absent, the movant can still establish standing to seek dismissal..."

THE COURT: But that doesn't say whether a director of a BVI corporation has authority or not.

MR. SKINNER: I'm --

THE COURT: It's very different than the issue of whether -- was it a foreign corporation?

MR. SKINNER: No. But, Your Honor, what it does say -- and this is the point that I think is helpful for the Court's analysis here -- what it does say is that eastern absent a financial stake, you can establish standing by demonstrating that the filing or pendency of the bankruptcy case impairs the movant's legal rights or ability to perform his duties.

So, there, the trustee was saying --

THE COURT: But here we have the JPLs, and they are put in place of the directors. They're the ones with the authority.

MR. SKINNER: In that case, the --

THE COURT: Go to the BVI Court and object there.

MR. SKINNER: But, Your Honor, we are objecting there. We have objected on behalf of the companies.

And there's no one to object to these proceedings, but us at this point, but Mr. Borrelli. So he has come in, in his capacity as a director, because this bankruptcy case, this Chapter 15 case will impair his legal rights or ability to perform his duties. It's -- he's not a trustee --

THE COURT: But his legal rights and duties are determined by BVI law, not by New York law.

MR. SKINNER: And the BVI judge has said there's nothing stopping an individual director from going up to --
THE COURT: That's not what the --
MR. SKINNER: -- oppose the Chapter.
THE COURT: -- judge said.
MR. SKINNER: Your Honor, I -- we just -- I mean, the order is still being finally negotiated, but as we just looked at on page 207 of this transcript, this is the position of the JPLs. They've got no problem with the directors, as individuals, going up to the U.S. Court.
THE COURT: So if he was owed money, director's fees, he could come into the court and he could -- and if there was a pot of money here and he argued that I'm entitled to receive X dollars --
MR. SKINNER: There is no money here, Your Honor. But he is -- he testified to this --
THE COURT: I don't know whether there's money here or not.
MR. SKINNER: Well, the -- and this, again, is part of the briefing, Your Honor -- the JPLs have made very clear that they haven't recognized any assets yet. They don't have any money. They haven't identified --
THE COURT: And if I recognize this as a foreign main proceeding, I'm sure that they will embark on their discovery to find out whether there are assets in the U.S.

MR. SKINNER: You've already recognized this provisionally and they already have embarked on discovery to try to identify assets in the U.S.

THE COURT: And that's typical in a Chapter 15 case?

MR. SKINNER: And I have no problem with them continuing to do that, pursuant to the provisional relief.

What I would ask the Court to do is wait until the BVI Court resolves its issues, with respect to we should proceed --

THE COURT: I'll tell you what. If the BVI Court rules contrary to what I happen to rule, you come back and ask me to modify my ruling.

MR. SKINNER: Well, I -- and I would -- I know I can do that and I will do that if that's where we end up. But as I mentioned, the relief they're seeking -- and maybe this comes down to the scope of the relief that Your Honor may ultimately enter, but a lot --

THE COURT: It will have to be identical.

MR. SKINNER: But it's essentially irreparable harm.

THE COURT: Case law establishes that the relief ordered in a Chapter 15 case does not need to be identical with the relief ordered in a foreign court.

MR. SKINNER: Of course, Your Honor. It also

provides for standard things that are entered under 1520.

But they're asking for relief beyond that and some of this relief, well, is the equivalent of irreparable harm to us. We won't be able to unring that proverbial bell.

So that is what he is up here, in his --

THE COURT: Okay.

MR. SKINNER: -- individual capacity, opposing.

With respect to the capacity for him to raise these objections, as Your Honor -- we'll provide the documents. To say that there's no evidence is just wrong because he testified under oath and -- but why would --

THE COURT: He hasn't identified who -- how -- what he purports to rely on --

MR. SKINNER: For --

THE COURT: -- for his authority.

MR. SKINNER: For good reason, Your Honor. Because those folks have said, We fear for our lives if you disclose our identity publicly.

