# EXHIBIT 7

## Letter from Bazul LLC to the Supreme Court of Singapore, Oct. 23, 2026

B A Z U L L L C

BUILT FOR HIGH-STAKES DISPUTES

Our Ref: *20260014/KH*
Your Ref: *SIC/OA 27/2026 to SIC/OA 56/2026*

23 October 2026

**THE REGISTRAR** **BY ELITIGATION ONLY**
Supreme Court of Singapore
1 Supreme Court Lane
Singapore 178879

Attention: The Honourable Justice Christopher Scott Sontchi

Dear Sirs,

**SIC/OA 27/2026 TO SIC/OA 56/2026 AND SIC/SUM 71/2026 TO SIC/SUM 95/2026**
**AMBER HILL VENTURES LIMITED (IN PROVISIONAL LIQUIDATION) & 3 ORS AND OTHER MATTERS**
**UPDATE ON THE BVI LIQUIDATION PROCEEDINGS**

1. We act for the Applicants in the Recognition Applications. Unless otherwise stated, we adopt the definitions used in the Applicants' Written Submissions dated 5 October 2026. We refer to the hearing of the Recognition Applications and the Stay Applications on 7 October 2026, and to the Registrar's Notice dated 22 October 2026 fixing a hearing on 23 November 2026 at 10 am for the Court to give its decision.

2. In keeping with the Applicants' duty under Article 18 of the Model Law, we write to inform the Court that on 21 October 2026, the BVI Court (Wallbank J (Ag.)) held a hearing to communicate its decision on the Liquidation Applications. We attach a copy of the official transcript of that hearing (the "**Transcript**").

3. In summary, Wallbank J indicated that, in his view, the Liquidation Applications "*should be dismissed*" and the BVI Orders "*should also be discharged*" (Transcript, p 15 lines 1–7). However, the Judge made clear that he was not making any such orders at this stage:

    a. He stated: "*I do not use the words 'are hereby dismissed'. Yes, they should be dismissed. So, I am not making that order right now.*" (Transcript, p 22 lines 2–4; see also p 22 lines 21–24).

    b. The substantive outcome, including "*how we discharge the Provisional Liquidation Order, whether we stay the Provisional Liquidation Order*", will be dealt with at a further consequential hearing, which the parties proposed for 8 and 9 December 2026, and reflected in an order made after that hearing (Transcript, p 23 lines 2–8, p 24 line 6 to p 25 line 9 and p 32 lines 1–6). The Judge observed that he would

not "*rush*" to implement the decision, since an immediate discharge of the JPLs could result in job losses and businesses being shut down (Transcript, p 15 line 12 to p 16 line 1).

c. Time for any appeal will only run from the later of the finalisation of the written judgment and the entry of the order on the judgment (Transcript, p 9 lines 16–25). Counsel for the BVI AG indicated the BVI AG's intention to seek a stay of execution, which the Judge confirmed may be raised at the consequential hearing (Transcript, p 20 line 14 to p 22 line 20). Our clients understand that the BVI AG intends to appeal the decision.

d. In the meantime, the BVI Orders remain in full force, and the JPLs remain in office, with no variation to their powers (Transcript, p 28 lines 23–25, p 29 lines 9–22 and p 31 lines 5–9).

4. The BVI Court's written judgment remains under embargo and is restricted to BVI-admitted lawyers. The Applicants will furnish a copy to the Court once it is finalised and released.

5. The Applicants respectfully submit that the requirements for recognition under Article 17(1) of the Model Law continue to be met: the BVI Liquidation Proceedings remain pending, the JPLs remain in office, and that will continue to be the position on 23 November 2026, and possibly thereafter, if a stay of the BVI Court's decision is granted. Recognition does not require the foreign proceeding to be concluded or appeals to be exhausted, and in any event any later change can be addressed under Articles 17(4) and 18 of the Model Law (*Garuda* at [77] to [80]). The parties can further address the Court on the effect of the BVI Court's decision at the upcoming hearing scheduled on 23 November 2026.

6. In the meantime, the Applicants will keep the Court informed of further developments in the BVI, including the outcome of the consequential hearing and any appeal or stay application.