So, we can -- if we could put proper protections on that, then he will disclose that information.

THE COURT: And you didn't go to, you or BVI counsel, didn't go to the foreign representative's counsel and say, We're prepared to make this information available, subject to an appropriate protective order?

MR. SKINNER: That's not true, Your Honor.

BVI counsel did offer to make that information available, subject to a confidentiality. And I very well may have done the same if we had had that discussion, but we did not.

And there were issues that I wanted from them. They refused to disclose a lot of information about their retainer, which might have been relevant to 109(a), that I wanted. And, you know, over the course of a fast-moving case, in the last week or two, as Mr. Dietderich, himself, pointed out, we made some decisions about what it was worth raising with the Court or not, and we elected not to pursue some of those things. Perhaps Your Honor would have ruled in our favor on some of those. We didn't present the issue to Your Honor. Neither side did. But I think we have a path forward now.

But I do have to -- I do have to note the notion that he didn't provide anything is just wrong, because he testified both, in his declaration and, again, at his deposition, that he had reviewed the underlying documents, that he was satisfied as to their authenticity, and that one reason he was satisfied as to their authenticity was because he recognized and he had reason to recognize Mr. Chen's signature. And, again, that testimony is part of the binder that we put up in front of Your Honor today.

So, I mean, we're talking about a preponderant

standard here. You know, I think the testimony, alone, from a well-credentialed, longstanding professional who has been on both sides of these JPL proceedings for decades, who came in after Mr. Chen had been taken into custody, after the JPLs had been appointed, had never met Mr. Chen before, why that man would have reason to put his reputation at stake, to put his career at stake by testifying as to obviously fabricated documents; none of that makes any sense. But we can all put that aside for now, because we'll work out a mechanism to provide the documents both, to the Court and to the other side, with proper protections in place so that the identity of the individuals is not disclosed in a way that would present them with safety risks.

Your Honor, I would like to say one or two quick words with respect to 109(a). I mean, look, it's always struck me as a little unusual that jurisdiction can be conferred to a U.S. Court simply by transferring money into an attorney escrow account. But the law is clear that, that that is the -- that is the law.

THE COURT: Not only in this court, but in other bankruptcy courts in other circuits, as well.

MR. SKINNER: For sure.

But in all of the examples in this court, in the cases that have been cited to Your Honor, there -- it's always the debtor's money that was transferred into the

attorney escrow account. And there's no dispute here that it was not the debtor's money.

THE COURT: I'm not sure that that's true.

(Laughter)

THE COURT: I'm fairly certain that's not true.

MR. SKINNER: Well, Your Honor --

THE COURT: I think the issue hasn't been contested in any cases before me, but I am -- you know, I can't give you the names of the cases from memory, but I've had cases where the retainer was paid by some other professional involved in the case.

MR. SKINNER: That -- Your Honor, that may be.

I can say the ones that I've looked at -- and I think I've looked at every one in this district, at least, and I've certainly looked at all the ones that were cited in the briefs -- the money that was transferred was the money of the debtor. You know, for example, the Ocean Rig case that was cited by the JPLs, that was a million dollars of the debtor's money that was held in a trust account. There's no dispute it was the debtor's money. Actually, we -- I think we cited Ocean Rig.

They cited Global Ocean for the proposition that it doesn't matter who paid the retainer. But in Global Ocean, what was at issue was a retainer that had been paid -- and this, I think, was in the amount of $400,000 -- by the

debtors. And in that instance, it was a weed [sic] debtor that was publicly traded, ocean drilling company that had, I think, 14 wholly owned, either subsidiaries or affiliates, and the money had been paid on behalf of all of them. You know, I can get you the name of the case later.

There was a case I saw where money was paid on behalf of a third party, pursuant to an agreement to forgive debt. All of these would be instances where, perhaps, there may have been money paid by a third party, but it was pursuant to some type of contractual arrangement with the debtor, where there was a concrete obligation of the debtor to pay it back.