7. We thank the Court for its kind attention to this letter.

Yours faithfully,

Bazul LLC

**KEITH HAN / AMMANI MATHIVANAN / SHANICE PHEE**
keith.han@bazul.sg / ammani.mathivanan@bazul.sg / shanice@bazul.sg

enc.

cc. (1) **Providence Law Asia LLC** **BY EMAIL & ELITIGATION**
Ref: AV/DT/AY/DW/26099 **(Service Upon Acceptance)**
Attention: Abraham Vergis, S.C. / Daniel Tan / Alston Yeong / Darren Wong / Amar Pandey

(2) **Advocatus Law LLP** **BY EMAIL & ELITIGATION**
**(Service Upon Acceptance)**
Attention: Christopher Anand Daniel / Eileen Yeo / Lim Yi Zheng

(3) **Clients**

BRITISH VIRGIN ISLANDS

IN THE HIGH COURT OF JUSTICE

VIRGIN ISLANDS

(COMMERCIAL DIVISION)

CLAIM NO BVIHC (COM) 2026/0003, CLAIM NO BVIHC (COM) 2026/0027, CLAIM NO BVIHC (COM) 2026/0001, CLAIM NO BVIHC (COM) 2026/0002, CLAIM NO BVIHC (COM) 2026/0004, CLAIM NO BVIHC (COM) 2026/0005, CLAIM NO BVIHC (COM) 2026/0006, CLAIM NO BVIHC (COM) 2026/0007, CLAIM NO BVIHC (COM) 2026/0008, CLAIM NO BVIHC (COM) 2026/0009, CLAIM NO BVIHC (COM) 2026/0010, CLAIM NO BVIHC (COM) 2026/0011, CLAIM NO BVIHC (COM) 2026/0012, CLAIM NO BVIHC (COM) 2026/0013, CLAIM NO BVIHC (COM) 2026/0014, CLAIM NO BVIHC (COM) 2026/0015, CLAIM NO BVIHC (COM) 2026/0016, CLAIM NO BVIHC (COM) 2026/0017, CLAIM NO BVIHC (COM) 2026/0018, CLAIM NO BVIHC (COM) 2026/0019, CLAIM NO BVIHC (COM) 2026/0020, CLAIM NO BVIHC (COM) 2026/0021, CLAIM NO BVIHC (COM) 2026/0022, CLAIM NO BVIHC (COM) 2026/0023, CLAIM NO BVIHC (COM) 2026/0024, CLAIM NO BVIHC (COM) 2026/0025, CLAIM NO BVIHC (COM) 2026/0026, CLAIM NO BVIHC (COM) 2026/0028, CLAIM NO BVIHC (COM) 2026/0029, CLAIM NO BVIHC (COM) 2026/0030

IN THE MATTER OF BRIGHT TEAM GLOBAL LIMITED & 29 OTHERS
AND IN THE MATTER OF THE INSOLVENCY ACT 2003

BETWEEN:

THE ATTORNEY GENERAL OF THE VIRGIN ISLANDS )
Applicant )
vs. )
)
BRIGHT TEAM GLOBAL LIMITED and 29 Others )
Respondents )
______________________________________________)

TRANSCRIPT OF JUDGMENT PROCEEDINGS

Wednesday, 21st October, 2026
12:30 a.m. to 1:15 p.m.

BEFORE: HON. JUSTICE GERHARD WALLBANK KC, Judge

Court Reporting Unit
Government of the British Virgin Islands
Road Town, Tortola
British Virgin Islands

APPEARANCES:

ONEAL WEBSTER
Chambers
181 Main Street
Road Town, Tortola
British Virgin Islands
BY: MR. PAUL DENNIS, KC
MRS. NADINE WHYTE-LAING
For the Attorney General Chambers

KOBRE & KIM (BVI) LP
Chambers
Commerce House, Waterfront Drive
Road Town, Tortola
British Virgin Islands
BY: MR. PETER TYERS-SMITH
MR. TIMOTHY DE SWARDT
MR. MERRICK RICARDO WATSON
For Amber Hill Ventures and Lateral Bridge Global Limited

CAMPBELLS
Chambers
Floor 4, Banco Popular Building
Road Town, Tortola
British Virgin Islands
BY: MR. ANDREAS GLEDHILL KC
For the 25 Respondent Companies

WALKERS (BVI)
Chambers
Main Street
Road Town, Tortola
British Virgin Islands
BY: MR. OLIVER CLIFTON
For the Joint Provisional Liquidators

P-R-O-C-E-E-D-I-N-G-S

* * *

(Matters commences at 12:30 p.m.)