Mr. Pretlove testified very clearly at his deposition that there's no such arrangement here. What happened here was they needed to pay the money. They didn't have any money. They couldn't get any money from the debtors so Interpath, the firm that he works for, paid for it out of their own funds. And at some point in the future if there ever is a realization of assets --

THE COURT: So the recent decision by Judge Perez in the Southern District of Texas, that the deposit needs to be made before the Chapter 15 case is dismissed.

MR. SKINNER: Correct.

THE COURT: And that's not an issue here, is it?

MR. SKINNER: The deposit was made before the

Chapter 15 case was initiated. If the Court finds that the fix here would be if the Court finds that it needs to be property of the debtor and that Interpath's money, in this instance, is not property of the debtor, as we suggest, then the remedy would be for them, if they can find property of the debtor, to transfer new funds in and restart these proceedings --

THE COURT: Okay.

MR. SKINNER: -- but in the meantime, this Court doesn't have jurisdiction.

And I would ask, because I do think that it's relevant to the jurisdictional question, that if we are producing documents subject to a protective order for Your Honor to review and for our opponents to review, that all we received, with respect to the retainer agreement, is the invoice have Sullivan & Cromwell saying that it is an advanced payment of retainer. That's all we know about it.

Mr. Pretlove wasn't able to provide any details about the retainer agreement during his deposition. He said he just didn't know. And we asked for the documents related to the retainer that would explain the terms under which the retainer was made and they refused to provide them.

I don't think that they're privileged, or I think if there is anything privileged in an engagement or (indiscernible) the like, it could likely be redacted. But

in any event, they didn't provide it.

And if this is a retainer, which, as we noted in our brief, is, in fact, pursuant to an agreement by Sullivan & Cromwell where they're not holding the money in trust on behalf of the debtor, if it's a retainer where title of the money has now transferred to them because it's a payment-in-advance retainer, then that's another reason why there actually isn't 109(a) jurisdiction here. Because it would have been Sullivan & Cromwell's money, not the debtor's money at the time they filed the Chapter 15 proceedings, because I don't think there's any dispute that the retainer was not transferred -- the wire of the $25,000 from Interpath was not made at the same instance that this proceeding was filed.

So I'd ask that if, you know, if we are going to have an additional document exchange to resolve some of these jurisdictional issues, that we get those documents so that we can determine what the facts are, with respect to the retainer, as relevant to the 109(a) argument.

Your Honor, with respect to the merits, whether this is a foreign proceeding or not, you know, Your Honor obviously ruled the way Your Honor ruled.

In the decision, Your Honor, resolving the application for provisional relief, I would like to point out one or two things that we think are deficiencies, with

respect to the foreign proceedings that have come up, you know, through discovery and the like for Your Honor's consideration. First, as you know, because we made this argument earlier and we've made it again in our objection, we believe that the proceedings are not for the purpose of reorganization or liquidation.

The JPLs were appointed to aid the BVI AG's investigation and to further her efforts to cooperate with foreign law enforcement and sanctions authorities, not to reorganize the debtors or liquidate assets for creditors. That will happen down the road, perhaps, with the permission of the BVI Court.

But in the order --

THE COURT: Isn't that always the case in every case --

MR. SKINNER: I don't know --

THE COURT: -- the foreign representative doesn't have authority, absent a plan -- an approved plan in a foreign court, to distribute assets further?

MR. SKINNER: For a reorganization plan, perhaps, Your Honor, and perhaps if there isn't --

THE COURT: Or a liquidation case.

MR. SKINNER: Well, and that's -- that, I think, is kind of the issue is here. You know, we don't have any creditors. We don't have any process by which creditors are

going to be identified. There's no process to --

THE COURT: Yet.

MR. SKINNER: -- identify yet.

No, we're talking about where things stand --

THE COURT: But that's always the case. So I have a case, believe it or not, it's called Asbestos Corporation Limited, if you could imagine --

MR. SKINNER: I believe that.