THE CLERK: BVIH COM 001 of 2026 to 0030 of 2026 - The Attorney General v Bright Team Global Limited et al.

THE COURT: Yes, appearances for the record, please, Learned Counsel.

Yes, Mr. Gledhill.

MR. GLEDHILL: My Lord, if no one wants to go first, I am Andreas Gledhill, King's Counsel. I am counsel on behalf of 25 of the Respondent Companies.

THE COURT: Yes.

MR. DENNIS: May it please you, My Lord, I appear for the Applicant in the substantive Application for Appointment of Liquidators and appearing with me is Mrs. Nadine Whyte-Liang.

THE COURT: Yes.

MR. TYERS-SMITH: My Lord, it's Mr. Tyers-Smith appearing with Mr. Tim de Swart and Merrick Watson for the Kobre & Kim Companies, Amber Hill and Lateral Bridge.

THE COURT: Yes.

MR. DENNIS: I might just

add, My Lord, the Attorney General, on whose behalf the Application was made, I believe she intended to join on the Zoom platform. I am not sure if she managed to actually join. She has been travelling. She is indeed here, My Lord. I can now see that.

THE COURT: She is. Yes, she is indeed.

Welcome, Honourable Attorney General. Yes. Very good.

MR. CLIFTON: And, My Lord, very much last, Oliver Clifton here for the Joint Provisional Liquidators. I see at least two of whom are in court.

THE COURT: Yes. Thank you very much, learned Counsel.

So, the purpose of today's hearing is for the Court to hand down the decision following the two-day hearing on the 16th and the 17th of April this year. And over those two days, the Court heard submissions in relation to some 30 separate Applications for the appointment of liquidators over Companies said to be connected to a Mr. Chen Zhi. And these separate Applications have been heard together. They were not consolidated into a single set of proceedings. And as you will see, Learned Counsel,

this is reflected in the title pages of the judgment.

Now, you will shortly, after this hearing, probably tomorrow, receive a draft written judgment for your review. And it has some 107 pages, although I have to say that the first four pages are the title pages. And so, really, we are looking at just over 100 pages, but it's nonetheless quite a lengthy judgment and there are quite a few authorities in it.

So, I was going to suggest, would you probably need, let us say, 21 days in which to consider this for non-substantive corrections, on track changes for it to be returned for finalisation, 21 days, you think that would work for you?

MR. DENNIS: I believe that would be more than enough, My Lord.

THE COURT: Yes. Well, I mean, I can take it down to, let's say, seven, if you prefer. But then, knowing that it is just over 100 pages, and things crop up in your world, to nudge these things to the back burner, then --

MR. DENNIS: In that event, 21 days, My Lord, I think would be eminently justifiable and reasonable in the circumstance.

THE COURT: Mr. Gledhill.

MR. GLEDHILL: My Lord, I have just been, forgive me for looking distracted, I was just taking instructions from my attorneys. We would respectfully invite you to grant a slightly lower period than that. Can I suggest 14 days? There is some urgency attaching to it. As Your Lordship appreciates, because the currency of the joint provisional liquidation of itself continues to incur fees and things continue to be done. So, if we could restrict it to 14 days, I am sure those instructing me would be most obliged.

THE COURT: Yes. Very well.

Mr. Dennis, from your side, 14 days would work, would it?

MR. DENNIS: We could live with 14 days, My Lord, I am sure.

THE COURT: I am sure, yes. Okay. We'll just have to keep it on the front burner.

Mr. Tyers-Smith, 14 days?

MR. TYERS-SMITH: Yes, My Lord, that's fine for our side as well, thank you.

THE COURT: Yes.

Kobra & Kim companies?

MR. TYERS-SMITH: Yes.

THE COURT: That's from Kobra & Kim.

MR. TYERS-SMITH: That's correct, yes.

THE COURT: Very good, okay.

And, Mr. Clifton?

MR. CLIFTON: My Lord, I don't think the JPLs have a dog in that particular fight, so we are happy to proceed as the Court suggests.

THE COURT: Okay, 14 days it is then.

Now, before we get into the meat of it, there is one procedural aspect which I ought to broach. Time for appeal, because we are obviously circulating a draft judgment and which will remain unfinalised for, you know, say 14 days and plus a couple of days more than that, I was going to say that the time for appeal should run from the date of the entry of the order upon judgment, that is the written order of judgment, or the finalisation of the written judgment, whichever is the later.