(Laughter)

THE COURT: -- naming your corporation, a Canadian corporation. But I recognized the Canadian proceeding as a foreign main proceeding. That's step one.

They're off in Canada arguing about what the plan, if any, that the Canadian Court should adopt and they'll be back, assuming that the Canadian Court approves a plan, they'll be back seeking recognition and enforcement of the plan.

MR. SKINNER: And we might be in a similar type of mainstream, Chapter 15 proceeding here.

THE COURT: But that doesn't delay recognition of the foreign proceeding.

MR. SKINNER: But it should.

THE COURT: It shouldn't.

You know, yes, I've had some Chapter 15 cases where they're filed at the time that the foreign court has

already adopted a plan. But in many cases, particularly involving the ones involving provisional relief, it may be years before a foreign court has adopted a plan and decided how, if it's able, you know, if assets are able to be recovered, how they should be distributed among creditors --

MR. SKINNER: And I suspect --

THE COURT: -- should there be, you know, a proof of claim procedure, et cetera. But that's all for the foreign court to decide, not for this Court.

MR. SKINNER: Of course, Your Honor.

And I would suspect that in all those cases, or virtually all of those cases, they were brought because the underlying company was insolvent. And the reason, the purpose for the foreign proceeding was because the company's liabilities exceeded its assets.

And we're going back to where I started, but the purpose of this proceeding was not liquidation. It may -- if they want to get to liquidation, that may be where they ultimately end up, but the purpose of the provisional preparing that Your Honor is being asked to recognize right now was clearly brought, pursuant to the other two prongs of the BVI statute which relate to --

THE COURT: What's your next argument?

MR. SKINNER: Your Honor, I would just ask you to humor me afterwards and look at the tabs that we attached to

that binder, Tab 7, Tab 15, Tab 4, Tab 5, Tab 6. These all have the appointment orders and the like and they all make crystal clear that the BVI AG, in her own -- that's taken her own positions in the BVI Court, that the appointment of the JPLs was to protect assets, investigate their activities, secure assets, not for purposes --

THE COURT: Secure assets for what purpose?

MR. SKINNER: Well, secure -- she want -- I don't want to say the same -- I don't want to just keep repeating the same arguments, Your Honor; I know you've told me to move on -- I don't dispute, and she's made clear, that she wants to get to liquidation at some point, but she's not there yet. And --

THE COURT: And that's frequently the case, you know, where the foreign representative doesn't know whether there will be assets to distribute or not.

MR. SKINNER: But that's the case where it was brought in the first place because the companies were insolvent.

These companies are not insolvent; they have assets. These assets -- they have assets. They don't have creditors.

And the BVI AG, for the first time ever -- this might be a totally different question, even if some other interested party on that list that we looked at before, a

shareholder, an employee -- I don't know -- if somebody else came in and said, you know, we should really be putting this company into liquidation, but it is a third party, a governmental entity that is exercising its authority for the very first time. And that is what makes this case unique and different. And that is why it's not like all of the other Chapter 15 cases that Your Honor has considered in the past.

The other issue that we had, as we pointed out in our brief, is that the BVI proceedings are not being conducted under a law related to insolvency or the adjustment of debt.

THE COURT: They absolutely are. The statute is in front of me. You may be unhappy with the confidentiality that has taken place within the BVI Court. Raise it with the BVI Court.

Your challenge is to the specific proceeding, you know, what's going on in the BVI and appeal it if you're unhappy with it.

MR. SKINNER: But, Your Honor, it would relate to insolvency if it was brought, pursuant to 162(1)(a), where the company is insolvent. It was not.

THE COURT: Okay. You've made that argument.

What else?

(Pause)

MR. SKINNER: And, Your Honor, again, I would just

ask you to look at what we put into the binder, which identifies some of what has happened since we were in court last time where, again, the BVI AG, in their arguments in the BVI, has made clear that the appointment of the liquidators doesn't necessarily entail a winding-up and that the later distribution process should not be assumed --

THE COURT: But isn't that true of --

MR. SKINNER: -- and that's the crux of our argument.