Basically, the point of that is, is that you can read what I have written in the draft judgment

and mull it over from an appeal point of view and any other kind of interim applications point of view without being jumped into action immediately at the close of business today. This is a standard order that we generally make in the Commercial Court.

Can I invite comments from the parties on that suggestion?

MR. DENNIS: My Lord, I believe it makes perfect sense that the running of time for appeal should commence once the judgment has been finalised or the order has been settled and entered. I believe, My Lord, in circumstances where there is an initial circulation of a draft, this accords with what the Court would ordinarily provide and so we would be happy with that position.

THE COURT: Yes. Just to be clear, I am proposing that the time for appeal should run from the later or the finalisation of the written judgment or the entry of the order upon judgment. The reason for that is whilst technically you can only appeal orders and not judgments, of course, it makes no sense to appeal something that you don't formally know is in its final form, hence, the running of the time from the finalisation of the judgment.

Yes, Mr. Dennis?

MR. DENNIS: Yes, My Lord.

THE COURT: Very well.

MR. DENNIS: We would be content with that.

THE COURT: Yes.

Mr. Gledhill.

MR. GLEDHILL: We are also content with Your Lordship's proposal. Thank you.

THE COURT: Yes.

Mr. Tyers-Smith.

MR. TYERS-SMITH: And the same for our Companies as well. Thank you.

THE COURT: Very good. Thank you. Very well. So, one moment.

Now, this is the first time that this Court has had detailed argument in relation to winding up companies on the public interest ground in the Insolvency Act. This is the first time that this Court has had to grapple with the legal standard for doing so and, in particular, the evidential standards which such an Application calls into play.

A lot of law has gone into this matter. The facts themselves are not that difficult and I am not going to rehearse them now. The law, on the other

hand, is new for us because this is the first time and it is also new in that the BVI Insolvency Act, in particular, I think it is our Section 162, does not follow the same regime that the UK has. Consequently, we are going into unchartered territory -- uncharted territory, sorry, not unchartered, uncharted territory.

The learned Attorney General and her legal team, they took a view and they presented it with vigour and they built their case carefully upon a reading of the authorities.

Equally, their opponents, represented by, in the case of 25 of them, by Mr. Gledhill and in respect of basically two of them by Mr. Tyers-Smith, they took a different view. There was a lot of crossover in their argument.

The Kobra & Kim Defendants, they brought their own particular arguments to the table as well in relation to the rule in Hollington and Hewthorn and in other respects in relation to the admissibility of evidence.

I have very carefully considered those authorities and I felt it necessary in this very long judgment to go through them in some detail. And the conclusion that I reached is not really a conclusion which, at a personal level, I would have necessarily

wanted. My personal inclinations here have got nothing to the point, of course.

What I would say, however, is that the Attorney General's concept of seeking to have liquidation orders made in respect of companies associated with somebody who is alleged to have engaged in horrendous business practices, that concept is, in my view, a sound one. Where, unfortunately, from their point of view, it fell apart, if I can call it that, is in respect of two aspects:

One was in relation to the law, and that was their understanding of the evidential burden in bringing an application for the winding up of companies on the public interest ground.

The second aspect where I considered myself constrained to disagree with the approach taken by the Honourable Attorney General's team is in relation to the evidence put forward. The evidence put forward was quite extensive in terms of steps taken against Mr. Chen in various jurisdictions, including the United States and in the Far East. It was quite extensive in that it included the terms of a US grand jury indictment and a US forfeiture complaint. It was quite extensive in terms of the BVI's anti-money laundering and the sanctions regime. And it was quite

extensive in relation to the sanctions which have been imposed in the United States and in the United Kingdom. It was also quite extensive in recounting the ownership and control that Mr. Chen Zhi had of the various BVI Companies; and in relation to including the K&K Companies at a further hearing after the appointment of provisional liquidators when some more had been found out. Then the Attorney General also found that there was a link between the K&K Companies and Mr. Chen in the form principally of Ms. Sandy Zhou as the custodian of the books and records of K&K Companies, or at least one of them, and the passage of monies.

Now, that was all very well, but as the Campbells Companies and the K&K Companies submitted, none of this evidence of allegations, particularly the horrendous things that Mr. Chen Zhi and his associates are alleged to have been perpetrating, none of these were reflected in evidence that is admissible before this Court. And the authorities from the UK are quite clear, in my respectful judgment, that evidence is required of objectionable business practices or other reasons for winding up companies. Mere association is not enough.