THE COURT: -- every foreign preparing, what the outcome is going to be? It isn't determined on day one.

MR. SKINNER: Not every foreign proceeding where the initiation was brought out of -- on public interest, inequitable grounds, as opposed to because the company was insolvent.

And the last argument -- which I'm frankly making only to preserve our arguments because you've already rejected it, squarely, and I don't think much has changed -- is that we do not believe that these are collective proceedings. And the reason for that is that there's -- there is no collective creditor process yet in the BVI.

THE COURT: Yet.

MR. SKINNER: Yet.

There may be future -- there may be in the future. And a lot of these arguments may go away if they win in the

BVI. But they haven't won in the BVI yet and Justice Wallbank very well may not give them what they've asked for.

THE COURT: And I'm sure you'll be back if they don't.

MR. SKINNER: Your Honor, perhaps if Your Honor -- I mean, I think it's pretty clear where Your Honor is likely to go. I'd ask you to do look at what we've put in front of you -- hope springs eternal that some of it might have an impact -- and I'm sure Your Honor will. But if where we are headed is to recognition at this time and the scope of that recognition order, I guess my question would be, do you want to -- would the Court prefer to argue some of those issues now or should we actually see where the JPLs are asking for something that we don't think the Court should be giving them that authority and come and bring those disputes back to you?

As I noted at the start, I think it's a bit of a moving target because we have two versions of the proposed order that has been submitted to Your Honor and --

THE COURT: So let's -- we're dealing with only the recently submitted order. I will give you until Friday at noon to put in objections to that form of order.

MR. SKINNER: Very well, Your Honor.

THE COURT: Okay. I won't -- you know, it should be no secret that I'm going to recognize the BVI proceeding -- proceedings as foreign main proceedings. I

still have questions about the relief. I will give you until Friday at noon to put in written objections to the form of the order.

Perhaps, you could meet and confer with Mr. Dietderich, and you can come up with an agreed form of order, but otherwise, put in your written objections by Friday at noon.

MR. SKINNER: And perhaps we can.

But I think, more likely, we will at least narrow the scope of the issues to as few as possible for Your Honor to address and resolve and we will only address those issues in our brief.

THE COURT: Okay. And -- Friday at noon.

MR. SKINNER: Okay. Very well, Your Honor.

Unless you have any further questions for us --

THE COURT: Mr. Dietderich?

MR. SKINNER: -- I do want to -- we did come -- my colleague, Ms. Femino did come amply prepared to address those now, but I think it -- it, likely, is a more efficient process to see what we can agree on first and then only bring the disputes to Your Honor.

THE COURT: I doubt very much whether we're going to have another hearing. I'm going to decide on the form of the order that should be entered and I expect, in all likelihood, I will enter the order before -- before it, with

an opinion to follow.

MR. SKINNER: Your Honor, if you do want to have a hearing, I'm always happy to come and appear in front of you.

THE COURT: Yeah.

MR. SKINNER: And I appreciate your patience with arguments that, clearly, you disagree with and in hearing me out.

THE COURT: Okay.

Mr. Dietderich?

(Pause)

THE COURT: Let me just say, Mr. Dietderich, I'm -- I will study the form of order. I will acknowledge that I didn't have time in all of this to review the final -- the new formed.

I am somewhat troubled by, at least as described to me -- and perhaps after I've reviewed the document, I will -- because some of the relief is not the ordinary. We've acknowledged it is not the ordinary relief.

MR. DIETDERICH: No, that's correct, Your Honor.

And I think I would ask Your Honor to bear in mind just a few things that are in the evidence before you. One is the testimony from Mr. Borrelli in his deposition that, well, as Your Honor knows, the Boies Schiller firm represents Chen Zhi and Mr. Borrelli. That Mr. Borrelli has not signed a conflict waiver between those companies -- between those

clients.