And as you will read in the draft judgment, then in terms of the availability of

evidence, the Honourable Attorney General and her team, they did not explain to the Court why it was that they couldn't get evidence of the things that Mr. Chen and his associates are supposed to have done, as recounted in the US indictment or the forfeiture complaint. They speak in terms of international cooperation. Well, that's fine, and clearly there has been international cooperation at some level. We are talking not just about international cooperation, but governmental cooperation.

It was not explained to the Court why it was that the US might have refused to share their primary evidence with the BVI or what efforts were made to get some of that primary evidence or enough of that primary evidence. Nothing. We simply have the indictment and we simply have the forfeiture complaint, and there is authority which binds this Court. It's Wang v Floreat from our Court of Appeal, which says that documents which commence process are not evidence of anything.

So where we are left with, as you will read, is that there are allegations, there are associations, but the authorities constrain me to say that that is not enough to wind companies up.

So, as you will read, I consider myself

constrained to find that only one outcome is open to the Court, which is that the Originating Applications should be dismissed. And since the Originating Applications should stand dismissed, and since, as you will read. I have found that a Provisional Liquidation Order is not a standalone remedy, the Provisional Liquidation Order should also be discharged.

Now, the Court will hear the parties further on consequential issues, including an orderly implementation of this decision and in relation to costs.

Now, by "an orderly implementation of this decision", what I mean is that I am sure that one particular party or two particular parties, they might agitate for an immediate dismissal of the Provisional Liquidation Order and an immediate dismissal of the Originating Applications. But I am conscious that the Provisional Liquidators have, for example, been taking steps, various steps, which would appear at least to have been beneficial at a number of levels. And if I simply discharge them, many people might immediately lose their jobs in operating companies, many businesses might find themselves immediately shut down. So, I am not going to rush to impose conclusions which might reflect a legal outcome. It has to be done in a

sensible orderly fashion.

So, the parties will have an opportunity to consider this draft judgment, and they will have an opportunity to address the Court further on consequential matters which flow from this Court's judgment. And that is how we are going to be dealing with things, learned Counsel, ladies and gentlemen.

MR. GLEDHILL: My Lord, I am very grateful for that indication. Since we are in open court and Your Lordship has obviously referred to the outcome of the Application, I am assuming that there is no embargo on the draft judgment that Your Lordship is proposing to circulate tomorrow.

THE COURT: Let me have a look to see whether I have included an embargo so far.

Well, I haven't included an embargo yet, but I do need to hear the parties in relation to an embargo. It would be normal to embargo a judgment and to keep the judgment confidential from publication, so that a draft judgment doesn't float around the world, creating all sorts of expectations which might not be reflected in the finalised version.

Now, the embargo would generally be in place to enable the learned counsel of the parties to return non-substantive comments and corrections on the

draft written judgment, and any disagreements with the judgment would have to be a matter for appeal. So, it would be normal to embargo a judgment so that only the lawyers, the BVI admitted lawyers, that includes London counsel, of course, who are working on the matter as BVI lawyers, like Mr. Gledhill, for example, and his team. The lawyers can know what the outcome is and the exact terms of the draft written judgment. I think the Honorable Attorney General should know what the precise terms are of the written judgment, but beyond the BVI admitted lawyers at this point, I think we ought to stick with the usual embargo terms, but I will hear the parties on this.

So, Mr. Gledhill, what do you say, since you raised the question of the embargo?

MR. GLEDHILL: Yes. I mean, My Lord, I am sure we have no difficulty with the suggestion that Your Lordship's judgment in draft shouldn't be in any way disseminated any further. The only point that I was respectfully making is, since this hearing is in open court, the outcome is already in the public domain.

THE COURT: Well, what I have read out earlier, that is in the public domain, that is fair enough. The reason for embargoing the

precise terms of a written judgment and restricting it to BVI admitted legal practitioners is so that there is comeback by the Court against people if a draft comes into the public domain. If it is that you want to send the draft judgment to Mr. Chen, for example, and he goes and publishes it, I have no comeback against him whatsoever. So, that's why we would like to restrict it to the lawyers, BVI admitted lawyers, but let me hear the other parties as well.

Can I look to, maybe since we are dealing with the successful parties here, can I look to Mr. Tyers-Smith for his comments?