THE COURT: This is the first I'm hearing -- that may be in some of the papers, but I'm particularly troubled by that question. And I may enter an order -- you know, I won't do it without further briefing -- but I am particularly troubled if the Boies Schiller firm is also representing --

MR. DIETDERICH: Your Honor, they've also claimed, in response to questions in deposition, Mr. Borrelli claimed a common interest with Mr. Chen. So that's what we're dealing with.

This idea --

THE COURT: Is that true?

MR. SKINNER: That's correct, Your Honor.

THE COURT: Okay. I want to see the brief addressed to the issue of whether you're permitted to represent Mr. Borrelli, again, by Friday at noon.

MR. SKINNER: Very well, Your Honor.

MR. DIETDERICH: Okay. Your Honor, so, when we talk about the Prince Group writ large, the mysterious, non-legal entity in Cambodia they purport to also now potentially represent, when we ask for the extraordinary relief in terms of not representing the -- you know, we do not represent the Prince Group in some abstract concept.

THE COURT: Well, I'm troubled by granting relief about the Prince Group in the abstract.

MR. DIETDERICH: We're not look -- yeah, we're not looking to represent the Prince Group in the abstract, ourselves, but what we're asking for is clarity. That, if we can't, really, no one can, without identifying a natural person or a legal entity. That is unusual relief and we'll leave it to Your Honor's consideration.

THE COURT: You know, it may be that you will get relief and you'll have to come back and ask for further relief. I'm uncertain of that.

I'm out of town next week at the Triple-I conference.

MR. DIETDERICH: Okay. Your Honor, one other point -- and this goes to something counsel said and preserving the right, you know, preserving the record and disagreeing with Your Honor and preserving that disagreement -- as I started this morning, that I do believe the question of standing is independently relevant in the context of appeal rights, in the context of the way this proceeding goes forward. So we would ask Your Honor to take under advisement our position on the standing of Mr. Borrelli to appear, in addition to the merits of recognition.

THE COURT: I think, Mr. Dietderich, the issue of standing will be addressed in the opinion, but an order is likely to be entered, well, before that -- before the opinion is issued.

MR. DIETDERICH: Okay. All right. Thank you.

THE COURT: Let me ask, what is your position with respect to Mr. Skinner's offer to provide the documents, pursuant to a protective order --

MR. DIETDERICH: Well, first, I guess I should be clear --

THE COURT: -- regarding Mr. Borrelli's appointment?

MR. DIETDERICH: -- at the procedural. It is not our burden to show evidence.

THE COURT: I'm asking a different question.

He's offered to provide you with documents, pursuant to a protective order. Are you willing to take it, pursuant to a protective order?

MR. DIETDERICH: Absolutely.

THE COURT: Okay. You ought to engage with Mr. Skinner to see whether you can agree on the form of protective order.

MR. DIETDERICH: Okay.

THE COURT: It should clearly permit the foreign representatives to see the documents, as well -- as well as counsel.

MR. DIETDERICH: Well, we had -- we're going to have this issue, as well, in our 2004 discovery requests, Your Honor; again, they've refused to accept service for

Mr. Borrelli under 2004 requests, but they go to this information, you know, as well, even if it may be mooted by the recognition.

THE COURT: Let's take one step at a time.

MR. DIETDERICH: All right. But, Your Honor, to answer your question, we'll take as much as we can get, as soon as we can get it.

THE COURT: Okay. You and Mr. Skinner should discuss the form of a protective order --

MR. DIETDERICH: Thank you, Your Honor.

THE COURT: -- to see if you can resolve that.

MR. DIETDERICH: Thank you.

THE COURT: Okay. Have all parties who wish to be heard, been heard?

(No verbal response)

THE COURT: All right. We are adjourned.

MR. SKINNER: Thank you very much, Your Honor.

(Proceedings concluded at 11:48 a.m.)

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

/s/ William J. Garling June 10, 2026

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable

/s/ Coleen Rand June 10, 2026

Coleen Rand, CET-341

Certified Court Transcriptionist

For Reliable