MR. TYERS-SMITH: My Lord, yes. I think my position is essentially consistent with what My Lord has just outlined, which is that the headline is out there, but the reasons are still subject to embargo for the reasons that My Lord has just given. So, we are happy with that position, if that makes it clear.

THE COURT: Yes.

Mr. Dennis.

MR. DENNIS: I had understood Your Lordship to be saying that the judgment would be embargoed in its entirety, not just the reasons. And if my understanding is correct, that is

how I have always understood an embargo on a draft judgment to operate, and we would have no difficulty with it operating in the same way in these proceedings, namely that the judgment is embargoed in its entirety until it is finalised.

THE COURT: Right. Well, what I have read out, obviously, is I have read out the disposition part of the judgment in terms of what should happen. I have deliberately used the words, "what should happen", yes? "It should be dismissed", et cetera. I have also given a very, very high level open court summary of the reasoning. That's obviously in the public domain, and there is no reason why that should be embargoed.

The specific analysis, which is to be found in the draft written judgment, and the way the thinking goes and the observations made, those should, of course, be embargoed. In other words, the entire written judgment should be embargoed. The things I have already read out, they can't be embargoed because they are read out in open court, and there's no reason why they should be withheld from anybody, but certainly the written judgment itself should not go beyond the BVI admitted lawyers.

It should also be noted that the way that

I have structured this is that we do need a consequentials hearing to discuss the timings and the way and what else needs to be done to move the matter forward in the most orderly way possible. So what this means is that we can have a 14-day embargo on the draft written judgment in the usual way. The only people who can see that document are the parties' BVI lawyers, and, of course, the Honourable Dawn J. Smith, who is a BVI lawyer.

MR. DENNIS: My Lord, I believe that is clear enough, and we certainly would have no difficulty with that.

THE COURT: Yes.

MR. DENNIS: There does arise, in the interim, My Lord, given the fact that time is being allowed for the judgment and order to be settled and finalised, and Your Lordship has already indicated in the circumstances that time for any appeal would not begin to run until that process is completed.

THE COURT: Right.

MR. DENNIS: It had been our intention, My Lord, had the decision gone against us, as it has, to make an oral application to Your Lordship at this juncture for a stay of execution of Your Lordship's Order pending the making of an application

for a stay of execution and our intention was to have asked for a 14-day period to do that on the understanding that if indeed an application for stay were made, either to Your Lordship or to the Court of Appeal, that stay of execution would be kept in place until the hearing and determination of that written application for a stay.

However, given the terms in which Your Lordship has indicated the disposition of the matter, which is to indicate that the orders already made ought to be discharged, it is a little unclear as to whether or not in the circumstances we would need to pursue such an application at this juncture or is it that effectively, My Lord, Your Lordship's Order would not or is not intended to take immediate effect until the consequential matters are resolved?

THE COURT: That's a very good question, Mr. Dennis, and let me explain it with reference to the precise wording which I used in the disposition part. Yes.

So, the first paragraph of the disposition part said that:

"I consider myself constrained to find that the only one outcome is open to the Court, which is that the Originating Applications should be

dismissed."

I do not use the words "are hereby dismissed". Yes, they should be dismissed. So, I am not making that order right now.

MR. DENNIS: Understood, My Lord.

THE COURT: Then secondly, the second one was about the provisional liquidation order not being a standalone remedy. I said "the provisional liquidation order should also be discharged". I don't say "the provisional liquidation order is hereby discharged", I don't say that.

Then what I say next is that:

"The Court will hear the parties further on consequential issues to include an orderly implementation of this decision and costs."

So, I use the words "to include", yes. It's not the only thing. If there are other things which you want to raise at a consequentials hearing, like a stay, for example, that could be included.

So, basically, what I am doing is giving in this written judgment an indication of what the Court considers itself constrained to do. It's not making an order today, but it's saying that having given the indication of what the Court considers should

be the outcome of the matter in the Court's constrained view, then there will be a further hearing at which it can be, things like including, things like costs, things like timing, things like how we discharge the Provisional Liquidation Order, whether we stay the Provisional Liquidation Order, things like that, they can be discussed and argued about at that further hearing.

I have explained already that I am wary that there is a commercial reality behind these enterprises, these Companies. There's a commercial reality which, in the case of some of them, includes employees, businesses, and which, if the rug is pulled, would mean probably immediate death for those Companies, which is, of course, not something which would be terribly commercial.

MR. DENNIS: My Lord, we are most obliged for that clarification. I believe our position in relation to the issue which I raised is now pellucidly clear.

THE COURT: Good, excellent.

Anything else, learned Counsel?

MR. CLIFTON: My Lord, if I may assist. Having a bit of a back and forth with

members of my team as far as when the consequentials hearing might be listed, we have obviously heard Mr. Gledhill's submission that matters should be moved on as quickly as possible. I think we may be in the realm of having to deal with the reality of the Court's availability. And one point that has been helpfully suggested to me is that Your Lordship currently has a day and a half of us on the 8th and the 9th of December, for which all counsel is available to deal with applications of varying baroqueness, I think all of which are probably cleared off the table by Your Lordship's judgment, and that would provide all parties with adequate time to make and then respond to any application that might be heard.

If Your Lordship has a large chunk of time before then, perhaps that timetable could be foreshortened, but when we made inquiries, it doesn't sound like Your Lordship is lacking for things to do over the next few weeks.

THE COURT: Well, I have got a long trial which hasn't collapsed, which is going to take most of November and into December as well. So if those days are there, then by all means talk to the Listing Department, have a word with each other about what the time estimate you anticipate for, for these

various consequentials and new applications and what time you are going to need for that. If it's a day and a half and it's under the reasonable time at the moment, then by all means switch out what we had planned for those days and have the consequentials then.

MR. CLIFTON: Yes.

THE COURT: But talk to each other and the Listing about it.

MR. CLIFTON: My Lord, yes.

So the suggestion, as I have the benefit of everyone being here, is that anyone who wants an application heard at that hearing files it within 21 days, anyone who wants to answer responds within 14 days, and anyone who wants to reply within seven days, and that should ensure that everybody knows by late November precisely what we are dealing with in terms of remuneration costs, stays and everything else, and it should, which will use time when Your Lordship is sitting on something else.

THE COURT: Yes.

Mr. Gledhill.

MR. GLEDHILL: I am just trying to take instructions on that proposal, if I may, you will forgive me because of course I am sitting in a

different room from my instructing attorneys. We are content with a proposal for the 8th and the 9th of December, that makes obvious sense, and we are also certainly content with the idea that people who wish to make, parties who wish to make applications in advance of that, signal them an appropriate time in advance. I am just taking instructions on the timetable which Mr. Clifton has just suggested. Perhaps Your Lordship could just hear from somebody else whilst I am just getting some answers to those questions.

THE COURT: Of course.

MR. GLEDHILL: Thank you.

THE COURT: Yes.

Can I look to Mr. Tyers-Smith. Basically, I am looking to the successful parties on this Application first for comments on this.

MR. TYERS-SMITH: May I say I am in a coterminous position to Mr. Gledhill. I am just furiously just conferring with my team, but those sound okay.

THE COURT: Okay.

MR. TYERS-SMITH: But can I just have 30 seconds, one minute more, please.

THE COURT: Yes, of course. While you are doing that I will look to Mr. Dennis.

MR. DENNIS: I was just myself, My Lord, conferring with my team in relation to the 21-day suggestion by Mr. Clifton. On the face of it, that sounds reasonable, My Lord, even without having that conference.

THE COURT: Yes. I saw the Honourable Attorney General nod a little bit earlier on, so I assume that means that she is happy with that.

MR. GLEDHILL: My Lord, if I may, we are very content with the broad shape of the proposals, 21 days, we suggest, is a bit longer than people need and will unduly compress the timetable for evidence. Could we suggest that if anybody wishes to make applications in anticipation of that hearing in December that they do so within 14 days?

THE COURT: Okay.

Mr. Dennis.

MR. DENNIS: With the best will in the world, My Lord, I believe, given all the moving parts, 21 days is much more realistic.

THE COURT: Okay.

Mr. Clifton.

MR. CLIFTON: Well, My Lord, I would say that on the timetable that I suggested to Your Lordship, reply evidence, which is one would hope

not going to be a major feature of any of this, would close on the 2nd of December before the hearing is on the 8th. So one would hope that that's enough time for everyone to get things together.

I am conscious that, My Lord, an aspect of this is that there are going to be certain difficulties in taking instructions to file applications on 14 days if the judgment remains embargoed on 14 days. At the moment, My Lord, certainly to the extent to which the Joint Provisional Liquidator will be doing anything, the judgment is going to remain embargoed against them for 14 days, and so you can't really file any application within that period. So I would ask for 21 days for that reason.

THE COURT: Yes. Okay.

Mr Tyers-Smith.

MR. TYERS-SMITH: My Lord, again, we are content, although we would prefer the shorter time limit propounded for by Mr. Gledhill, but if My Lord wants to give the additional seven days in the spirit of pragmatism, then we don't push back strenuously against that.

Subject to one point, that of course is that, as matters stand, the Provisional Liquidation Order remains in full force, and obviously there is a

tension between that remaining in force and My Lord's headline decision. So whilst we appreciate we can't legislate for what the Provisional Liquidator is going to do within the remaining time that they have before this comes back, we would, in so far as it's possible, invite My Lord to give some guidance on what their role is, because we would expect it to be reserved and not adversarial in the light of the decision today.

THE COURT: Well, Mr. Clifton, I don't think I need to hear you on that.

There is an order, a Provisional Liquidation Order in place which governs their conduct, basically, and they obviously would know what the outcome is of today, and they know that if they have any questions in relation to what they are supposed to be doing, that, you know, what the law is in relation to coming to court for guidance, and they know the risks if they don't. So I don't think I need to make any particular pronouncements or orders or anything of this nature. They are professional people who are used to working without any skin in any game, and so they, I don't think I need to say any more at the moment.

MR. TYERS-SMITH: Very well, My Lord, thank you very much.

THE COURT: Thank you.

So, Mr. Dennis, the suggestion from Mr. Clifton is that you would have 21 days from today for filing any application, yes?

MR. DENNIS: We are happy with that, My Lord. I have taken instructions and we are happy with that.

THE COURT: Very well. Very good.

MR. CLIFTON: My Lord, just one additional point, which I thought was where Mr. Tyers-Smith was going, but I think it was just a celebration of cordial conduct instead.

My Lord, there has obviously been some fairly frenzied debate at various points about the effect of the Appointment Orders and Your Lordship's Order on the 14th of May. For the avoidance of doubt that the JPLs don't take the position that the applications consequential upon Your Lordship's judgment could possibly be caught without the residual powers of the directors. So in case that's something that anyone's going to get concerned about, we think that these are all, the applications that are under contemplation by reference to the judgment are all ones that can very properly be made by the Companies without further variation of the appointment order.

THE COURT: Well, I am not going to get into, I don't quite understand this particular rabbit hole. If there is something that needs to be applied for by way of guidance or clarification, doubtlessly that can be done. But right now, you know, the Provisional Liquidators, they are still in place. They have been in place so far. They have been doing a few things, obviously. They know what the Order says. That governs their conduct. If anything crops up in the meantime, then somebody is just going to have to trouble the Court to knock on the Court's door for some clarification.

So the 21 days, plus the reply time that Mr. Clifton proposed, we will adopt that in the timetable going forward. Yes? Very good. All right.

Do we need to do anything further before we have the -- I suppose, what's realistically going to happen now? You are going to get this draft judgment tomorrow and we can reflect, we can reflect the timetable for directions for further applications in a short draft order, which basically says that:

Upon the handing down of the decision in these various Originating Applications, the Court directs the following. And then we just reflect those directions in the draft order.

And then the actual substantive outcome and any consequentials, that can be reflected in the further order that we will settle after we have the consequentials hearing or at the close of the consequentials hearing. Okay. So we do it in an orderly fashion. Yes. Very good.

So I'll expect then to see that little short draft order and I will be happy to endorse it when I see it. So please, counsel, can you liaise together to put that together?

Anything further, learned Counsel? No.

MR. DENNIS: I don't believe so, My Lord.

THE COURT: So, well, thank you very much, learned counsel. We will take the adjournment on this matter now.

MR. TYERS-SMITH: Thank you very much, My Lord.

MR. GLEDHILL: Thank you, My Lord.

(Court concludes at 1:15 p.m.)

**REPORTER'S CERTIFICATE**

I, LISSA NOEL-DONOVAN, Certified Court Reporter do hereby certify:

That on the 21st day of October, 2026, the foregoing proceedings were taken down by me in machine shorthand, consisting of 33 pages herein; that the foregoing is a true and correct transcript of the proceedings had.

That I am not an attorney, relative, or employee of any party hereto, or otherwise interested in the events of this cause;

IN WITNESS WHEREOF, I have hereunto affixed my signature at Road Town, Tortola, British Virgin Islands, this 21st day of October, 2026.

LISSA NOEL-DONOVAN
Certified Court Reporter